1  CHAD A. READLER
   Acting Assistant Attorney General
2  MCGREGOR SCOTT
   United States Attorney
3  AUGUST FLENTJE
   Special Counsel
4  WILLIAM C. PEACHEY
   Director
5  EREZ REUVENI
   Assistant Director, Office of Immigration Litigation
6  U.S. Department of Justice, Civil Division
   P.O. Box 868, Ben Franklin Station
7  Washington, DC 20044
   Tel. (202) 307-4293
8  Erez.R.Reuveni@usdoj.gov
   DAVID SHELLEDY
9  Civil Chief, Assistant United States Attorney
10 LAUREN C. BINGHAM
   JOSEPH A.DARROW
11 JOSHUA S. PRESS
   Trial Attorneys
12 *Attorneys for the United States*
13
14
15            **UNITED STATES DISTRICT COURT**
16            **EASTERN DISTRICT OF CALIFORNIA**
17
   THE UNITED STATES OF AMERICA,
18
            Plaintiff,                    No. 18-264
19
        v.
20
   THE STATE OF CALIFORNIA;              **PLAINTIFF'S MOTION FOR**
21 EDMUND GERALD BROWN JR.,              **PRELIMINARY INJUNCTION AND**
   Governor of California, in his Official   **MEMORANDUM OF LAW IN SUPPORT**
22 Capacity; and XAVIER BECERRA,
   Attorney General of California, in his
23 Official Capacity,
24           Defendants.
25
26
27
28

Memorandum in support of motion
for preliminary injunction

## TABLE OF CONTENTS

**INTRODUCTION**..................................................................................................1

**BACKGROUND** .................................................................................................4

    1.    Immigrant Worker Protection Act (AB 450) ......................................4

    2.    Inspection and Review of Facilities Housing Federal Detainees (AB 103) ...........6

    3.    SB 54 and the California Values Act ..................................................7

**LEGAL STANDARD** ...........................................................................................8

**ARGUMENT** .......................................................................................................9

**I.    The United States Is Likely to Prevail on the Merits**......................................9

    A.    The Constitution does not allow California to obstruct federal law enforcement efforts by prohibiting employers from voluntarily cooperating with federal law enforcement officials (AB 450). .............................................................11

    B.    The Constitution does not allow California to inspect facilities holding federal detainees to review federal law enforcement efforts (AB 103) .............................18

    C.    The Constitution does not allow California to restrict cooperation with the United States that is contemplated and protected by federal law (SB 54)........................23

**II.    Irreparable Harm to the United States, The Balance of Harms, and the Public Interest Strongly Militate in Favor of Injunctive Relief**...............................31

**CONCLUSION** ..................................................................................................37

**CERTIFICATE OF SERVICE** ...............................................................................

# TABLE OF AUTHORITIES

## CASE LAW

*Abel v. United States*,
 362 U.S. 217 (1960)................................................................................ 30

*Am. Civil Liberties Union of New Jersey, Inc. v. Cty. of Hudson*,
 799 A.2d 629 (N.J. App. Div. 2002) ................................................... 22, 23

*Arizona v. United States*,
 567 U.S. 387 (2012)........................................................................... *passim*

*Blackburn v. United States*,
 100 F.3d 1426 (9th Cir. 1996) ................................................................ 22

*Boeing Co. v. Movassaghi*,
 768 F.3d 832 (9th Cir. 2014) .................................................... 3, 10, 14, 21

*Bologna v. City & Cnty. of San Francisco*,
 121 Cal. Rptr. 3d 406 (Cal. Ct. App. 3d Div. 2011) ............................... 27

*Buckman Co. v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001)................................................................................ 13

*Cal. Pharmacists Ass'n v. Maxwell–Jolly*,
 563 F.3d 847 (9th Cir. 2009) ................................................................. 37

*City of New York v. United States*,
 179 F.3d 29 (2d Cir. 1999)...................................................................... 27

*Comm'r of Correction v. Freedom of Info. Comm'n*,
 52 A.3d 636 (Conn. 2012) ................................................................. 22, 23

*De Canas v. Bica*,
 424 U.S. 351 (1976).................................................................................. 9

*Demore v. Kim*,
 538 U.S. 510 (2003)................................................................................ 29

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
 458 U.S. 151 (1982)................................................................................ 10

*Frontera v. Clarke*,
 891 N.W.2d 803 (Wis. 2017)................................................................... 23

*Gartrell Constr. Inc. v. Aubry,*
  940 F.2d 437 (9th Cir. 1991) .................................................................................. 13, 20

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) ...................................................................................................... 10

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ...................................................................................................... 10

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) .................................................................................................... 3, 10

*I.N.S. v. Delgado,*
  466 U.S. 210 (1984) ...................................................................................................... 12

*In re Tarble,*
  80 U.S. 397 (1871) ........................................................................................................ 20

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
  799 F.2d 547 (9th Cir. 1986) ...................................................................................... 12

*Int'l Paper Co. v. Ouellette,*
  479 U.S. 481 (1987) ...................................................................................................... 27

*Jennings v. Rodriguez,*
  No. 15-1204, --- U.S. ---, 2018 WL 1054878 (U.S. Feb. 27, 2018) ................... 25, 29

*Johnson v. Maryland,*
  254 U.S. 51 (1920) ........................................................................................................ 20

*Leslie Miller, Inc. v. Arkansas,*
  352 U.S. 187 (1956) ...................................................................................................... 20

*Montero v. I.N.S.,*
  124 F.3d 381 (2d Cir. 1997) ........................................................................................ 11

*New El Rey Sausage Co. v. U.S. I.N.S.,*
  925 F.2d 1153 (9th Cir. 1991) .................................................................................... 18

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
  491 U.S. 350 (1989) ...................................................................................................... 37

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................................ 32, 37

Memorandum in support of motion
for preliminary injunction
- iii -

*North Dakota v. United States,*
    495 U.S. 423 (1990) .................................................................................... *passim*

*People v. Shields,*
    205 Cal. App. 3d 1065 (6th Dist. 1988) ................................................... 16

*Preap v. Johnson*,
    831 F.3d 1193 (9th Cir. 2016) ........................................................... 24, 26

*Rudolph and Sletten, Inc., Employer,*
    2004 WL 817770 (Ca. O.S.H.A. Mar. 30, 2004) ................................... 16

*Salwasser Mfg. Co. v. Occupational Saf. & Health Appeals Bd.,*
    214 Cal. App. 3d 625 (5th Dist. 1989) ................................................... 16

*Sherman v. U.S. Parole Comm'n,*
    502 F.3d 869 (9th Cir. 2007) ................................................................. 30

*Sol Inc v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ........................................................... 9, 37

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ........................................................................... 10, 15

*Steinle v. City & Cty. of San Francisco,*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) ................................................... 28

*United States v. Arizona,*
    641 F.3d 339 (9th Cir. 2011) ............................................................. 9, 37

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2009) ........................................................ 3, 14, 15

*Walnut Hill Estate Enters., LLC v. City of Oroville,*
    No. 09-cv-0500, 2010 WL 2902346 (E.D. Cal. July 22, 2010) ............. 16

*Zepeda v. I.N.S.,*
    753 F.2d 719 (9th Cir. 1983) ................................................................. 12

**FEDERAL STATUTES**

8 U.S.C. § 1101 ......................................................................................... 9

8 U.S.C. § 1101(a)(15)(B) ..................................................................... 28

8 U.S.C. § 1101(F)(1) ............................................................................. 28

8 U.S.C. § 1101(H)(ii)(a) ........................................................................................ 28

8 U.S.C. § 1101(H)(ii)(b) ........................................................................................ 28

8 U.S.C. § 1101(J) .................................................................................................. 28

8 U.S.C. § 1101(L) .................................................................................................. 28

8 U.S.C. § 1101(M) ................................................................................................. 28

8 U.S.C. § 1101(O)(ii)(iv) ....................................................................................... 28

8 U.S.C. § 1101(P) .................................................................................................. 28

8 U.S.C. § 1101(Q) ................................................................................................. 28

8 U.S.C. § 1182(a)(2) .............................................................................................. 27

8 U.S.C. § 1187 ....................................................................................................... 23

8 U.S.C. § 1225 ....................................................................................................... 23

8 U.S.C. § 1226 ....................................................................................................... 23

8 U.S.C. § 1226(a) .................................................................................................. 30

8 U.S.C. § 1226(a)(1) ............................................................................................. 30

8 U.S.C. § 1226(c) ............................................................................................. 36, 37

8 U.S.C. § 1226(c)(1) ........................................................................... 23, 24, 26, 27

8 U.S.C. § 1226(c)(1)(C) ........................................................................................ 27

8 U.S.C. § 1227(a)(1)(C) ........................................................................................ 29

8 U.S.C. § 1227(a)(2) .............................................................................................. 27

8 U.S.C. § 1227(a)(4)(A) ........................................................................................ 26

8 U.S.C. § 1231 ................................................................................................. 23, 28

8 U.S.C. § 1231(a) ............................................................................................ 26, 30

8 U.S.C. § 1231(a)(2) ........................................................................................ 23, 24

8 U.S.C. § 1231(g)(1) .................................................................................................... 18

8 U.S.C. § 1231(g)(1)-(2) ............................................................................................. 18

8 U.S.C. § 1231(a)(4) ............................................................................................ 24, 28

8 U.S.C. § 1305 ............................................................................................................. 29

8 U.S.C. § 1324a(a)(1)(A) ........................................................................................... 11

8 U.S.C. § 1324a(a)(2) ................................................................................................. 17

8 U.S.C. § 1324a(b) ................................................................................................. 5, 11

