# EXHIBIT C

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America,<br>　　*Plaintiff,*<br><br>v.<br><br>State of California, *et al.*,<br>　　*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. |

## DECLARATION OF CHIEF RODNEY S. SCOTT

I, Rodney S. Scott, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby declare as follows.

1.　　I am the Chief Patrol Agent, San Diego Sector, United States Border Patrol (Border Patrol), U.S. Customs and Border Protection (CBP). I have held this position since November 2017. I have over 15 years of federal law enforcement experience in the State of California. I have 20 years of progressive supervisory and leadership experience within CBP and the Border Patrol, with 15 of those years in field leadership positions and 5 years assigned to Headquarters, Washington D.C. I entered on duty with Border Patrol in May of 1992. I was first assigned to the Imperial Beach Station in San Diego Sector. In September of 1996, I was promoted to Senior Patrol Agent at the Chula Vista Station, San Diego Sector. In November of 1997, I was promoted to Supervisory Border Patrol Agent at the Chula Vista Station. In 1998, I transferred as a Supervisory Border Patrol Agent to the Nogales Station in Tucson Sector. In 2002, I was promoted to Field Operations Supervisor at the Nogales Station, where I became involved in national level policy development, specifically for traffic checkpoint operations. In January 2005, I accepted a promotion as the Assistant Chief in the Office of Anti-Terrorism (OAT),

1

Office of the Commissioner at CBP Headquarters in Washington DC. While in this position, I served as a principal advisor to the Commissioner and other senior officials on anti-terrorism issues. I was later promoted to Deputy Executive Director for the Office of Anti-Terrorism in 2006. In 2007, I was appointed as the Director for the Incident Management and Operations Coordination Division at CBP Headquarters. In 2008, I returned to San Diego, and accepted the position of Assistant Chief Patrol Agent in San Diego Sector. I was selected as the Patrol Agent in Charge of the Brown Field Station in San Diego Sector in 2009. I was promoted to the Senior Executive Service ranks as Deputy Chief Patrol Agent in San Diego Sector in January of 2012. I was promoted to Chief Patrol Agent over the El Centro Sector in February 2016, and was selected as the Chief Patrol Agent for San Diego Sector in October of 2017.

2.      As the Chief Patrol Agent, I am responsible for managing all Border Patrol operations and administrative functions within the San Diego Sector, which encompasses 60 miles of land border between California and Mexico, as well as the coastal region of California, extending to the Oregon State line. In this role, I have management and oversight over 8 Border Patrol stations, a Special Operations Detachment, a robust intelligence unit, and over 2,300 sworn federal law enforcement agents and mission support staff. This operational oversight extends to all areas, to include federal and state and local partnerships and interoperability in the broader law enforcement context. I coordinate with, and represent, San Diego Sector Border Patrol operations, and issues relating to San Diego Sector activities, to the Border Patrol Headquarters.

3.      CBP, a component of the Department of Homeland Security (DHS), is responsible for safeguarding the United States from dangerous people and materials, while facilitating

legitimate trade and travel.  Border Patrol is the primary federal law enforcement agency responsible for preventing terrorists and their weapons from entering the United States between ports of entry.  Border Patrol is also tasked with preventing the illicit trafficking of people and contraband between the official ports of entry.

4.  In the law enforcement community, Border Patrol is committed to strong working relationships with state and local law enforcement partners.  Given the nature of its mission, Border Patrol often acts within the same geographic area as state and local law enforcement entities, and relies heavily on these partnerships to ensure officer safety and public safety.

5.  When individuals are apprehended by Border Patrol, agents perform a number of routine checks to determine, for instance, immigration status, criminal history and other information that is often important in immigration processing decisions.  In the course of those routine checks, Border Patrol agents often learn that there are pending state or local criminal charges and outstanding warrants.