8 U.S.C. § 1324a(b)(3) ................................................................................................... 5

8 U.S.C. § 1324a(b)(6)(A) ........................................................................................... 11

8 U.S.C. § 1357 ............................................................................................................. 23

8 U.S.C. § 1357(a)(1) ................................................................................................... 11

8 U.S.C. § 1357(g)(10)(A) ........................................................................................... 28

8 U.S.C. § 1373 ........................................................................................ 3, 25, 27, 28

**PUBLIC LAW**

Pub. L. No. 99–603 ...................................................................................................... 32

**FEDERAL REGULATIONS**

8 C.F.R. § 236.6 ....................................................................................... 7, 18, 22, 23

8 C.F.R. § 287.7(a) ....................................................................................................... 25

**FEDERAL RULES FOR CIVIL PROCEDURE'**

Fed. R. Civ. P. 65 ........................................................................................................... 1

**CALIFORNIA STATUTES**

Assem. B. 103 ....................................................................................................... *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Assem. B. 450 ................................................................................ *passim*

CA. S. B. 4 ............................................................................................ 7, 33

CA. S. B. 54 .................................................................................... *passim*

Cal. Civil Code § 1798.3 ................................................................. 26, 29

Cal. Gov't Code § 7282.5(a) ........................................................ *passim*

Cal. Gov't Code § 7285.2(a)(1) ............................................................ 16

Cal. Gov't Code § 7284.4(e) ................................................................ 31

Cal. Gov't Code § 7284.6 .................................................................... 25

Cal. Gov't Code § 7284.6(a)(1) ........................................................... 31

Cal. Gov't Code § 7284.6(a)(1)(C) ............................................... *passim*

Cal. Gov't Code § 7284.6(a)(1)(D) ............................................... *passim*

Cal. Gov't Code § 7284.6(a)(4) .................................................... *passim*

Cal. Gov't Code § 7285.1 ...................................................................... 1

Cal. Gov't Code § 7285.1(b) ............................................................ 6, 14

Cal. Gov't Code § 7285.1(c) .................................................................. 6

Cal. Gov't Code § 7285.1(a) ...................................................... 5, 13, 14

Cal. Gov't Code § 7285.2 ...................................................................... 1

Cal. Gov't Code § 12532 .......................................................... 1, 22, 23

Cal. Gov't Code § 12532(a) ............................................................. 6, 21

Cal. Gov't Code § 12532(b) ................................................................ 7,

Cal. Gov't Code § 12532(c) .............................................................. 7, 22

Cal. Lab. Code § 90 ............................................................................ 15

Cal. Lab. Code § 90.2 ..................................................................... 1, 17

Cal. Lab. Code § 90.2(a)(1) ............................................................... 5

Cal. Lab. Code § 90.2(c) .................................................................. 6

Cal. Lab. Code § 1019.2(a) .......................................................... 5, 17

Cal. Lab. Code § 1174 ............................................................... 15, 17

Cal. Lab. Code § 1175(b) ................................................................ 15

Cal. Lab. Code § 6321 .................................................................. 17

Cal. Penal Code § 6031.1(a) ...................................................... 6, 7, 21

## LEGISLATIVE HISTORY

H.R. Rep. No. 99-682(I), at 45 ........................................................ 11

## CALIFORNIA LEGISLATIVE HISTORY

CA. Assem. Comm. on the Judiciary Rep., Apr. 22, 2017 .................................. 1, 4, 33

CA. S. Comm. On the Judiciary Rep., July 10, 2017 .................................. 1, 4, 13, 33

CA S. Hearing, April 03, 2017
    https://ca.digitaldemocracy.org/hearing/52288?startTime=1150&vid=910977abbea937bca742
    4c93fe3caf1c (last visited on March 6, 2018)........................................ 7, 31

Hearing on S.B. 54 before the S. Standing Comm. On Public Safety (Jan. 31,
    2017) (statement of Sen. Scott Wiener), https://ca.digitaldemocracy.org/hearing/10091?
    startTime=275&vid=381a741e4e525c9efccbbf6062c67f3c (last visited on March 6, 2018) 7,31

## MISCELLANEOUS

Assem. David Chui, *Governor Brown Signs Bill to Provide Labor Protections Against ICE
    Worksite Raids*.
    https://a17.asmdc.org/press-releases/governor-brown-signs-bill-provide-labor-protections-agai
    nst-ice-worksite-raids (last visited on March 6, 2018) .......................................... 33

Angela Hart, *'We will prosecute' employers who help immigration sweeps, California AG says*
    http://www.sacbee.com/news/politics-government/capitol-alert/article195434409.html (last
    visited on March 6, 2018) .................................................................. 6

CA DOJ, *Attorney General Becerra Issues Advisory Providing Guidance on the Privacy Requirements of the Immigrant Worker Protection Act,* https://oag.ca.gov/news/press-releases/attorney-general-becerra-issues-advisory%C2%A0providing-guidance-privacy-requirements (last visited on March 6, 2018)..................................... 6

CA DIR, *Immigrant Worker Protection Act (Assembly Bill 450) Frequently Asked Questions https://oag.ca.gov/sites/all/files/agweb/pdfs/immigrants/immigration-ab450.pdf* (last visited on March 6, 2018)................................................................................ 6

Jazmine Ulloa, *California becomes 'sanctuary state' in rebuke of Trump immigration policy* http://www.latimes.com/politics/la-pol-ca-brown-california-sanctuary-state-bill-20171005-story.html (last visited on March 6, 2018) ................................................................ 33

In order to avoid ongoing, irreparable harm to the United States and its interests, and pursuant to Federal Rule of Civil Procedure 65, the United States hereby moves this Court to preliminarily enjoin enforcement of certain provisions of California law enacted through Assembly Bill 450 ("AB 450"), Assembly Bill 103 ("AB 103"), and Senate Bill 54 ("SB 54"). As detailed in the accompanying proposed order, the United States respectfully requests that this Court preliminarily enjoin Sections 7285.1, 7285.2, 7284.6(a)(1)(C) and (D), 7284.6(a)(4), and 12532 of the California Government Code, and Sections 90.2 and 1019.2 of the California Labor Code.

## INTRODUCTION

California is intentionally obstructing the enforcement of federal law in violation of the Supremacy Clause. California has enacted several laws with the express goal of interfering with "an expected increase in federal immigration enforcement actions," California Committee on the Judiciary Report (Assembly), Apr. 22, 2017, at 1, and shielding the "more than 2.6 million undocumented immigrant[s]" residing in California from any "increase in workplace immigration enforcement." California Committee on the Judiciary Report (Senate), July 10, 2017, at 1.  As a matter of law and in the public interest, this Court should enter a preliminary injunction to enjoin certain provisions of three such laws. The challenged provisions have both the purpose and effect of obstructing enforcement of the federal immigration laws and discriminating against the Federal Government.

The first statute, AB 450, the "Immigrant Worker Protection Act," restricts private employers from voluntarily cooperating with federal officials who seek to ensure compliance with federal immigration laws in the workplace.

The second statute, AB 103, creates an intrusive inspection and review scheme applicable

only to facilities holding civil immigration detainees on the United States' behalf. The statute authorizes the California Attorney General to examine, among other things, the "due process provided" to civil immigration detainees by the United States, and the "circumstances around their apprehension and transfer" to detention facilities.

The third statute, SB 54, includes the "California Values Act," which precludes state and local officials from voluntarily providing to the United States information about the release date from state or local criminal custody of criminal aliens who may be subject to removal and are subject to detention by the United States, or other information relevant to the alien's immigration status. SB 54 also prohibits state and local officials from transferring aliens to the United States when they are scheduled to be released from state or local custody, thus interfering with the United States' ability to carry out its responsibilities under federal law.

All of these provisions are preempted by federal law. A state lacks the authority to intentionally interfere with private citizens' ability to cooperate voluntarily with the United States or to comply with federal obligations. Likewise, a state has no authority to target facilities holding federal detainees pursuant to a federal contract for an inspection scheme to review the "due process" afforded during the arrest and detention. Similarly, a state cannot direct state and local employees to refuse to engage in basic cooperation with federal immigration authorities contemplated by federal law. For example, Congress has determined that—rather than having the United States remove all criminal aliens immediately even if incarcerated for state convictions— states should be allowed to vindicate their law enforcement interests in the alien serving their sentence prior to their removal. This decision by Congress to allow states to punish individuals who commit crimes against their citizens hinges on one very reasonable assumption—once the individual has served his or her time under state law, the state will transfer custody to the United

States so the person can be properly processed under applicable federal immigration laws. When states release these criminals back onto the streets—rather than notifying DHS of the release and transferring custody—they intentionally subvert the careful balancing of state and federal interests that Congress established in the Immigration and Nationality Act ("INA"). And all the more so given that Congress has enacted 8 U.S.C. § 1373, which expressly prohibits states from restricting their officers from sharing information regarding immigration status with the United States.

California's acknowledged efforts to stymie immigration enforcement should be enjoined. These state enactments ""stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)), and thus are preempted by federal law. In addition, they are invalid under the intergovernmental immunity doctrine: far from being laws that "affect the Federal Government incidentally as the consequence of a broad, neutrally applicable rule," *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2009), they "are invalid" because they "'regulate the United States directly'" or "'discriminate against the Federal Government or those with whom it deals.'" *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.) (brackets omitted)).