6.  As part of its important cooperation with state and local law enforcement partners, Border Patrol routinely permits state and local law enforcement authorities to take custody of aliens initially apprehended by Border Patrol, so that the alien may be prosecuted for any pending state or local charges.  This is normally done by the discretionary act of releasing the alien from immigration custody directly to the appropriate law enforcement agency with a detainer requesting notification of the alien's release and transfer back to CBP custody upon release from state or local custody.  That way, the state or local law enforcement agency is on notice that Border Patrol is turning over the alien temporarily—with an expectation that he or she will be returned to immigration custody

3

once the reason for which the alien was turned over to the state or local agency has been resolved. From FY2013 through FY2018 year to date (February 2, 2018), the San Diego and El Centro Sectors (the two Sectors that encompass portions of the state of California) have turned over approximately 700 aliens who were not lawfully present to state and local law enforcement agencies. Some of these individuals were wanted for serious crimes, including robbery, kidnapping, aggravated battery, arson, and sexual abuse. The Sectors also turned over approximately 150 individuals with lawful immigration status, but whom Border Patrol encountered for some other violation of law.

7.     While most aliens apprehended by Border Patrol entered the United States in violation of the federal immigration laws and therefore may be prosecutable under 8 U.S.C. §§ 1325 (illegal entry) and 1326 (illegal reentry), that prosecution may be deferred or foregone if a state or local law enforcement entity desires to pursue more serious prosecutions. In these situations, after completion of the state or local case, the alien is placed in civil administrative removal proceedings. In my experience, most aliens who are first prosecuted in the state or local system and then returned to federal custody are detained in immigration custody and referred for either a reinstatement of a prior order of removal, or removal proceedings before an Immigration Judge, rather than referred for federal criminal prosecution.

8.     Border Patrol issues detainers in order to ensure that aliens it has apprehended, but determined to exercise its discretion to turn over to state and local law enforcement agencies, do not end up being released into the community after facing or serving state or local charges. These detainers serve to notify local law enforcement agencies that Border Patrol seeks to take custody of the alien upon completion of the state or local case.

4

9.      When Border Patrol turns over an alien wanted for the most egregious crimes by the state of California, it is Border Patrol's desire to assist California citizens in holding the alien accountable for his or her actions under California law.

10. To the best of my knowledge, San Diego and El Centro Sectors generally did not have any problems with local law enforcement honoring these detainers; that is, aliens were routinely returned to Border Patrol for the completion of their immigration processing and potential removal, prior to the passage of 2017 California Senate Bill No. 54 ("SB 54") in October 2017.  Specifically, prior to October 2017, for many of the criminal acts listed in the California Values Act, most state and local law enforcement agencies routinely provided notification of release to Border Patrol without any additional process or requiring a warrant in order to facilitate the alien's transfer back to CBP custody.

11.      I understand that, pursuant to SB 54, state and local law enforcement agencies are prohibited from honoring immigration detainers or hold requests, sharing information concerning an alien's release from state custody, or transferring such aliens back to Border Patrol absent a judicial warrant.  Even in the most serious of offenses (such as child sexual abuse, possession of explosive devices, trafficking in controlled substances, slavery, human trafficking, torture, rape, murder, etc.), it is my understanding that the California Values Act forbids state and local law enforcement in California from transferring custody of an alien to DHS without a judicial warrant, and, unless very limited circumstances apply, sharing with DHS an alien's release date or home address. This information is critical to Border Patrol's operational ability to turn over aliens wanted for crimes in California, including serious ones, to law enforcement in that state for prosecution.

12.     Border Patrol remains committed to cooperating with its state and local law enforcement

partners, including to ensure that all people are held accountable for their conduct.

However, Border Patrol's mission also includes the faithful enforcement of federal

immigration laws.  Border Patrol is committed to ensuring the security of the border,

including the removal of those aliens who pose a risk to this country, such as those

charged with these serious crimes.  Releasing aliens who have entered the country

unlawfully and who are also wanted in connection with crimes is inconsistent with

Border Patrol's mission. It poses a serious risk of permitting the alien to avoid removal

proceedings.