Absent injunctive relief, the United States will continue to suffer irreparable harm caused by California. Enforcement of these provisions disrupts the constitutional order by undermining the United States' control over the enforcement of the immigration laws and regulation of immigration policy. The challenged provisions severely frustrate the United States' enforcement of the immigration laws by placing significant burdens on the federal agencies responsible for

such enforcement. They interfere with those agencies' oversight of unlawful employment of aliens; intrude upon their performance of federal functions by authorizing investigations into their employees' performance of their mandated duties; and force federal officers to engage in burdensome, dangerous, and far more costly efforts to re-arrest aliens, including dangerous criminals, who were previously in local or state custody and have been released to the streets rather than to federal custody, thereby endangering federal officers, the alien at issue, others who may be nearby, and the public at large.

## BACKGROUND

The California legislature recently enacted the three statutes at issue here for the explicit purpose of impeding the United States' enforcement of the immigration laws.

*1. Immigrant Worker Protection Act (AB 450)*

The Immigration Worker Protection Act, or AB 450, was enacted to regulate employers who might be the subject of "immigration worksite enforcement actions" by federal immigration authorities. AB 450, Preamble. Like the other statutes at issue, AB 450 is designed to frustrate "an expected increase in federal immigration enforcement actions." California Committee on the Judiciary Report (Assembly), Apr. 22, 2017, at 1. It also is intended to shield the "more than 2.6 million undocumented immigrant[s]" residing in California from any "increase in workplace immigration enforcement." Committee on the Judiciary Report (Senate), July 10, 2017, at 1. To that end, AB 450 restricts private (and public) employers from voluntarily cooperating with federal officers and in complying with obligations under federal law, including when those officers seek information relevant to federal efforts to investigate the illegal employment of aliens.

Among other things, AB 450 adds Sections 7285.1 and 7285.2 to the California

Government Code. Section 7285.1(a) provides that an employer or its agent "shall not provide voluntary consent to an immigration enforcement agent to enter any nonpublic areas of a place of labor," unless "the immigration enforcement agent provides a judicial warrant," or consent is "otherwise required by federal law." Section 7285.2(a)(1) similarly prohibits an employer or its agent from "provid[ing] voluntary consent to an immigration enforcement agent to access, review, or obtain the employer's employee records without a subpoena or judicial warrant." Section 7285.2(a)(2) contains an exception for certain documents for which the United States has provided a "Notice of Inspection" issued pursuant to 8 U.S.C. § 1324a(b)(3).

AB 450 also adds provisions to the California Labor Code that establish new requirements that employers must satisfy before allowing U.S. Immigration and Customs Enforcement ("ICE"), a component of the U.S. Department of Homeland Security ("DHS"), to conduct its inspection process. New Section 90.2 of the Labor Code requires employers to notify employees and their authorized representatives of upcoming inspections of employment records "within 72 hours of receiving notice of the inspection," Cal. Lab. Code § 90.2(a)(1), and requires employers to provide employees and their authorized representatives, within 72 hours, with copies of written immigration agency notices providing results of inspections, *id.* § 90.2(b)(1). New Section 1019.2(a) of the Labor Code provides that an employer or its agent "shall not reverify the employment eligibility of a current employee at a time or in a manner not required by Section 1324a(b) of Title 8 of the United States Code."

The California statutory framework imposes severe financial consequences on private citizens who lawfully comply with federal immigration.  All of these provisions are subject to a schedule of civil penalties "of two thousand dollars ($2,000) up to five thousand dollars ($5,000) for a first violation and five thousand dollars ($5,000) up to ten thousand dollars ($10,000) for

each subsequent violation." Cal. Gov't Code §§ 7285.1(b), 7285.2(b); Lab. Code § 90.2(c).

On January 18, 2018, the California Attorney General issued a warning to all employers in the state that his office would "prosecute those who violate [AB 450]" by voluntarily cooperating with ICE enforcement efforts. *See* Angela Hart, *'We will prosecute' employers who help immigration sweeps, California AG says*, Sacramento Bee, Jan. 18, 2018.[1] And on February 13, 2018, the California Attorney General issued guidance to employers, which "explains" that "they cannot voluntarily grant immigration enforcement agents physical access to nonpublic areas of the worksite or to employee records,"[2] without "trigger[ing] certain penalties for their violation."[3]

2. *Inspection and Review of Facilities Housing Federal Detainees (AB 103)*

Under longstanding California law, "local detention facilities," including those that house federal immigration detainees on behalf of the United States, are subject to biennial inspections concerning health and safety, fire suppression preplanning, compliance with training and funding requirements, and the types and availability of visitation. Cal. Penal Code § 6031.1(a). The term "local detention facilities" includes facilities operated by cities, counties, or private entities that contract with cities or counties (while excluding certain facilities for parolees, treatment and restitution facilities, community correctional centers, and work furlough programs), but does not include federal facilities. *Id.* § 6031.4.

AB 103, which adds Section 12532(a) to the California Government Code, establishes an additional inspection and review scheme applicable only to "county, local, or private locked detention facilities in which *noncitizens* are being housed or detained for purposes of *civil*

---

[1] http://www.sacbee.com/news/politics-government/capitol-alert/article195434409.html.
[2] https://oag.ca.gov/news/press-releases/attorney-general-becerra-issues-advisory%C2%A0providing-guidance-privacy-requirements.
[3] https://oag.ca.gov/sites/all/files/agweb/pdfs/immigrants/immigration-ab450.pdf.

*immigration proceedings* in California." (emphases added). This new set of requirements goes far beyond inspections and review already established by Cal. Penal Code § 6031.1(a). The California Attorney General is instructed to examine and report on, among other things, the "due process provided" to civil immigration detainees, and "the circumstances around their apprehension and transfer to the facility." Cal. Gov't Code § 12532(b). Section 12532(c) requires that the state "shall be provided all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but not limited to, access to detainees, officials, personnel, and records."

On November 16, 2017, the California Attorney General initiated via letter a request to inspect various detention facilities housing ICE detainees. Five such facilities have been inspected since the law's effective date. Homan Decl.. ¶¶ 58-59.

3.   *SB 54 and the California Values Act*

The California Values Act is part of SB 54, which "prohibit[s] state and local law enforcement agencies," other than employees of the state Department of Corrections and Rehabilitation, from "cooperat[ing] with [Federal] immigration authorities" except in certain circumscribed circumstances. *See* SB 54, Preamble; Cal. Gov't Code § 7282.5(a). The Act is intended to serve as a "counterbalance to this [Presidential] administration" on enforcement of immigration laws, Hearing on S.B. 54 before the Senate Standing Comm. On Public Safety (Jan. 31, 2017) (statement of Sen. Scott Wiener),[4] by requiring state and local actions on immigration that are "separate from that of the Federal Government," Senate Floor Hearing on 04-03-2017.[5]

Among other things, with certain exceptions discussed below, new Section 7284.6 prohibits state and local officials from "[p]roviding information regarding a person's release date

---

[4] https://ca.digitaldemocracy.org/hearing/10091?startTime=275&vid=381a741e4e525c9efccbbf6062c67f3c
[5] https://ca.digitaldemocracy.org/hearing/52288?startTime=1150&vid=910977abbea937bca7424c93fe3caf1c.

or responding to requests for notification by providing release dates or other information," Cal Gov't Code § 7284.6(a)(1)(C); providing "personal information," including an individual's home address or work address, *id.* § 7284.6(a)(1)(D); and "[t]ransfer[ring] an individual to immigration authorities," *id.* § 7284.6(a)(4).

SB 54 provides that state and local law enforcement (other than employees of the California Department of Corrections and Rehabilitation) may share with the United States "information regarding a person's release date" or respond "to requests for notification by providing release dates or other information," only where an individual subject to such information sharing has been convicted of certain crimes, or where the information is available to the public. Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C). Personal information may be shared only if it is available to the public. *Id.* § 7284.6(a)(1)(D). State and local law enforcement agencies may "[t]ransfer an individual to immigration authorities" only if the United States presents a "judicial warrant or judicial probable cause determination," or the individual in question has been convicted of one of certain crimes. Cal. Gov't Code §§ 7282.5(a); 7284.6(a)(4).

## LEGAL STANDARD

A preliminary injunction is warranted where, as here, the movant has established that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). Generally, where the United States has demonstrated a likelihood of success on the merits of a Supremacy Clause claim, the other factors similarly favor an injunction. *See, e.g.*, *id.*; *United States v. Arizona*, 641 F.3d 339, 366

(9th Cir. 2011), *aff'd in part, rev'd in part*, 567 U.S. 387 (2012).

## ARGUMENT

## I.     The United States Is Likely to Prevail on the Merits

The federal immigration scheme, largely enacted in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, empowers DHS, including its component agencies, ICE and Customs and Border Protection ("CBP"), as well as other federal agencies including the Department of Justice ("DOJ"), and the Department of State ("DOS"), to administer and enforce the immigration laws. It affords the United States considerable discretion to provide for and direct enforcement of the immigration laws in a manner consistent with federal policy objectives.

"The Government of the United States has broad, undoubted power over the subject of immigration" and "[f]ederal governance of immigration and alien status is extensive and complex." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The Constitution vests the political branches with exclusive and plenary authority to establish the nation's immigration policy—a power inherent in national sovereignty. *See* U.S. Const., art. I § 8, cl. 4 (Congress has the authority to "establish an uniform Rule of Naturalization"); U.S. Const., art. I § 8, cl. 3 (Congress has the authority to "regulate Commerce with foreign Nations"). The "[p]ower to regulate immigration is unquestionably exclusively a federal power," *De Canas v. Bica*, 424 U.S. 351, 354 (1976), and "[t]he federal power to determine immigration policy is well settled," *Arizona*, 567 U.S. at 395.