13.     The implementation of SB 54 has already had an impact on relationships between Border

Patrol and law enforcement agencies in the state of California.  Normally, Border Patrol

routinely works with state, local and tribal agencies in California.  For example, Border

Patrol oversees the implementation of DHS's Operation Stonegarden, which provides

grants to state, local, and tribal agencies.  Participating agencies provide enhanced

enforcement presence in proximity to the border and/or routes of ingress from the

international land and water borders.  Grant funds are used to increase operational patrols

and to modernize equipment and the capabilities of the state, local, and tribal agencies.

While participating agencies do not enforce immigration laws, the agencies' activities

promote border security and reduce border-related crimes in the region.  For example, the

enhanced enforcement resulted in 4,020 apprehensions for violations of the California

Penal Code and 1,859 non-immigration seizures from FY 2013-2016 in San Diego

Sector, as well as 2,156 apprehensions and 315 seizures in El Centro Sector.  Currently,

11 local law enforcement agencies participate in El Centro Sector's program and 22 law

enforcement agencies participate in San Diego Sector's program. However, despite the past collaborative working relationship between Border Patrol and Operation Stonegarden participants, two local law enforcement agencies have withdrawn from participating as a result of SB 54 thus far.

14. SB 54 has had additional impacts on relationships between Border Patrol and law enforcement agencies in the state of California. For example, Border Patrol routinely engages and enlists state and local law enforcement partners to participate in treasury forfeiture fund (TFF) joint operations. These agreements provide for the reimbursement of certain expenses to California state and local law enforcement agencies incurred as participants in joint operations conducted with Border Patrol as a federal law enforcement agency participating in the TFF. The TFF joint operations are similar in intent to Stonegarden, and do not convey any additional CBP or immigration enforcement authority to California law enforcement agencies.

15. TFF provides an opportunity to conduct joint operations, directed and coordinated by Border Patrol, with state and local law enforcement agencies. These operations often involve increased vehicle patrols to provide additional law enforcement presence or report observations of violations witnessed, in order to enhance border security. TFF patrols may consist of only state and local officers, or may include Border Patrol Agents working with state and local officers. TFF operations also focus on identification of suspects in and around areas known to be susceptible to illegal entries, predominantly in areas susceptible to maritime smuggling events. The prohibitions in SB 54 have the potential to render TFF operations ineffective, as state and local officers can no longer

"assist" Border Patrol Agents, and are prohibited from providing information that may be beneficial in intelligence and targeting operations for maritime smuggling threats.

16. SB 54 has also had an impact on state and local law enforcement agencies' willingness to respond to Border Patrol's calls for service. On a recent incident, Border Patrol Agents from the Indio Station conducted a stop under their immigration authorities. As the Border Patrol agents approached the vehicle, it was obvious that the driver was intoxicated. After determining that no immigration issues required further inquiry, the agents notified the Indio Police Department (IPD) to respond to the intoxicated driver. IPD stated they would not respond because the initial vehicle stop was immigration based. IPD further stated that they would only respond to Border Patrol calls based on "Officer Safety" concerns. Under those circumstances, Border Patrol had no choice but to release the intoxicated subject to the public.

17. SB 54 also impacted state and local law enforcement agencies' responding to Border Patrol's calls for service in another event. Border Patrol Agents from the Campo Station attempted a vehicle stop on February 12, 2018. The vehicle failed to yield on Interstate 8 in California and fled west, travelling a distance of more than 20 miles, while being pursued by Border Patrol. Eventually Border Patrol Agents assigned to the El Cajon station successfully deployed a controlled tire deflation device, and the vehicle came to a stop on Highway 67 in the city of El Cajon, California. Three subjects fled the vehicle; two were successfully arrested, and one absconded. During the pursuit, requests for assistance were made by Border Patrol Dispatch to the El Cajon Police Department. The El Cajon Police Department declined to assist. After the event, it was determined that the officer declined the request to assist presuming it was an immigration matter, as opposed

8

to a fleeing subject whose identity/immigration status was not known at the time of the incident. This declination for assistance occurred even though it involved a vehicle that failed to yield, endangering federal law enforcement and the public while traveling on a California Interstate and highway within their jurisdiction.