Where a state enactment "conflict[s] or [is] at cross-purposes" with the Federal exercise of its authority, "[t]he Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary

notwithstanding.'" *Arizona*, 567 U.S. at 399 (quoting U.S. Const., art. VI, cl. 2). And given that immigration enforcement impacts foreign affairs—an exclusively federal function under the Supremacy Clause—courts should be especially skeptical of state regulation impacting immigration. *See id.* at 395 (explaining immigration regulation impacts the United States' "inherent power as sovereign to control and conduct relations with foreign nations"); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589 (1952) (explaining that "[s]uch matters are so exclusively entrusted to the political branches of government" because "any policy toward aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government").

It follows that the California provisions at issue here are preempted and invalid under each of two related doctrines. First, a state law is preempted by federal law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) ("obstacle" exists whether it "goes by the name of conflicting; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference, or the like") (quotation marks omitted)); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 151, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes"). Second, under the doctrine of intergovernmental immunity, state laws are invalid if they "regulate the United States directly" or "discriminate against the Federal Government or those with whom it deals.'" *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.); *see South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988) (similar).[6] The provisions at issue here have the purpose and effect of interfering with and effectively nullifying the United States'

---

[6] Although the controlling opinion in *North Dakota* was a plurality, the Court was unanimous in concluding that states may not regulate or discriminate against the United States. 495 U.S. at 435 (plurality op.); *id.* at 444 (Scalia, J., concurring); *id.* at 451-52 (Brennan, J., dissenting).

enforcement of the immigration laws, and of singling out for adverse treatment the federal government and those who assist it with immigration enforcement efforts.

**A.     The Constitution does not allow California to obstruct federal law enforcement efforts by prohibiting employers from voluntarily cooperating with federal law enforcement officials (AB 450)**

1. In enacting the Immigration Reform and Control Act of 1986 ("IRCA"), Congress established a "comprehensive framework for combating the employment of illegal aliens," *Arizona*, 567 U.S. at 404, and its "primary purpose" is to "reduce the flow of illegal immigration into the United States by removing the employment 'magnet' that draws undocumented aliens into the country," *Montero v. I.N.S.*, 124 F.3d 381, 384 (2d Cir. 1997) (quoting H.R. Rep. No. 99-682(I), at 45-46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649-50). IRCA makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers. 8 U.S.C. § 1324a(a)(1)(A), (a)(2). Employers who attempt to comply in good faith with verification requirements are protected from civil and criminal penalties under federal law. *Id.* § 1324a(b)(6)(A). And importantly, Congress established a uniform inspection process whereby employers are required to retain documentary evidence of authorized employment of aliens, and to permit federal investigative officers to inspect that evidence. *See id.* § 1324a(b), (e)(2)(A).

Federal law contains no requirement that immigration officials seeking to enforce either criminal or civil immigration provisions exclusively procure a judicial warrant before seeking to enter a place of employment for immigration enforcement purposes. *See* 8 U.S.C. § 1357(a)(1) (authorizing federal agents to interrogate suspected aliens without a warrant); *id.* § 1357(e) (federal immigration officer may not, "without the *consent* of the owner (or agent thereof) or a properly executed warrant," enter "a farm or other outdoor agricultural operation for the purpose of interrogating a person believed to be an alien as to the person's right to be or to remain in the United States") (emphasis added). Instead, Congress provided for a method for immigration

enforcement, including in the context of worksite inspections, that is premised on the private property owner's ability to consent to inspections of their property and employee records. This framework, established by Congress, provides a rational balancing of Executive Branch and Judicial Branch resources.

It is thus established that "[i]n the course of enforcing the immigration laws, [federal immigration officers may] enter[] employers' worksites to determine whether any illegal aliens may be present as employees." *I.N.S. v. Delgado*, 466 U.S. 210, 211-12 (1984). As the Supreme Court explained, "it makes no difference . . . that the encounters t[ake] place inside a factory, a location usually not accessible to the public." *See id.* at 217 n.5. So long as immigration "officers were lawfully present *pursuant to consent* or a warrant," the "same considerations attending contacts between the police and citizens in public places should apply." *Id.* (emphasis added). Indeed, the Ninth Circuit has agreed with the United States' argument that "Congress, in adopting [8 U.S.C. § 1357]" intended for immigration officers to possess enforcement authority "to the fullest extent permissible under the fourth amendment." *Zepeda v. INS*, 753 F.2d 719, 725 (9th Cir. 1983); *accord Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986) (reversing portion of injunction against INS because it "exceed[ed] the particularity requirements of the Fourth Amendment and unduly restrict[ed] [federal immigration officers'] ability to engage in consensual questioning" by requiring the United States to procure search warrant identifying specific persons suspected of being unlawfully present before undertaking a workplace search).

2. AB 450 imposes civil penalties on private employers in California who provide "consent[] to an immigration enforcement agent to enter any nonpublic areas of a place of labor," unless "the immigration enforcement agent provides a judicial warrant" or consent is "otherwise

required by federal law." Cal. Gov't Code § 7285.1(a).

The Constitution does not allow California to impede federal law enforcement in this fashion. It is well established that a state enactment is preempted if it "results in interference with Federal Government functions." *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438 (9th Cir. 1991) (invalidating statute that purported to preclude a contractor from performing services on a federal construction project without first obtaining a license from the state); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"). AB 450 interferes with federal law enforcement by making it more difficult for federal officers to investigate both criminal and civil immigration violations at employment sites. In particular, the statute poses an obstacle to federal enforcement by effectively restricting the ability to conduct federal investigations without a judicial warrant, despite the INA's express authorization of such enforcement.[7] *See, e.g.*, *Arizona*, 567 U.S. at 402, 406 (finding preempted a state law that conflicted with the "method of enforcement" of immigration laws available to the United States through the INA and thus "diminish[ed] the Federal Government's control over enforcement and detract[ed] from the integrated scheme of regulation created by Congress"). Indeed, the INA does not provide a mechanism for procuring judicial rather than administrative warrants for immigration enforcement. Thus, any requirement to do so further burdening DHS's ability to fulfill its statutory mandate in the manner prescribed by Congress. Homan Decl. ¶ 70. California cannot plausibly assert that it is vindicating a legitimate state interest in employee privacy here, given

---

[7] Indeed AB 450 was expressly designed to thwart federal law on consent. *See* Committee on the Judiciary Report (Senate), July 10, 2017, at 3 (acknowledging that "existing law provides, under federal law, that an immigration officer may" enter nonpublic areas of an employer with either "a warrant or the *consent* of the owner) (emphasis added).

that this restriction on employer consent does not apply to any other types of investigatory activity—not any state enforcement, or even federal non-immigration enforcement. Rather, AB 450's clear purpose and effect is to prevent federal immigration officials alone from carrying out their congressionally-mandated functions.[8]

For similar reasons, the state enactment violates principles of intergovernmental immunity. It is established that "the States may not directly obstruct the activities of the Federal Government." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2009) (quoting *North Dakota*, 495 U.S. at 437-38 (plurality op.)). Applying this principle in *Arcata*, the Ninth Circuit invalidated local ordinances that purported to regulate military recruiting. As the court explained, such ordinances "do not merely regulate the Federal Government incidentally," but "are expressly intended to do so." *Arcata*, 629 F.3d at 991. Similarly, in *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), the Ninth Circuit invalidated a state enactment that purported to create special rules for cleanup of a federal nuclear site, concluding that by imposing regulations on a government contractor, the statute "directly interfere[d] with the functions of the Federal Government." *Id.* at 840.

AB 450 violates this settled principle. The state enactment imposes penalties on private

---

[8] AB 450 also poses an obstacle to enforcement activities that are unrelated to workplace enforcement but happen to occur at what AB 450 defines as a "place of labor," including critical enforcement activities that occur near the international border. For example, when DHS is engaged in an enforcement action – such as the search for an identified suspect who is a known criminal alien, or trying to locate or pursue recent illegal border-crossers near the international border – that action may lead agents onto private property. Homan Decl. ¶ 88; Scott Decl. ¶ 27-29. In those circumstances, seeking consent from the private property owner may be the most efficient method to continue that operation, including in potentially dangerous circumstances involving pursuit of absconding aliens near the border. *Id.* But AB 450 would preclude the property owner from providing consent if its property counted as a "place of labor" – a term with a potentially broad and malleable meaning that could include wide swaths of property used for farming or ranching, a warehouse, or other locations where DHS might need to conduct non-workplace enforcement related operations. Indeed, Congress has explicitly authorized immigration officers within a reasonable distance from the international border to have access—*without a warrant*—to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). More generally, non-work related enforcement operations frequently rely on property owner consent, and AB 450 places a clear obstacle in the path of an immigration enforcement scheme that clearly envisions access to property with the consent of the property owner. *Cf. id.* § 1357(e) (DHS officers authorized to enter farm property for interrogation with "consent of the owner").

employers, but only to the extent that they voluntarily cooperate with the United States. *See* Cal. Gov't Code §§ 7285.1(a), 7285.1(b). California is not attempting to impose a generally applicable law that purports to protect employee privacy, but rather is specifically targeting federal immigration enforcement. As in *Arcata*, the statute "do[es] not merely regulate the Federal Government incidentally; rather, [it is] expressly intended to do so." 629 F.3d at 991.

California cannot plausibly assert that it has authority to directly prohibit the United States from entering private property with consent from the property owner. Its effort to do so is no more permissible when achieved indirectly through regulation of the property owner. Because "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as regulation imposed on the Government itself," the Supreme Court "has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438 (plurality op.). Here, the state enactment is imposed based solely on the private entity's decision to deal with the United States. Similarly, California cannot plausibly assert that it has authority to impose a tax only on those businesses that enter into agreements with the United States. *See, e.g.*, *South Carolina*, 485 U.S. at 514-15. That basic principle does not yield when the tax takes the form of a civil penalty, and the agreement with the United States takes the form of cooperation with immigration officers.