18. Another example of how SB 54 is already affecting the relationships between Border Patrol and law enforcement agencies in the state of California occurred in January of 2018. A Border Patrol Agent on routine patrol witnessed a single officer vehicle stop being made by California Highway Patrol (CHP). The CHP vehicle stop was in relation to an invalid registration. The stop occurred in a remote location in the eastern portion of San Diego, California. It is an area well known for alien and narcotic smuggling, with little infrastructure and limited resources for officer back up. The Border Patrol Agent pulled over to provide backup and assistance to the CHP officer. As it turned out, the stopped vehicle was a cloned United Parcel Service truck with stolen plates. There were 77 illegal aliens inside the vehicle being smuggled into the United States. After determining that all of the subjects were illegally present in the United States, the Border Patrol Agent placed the subjects and the driver under arrest.

19. Under SB 54, as I understand the law, the CHP officer is not permitted to question any of the 77 occupants perilously crammed into the rear compartment area as to their citizenship, or even contact Border Patrol based upon his suspicions or observations. While circumstances here meant that a Border Patrol Agent happened to arrive at the scene, this is unlikely to happen in other circumstances. Thus, individuals who have been put at risk or who may be committing serious crimes like smuggling or trafficking would not be apprehended.

9

20. There is the real possibility that had the Border Patrol Agent not stopped to provide back up, or had the CHP officer declined assistance or been forced to decline assistance under SB 54, that all 77 occupants may have been allowed to travel on or depart the scene (aside from any other state crime or motor vehicle violation). This would undermine not only the potential criminal prosecution of the driver and several other subjects, but it also would have allowed a serious trafficking and smuggling incident to go unchecked by federal authorities.

21. The most troubling issue for Border Patrol is that after the arrest, and due to the passage of SB 54, CHP officers expressed concern about Border Patrol's encounter and subsequent arrest of the subjects. Although the encounter was the result of an Agent taking initiative and attempting to ensure the safety of a fellow law enforcement officer conducting a single officer vehicle stop, it was seen as a negative encounter due to the passage of SB 54. However, this protective and friendly practice of providing back up to each other has existed amongst the law enforcement community for decades. Such camaraderie between Border Patrol and state and local law enforcement in California will likely soon begin to deteriorate, and providing back up to a fellow officer for safety reasons will no longer be acceptable.

22. Below are just a few of the numerous examples of how SB 54 is affecting Border Patrol's ability to assist the state of California in prosecuting aliens wanted for serious criminal charges. In each example, after determining that the alien was illegally present in the United States, the Border Patrol Agent placed the alien under arrest. As a routine step in processing, the alien's biographical and biometric information was checked. During those checks, state or local pending criminal charges and/or outstanding warrants were

identified.  In each instance, the Border Patrol Agent determined it was not appropriate, consistent with his or her federal responsibilities to ensure the enforcement of immigration law, to release a criminal alien to the state and local law enforcement.  This was because, although the alien was subject to removal, if released to California law enforcement, the alien would ultimately be released into the public.  Instead, the alien remained in DHS custody, and was processed for prosecution under 8 U.S.C. §§ 1325, 1326, and/or removal from the United States.

a.  Example 1:  Systems checks revealed that the alien was a previously-removed felon from Nicaragua, was a registered sex offender from the state of Arizona, and had an active warrant from the San Diego Sheriff's Office (SDSO) for "Sexual Assault." Despite these egregious criminal violations, the SDSO could not provide any assurances it would cooperate with the Border Patrol so that immigration authorities would be notified if and when the alien was released.  Therefore, the criminal alien remained in DHS custody, and was processed for prosecution under 8 U.S.C. § 1326.

b.  Example 2:  Systems checks revealed that the alien was a previously-removed felon from Mexico, with a current no bail felony warrant issued by Orange County Sheriff's Department (OCSD) for possession of a controlled substance.  Despite the past criminal history and multiple violations and convictions, OCSD could not provide any assurances it would cooperate with Border Patrol so that immigration authorities would be notified if and when the alien was released.  Thus, the criminal alien remained in DHS custody, and was processed for removal from the United States.