That AB 450 regulates private property owners in a manner that discriminates exclusively against the United States is made plain by the fact that California law does not establish any similar proscription on a private employer's consenting to inspections by any California law enforcement agencies, some of whose regulatory schemes in fact *mandate* that regulated places

of employment provide state inspectors "free access" to their premises, often on penalty of criminal prosecution, and with no warrant requirement. *See, e.g.*, Cal. Lab. Code §§ 90, 1174, 1175(b) (Division of Labor Standards Enforcement); *id.* §§ 2666, 2667 (Department of Industrial Relations); *id.* § 6314 (Division of Occupational Safety and Health); *see also id.* § 1151 (Agricultural Labor Relations Board shall have "free access to all places of labor"). None of these provisions forbid private property owners from consenting to a State inspection. Nor does California law require private employers to refuse State officers consent unless a judicial warrant is presented. Rather, "[e]mployers have the right to consent to a police search," *People v. Shields*, 205 Cal. App. 3d 1065, 1068 (6th Dist. 1988), or to a regulatory "inspection." *Appeal of Rudolph and Sletten, Inc., Employer*, 2004 WL 817770, at *5 (Ca. O.S.H.A. Mar. 30, 2004). Moreover, law enforcement entities may rely on consent and need not normally procure judicial warrants before fulfilling their regulatory mandates. *See, e.g.*, *Walnut Hill Estate Enters., LLC v. City of Oroville*, No. 09-cv-0500, 2010 WL 2902346, at *3 (E.D. Cal. July 22, 2010); *Salwasser Mfg. Co. v. Occupational Safety & Health Appeals Bd.*, 214 Cal. App. 3d 625 (5th Dist. 1989).

The other challenged provisions of AB 450 have the same purpose and effect of impermissibly regulating and discriminating against the United States. California prohibits employers from "provid[ing] voluntary consent to an immigration enforcement agent to access, review, or obtain the employer's employee records without a subpoena or judicial warrant." Cal. Gov't Code § 7285.2(a)(1). Although the statute contains exceptions for particular categories of documents, *id.* § 7285.2(a)(2), there can be no serious dispute that the statute, when it applies, deliberately stands as an obstacle to the enforcement of federal laws and targets the United States for adverse treatment. *See* Homan Decl. ¶¶ 86, 88 (explaining that AB 450's exception does not exempt criminal investigations, including, for example, investigations into "human smuggling

and trafficking" at certain employers, and impedes "[n]on-work related enforcement operations" that rely on "property owner consent and cooperation"). Indeed, California treats itself far better, providing that any place of business that "refuses to furnish [upon request] any statistics or information" to some of its own regulatory entities "is guilty of a misdemeanor." Cal. Lab. Code § 1174.

Similarly impermissible is California's requirement that employers provide notice to their employees and their authorized representatives of upcoming inspections within 72 hours of receiving notice of such inspections and their results. Cal. Lab. Code § 90.2. Federal investigations obiously will be less effective if targets of the investigations are warned ahead of time and kept abreast of the status of the United States' enforcement efforts. It would be unthinkable for a state to require that suspects be warned of upcoming criminal investigations by the Federal Bureau of Investigation ("FBI") or the California Bureau of Investigations, or that suspects be kept up to date on the results of investigative work done by the FBI and similar state law enforcement entities. There is no basis for a different rule for federal officers enforcing the immigration laws, particularly where California does not apply the same standard to its own law enforcement officers. *See* Cal. Lab. Code § 6321 ("[n]o person or employer shall be given advance warning of an [OSHA] inspection or investigation").

Finally, AB 450 precludes employers from reverifying the employment eligibility of their employees, except when such reverification is required by federal law. Cal. Lab. Code 1019.2(a). Under IRCA, it is unlawful both to hire an unauthorized worker and "to continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). Thus, although employers do not have an obligation to continually reverify employment status for any particular individual, they do have a

continuing obligation to avoid knowingly employing unauthorized aliens. And as the Ninth Circuit has recognized, in some circumstances "deliberate failure to investigate suspicious circumstances imputes knowledge." *New El Rey Sausage Co. v. U.S. I.N.S.*, 925 F.2d 1153, 1158 (9th Cir. 1991). Congress thus intended that employers remain well-informed of their employees' immigration status and work authorization, thus satisfying their obligation to prevent unauthorized employment under IRCA. Prohibiting employers from reverifying work authorization when they deem it appropriate to remain in lawful compliance interferes with that employer's ability to mitigate liability and frustrates ICE's overall worksite enforcement efforts, which seek to instill a culture of compliance and accountability.

### B.   The Constitution does not allow California to inspect facilities holding federal detainees to review federal law enforcement efforts (AB 103)

1. The INA explicitly recognizes the United States' authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). Congress expressly contemplated that some of those aliens might not be housed in federal facilities. *See id.* § 1231(g)(1)-(2) (lease or rental of facilities); *id.* § 1103(a)(11) (authorizing payment to states and localities for bed space for detainees).

Although detainees may be housed in nonfederal facilities, they remain federal detainees subject to the control of the United States. Federal law does not contemplate any role for the facility itself, or for states and localities, in determining which aliens are properly subject to detention or the terms and conditions of that detention. And federal regulation prohibits state, local, or private facilities from disclosing information related to detainees. 8 C.F.R. § 236.6.

DHS, through ICE, utilizes twenty detention facilities in California to house civil immigration detainees in federal custody, and regularly uses nine of these facilities. Homan Decl. ¶ 51. All together, these facilities can house approximately 5,700 immigration detainees. *Id.*

Most of these detention facilities are governed by agreements that ICE enters into with county, city, or local government entities. *Id.* ¶¶ 48-51.

2. AB 103 mandates inspection and review of immigration detention facilities that includes the California Attorney General's own assessment of the United States' basis for the alien's detention and transfer and the due process afforded to the alien. California thus seeks through AB 103 to use the location of detention as a mechanism to undertake its own inspection and review of the United States' enforcement of federal immigration law. Cal. Gov't Code § 12532(a), (b). But the Constitution and the INA give the Federal Government authority over federal immigration enforcement, and neither affords California authority to second-guess the Federal Government's determinations regarding detention and transfer of aliens. *See generally Arizona*, 567 U.S. at 394-97.

Under the federal immigration scheme, "[f]ederal officials," and not States, "must decide whether it makes sense to pursue removal." *Arizona*, 567 U.S. at 396. The Supreme Court has thus recognized "the principle that the removal process is entrusted to the discretion of the Federal Government," and held (invalidating a state statute that purported to authorize state officers to make unilateral immigration arrests) that states may not authorize their "officers to decide whether an alien should be detained for being removable." *Id.* at 409. "Decisions of this nature," the Court explained, "touch on foreign relations and must be made with one voice." *Id.*

AB 103 disregards the Federal Government's exclusive authority to determine detention and transfer of removable aliens by creating a state inspection scheme designed to review and publicly report on the circumstances surrounding an alien's apprehension. California's efforts to interfere with the Federal Government's enforcement efforts by applying its own assessment of due process afforded an alien pose an impermissible obstacle to administering the federal

immigration scheme. Just as incarceration of convicted criminals in a nonfederal facility does not afford states the authority to second-guess the circumstances of the prisoners' arrest and criminal conviction, the states have no authority to second-guess the United States' immigration enforcement efforts through an inspection and review scheme. *Cf. Tarble's Case*, 80 U.S. 397 (1871) (state courts cannot exercise habeas review of federal detention).

As the Ninth Circuit explained in invalidating state licensing requirements for federal contractors, a state enactment is preempted to the extent that it "is effectively attempting to review the Federal Government's responsibility determination" in selecting its contractor. *Gartrell Constr.*, 940 F.2d at 439; *see also Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-90 (1956) (invalidating state licensing requirement for federal contractors). Here, California attempts to inspect and review the United States' actions in an area of exclusive federal responsibility.

For similar reasons, the effort to inspect and review federal enforcement efforts is prohibited by the doctrine of intergovernmental immunity. *See Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) ("immunity of the instruments of the United States from state control in the performance of their duties extends to a requirements [sic] that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them"). While neutral, generally applicable state regulations may in certain circumstances incidentally regulate federal contractors, the Ninth Circuit has recognized that absent unambiguous congressional authorization, a state is barred from "regulat[ing] not only the federal contractor[,] but the effective terms of federal contract itself." *Boeing*, 768 F.3d at 840. Here, California impermissibly seeks to regulate and second-guess not only the performance of a federal contract for detention, but the government behavior that led to detention in the first place.

This is an impermissible effort to regulate the United States. *See id.* (invalidating California law that "directly interfere[d] with the functions of the Federal Government" by "mandating the ways in which [federal contractors] render[ed] services that the Federal Government hired [them] to perform").

California's violation of fundamental tenets of our federal system is underscored by the fact that its law applies solely to those having contracts with the United States. The inspection requirements of Section 12532 of the California Government Code apply only to "county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov't Code § 12532(a). In contrast, California subjects all other "local detention facilities" to only biennial inspections concerning health and safety, fire suppression preplanning, compliance with training and funding requirements, and the types and availability of visitation. Cal. Penal Code § 6031.1(a) (with the exception of certain specialized facilities). And these state investigations are limited to "minimum standards" concerning the conditions of local correctional facilities and the treatment of prisoners. *Id.* § 6030; *accord* 15 Cal. Code Reg. §§ 1000–1282. Any legitimate state interest in the operation of detention facilities within the state's borders could be addressed by the application of such provisions. There is no legitimate basis for conducting a unique review of immigration facilities merely because the state disagrees with the United States' enforcement of federal immigration law. *See Boeing*, 768 F.3d at 843 (contractor "cannot be subjected to discriminatory regulations because it contracted with the Federal Government").