11

c.  Example 3:  Systems checks revealed that the alien was a previously-removed felon from Mexico, with a current no bail felony warrant issued by Santa Barbara County Sheriff's Office (SBSO) for Driving Under the Influence (DUI) with multiple prior convictions, and reckless highway driving.  Despite the past criminal history with multiple DUI violations, SBSO could not provide any assurances it would cooperate with Border Patrol so that immigration authorities would be notified if and when the alien was released.  Therefore, Border Patrol declined to parole the alien into the custody of California law enforcement, instead processing the alien for removal to ensure that all steps possible to remove the alien were taken.

d.  Example 4:  Systems checks revealed that the alien was a previously-removed felon from Mexico, with a current no bail felony warrant issued by Santa Barbara County Sheriff's Office (SBSO) for a probation violation relating to the possession, transportation, and sale of narcotics and controlled substances.  The alien had been previously convicted for charges relating to possession and transportation of cocaine, and was released on probation in California.  Despite the alien's criminal narcotics history, SBSO could not provide any assurances it would cooperate with Border Patrol so that immigration authorities would be notified if and when the alien was released.  Thus, the criminal alien remained in DHS custody, and was processed for removal from the United States

23. Since the implementation of SB 54, I understand that El Centro Sector has also seen the impact on its ability to cooperate with the Imperial County Sheriff's Office (ICSO).  For example, the El Centro Station apprehended an alien with an active warrant for a probation violation from the Ventura County Sheriff's Office.  Relying on a long history

12

of cooperation, Border Patrol released the alien to the ICSO based on the confirmation of extradition by Ventura County. Ventura County rescinded their intent to extradite the individual. ICSO subsequently released the alien without notifying Border Patrol that he was pending release or that he was released.

24. In another case, an alien that was federally prosecuted for violating 8 U.S.C. § 1325 was incarcerated at the Imperial County Jail. After serving his sentence for the misdemeanor conviction under 8 U.S.C. § 1325, the alien was released by Imperial County Jail (ICJ) without any notice to Border Patrol or immigration authorities of his pending release or that he was released. Notably, ICJ is the only location Border Patrol utilizes in the local Imperial Valley area for detainees awaiting court proceedings. In this case, this individual had a criminal history, to include two felony convictions (Possession without Prescription, Burglary). Since this incident, Border Patrol has tried to work with the U.S. Marshals Service to relocate individuals to San Diego Metropolitan Correctional Center or facilities run by the GEO Group in order to ensure removal after time served.

25. By contrast, San Diego Sheriff's Department (SDSD) worked cooperatively with Border Patrol to extradite an alien to Los Angeles County to face serious criminal charges in January 2018. As a result, this alien, who has no lawful status in the United States, can be prosecuted, and if successful, held responsible for his violations of both California and federal law. After determining that the alien was illegally present in the United States, a Border Patrol Agent placed the subject under arrest. At the time of the arrest, the alien was attempting to depart the United States into Mexico between the ports of entry near the Otay Mesa area. Upon processing the alien, systems checks revealed that he was previously arrested by California authorities in 2015 for a DUI, and was scheduled to

13

appear in Los Angeles County court on January 4, 2018, to face charges for a 2017 arrest for sexual battery and assault with a deadly weapon. The alien had been granted bail by a state court in the course of prosecution for those charges and had been out of custody on bond. Initially, Border Patrol considered simply placing the alien in removal proceedings because SDSD could not confirm it would notify CBP when he would be released or notify Border Patrol of release, and transfer the alien back to Border Patrol's custody. However, after later confirmation by SDSD that it would agree to provide notification and transfer, the alien was turned over to SDSD for extradition to Los Angeles County. That alien can now continue to be prosecuted for the serious local charges but also, upon return to Border Patrol custody, likely removed from the United States. That being said, we have ongoing concerns that SDSD is engaging in this cooperation in a way that likely cannot be squared with the text of SB 54, and have significant ongoing concerns with relying on this kind of informal cooperation in the face of SB 54.