The statute also impermissibly interferes with federal enforcement of the immigration laws by requiring facilities housing immigration detainees to provide "all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but

not limited to, access to detainees, officials, personnel, and records." Cal. Gov't Code § 12532(c). The California Attorney General has already attempted to enforce this provision by seeking to inspect various detention facilities—and in fact inspecting five such facilities—housing immigration detainees on behalf of ICE, including detainee records and law enforcement decisions by facility personnel. Homan Decl. ¶¶ 58-59. Thus, Section 12532(c) intrudes on the orderly operation of facilities carrying out federal functions and is irreconcilable with 8 C.F.R. § 236.6, which establishes that information about immigration detainees belongs solely to the Federal Government. *See* 8 C.F.R. § 236.6. Section 12532(c) therefore "directly regulate[s] the Federal Government's . . . *property*," and is invalid for that reason as well. *See Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) (emphasis added). Indeed, AB 103 actually requires contractors to violate that regulation, which prohibits "any state or local government entity or any privately operated detention facility that houses, maintains, provides services to, or otherwise holds any detainee on behalf" of DHS from "disclos[ing] or otherwise permit[ting] to be made public the name of, or other information relating to, such detainee." 8 C.F.R. § 236.6; *see Am. Civil Liberties Union of New Jersey, Inc. v. Cty. of Hudson*, 799 A.2d 629, 646–47 (N.J. App. Div. 2002) (explaining that 8 C.F.R. § 236.6 "prohibits the disclosure" of information "concerning federal detainees"). And, unlike laws in other states concerning contract facilities housing immigration detainees, Section 12532 does not "expressly exempt[] from the act any information that is protected from disclosure under federal law." *See, e.g.*, *Comm'r of Correction v. Freedom of Info. Comm'n*, 52 A.3d 636, 654 (Conn. 2012). Section 12532 therefore conflicts with federal law and is preempted because ICE contractors cannot comply with it and 8 C.F.R. § 236.6.[9] *See Arizona*, 567 U.S. at 399.

---

[9] E Even if section 12532 was not subject to preemption on its face, the manner in which Defendant Becerra has sought to enforce it demonstrates that it is preempted as applied. As noted, Defendant Becerra has, through various

C.   **The Constitution does not allow California to restrict cooperation with the United States that is contemplated and protected by federal law (SB 54)**

1. In addition to establishing the circumstances in which aliens can enter, remain in, or be removed from the United States, the INA codifies the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens suspected of being, or found to be, unlawfully present in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. Actual knowledge of the date of release from state or local custody or the home address of an alien covered by these provisions is critical to DHS's ability to fulfill its statutory obligations regarding detention and removal.

Where an alien has committed certain criminal offenses, "the [Secretary] shall take into custody any alien who" has committed such offenses "when the alien is released," if the alien is already in the custody of state or local officials. *Id.* § 1226(c)(1). Detention following such apprehension is mandatory. *Id.* Where "an alien [ha]s [been] ordered removed, the [Secretary] shall remove the alien from the United States within a period of 90 days," during which time an alien subject to a final order of removal shall be detained pending effectuation of the order. *Id.* § 1231(a)(2). Detention during the removal period prevents the alien from absconding and ensures the alien's presence for removal. *See id.* Aliens may be detained beyond the removal period if they have qualifying criminal convictions, have engaged in activity which endangers public safety, or have been found to be a risk to the community or to be unlikely to comply with the order of removal. *Id.* § 1231(a)(6).

---

letters to DHS's detention contractors, indicated an intention to imminently inspect their facilities and has demanded access to various private documents respecting the "welfare of persons detained." To the extent such documents refer to any specific immigration detainee in any way, they are covered by section 236.6, and section 12532 is therefore preempted. *See, e.g.*, *Cty. of Hudson*, 799 A.2d at 655 (finding preempted law "requiring public disclosure of information regarding [DHS] detainees"); *accord Voces de la Frontera v. Clarke*, 891 N.W.2d 803, 815 (Wis. 2017) (request under state law for disclosure of ICE Detainer Form I-247 would be preempted); *Comm'r of Correction*, 52 A.3d at 653 (request under state law for "[National Crime Information Center] printout" of immigration detainee would be preempted).

Congress has also determined, however, that confinement as part of a state criminal sentence shall generally be permitted to proceed notwithstanding the prospect of or pendency of federal removal proceedings, providing that the United States "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4); *see id.* § 1231(a)(4)(B) (permitting earlier removal in certain circumstances when the State agrees it is in the "best interest of the State"). The structure of the INA makes clear that states and localities are, in turn, required to allow a basic level of information-sharing to ensure that they do not frustrate federal immigration law. The INA presumes that the United States will be made aware of the release date of aliens who are subject to a final order of removal, providing that an alien's release date from state or local criminal custody and transfer to DHS will trigger a 90-day period in which to execute removal. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) (removal period "begins on . . . the date the alien is released from [state criminal] detention"). Detention during this "removal period" is mandatory for aliens with a qualifying criminal history. *See* 8 U.S.C. § 1231(a)(2). Likewise, as to removable aliens in removal proceedings but not yet subject to a final order of removal, the INA directs DHS to take criminal aliens into mandatory detention during removal proceedings "when the alien is *released*" from state criminal custody. 8 U.S.C. § 1226(c)(1) (emphasis added). The need for information sharing is made more stark by the Ninth Circuit's holding in *Preap v. Johnson* that DHS may not detain such a criminal alien under the mandatory detention provisions if it does not take the alien into custody "promptly upon [his or her] release" from criminal custody. 831 F.3d 1193, 1205 (9th Cir. 2016), *pet. for cert. pending*, No. 16-1363 (U.S. filed May 11, 2017). Thus, it is critical that DHS timely obtain release date information in order to carry out its statutorily mandated functions. *Cf. Jennings v. Rodriguez*, No. 15-1204, --- U.S. ---, 2018 WL 1054878, at *4 (U.S. Feb. 27, 2018) ("To

implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering.").

To effectuate the INA's provisions, DHS issues an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody." *Id.* DHS may also request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d).

Congress has underscored the necessity for "[c]onsultation between federal and state officials" in immigration enforcement, *Arizona*, 567 U.S. at 411, by expressly providing in 8 U.S.C. § 1373(a), that "[n]otwithstanding any other provision of . . . law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal authorities] information regarding the citizenship or immigration status . . . of any individual."

2. New California Government Code Section 7284.6 deliberately seeks to undermine the system that Congress designed, under which states are permitted to have aliens complete their state criminal sentences before being subject to removal by federal officials. The new California statute restricts state and local officials, other than state correctional officers, from cooperating with the United States. Among other things, Section 7284.6 prohibits state and local officials from: "[p]roviding information regarding a person's release date or responding to requests for notification by providing release dates or other information," Cal Gov't Code § 7284.6(a)(1)(C); providing "personal information," including an individual's home address or work address or

any "statements made by, or attributed to, the individual," *id.* § 7284.6(a)(1)(D); Cal. Civil Code § 1798.3; and "[t]ransfer[ring] an individual to immigration authorities," *id.* § 7284.6(a)(4). This general bar is subject to only limited exceptions. State and local law enforcement may share with the United States "information regarding a person's release date" or respond "to requests for notification by providing release dates or other information," but only where an individual subject to such information sharing has been convicted of a limited subset of crimes established by California rather than Congress, or where the information is available to the public. Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C). Personal information may be shared only if it is available to the public. *Id.* § 7284.6(a)(1)(D). State and local law enforcement agencies may "[t]ransfer an individual to immigration authorities" only if the United States presents a "judicial warrant or judicial probable cause determination," or the individual in question has been convicted of a similarly limited subset of crimes, also established by California rather than Congress. *Id.* §§ 7284.6(a)(4), 7282.5(a).

Notably, the limited subset of crimes under SB 54 that permits sharing release dates or personal information or transferring aliens to federal custody without a judicial warrant does not match the set of crimes under federal law governing that may serve as the predicate for removability (even without a conviction). *See*, *e.g.* 8 U.S.C. § 1227(a)(4)(A), (B) (individuals who engage in "criminal activity which endangers public safety or national security," or "is engaged in or is likely to engage . . . in any terrorist activity"); *see generally id.* §§ 1182(a)(2), 1227(a)(2), (4). Nor does SB 54 track the set of crimes that require the federal government to detain such aliens upon their release from state or local custody. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(C); 1227(a)(2)(A)(i)(II) (mandating federal custody of aliens "convicted of a crime for which a sentence of one year or longer *may* be imposed") (emphasis added); *see generally id.*

§ 1226(c)(1).

If a state refuses to share with DHS an alien's release date, then DHS cannot fulfill its statutory responsibilities regarding detention and removal because it cannot arrest the alien upon the alien's release from custody. And if it cannot arrest the alien promptly upon release, DHS is impeded in effectuating its statutory mandate to detain dangerous criminals and prevent danger to the community or flight by removable aliens during the administrative immigration hearing and removal process. *See* 8 U.S.C. §§ 1226(c)(1), 1231(a); *Preap*, 831 F.3d at 1205. The effect of the prohibition on providing release dates is compounded by SB 54's prohibition on sharing personal information, including home addresses, with the United States, § 7284.6(a)(1)(D), which deprives DHS of information it needs to locate an alien if the locality refuses to provide notice of release. Such obstruction of DHS's ability to fulfill Congress's directives to it "stand[]" as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399; *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("state law . . . is pre-empted if it interferes with the *methods* by which the federal statute was designed to reach [its] goal") (emphasis added).