26.    SB 54 is also impacting Border Patrol's ability to assist other states throughout the nation in the extradition of criminal aliens responsible for state law violations that occurred outside of California. An example occurred in January 2018. After determining that an alien was illegally present in the United States, a Border Patrol Agent placed the alien under arrest. During processing, systems checks revealed that the alien had a previous state charge filed in the state of Iowa for felony "willful injury," and had a warrant issued for his arrest pursuant to "ASSAULT – Serious." Border Patrol contacted Des Moines, Iowa law enforcement officials who communicated they were willing to extradite, would honor the detainer and notification requests, and that they would cover related logistical and detention expenses associated with the extradition process with California SDSD.

14

However, I understand that state extradition legal procedures in California allow an individual to refuse or contest the extradition. Thus, if the alien were turned over to California law enforcement, even though the underlying warrant was in Iowa, the alien could still be released from California custody during the extradition process. Thus, it was important to Border Patrol that any immigration notification request be honored. SDSD advised they could not provide assurances to Border Patrol that immigration authorities would be notified if and when the alien could be released while facing extradition. Border Patrol investigated whether there were any other means to transfer custody to Iowa law enforcement officials. However, I understand that such a transfer of custody could not be accomplished. Given the significant risk that an alien with a significant felony arrest warrant from another state who was unlawfully present in the United States would simply be released into the country, Border Patrol declined to permit SDSD to take custody. The criminal alien remained in DHS custody, and was ultimately processed and removed from the United States.

27. I also understand that California has passed a separate law, AB 450, which may also negatively impact Border Patrol's operations and relationships with local businesses in California. Specifically, Border Patrol Agents have developed trusted relationships with many business owners in close proximity to the border. At times, some of these business owners may provide Border Patrol Agents access to non-public areas of their businesses, which can provide Agents with real-time information on cross border smuggling and other illegal activity. This consensual access is extremely beneficial to enforcement operations, especially in the densely populated and urbanized areas of California. These rapidly evolving situations often involve subjects that are significant flight risks, and

timely access and information is essential to a successful or positive law enforcement outcome.  If employers are not able to provide such consensual access, Border Patrol's ability to detect and interdict real time illegal activity, ranging from criminal activity to the smuggling of narcotics to potential terrorists seeking to enter the United States, along the border will be diminished.

28. It is also possible that, if employers are not able to consent to allowing access to local businesses, the threat of cross border clandestine tunnels and maritime smuggling going undetected will increase.  In recent years, the San Diego Tunnel Taskforce (TTF), an integrated team comprised of CBP Officers, Border Patrol Agents and ICE Agents, routinely worked with businesses in and around the Otay Mesa Port of Entry to educate them on the indicators of cross border clandestine tunnel activity and solicit their support to notify law enforcement if they saw or heard anything suspicious.  Similarly, the San Diego Marine Task Force (MTF), an integrated team comprised of CBP Officers, Border Patrol Agents and ICE Agents, routinely worked with businesses in and around the coastal area to educate them on the indicators of maritime smuggling activity and solicit their support to notify law enforcement if they saw or heard anything suspicious.

29. Working with these businesses, including having access to non-public areas, allowed the TTF and the MTF to maximize very limited investigative resources by narrowing the number of warehouses that required additional investigative follow up.  Access to nonpublic areas has also played a critical role in numerous investigations that resulted in the discovery of sophisticated cross border tunnels and the seizure of thousands of tons of illegal narcotics, as well as the discovery of illegal maritime human and narcotics

smuggling loads and the seizure of tons of illegal narcotics, and arrests of many criminal

defendants and aggravated felons.


I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed this __6__ day of March, 2018.

Rodney S. Scott
Chief Patrol Agent
San Diego Sector
U.S. Customs and Border Protection