In prohibiting officials from sharing information such as an alien's release date, sections 7284.6(a)(1)(C) & (D) also directly conflict with 8 U.S.C. § 1373(a), under which a state or local government may not prohibit the exchange of "information regarding" an individual's immigration status. In "enacting section 1373, Congress sought to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS.'" *Bologna v. City & Cty. of San Francisco*, 121 Cal. Rptr. 3d 406, 414 (Cal. Ct. App. 3d Div. 2011) (quoting House report) (explaining further that Congressional reports on section 1373 "demonstrate legislative intent to facilitate the enforcement of federal immigration

law"); *see also City of New York v. United States*, 179 F.3d 29, 31-33 (2d Cir. 1999) (discussing legislative history and purpose of § 1373 and concluding that states cannot claim "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs"). The relevant legislative history of the 1996 amendments to the INA, which added section 1373, explains that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104–249, at 19-20 (2d Sess. 1996).

Information such as the release date is "information regarding" immigration status within the contemplation of Section 1373, particularly where the release date implicates the federal authority to take custody pursuant to the removal statute in 8 U.S.C. § 1231. That term does not merely denote an alien's technical immigration status (as has been argued elsewhere), a reading that disregards the interrelationship between state custody and federal obligations. Indeed, Congress's use of "information regarding" in section 1373(a) was intended to broaden the scope of the information covered, as demonstrated by comparing Section 1373(a) to Section 1373(c), which uses the different phrase "[immigration] status information." 8 U.S.C. § 1373. Moreover, another provision of the INA, 8 U.S.C. § 1357(g)(10)(A), in fact defines the phrase "immigration status" to include whether "a particular alien is not lawfully present in the United States." Whether an alien has been *released* from state or local charges is highly relevant to his "lawful presence" given that Congress has explicitly excepted DHS from its duty to remove *unlawfully* present aliens subject to final orders of removal *only* where those aliens are serving a criminal

sentence in State or local custody. *See* 8 U.S.C. § 1231(a)(4).[10]

An alien's home and work address is also relevant to many immigration status issues, including whether an alien admitted in a particular nonimmigrant status (e.g., B-1 business visitor) has remained in the United States beyond their authorized period of admission, evidenced an intent not to abandon his or her foreign residence, or otherwise violated the terms and conditions of such admission (e.g., engaged in unauthorized employment), *see* 8 U.S.C. § 1227(a)(1)(C), 8 C.F.R. § 214.1; whether the alien has been granted work authorization as a benefit attached to a particular status or form of relief, *see* 8 C.F.R. § 274a.12; whether the alien has kept DHS informed of any change of address as required under 8 U.S.C. § 1305; and whether an alien has accrued the necessary continuous presence to be eligible for relief from removal, *id.* § 1229b(a)(1), (a)(2), (b)(1)(A). Moreover, because section 7284.6(a)(1)(D) incorporates Cal. Civil Code § 1798.3, SB 54's general prohibition on sharing any "statements made by, or attributed to" an alien in state or local custody does not just reach home and work address: it reaches even information "regarding immigration" status stated orally by an alien concerning whether they are illegally in the United States or subject to federal custody and removal from the United States.

New section 7284.6(a)(4) likewise impermissibly undermines the INA and impedes the enforcement of the immigration laws. That provision prohibits state and local law enforcement from "[t]ransfer[ring] an individual to immigration authorities," Cal. Gov't Code § 7284.6(a)(4), unless the United States presents a "judicial warrant or judicial probable cause determination," or the individual in question has committed one of a limited subset of crimes. *Id.* § 7282.5(a). As discussed, the INA contemplates that DHS will be able to take custody of removable criminal

---

[10] To the extent *Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) suggests otherwise, that Court lacked the benefit of briefing from the United States on this question and did not squarely address the arguments raised by the United States here.

aliens directly at the point and place of release from state or local detention and that detention of such aliens "*must* continue pending a decision on whether the alien is to be removed from the United States" "and that detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes." *Jennings*, --- U.S. ---, 2018 WL 1054878, *14-15. Frustrating that scheme will afford an alien the opportunity to abscond and potentially endanger federal officers or members of the public. *Cf. Demore v. Kim*, 538 U.S. 510, 528 (2003) (Congress determined that permitting "release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully").

Requiring a judicial warrant or judicial finding of probable cause is irreconcilable with the INA, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a). Congress established, through the INA, that civil immigration enforcement is premised on administrative "warrant[s] issued by" DHS and that "an alien may be arrested and detained" based on such a warrant "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a)(1); *see Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 876–80 (9th Cir. 2007) (stating that an executive officer can constitutionally make the necessary probable-cause determination to warrant arrest of an alien "outside the scope of the Fourth Amendment's Warrant Clause," without presentment to a judicial officer); *see also Abel v. United States*, 362 U.S. 217, 233 (1960) (observing "impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation"). The INA does not require a judicial warrant or a judicial probable cause determination unless a

criminal offense is being charged. *See* 8 U.S.C. § 1226(a); *see also* Homan Decl. ¶ 70. Requiring that DHS procure a judicial warrant in order to take custody of aliens that Congress has already determined are subject to Federal, and not state or local, custody, for removal purposes thus upsets the careful calibration that Congress established in requiring only an administrative warrant as the basis of civil immigration enforcement. *See, e.g.*, *Arizona*, 567 U.S. at 402, 406, 408. It would add significant resource burdens to both the Judicial Branch and the Executive Branch – burdens that would be magnified if other states follow California's example.

Finally, sections 7284.6(a)(1)(C) & (D) and 7284.6(a)(4) are especially flawed because the restrictions on information-sharing and transfer apply only to requests made by federal entities, including "United States Immigration and Customs Enforcement or United States Customs and Border Protection as well as any other immigration authorities." Cal. Gov't Code § 7284.4(e); *see id.* §§ 7284.6(a)(1)(C), (D)(4). Moreover, while the statute defines "immigration authorities" to include, in addition to federal officers, "state, or local officer[s], employee[s], or person[s] performing immigration enforcement functions," *id.* § 7284.4(c), it also defines "[i]mmigration enforcement" to mean "any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any *federal* civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any *federal* criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States." *Id.* § 7284.4(f) (emphasis added).

The challenged provisions have the purpose and effect of treating federal immigration officials worse than other entities that might seek information. If other states or federal officials seek information or transfer of prisoners, SB 54 has no application. Rather, the provision is specifically designed to obstruct federal immigration enforcement: the Bill's drafters made clear

that the Bill is intended to serve as a "counterbalance to this administration" on immigration matters, *see* Hearing on S.B. 54 before the S. Standing Comm. on Public Safety (Jan. 31, 2017) (statement of Sen. Scott Wiener),[11] by requiring state and local actions on immigration "separate from that of the Federal Government." Senate Floor Hearing of 04-03-2017.[12]  California has no legitimate interest in obstructing federal immigration enforcement.

## II.   Irreparable Harm to the United States, The Balance of Harms, and the Public Interest Strongly Militate in Favor of Injunctive Relief.

The challenged provisions of AB 450, AB 103, and SB 54 are intended to uniquely impede the enforcement of the immigration laws, and they have their intended effect. In so doing, the provisions inflict irreparable harm on the United States and on the strong public interest in enforcement of the immigration laws. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (stating, in the related context of criteria governing stay of removal, that the criteria of "harm to the opposing party" and "the public interest" "merge when the Government is the opposing party" because the Government represents the public interest). In contrast, the State has no legitimate interest in thwarting the operation of the immigration laws and will suffer no harm whatsoever as a result of an injunction.

1. The challenged provisions irreparably undermine the United States' control over regulation of immigration and immigration policy and thereby interfere with the United States' ability to achieve the purposes and objectives of federal law and to pursue its chosen enforcement priorities. In so doing, they undermine the strong public interest in enforcement of the immigration laws.

Among other things, as explained above, these provisions impede federal immigration enforcement by (1) hindering the United States' detection of unauthorized alien workers and

---

[11] https://ca.digitaldemocracy.org/hearing/10091?startTime=275&vid=381a741e4e525c9efccbbf6062c67f3c
[12] https://ca.digitaldemocracy.org/hearing/52288?startTime=1150&vid=910977abbea937bca7424c93fe3caf1c

employers who employ them, (2) inspecting facilities that hold federal immigration detainees to review the United States' law enforcement efforts to apprehend and detain removable aliens, and (3) restricting cooperation and thus assisting removable aliens, including dangerous criminal aliens, in their efforts to evade federal law enforcement, thereby impairing the United States' ability to locate, detain, prosecute, and remove aliens who pose risks to the safety and security of our Nation's citizens. *See* Homan Decl. ¶¶ 12-92; Scott Decl. ¶¶ 9-29; Hoffman Decl. ¶¶ 13-21. If left intact, these provisions of California law would conflict with Congress's instruction that "the immigration laws of the United States should be enforced vigorously and uniformly," *see* IRCA, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 338, and would encourage other state or local laws throughout the United States that seek to restrict or regulate the United States' immigration enforcement efforts, creating a patchwork system of laws severely undermining the "'integrated scheme of regulation' created by Congress," *Arizona*, 567 U.S. at 400; *see also id.* at 395 (immigration the province of "the national sovereign, not the 50 separate States"); *see* Risch Decl. ¶ 10 ("it is critically important that national immigration policy – including immigration enforcement – be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the national government, so that the United States can speak to the international arena with one voice in this area.")

The impact on federal enforcement efforts and priorities is not speculative; it is the clear purpose and effect of these provisions. *See* AB 450, Preamble; Cal. Gov't Code § 12532(b); SB 4, Preamble; Cal. Gov't Code § 7282.5(a). Indeed, according to AB 450's sponsor, the purpose of AB 450 is to "protect[] workers from immigration enforcement." *See* Press Release, Assembly Member David Chiu, *Governor Brown Signs Bill to Provide Labor Protections Against ICE*

*Worksite Raids*.[13]   And according to SB 54's sponsors, that law is designed to "build[] a wall of justice against" the United States' "immigration policies." Jazmine Ulloa, *California becomes 'sanctuary state' in rebuke of Trump immigration policy*, L.A. Times, Oct. 5, 2017.[14] And all three of these laws serve California's "goal of protecting immigrants from an expected increase in federal immigration enforcement activities," California Committee on the Judiciary Report, Apr. 22, 2017 (Assembly), at 1, including the "more than 2.6 million undocumented immigrant[s]" residing in California. California Committee on the Judiciary Report (Senate), July 10, 2017, at 1.

Irreparable harm will result because enforcement of the challenged provisions, as discussed above, has caused and continues to cause a significant burden on DHS resources and enforcement of the immigration laws. Homan Decl. ¶¶ 80-89; Hoffman Decl. ¶¶ 14-21; Scott Decl. ¶¶ 27-29. To start, by prohibiting consensual access to any non-public location in a "place of labor," AB 450 eliminates a critical enforcement tool—authorized by the INA—that ICE relies on to combat unauthorized employment of aliens. Homan Decl. ¶¶ 84-88. Similarly, it impedes enforcement efforts by both ICE and CBP, which rely on consent to locate and apprehend illegal aliens such as criminals, aliens unlawfully entering or re-entering between ports of entry, and aliens in flight, but who are located within a place of employment, including exigent circumstances where ICE or CBP agents are in pursuit of illegal aliens. Homan Decl. ¶¶ 86 (AB 450's bar on consent undermines investigations into "human smuggling and trafficking"); Scott Decl. ¶¶ 27, 28 ("If employers are not able to provide such consensual access, Border Patrol's ability to detect and interdict real time illegal activity, ranging from criminal activity to the smuggling of narcotics to potential terrorists seeking to enter the United

---

[13] available at https://a17.asmdc.org/press-releases/governor-brown-signs-bill-provide-labor-protections-against-ice-worksite-raids (last visited Feb. 14, 2018)

[14] available at http://www.latimes.com/politics/la-pol-ca-brown-california-sanctuary-state-bill-20171005-story.html

States, along the border will be diminished" and "the threat of cross border clandestine tunnels and maritime smuggling going undetected will increase"). Additionally, AB 450 interferes with ICE's ability to resolve civil and criminal cases based on mitigating factors that may warrant lower monetary penalties by limiting what actions employers may agree to take as part of any settlement. Homan Decl. ¶ 85. Furthermore, AB 450 could cause disclosure of employee's personal and sensitive information due to its prohibition on document inspection in private areas, unlike prior to AB 450. Homan Decl. ¶¶ 84, 87.

AB 103 similarly impedes DHS's ability to manage the congressionally mandated detention of removable aliens. Homan Decl. ¶ 60. Already the California Attorney General has demanded that ICE contractors allow inspections of their facilities, provide access to immigration detainees, and turn over sensitive information concerning detainees and immigration enforcement operations. *Id.* ¶¶ 58-60. These inspections require ICE contractors to violate federal statutes and regulations protecting detainee privacy and the confidentiality of ICE records, and require ICE contractors to devote scarce time and resources to responding to such inspection requests, which requires ICE and its contractors to re-allocate resources away from other mission-critical tasks. *Id.* ¶¶ 60, 65. The imposition of these burdensome review requirements, further, may deter private contractors from continuing to work with ICE, thereby necessitating the transfer of immigration detainees outside of California to detention facilities further afield, and the reallocation of scarce resources to do so. *Id.* ¶ 68.

Likewise, SB 54 severely impedes the United States' ability to identify and apprehend removable aliens, especially criminal aliens. Homan Decl. ¶ 22. "In effect, these laws shield from detection removable aliens detained in California prisons and jails and obstruct ICE's efforts to take these aliens into custody for removal purposes." *Id.* ¶ 22. And that effect requires

ICE to expend greater time and resources to identify and apprehend removable criminal aliens. *Id.* ¶ 35. Unlike the transfer of custody in a custodial setting, at-large arrests of removable aliens are both far more costly and dangerous. *Id.* ¶¶ 36-38. While a single ICE officer with timely information and access to a state or local detention facility can identify and arrest multiple individuals each day, ICE otherwise must provide a team of officers to engage in time-consuming work, *e.g.*, data-base searches, visits to address(es) associated with the target, coordination with the activities of other law enforcement agencies, and surveillance, in order to locate each at-large alien. *Id.* ¶ 37. Such apprehensions generally require five officers to be present for officer safety reasons, compared to an arrest of a removable alien within a prison or jail through an orderly transfer from state custody, where only one officer is needed, and require greater training and equipment investment for officers engaged in this comparatively more dangerous field work. *Id.* At-large arrests also involve a greater possibility of the use of force or violence by the target, who, once out in the community, may resist being taken back into custody and have greater access to weapons, exposing officers, the public, and the alien to greater risks of harm. *Id.* ¶ 38. The law has already caused ICE to repurpose at-large teams, which used to be focused on fugitive aliens with final orders of removal, to identifying and apprehending aliens who were released back into the community. *Id.* ¶ 39. This shift has necessarily caused a backlog of fugitive aliens evading their final orders of removal. *Id.*

Moreover, SB 54 undermines the cooperative scheme the INA establishes for purposes of prosecuting criminals on their state charges before removal. Because California effectively requires its subdivisions to release dangerous criminal aliens to the public rather than transfer them back to DHS custody upon release, Scott Decl. ¶ 22, DHS faces a deterrent to transferring aliens it encounters to state or local law enforcement to face accountability for state and local

criminal charges, including serious charges like child sexual abuse, possession of explosive devices, trafficking in controlled substances, slavery, human trafficking, torture, rape, and murder. Scott Decl. ¶¶ 11, 22, 26; Hoffman Decl. ¶¶ 14-18; Homan Decl. ¶ 75. And the release of criminal aliens Congress intended for mandatory detention under 8 U.S.C. § 1226(c) permits those aliens to commit further crimes, as illustrated by their high re-arrest rate, including for very serious crimes likes murder, rape, kidnapping, burglary, domestic abuse, and crimes involving child sexual assault, abuse, or cruelty. Homan Decl. ¶¶ 43-45. Further, SB 54's restrictions on information sharing impede DHS's counterterrorism operations as well, by obstructing real-time sharing of information between DHS and local law enforcement; this "could significantly delay a time-sensitive investigation, the identification of additional targets, and the ability for DHS to place lookouts in systems to prevent outbound travel via air carrier should a target attempt to flee the United States." Homan Decl. ¶ 72.

These provisions also cause irreparable harm to the United States' ability to manage foreign affairs.  "A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409. "[E]ven small changes or differences across states in immigration laws, policies, and practices can have ramifications for [the United States'] ability to communicate [its] foreign policy in a single voice – both in the immigration context and across American diplomatic concerns." Risch Decl.  ¶ 12. "By imposing requirements on the federal government such as a search warrant to enter premises to enforce U.S. immigration law, or notice requirements prior to surrendering an alien to federal authorities for removal, California law deviates from the national government's policies of strict immigration enforcement and removal of aliens," *id.* ¶ 14, "interfere[s] with efforts to

communicate to foreign governments the need to take back their nationals who are subject to final orders of removal," *id.*, and "interfere[s] with actual removal efforts and dilute[s] the messages the U.S. government communicates to foreign governments concerning their need to cooperate with the United States on removal of their nationals who are subject to final orders of removal." *Id.* ¶ 15.

Finally, even apart from these immediate and concrete effects, the challenged provisions cause ongoing irreparable harm to the constitutional order. As the Supreme Court and the Ninth Circuit have explained, irreparable harm inherently results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that "irreparable injury may possibly be established . . . by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause"); *Valle del Sol*, 732 F.3d at 1029 (finding irreparable harm where Supremacy Clause violated); *Arizona*, 641 F.3d at 366 (same).

2. By contrast, a preliminary injunction will not meaningfully burden California and will restore the longstanding constitutional order. California enacted these statutes for the purpose of undermining federal enforcement of the immigration laws. It has no lawful interest in that goal, and it will suffer no cognizable harm as a result of an injunction. *See Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available. . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount."). There is, however, "always a public interest in prompt execution of [the immigration laws.]" *Nken*, 556 U.S. at 436 (recognizing that "[t]he continued presence of an alien lawfully deemed removable undermines [federal removal

proceedings] and permits and prolongs a continuing violation of United States law").

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction.

DATED: March 6, 2018

CHAD A. READLER
Acting Assistant Attorney General

MCGREGOR SCOTT
United States Attorney

AUGUST FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

/s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-4293
Fax: (202) 616-8202
E-mail: Erez.R.Reuveni@usdoj.gov

DAVID SHELLEDY
Civil Chief, Assistant United States Attorney

LAUREN C. BINGHAM
JOSEPH A. DARROW
JOSHUA S. PRESS
Trial Attorneys

*Attorneys for Plaintiff*