# EXHIBIT A

# US District Court Civil Docket

## U.S. District - California Northern
### (San Francisco)

## 3:17cv4701

## State of California, EX Rel. Xavier Becerra, IN His Official Capacity as Attorney General of The State of California v. Sessions et al

This case was retrieved from the court on Tuesday, March 13, 2018

| | | | |
|---|---|---|---|
| Date Filed: | **08/14/2017** | Class Code: | **OPEN** |
| Assigned To: | **Judge William H. Orrick** | Closed: | |
| Referred To: | | Statute: | **28:1331** |
| Nature of suit: | **Other Statutory Actions (890)** | Jury Demand: | **None** |
| Cause: | **Fed. Question** | Demand Amount: | **$0** |
| Lead Docket: | **None** | NOS Description: | **Other Statutory Actions** |
| Other Docket: | **3:17cv00485** | | |
| Jurisdiction: | **U.S. Government Defendant** | | |

| Litigants | Attorneys |
|---|---|
| State of California, EX Rel. Xavier Becerra, IN His Official Capacity as Attorney General of The State of California<br>Plaintiff | Lisa Catherine Ehrlich<br>ATTORNEY TO BE NOTICED<br>California Attorney General's Office<br>1515 Clay Street, 20th Floor<br>Oakland, CA 94612<br>USA<br>(510) 879-0173<br>Fax: (510) 622-2270<br>Email: Lisa.Ehrlich@doj.Ca.Gov<br><br>Sarah Elizabeth Belton<br>ATTORNEY TO BE NOTICED<br>Supervisiong Deputy Attorney General<br>1515 Clay Street, Suite 2100<br>Oakland, CA 94612<br>USA<br>510-879-0009<br>Email: Sarah.Belton@doj.Ca.Gov<br><br>Lee Isaac Sherman<br>ATTORNEY TO BE NOTICED<br>California Department of Justice<br>300 S. Spring Street<br>Los Angeles, CA 90013<br>USA<br>(213) 897-7605<br>Email: Lee.Sherman@doj.Ca.Gov |
| Jefferson Beauregard Sessions, III<br>Defendant | Antonia Konkoly<br>ATTORNEY TO BE NOTICED |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

U.S. Department of Justice
Federal Programs Branch
20 Massachusetts Avenue Nw
Washington, DC 20530
USA
202-514-2395
Email: Antonia.Konkoly@usdoj.Gov

W. Scott Simpson
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Federal Programs Branch, Room 7210
Civil   Division
20 Massachusetts Avenue, Nw
Washington, VA 20530
USA
202-514-3495
Email: Scott.Simpson@usdoj.Gov

Acting Asst. AG   Alan R Hanson
Defendant

Antonia Konkoly
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Federal Programs Branch
20 Massachusetts Avenue Nw
Washington, DC 20530
USA
202-514-2395
Email: Antonia.Konkoly@usdoj.Gov

W. Scott Simpson
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Federal Programs Branch, Room 7210
Civil   Division
20 Massachusetts Avenue, Nw
Washington, VA 20530
USA
202-514-3495
Email: Scott.Simpson@usdoj.Gov

United States Department of Justice
Defendant

Antonia Konkoly
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Federal Programs Branch
20 Massachusetts Avenue Nw
Washington, DC 20530
USA
202-514-2395
Email: Antonia.Konkoly@usdoj.Gov

W. Scott Simpson
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Federal Programs Branch, Room 7210
Civil   Division
20 Massachusetts Avenue, Nw
Washington, VA 20530
USA
202-514-3495
Email: Scott.Simpson@usdoj.Gov

Current And Former Prosecutors And Law Enforcement
Leaders
Amicus

Matthew J. Piers
LEAD ATTORNEY: ATTORNEY TO BE NOTICED
Hughes, Socol, Piers, Resnick & Dym, Ltd.
Three First National Plaza 70 West Madison Street, Suite
4000
Chicago, IL 60602
USA
(312) 580-0100

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

Fax: (312) 580-1994
Email:Mpiers@hsplegal.Com

| | |
|---|---|
| Administrative Law, Constitutional Law, And Immigration Law Scholars<br>Amicus | Jamison Davies<br>ATTORNEY TO BE NOTICED<br>Patterson Belknap Webb and Tyler LLP<br>1133 Avenue Of The Americas<br>New York, NY 10036<br>USA<br>212-336-2455<br>Email:Jmdavies@pbwt.Com |
| Anti-Defamation League<br>Amicus | Robert Ward Perrin<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>USA<br>213-485-1234<br>Fax: 213-891-8963<br>Email:Robert.Perrin@lw.Com |
| County of Los Angeles<br>Amicus | Margaret Louise Carter<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>O'Melveny and Myers LLP<br>400 S Hope St 18th Floor<br>Los Angeles, CA 90071-2899<br>USA<br>(213) 430-7592<br>Email:Mcarter@omm.Com<br><br>Daniel R. Suvor<br>ATTORNEY TO BE NOTICED<br>O'Melveny Myers LLP<br>400 South Hope St.<br>Los Angeles, CA 90071<br>USA<br>(213) 430-7669<br>Fax: (213) 430-6407<br>Email:Dsuvor@omm.Com<br><br>James Wesley Crooks<br>ATTORNEY TO BE NOTICED<br>O'Melveny and Myers<br>1625 Eye Street Nw<br>Washington, DC 20006<br>USA<br>202-383-5178<br>Email:Jcrooks@omm.Com |
| District of Columbia<br>Amicus | Jimmy Rock<br>ATTORNEY TO BE NOTICED<br>Office of Attorney General, D.C.<br>Public Advocacy Division 441 Fourth Street Nw Suite 600-S<br>Washington, DC 20001<br>USA<br>202-741-0770<br>Email:Jimmy.Rock@dc.Gov |
| Public Counsel<br>Amicus | Daniel Stanley John Nowicki<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>Gibson Dunn and Crutcher<br>1881 Page Mill Road<br>Palo Alto, CA 94304-1211<br>USA<br>(650) 849-5300<br>Email:Dnowicki@gibsondunn.Com |
| American Civil Liberties Union Foundation Immigrants' | Cody H. Wofsy |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

Rights Project
Amicus

ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
USA
415-343-0785
Fax: 415-395-0950
Email:Cwofsy@aclu.Org

Mark M. Fleming
ATTORNEY TO BE NOTICED
National Immigrant Justice Center
208 S. Lasalle Street Suite 1300
Chicago, IL 60604
USA
312-660-1628
Email:Mfleming@heartlandalliance.Org

Spencer Elijah Wittmann Amdur
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
USA
(212) 549-2572
Email:Samdur@aclu.Org

American Civil Liberties Union   Foundation of Northern
California, Inc.
Amicus

Cody H. Wofsy
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
USA
415-343-0785
Fax: 415-395-0950
Email:Cwofsy@aclu.Org

Mark M. Fleming
ATTORNEY TO BE NOTICED
National Immigrant Justice Center
208 S. Lasalle Street Suite 1300
Chicago, IL 60604
USA
312-660-1628
Email:Mfleming@heartlandalliance.Org

Spencer Elijah Wittmann Amdur
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
USA
(212) 549-2572
Email:Samdur@aclu.Org

National Immigrant Justice Center
Amicus

Cody H. Wofsy
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
USA
415-343-0785
Fax: 415-395-0950
Email:Cwofsy@aclu.Org

Mark M. Fleming
ATTORNEY TO BE NOTICED
National Immigrant Justice Center
208 S. Lasalle Street Suite 1300

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

Chicago, IL 60604
USA
312-660-1628
Email:Mfleming@heartlandalliance.Org

Spencer Elijah Wittmann Amdur
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
USA
(212) 549-2572
Email:Samdur@aclu.Org

| | |
|---|---|
| Amici Curiae Immigrant Legal Resource Center<br>Amicus | W. Hardy Callcott<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>Sidley Austin LLP<br>555 California Street Suite 2000<br>San Francisco, CA 94104<br>USA<br>(415)772-1200<br>Fax: (415)772-7400<br>Email:Hcallcott@sidley.Com |
| Asian Americans Advancing Justice - Asian Law Caucus<br>Amicus | W. Hardy Callcott<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>Sidley Austin LLP<br>555 California Street Suite 2000<br>San Francisco, CA 94104<br>USA<br>(415)772-1200<br>Fax: (415)772-7400<br>Email:Hcallcott@sidley.Com |
| National Day Laborer Organizing Network<br>Amicus | W. Hardy Callcott<br>LEAD ATTORNEY:ATTORNEY TO BE NOTICED<br>Sidley Austin LLP<br>555 California Street Suite 2000<br>San Francisco, CA 94104<br>USA<br>(415)772-1200<br>Fax: (415)772-7400<br>Email:Hcallcott@sidley.Com |

| Date | # | Proceeding Text |
|---|---|---|
| 08/14/2017 | 1 | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF against All Defendants ( Filing fee $ 400, receipt number 0971-11630590.). Filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sherman, Lee) (Filed on 8/14/2017) (Entered: 08/14/2017) |
| 08/14/2017 | 2 | Civil Cover Sheet by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California . (Sherman, Lee) (Filed on 8/14/2017) (Entered: 08/14/2017) |
| 08/14/2017 | 3 | Proposed Summons. (Sherman, Lee) (Filed on 8/14/2017) (Entered: 08/14/2017) |
| 08/15/2017 | 4 | Case assigned to Magistrate Judge Maria-Elena James. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit E-Filing A New Civil Case at http://cand.uscourts.gov/ecf/caseopening.Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/29/2017. (jmlS, COURT STAFF) (Filed on 8/15/2017) (Entered: 08/15/2017) |
| 08/15/2017 | 5 | Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 11/9/2017. Initial Case Management Conference set for 11/16/2017 10:00 AM. (hdjS, COURT STAFF) (Filed on 8/15/2017) Modified on 8/15/2017 (hdjS, COURT STAFF). (Entered: 08/15/2017) |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

| 08/15/2017 | 6 | Summons Issued as to Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice, Atrorney General Office, U.S. Attorney and U.S. Attorney General (hdjS, COURT STAFF) (Filed on 8/15/2017) (Entered: 08/15/2017) |
|---|---|---|
| 08/25/2017 | 7 | ORDER RELATING CASE to Case No. 17-cv-485-WHO and additional related matters. Signed by Judge William H. Orrick on 08/25/2017. (jmdS, COURT STAFF) (Filed on 8/25/2017) (Entered: 08/25/2017) |
| 08/25/2017 | 8 | AFFIDAVIT of Service for Process Server Affidavit  served on Jefferson B. Sessions on 8.25.2017, filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 8/25/2017) (Entered: 08/25/2017) |
| 08/28/2017 | 9 | Case reassigned to Judge Hon. William H. Orrick. Magistrate Judge Maria-Elena James no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras (srnS, COURT STAFF) (Filed on 8/28/2017) (Entered: 08/28/2017) |
| 10/13/2017 | 10 | NOTICE of Appearance by Lisa Catherine Ehrlich   (Ehrlich, Lisa) (Filed on 10/13/2017) (Entered: 10/13/2017) |
| 10/13/2017 | 11 | AMENDED COMPLAINT For Declaratory and Injunctive Relief against Jefferson Beauregard Sessions, III. Filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 10/13/2017) (Entered: 10/13/2017) |
| 10/13/2017 | 12 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California   (Ehrlich, Lisa) (Filed on 10/13/2017) (Entered: 10/13/2017) |
| 10/19/2017 | 13 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California   (Ehrlich, Lisa) (Filed on 10/19/2017) (Entered: 10/19/2017) |
| 10/19/2017 | 14 | CASE MANAGEMENT CONFERENCE ORDER - Case Management Conference set for 11/21/2017 02:00 PM in Courtroom 2, 17th Floor, San Francisco. Case Management Statement due by 11/14/2017. Signed by Judge William H. Orrick on 10/19/2017. (jmdS, COURT STAFF) (Filed on 10/19/2017) (Entered: 10/19/2017) |
| 10/23/2017 | 15 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California re 14 Case Management Scheduling Order,   (Ehrlich, Lisa) (Filed on 10/23/2017) (Entered: 10/23/2017) |
| 10/25/2017 | 16 | NOTICE of Appearance by Sarah Elizabeth Belton   (Belton, Sarah) (Filed on 10/25/2017) (Entered: 10/25/2017) |
| 10/31/2017 | 17 | MOTION for Preliminary Injunction   filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. Motion Hearing set for 12/6/2017 02:00 PM in Courtroom 2, 17th Floor, San Francisco before Judge William H. Orrick. Responses due by 11/14/2017. Replies due by 11/21/2017. (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 18 | Request for Judicial Notice re 17 MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit Part 1, # 2 Exhibit Part 2)(Related document(s) 17 ) (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 19 | Declaration of Lee I. Sherman in Support of 17 MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit)(Related document(s) 17 ) (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 20 | Declaration of Mary Jolls in Support of 17 MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit Part 1, # 2 Exhibit Part 2)(Related document(s) 17 ) (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 21 | Declaration in Support of 17 MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit)(Related document(s) 17 ) (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

| | | |
|---|---|---|
| 10/31/2017 | 22 | Declaration in Support of 17 MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Related document(s) 17 ) (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 23 | Proposed Order re 17 MOTION for Preliminary Injunction   by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 10/31/2017 | 24 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California re 18 Request for Judicial Notice, 19 Declaration in Support, 17 MOTION for Preliminary Injunction , 21 Declaration in Support, 20 Declaration in Support, 22 Declaration in Support,   (Sherman, Lee) (Filed on 10/31/2017) (Entered: 10/31/2017) |
| 11/07/2017 | 25 | ADMINISTRATIVE MOTION Leave to File Excess Pages re Amended Motion for Preliminary Injunction filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. Responses due by 11/13/2017. (Attachments: # 1 Proposed Order Stipulation and Proposed Order)(Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 26 | Amended MOTION for Preliminary Injunction   filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. Motion Hearing set for 12/13/2017 02:00 PM in Courtroom 2, 17th Floor, San Francisco before Judge William H. Orrick. Responses due by 11/21/2017. Replies due by 11/28/2017. (Attachments: # 1 Proposed Order)(Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 27 | Request for Judicial Notice re 26 Amended MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit RJN Exs. A-E, # 2 Exhibit RJN Exs. F-I, # 3 Exhibit RJN Exs. J-X)(Related document(s) 26 ) (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 28 | Declaration of Lee Sherman in Support of 26 Amended MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit Exs. A-L)(Related document(s) 26 ) (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 29 | Declaration of Mary Jolls in Support of 26 Amended MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit A-C, # 2 Exhibit D)(Related document(s) 26 ) (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 30 | Declaration of Christopher Caligiuri in Support of 26 Amended MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 Exhibit A-D)(Related document(s) 26 ) (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 31 | Declaration of Jim McDonnell in Support of 26 Amended MOTION for Preliminary Injunction   filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Related document(s) 26 ) (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/07/2017 | 32 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California re 26 Amended MOTION for Preliminary Injunction , 29 Declaration in Support, 31 Declaration in Support, 30 Declaration in Support, 28 Declaration in Support, 27 Request for Judicial Notice, 25 ADMINISTRATIVE MOTION Leave to File Excess Pages re Amended Motion for Preliminary Injunction   (Sherman, Lee) (Filed on 11/7/2017) (Entered: 11/07/2017) |
| 11/08/2017 | 33 | STIPULATION WITH PROPOSED ORDER re 26 Amended MOTION for Preliminary Injunction   and Responsive Pleading Briefing filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 11/8/2017) (Entered: 11/08/2017) |
| 11/08/2017 | 34 | CERTIFICATE OF SERVICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California re 33 STIPULATION WITH PROPOSED ORDER re 26 Amended MOTION for Preliminary Injunction   and Responsive Pleading Briefing   (Sherman, Lee) (Filed on 11/8/2017) (Entered: 11/08/2017) |
| 11/09/2017 | 35 | NOTICE of Appearance by Antonia Konkoly   (Konkoly, Antonia) (Filed on 11/9/2017) (Entered: 11/09/2017) |
| 11/09/2017 | 36 | Joint ADMINISTRATIVE MOTION Relief from Automatic Referral to the ADR Multi-Option Program |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

filed by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. Responses due by 11/13/2017. (Attachments: # 1 Proposed Order Stipulation and Proposed Order)(Konkoly, Antonia) (Filed on 11/9/2017) (Entered: 11/09/2017)

| 11/09/2017 | 37 | Order Granting Plaintiff State of California's Administrative Motion for Leave to Exceed Page Limits by Judge William H. Orrick granting 25 Stipulation. (jmdS, COURT STAFF) (Filed on 11/9/2017) (Entered: 11/09/2017) |
|---|---|---|
| 11/13/2017 | 38 | ORDER RE SCHEDULING MATTERS granting 33 Stipulation. Signed by Judge William H. Orrick on 11/13/2017. (jmdS, COURT STAFF) (Filed on 11/13/2017) (Entered: 11/13/2017) |
| 11/14/2017 | 39 | NOTICE of Appearance by W. Scott Simpson   (Simpson, W.) (Filed on 11/14/2017) (Entered: 11/14/2017) |
| 11/14/2017 | 40 | CASE MANAGEMENT STATEMENT &amp; [PROPOSED] ORDER: filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 11/14/2017) Modified on 11/15/2017 (aaaS, COURT STAFF). (Entered: 11/14/2017) |
| 11/20/2017 | 41 | ORDER REGARDING AMICUS BRIEFING. Signed by Judge William H. Orrick on 11/20/2017. (jmdS, COURT STAFF) (Filed on 11/20/2017) (Entered: 11/20/2017) |
| 11/21/2017 | 43 | Minute Entry for proceedings held before Judge William H. Orrick: Case Management Conference held on 11/27/2018. Close of Fact Discovery: 6/29/2018. Dispositive Motion to be heard by 9/5/2018. Pretrial Conference set for 11/13/2018 02:00 PM and Bench Trial set for 12/10/2018 09:00 AM, both in Courtroom 2, 17th Floor before Judge William H. Orrick. FTR Time: 2:39-2:59. Plaintiff Attorneys: Aileen McGrath, Mollie Lee, Lisa Ehrlich, Sarah Belton, and Lee Sherman. Defendant Attorneys: Antonia Konkoly and W. Scott Simpson. (jmdS, COURT STAFF) (Date Filed: 11/21/2017) Matter transcribed by Victoria Valine. (notewareIS, COURT STAFF). (Entered: 11/27/2017) |
| 11/22/2017 | 42 | OPPOSITION/RESPONSE to (re 26 Amended MOTION for Preliminary Injunction) filed by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. (Attachments: # 1 Declaration of Alan R. Hanson, # 2 Declaration of Andrew A. Dorr, # 3 Request for Referendum, # 4 Declaration of Jim Brown)(Simpson, W.) (Filed on 11/22/2017) (Entered: 11/22/2017) |
| 11/27/2017 | 44 | CIVIL PRETRIAL ORDER. Signed by Judge William H. Orrick on 11/27/2017. (jmdS, COURT STAFF) (Filed on 11/27/2017) (Entered: 11/27/2017) |
| 11/27/2017 | 45 | Order Granting Joint Motion for Relief from Automatic Referral to the ADR Multi-Option Program by Judge William H. Orrick granting 36 Administrative Motion. (jmdS, COURT STAFF) (Filed on 11/27/2017) (Entered: 11/27/2017) |
| 11/29/2017 | 46 | ADMINISTRATIVE MOTION Leave to File Brief Amici Curiae   filed by Current and Former Prosecutors and Law Enforcement Leaders. Responses due by 12/4/2017. (Attachments: # 1 Exhibit Brief Amici Curiae, # 2 Proposed Order)(Piers, Matthew) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 47 | ADMINISTRATIVE MOTION Leave to File Amici Curiae Brief in Support of Plaintiff's Motion for a Preliminary Injunction   filed by Administrative Law, Constitutional Law, and Immigration Law Scholars. Responses due by 12/4/2017. (Attachments: # 1 Exhibit Brief Amici Curiae, # 2 Proposed Order)(Davies, Jamison) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 48 | ADMINISTRATIVE MOTION for Leave to File Statement of Amicus Curiae Anti-Defamation League in Support of Plaintiff's Amended Motion for Preliminary Injunction   filed by Anti-Defamation League. Responses due by 12/4/2017. (Attachments: # 1 Amicus Curiae Brief, # 2 Proposed Order)(Perrin, Robert) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 49 | NOTICE of Appearance by Margaret Louise Carter for Amicus Curiae County of Los Angeles (Carter, Margaret) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 50 | NOTICE of Appearance by Daniel R. Suvor for Amicus Curiae County of Los Angeles (Suvor, Daniel) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 51 | NOTICE of Appearance by James Wesley Crooks for Amicus Curiae County of Los Angeles (Crooks, James) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 52 | First ADMINISTRATIVE MOTION acceptance of Amicus Brief in support of Plaintiff's Motion for Preliminary Injunction filed by District of Columbia. Responses due by 12/4/2017. (Attachments: # 1 Errata Cover Sheet for Exhibit 1 to Motion, # 2 Exhibit 1 to Administrative Motion - proposed Amicus brief, # 3 Exhibit A to proposed Amicus Brief, # 4 Proposed Order)(Rock, Jimmy) (Filed on |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

11/29/2017) (Entered: 11/29/2017)

| 11/29/2017 | 53 | MOTION for Leave to File / Administrative Motion for Leave to File Brief of Amici Curiae 5 Counties and 9 Cities in Support of Plaintiff's Amended Motion for Preliminary Injunction (ECF. No. 26) filed by County of Los Angeles. (Attachments: # 1 Attachment - 1 Amicus Brief, # 2 Proposed Order)(Carter, Margaret) (Filed on 11/29/2017) (Entered: 11/29/2017) |
|---|---|---|
| 11/29/2017 | 54 | ADMINISTRATIVE MOTION To File Amicus Curiae Brief in Support of Plaintiff's Motion for a Preliminary Injunction  filed by Public Counsel. Responses due by 12/4/2017. (Attachments: # 1 Proposed Order)(Nowicki, Daniel) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 55 | MOTION to File Amicus Curiae Brief  filed by American Civil Liberties Union Foundation Immigrants' Rights Project, American Civil Liberties Union Foundation of Northern California, Inc., National Immigrant Justice Center. Motion Hearing set for 12/13/2017 02:00 PM before Judge William H. Orrick. Responses due by 12/13/2017. Replies due by 12/20/2017. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order)(Amdur, Spencer) (Filed on 11/29/2017) (Entered: 11/29/2017) |
| 11/29/2017 | 56 | MOTION for Leave to File Amicus Curiae Brief in Support of Plaintiff State of California's Motion for Preliminary Injunction filed by Amici Curiae Immigrant Legal Resource Center, Asian Americans Advancing Justice - Asian Law Caucus, National Day Laborer Organizing Network. (Attachments: # 1 [Proposed] Amicus Curiae Brief, # 2 Proposed Order)(Callcott, W.) (Filed on 11/29/2017) Modified on 12/4/2017 (wv, COURT STAFF). Modified on 12/4/2017 (wv, COURT STAFF). (Entered: 11/29/2017) |
| 11/30/2017 | 57 | NOTICE of Appearance by Cody H. Wofsy   (Wofsy, Cody) (Filed on 11/30/2017) (Entered: 11/30/2017) |
| 11/30/2017 | 58 | NOTICE of Appearance by Mark M. Fleming    (Fleming, Mark) (Filed on 11/30/2017) (Entered: 11/30/2017) |
| 11/30/2017 | 59 | TRANSCRIPT ORDER for proceedings held on 11/21/2017 before Judge William H. Orrick by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California, for Court Reporter FTR - San Francisco. (Sherman, Lee) (Filed on 11/30/2017) (Entered: 11/30/2017) |
| 12/01/2017 | 60 | REPLY (re 26 Amended MOTION for Preliminary Injunction   ) in support of its Motion for Preliminary Injunction filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 12/1/2017) (Entered: 12/01/2017) |
| 12/01/2017 | 61 | Request for Judicial Notice in support of State of California's Reply in Support of its 26 Motion for Preliminary Injunction filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 12/1/2017) Modified on 12/4/2017 (aaaS, COURT STAFF). (Entered: 12/01/2017) |
| 12/01/2017 | 62 | Declaration of Jim Hart In support of Plaintiff's Reply in SUppoort of its 26 Motion for Preliminary Injunction filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 12/1/2017) Modified on 12/4/2017 (aaaS, COURT STAFF). (Entered: 12/01/2017) |
| 12/01/2017 | 63 | Declaration of Lee Sherman In support of Plaintiff's Reply in Support of its 26 Motion for Preliminary Injunction filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 12/1/2017) Modified on 12/4/2017 (aaaS, COURT STAFF). (Entered: 12/01/2017) |
| 12/01/2017 | 64 | STIPULATION WITH PROPOSED ORDER RE scheduling matters filed by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Sherman, Lee) (Filed on 12/1/2017) (Entered: 12/01/2017) |
| 12/04/2017 | 65 | Order re Scheduling Matters by Judge William H. Orrick granting 64 Stipulation. Close of Fact Discovery: 7/31/2018. Motion Hearing set for 2/28/2018 02:00 PM in Courtroom 2, 17th Floor, San Francisco before Judge William H. Orrick. (jmdS, COURT STAFF) (Filed on 12/4/2017) (Entered: 12/04/2017) |
| 12/04/2017 | 66 | NOTICE by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice re 42 Opposition/Response to Motion, Notice of Administrative Action (Attachments: # 1 FY 2017 CAMP Award)(Simpson, W.) (Filed on 12/4/2017) (Entered: 12/04/2017) |
| 12/07/2017 | 67 | RESPONSE to re 66 Notice (Other),   by State of California, ex rel. XAVIER BECERRA, in his official |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

capacity as Attorney General of the State of California. (Attachments: # 1 Declaration)(Sherman, Lee) (Filed on 12/7/2017) (Entered: 12/07/2017)

| 12/11/2017 | 68 | CLERK'S NOTICE OF CHANGE IN HEARING TIME - Hearing as to 26 Amended MOTION for Preliminary Injunction reset for 12/13/2017 03:00 PM in Courtroom 4, 17th Floor, San Francisco before Judge William H. Orrick.   (This is a text-only entry generated by the court. There is no document associated with this entry.) (jmdS, COURT STAFF) (Filed on 12/11/2017) (Entered: 12/11/2017) |

| 12/11/2017 | | Reset Deadlines as to 26 Amended MOTION for Preliminary Injunction. Motion Hearing reset for 12/13/2017 03:00 PM in Courtroom 4, 17th Floor, San Francisco before Judge William H. Orrick. (jmdS, COURT STAFF) (Filed on 12/11/2017) (Entered: 12/11/2017) |

| 12/11/2017 | 69 | RESPONSE to re 67 Response ( Non Motion ) Reply to Plaintiff's Response to Notice of Administrative Action by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. (Simpson, W.) (Filed on 12/11/2017) (Entered: 12/11/2017) |

| 12/13/2017 | 73 | Minute Entry for proceedings held before Judge William H. Orrick: Motion Hearing held on 12/13/2017 re 17 MOTION for Preliminary Injunction. Total Time in Court: 1 hour, 5 minutes. Court Reporter: Katherine Sullivan. Plaintiff Attorneys: Lee I. Sherman, Lisa Ehrlich, and Sarah E. Belton. Defendant Attorneys: Chad Readler, W. Scott Simpson, and Steven J. Saltiel. (jmdS, COURT STAFF) (Date Filed: 12/13/2017) (Entered: 12/18/2017) |

| 12/14/2017 | 70 | TRANSCRIPT ORDER for proceedings held on 12/13/2017 before Judge William H. Orrick by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California, for Court Reporter Katherine Powell. (Sherman, Lee) (Filed on 12/14/2017) (Entered: 12/14/2017) |

| 12/15/2017 | 71 | Transcript of Proceedings held on 12/13/17, before Judge William H. Orrick. Court Reporter/Transcriber Katherine Powell Sullivan, Katherine_Sullivan@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 70 Transcript Order, ) Redaction Request due 1/5/2018. Redacted Transcript Deadline set for 1/16/2018. Release of Transcript Restriction set for 3/15/2018. (Related documents(s) 70 ) (Sullivan, Katherine) (Filed on 12/15/2017) (Entered: 12/15/2017) |

| 12/15/2017 | 72 | TRANSCRIPT ORDER for proceedings held on 12/13/2017 before Judge William H. Orrick by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice, for Court Reporter Katherine Powell. (Simpson, W.) (Filed on 12/15/2017) (Entered: 12/15/2017) |

| 12/19/2017 | 74 | Transcript of Proceedings held on November 21, 2017, before Judge William H. Orrick. Court Reporter/Transcriber Victoria L. Valine, telephone number victoriavalinecsr@gmail.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (58 in 3:17-cv-04642-WHO) Transcript Order, (59 in 3:17-cv-04701-WHO) Transcript Order, ) Redaction Request due 1/9/2018. Redacted Transcript Deadline set for 1/19/2018. Release of Transcript Restriction set for 3/19/2018. (vlv, COURT STAFF) (Filed on 12/19/2017) (Entered: 12/19/2017) |

| 01/10/2018 | 75 | Joint ADMINISTRATIVE MOTION Leave to Exceed Otherwise Applicable Page Limits   filed by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. Responses due by 1/16/2018. (Attachments: # 1 Proposed Order)(Konkoly, Antonia) (Filed on 1/10/2018) (Entered: 01/10/2018) |

| 01/10/2018 | 76 | ORDER GRANTING THE PARTIES' JOINT ADMINISTRATIVE MOTION FOR LEAVE TO EXCEED OTHERWISE APPLICABLE PAGE LIMITS by Judge William H. Orrick granting 75 Administrative Motion for Leave to Exceed Page Limits. (jmdS, COURT STAFF) (Filed on 1/10/2018) (Entered: 01/10/2018) |

| 01/16/2018 | 77 | MOTION to Dismiss   filed by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. Motion Hearing set for 2/28/2018 02:00 PM in Courtroom 2, 17th Floor, San Francisco before Judge William H. Orrick. Responses due by 1/30/2018. Replies due by 2/6/2018. (Attachments: # 1 Request for Judicial Notice, # 2 Proposed Order)(Simpson, W.) (Filed on 1/16/2018) (Entered: 01/16/2018) |

| 01/18/2018 | 78 | NOTICE by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General |

Copyright © 2018 LexisNexis CourtLink, Inc.   All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

of the State of California Notice of Effective Date of California Values Act and Amended Trust Act (Sherman, Lee) (Filed on 1/18/2018) (Entered: 01/18/2018)

| | | |
|---|---|---|
| 01/18/2018 | 79 | Request for Judicial Notice re 26 Amended MOTION for Preliminary Injunction Second Supplemental Request for Judicial Notice in Support of State of California's Motion for Preliminary Injunction filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Related document(s) 26 ) (Sherman, Lee) (Filed on 1/18/2018) (Entered: 01/18/2018) |
| 01/30/2018 | 80 | OPPOSITION/RESPONSE (re 77 MOTION to Dismiss ) PLAINTIFF STATE OF CALIFORNIAS OPPOSITION TO DEFENDANTS MOTION TO DISMISS filed byState of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California. (Attachments: # 1 REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF STATE OF CALIFORNIAS OPPOSITION TO DEFENDANTS MOTION TO DISMISS, # 2 DECLARATION OF LEE SHERMAN IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS)(Sherman, Lee) (Filed on 1/30/2018) (Entered: 01/30/2018) |
| 02/05/2018 | 81 | Consent ADMINISTRATIVE MOTION Leave to Exceed Otherwise Applicable Page Limits filed by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. Responses due by 2/9/2018. (Attachments: # 1 Proposed Order)(Konkoly, Antonia) (Filed on 2/5/2018) (Entered: 02/05/2018) |
| 02/05/2018 | 82 | Order by Judge William H. Orrick granting 81 Administrative Motion to Exceed Page Limits. (jmdS, COURT STAFF) (Filed on 2/5/2018) (Entered: 02/05/2018) |
| 02/06/2018 | 83 | REPLY (re 77 MOTION to Dismiss ) filed byAlan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice. (Konkoly, Antonia) (Filed on 2/6/2018) (Entered: 02/06/2018) |
| 02/28/2018 | 85 | Minute Entry for proceedings held before Judge William H. Orrick: Motion Hearing held on 2/28/2018 re: motions to dismiss. Motions taken under submission; written order to follow. Case Management Statement due by 3/20/2018. Case Management Conference set for 3/27/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor. Total Time in Court: 1 hour. Court Reporter: Lydia Zinn. (jmdS, COURT STAFF) (Date Filed: 2/28/2018) (Entered: 03/01/2018) |
| 03/01/2018 | 84 | TRANSCRIPT ORDER for proceedings held on 02/28/2018 before Judge William H. Orrick by State of California, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California, for Court Reporter Lydia Zinn. (Sherman, Lee) (Filed on 3/1/2018) (Entered: 03/01/2018) |
| 03/02/2018 | 86 | Transcript of Proceedings held on 2/28/2018, before Judge William H. Orrick. Court Reporter/Transcriber Lydia Zinn, telephone number (415) 531-6587. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (84 in 3:17-cv-04701-WHO) Transcript Order, (75 in 3:17-cv-04642-WHO) Transcript Order, (74 in 3:17-cv-04642-WHO) Transcript Order ) Redacted Transcript Deadline set for 4/2/2018. Release of Transcript Restriction set for 5/31/2018. (zinnlr62S, COURT STAFF) (Filed on 3/2/2018) (Entered: 03/02/2018) |
| 03/05/2018 | 87 | TRANSCRIPT ORDER for proceedings held on 2/28/2018 before Judge William H. Orrick by Alan R Hanson, Jefferson Beauregard Sessions, III, United States Department of Justice, for Court Reporter Lydia Zinn. (Simpson, W.) (Filed on 3/5/2018) (Entered: 03/05/2018) |
| 03/05/2018 | 88 | ORDER DENYING 77 MOTION TO DISMISS by Judge William H. Orrick. (jmdS, COURT STAFF) (Filed on 3/5/2018) (Entered: 03/05/2018) |
| 03/05/2018 | 89 | Order by Judge William H. Orrick denying 26 Amended Motion for Preliminary Injunction. (jmdS, COURT STAFF) (Filed on 3/5/2018) (Entered: 03/05/2018) |

Copyright © 2018 LexisNexis CourtLink, Inc. All Rights Reserved.
***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

# EXHIBIT B

XAVIER BECERRA
Attorney General of California
ANGELA SIERRA
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH BELTON
LISA EHRLICH
LEE SHERMAN
Deputy Attorneys General
State Bar No. 272271
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone:  (213) 269-6404
  Fax:  (213) 897-7605
  E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel. XAVIER BECERRA, in his official capacity as Attorney General of the State of California**<br><br>Plaintiff,<br><br>**v.**<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | **Case No. 17-cv-4701**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.    Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General ("Plaintiff") brings this complaint to protect California from the Trump Administration's attempt to usurp the State and its political subdivisions' discretion to determine how to best protect public safety in their jurisdictions.  The Administration has threatened to withhold congressionally appropriated federal funds unless the State and local jurisdictions acquiesce to the President's immigration enforcement demands, and is misinterpreting federal law to do so.  The State now faces the immediate prospect of losing $31.1 million between two federal grants as a byproduct of the federal government's pattern of trying to intimidate state and local governments into altering their public-safety oriented laws and policies.  This is unconstitutional and should be halted.

2.    Congress has appropriated $28.3 million in law enforcement funding to California and its political subdivisions pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program.  The United States Department of Justice ("USDOJ"), led by Attorney General Jefferson B. Sessions III, and the Office of Justice Programs ("OJP"), led by Acting Assistant Attorney General Alan R. Hanson (collectively, with USDOJ and Attorney General Sessions, the "Defendants"), are responsible for administering these grants.

3.    JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct crime prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.

4.    The JAG authorizing statute, 34 U.S.C. § 10151 *et seq.*, requires that jurisdictions comply with "applicable Federal laws."  The statute governing OJP, 34 U.S.C. § 10102(a)(6) ("Section 10102"), also allows for the imposition of "special conditions," which historically have been understood to refer to conditions imposed to address performance issues with particular high-risk grantees, and not as conditions to be placed on *all* grantees.

5.    Defendants have added three immigration enforcement related conditions to JAG, each of which are relevant to this lawsuit.  First, in Fiscal Year 2016, USDOJ added a condition requiring recipient jurisdictions to comply with 8 U.S.C. § 1373 ("Section 1373"), which

1    prohibits restrictions on certain exchanges of immigration and citizenship status information, and

2    the maintaining of immigration status information (the "JAG Section 1373 Condition").

3    Defendants kept the Section 1373 condition in the JAG Fiscal Year 2017 State Solicitation that

4    they announced on July 25, 2017.[1]   Meanwhile, in Fiscal Year 2017, USDOJ has added a similar

5    Section 1373 condition to the Community Oriented Policing Services ("COPS") grant, for which

6    the California Department of Justice ("CalDOJ") has two applications pending worth $2.8 million

7    dollars for investigating illicit drug distribution ("COPS Section 1373 Condition," collectively

8    with the JAG Section 1373 Condition, the "Section 1373 Conditions").[2]

9           6.      Also in this year's JAG Solicitations, for the first time, Defendants imposed two

10   additional so-called "special conditions" on all JAG recipients that require compliance with

11   immigration enforcement activities.  These conditions require jurisdictions to: (a) provide federal

12   immigration enforcement agents with the Department of Homeland Security ("DHS") access to

13   detention facilities to interview inmates who are "aliens" or believed to be "aliens" (the "Access

14   Condition"); and (b) provide 48 hours advance notice to DHS regarding the scheduled release

15   date of an "alien" upon request by DHS (the "Notification Condition").  In another litigation by

16   the City of Chicago surrounding these same conditions, USDOJ attached to a declaration by

17   Defendant Hanson submitted in opposition to the city's motion for preliminary injunction what

18   USDOJ represented to be the final conditions.  Those represented final conditions show that

19   jurisdictions will have to enact an *affirmative* "statute," "rule," "regulation," "policy" or

20   "practice" that is "designed to ensure" compliance with these conditions.  In effect, Defendants

21   attempt to create, without congressional approval, a national requirement that state and local law

22   enforcement engage in specific behaviors to assist in the Executive's approach to federal

23   immigration enforcement.

24           [1] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY
2017 State Solicitation ("JAG State Solicitation) (attached as Ex. A); *see also* U.S. Dep't of
25   Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation
("JAG Local Solicitation, collectively with the JAG State Solicitation, "JAG Solicitations")
26   (attached as Ex. B).
            [2] U.S. Dep't of Justice, 2017 COPS Anti-Methamphetamine (CAMP) Application Guide
27   ("CAMP Solicitation") (attached as Ex. C); U.S. Dep't of Justice, 2017 COPS Office Anti-Heroin
Task Force (AHTF) Program Application Guide ("AHTF Solicitation," collectively with the
28   CAMP Solicitation, the "COPS Solicitations") (attached as Ex. D).

7.     Moreover, while Section 10102 allows for the imposition of "special conditions," it does not provide OJP with the authority to add these particular substantive immigration conditions.  These are not special conditions, as that term is generally understood, since they are applicable to all recipients, not just high-risk grantees.  In addition, they conflict with the JAG authorizing statute's Congressional intent to: (a) guarantee the delivery of appropriated formula grant funding to particular state and local jurisdictions so long as they satisfy the requirements found in federal law; and (b) not condition funding on immigration enforcement related activities.

8.     Defendants also have exceeded constitutional limits under the Spending Clause of the United States Constitution.  The JAG Section 1373, Access, and Notification Conditions are not sufficiently related to the federal purpose areas of the JAG funding scheme designed by Congress, and the Access and Notification Conditions are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply.

9.     The JAG Section 1373, Access, and Notification Conditions also violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, because of their constitutional infirmities, and because Defendants acted in excess of their statutory authority and in an arbitrary and capricious manner.

10.    Defendants have threatened to find California in violation of Section 1373, indicating they will enforce the Section 1373 Conditions against the State and its local jurisdictions, thus disqualifying them from receiving the JAG and COPS awards.  Since California's laws comply with Section 1373, the State is left to guess what Defendants may possibly do, and which laws Defendants may find to be offensive.  Defendants have made statements indicating that they find one group of State statutes that define the circumstances where state or local law enforcement may assist in federal immigration enforcement, *i.e.* the Transparency and Responsibility Using State Tools Act ("TRUST Act"), Cal. Gov't Code § 7282 *et seq.*, the Transparent Review of Unjust Transfers and Holds ("TRUTH Act"), Cal. Gov't Code § 7283 *et seq.*, and the California Values Act, Cal. Gov't Code § 7284 *et seq.*, as violating Section 1373, although they do not restrict the exchanging or maintaining of immigration and/or citizenship status information.  With respect to the California Values Act, recently signed into law on October 5, 2017, President

3

1   Trump directly threatened that he would use de-funding "as a weapon" against the State if the bill

2   became law.

3       11.   Alternatively, the only arguably relevant State statutes that even touch upon

4   immigration or citizenship status information are the State's confidentiality statutes that protect

5   residents' personal information, and are necessary for the State and its local governments to

6   effectuate governmental activities ("Shield Confidentiality Statutes").  Interpreting Section 1373

7   as to the first group of statutes (the TRUST, TRUTH, and Values Acts) would be in contravention

8   of the intent of Section 1373, which only limits restrictions on the exchanging and maintaining of

9   immigration and/or citizenship status information.  Reading Section 1373 as applying to the

10  Shield Confidentiality Statutes would be inconsistent with the intent of the rest of the

11  Immigration and Naturalization Act ("INA"), substantially interfere with fundamental State and

12  local governmental functions, and amount to an infringement on the State's sovereignty that the

13  Tenth Amendment of the U.S. Constitution does not allow.

14      12.   Since the State has a credible fear that Defendants will find the State non-compliant

15  with Section 1373, there is a case and controversy, and the State is entitled to a declaration that

16  these State laws comply with Section 1373.  Such a declaration is particularly necessary now

17  when the State entity that receives the State's share of JAG funding, the Board of State and

18  Community Corrections ("BSCC") was one of ten jurisdictions that already provided Defendants

19  with a requested legal opinion confirming compliance with Section 1373.  Defendants have failed

20  to timely respond to inform the State whether they believe the State complies with Section 1373.

21  Instead, on October 12, 2017, Defendants announced the results of a preliminary compliance

22  assessments on all of the other nine jurisdictions except California, including determining that

23  five jurisdictions do not appear to comply with Section 1373.  Defendants' letters communicating

24  preliminary non-compliance determinations to these five jurisdictions only add to the State's

25  credible fear because Defendants' assessments demonstrate that they are wrongfully seeking to

26  enforce Section 1373 as to laws and policies that regulate the disclosure of release dates, protect

27  the disclosure of information regarding victims of crime, and potentially, to laws and policies that

28  prohibit the initiation of immigration status investigations.  The State and its local jurisdictions

1    will soon have to submit an unqualified certification of compliance with Section 1373 under

2    penalty of perjury without knowing Defendants' position on the State's laws in the face of

3    Defendants' determinations on other jurisdictions.

4        13.   All three conditions, in conjunction with Defendants likely enforcement of Section

5    1373 against the State, harm California and its local jurisdictions.  If California and local

6    jurisdictions do not accept the funds authorized by the JAG statute and appropriated by Congress,

7    important programs will need to be cut.  The same holds true with respect to the State and the

8    COPS grants.  And if these conditions pressure the State and/or its localities to change their

9    public-safety oriented laws and policies in order to ensure they comply with these ambiguous

10   conditions or Defendant's incorrect interpretation of Section 1373, they will have abandoned

11   policies that the State and local jurisdictions have found to be effective in their communities.  As

12   a result, the State and its localities will lose control of their ability to focus their resources on

13   fighting crime rather than on federal immigration enforcement.  And the trust and cooperation

14   that the State's laws and local ordinances are intended to build between law enforcement and

15   immigrant communities will be eroded.

16       14.   The California Legislature, as well as local governments throughout the State,

17   carefully crafted a statutory scheme that allows law enforcement resources to be allocated in the

18   most effective manner to promote public safety for all people in California, regardless of

19   immigration status, national origin, ancestry, or any other characteristic protected by California

20   law.  The Defendants' actions and statements threaten that design and intrude on the sovereignty

21   of California and its local jurisdictions.

22       15.   Defendants originally indicated that they aimed to send JAG and COPS award

23   notifications by September 30, 2017.  The State has yet to receive an award notification, and upon

24   information and belief, its local jurisdictions have yet to receive award notifications either.  Once

25   Defendants send the JAG award notification to the State and its localities, according to USDOJ,

26   the State and its local jurisdictions will have 45 days to accept the award conditions and execute

27   the necessary certifications.  Defendants have announced that they will not provide any awards to

28   jurisdictions that do not meet the JAG Section 1373, Access, and Notification Conditions.

1   Defendants' actions and statements also raise doubt as to whether the State will receive COPS

2   funding conditioned on compliance with Section 1373, which USDOJ expects to award "as

3   quickly as possible."  In light of Defendants' actions with respect to California, and their Section

4   1373 determinations as to other jurisdictions, the State therefore immediately confronts the

5   prospect of losing $31.1 million for these critical law enforcement programs between these two

6   programs.  Without this grant funding, California's award recipients and the programs funded will

7   be harmed, which will have a detrimental effect on state and local law enforcement and budgets.

8       16.   For these reasons, and those discussed below, the Court should strike down the

9   Section 1373, Access, and Notification Conditions in the JAG Solicitations as unconstitutional

10  and/or as a violation of the APA, and declare that the State's statutes identified in this Complaint

11  comply with Section 1373 and do not render the State or its jurisdictions ineligible for JAG

12  funding, and the State ineligible for COPS funding.

13                          **JURISDICTION AND VENUE**

14      17.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this case

15  involves a civil action arising under the Constitution and the laws of the United States.  The Court

16  also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal

17  government founded upon the Constitution and an Act of Congress.  Jurisdiction is proper under

18  the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-06.  The

19  Court has authority to provide relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

20      18.   Pursuant to 28 U.S.C. § 1391(e)(1) and (3), venue is proper in the Northern District of

21  California because the Attorney General and the State of California have offices at 455 Golden

22  Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California and

23  Defendants have offices at 450 Golden Gate Avenue, San Francisco, California.

24                         **INTRADISTRICT ASSIGNMENT**

25      19.   Assignment to the San Francisco Division of this District is proper pursuant to Civil

26  Local Rule 3-2(c)-(d) because Plaintiff, the State of California, and Defendants both maintain

27  offices in the District in San Francisco.

28  ///

## **PARTIES**

20.   Plaintiff State of California is a sovereign state in the United States of America.

21.   Xavier Becerra is the Attorney General of California, and as such, is the chief law officer in the State and has "direct supervision over every … sheriff and over such other law enforcement officers as may be designated by laws, in all matters pertaining to their respective offices."  Cal. Const., art. V, § 13; Cal. Gov't Code § 12500, *et seq.*; *see Pierce v. Super.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state. . . and the protection of public rights and interests.").

22.   California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a state caused by the challenged federal actions. The inclusion of unconstitutional and unlawful conditions as part of the JAG award impairs the State's exercise of its police power in a manner it deems necessary to protect the public safety. The JAG Access and Notification Conditions, and Defendants' actions with respect to the Section 1373 Conditions, burden California's exercise of its sovereign power to enforce its laws.  The JAG Section 1373, Access, and Notification Conditions place a regulatory burden on California as a funding recipient, obligating the State to continuously monitor compliance of all subgrantees throughout the State, which will result in increased staff time and expenses.  Defendants' imposition of the Access and Notification Conditions also place a burden on any entity with a State or State-contracted correctional or detention facility that receives JAG funds to impose affirmative policies to comply with the conditions.

23.   As a result of Defendants' unconstitutional actions, the State of California, including its political subdivisions, is in imminent danger of losing federal funding, including $28.3 million from the JAG program this fiscal year, of which $17.7 million is owed to the State itself, and $2.8 million from the COPS grants.

24.   Plaintiff Attorney General Xavier Becerra is the chief law officer of the State and the head of the California Department of Justice, which is a subgrantee for JAG and recipient of COPS grant funding.  Cal. Const., art. V, § 13.  Attorney General Becerra, on behalf of

1  California, has standing to bring this action because funding for law enforcement throughout the

2  State is at stake.  As the Chief Law Officer, the Attorney General is responsible for ensuring that

3  the laws of the State are enforced.  *Id.*  The JAG Access and Notification Conditions, and

4  Defendants' apparent interpretation of Section 1373, threaten California statutes.  In addition, the

5  Attorney General has standing on the basis of the requirement that his office certify compliance

6  with Section 1373, as applicable to the "program or activity" to be funded, for CalDOJ with

7  respect to the COPS grants and for the State and "any entity, agency, or official" of the State for

8  JAG.

9      25.    Defendant U.S. Department of Justice ("USDOJ") is an executive department of the

10  United States of America pursuant to 5 U.S.C. § 101 and a federal agency within the meaning of

11  28 U.S.C. § 2671.  As such, it engages in agency action, within the meaning of 5 U.S.C. § 702

12  and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  USDOJ is responsible for

13  administering the JAG and COPS funds appropriated by Congress.

14      26.    Defendant Jefferson B. Sessions III, is Attorney General of the United States, and

15  oversees the USDOJ, including the Office of Justice Programs ("OJP"), which administers JAG,

16  and the Office of Community Oriented Policing Services, which administers COPS grants.

17  Defendant Sessions made statements announcing the JAG Access and Notification Conditions on

18  the USDOJ website on July 25, 2017.  He is sued in his official capacity pursuant to 5 U.S.C. §

19  702.

20      27.    Defendant Alan R. Hanson is Acting Assistant Attorney General in charge of the OJP,

21  which administers JAG funding and which set forth the so-called "special conditions" at issue.

22  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

23      28.    Each of the Defendants named in this Complaint are acting in their official capacity

24  for the United States government bearing responsibility, in whole or in part, for the acts

25  enumerated in this Complaint.

26      29.    The true names and capacities of Defendants identified as DOES 1-100 are unknown

27  to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and capacities of

28  those fictitiously named Defendants when they are ascertained.

# FACTUAL ALLEGATIONS

## I.   CALIFORNIA'S LAWS SEEK TO PROTECT THE STATE RESIDENTS' SAFETY AND WELFARE BY FOCUSING LAW ENFORCEMENT ON CRIMINAL ACTIVITY AND BY BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES

30.   California state and local law enforcement agencies ("LEAs"), guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively policing, protecting, and serving all residents, including more than 10 million foreign-born individuals, who live in the State.  California's laws implicated in this suit are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents.  These laws strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement so that perpetrators are apprehended before harming others.

31.   The purpose of these California laws is to ensure that law enforcement resources are focused on a core public safety mission and to build trust and cooperation between law enforcement and the State's immigrant communities.  When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

32.   California's laws are not unique.  Many jurisdictions across the country have policies that define the circumstances under which local law enforcement personnel may expend time and resources in furtherance of federal immigration enforcement.  Those jurisdictions variously impose limits on compliance with Immigration and Customs Enforcement ("ICE") detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections to them.

### A.   The TRUST Act

33.   In 2013, California enacted the TRUST Act, Cal. Gov't Code § 7282 *et seq.*  The TRUST Act defined the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities.  The TRUST Act went into effect on January 1, 2014.

34.   The TRUST Act was intended to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement.  Among the Legislature's

1   concerns were that federal courts have concluded that detainer requests do not provide sufficient

2   probable cause, and data showing that detainer requests "have erroneously been placed on United

3   States citizens, as well as immigrants who are not deportable."  Assem. Bill No. 4, Reg. Sess.

4   (Cal. 2013) § 1(c).

5        35.   The Legislature found that "immigration detainers harm community policing efforts

6   because immigrant residents who are victims of or witnesses to crime, including domestic

7   violence, are less likely to report crime or cooperate with law enforcement when any contact with

8   law enforcement could result in deportation."  *Id.* § 1(d).  The Legislature also considered data

9   demonstrating that the vast majority of individuals detained had no criminal history or were only

10  convicted of minor offenses, and research establishing that "immigrants, including undocumented

11  immigrants, do not commit crimes at higher rates than American-born residents."  *Id.*

12       36.   The TRUST Act set forth two conditions that local law enforcement must meet to

13  have discretion to detain a person pursuant to an "immigration hold" (also known as a "detainer

14  request" or "detainer hold") that occurs when a federal immigration agent requests that the law

15  enforcement official "maintain custody of the individual for a period not to exceed 48 hours,

16  excluding Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c).  First, the detention

17  could not "violate any federal, state, or local law, or any local policy," which includes the Fourth

18  Amendment of the U.S. Constitution.  *Id.* § 7282.5(a).  Second, law enforcement officers could

19  only detain someone with certain, specified criminal backgrounds, an individual on the California

20  Sex and Arson Registry, or a person charged with a serious or violent felony who was the subject

21  of a probable cause determination from a magistrate judge.  *Id.* § 7282.5(a)(1)-(6).  Only when

22  both of these conditions were met could local law enforcement detain an individual "on the basis

23  of an immigration hold after the individual becomes eligible for release from custody."  *Id.* §

24  7282.5(b).

25       **B.    The TRUTH Act**

26       37.   In 2016, California enacted the TRUTH Act, Cal. Gov't Code § 7283 *et seq.*, which

27  took effect on January 1, 2017.  The purpose of the TRUTH Act is to increase transparency about

28  immigration enforcement and "to promote public safety and preserve limited resources because

1   entanglement between local law enforcement and ICE undermines community policing strategies

2   and drains local resources."  Assem. Bill No. 2792, Reg. Sess. (Cal. 2016) § 2(a)-(c), (g)-(i).

3       38.   Under the TRUTH Act, before an interview with ICE takes place, a local law

4   enforcement officer must provide the detained individual with a "written consent form that explains

5   the purpose of the interview, that the interview is voluntary, and that he or she may decline to be

6   interviewed or may choose to be interviewed only with his or her attorney present."  Cal. Gov't

7   Code § 7283.1(a).  In addition, when a local LEA receives a detainer hold, notification, or transfer

8   request, the local LEA must "provide a copy of the request to the [detained] individual and inform

9   him or her whether the law enforcement agency intends to comply with the request."  *Id.* §

10  7283.1(b).  If the LEA complies with ICE's request to notify ICE as to when the individual will be

11  released, it must also "promptly provide the same notification in writing to the individual and to

12  his or her attorney or to one additional person who the individual shall be permitted to designate."

13  *Id.*

14      39.   The TRUTH Act has never prohibited a jurisdiction from allowing ICE to access its

15  jails to interview inmates.

16      **C.    The California Values Act**

17      40.   On October 5, 2017, Governor Edmund G. Brown Jr. signed the California Values

18  Act, Cal. Gov't Code § 7284 *et seq*, into law effective January 1, 2018.  In conjunction with this

19  measure, California amended the TRUST Act.

20      41.   Consistent with the Legislature's purpose in passing the TRUST and TRUTH Acts, in

21  its findings, the Legislature emphasized that "a relationship of trust between California's

22  immigrant community and state and local agencies" is "central to the public safety of the people

23  of California."  Cal. Gov't Code § 7284.2(b).  The Legislature recognized "[t]his trust is

24  threatened when state and local agencies are entangled with federal immigration enforcement,

25  with the result that immigrant community members fear approaching police when they are

26  victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the

27  detriment of public safety and the well-being of all Californians."  *Id.* § 7284.2(c).  The

28  Legislature declared that the focus of the Value Act is on "[e]nsur[ing] effective policing, to

1   protect the safety, well-being, and constitutional rights of the people of California, and to direct

2   the state's limited resources to matters of greatest concern to state and local governments." *Id.* §

3   7284.2(f).

4       42.   The Values Act generally prohibits LEAs from using agency money or personnel to

5   ask an individual about his or her immigration status for immigration enforcement purposes. *See*

6   *id.* § 7284.6(a)(1)(A) (effective Jan. 1, 2018).

7       43.   The Values Act, expanding upon the limitations contained in the prior iteration of the

8   TRUST Act, prohibits compliance with detainer requests. *See id.* § 7284.6(a)(1)(B) (effective

9   Jan. 1, 2018).  In conjunction with the passage of the Values Act, the TRUST Act was amended

10  to identify the circumstances when local law enforcement has discretion to respond to

11  "notification requests."  *Id.* § 7282.5(a) (effective Jan. 1, 2018).  "Notification requests" are

12  requests by an immigration authority asking that a law enforcement official inform it "of the

13  release date and time in advance of the public of an individual in its custody."  *See id.* §§ 7282(c)

14  (effective Jan. 1, 2018), 7283(f).

15      44.   Under the Values Act, LEAs have discretion to comply with notification requests if

16  doing so would not "violate any federal, state, or local law, or any local policy."  *Id.* § 7282.5(a)

17  (effective Jan. 1, 2018); *see id.* § 7284.6(a)(1)(C) (effective Jan. 1, 2018).  In addition, the Values

18  Act allows LEAs to comply with notification requests under one of two scenarios.  First, LEAs

19  may respond to notification requests regarding someone who was previously convicted of one or

20  more of a multitude of felonies or misdemeanors identified in the TRUST Act, a person charged

21  with one or more of an array of felonies who was subject to a probable cause determination from

22  a magistrate judge, or an individual on the California Sex and Arson Registry.  *Id.* § 7282.5(a)(1)-

23  (5) (effective Jan. 1, 2018).  Alternatively, LEAs may comply with a notification request if the

24  information requested is already "available to the public."  *Id.* § 7284.6(a)(1)(C) (effective Jan. 1,

25  2018).

26      45.   The Values Act also prohibits LEAs from using agency or department money or

27  personnel to "provid[e] personal information, as defined in Section 1798.3 of the Civil Code,

28  about an individual" "for immigration enforcement purposes," unless that information is publicly

1   available. *Id.* § 7284.6(a)(1)(D) (effective Jan. 1, 2018).  "Personal information" is defined in the

2   Civil Code as any information "that identifies or describes an individual, including, but not

3   limited to, his or her name, social security number, physical description, home address, home

4   telephone number, education, financial matters, and medical or employment history" and

5   "includes statements made by, or attributed to, the individual."  Cal. Civ. Code § 1798.3(a).

6       46.   The Values Act includes a savings clause that permits compliance with all aspects of

7   Section 1373:

8       This section does not prohibit or restrict any government entity or official from sending to,

9       or receiving from, federal immigration authorities, information regarding the citizenship

10      or immigration status, lawful or unlawful, of an individual, or from requesting from

11      federal immigration authorities immigration status information, lawful or unlawful, of any

12      individual, or maintaining or exchanging that information with any other federal, state, or

13      local government entity, pursuant to Sections 1373 and 1644 of title 8 of the United States

14      Code.

15   Cal. Gov't Code § 7284.6(e).

16      47.   Neither the Values nor TRUTH Acts prohibit a jurisdiction from allowing ICE to

17   access its jails to interview inmates.  The Values Act explicitly reaffirms the absence of any such

18   restriction, and requires only that state and local law enforcement, including the California

19   Department of Corrections and Rehabilitation, comply with the TRUTH Act when providing such

20   access to immigration authorities.  *Id.* §§ 7284.6(b)(5), 7284.10(a) (both effective Jan. 1, 2018).

21       **D.   State Shield Confidentiality Statutes**

22      48.   California has also enacted statutes aimed at protecting the confidentiality of sensitive

23   information the State and its localities collect and maintain in a number of discrete circumstances.

24   California does this, in part, by directing governmental employees, officers, and agents to

25   affirmatively act, as part of their official duties, to protect information and records containing the

26   citizenship or immigration status of individuals, along with other types of personal information.

27      49.   These statutes are not intended to be a "sword" to interfere with the federal

28   government's programs.  Rather, these confidentiality statutes are a "shield" meant to protect

1   residents' personal information from third parties when the State has determined that such

2   confidentiality is essential to the performance of particular state and local government functions.

3   Assurances of confidentiality in these instances are necessary for the proper operation of the state

4   and local criminal and juvenile justice systems.

5       50.   The Shield Confidentiality Statutes discussed below are those that are arguably

6   applicable to the "program or activity" to be funded for State recipients of a JAG award.

7       51.   California Penal Code sections 679.10 (effective January 1, 2016) and 679.11

8   (effective January 1, 2017) are the State laws that implement a federal process of immigration

9   benefits for victims of certain enumerated crimes who have cooperated or are currently

10   cooperating with law enforcement in the investigation or prosecution of a crime (U-Visas),

11   including victims of human trafficking (T-Visas).  *See* 8 C.F.R. § 214.14.  Under both California

12   Penal Code sections 679.10 and 679.11, certifying entities are prohibited from disclosing the

13   immigration status of a victim to anyone, except to comply with federal law or legal process, or if

14   authorized by the victim or person requesting the certification form.  Cal. Pen. Code §§

15   679.10(k), 679.11(k).  The purpose for preserving this confidentiality is to promote the shared

16   federal and state mission to encourage victims of rape, torture, and human trafficking to report

17   these serious crimes to law enforcement.

18       52.   Similarly, California Penal Code section 422.93, effective January 1, 2005, protects

19   information provided by victims and witnesses of hate crimes.  The Legislature's purpose for

20   section 422.93 is to further California's interest in protecting the public from hate crimes and

21   violence by "encouraging all persons who are victims of or witnesses to crimes, or who otherwise

22   can give evidence in a criminal investigation, to cooperate with the criminal justice system, and

23   not to penalize these persons for being victims or for cooperating with the criminal justice

24   system."  *Id.* § 422.93(a).  Subdivision (b) of section 422.93 accomplishes this legislative purpose

25   by providing:

26           Whenever an individual is a victim of or witness to a hate crime, or who otherwise can

27           give evidence in a hate crime investigation, is not charged with or convicted of

28           committing any crime under state law, a peace officer may not detain the individual

1        exclusively for any actual or suspected immigration violation or report or turn the

2        individual over to federal immigration authorities.

3   *Id.* § 422.93(b).

4      53.   California has a well-established policy of preserving the confidentiality of juvenile

5  case files and information collected in the juvenile justice system.  The Legislature has found that

6  "[c]onfidentiality is integral to the operation of the juvenile justice system in order to avoid

7  stigma and promote rehabilitation for all youth."  Cal. Welf. & Inst. Code § 831(a).  Thus, as a

8  general rule, juvenile court records are kept confidential and only made available to statutorily

9  designated parties or by court order.  *See id.* § 827; Cal. R. of Ct. 5.552(b)-(c).  Declaratory of

10  this long-standing law, California Welfare and Institutions Code section 831, effective January 1,

11  2016, makes clear that this prohibition applies equally to immigration status information in

12  juvenile case files as to all other covered personal information.  Cal. Welf. & Inst. Code § 831.

13     54.   This prohibition is consistent with California's implementation of the "Special

14  Immigrant Juvenile" federal process through which certain abused, neglected, or abandoned

15  undocumented immigrant children may seek legal immigration status only after obtaining a

16  predicate order from a state court.  8 U.S.C. § 1101(a)(27)(J).  California Code of Civil Procedure

17  section 155, effective January 1, 2015, guides California courts in making the judicial

18  determinations that are necessary for a predicate order.  Under the statute, information about the

19  child's immigration status must "remain confidential and shall be available for inspection only by

20  the court, the child who is the subject of the proceeding, the parties, the attorneys for the parties,

21  the child's counsel and the child's guardian."  Cal. Civ. Proc. Code § 155(c).  Preserving this

22  confidentiality protects already vulnerable children who may apply for Special Immigrant

23  Juvenile status in order to provide for their long-term safety and security.

24  **II.    CONGRESS DID NOT INTEND JAG TO BE CONDITIONED ON STATE AND LOCAL LAW
25       ENFORCEMENT ASSISTING IN FEDERAL IMMIGRATION ENFORCEMENT**

26     55.   JAG is a formula grant administered by OJP within USDOJ.  JAG funding is

27  authorized by Congress under 34 U.S.C. § 10151, *et seq*.  The authorizing statute has been

28  amended numerous times since its inception in 1988, evolving into the JAG program as it exists

today.

56.   The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs grants ("Byrne Grants") "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181 (1988) (repealed 2006).  Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions.  *Id.*  Congress identified 21 "purpose areas" for which Byrne Grants could be used.  Many of the purpose areas relate to the investigation, enforcement, and prosecution of drug offenses.  *See id.*, tit. V, § 5104.  Immigration enforcement was never specified in any of the grant purpose areas.

57.   In amendments between 1994 and 2000, Congress identified eight more purpose areas for which Byrne funding could be used, bringing the total to 29.  42 U.S.C. § 3751(b) (as it existed on Dec. 21, 2000) (repealed 2006).  Immigration enforcement was not specified in any of these eight additional purpose areas.

58.   For Fiscal Year 1996, Congress separately authorized Local Law Enforcement Block Grants ("LLEBG") that directed payment to units of local government for the purpose of hiring more police officers or "reducing crime and improving public safety."  Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified eight "purpose areas" for LLEBG, none of which were immigration enforcement.

59.   The Byrne Grant and LLEBG programs were then merged to eliminate duplication, improve their administration, and to provide State and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" to local law enforcement.  Pub. L. No. 108-447, 118 Stat. 2809 (2004); H.R. Rep. No. 109-233, at 89 (2005); *see also* 34 U.S.C. § 10151(a), (b)(1).

60.   Now the JAG authorizing statute enumerates eight purpose areas for: (A) law enforcement programs; (B) prosecution and court programs; (C) prevention and education

16

programs; (D) corrections and community corrections programs; (E) drug treatments and enforcement programs; (F) planning, evaluation, and technology improvement programs; (G) crime victim and witness programs; and (H) mental health programs related to law enforcement and corrections.  34 U.S.C. § 10152(a)(1).

61.   The purpose areas for these grants are to support "criminal justice" programs; immigration enforcement is generally civil in nature.  *See Arizona v. U.S.*, 567 U.S. 387, 396 (2012).  Immigration enforcement was also never specified in the purpose areas for any of these grants throughout this entire legislative history.

62.   In 2006, Congress repealed the only immigration enforcement related requirement that had ever existed for JAG funding, a requirement that the chief executive officer of the state receiving JAG funding provide certified records of criminal convictions of "aliens."  *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006).  The repeal of this provision evidences Congress' intent *not* to condition JAG funding on immigration enforcement related activities.  This is consistent with the statutory scheme that does not include a purpose area connected to immigration enforcement.

63.   In addition, more recently, Congress has considered but declined to adopt legislation that would penalize cities for setting their own law enforcement priorities and attempt to impose conditions similar to those here.[3]

### III.   THE JAG AUTHORIZING STRUCTURE REQUIRES THAT STATE AND LOCAL JURISDICTIONS RECEIVE FORMULA GRANTS

#### A.   The JAG Formula Structure and Conditions

64.   When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions.  34 U.S.C. § 10156.  Population and violent crime rates are used to calculate each state's allocation.  34 U.S.C. § 10156(a)(1).  Congress

---

[3] *See, e.g.*, Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) (cloture on the motion to proceed rejected).

1   guarantees to each state a minimum allocation of JAG funds. 34 U.S.C. § 10156(a)(2).

2       65.   In addition to determining the amount of money received by grantees within each

3   state, Congress set forth how that money is to be shared between state and local jurisdictions.

4   Under the statutory formula, 60 percent of the total allocation to a state must be given directly to

5   the state.  34 U.S.C. § 10156(b)(1).

6       66.   The statutory formula also provides that 40 percent of the total allocation to a state

7   must be given to local governments within the state.  34 U.S.C. § 10156(d)(1).  Each unit of local

8   government receives funds based on its crime rate.  34 U.S.C. § 10156(d)(2)(A).

9       67.   According to Congress's JAG funding scheme, states and local governments that

10  apply for JAG funds are required to make limited certifications and assurances.  Beyond

11  ministerial requirements identified in the authorizing statute, the chief executive officer of each

12  applicant must certify that: (A) the law enforcement programs to be funded meet all requirements

13  of the JAG authorizing statute; (B) all information in the application is correct; (C) there was

14  coordination with affected agencies; and (D) the applicant will comply with all provisions of the

15  JAG authorizing statute.  34 U.S.C. § 10153(a)(5).

16      68.   Congress has enacted reductions or penalties in JAG funds when certain conditions

17  occur, such as a state failing to substantially implement the Sex Offender Registration and

18  Notification Act or a governor not certifying compliance with the national Prison Rape

19  Elimination Act standards.  *See* 34 U.S.C. §§ 20927, 30307(e)(2).  Unlike the Access and

20  Notification Conditions, these conditions were explicitly added by Congress.

21      **B.    California's Allocation and Use of the JAG Award**

22      69.   Based on the formula prescribed by statute, California is expected to receive

23  approximately $28.3 million in JAG funding in Fiscal Year 2017, with $17.7 million going to the

24  Board of State and Community Corrections ("BSCC"), the entity that receives the formula grant

25  funds that are allocated to the State.

26      70.   The BSCC disburses JAG funding using subgrants predominately to local jurisdictions

27  throughout California to fund programs that meet the purpose areas identified in the JAG

28  authorizing statute.  Between Fiscal Years 2015-17, the BSCC funded 32 local jurisdictions and

1    CalDOJ.

2        71.   In the past, the BSCC prioritized subgrants to those jurisdictions that focus on

3    education and crime prevention programs, law enforcement programs, and court programs,

4    including indigent defense.  Some examples of California jurisdictions' purpose-driven use of

5    JAG funds include: (a) implementing programs to improve educational outcomes, increase

6    graduation rates, and curb truancy; (b) providing youth and adult gang members with multi-

7    disciplinary education, employment, treatment, and other support services to prevent gang

8    involvement, reduce substance abuse, and curtail delinquency and recidivism; (c) implementing

9    school-wide prevention and intervention initiatives for some of the county's highest-risk students;

10   (d) providing comprehensive post-dispositional advocacy and reentry services to improve

11   outcomes and reduce recidivism for juvenile probationers; (e) providing a continuum of detention

12   alternatives to juvenile offenders who do not require secure detention, which includes assessment,

13   referral, case advocacy, home detention, reporting centers, non-secure shelter, intensive case

14   management and wraparound family support services; and (f) funding diversion and re-entry

15   programs for both minors and young adult offenders.

16   IV.   **DEFENDANTS ADDED THE SECTION 1373 CONDITION AND THE AMBIGUOUS ACCESS
         AND NOTIFICATION CONDITIONS WITHOUT SUFFICIENTLY EXPLAINING THE**
17       **RELATIONSHIP BETWEEN THE CONDITIONS TO THE JAG PROGRAM**

18       A.   **Description of the JAG Solicitation**

19       72.   On July 25, 2017, OJP announced the Fiscal Year 2017 State JAG Solicitation.  OJP

20   set the deadline for applications as August 25, 2017.  On August 3, 2017, OJP announced the

21   Fiscal Year 2017 JAG Local Solicitation with a deadline of September 5, 2017.

22       73.   In the JAG Solicitations, OJP announced that jurisdictions will have to comply with

23   three conditions that are related to immigration enforcement.  To start, recipients will have to

24   certify compliance with Section 1373.  Section 1373 is entitled "Communication between

25   government agencies and the Immigration and Naturalization Services" (the "JAG Section 1373

26   Condition").  Section 1373(a) provides:

27       Notwithstanding any other provision of Federal, State, or local law, a Federal state or local

28       government entity or official may not prohibit, or in any way restrict any government

                                          19

1  entity or official from sending to, or receiving from [federal immigration enforcement

2  authorities] information regarding the citizenship or immigration status, lawful or

3  unlawful, of any individual.

4 8 U.S.C. § 1373(a).

5   74.   Section 1373(b) also prohibits any "person or agency" from restricting federal, state,

6 or local government entities from "requesting" immigration status information from federal

7 immigration authorities, "maintaining" such information, or "exchanging" such information with

8 federal, state, or local government entities.  *Id.* § 1373(b).

9   75.   In Fiscal Year 2016, OJP first announced that Section 1373 was an "applicable law"

10 under JAG, and would be a required condition for all grantees receiving JAG funds.  For that

11 fiscal year, OJP required the BSCC to submit a legal opinion validating its compliance with

12 Section 1373.

13   76.   In addition to the requirement that jurisdictions certify compliance with Section 1373,

14 for the first time in Fiscal Year 2017, OJP announced two additional substantive "special

15 conditions" related to federal immigration enforcement.  To receive a JAG award, jurisdictions

16 must:

17   &bull; permit personnel of the U.S. Department of Homeland Security ("DHS") to access any

18    correctional or detention facility in order to meet with an "alien" (or an individual

19    believed to be an "alien") and inquire as to his or her right to be or remain in the

20    United States (the "Access Condition"); and

21   &bull; provide at least 48 hours' advance notice to DHS regarding the scheduled release date

22    and time of an "alien" in the jurisdiction's custody when DHS requests such notice in

23    order to take custody of the individual pursuant to the Immigration and Nationality

24    Act (the "Notification Condition").

25 Ex. A, at 32.  Both of these conditions, as well as the JAG Section 1373 Condition, exist in the

26 State and Local JAG Solicitations.

27   77.   The State and its local jurisdictions will also have to make the following

28 representations about the immigration enforcement related conditions in order to receive a grant

20

or subgrant:

- The chief law officer of the jurisdiction, including the California Attorney General, must sign an affidavit certifying compliance with Section 1373, under penalty of perjury, on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity" to be funded.  *See* Exh. A, Appx. II.

- The chief executive officer of the jurisdiction, including the Governor of the State of California, must sign an affidavit making a number of assurances, under penalty of perjury, including that the chief executive adopts the chief law officer's certification of compliance with Section 1373.  *See* Exh. A, Appx I.

- The subrecipients must certify compliance with Section 1373, as applicable to the program and award to be funded, and assure that they will comply with all award conditions, including the Access and Notification Conditions.  *See id.* at 20-21.

78.   Based on information and belief, Plaintiff understands that Defendants instructed applicants that they would not accept altered certifications.

79.   On August 25, 2017, the BSCC submitted the State's application for JAG.  In that application, the BSCC stated that it "withholds any commitment at this time concerning new grant conditions, pending receipt of the award documents."

80.   In the JAG Solicitations, OJP anticipated that it would "issue award notifications by September 30, 2017."  *Id*. at 31.  The USDOJ Financial Guide explains that jurisdictions "have 45 days from the award date to accept [an] OJP … award document or the award may be rescinded."[4]

81.   At no point has any Defendant provided an explanation as to how the Section 1373, Access, and Notification Conditions are consistent with Congress's intent in adopting and authorizing funds for the JAG program.

**B.   Description of the Represented JAG Award Final Conditions**

82.   The State has not received the final award conditions as of the date of this filing.

---

[4] U.S. Dep't of Justice, *2015 DOJ Grants Financial Guide,* § 2.2, https://www.justice.gov/ovw/file/892031/download.

21

83.   USDOJ identified what it represented to be the final award conditions in its filing in the lawsuit challenging these same conditions pending in the Northern District of Illinois.  *See* Ex. A and B to the Decl. of Alan R. Hanson, *City of Chicago v. Sessions*, Case No. 17-cv-5720 (N.D. Ill. Aug. 24, 2017), ECF No. 32-1.  Paragraphs 53 and 54 of those represented final conditions describe the JAG Section 1373 Condition.  In addition to completing the Section 1373 certification described above, the grant recipient for the state must obtain a certification of compliance with Section 1373 from any subgrantees before issuing an award.  *Id.*, Ex. A, ¶ 53(2). The grant recipient must also monitor the subgrantee's compliance with the JAG Section 1373 Condition and "promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded 'program or activity' of the recipient, or of any [governmental] subrecipient" does not comply with Section 1373.  *Id.* at ¶¶ 53(3), 54(1)(D).

84.   Paragraph 55 of the represented final conditions describes the Access and Notification Conditions as requiring states to have an affirmative statute, rule, regulation, policy, or practice "designed to ensure" compliance with the conditions for state or state-contracted correctional facilities "[w]ith respect to the 'program or activity' that is funded."  The "[r]equirement" in full says:

> 1. Requirement
>
> With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award—
>
> A.  A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to or remain in the Unites States.
>
> B. A State statute, or a State rule, -regulation, -policy, or –practice, must be in place

1        that is designed to ensure that, when a State (or State-contracted) correctional facility

2        receives from DHS a formal written request authorized by the Immigration and

3        Nationality Act that seeks advance notice of the scheduled release date and time for a

4        particular alien in such facility, then such facility will honor such request and– as early

5        as practicable (see para. 4.B. of this condition) – provide the requested notice to

6        DHS.[5]

7  *Id.* at ¶ 55(1).

8     85.   Paragraph 56 of the represented final conditions impose similar obligations on local

9  government recipients and subrecipients.  Recipients that disburse funding to subrecipients must

10  "monitor[] subrecipient compliance with the requirements of this condition."  *Id.* at ¶ 55(2).

11        **C.**    **The Access and Notification Conditions do not Provide Jurisdictions with**
                  **Clear Notice of what the Conditions Require**

12

13     86.   It is ambiguous whether the Access and Notification Conditions prohibit grant

14  recipients from possessing certain laws and practices.  For example, it is unclear whether the

15  condition requiring jurisdictions to provide ICE jail access for interview purposes prohibits grant

16  recipients from informing inmates of their right to have a lawyer present or decline an interview

17  with ICE, which would implicate the notice requirements in the TRUTH Act.

18     87.   Both conditions also fail to provide clear notice of what affirmative actions are

19  required by grant recipients to comply with the conditions.  For example, the represented final

20  Access and Notification Conditions require that a state "rule, -regulation, -policy, or –practice,

21  must be in place that is designed to ensure" either access for DHS agents or compliance with

22  DHS notification requests.  The conditions provide no guidance or further information as to the

23

24           [5] The represented final conditions state that "[n]othing in this condition shall be
understood to authorize or require any recipient, any subrecipient at any tier, any State or local

25  government, or any other entity or individual to maintain (or detain) any individual in custody
beyond the date and time the individual would have been released in the absence of this

26  condition."  *Id.* at ¶ 55(4)(B).  The condition also states that it "imposes NO requirements as to …
DHS requests for detention."  *Id.* (emphasis added).  If these clarifications do not appear in the

27  actual final conditions that the State receives, the condition would otherwise be ambiguous and/or
unconstitutional for the independent reason that it would condition funding on LEAs, in at least

28  some instances, violating the Fourth Amendment—because DHS notification and detainer
requests are not typically supported by probable cause.

1   meaning of the ambiguous term "designed to ensure."  Among other issues, this term is unclear

2   whether the "policy" or "practice" must be directed specifically to the Access and Notification

3   Conditions, or may be encompassed in other regulations or practices dealing with the treatment of

4   detention facilities more generally.

5   **V.    OJP HAS EXCEEDED ITS STATUTORY AUTHORITY BY IMPOSING THE ACCESS AND
        NOTIFICATION CONDITIONS**

6

7        88.   JAG's authorizing statute provides no authority for OJP to impose the Access and

8   Notification Conditions (the so-called "special conditions") on all grant recipients.  Indeed, the

9   same statute that authorizes JAG funding, the Omnibus Crime Control and Safe Streets Act of

10  1968, also authorizes funding pursuant to the Violence Against Women Act ("VAWA") that

11  permits the Attorney General to "impose reasonable conditions on grant awards."  34 U.S.C. §

12  10446(e)(3).  Congress's clear direction to USDOJ to add "reasonable conditions" pursuant to

13  VAWA, but not for JAG, indicates that Congress did not intend to confer discretion on OJP to

14  add unlimited substantive conditions at its whim.

15       89.   Although nothing related to the Access and Notification Conditions is found within

16  the statutory text or legislative history related to JAG, OJP claims it has the authority to add these

17  conditions under Section 10102, which allows OJP to add "special conditions on all grants."  34

18  U.S.C. § 10102(a)(6).

19       90.   OJP's basis for using its purported authority to add these conditions here, without

20  limitation, is statutorily and constitutionally flawed.

21       91.   In 2006, when this provision was amended to permit OJP to "plac[e] special

22  conditions on all grants," the term "special conditions" had a precise meaning.  According to a

23  USDOJ regulation in place at the time, the agency could impose "special grant or subgrant

24  conditions" on "high-risk grantees" if the grant applicant: (a) had a history of poor performance;

25  (b) was not financially stable; (c) had a management system that did not meet certain federal

26  standards; (d) had not conformed to the terms and conditions of a previous grant award; or (e)

27  was not otherwise responsible.  28 C.F.R. § 66.12 (removed December 25, 2014).  This language

28  was based on the grants management common rule adopted by the Office of Management and

1   Budget ("OMB"), and followed by "all Federal agencies" when administering grants to state and

2   local governments.   OMB Circular A-102 (as amended Aug. 29, 1997).   Other federal statutes

3   and regulations have also historically identified "special conditions" as those that federal agencies

4   may place on particular high-risk grantees who have struggled or failed to comply with grant

5   conditions in the past, not on all grantees irrespective of performance.

6       92.   Interpreting OJP's authority to permit it to impose any substantive conditions with

7   respect to formula grants, like JAG, beyond what is allowed under federal law further conflicts

8   with Congressional intent in establishing a prescribed formula grant structure.   Congress designed

9   JAG so that "*each State*" receives an allocation according to a precise statutory formula.   42

10  U.S.C. § 10156(a) (emphasis added).   Likewise, Congress's formula provides allocation to "*each

11  unit of local government.*"   34 U.S.C. § 10156(d)(2) (emphasis added).   As such, if USDOJ

12  makes grants from funds that Congress appropriated to JAG, OJP must disburse the funds

13  according to the statutory formula enacted by Congress so long as the jurisdiction complies with

14  the conditions that exist in federal law.

15      93.   The conditions also conflict with the immigration enforcement scheme set forth by

16  Congress in the INA that makes cooperation with immigration enforcement agencies voluntary.

17  There is no provision in the INA, or any federal law, that requires jurisdictions to assist with

18  otherwise voluntary immigration enforcement related activities in order to receive these federal

19  funds.

20      94.   While USDOJ has the ability to add conditions to JAG awards, it cannot add

21  substantive grant conditions such as these, that are not tethered to any federal statute.   For

22  instance, it could add "special conditions" for high-risk grantees as described above.   It could add

23  conditions that stem from the authorizing JAG statute.   And it could add conditions that Congress

24  directed be applied to federally funded programs.   *See, e.g.*, 42 U.S.C. § 2000d-1; 29 U.S.C. §

25  794(a)(1); 20 U.S.C. § 1681(a)(1); 42 U.S.C. § 6102.

26  **VI.   FOR FISCAL YEAR 2017, USDOJ IMPOSED A REQUIREMENT OF CERTIFYING
         COMPLIANCE WITH SECTION 1373 ON COPS GRANTS THAT THE STATE RECEIVES**

27      **A.   California's Prior Use of COPS Grant Funds**

28

95.   COPS is a competitive grant administered by the Office of Community Oriented
Policing Services ("COPS Office") within USDOJ.  28 C.F.R. §§ 0.119-0.121.  COPS funding is
authorized by Congress under 34 U.S.C. § 10381 *et seq.*

96.   Beginning in Fiscal Year 2014, Congress appropriated funds for "competitive grants
to State law enforcement agencies" for "investigative purposes to locate or investigate illicit
activities, including precursor diversion, laboratories, or methamphetamine traffickers," and has
continued to set aside COPS grant funds for that purpose ever since. *See, e.g.*, Consolidated
Appropriations Act, 2014, Pub. L. No. 113-76, div. B, tit. II, 128 Stat. 65 (2014).  Beginning in
2015, Congress appropriated funds for "competitive grants to State law enforcement agencies" for
"investigative purposes to locate or investigate illicit activities, including activities related to the
distribution of heroin and prescription opioid traffickers," and has done so ever since.
Consolidated Appropriations Act, 2015, Pub. L. No. 113-235, div. B, tit. II, 128 Stat. 2196
(2015).

97.   Since the inception of the COPS program, CalDOJ has received over $11 million to
support law enforcement efforts around the State, including work on multi-jurisdictional task
forces.  Every year since Congress appropriated funds for the COPS Anti-Methamphetamine
Program ("CAMP") in 2014, CalDOJ has applied for and received funds to support Group 22, a
part of the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force (LA
IMPACT).  Group 22 is responsible for targeted enforcement efforts of large-scale
methamphetamine drug trafficking organizations, including dismantling operations in California
or elsewhere in the country.  A CalDOJ special agent is the Executive Director of LA IMPACT
and in 2016, CalDOJ used its $1,447,880 COPS grant to cover salaries, benefits, and other costs
in support of the State's anti-methamphetamine efforts.  CalDOJ's 2017 CAMP application seeks
to continue and expand its support of Group 22.

98.   Similarly, every year since Congress appropriated funds for the COPS Anti-Heroin
Task Force ("AHTF") Program, CalDOJ has applied for and received funds to support efforts to
combat heroin in the State's 14 multi-disciplinary and interdisciplinary task forces.  These task
forces conduct large-scale heroin investigations, seize heroin, share data and intelligence among

law enforcement personnel throughout the state, and conduct education sessions in the community about drug abuse awareness.  In 2016, California received $1,276,924 to cover equipment, consultants, and other costs in support of the State's anti-heroin efforts.  CalDOJ's 2017 ATHF application seeks to continue and expand its support of these task forces.

> ### B.   California Applied for Fiscal Year 2017 COPS Funding that was Conditioned on Section 1373

99.   On or about May 22, 2017, the COPS Office announced the Fiscal Year 2017 COPS Solicitations.  The COPS Office set July 10, 2017 as the deadline for applications.

100. In the COPS Solicitations, the COPS Office announced that applicant entities must certify compliance with Section 1373 ("COPS Section 1373 Certifications").  *See* Ex. C at 2, 30, and Appx. D; Ex. D at 2, 29, and Appx. D.  Specifically, to be considered for COPS funding, the chief legal office of the applicant entities had to certify that:

> As of the date of this certification, no state or local government entity or official has in effect (or purports to have in effect) any prohibition that is applicable to the program or activity to be funded in whole or in part under the FY 2017 program and that deals with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §1373(a) or (b).

101. CalDOJ's Division of Law Enforcement ("DLE") applied for AHTF and CAMP COPS grants on July 7 and 10, respectively.  As part of the applications, DLE included the COPS Section 1373 Certifications.

102. As part of its applications, the DLE included a supplemental statement by CalDOJ in connection with the COPS Section 1373 Certifications.  In the supplemental statement, CalDOJ clarified that the COPS Section 1373 Certifications were made "as that federal statute is lawfully interpreted."  CalDOJ also expressly reserved its rights to challenge "any unconstitutional enforcement of Section 1373."

103. As of the date of this filing, DLE has not yet received any response to its applications. USDOJ acknowledged that it would not meet its intended September 30 deadline for making award announcements, but in a September 7, 2017 e-mail, USDOJ "committed to finishing

1    application reviews and announcing this year's award recipients as quickly as possible."

2    **VII.  DEFENDANTS' STATEMENTS REVEAL THAT THEY INTEND TO WRONGFULLY**
3    **WITHHOLD FUNDING FROM CALIFORNIA BASED ON A MISTAKEN BELIEF THAT THE**
     **STATE DOES NOT COMPLY WITH SECTION 1373**

4    104.  Although California's laws comply with the Section 1373 Conditions, Defendants

5    have consistently stated or suggested their perception that California and its local jurisdictions

6    potentially violate Section 1373, and will withhold and/or take JAG and COPS funding away

7    from the State on that basis.

8    105.  Now that the State has enacted the Values Act, that fear is more immediate.  In

9    response to a question from Bill O' Reilly about what he would do if California enacted the

10   Values Act, President Trump said that he would use de-funding "as a weapon" against

11   California.[6]

12       **A.    An Office of Inspector General Report that Defendants Have Relied Upon**
             **Indicates that they Mistakenly Believe California's Laws Violate Section**
13           **1373**

14   106.  In May 2016, the USDOJ's Office of Inspector General ("OIG") completed a report

15   analyzing practices of ten state or local jurisdictions that limit compliance with requests from

16   immigration authorities ("OIG Report").  The OIG Report was in response to a request by

17   Congressman John Culberson to determine whether USDOJ grant recipients violate Section 1373.

18   The State of California was identified as one of the ten jurisdictions on the basis of the TRUST

19   Act, although its laws were not discussed in detail in the OIG Report.[7]

20   107.  Although the OIG Report acknowledged that Section 1373 only governs immigration

21   and citizenship status information, it said "[a] reasonable reading of Section 1373, based on its 'in

22   any way restrict' language, would be that it applies not only to the situation where a local law or

23   policy specifically prohibits or restricts an employee from providing citizenship or immigration

24   status information, but also where the actions of local officials result in prohibitions or restrictions

---

25       [6] *Donald Trump Super Bowl interview transcript with Fox News' Bill O' Reilly*, SBNation
26   (released Feb. 5, 2017), https://www.sbnation.com/2017/2/5/14516156/donald-trump-interview-
     transcript-bill-oreilly-super-bowl-2017.
27       [7] Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol
     V. Mason, Assistant Attorney Gen., Office of Justice Program, U.S. Dep't of Justice, Department
     of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients,
28   U.S. Department of Justice, Office of the Inspector General 13 (May 31, 2016).

1    on employees providing such information to ICE." OIG Rep. at 7 n.9.  OIG remarked that laws

2    and policies that "apply to the handling of ICE detainer requests, may have a broader practical

3    impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be

4    inconsistent with at least the intent of Section 1373." *Id.* at 7.  OIG identified several

5    jurisdictions as possibly violating Section 1373 because they either prohibited the disclosure of

6    release dates or defined the parameters under which the jurisdictions may respond to such

7    requests. *Id.* at 7-8.  Furthermore, it noted that one jurisdiction that both prohibited the initiation

8    of immigration status investigations and regulated law enforcement's response to an ICE request

9    for an inmate's release date, "raises a … concern as to the limits it places on the authority of [law

10   enforcement] officials to share information on that topic with ICE."  *Id.*

11      108.   Defendants appear to rely on OIG's findings.  On March 27, 2017, in formal

12   "Remarks Announcing Sanctuary Jurisdictions" discussing Section 1373, Defendant Sessions

13   cited the OIG Report to support his statement that policies that limit compliance with detainer

14   requests "violate federal laws."  Defendant Sessions claimed that such policies limiting

15   compliance with detainer requests put jurisdictions "at risk of losing valuable federal dollars."[8]

16      109.  In Congressional testimony three months later, ICE Acting Director Thomas Homan

17   told Congress that he viewed violators of Section 1373 as those that "have some sort of policy

18   where they don't honor detainers or allow [ICE] access to the jails."[9]  Homan also said in that

19   testimony that Section 1373 not only covers "sharing the information, but allow[ing] us access to

20   the jails." *Id.* at 45-46.[10]

---

[8] Attorney General Jeff Sessions, *Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions*, U.S. Dep't of Justice (Mar. 27, 2017),
https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

[9] *ICE and CBP F.Y. 2018 Budget Request: Hearing Before the Subcomm. on Homeland Security of the H. Appropriations Comm. Hr'g Tr.*, 115th Cong., Fed. News Serv. Transcripts, 2017 WLNR 18737622, 33-34 (June 13, 2017) (statement of ICE Acting Director Thomas Homan).

[10] Although, California's laws do not prohibit ICE's access to detention facilities, in a letter to the Chief Justice of California sent on March 31, 2017, Defendant Sessions and then-DHS Secretary John F. Kelly said that the "the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by … denying requests by ICE officers and agents to enter prisons and jails to make arrests." *Attorney General Jefferson B. Sessions and Secretary John F.*

110.   On April 21, 2017, Defendant Hanson sent letters to nine of the ten jurisdictions identified in the OIG Report that received a JAG award in 2016, including the BSCC, demanding that they submit an official legal opinion validating their compliance with Section 1373.[11]   In a connected press release, Defendant USDOJ claimed that OIG had previously identified these jurisdictions, including the State of California, "as having laws that potentially violate 8 U.S.C. § 1373."[12]   In a speech that same day in San Diego, California, Defendant Sessions reiterated that "the Department of Justice sent letters to jurisdictions that were identified (by the Obama administration) as having policies that potentially violate federal law to receive millions in federal grants."[13]   Defendant Sessions identified the State of California as being one of those jurisdictions potentially in violation of Section 1373.

> **B.**   **Defendants' Actions since California's Submission of a Legal Opinion Validating Compliance Support a Credible Fear that Defendants Will Wrongfully Withhold Funding on the Basis of Section 1373**

111.   Given Defendants' reliance on OIG's erroneous interpretation of Section 1373, California has a credible fear that Defendants will withhold JAG and COPS funding away from the State.

112.   On June 29, 2017, the BSCC, the State entity that directly receives the JAG award, submitted its legal opinion explaining that the State's laws, including the TRUST and TRUTH Acts, do not violate Section 1373.

113.   Subsequently, on July 6, 2017, Defendant Sessions suggested, without any support, that the jurisdictions that submitted the Section 1373 legal opinions may not be in compliance with Section 1373, saying, "It is not enough to assert compliance, the jurisdictions must actually

---

*Kelly Letter to the Honorable Tani G. Cantil*, N.Y. Times (Mar. 31, 2017), https://www.nytimes.com/interactive/2017/03/31/us/sessions-kelly-letter.html.
   [11] Press Release, U.S. Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.
   [12] *Id.*
   [13] Attorney General Jeff Sessions, *Attorney General Jeff Sessions Delivers Remarks Before Media Availability in San Diego, California*, U.S. Dep't of Justice (Apr. 21, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-media-availability-san-diego-california.

First Amended Complaint for Declaratory and Injunctive Relief (17-cv-4701)

1    be in compliance."[14]

2         114.  On that same date, Defendant USDOJ asserted that it would make a determination

3    soon whether the jurisdictions that submitted the requested legal opinions comply with Section

4    1373.

5         115.  In August 2017, Defendants informed at least two of those jurisdictions that they

6    comply with Section 1373.

7         116.  On October 12, 2017, Defendants announced results of their preliminary compliance

8    assessments for the remaining jurisdictions except California.  Defendants announced that they

9    had found no evidence that two of the jurisdictions are currently out of compliance with Section

10   1373.  Defendants announced that they had preliminarily determined that five of the jurisdictions

11   do not appear to comply with Section 1373.  Defendants determined that four of the five

12   jurisdictions appear to violate Section 1373 on its face because they regulate the sharing of

13   release dates.  Defendants determined that one of the five jurisdictions appears to violate Section

14   1373 because it protects the disclosure of information regarding victims of crime.  And

15   Defendants noted that all five of the jurisdictions that limit inquiries into one's immigration status

16   may violate Section 1373, depending on how their laws or policies are applied.[15]

17        117.  As a result of the above, California must assume, based on Defendants USDOJ and

18   Sessions' rhetoric and Defendants' determinations as to other jurisdictions, that California is in

19   danger of being found not to be in compliance with Section 1373.

20   VIII. THE IMPOSITION OF THE ILLEGAL FUNDING CONDITIONS WILL CREATE
           IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS
21

22        118.  Defendants' actions create the prospect that the State and/or its local jurisdictions will

23   have to decide whether they may have to forego acceptance of their JAG awards, unless there is

24

25        [14] Press Release, U.S. Dep't of Justice, *Department of Justice Reviewing Letters from Ten
     Potential Sanctuary Jurisdictions* (July 6, 2017), https://www.justice.gov/opa/pr/department-
     justice-reviewing-letters-ten-potential-sanctuary-jurisdictions.
26        [15] Press Release, U.S. Dep't of Justice, *Justice Department Provides Last Chance for
     Cities to Show Section 1373 Compliance* (Oct. 12, 2017), https://www.justice.gov/opa/pr/justice-
27   department-provides-last-chance-cities-show-1373-compliance (Section 1373 Compliance
     Determination Letters sent to Chicago, Cook County, New Orleans, New York, and
28   Philadelphia).

1   clarification about the scope of the new conditions and Defendants' interpretation of Section

2   1373.  That means a loss of critical law enforcement funds of up to $28.3 million for JAG and

3   $2.8 million for COPS, in the event those monies are withheld by Defendants, that would

4   otherwise go toward programs throughout the State that reduce recidivism for at-risk youth,

5   counter the distribution of illegal drugs, advance community policing, and improve educational

6   outcomes.

7         119.   Another prospect is that the State and/or its localities accept the funding and change

8   their public-safety oriented laws and policies in order to ensure they are viewed as complying

9   with these ambiguous JAG Access and Notification Conditions, and with Section 1373 based on

10  the Defendants' actions seeking to interpret and enforce Section 1373 in an erroneous and

11  unconstitutional manner.  Abandoning these policies, that law enforcement has found to be

12  effective in their communities, would divert resources away from fighting crime and erode trust

13  between the State and local governments and their immigrant communities that the TRUST and

14  TRUTH Acts, the Values Act, and the Shield Confidentiality Statutes, as well as local ordinances,

15  are intended to build.

16        120.   In order to compel jurisdictions to adopt its federal immigration enforcement

17  program, the Administration has admitted that it intends to force state and local jurisdictions to

18  abandon policies these jurisdictions have adopted based on their considered judgment on how

19  best to enhance public safety.  The ambiguity of these conditions is part and parcel of the

20  Administration's plan to create a chilling effect that makes state and local jurisdictions think

21  twice about maintaining their current policies.  If Defendants clarify the JAG Access Condition to

22  explain that they expect jurisdictions to not provide any procedural protections to detainees before

23  an ICE interview, jurisdictions will still feel pressured to change their laws or policies to avoid

24  losing any federal funding.  Defendants' (perhaps intentional) silence on how they interpret the

25  State's compliance with Section 1373 only adds to this pressure.

26        121. By their actions, Defendants are compelling state and local governments to make a

27  decision about whether to modify or abandon public safety policies or forego federal funding

28  without providing clarity about the scope of the conditions, or even Defendant's interpretation of

1    Section 1373 as applied to the State.  This forces jurisdictions to sign an unqualified certification

2    under penalty of perjury within 45 days of receiving the final JAG award conditions in the face of

3    the doubt that Defendants have created through their specious interpretations of Section 1373 and

4    their failure to timely respond to the BSCC's legal opinion.  And this makes it unlikely that the

5    State will receive the COPS awards that will be granted soon.  Defendants' scheme undermines

6    public safety, is unconstitutional, and should be halted.

7                                   **FIRST CLAIM FOR RELIEF**

8              **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

9                        **(JAG Access and Notification Conditions)**

10            122.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

11            123.   Article I, Section I of the United States Constitution enumerates that "[a]ll legislative

12    Powers herein granted shall be vested in [the] Congress."

13            124.   Article I, Section VIII of the United States Constitution vests exclusively in Congress

14    the spending power to "provide for . . . the General Welfare of the United States."

15            125.   Defendants have exceeded Congressional authority by adding conditions requiring

16    jurisdictions to provide access to detention facilities to interview inmates and to comply with

17    notification requests that are not conferred by the JAG authorizing statute or any other federal

18    law.  *See* 34 U.S.C. §§ 10151-58 *et seq*.  The new Access and Notification Conditions therefore

19    unlawfully exceed the Executive Branch's powers and intrude upon the powers of Congress.

20            126.   For the reasons stated herein, the Access and Notification Conditions in the JAG

21    Solicitations are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.

22                                **SECOND CLAIM FOR RELIEF**

23              **VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY**

24                   **(JAG Section 1373, Access, and Notification Conditions)**

25            127.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

26            128.   Congress' spending power is not unlimited.  When "Congress desires to condition the

27    States' receipt of federal funds, it 'must do so (a) unambiguously …, enabl[ing] the States to

28    exercise their choice knowingly, cognizant of the consequences of their participation;'" and (b)

                                                    33

1   by placing conditions that are related "to the federal interest in particular national projects or

2   programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

3       129.   To the extent that Congress delegated its authority to impose conditions (special

4   conditions or otherwise) on JAG funding (which Plaintiff does not concede), the Section 1373,

5   Access, and Notification Conditions violate the Spending Clause of the U.S. Constitution.

6       130.   The Section 1373, Access, and Notification Conditions are unrelated to the "federal

7   interest in particular national projects or programs" for which Congress intended JAG funding to

8   be used.

9       131.   The Access and Notification Conditions violate the Spending Clause because they

10   are ambiguous and do not provide the State with notice to make a "choice knowingly" of whether

11   to comply.

12       132.   For the reasons stated herein, the Section 1373, Access, and Notification Conditions

13   in the JAG Solicitations are unlawful, unconstitutional, and should be set aside under 28 U.S.C. §

14   2201.

15                      **THIRD CLAIM FOR RELIEF**

16          **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

17   **(Constitutional Violations and Excess of Statutory Authority as to the JAG Section 1373,**

18                  **Access, and Notification Conditions)**

19       133.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

20       134.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG

21   Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

22       135.   The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and

23   final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.

24       136.   The APA requires that a court "hold unlawful and set aside agency action, findings,

25   and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or

26   "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* §

27   706(2)(B)-(C).

28       137.  Defendants' imposition of the Access and Notification Conditions in the JAG

1  Solicitations is unconstitutional because Defendants overstepped their powers by exercising

2  lawmaking authority that is solely reserved to Congress under Article I, Section I of the U.S.

3  Constitution.  Also, Defendants' imposition of the Access and Notification Conditions in the JAG

4  Solicitations was in excess of their statutory authority.  Furthermore, the Section 1373, Access,

5  and Notification Conditions violate the Spending Clause because they are unrelated to the federal

6  purpose of the grant and/or are ambiguous.

7      138.  Because Defendants acted unconstitutionally and in excess of their statutory authority

8  through the JAG Solicitations, these actions are unlawful and should be set aside under 5 U.S.C. §

9  706.

10                    **<u>FOURTH CLAIM FOR RELIEF</u>**

11            **<u>VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT</u>**

12  **(Arbitrary and Capricious as to the JAG Section 1373, Access, and Notification Conditions)**

13      139.  Plaintiff incorporates the allegations of the preceding paragraphs by reference.

14      140.  Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG

15  Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

16      141.  The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and

17  final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.

18      142.  The APA requires that a court "hold unlawful and set aside agency action, findings,

19  and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in

20  accordance with law." *Id.* § 706(2)(A).

21      143.  The imposition of the Section 1373, Access, and Notification Conditions is arbitrary

22  and capricious and an abuse of discretion because Defendants have relied on factors that

23  Congress did not intend by adding these conditions to JAG funding.

24      144.  For the reasons discussed herein, the Section 1373, Access and Notification

25  Conditions in the JAG Solicitations are unlawful and should be set aside under 5 U.S.C. § 706 for

26  being arbitrary and capricious and an abuse of discretion.

27                      **<u>FIFTH CAUSE OF ACTION</u>**

28                        **<u>DECLARATORY RELIEF</u>**

**(JAG and COPS Section 1373 Conditions)**

145.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

146.  An actual controversy exists as to whether the State of California and its localities comply with the Section 1373 Conditions in the JAG and COPS Solicitations on the basis of the TRUST, TRUTH, and Values Acts and California's Shield Confidentiality Statutes.  Although California law complies with Section 1373, Defendants' statements indicate that they will determine that California does not comply with Section 1373, and thus, the conditions.

147.   Section 1373 only governs restrictions on the sharing and receiving of immigration and citizenship status information, and requesting from federal immigration enforcement agents, and maintaining of, immigration status information.  Section 1373 does not prohibit restrictions on asking an individual about his or her immigration status, detainer requests, notification requests, ICE's access to jails, or requests for other personal information.  *See Steinle v. City and County of San Francisco*, 230 F. Supp.3d 994, 1015-16 (N.D. Cal. 2017).  Therefore, the TRUST, TRUTH, and Values Acts comply with Section 1373

148.  Section 1373 must be read in the context of the entire INA and in light of limitations set forth in the U.S. Constitution.  The Supreme Court has often "read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

149.  The Tenth Amendment further prohibits the federal government from requiring states and localities "to govern according to Congress's instructions" or "command[ing] state officers … to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also New York v. United States*, 505 U.S. 144, 161 (1992).  Specifically, where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional.  *Printz*, 521 U.S. at 932.

150.  If Section 1373 is read to extend to the TRUST, TRUTH, and Values Act and/or California's Shield Confidentiality Statutes, that would undermine the State's ability to ensure law and order, and execute over sovereign state and local government functions.  As a result, the

36

1   federal government would be commandeering the State and its political subdivisions by directing

2   their personnel how to act and handle data under State and local control in order to advance a

3   federal program.  Such an interference would be a violation of the Tenth Amendment.  *See Printz*,

4   521 U.S. at 932 & n.17, 935.

5       151. Thus, any non-disclosure about immigration status information that the State's Shield

6   Confidentiality Statutes direct is consistent with Section 1373 when read in light of the U.S.

7   Constitution.

8       152.   Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the TRUST,

9   TRUTH, and Values Acts and the State's Shield Confidentiality Statutes comply with Section

10  1373 as properly interpreted and construed, and thus, should not be a basis for withholding and

11  terminating federal funding, or disbarring and making ineligible the State and its political

12  subdivisions.

13      153.  Alternatively, Plaintiff is entitled to a declaration that Section 1373 cannot be

14  constitutionally enforced against the TRUST, TRUTH, and Values Act and the State's Shield

15  Confidentiality Statutes under the Tenth Amendment of the U.S. Constitution, and thus, should

16  not be a basis for withholding and terminating federal funding, or disbarring and making

17  ineligible the State and its political subdivisions.

18                              **PRAYER FOR RELIEF**

19      WHEREFORE, Plaintiff, including the State of California, respectfully requests that this

20  Court enter judgment in its favor, and grant the following relief:

21      1.     Issue a declaration that the Section 1373, Access, and Notification Conditions in the

22  JAG Solicitations are unconstitutional and/or unlawful because (a) they exceed the Congressional

23  authority conferred to the Executive Branch; (b) to the extent there is Congressional

24  authorization, they exceed the Congress's spending powers under Article I of the Constitution;

25  and/or (c) they violate the Administrative Procedure Act;

26      2.     Permanently enjoin Defendants from using the Section 1373, Access, and

27  Notification Conditions as restrictions for JAG funding;

28

3.   Permanently enjoin Defendants from withholding and terminating, or disbarring and making ineligible the State and its political subdivisions for JAG and COPS funding on account of the TRUST, TRUTH, and Values Acts;

4.   Permanently enjoin Defendants from withholding, terminating, disbarring, or making any state entity or local jurisdiction ineligible for JAG and COPS funding on account of the State's Shield Confidentiality Statutes;

5.   Issue a declaration that the TRUST, TRUTH, and Values Acts comply with Section 1373;

6.   Issue a declaration that California's Shield Confidentiality Statutes comply with Section 1373;

7.   In the alternative, issue a declaration that Section 1373 cannot be lawfully enforced as to the TRUST, TRUTH, and Values Acts;

8.   In the alternative; issue a declaration that Section 1373 cannot be lawfully enforced as to California's Shield Confidentiality Statutes; and

9   Award the State costs and grant such other relief as the Court may deem just and proper.

Dated:  October 13, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ANGELA SIERRA
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH BELTON
Deputy Attorney General

*/s/Lee Sherman*
*/s/Lisa C. Ehrlich*
LEE SHERMAN
LISA EHRLICH
Deputy Attorneys General
*Attorneys for the State of California*

First Amended Complaint for Declaratory and Injunctive Relief (17-cv-4701)

# EXHIBIT C

1   XAVIER BECERRA
    Attorney General of California
2   ANGELA SIERRA
    Senior Assistant Attorney General
3   SATOSHI YANAI
    Supervising Deputy Attorney General
4   SARAH E. BELTON
    LISA C. EHRLICH
5   LEE SHERMAN (SBN 272271)
    Deputy Attorneys General
6     300 S. Spring St., Suite 1702
      Los Angeles, CA  90013
7     Telephone:  (213) 269-6404
      Fax:  (213) 879-7605
8     E-mail:  Lee.Sherman@doj.ca.gov
    *Attorneys for Plaintiff State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**<br><br>Plaintiff,<br><br>v.<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | Case No. 17-cv-4701<br><br>**PLAINTIFF STATE OF CALIFORNIA'S NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:           December 13, 2017<br>Time:          2:00 p.m.<br>Dept:          2<br>Judge:         Honorable William H. Orrick<br>Trial Date:   None Set<br>Action Filed:  8/14/2017 |

1

**TABLE OF CONTENTS**

2

**Page**

3

Notice of Amended Motion and Amended Motion for Preliminary Injunction ........................... 1

Memorandum of Points and Authorities .................................................................................... 1

Introduction   …………………………………………………………………………………1

Background   …………................................................................................................................ 4

           A.    Section 1373 and the INA ........................................................... 4

           B.    California's Statutes .................................................................... 5

                   1.    The TRUST, TRUTH and Values Acts ........................ 6

                   2.    California's Confidentiality Statutes............................ 8

           C.    The History and Purpose of JAG ............................................... 9

           D.    California's Use of JAG and COPS Funds ............................... 10

           E.    JAG and COPS Requirements in Relation to Section 1373..................... 12

           F.    Defendants' Other Actions Threatening to Find the State in
                Violation of Section 1373 ......................................................... 13

Legal Argument ...................................................................................................................... 15

I.        Legal Standard ........................................................................................... 15

II.      California is Likely to Succeed on Its Claims that the JAG Section 1373
        Condition is Unlawful .................................................................................. 15

           A.    The JAG Section 1373 Condition Violates the Spending Clause
                Because it is Unrelated to the Purpose of JAG ......................... 15

           B.    Imposition of the JAG Section 1373 Condition is Arbitrary and
                 Capricious .................................................................................. 16

III.     California is Likely to Succeed in Showing that California's Statutes Do Not
        Violate Section 1373 ................................................................................... 17

           A.    The Values, TRUST, and TRUTH Acts Do Not Conflict with
                 Section 1373.............................................................................. 18

           B.    California's Confidentiality Statutes Do Not Conflict with Section
                 1373 .......................................................................................... 19

           C.    The Tenth Amendment Does Not Allow for Section 1373 to
                 Commandeer the State in its Control over Governmental
                 Employees and its Residents' Confidential Personal Information........... 20

IV.     Without Court Intervention, the Section 1373 Conditions will Cause the State
        Imminent and Irreparable Harm.................................................................. 25

V.      The Balance of Hardships Favors Granting a Preliminary Injunction................. 27

Conclusion .............................................................................................................................. 28

i

1

**TABLE OF AUTHORITIES**

2

**Page**

3

CASES

4

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*

5

    458 U.S. 592 (1982) ............................................................................28

6

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
    559 F.3d 1046 (9th Cir. 2009) ................................................25, 26, 27

7

*Ariz. Dream Act Coalition v. Brewer*

8

    757 F.3d 1053 (9th Cir. 2014) ..........................................................28

9

*Arizona v. United States*

10

    567 U.S. 387 (2012) ............................................................................16

11

*Atascadero State Hospital v. Scanlon*
    473 U.S. 234 (1985) ............................................................................20

12

*Bond v. United States*

13

    134 S. Ct. 2077 (2014) ........................................................................20

14

*Cape May Greene, Inc. v. Warren*
    698 F.2d 179 (3d Cir. 1983) ..............................................................17

15

*Chamber of Commerce of U.S. v. Whiting*

16

    563 U.S. 582 (2011) ............................................................................18

17

*City of Chicago v. Sessions*

18

    No. 17-cv-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ...................24, 25, 27

19

*City of New York v. United States*
    179 F.3d 29 (2d Cir. 1999) ..................................................22, 24, 25

20

*Cty. of Santa Clara v. Trump*

21

    250 F. Supp. 3d 497 (N.D. Cal. 2017) ..............................................15

22

*Davis v. Mich. Dep't. of Treasury*

23

    489 U.S. 803 (1989) ......................................................................19, 20

24

*Encino Motorcars, LLC v. Navarro*
    136 S.Ct. 2117 (2016) ........................................................................17

25

*FCC v. Fox Television Stations, Inc.*

26

    556 U.S. 502 (2009) ......................................................................16, 17

27

*FERC v. Mississippi*

28

    456 U.S. 742 (1982) ............................................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Giovani Carandola, Ltd. v. Bason*
   303 F.3d 507 (4th Cir. 2002)...........................................................................................28

*Gregory v. Ashcroft*
   501 U.S. 452 (1991)............................................................................................20, 23

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001).......................................................................................25

*Koog v. United States*
   79 F.3d 452 (5th Cir. 1996)...................................................................................21, 22, 23

*Massachusetts v. United States*
   435 U.S. 444 (1978)....................................................................................................15

*Melendres v. Arpaio*
   695 F.3d 990 (9th Cir. 2012)..........................................................................................28

*Morales v. Trans World Airlines*
   504 U.S. 374 (1992)....................................................................................................25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983)................................................................................................16, 17

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
   545 U.S. 967 (2005)....................................................................................................17

*New York v. United States*
   505 U.S. 144 (1992)..........................................................................................20, 21, 23

*Nken v. Holder*
   556 U.S. 418 (2009)....................................................................................................27

*Printz v. United States*
   521 U.S. 898 (1997)......................................................................................20, 21, 22, 23

*Raygor v. Regents of Univ. of Minn.*
   534 U.S. 533 (2002)....................................................................................................20

*Romero v. United States*
   883 F. Supp. 1076 (W.D. La. 1994).................................................................................22

*South Dakota v. Dole*
   483 U.S. 203 (1987)....................................................................................................15

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Steinle v. City & Cty. of San Francisco*
     230 F. Supp. 3d 994 (N.D. Cal. 2017) .................................................................18

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*
     695 F.3d 676 (7th Cir. 2012)..........................................................................27

*Texas v. United States*
     No. 15-cv-151, 2016 WL 4138632 (N.D. Tex. Aug. 4, 2016).................................16

*Trump v. Int'l Refugee Assistance Project*
     137 S.Ct. 2080 (2017) ....................................................................................15

*United States v. Lopez*
     514 U.S. 549 (1995) .......................................................................................23

*United States v. Morrison*
     529 U.S. 598 (2000) .......................................................................................22

*United States v. North Carolina*
     192 F. Supp. 3d 620 (M.D.N.C. 2016)...............................................................27

*Univ. of Texas v. Camenisch*
     451 U.S. 390 (1981) .......................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*
     555 U.S. 7 (2008) ....................................................................................15, 27

*Zadvydas v. Davis*
     533 U.S. 678 (2001) .......................................................................................21

**FEDERAL STATUTES**

5 U.S.C. § 706 ........................................................................................................16

8 U.S.C. § 1101 ...................................................................................................5, 19

8 U.S.C. § 1367 ...................................................................................................5, 19

8 U.S.C. § 1373 ............................................................................................... *passim*

8 U.S.C. § 1644 ........................................................................................................4

34 U.S.C. §§ 10151-58 ............................................................................................9

34 U.S.C. § 10152 ...........................................................................................10, 16

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

34 U.S.C. § 10153 ............................................................................................................10

4

34 U.S.C. § 10156 ..............................................................................................................9

5

**CALIFORNIA STATUTES**

6

Cal. Civ. Code

7

    § 1798.3 .........................................................................................................................7

8

Cal. Civ. Proc. Code

9

    § 155 ..................................................................................................................... *passim*

10

Cal. Gov't Code
    § 7282 ...........................................................................................................................6

11

    § 7282.5 ........................................................................................................................6
    § 7282.5 (amended and chaptered on Oct. 5, 2017)................................7, 18, 21, 23

12

    § 7283.1 .................................................................................................................7, 21
    § 7284.2 (chaptered on Oct. 5, 2017)......................................................................6, 7

13

    § 7284.6 (chaptered on Oct. 5, 2017) ............................................................. *passim*

14

Cal. Penal Code

15

    § 422.93 ................................................................................................................ *passim*
    § 679.10 ................................................................................................................ *passim*

16

    § 679.11 ................................................................................................................ *passim*

17

Cal. Welf. & Inst. Code

18

    § 827 ..................................................................................................................... *passim*
    § 831 ..................................................................................................................... *passim*

19

**CONSTITUTIONAL PROVISIONS**

20

U. S. Const., art. I, § 8, cl. 4 ...............................................................................................4

21

**COURT RULES**

22

Cal. R. of Ct. 5.552 ............................................................................................................9

23

**OTHER AUTHORITIES**

24

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (1988)...................9

25

Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies

26

    Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996)...............10

27

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.

28

    104-208, 110 Stat. 3009-546 (1996) ........................................................................5

1

## TABLE OF AUTHORITIES
### (continued)

2
                                                                                    Page

3      Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990).......................................10

4      Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-
5          232, 105 Stat. 1733 (1991)..........................................................................................10

6      Violence Against Women and Department of Justice Reauthorization Act of 2005,
           Pub. L. No. 109-162, 119 Stat. 2960 (2006)..............................................................10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR PRELIMINARY INJUNCTION</u>

PLEASE TAKE NOTICE that on Wednesday, December 13, 2017, at 2:00 p.m. or as soon thereafter as it may be heard before the Honorable William H. Orrick in Courtroom 2 of the U. S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General will and does hereby move the Court pursuant to F.R.C.P. 65 for a preliminary injunction against Defendants Attorney General Jefferson Sessions, Assistant Attorney General Alan Hanson, and the United States Department of Justice, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

California moves the Court to enter a preliminary injunction prohibiting Defendants from requiring compliance with 8 U.S.C. § 1373 as a condition for the State and its political subdivisions to receive funding pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program. In addition, because the State's laws comply with Section 1373, California seeks an order enjoining Defendants from interpreting or enforcing Section 1373 in such a manner to withhold, terminate, or claw-back funding from, or disbar or make ineligible, the State or any of its political subdivisions that apply for JAG or Community Policing Services grants on account of the following state statutes: California Government Code sections 7282 *et seq.*, 7283 *et seq.*, 7284 *et seq.*, Penal Code sections 422.93, 679.10, 679.11, California Welfare and Institutions Code sections 827 and 831, and California Code of Civil Procedure section 155. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations, the Request for Judicial Notice, as well as the papers, evidence and records on file, and any other written or oral evidence or argument as may be presented.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

<u>INTRODUCTION</u>

Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General moves for a preliminary injunction preventing Defendants from enforcing against the State and its political subdivisions conditions requiring compliance with 8 U.S.C. § 1373 in order to receive $31.1 million in law enforcement funding pursuant to the Edward Byrne Memorial Justice Assistance

1

1    Grant ("JAG") and Community Oriented Policing Services ("COPS") grants.[1]  Starting with

2    President Trump's Executive Order No. 13768 directed at so-called "sanctuary jurisdictions," that

3    has already been found likely unconstitutional, the Trump Administration has sought to interpret

4    and use Section 1373 in a constitutionally impermissible manner as a cudgel to force state and

5    local jurisdictions to acquiesce to the President's immigration enforcement demands.  Defendants

6    now require jurisdictions to certify compliance with Section 1373, a statute restricting federal,

7    state, and local jurisdictions from prohibiting the exchange of information regarding an

8    individual's immigration and citizenship status, in order to receive grants that are unrelated to

9    immigration enforcement.

10          Although Defendants lack constitutional and legal authority to impose the Section 1373

11   condition for JAG, under normal circumstances there would be no dispute because the State's

12   laws comply with Section 1373.  To be sure, California has enacted one group of statutes that set

13   parameters for when and how state or local law enforcement agencies ("LEAs") may engage in

14   immigration enforcement activities—such as prolonging an individual's ordinary release on the

15   basis of a Department of Homeland Security ("DHS") detainer request, notifying DHS agents of

16   an individual's release date, and informing those detainees that DHS seeks to interview of their

17   rights.  But these statutes do not touch upon the activities regulated by Section 1373.  California

18   has also enacted confidentiality statutes that protect residents' personal information, including

19   immigration status information, when the State has deemed such protection necessary to

20   effectuate State and local governmental activities.  All of these statutes are designed to improve

21   the public safety of all Californians by promoting relationships of trust between the State and its

22   10 million foreign-born residents and their family members, and encourage victims and witnesses

23   of crime to come forward.  Reading Section 1373 as applying to the first group of statutes would

24   conflict with the text of Section 1373, while reading Section 1373 as to California's

25   confidentiality statutes would be inconsistent with the remainder of the Immigration and

26   _____

27   [1] The FY 2017 State and Local Solicitations for JAG are Exhibits A and B, respectively, to the
     Request for Judicial Notice accompanying this Motion.  The FY 2017 COPS Application Guides
     for the Anti-Methamphetamine Program and Anti-Heroin Task Forces are Exhibits C and D,
28   respectively, to the Judicial Notice Request.

2

1   Naturalization Act ("INA") and the federal government's own handling of immigration status

2   information.  And either would violate the Tenth Amendment of the U.S. Constitution.

3   Defendants have nevertheless indicated that at least one of California's laws may be

4   incompatible with Section 1373, and that other jurisdictions' statutes and policies similar to those

5   in California are incompatible with Section 1373.  On October 12, 2017, Defendants announced

6   preliminary assessments with respect to seven jurisdictions from which Defendants sought legal

7   opinions validating their compliance with Section 1373.  Defendants determined that five of the

8   jurisdictions had laws or policies that appear to violate Section 1373, including one jurisdiction

9   because it, like California, regulates the disclosure of information regarding victims of crime.

10   California too submitted a legal opinion that analyzed California's laws and concluded that

11   the State does not violate Section 1373.  The day after the State filed its initial Motion for

12   Preliminary Injunction ("PI Mot"), ECF No. 17, Defendants informed the State of their

13   determination that the recently adopted California Values Act, California Government Code

14   section 7284 *et seq.*,[2] a law that has not taken effect yet, "may violate [Section 1373], depending

15   on how your jurisdiction interprets and applies [it]."[3]  Moreover, Defendants expressly stated that

16   they may take action on other California statutes.  Defendants' interpretation of Section 1373 as

17   communicated in that letter interferes with the State's ability to submit an unqualified

18   certification of compliance with Section 1373, under penalty of perjury, that the State must do in

19   order to receive JAG funding.  In addition, USDOJ will soon make awards for the COPS grants,

20   which Defendants will either deny to the State or demand that the State accept only if it assures

21   that it will comply with all applicable laws, which would include compliance with Defendants'

22   misinterpretation of Section 1373.

23   Defendants' actions cause irreparable harm to the State's sovereignty, public safety, and

24   operations.  Congress has appropriated $28.3 million in JAG funding to California to support

25   

26   [2] All references to provisions in Government Code section 7284 *et seq.* refer to the law that was chaptered on October 5, 2017, and is set to take effect on January 4, 2018.

27   [3] Defendants' November 1, 2017 letter, which seeks to enforce Section 1373 against the Values

28   Act as to FY 2016 funds already awarded, although the law was not in effect in that fiscal year, leaves no doubt that the Values Act and amended TRUST Act are ripe for determination here.

3

1   criminal justice programs.  Among other things, these programs support crime victims and

2   witnesses, reduce recidivism, facilitate crime prevention education for at-risk youth, and fund

3   other law enforcement programs.  The State is also expected to receive $2.8 million pursuant to

4   two COPS grants, grants that the State has received every year they have existed, which are used

5   to investigate illicit drug distribution.  Loss of these funds will harm public safety.  But public

6   safety will also be harmed if the State and its political subdivisions must accede to Defendants'

7   demands in order to receive these federal dollars.  Defendants' misinterpretation of Section 1373

8   further means that Californians will not be able to hold their state and local officials appropriately

9   accountable for policy changes that are beyond their control—the very harm the Tenth

10  Amendment aims to prevent.  To prevent these harms, a preliminary injunction is necessary.[4]

11                              **BACKGROUND**

12          **A.    Section 1373 and the INA**

13          The U.S. Constitution grants Congress the power to regulate immigration and

14  naturalization.  *See* art. I, § 8, cl. 4.  Congress has done so via the comprehensive framework

15  codified in the INA.  Two provisions of the INA restrict federal, state, and local governments in

16  how they may control the exchange of information regarding an individual's immigration and

17  citizenship status.  The statute relevant to this litigation is 8 U.S.C. § 1373.[5]  Paragraph (a) of

18  Section 1373 provides as follows:

19          Notwithstanding any other provision of Federal, State, or local law, a Federal, State,
            or local government entity or official may not prohibit, or in any way restrict, any
20          government entity or official from sending to, or receiving from [federal immigration
            authorities] information regarding the citizenship or immigration status, lawful or
21          unlawful, of any individual.

22  Paragraph (b) forbids federal, state, or local governments from prohibiting the following: (i)

23  "[s]ending [immigration status] information to, or requesting or receiving such information from

24  [4] California has also brought claims challenging Defendants' imposition of conditions requiring
    jurisdictions to respond to DHS requests for inmates' release dates and to provide DHS agents
25  access to detention facilities for interview purposes.  *See, e.g.*, FAC, ¶¶ 122-144.  Those
    conditions are currently subject to a nationwide injunction.  *See City of Chicago v. Sessions*, No.
26  17-cv-5720, ECF No. 78 (N.D. Ill. Sept. 15, 2017).  California reserves its right to seek a
    preliminary injunction as to those conditions if the nationwide injunction is stayed or modified.

27

28  [5] The other statute, 8 U.S.C. § 1644, exists in a chapter within the INA for "Restricting Welfare
    and Public Benefits for Aliens" and contains restrictions that are encompassed by Section 1373.

                                        4

1   [federal immigration authorities];" (ii) "[m]aintaining such information;" or (iii) "[e]xchanging

2   such information with any other Federal, State, or local government entity."

3          Other provisions of the INA provide information-sharing safeguards for certain vulnerable

4   immigrants, including those who are undocumented.  For example, the INA offers protections and

5   benefits to victims and witnesses of crime by creating specialized U-visas for those who have

6   cooperated with law enforcement in investigating or prosecuting enumerated crimes such as

7   domestic violence and child abuse, and T-visas for those who have cooperated in prosecuting

8   human trafficking.  *Id.* § 1101(a)(15)(T)-(U).  Title 8, Section 1367, which was enacted as part of

9   the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208,

10  110 Stat. 3009-546, the same Act that created Section 1373,[6] generally prohibits the "use by or

11  disclosure" of any information provided during the process of applying for U- or T-visas, or other

12  benefits available for immigrant witnesses and victims of crime, "to anyone" other than identified

13  federal departments.  *See* 8 U.S.C. § 1367(a)(1)-(2).  It also prohibits using the information

14  provided to "make an adverse determination of admissibility or deportability" for the immigrant

15  victims and witnesses of crime.  *Id.*  The INA also details a "Special Immigrant Juvenile" process,

16  through which certain abused, neglected, or abandoned undocumented immigrant children may

17  seek legal immigration status.  *Id.* § 1101(a)(27)(J).  Federal law relies on state courts to make the

18  predicate determination for youth who are eligible to apply for this status.  *See id.*

19          **B.     California's Statutes**

20          California's laws are consistent with the INA.  Relevant to this Motion are the State's laws

21  impacted by Defendants' interpretation of Section 1373, and arguably implicated by the Section

22  1373 conditions.  These laws fit into two categories: (a) those laws that define the circumstances

23  under which LEAs may assist in immigration enforcement (the TRUTH, TRUST, and Values

24  Acts); and (b) six state statutes safeguarding confidentiality, the "State's Confidentiality

25  Statutes": Penal Code sections 422.93, 679.10, and 679.11, Welfare and Institutions Code

26  sections 827 and 831, and Code of Civil Procedure section 155.

27  ───────────────
    [6] *Compare id.* tit. III, § 384, 110 Stat. at 3009-652-53 *with id.* tit. VI, § 642, 110 Stat. at 3009-
28  707.

1    California has enacted these statutes to strengthen community policing efforts.[7]  Exercising

2    its discretion, California has concluded that statutes like these improve public safety in light of

3    evidence that immigrants are no more likely to commit crimes than native-born Americans,[8] and

4    that a clear distinction between local law enforcement and immigration enforcement results in

5    safer communities.  *See, e.g.*, RJN, Exs. F at 5, G at 8; W at 8.  The California Legislature has

6    relied on law enforcement officers' statements about the public safety benefits of practices that

7    reduce the entanglement between their agencies and immigration enforcement.  *See, e.g.*, RJN,

8    Exs. G at 9; X at 7.  LEAs throughout the State continue to build trust between LEAs and

9    immigrant communities so that "people could come forward if they are a crime victim or . . .

10   witness to a crime without fear of being deported."  *See* Decl. of L.A. Cty. Sheriff Jim McDonnell

11   in Supp. of Pl.'s Am. Mot. for Prelim. Inj. ("McDonnell Decl."), ¶¶ 10-13; *see also* Compl., *City*

12   *and Cty. of San Francisco v. Sessions*, No. 17-4642 (N.D. Cal. Aug. 11, 2017) ("S.F. Compl.") ¶¶

13   19, 28.  These laws and local practices protect the public safety of all Californians, regardless of

14   immigration status.  *See, e.g.*, Cal. Gov't Code § 7284.2(f); RJN, Ex. X at 1.

## 1.    The TRUST, TRUTH and Values Acts

16       In 2013, California enacted the TRUST Act, Cal. Gov't Code § 7282 *et seq.*, which defined

17   when local LEAs could detain an individual for up to 48 hours after the person's ordinary release

18   on the basis of a detainer request.  *See id.* §§ 7282(c), 7282.5.  The TRUST Act allowed

19   compliance with detainers if they did not "violate any federal, state, or local law, or any local

20   policy," and the subject possessed a specified criminal background (including a prior conviction

21   of one of hundreds of crimes), was on the California Sex and Arson Registry, or was held after a

22   magistrate's finding of probable cause for a serious or violent felony.  *See id.* § 7282.5(a).

23       Three years later, the State enacted the TRUTH Act, Cal. Gov't Code § 7283 *et seq.*, which

24   increased transparency about local LEA's involvement when federal immigration authorities seek

25   to interview someone in a jail's custody.  Under the TRUTH Act, a jail must notify such an

---

[7] *See, e.g.*, Cal. Gov't Code § 7284.2(c); 2016 Cal. Legis. Serv. Ch. 768 § 2(i) (the "TRUTH Act"); 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (the "TRUST Act"); Cal. Penal Code § 422.93(a).

[8] *See, e.g.*, 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (the "TRUST Act"); RJN, Ex. E at 6.

1   individual that interviews are voluntary and the detainee has the right to seek counsel.  *Id.* §

2   7283.1(a).  Upon receipt of a detainer, notification, or transfer request, a LEA must provide the

3   subject a copy and inform him or her whether the LEA intends to comply.  *Id.* § 7283.1(b).

4        On October 5, 2017, Governor Edmund G. Brown signed into law the California Values

5   Act, Cal. Gov't Code § 7284 *et seq*., intended "to ensure effective policing, to protect the safety,

6   well-being, and constitutional rights of the people of California, and to direct the state's limited

7   resources to matters of greatest concern to state and local governments."  *Id.* § 7284.2(f).  The

8   Values Act accomplishes these goals by generally prohibiting "[i]nquiri[es] into an individual's

9   immigration status," meaning LEAs cannot ask an individual about his or her immigration status

10  for immigration enforcement purposes.  *See id.* § 7284.6(a)(1)(A).  In order to ensure compliance

11  with federal court decisions that have found Fourth Amendment violations when law enforcement

12  holds inmates beyond their ordinary release pursuant to a warrantless detainer request, the Values

13  Act prohibits compliance with such requests.  *See id.* §§ 7284.2(e), 7284.6(a)(1)(B).  The Values

14  Act amends the TRUST Act to define when LEAs have discretion to respond to "notification

15  requests," which are requests by an immigration authority asking an LEA to inform it "of the

16  release date and time in advance of the public of an individual in its custody."  *See id.* §§

17  7282.5(a) (chaptered Oct. 5, 2017), 7283(f), 7284.6(a)(1)(C).  LEAs may notify immigration

18  authorities about the release dates of individuals with a prior criminal conviction of one of

19  hundreds of crimes, or if the information is already "available to the public."  *See id.* §

20  7284.6(a)(1)(C).  The Values Act also prohibits the use of LEA money or personnel to "provid[e]

21  personal information," about an individual "for immigration enforcement purposes," unless that

22  information is "available to the public."[9]  *Id.* § 7284.6(a)(1)(D).  This "personal information"

23  includes information about victims and witnesses of crime that a LEA would also possess.

24        Notwithstanding any of the above, the Values Act contains a savings clause that expressly

25  permits compliance with all aspects of Section 1373:

26  _____

[9] "Personal information" is defined as "any information that is maintained by an agency that
identifies or describes an individual, including, but not limited to, his or her name, social security
27  number, physical description, home address, home telephone number, education, financial
matters, and medical or employment history.  It includes statements made by, or attributed to, the
28  individual."  Cal. Civ. Code § 1798.3(a).

7

1

2

3

4

> This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of title 8 of the United States Code.

5

6

*Id.* § 7284.6(e).  The Values Act also explicitly does not prohibit any jurisdiction from allowing immigration authorities access to jails.  *Id.* § 7284.6(b)(5).

7

### 2.   California's Confidentiality Statutes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

       To ensure the proper operation of state and local criminal and juvenile justice systems, the State's Confidentiality Statues protect, in discrete circumstances, the confidentiality of sensitive information that the State and its localities collect and maintain.  These Confidentiality Statutes can be broken down into two subcategories.  The first subcategory (Cal. Penal Code §§ 422.93, 679.10, 679.11) consists of statutes that protect the confidential information of victims and witnesses of crime, in order to "encourag[e]" "victims of or witnesses to crime, or [those] who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice system."  *See, e.g.*, *id.* § 422.93(a).  California Penal Code sections 679.10 and 679.11 implement the state and local LEA's role in the federal U- and T-visa process by, among other things, prohibiting certifying entities from "disclosing the immigration status of a victim" or other person requesting certification "except to comply with federal law or legal process, or if authorized by the victim or person requesting [the certification form]."  *Id.* §§ 679.10(k), 679.11(k).  These confidentiality protections impact thousands of immigrants who come forward to cooperate with law enforcement.  For example, in 2016, the year Section 679.10 came into effect for U-visa applicants, L.A. County Sheriff's Department received double the number of U-visa applications from the year before (954 in total, 80 percent of which were certified), and in 2017, L.A. County has already processed 774 applications, 90 percent of which have been certified.  McDonnell Decl., ¶ 14.  The third state statute in this subcategory, Penal Code section 422.93, protects hate-crime victims or witnesses who are "not charged with or convicted of committing any crime under State law" by prohibiting law enforcement from "detain[ing] the individual exclusively for

28

8

1   any actual or suspected immigration violation or report[ing] or turn[ing] the individual over to

2   federal immigration authorities."  Cal. Penal Code § 422.93(b).

3        The second subcategory of statutes (Cal. Welf. & Inst. Code §§ 827, 831; Cal. Civ. Proc.

4   Code § 155) protects the confidential information of youth in the State's juvenile court system.

5   The Legislature determined that "[c]onfidentiality is integral to the operation of the juvenile

6   system in order to avoid stigma and promote rehabilitation for all youth."  Cal. Welf. & Inst.

7   Code § 831(a).  As a general rule, juvenile court records and the information therein is

8   confidential except to statutorily designated parties.  *Id.* § 827; *see also* Cal. R. of Ct. 5.552(b)-

9   (c).  Consistent with that general requirement, the State implemented its role in the federal Special

10  Immigrant Juvenile process, through its dependency court system, by directing that "information

11  regarding the child's immigration status . . . remain confidential and shall be available for

12  inspection only" to a handful of enumerated parties.  Cal. Civ. Proc. Code § 155(c).  Information

13  about a child's immigration status in any juvenile court proceeding must "remain confidential"

14  just like all other information in the youth's court records.  *See* Cal. Welf. & Inst. Code § 831(e).

15       **C.    The History and Purpose of JAG**

16       JAG is a formula grant authorized by Congress and administered by OJP.  34 U.S.C. §§

17  10151-58.  The statutory formula guarantees to each state a minimum allocation based on the

18  state's population and violent crime rate.  *Id.* § 10156(a).  Sixty percent of a state's total

19  allocation goes directly to the state and the remainder goes directly to local governments.  *Id.* §

20  10156(b)(1), (d).

21       The current JAG program descended from two earlier programs.  Congress created the

22  Edward Byrne Memorial State and Local Law Enforcement Assistance Program grants ("Byrne

23  Grants") as part of the Anti-Drug Abuse Act of 1988.  The purpose was "to assist States and units

24  of local government in carrying out specific programs which offer a high probability of

25  improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L.

26  No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4329 (1988).  Between 1988 and 2006, Congress

27  identified 29 purposes for which Byrne Grants could be used.  *See* 42 U.S.C. § 3751(b) (Dec.

28  2000) (as it existed on Jan. 4, 2006).  Separately, Congress identified nine purposes for Local

9

1    Law Enforcement Block Grants ("LLEBG").[10]  Immigration enforcement never appeared as a

2    purpose for either the Byrne Grants or LLEBG.[11]

3         In 2006, Congress merged Byrne Grant and LLEBG, creating the current JAG program,

4    Pub. L. No. 109-162, 119 Stat. 2960, 3094 (2006), to provide state and local governments "more

5    flexibility to spend money for programs that work for them rather than to impose a 'one size fits'

6    all solution." to local law enforcement.  H.R., Rep. No. 109-233, at 89 (2005).  Following that

7    merger, Congress consolidated the "purpose areas" down to eight: (A) law enforcement

8    programs; (B) prosecution and court programs; (C) prevention and education programs; (D)

9    corrections and community corrections programs; (E) drug treatment and enforcement programs;

10   (F) planning, evaluation, and technology improvement programs; (G) crime victim and witness

11   programs; and (H) mental health programs.  34 U.S.C. § 10152(a)(1).

12        Congress never created a "purpose area" of immigration enforcement in either the former or

13   current iterations of JAG.  Only one immigration-related requirement ever existed in any iteration

14   of the JAG authorizing statute: a requirement that the chief executive officer of the recipient state

15   provide certified records of "criminal convictions of aliens."[12]  Congress repealed that

16   requirement in the 2006 merger that created the current JAG program.  *See* 34 U.S.C. § 10153(a).

17        **D.      California's Use of JAG and COPS Funds**

18        California's Board of State and Community Corrections ("BSCC") is the State entity that

19   receives California's allocation of JAG's formula grant funds.  The State has received $252.7

20   million pursuant to JAG since 2006, excluding funding that the federal government granted

21   directly to the State's local jurisdictions.  *See* Decl. of Mary Jolls in Supp. of Pl.'s Am. Mot. for

22   Prelim. Inj. ("Jolls Decl."), ¶ 7.  Based on the statutory formula, California is expected to receive

23

24   [10] Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995)
     first authorized as part of the Dep't of Commerce, Justice, and State, the Judiciary, and Related
25   Agencies Appropriations Act of 1996, Pub. L. No. 104-134, tit. I, 110 Stat. 1321, 1321-12 (1996).

26   [11] *See* Decl. of Lee Sherman in Supp. of Pl.'s Mot. for Prelim. Inj. ("Sherman Decl.") Exs. H
     (identifying the 29 Byrne Grant purposes), I (identifying the 9 LLEBG purposes).

27   [12] Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51
     (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.
28   L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006).

1   approximately $28.3 million in JAG funding in FY 2017, with $17.7 million going to the BSCC.

2   *Id.* ¶ 5.  The BSCC uses the State's share of the JAG award to issue subgrants to jurisdictions that

3   propose using the funds for education and crime prevention programs, law enforcement

4   programs, and court programs, including toward the goals of improving educational outcomes,

5   increasing graduation rates, curbing truancy, reducing substance abuse, and curtailing

6   delinquency and recidivism for at-risk youth and young adults.  *Id.* ¶¶ 8, 10 & Ex. A.  For

7   example, L.A. County uses JAG funding to support anti-drug trafficking programs and

8   investigations, intervention programs for vulnerable youth, mental health programs, and anti-gang

9   enforcement activities.  McDonnell Decl., ¶¶ 4-9.  The City and County of San Francisco relies

10  on JAG to fund, among other thing, projects that seek to reduce recidivism by providing an

11  alternative to suspension and other services for at-risk juveniles and young adults. S.F. Compl., ¶¶

12  42-45.  The BSCC currently funds programs for 32 local jurisdictions, as well as the California

13  Department of Justice ("CalDOJ") to support task forces focused on criminal drug enforcement,

14  violent crime, and gang activity.  Jolls Decl., ¶ 10; Decl. of Christopher Caligiuri in Supp. of Pl.'s

15  Am. Mot. for Prelim. Inj. ("Caligiuri Decl."), ¶¶ 19-21.  The BSCC plans on using FY 2017 JAG

16  funds to support programs similar to those that it has funded in the past.  Jolls Decl., ¶ 11.

17      The Division of Law Enforcement ("DLE") within CalDOJ is the State entity that receives

18  COPS competitive grants.  Since the inception of the COPS program, CalDOJ has received over

19  $11 million to support law enforcement efforts around the State, including work on multi-

20  jurisdictional task forces.  Caligiuri Decl., ¶ 4.  For this fiscal year, CalDOJ applied for two COPS

21  grants worth $2.8 million.  *See id.* ¶¶ 10, 16.  CalDOJ applied for the COPS Anti-

22  Methamphetamine Program ("CAMP") grant to cover salaries, benefits, and other costs to

23  continue the State's leadership in a task force whose targeted enforcement against large-scale

24  methamphetamine drug trafficking organizations has resulted in the seizure of upwards of $60

25  million of methamphetamine, cocaine, and heroin.  *See id.* ¶¶ 6-8, 10.  CalDOJ also applied for

26  the COPS Anti-Heroin Task Force ("AHTF") grant to cover equipment, including potentially-

27  lifesaving TruNarc handheld narcotics analyzers, consultants, and other costs in support of 14

28  heroin-related task forces that conduct large scale heroin investigations, share data and

11

1   intelligence among law enforcement personnel throughout the State, and hold education sessions

2   in the community about drug abuse awareness.  *See id.* ¶¶ 12-14, 16.  CalDOJ has been awarded

3   CAMP and AHTF grants for each year these programs have been in existence.  *Id.* ¶¶ 5, 12.

4           **E.   JAG and COPS Requirements in Relation to Section 1373**

5           In FY 2016, USDOJ declared Section 1373 an "applicable law" for JAG, RJN, Ex. H, and

6   specifically required BSCC to submit a legal opinion validating its compliance with Section 1373.

7   Jolls Decl., Ex. B, ¶ 55.  For FY 2017, Defendants announced that all jurisdictions receiving JAG

8   funds must certify compliance with Section 1373.  *E.g.*, RJN, Ex. A at 1, Ex. B at 1.  Each grant

9   recipient's chief law officer, the Attorney General in the State's case, must sign a standard

10  affidavit, under penalty of perjury, affirming compliance with Section 1373 on behalf of the State

11  and "any entity, agency, or official" of the State as applicable to the "program or activity to be

12  funded."  RJN, Ex. A, Appx. II.  The grant recipient's chief executive officer, the Governor in the

13  State's case, must adopt that certification, under penalty of perjury.  *Id.*, Appx. I.  Grant recipients

14  must collect Section 1373 certifications from all subgrant recipients before issuing an award.

15  RJN, Ex. J, ¶ 53(2).  In addition, USDOJ's represented final award conditions require grantees to

16  monitor their subgrantees' compliance with Section 1373 and to promptly notify OJP if any

17  subgrantee does not comply.  *Id.* ¶¶ 53(3), 54(1)(D).  USDOJ's Financial Guide explains that

18  jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the

19  award may be rescinded," which includes the requisite certifications.  *See* RJN, Ex. K, § 2.2.

20          USDOJ announced that COPS applicants for 2017 must execute a similar Section 1373

21  certification of compliance with respect to the "program or activity to be funded."  RJN, Ex. C at

22  2 & Appx. D; Ex. D at 1-2 & Appx. D.  CalDOJ submitted its applications with the executed

23  certifications for AHTF and CAMP on July 7 and 10, respectively.  Caligiuri Decl., ¶¶ 9, 15 &

24  Exs. B, D.  As part of their applications, DLE included a supplemental statement by CalDOJ in

25  connection with the COPS Section 1373 Certifications.  *Id.*  There, CalDOJ clarified that the

26  COPS Section 1373 Certifications were made "as that federal statute is lawfully interpreted," and

27  reserved its rights to challenge "any unconstitutional enforcement of Section 1373."  *Id.*, Exs. B,

28  D.  On September 7, 2017, USDOJ communicated to applicants that it was "committed" to

1   "announcing this year's award recipients as quickly as possible."  Sherman Decl., Ex. J.  As has

2   been required in years' past, once CAMP and AHTF COPS awards are announced, recipients will

3   have to execute award conditions certifying that they will comply with all applicable laws, which

4   includes Section 1373.  *See* Caligiuri Decl., ¶¶ 5, 13 & Exs. A, ¶ 1, C, ¶ 1.  On October 23, 2017,

5   USDOJ announced COPS awards for other programs, RJN, Ex. L, but as of the date of this filing,

6   DLE has not received any response to its applications.  *See id.* ¶¶ 11, 17.

7         **F.**    **Defendants' Other Actions Threatening to Find the State in Violation of
                 Section 1373**

8

9          On April 21, 2017, Defendants sent letters to nine jurisdictions that received the JAG award

10  in 2016, including the BSCC, demanding they submit an official legal opinion validating their

11  compliance with Section 1373.  RJN, Exs. I, M.  That same day, Defendants Sessions and USDOJ

12  both stated that the State of California has laws "that potentially violate 8 U.S.C. § 1373," relying

13  on an Office of Inspector General Report.[13]  RJN, Exs. M, N.  On June 29, the BSCC submitted

14  the requested legal opinion explaining the State's laws do not violate Section 1373, focusing on

15  the applications of Section 1373 discussed in that OIG Report.  *See* Jolls Decl., Ex. C.

16         In August 2017, Defendants informed two of the nine jurisdictions that they comply with

17  Section 1373.  On October 12, 2017, Defendants announced that they made preliminary

18  compliance assessments on six of the other jurisdictions (plus one other jurisdiction).  *See* RJN,

19  Ex. Q.  Defendants announced that they found no evidence of non-compliance with Section 1373

20  as to two jurisdictions, and preliminarily determined that the remaining five appeared not to

21  comply with Section 1373.  *Id.*  For one jurisdiction's negative preliminary determination,

22  Defendants based their determination, in part, on the jurisdiction's protections against the

23  disclosure of crime victims' information, *see* RJN, Ex. R at 1-2, which California's laws also

24  protect against in some instances.

25

26  [13] Defendants are incorrect in claiming that the OIG Report found California in "potential"
   violation of Section 1373.  The State of California was identified in the OIG report, in large part,

27  because of the relatively large amount of money it receives in federal funding from USDOJ.  *See*
   RJN, Ex. O at 3.  While the OIG Report commented about some jurisdictions' compliance with

28  Section 1373, the report did not discuss in detail California's law as it existed at that time.

1         Having not received a preliminary assessment letter, on October 31, California filed its

2    initial PI Motion to prevent enforcement of the Section 1373 conditions as to the TRUTH Act and

3    the State's Confidentiality Statutes, but not the laws that have yet to go in effect.  On November

4    1, Defendants sent the State a preliminary compliance assessment letter asserting that three

5    provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State]

6    interprets and applies them."  RJN, Ex. P at 1.  Those are the provisions regulating: (i) inquiries

7    into an individual's immigration status (Gov't Code, § 7284.6(a)(1)(A)); (ii) responses to

8    notification requests (*id.* § 7284.6(a)(1)(C)); and (iii) the sharing of "personal information" (*id.* §

9    7284.6(a)(1)(D)).  RJN, Ex. P at 1-2.  As to the first provision, Defendants said that to comply

10   with Section 1373, the State must certify it interprets that provision as "not restrict[ing] California

11   officers and employees from requesting information regarding immigration status from federal

12   immigration officers."  *Id.* at 2.  For the notification request and personal information provisions

13   to comply with Section 1373, Defendants said the State must certify it "interprets and applies

14   these provisions to not restrict California officers from sharing information regarding immigration

15   status with federal immigration officers, including information regarding release date[s] and

16   home address[es]."  *Id.* at 1.  If the State cannot so "certify," then "[USDOJ] has determined that

17   these provisions violate [Section 1373]."  *Id* at 1-2.  Defendants further "reserve[d] [their] right to

18   identify additional bases of potential violation of 8 U.S.C. § 1373."  *Id.* at 2.

19        The Administration has made additional statements suggesting it has an even broader

20   interpretation of Section 1373 than communicated in the preliminary assessment letters, and a

21   misunderstanding about California's laws.  On June 13, 2017, the Acting Director of Immigration

22   and Customs Enforcement ("ICE"), Thomas Homan, testified before Congress that jurisdictions

23   that "have some sort of policy where they don't . . . allow [ICE] access to the jails" violate

24   Section 1373.  *See* RJN, Ex. S at 35, 47-48.  Although California's TRUTH Act does not prohibit

25   LEAs from providing such access, Defendant Sessions has stated that "the State of California . . .

26   [has] enacted statutes . . . designed to specifically prohibit or hinder ICE from enforcing

27   immigration law by . . . denying requests by ICE officers and agents to enter prisons and jails to

28   make arrests."  RJN, Ex. T at 2.

14

<u>LEGAL ARGUMENT</u>

I.   **LEGAL STANDARD**

"The purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "often dependent as much on the equities of [the] case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017).

II.   **CALIFORNIA IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE JAG SECTION 1373 CONDITION IS UNLAWFUL**

Before considering whether California's laws comply with Section 1373, the Court must first determine whether Defendants may even lawfully impose the JAG Section 1373 Condition. They cannot: the State is likely to succeed on its claims that this Section 1373 Condition violates the Spending Clause and is arbitrary and capricious under the Administrative Procedure Act.

   A.   **The JAG Section 1373 Condition Violates the Spending Clause Because it is Unrelated to the Purpose of JAG**

Congress may only use its spending power to place conditions on federal funds that are related "'to the federal interest in particular national projects or programs.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). This Court has determined that the same test applies when the Executive Branch imposes a condition by purported delegation from Congress, and that "funds conditioned on compliance with Section 1373 must have some nexus to immigration enforcement." *See Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017).

Section 1373 has no such nexus to the JAG program. Congress has never identified immigration enforcement as a "purpose area" for JAG, and repealed the only immigration-enforcement related condition that it had ever authorized for JAG funding. *Supra* at 9-10. The

15

1    present statute identifies eight purpose areas for JAG, which the State predominantly uses to fund

2    community policing initiatives for crime prevention and education for at-risk youth, drug

3    treatment and enforcement, and mental health programs.  *See* Jolls Decl., ¶¶ 8, 10.

4           Congress has been clear in identifying these as purposes areas to fund "*criminal* justice"

5    initiatives, 34 U.S.C. § 10152, (emphasis added), whereas, immigration enforcement is generally

6    *civil* in nature and predominantly the responsibility of the federal government.  *See Arizona v.*

7    *United States*, 567 U.S. 387, 396 (2012).  In reinforcement of this distinction, the only

8    immigration enforcement related condition that ever existed for JAG required jurisdictions to

9    provide records for "criminal convictions of aliens."  *Supra* at 10.  The Executive Branch's

10   unilateral act to add Section 1373 as an "applicable law" violates the nexus prong of the Spending

11   Clause as it requires state and local jurisdictions to comply with a condition to support a different

12   program (the federal government's civil immigration priorities) than the "criminal justice"

13   program being funded.  34 U.S.C. §§ 10152; *see Texas v. United States*, No. 15-cv-151, 2016 WL

14   4138632, at *17 (N.D. Tex. Aug. 4, 2016) (holding that a Spending Clause claim was viable

15   because a challenged health insurance fee was not "'directly related,' let alone 'reasonably

16   related'" to Medicaid since its purpose was to fund a different federal program).

17          **B.      Imposition of the JAG Section 1373 Condition is Arbitrary and Capricious**

18          Defendants' identification of Section 1373 as an "applicable law" for JAG is arbitrary and

19   capricious in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).  "[A]n agency

20   must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicle*

21   *Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  Before 2016,

22   JAG was never linked to Section 1373 at any point in the nearly twenty years that Section 1373

23   has been law.  In response to an inquiry by one Congressman, and without providing any

24   evidence that Congress intended for immigration enforcement to be a purpose area for JAG, in

25   2016, USDOJ declared Section 1373 an "applicable law," with which JAG recipients must

26   comply.  *See* RJN, Ex. H.  At no point, either for FY 2016 or 2017, have Defendants "show[n]

27   that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S.

28

16

1   502, 515 (2009); *see also State Farm*, 463 U.S. at 50 ("It is well established that an agency's

2   action must be upheld, if at all, on the basis articulated by the agency itself.").

3       Indeed, Defendants have put forth *nothing*—no studies, no reports, no analysis—to support

4   the JAG Section 1373 Condition.  The OIG Report does not discuss or contemplate how the

5   Section 1373 Condition is consistent with the underlying goals of JAG, or Congress' intent in

6   adopting JAG.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

7   981 (2005) ("Unexplained inconsistency is. . . a reason for holding an interpretation to be an

8   arbitrary and capricious change from agency practice under the Administrative Procedure Act.");

9   *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 186-87 (3d Cir. 1983) (invalidating agency

10   action on grant conditions as arbitrary and capricious where the agency sought "to accomplish

11   matters not included in that statute").  Neither do the JAG Solicitations.  A general recitation of

12   "Border Security" as an area of emphasis in the JAG Solicitations, RJN, Ex. A at 11, falls "short

13   of the agency's duty to explain why it deemed it necessary to overrule its previous position,"

14   particularly where Congress never identified Border Security as a purpose.  *Encino Motorcars,*

15   *LLC v. Navarro*, 136 S.Ct. 2117, 2125, 2126 (2016); *see id.* ("Agencies are free to change their

16   existing policies as long as they provide a reasoned explanation for the change.").

17       There is also nothing to suggest that Defendants considered the empirical evidence and law

18   enforcement perspectives that jurisdictions around the country, including the State and its

19   political subdivisions, have relied upon in exercise of their sovereign discretion, that policies that

20   build trust and cooperation with immigrant communities result in positive criminal enforcement

21   and safety outcomes.  *See, e.g.*, RJN, Exs. E-G, X; McDonnell Decl., ¶ 12; S.F. Compl., ¶ 28; *see*

22   *also State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if

23   the agency has . . . entirely failed to consider an important aspect of the problem. . . .").

24   **III.   CALIFORNIA IS LIKELY TO SUCCEED IN SHOWING THAT CALIFORNIA'S STATUTES
       DO NOT VIOLATE SECTION 1373**

25

26       Even if the JAG Section 1373 Condition is lawful, the State is likely to succeed in showing

27   that the applicable state statutes do not conflict with Section 1373, or, alternatively, Section 1373

28   cannot be enforced against those statutes, which is relevant to both JAG and COPS.  The Values,

1   TRUST, and TRUTH Acts do not regulate the activities covered by Section 1373.  The State's

2   Confidentiality Statutes do not conflict with Section 1373 when read in the context of the rest of

3   the INA.  And reading Section 1373 to invalidate all of these statutes would constitute

4   unconstitutional commandeering that the Tenth Amendment prohibits.

5   **A.**    **The Values, TRUST, and TRUTH Acts Do Not Conflict with Section 1373**

6   The TRUST, TRUTH, and Values Acts do not conflict with Section 1373 because they do

7   not regulate the sharing of "information regarding the citizenship or immigration status" of

8   individuals.  8 U.S.C. § 1373.  The TRUTH Act simply provides transparency surrounding LEAs'

9   interactions with ICE.  The Values and amended TRUST Acts identify when LEAs have

10   discretion to respond to "notification requests," *i.e.*, requests for release dates.  Cal. Gov't Code

11   §§ 7282.5(a); 7284.6(a)(1)(C) (both chaptered Oct. 5, 2017).  These provisions do not fall within

12   the ambit of Section 1373 because "no plausible reading of 'information regarding . . . citizenship

13   or immigration status' encompasses the release date of an undocumented inmate."  *Steinle v. City*

14   *& Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

15   In fact, the Values Act's savings clause explicitly permits the exchange of such information

16   in complete accordance with Section 1373.  *See* Cal. Gov't Code § 7284.6(e).  The "authoritative

17   statement" of a statute is its "plain text," including its "savings clause."  *Chamber of Commerce*

18   *of U.S. v. Whiting*, 563 U.S. 582, 599 (2011).  In light of the Values Act's plain text, including its

19   savings clause, *none* of the Values Act's provisions restrict communications on immigration

20   status information between LEAs and federal immigration authorities.  For instance, the

21   prohibition on "[i]nquiring into an individual's immigration status" means that LEAs may not ask

22   an individual about his or her immigration status, or may not ask for that information from non-

23   governmental third parties.  Although Defendants suggested in their letter to the State, RJN, Ex.

24   P, that this prohibition may restrict requesting immigration status information from federal

25   officials, the savings clause makes clear that is not the case.  The savings clause, however, does

26   not limit the scope of the notification request or "personal information" provisions since such

27   information, including home addresses, are not covered by Section 1373.

28

**B.    California's Confidentiality Statutes Do Not Conflict with Section 1373**

Section 1373 must be read in the context of the rest of the INA.  *See Davis v. Mich. Dep't. of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  The INA specifically protects the confidentiality of information about those who have been victims of or witnesses to certain crimes.  Section 1367(a)(2), enacted as part of the same legislative act as Section 1373, prevents federal employees from "disclos[ing] to anyone [with exceptions] any information which relates to an alien who is the beneficiary of an application for relief" under the statute, *i.e.* certain victims and witnesses of crime including U- and T-visa recipients.  The Defendants' reading of Section 1373 would require federal employees, in implementing Section 1367(a)(2)'s general disclosure prohibitions, to violate Section 1373(b)(3)'s prohibitions on limits to the disclosure of immigration status information from federal employees to other governmental entities.

The INA also provides protections and support for certain juveniles.  For example, the "Special Immigrant Juvenile" process allows abused, abandoned and neglected immigrant youth to secure lawful immigration status, demonstrating the INA's broader concern with the long-term safety of such children generally.  *See* 8 U.S.C. § 1101(a)(27)(J).  Furthermore, in implementing the Deferred Action for Childhood Arrivals ("DACA") program, United States Citizenship and Immigration Services ("USCIS") specifically determined that the information provided by DACA applicants must be "protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings," with limited exceptions.  *See* RJN, Ex. U, Q19.

Accordingly, reading the text of Section 1373 in the context of the rest of the INA shows that the prohibition on limiting information-sharing should not be properly interpreted to cover the limited circumstances encompassed by the State's Confidentiality Statutes.  The persons covered by the State's statutes are similar classes of individuals to those that the INA (and the federal government) itself seeks to protect both through confidentiality and other protections: (a) victims and witnesses of crime (Cal. Penal Code §§ 422.93, 679.10(k), and 679.11(k)); and (b) vulnerable youth (Cal. Civ. Proc. Code § 155(c); Welf. & Inst. Code §§ 827, 831).

19

1   The plain language of Section 1373 does not demand a different reading.  The words in

2   Section 1373 regarding the immigration status of "any individual," must "be read in their context

3   and with a view to their place in the overall statutory scheme."  *Davis*, 489 U.S. at 809.  For

4   example, in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Supreme Court read

5   "*any* recipient of Federal assistance" to not include every recipient, but instead to exclude state

6   defendants.  *Id.* at 245-46 (emphasis in original), *superseded by statute*; *see also Raygor v.*

7   *Regents of Univ. of Minn.*, 534 U.S. 533, 545-46 (2002) ("any claim" did not include every claim,

8   but instead excluded certain claims against state defendants).  In this instance, "any individual"

9   should be read in the context of the rest of the INA to exclude those individuals protected by

10   other specific sections of the INA.  That is particularly so given the serious constitutional

11   questions about the statute that would otherwise arise, as discussed below.  *See Bond v. United*

12   *States*, 134 S. Ct. 2077, 2089 (2014) ("'[I]t is incumbent upon the federal courts to be certain of

13   Congress' intent before finding that federal law overrides' the 'usual constitutional balance of

14   federal and state powers.'") (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

15
16   **C.   The Tenth Amendment Does Not Allow for Section 1373 to Commandeer the State in its Control over Governmental Employees and its Residents' Confidential Personal Information**

17   The Supreme Court has read the Tenth Amendment to impose recognized limits on

18   Congressional enactments.  The Framers "explicitly chose a Constitution that confers upon

19   Congress the power to regulate individuals, not States" and the Constitution "has never been

20   understood to confer upon Congress the ability to require the States to govern according to

21   Congress' instructions."  *New York v. United States*, 505 U.S. 144, 162, 166 (1992).  As such, the

22   Supreme Court held in *New York* and *Printz v. United States*, 521 U.S. 898 (1997) that the federal

23   government may not "commandeer" state and local governments and officials "by directly

24   compelling them to enact and enforce a federal regulatory program."  *Printz*, 521 U.S. at 935;

25   *New York*, 505 U.S. at 162.  Both cases advance the principles that: (i) "the federal government

26   may not compel the States to enact or administer a federal regulatory program" *e.g.*, *New York*,

27   505 U.S. at 188; (ii) such coercion is impermissible where the "whole object" of the

28   Congressional action is direction of state functions, *e.g.*, *Printz*, 521 U.S. at 932; and (iii) the

20

1   intrusion on state sovereignty is "worse" where the federal government "strips" away at state and

2   local government's discretion at policy-making.  *E.g.*, *Printz*, 521 U.S. at 927-28; *see also Koog*

3   *v. U.S.*, 79 F.3d 452, 457-60 (5th Cir. 1996).  These principles ensure that state and local

4   governments remain politically accountable to their residents.  *See Printz,* 521 U.S. at 920, 922-

5   23; *Koog*, 79 F.3d at 460-61.  Reading Section 1373 to cover the Values, TRUST, and TRUTH

6   Acts and the State's Confidentiality Statutes violates these principles and upsets constitutional

7   notions of political accountability.  The Court should thus construe Section 1373 in a manner that

8   prevents its "invalidation."  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("We have read

9   significant limitations into other immigration statutes in order to avoid their constitutional

10  invalidation.").

11       First, construing Section 1373 to cover these statutes would compel the State to participate

12  in the administration of a federal regulatory program of immigration enforcement.  *See New York*,

13  505 U.S. at 176, 188.  The state statutes at issue here apply to criminal and juvenile systems,

14  which the State and local governments must provide for.  To comply with Defendants' reading of

15  Section 1373, the State Legislature, in setting policy for those systems where the State's

16  residents' immigration status information may be relevant, would either have to make no

17  assurances about the confidentiality of that information, or affirmatively make exceptions to

18  allow for disclosure to federal immigration authorities, even when disclosure is prohibited in

19  other instances.  *See* Cal. Penal Code §§ 679.10-.11; Cal. Civ. Proc. Code § 155(c); Cal. Welf. &

20  Inst. Code §§ 827, 831.  Regardless of what the State does, it would have to act in furtherance of

21  a federal program that is not its own.  Furthermore, where the whole purpose of the statute is to

22  encourage residents to report crimes (*see, e.g.*, Cal. Penal Code §§ 422.93, 679.10-.11), or to

23  define the roles of state and local law enforcement (*see, e.g.*, Cal. Gov't Code §§ 7282.5(a)

24  (chaptered Oct. 5, 2017), 7283.1, 7284.6(a)(1)(C)-(D)), the enforcement of Section 1373 against

25  these statutes would force the State to surrender its own judgment regarding the public safety risk

26  of entangling local law enforcement in federal immigration matters in favor of the federal

27  government's preference that federal immigration enforcement prevails over all other concerns.

28  This is "tantamount to forced state legislation" and coercion to administer a federal program that

21

1   the Tenth Amendment prohibits.  *See Koog*, 79 F.3d at 458.

2       Second, construing Section 1373 in a manner to negate the Values, TRUST, and TRUTH

3   Acts and the State's Confidentiality Statutes would make the "whole object of [Section 1373] to

4   direct the functioning of the state executive," *see Printz*, 521 U.S. at 932, by commanding solely

5   state and local governments to allow the unfettered use of their resources and personnel to act in

6   furtherance of a federal immigration enforcement program.  Whether Section 1373 could be

7   enforced against a categorical prohibition on sharing of immigration status information with

8   federal immigration authorities, *see City of New York v. United States*, 179 F.3d 29, 35 (2d Cir.

9   1999), is not at issue in this case.  When applied to these State statutes, however, Section 1373

10  directs action at the core of the State's sovereign power to make its own determination about how

11  to best address crime and public safety.  *See United States v. Morrison*, 529 U.S. 598, 618 (2000)

12  ("[W]e can think of no better example of the police power, which the Founders denied the

13  National Government and reposed in the States, than the suppression of violent crime and

14  vindication of its victims.").  It is the State or its political subdivisions that have the responsibility

15  to manage detention facilities, operate the juvenile court system, certify U- or T-visa requests, and

16  receive reports from victims and witnesses of crime.  If applied to these statutes, Section 1373

17  would be enforced against the use of information that "belongs to the State" and that is "available

18  to [law enforcement officers] only in their official capacity."  *Printz*, 521 U.S. at 932 n.17.

19  Section 1373 is, thus, inevitably an "object … to direct the functioning of the State" if the statute

20  is enforced against these aspects of the State's sovereignty.  *See id.* at 932; *see also Romero v.*

21  *United States*, 883 F. Supp. 1076, 1086-87 (W.D. La. 1994) (the Tenth Amendment limits

22  Congress from preempting "state regulation for the maintenance of public order" that "remove[d]

23  [the sheriff's] ability to perform certain tasks assigned him by the state which preserve the public

24  order and therefore remove their sovereign authority to maintain public order").

25       Third, construing Section 1373 to encompass the Values, TRUST, and TRUTH Acts and

26  the State's Confidentiality Statutes would take away the State's discretion in establishing policies

27  about how governmental employees may handle private information about the State's residents

28  within the custody and control of the State and local governments, thus "worsen[ing] the intrusion

1    upon state sovereignty." *See Printz*, 521 U.S. at 927-28.  The State has no blanket prohibition on

2    government employees sharing immigration status information with federal immigration

3    enforcement agents.  Instead, the State has made nuanced decisions regulating the specific

4    circumstances where immigration status information, personal information, and release dates are

5    protected from disclosure in general (not solely as to immigration enforcement agents), and/or the

6    limited class of individuals to whom such protections apply.  *See* Cal. Penal Code §§ 422.93

7    (limited to hate crime victims and witnesses, who are not perpetrators of crime); 679.10-11

8    (limited to U- or T-visa applicants); Cal. Civ. Proc. Code § 155(c) (limited to "Special Immigrant

9    Juvenile" applicants); Cal. Welf & Inst. Code §§ 827 & 831 (limiting disclosure of juvenile case

10   files to all except statutorily designated parties); Cal. Gov't Code, §§ 7282.5(a) (chaptered Oct. 5,

11   2017), 7284.6(a)(1)(C)-(D) (defining when release dates and personal information may be

12   disclosed, including when "available to the public").  The enforcement of Section 1373 as to these

13   statutes would weaken the State's ability to regulate the actions of their own governmental

14   employees, *see Gregory*, 501 U.S. at 160, and "foreclose[] the State[] from experimenting and

15   exercising [its] own judgment in an area to which States lay claim by right of history and

16   expertise."  *See United States v. Lopez*, 514 U.S. 549, 583 (1995).  "Whatever the outer limits of

17   state sovereignty may be, it surely encompasses the right to set the duties of office for state-

18   created officials and to regulate the internal affairs of government bodies."  *Koog*, 79 F.3d at 460

19   (citing *FERC v. Mississippi*, 456 U.S. 742, 761 (1982)).

20        Fourth, commandeering the State in the handling of its residents' personal information

21   undermines state and local accountability.  The U.S. Constitution's structure of dual sovereignty

22   between the federal government and the states "reduce[s] the risk of tyranny and abuse from

23   either front."  *Printz*, 521 U.S. at 921 (quoting *Gregory*, 501 U.S. at 458).  Commandeering

24   forces the states to "bear the brunt of public disapproval."  *New York*, 505 U.S. at 169.  As the

25   Court warned in *Printz*, "[t]he power of the Federal Government would be augmented

26   immeasurably if it were able to impress into its service—and at no cost to itself—the police

27   officers of the 50 States."  521 U.S. at 922.  This is exactly what Defendants would be permitted

28   to accomplish if Section 1373 were construed to forbid states and localities from ensuring that

1  LEAs safeguard the confidentiality of victims' and witness' personal information, or to prevent

2  the setting of boundaries on law enforcement's involvement in immigration enforcement.  Should

3  Section 1373 be enforced as to the Values, TRUST, and TRUTH Acts and the Confidentiality

4  Statutes, witnesses and victims will be less inclined to report crimes, *see, e.g.*, RJN, Ex. V, and

5  relationships between immigrant communities and state and local officials would be strained.

6  State and local governments would "face the brunt of public disapproval," rather than the

7  Defendants who effectively coerced the State and localities to act according to a federal program.

8       Although two federal courts have upheld Section 1373 against facial constitutional

9  challenges, neither ruling is dispositive to the issues presented in this case.  In fact, both decisions

10  reflect significant concern about extending Section 1373 to apply to statutes such as those at issue

11  here.  In *City of Chicago v. Sessions*, while the district court held that there was a likelihood that

12  Section 1373 was facially constitutional, it also expressed concern about its potential applications.

13  The court noted that Section 1373 "mandate[s]" state and local governments to give employees

14  the option of providing information to federal immigration agents.  2017 WL 4081821, at *12.

15  The court found that the "practical" impact is that state and local governments are "limited [in

16  their] ability to decline to administer or enforce a federal regulatory program" and "extricate their

17  state or municipality's involvement in a federal program."  *Id.*

18       In *City of New York*, the city argued that Section 1373 was facially unconstitutional, in part,

19  because it interfered with the use of confidential information and control over the city's

20  employees in a range of local government functions.  The Second Circuit held Section 1373

21  facially constitutional, but recognized:

22       The City's concerns [about confidentiality] are not insubstantial.  The obtaining of
         pertinent information, which is essential to the performance of a wide variety of state
23       and local governmental functions, may in some cases be difficult or impossible if
         some expectation of confidentiality is not preserved.  Preserving confidentiality may
24       in turn require that state and local governments regulate the use of such information
         by their employees.
25

26  179 F.3d at 36.  The Second Circuit acknowledged that the Tenth Amendment may limit Section

27  1373 from being "an impermissible intrusion on state and local power to control information

28  obtained in the course of official business or to regulate the duties and responsibilities of state and

24

1    local governmental employees," but it did not consider these arguments in earnest because the

2    city's executive order promoted a policy of "non-cooperation while allowing City employees to

3    share freely the information in question with the rest of the world."  *See id.* at 37.  The Second

4    Circuit determined that the city was attempting to transform "the Tenth Amendment's shield

5    against the federal government's using state and local governments to enact and administer

6    federal programs into a sword allowing states and localities to engage in passive resistance that

7    frustrates federal programs."  *Id.* at 35.

8        That is not so with the State's Confidentiality Statutes, the only statutes that are arguably

9    relevant to the grants at issue that place limited regulations on the sharing of immigration status

10   information.  They either generally prohibit disclosure to a wide range of individuals, not just to

11   federal agents, or narrowly tailor the segment of the population that is protected.  The same is true

12   of the notification request provision in the Values and amended TRUST Acts and the personal

13   information provision in the Values Act which allow for disclosure when the information is

14   already "available to the public."  And the TRUTH Act does not regulate the sharing of any

15   information.  As a result, these statutes possess the qualities that eluded the jurisdictions' facial

16   challenges in *City of New York* and *Chicago*, and underscore the serious constitutional issues that

17   the Second Circuit and the Northern District of Illinois found troubling in Section's 1373's

18   practical application.  *See Chicago*, 2017 WL 4081821, at *12 ("practically limit[ing] the ability

19   of state and local governments to decline to administer or enforce a federal regulatory program"

20   could "implicate the logic underlying the *Printz* decision").

21   **IV.    WITHOUT COURT INTERVENTION, THE SECTION 1373 CONDITIONS WILL CAUSE
         THE STATE IMMINENT AND IRREPARABLE HARM**

22

23       "[C]onstitutional violation[s] alone, coupled with the damages incurred, can suffice to show

24   irreparable harm."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th

25   Cir. 2009) (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)).  Moreover,

26   injuries where "sovereign interests and public policies [are] at stake" are irreparable.  *Kansas v.*

27   *United States*, 249 F.3d 1213, 1228 (10th Cir. 2001).

28

1    California will suffer a constitutional injury to the State's sovereignty if Defendants

2    effectively coerce the State and its political subdivisions to carry out their federal immigration

3    enforcement agenda, particularly under their misinterpretation of Section 1373.  A plaintiff can

4    suffer a constitutional injury by being forced either to comply with an unconstitutional law or else

5    face community and financial injury.  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058-59

6    (plaintiffs were injured where they faced the choice of signing unconstitutional agreements or a

7    loss of customer goodwill and business).  Such is the case here where the State is confronted with

8    making an unqualified certification of compliance under penalty of perjury under the shadow of

9    Defendants' misinterpretation of Section 1373, specifically as to the State's law.  Defendants'

10   November 1 letter makes clear that Defendants view the State as currently ineligible to receive

11   grant funds because of the Values Act, and that the State likely will face legal jeopardy should it

12   execute the certification based on Defendants' erroneous interpretation of Section 1373.[14]  *See*

13   *Morales*, 504 U.S. at 380-81 (injunctive relief proper where "respondents were faced with a

14   Hobson's choice: continually violate the Texas law and expose themselves to potentially huge

15   liability; or violate the law once as a test case and suffer the injury of obeying the law during the

16   pendency of the proceedings").

17       Construing Section 1373 to invalidate the State's statutes will also cause real harm to our

18   communities, no matter what the State does.  If the State changes its laws to comply with an

19   unlawful and constitutionally impermissible interpretation of Section 1373, the relationship of

20   trust that these State statutes are intended to build between law enforcement and immigrant

21   communities will erode.  *See* McDonnell Decl., ¶¶ 10, 12; San Francisco Compl., ¶ 28.

22   Alternatively, if the State preserves its laws and Defendants cut millions of dollars in JAG

23   funding that the State is otherwise entitled to by statutory formula, the State would be unable to

24   fund critical public safety programs, *see* Jolls Decl., ¶ 19; Caligiuri Decl., ¶¶ 19-22, and local

25   jurisdictions' programs will be detrimentally impacted, including the possibility that programs

26

---

27   [14] Even if the State submits a statement explaining why the State's laws comply with Section
1373, notwithstanding Defendants' misinterpretation, the State still has to submit the standard

28   certification required by Defendants in order to receive funding, and Defendants may deny the
State funding on the basis of this explanatory statement.

26

1    and staff positions will be eliminated in their entirety.  *See McDonnell Decl.*, ¶¶ 8-9, 15; S.F.

2    Compl., ¶ 46; *see United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016)

3    (finding irreparable harm where the lack of funds was "likely to have an immediate impact on

4    [the state's] ability to provide critical resources to the public, causing damage that would persist

5    regardless of whether funding [was] subsequently reinstated").  Furthermore, without any

6    guidance from Defendants, BSCC will be placed in the position of having to monitor subgrantees

7    and report them for having policies that the State and/or the subgrantees determined benefit

8    public safety.  *See* RJN, Ex. J, ¶¶ 53(3), 54(1)(D); *see also* Jolls Decl., ¶¶ 21-22.

9          The harm to the State from the loss of COPS grants is at least as immediate.  USDOJ is

10   poised to issue COPS awards and demand compliance with applicable laws, including Section

11   1373, based on their apparent misreading of the statute.  *See supra* at 12-13.  If CalDOJ does not

12   receive the COPS grants based on Defendants' interpretation of Section 1373 or they are

13   conditioned based on this misinterpretation, CalDOJ will be unable to fund task forces and

14   equipment that combat heroin and methamphetamine distribution, creating harm that will extend

15   to the local jurisdictions that those task forces serve.  *See* Caligiuri Decl., ¶¶ 10, 16.

16         The damages incurred here—the deprivation of constitutional rights, the loss of community

17   goodwill, decrease in public safety, and the loss of millions of dollars of funding —"suffice to

18   show irreparable harm."  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058; *Stuller, Inc. v. Steak N*

19   *Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (injuries to goodwill not easily

20   measurable and often irreparable).  These are the same types of damages that the court in *Chicago*

21   recently found to be irreparable in enjoining other immigration enforcement related conditions for

22   JAG.  *See Chicago*, 2017 WL 4081821, at *12-14.

23   **V.    THE BALANCE OF HARDSHIPS FAVORS GRANTING A PRELIMINARY INJUNCTION**

24         A party seeking a preliminary injunction "must establish . . . that the balance of equities tips

25   in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These two

26   factors merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And

27   the balance of the hardships and public interest both favor "'prevent[ing] the violation of a party's

28

1   constitutional rights.'"  *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)

2   (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

3        Here, the balance of the hardships and the public interest favors an injunction.  California

4   has determined that the public safety requires protecting its residents' personal information and

5   limiting law enforcement's entanglement in immigration enforcement.  Defendants are forcing

6   California, under extreme time pressure, to consider undermining these policies to avoid losing

7   critical federal funding.  An injunction protects the public interest in shielding the State's

8   sovereignty from unconstitutional conditions without harm to the federal government's ability to

9   enforce federal laws with federal resources.

10       The Government "is in no way harmed by issuance of a preliminary injunction which

11  prevents the [federal government] from enforcing restrictions likely to be found unconstitutional.

12  If anything, the system is improved by such an injunction."  *See Giovani Carandola, Ltd. v.*

13  *Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted).  This is particularly true when an

14  injunction protects a State's interest in "the exercise of sovereign power over individuals and

15  entities within . . . [their] jurisdiction that involves the power to create and enforce a legal code,

16  both civil and criminal."  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S.

17  592, 601 (1982).  The potential impact on numerous local jurisdictions further tips the balance of

18  interests.  *See, e.g.*, McDonnell Decl., ¶ 8-9, 15; S.F. Compl., ¶ 46.  In contrast, Defendants face

19  no harm since the status quo would remain, and they would only have to provide money that

20  Congress has already appropriated.

21                                          **CONCLUSION**

22       For the foregoing reasons, California requests this Court grant its Motion.

23

24

25

26

27

28

28

1    Dated:  November 7, 2017                Respectfully Submitted,

2                                        XAVIER BECERRA
Attorney General of California

3                                        ANGELA SIERRA
Senior Assistant Attorney General

4                                        SATOSHI YANAI
Supervising Deputy Attorney General

5                                        SARAH E. BELTON
Deputy Attorney General

6

7                                        */s/ Lee Sherman*
*/s/ Lisa C. Ehrlich*

8                                        LEE SHERMAN
LISA C. EHRLICH

9                                        Deputy Attorneys General
*Attorneys for Plaintiff*

10                                        *State of California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Not. of Am. Mot. and Am. Motion for Preliminary Injunction; MPA in Support Thereof (17-cv-4701)

# EXHIBIT D

1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   STATE OF CALIFORNIA, EX REL.                Case No.  17-cv-04701-WHO
    XAVIER BECERRA, IN HIS OFFICIAL
8   CAPACITY AS ATTORNEY GENERAL
    OF THE STATE OF CALIFORNIA,                 **ORDER DENYING MOTION TO
9                                               DISMISS**
                    Plaintiff,
10                                              Re: Dkt. No. 77
            v.
11
    JEFFERSON BEAUREGARD SESSIONS,
12  et al.,

13                  Defendants.

14          Defendants have moved to dismiss the State of California's Amended Complaint seeking

15  declaratory relief and asserting claims of the violation of constitutional separation of powers,

16  congressional spending authority and the Administrative Procedures Act.  The matter was fully

17  briefed and argued on February 28, 2018.  For the reasons described in the Order Denying

18  Amended Motion for Preliminary Injunction ("the Order") filed today at pages 11 - 18, the State

19  has Article III standing: it has a well-founded fear of prosecution and has demonstrated injury-in-

20  fact.   Its claims are ripe.

21          While the Order does not grant preliminary injunctive relief at this time, each of the State's

22  claims is legally sufficient to state a claim upon which relief could be granted.  The weighty and

23  novel constitutional issues posed in this litigation deserve a complete record before they are

24  adjudicated.   The Order only glancingly dealt with the Notice and Access conditions that have

25  been enjoined on a nationwide basis in *City of Chicago v. Sessions*, but for the reasons set forth in

26  that case and in *City of Philadelphia v. Sessions*, the State's related claims state a plausible basis

27  for relief.  *See City of Philadelphia v. Sessions*, No. 17–3894, —— F.Supp.3d ——, 2017 WL

28  5489476, at *48-49 (E.D. Pa. Nov. 15, 2017) (finding that the Notice and Access conditions are

*United States District Court*
*Northern District of California*

1  not statutorily authorized and the imposition of the conditions implicate constitutional concerns);

2  *City of Chicago v. Sessions*, 264 F.Supp.3d 933, 943 (N.D. Ill. 2017) (holding that the Notice and

3  Access conditions exceed statutory authority of Executive Branch and imposition of the conditions

4  violated the separation of powers doctrine).  Defendants' motion is DENIED.

5        The parties are directed to meet and confer and agree to the extent possible on a schedule

6  for discovery and cross-motions for summary judgment.  A Joint Case Management Statement

7  shall be filed on March 20, 2018 setting forth either an agreed schedule or competing ones.  A

8  Case Management Conference will be held on March 27, 2018 at 2 p.m. in the event the parties

9  have been unable to agree or that one of the parties wishes to be heard on any other issue in the

10  litigation.

11        **IT IS SO ORDERED.**

12  Dated: March 5, 2018

William H. Orrick
United States District Judge

2

# EXHIBIT E

1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   STATE OF CALIFORNIA, EX REL.            Case No.  17-cv-04701-WHO
    XAVIER BECERRA, IN HIS OFFICIAL
8   CAPACITY AS ATTORNEY GENERAL
    OF THE STATE OF CALIFORNIA,             **ORDER DENYING AMENDED**
9                                           **MOTION FOR PRELIMINARY**
                 Plaintiff,                 **INJUNCTION**
10
          v.
11
    JEFFERSON BEAUREGARD SESSIONS,
12  et al.,

13               Defendants.

14                                  **INTRODUCTION**

15          The State of California has sued United States Attorney General Jefferson Beauregard

16  Sessions, Acting Assistant Attorney General Alan B. Hanson, and the United States Department of

17  Justice ("DOJ") (collectively, the federal government), seeking a declaration that Section 1373 of

18  the Immigration and Nationalization Act (as interpreted by the federal government) violates the

19  Constitution and an injunction enjoining the federal government from withholding, terminating,

20  disbarring, or making any state entity or local jurisdiction ineligible for certain law enforcement

21  grants.  The State then moved for a preliminary injunction.

22          At some later date, this case may help define the contours of the State's broad

23  constitutional police powers under the Tenth Amendment and the federal government's "broad,

24  undoubted power over the subject of immigration and the status of aliens."  *U.S. v Arizona*, 567

25  U.S. 387, 394 (2012).  The Trump administration's immigration enforcement policy is clearly at

26  odds with the State's determination of the most effective methods to implement criminal law

27  enforcement.  But for today, the question I decide is narrow: is the State entitled to a preliminary

28  injunction to require the federal government to fund a $1 million law enforcement grant that it has

United States District Court
Northern District of California

1   held up because it appears likely to decide that the State is not complying with 8 U.S.C. § 1373

2   (Section 1373) by restricting its officials from providing personal information and release dates of

3   certain people detained in jails across the state.

4       The injury threatened is not irreparable.  The amount of money at stake is small compared

5   to the State's budget.  Payment is delayed, for the moment.  The DOJ appears to be using its

6   regular administrative process to decide whether it will follow its initial inclinations. Given the

7   number of open questions concerning the federal government's positions concerning the

8   provisions of the statutes in question, the relatively minimal injury its delay has caused thus far,

9   and the extraordinary nature of the relief sought, I deny the State's motion without prejudice.

10  These issues will be better addressed on a more complete record after discovery on a motion for

11  summary judgment.

12  **BACKGROUND**

13  **I.**    **CALIFORNIA'S "SANCTUARY CITY" STATUTES**

14      The State has enacted several laws affecting local and state criminal law enforcement

15  concerning immigrants.  Mot. at 5 (Dkt. No. 26).  These statutes fit into two categories: (1) laws

16  regarding how and in what manner local law enforcement can communicate and assist federal

17  immigration officers (the TRUTH, TRUST, and Values Acts); and (2) statutes related to

18  individuals' confidential information (Penal Code sections 422.93, 679.10, and 679.11, Welfare

19  and Institutions Code sections 827 and 831, and Code of Civil Procedure section 155).

20      **A.**    **The TRUST, TRUTH and Values Acts**

21      In 2013, the State enacted the TRUST Act, Cal. Gov't Code § 7282 et seq., which explains

22  when local law enforcement officers may abide by a Department of Homeland Security ("DHS")

23  civil detainer request.  *See id.* §§ 7282(c), 7282.5.  Per the TRUST Act, local law enforcement

24  may only comply with a DHS civil detainer if the detainer does not "violate any federal, state, or

25  local law, or any local policy," and (1) the detainee's criminal background includes one of a

26  delineated list of crimes, (2) the detainee was on the California Sex and Arson Registry, or (3) the

27  detainee was held after a magistrate's finding of probable cause for a serious or violent felony.

28  *See id.* § 7282.5(a).

2

In 2016, the State enacted the TRUTH Act.  Cal. Gov't Code § 7283 *et seq*.  The TRUTH Act requires that if a federal immigration agent requests an interview with a detainee, the jail must notify the detainee that such interviews are voluntary and that he has the right to seek counsel.  *Id.* § 7283.1(a).  Further, when a jail receives a DHS request, local law enforcement must provide the implicated detainee with a copy of the request and inform him whether the jail intends to comply with the request.  *Id.* § 7283.1(b).

Most recently, on October 5, 2017, the State passed the California Values Act (the "Values Act"), Cal. Gov't Code § 7284 *et seq*., "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments."  *Id.* § 7284.2(f).  The Values Act prohibits compliance with warrantless detainer requests.  *See id.* §§ 7284.2(e), 7284.6(a)(1)(B).  It also forbids a local law enforcement officer from asking any individual his immigration status for immigration enforcement purposes.  *See id.* § 7284.6(a)(1)(A).  Further, the use of local law enforcement funds or personnel to "provid[e] personal information" about an individual "for immigration enforcement purposes" is disallowed unless that information is "available to the public."  *Id.* § 7284.6(a)(1)(D).

The Values Act also amends the TRUST Act to clarify when local law enforcement officers have discretion to respond to DHS notification requests.  *See id.* §§ 7282.5(a), 7283(f), 7284.6(a)(1)(C).  Local law enforcement officers may only comply with notification requests when the relevant individual has a prior criminal conviction included on a long list of specified crimes or if the information that DHS seeks is already available to the public.  *See id.* § 7284.6(a)(1)(C).

The Values Act explicitly purports to comply with section 1373 through a savings clause.  Section 7284(e) reads:

> This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging

United States District Court
Northern District of California

3

that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of title 8 of the United States Code.

On October 17, 2017, the CalDOJ received a request for a proposed statewide voter referendum regarding the Values Act.  On January 17, 2018, the California secretary of state's office announced that the initiative failed to make the ballot.  Supplemental RJN, Ex. A (Dkt. No. 79).

### B.   Confidentiality Statutes

The State's confidentiality statues purport to protect (1) the confidential information of victims and witnesses of crime, Cal. Penal Code §§ 422.93, 679.10, 679.11, and (2) confidential information of youth in its juvenile court system, Cal. Welf. & Inst. Code §§ 827, 831; Cal. Civ. Proc. Code § 155.  Relevant to this lawsuit, California Penal Code sections 679.10 and 679.11 prohibit any state entity that certifies information for the sake of the U-visa and T-visa application process from disclosing the immigration status of individuals requesting certification "except to comply with federal law or legal process, or if authorized by the victim or person requesting [certification]."  *Id.* §§ 679.10(k), 679.11(k).

California Penal Code section 422.93 also focuses on the confidential information of victims and witnesses of crime.  It prohibits detainment of an individual who is a hate crime victim or witness in instances where the sole reason for the detainment is an "actual or suspected" immigration violation.  Cal. Penal Code § 422.93(b).  Law enforcement also cannot report or turn over the individual to federal immigration authorities.  *Id.*

The State's laws regarding confidential information of juveniles dictate that juvenile court records and any information that the records contain are confidential except to statutorily designated parties.  Cal. Welf. & Inst. Code § 827.  Additionally, in the Special Immigrant Juvenile process, the State's laws require that information regarding a juvenile's immigration status remain confidential.  *See id.* § 831(e).  Accordingly, any information about a child's immigration status that is apparent during any juvenile court proceeding remains confidential and is only available for inspection "by the court, the child who is the subject of the proceeding, the parties, the attorneys for the parties, the child's counsel, and the child's guardian."  Cal. Civ. Proc.

United States District Court
Northern District of California

1    Code § 155(c).

2    **II.    THE GRANTS IN QUESTION**

3         The State has been a recipient of both the Byrne JAG and COPS grants, but its future receipt

4    of the grants is threatened by the federal government's interpretation of Section 1373.

5              **A.    The Byrne JAG Program**

6         The Office of Justice Programs ("OJP") administers the Edward Byrne Memorial Justice

7    Assistance Grant Program ("Byrne JAG" Program). *See* 34 U.S.C. §§ 10151-10158. The Byrne

8    JAG Program is a mandatory formula grant, meaning that funds from the grant program are

9    awarded based on a statutorily defined formula and the federal government must disburse the grant

10   if an applicant meets the requirements set forth in the authorizing statutes. *See id.* § 10156. The

11   Byrne JAG Program supports state and local law enforcement efforts by providing additional

12   funds for personnel, equipment, training, and other criminal justice needs. *See id.* § 10151. For

13   the 2017 fiscal year ("FY2017"), Congress has appropriated $396 million for the Byrne JAG

14   Program. Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, 131 Stat. 135, 203.

15        The current Byrne JAG Program is the result of the merging of two earlier programs: the

16   Edward Byrne Memorial State and Local Law Enforcement Assistance Program grants; and Local

17   Law Enforcement Block Grants. *See* Pub. L. No. 109-162, 119 Stat. 2960, 3094 (2006).

18   Following the merger of the two programs, Congress enumerated eight type of programs that the

19   grant was meant to encompass: (1) law enforcement programs; (2) prosecution and court

20   programs; (3) prevention and education programs; (4) corrections and community corrections

21   programs; (5) drug treatment and enforcement programs; (6) planning, evaluation, and technology

22   improvement programs; (7) crime victim and witness programs; and (8) mental health programs.

23   34 U.S.C. § 10152(a)(1)(A)-(H).

24            **B.    The Office of Community Oriented Policing Services**

25        The federal government also announced that grants issued by the Office of Community

26   Oriented Policing Services ("COPS") would also have a Section 1373 certification condition.

27   Office of Community Oriented Policing Services' 2017 COPS Anti-Methamphetamine

28   Program Application Guide, RJN, Ex. C at 2, Appx. D (Dkt. No. 27-1); Office of Community

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   Oriented Policing Services' 2017 COPS Office Anti-Heroin Task Force Program Application

2   Guide, RJN, Ex. D at 1-2, Appx. D (Dkt. No. 27-1). In FY 2017, access to COPS funds will have

3   threshold eligibility requirement of certified compliance with Section 1373.  COPS currently

4   administers six programs, including the COPS Anti-Methamphetamine Program ("CAMP") and

5   the Anti-Heroin-Task Force Program ("AHTF").  State law enforcement agencies use CAMP

6   funds to investigate unlawful activities related to the manufacture and distribution of

7   methamphetamine. COPS Fact Sheet, FY2017 COPS Anti-Methamphetamine Program, *available*

8   *at* https://cops. usdoj.gov/pdf/2017AwardDocs/camp/Fact_Sheet.pdf.  AHTF funds are used to

9   investigate illegal activities "related to the distribution of heroin or unlawful distribution of

10   prescriptive opioids, or unlawful heroin and prescription opioid traffickers[.]"  COPS Fact Sheet,

11   FY2017 COPS Anti-Heroin Task Force Program, *available at* https://cops.usdoj.gov/pdf/2017

12   AwardDocs/ahtf/Fact_ Sheet.pdf.  CAMP and AHTF are each authorized by the Consolidated

13   Appropriations Act, 2017.  H.R. 244, Pub. L. 115–31.

14   ### III.   CALIFORNIA'S USE OF "JAG" AND "COPS" FUNDS

15          The State's Byrne JAG Program grants are distributed to its Board of State and

16   Community Corrections ("BSCC").  BSCC has received $252.7 million from the Byrne JAG

17   program since 2006.  See Declaration of Mary Jolls ("Jolls Decl.") ¶7.  For FY2017, the State

18   expects approximately $28.3 million in JAG funding, with $17.7 million going to BSCC.  *Id.*, ¶5.

19   BSCC uses the funding to issue subgrants to local jurisdictions; these jurisdictions then use them

20   for education and crime prevention programs, law enforcement programs, and court programs.  *Id.*

21   ¶¶s 8, 10, Ex. A.  BSCC currently funds programs for 32 local jurisdictions and the CalDOJ; the

22   funds benefit task forces focused on criminal drug enforcement, violent crime, and gang activity.

23   Jolls Decl. ¶10; Caligiuri Decl. ¶¶s 19-21.

24          CalDOJ has received over $11 million in COPS funding to support law enforcement efforts

25   around the State since it began.  Caligiuri Decl. ¶4.  For FY2017, CalDOJ applied for

26   approximately $2.8 million in CAMP and AHTF grants.  The CAMP grant would cover salaries,

27   benefits, and other costs for a task force targeting enforcement against large–scale

28   methamphetamine drug trafficking organizations.  *See id.,*  ¶¶s 6-8, 10.  The AHTF grant covers

equipment, consultants, and other costs for support of task forces that conduct large scale heroin investigations, share data and intelligence among law enforcement throughout the State, and hold education sessions in the community about drug abuse awareness.  *See id.,* ¶¶s 12-14, 16.

## IV.   SECTION 1373

Through the Immigration and Nationalization Act ("INA"), 8 U.S.C. §§ 1101 et seq., Congress granted the executive branch near plenary power over the regulation and enforcement of immigration laws in the U.S.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).  Most pertinent to this lawsuit, Section 1373 of the INA, which was passed in 1996, prohibits local governments from restricting government officials or entities from communicating information regarding immigration status to the U.S. Immigration and Customs Enforcement ("ICE").  It states in relevant part:

> (a) In General. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> (b) Additional Authority of Government Entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
>> (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
>>
>> (2) Maintaining such information.
>>
>> (3) Exchanging such information with any other Federal, State, or local government entity.

U.S.C. 1373.

In the 2016 fiscal year ("FY16"), OJP identified Section 1373 as an applicable federal law for the Byrne JAG Program for the first time since the program's inception.  *See* Decl. of Alan R. Hanson (Hanson Decl.) ¶ 3 (Dkt. No. 42-1).  In receiving the award, the State accepted the Section 1373 compliance condition as it relates to the FY 2016 Byrne JAG Program grant.  *See*

United States District Court
Northern District of California

California's FY 2016 Byrne JAG Program Award Document, Hanson Decl., Ex. A (Dkt. No. 42-1).  In July 2017, OJP sought applications for the FY 2017 Byrne JAG Program.  *See* Edward Byrne Memorial Justice Assistance Grant Program FY 2017 State Solicitation, Request for Judicial Notice ("RJN"), Ex. A (Dkt. No. 27-1).  This solicitation informed prospective applicants that the FY 2017 award would be conditioned on all grantees certifying compliance with Section 1373.  *Id.* at 31.  The State's Attorney General must sign a standard affidavit, under penalty of perjury, affirming compliance with Section 1373 on behalf of the State and "any entity, agency, or official" as applicable to the "program or activity to be funded." *Id.* at Appx. II.  Governor Edmund G. Brown must also adopt that certification under penalty of perjury.  *Id.* at Appx. I.

California Department of Justice ("CalDOJ") submitted its applications with the executed certifications for AHTF and CAMP on July 7 and 10, respectively.  Decl. of Christopher Caligiuri ("Caligiuri Decl.") ¶¶ 9, 15 (Dkt. No. 30). As part of their applications, CalDOJ included a supplemental statement with its COPS Section 1373 certifications.  *Id.*  It clarified that its certifications were made "as [Section 1373] is lawfully interpreted," and reserved its rights to challenge "any unconstitutional enforcement of Section 1373."  *Id.*  The federal government has yet to respond to CalDOJ's applications.  *See id.* ¶¶ 11, 17.

## V.      THE DISPUTE IN CALIFORNIA

On April 21, 2017, the federal government sent letters to nine jurisdictions that received the JAG award in 2016, including the State, demanding an official legal opinion that explained the jurisdictions' compliance with Section 1373.  Department of Justice, Letter to Kathleen Howard, Executive Director of the California Board of State and Community Corrections from Alan R. Hanson, Acting Assistant Attorney General for the Office of Justice Programs (April 21, 2017), RJN, Ex. I (Dkt. No. 27-2); Press Release, U.S. Dep't of Justice, Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017), RJN, Ex. M (Dkt. No. 27-3).  On June 29, BSCC submitted the requested legal opinion explaining the State's laws do not violate Section 1373.  *See* Jolls Decl., Ex. C (Dkt. No. 20-1).  Having not received a response when other jurisdictions had received guidance on Section 1373 compliance, on October 31, the State filed a Motion for Preliminary Injunction to prevent enforcement of the

Section 1373 conditions as to the TRUTH Act and its Confidentiality Statutes.

On November 1, 2017, the federal government sent a preliminary compliance assessment letter to California and alerted the State that three provisions of the Values Act may violate Section 1373.  Department of Justice, Letter to Kathleen Howard, Executive Director of the California Board of State and Community Corrections from Alan R. Hanson, Acting Assistant Attorney General for the Office of Justice Programs (November 1, 2017), RJN, Ex. P (Dkt. No. 27-3). The highlighted provisions related to: (i) inquiries into an individual's immigration status, Cal. Gov't Code, § 7284.6(a)(1)(A), (ii) responses to notification requests, *id.* § 7284.6(a)(1)(C), and (iii) the sharing of "personal information," *id.* § 7284.6(a)(1)(D)).  RJN, Ex. P at 1-2.  To comply with Section 1373, the federal government stated that the State must certify that:  (1) it does "not restrict California officers and employees from requesting information regarding immigration status from federal immigration officers", and (2) it "interprets and applies [the notification request and personal information] provisions to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]." *Id.* at 1-2.  The federal government interprets the State's laws as violating Section 1373 if it cannot make those certifications.

On November 13, the State replied to the federal government's assessment letter.  Hanson Decl. ¶ 14.  OJP has not responded. *Id.* ¶ 15.  The federal government claims that OJP is not issuing FY 2017 Byrne JAG award documents to any applicants while awaiting developments in the other relevant litigation. *Id.* ¶ 10.

## VI.    OTHER RELATED LITIGATION

There have been two other lawsuits challenging the federal government's imposition of new conditions on the Byrne JAG Program grants.  In addition to the Section 1373 certification condition, these lawsuits addressed the federal government's imposition of conditions requiring that local authorities provide federal agents advance notice of the scheduled release from state or local correctional facilities of certain individuals suspected of immigration violations (the "notice condition") and that local authorities provide immigration agents with access to local detention facilities (the "access condition").

United States District Court
Northern District of California

1    In *City of Chicago v. Sessions*, 264 F.Supp.3d 933, 951 (N.D. Ill. 2017), the court granted

2    the City of Chicago's motion for a nationwide preliminary injunction against the imposition of the

3    notice and access conditions and denied the City of Chicago's motion to enjoin the condition

4    requiring compliance with Section 1373.[1]  *Id.* at 951.  With respect to the certification condition,

5    the court found that a provision of the Byrne JAG Program authorizing statute, 34 U.S.C. §

6    10153(a)(5)(D) that requires certification that an applicant for Byrne JAG Program funds "will

7    comply with all provisions of this part and all other applicable Federal laws" gave the federal

8    government the statutory authority to impose the Section 1373 certification condition. *Id.* at 944-

9    46.  In the court's view, "[t]he most natural reading of the statute authorizes the Attorney General

10   to require a certification of compliance with all other applicable federal laws, which by the

11   plainest definition includes Section 1373." *Id.* at 945-46.  Accordingly, the court found that the

12   City of Chicago could not demonstrate success on the merits as to the certification condition.  The

13   court's order is on appeal.  *See City of Chicago v. Sessions*, No. 17-02991 (7th Cir. Sept 26, 2017)

14   (case heard and taken under advisement by panel on January 19, 2018).

15   In *City of Philadelphia v. Sessions*, No. 17–3894, ––– F.Supp.3d ––––, 2017 WL 5489476,

16   at *61-62 (E.D. Pa. Nov. 15, 2017), the court granted the City of Philadelphia's motion for

17   preliminary injunction against the imposition of each of the challenged conditions for the Byrne

18   JAG Program grants.  The court found that the federal government's imposition of the notice and

19   access conditions was without appropriate statutory authority under the APA because it was clear

20   that Section 10102(a)(6), which the federal government argues grants it authority to impose the

21   conditions, did not authorize any of the challenged conditions.  *Id.* at *25-27.  As to the

22   certification condition, the court found that Section 10153(a)(5)(D) may act as a separate grant of

23   authority allowing the federal government's imposition of the certification condition.  *Id.*  But the

24   court held that imposition of the certification condition is arbitrary and capricious under the APA

25   because the federal government "failed to give adequate reasons for its decisions examining the

26   relevant data and articulating a satisfactory explanation for its action including rational connection

27

28   _____

[1] As a result of the nationwide injunction, this Order focuses on the certification condition, which
has not been enjoined.

between the facts found and the choice made." *Id.* at \*33 (citing *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted)). Further, the court found that the federal government failed to consider important aspects of the problems it sought to solve and its justifications could not "be ascribed to a difference in view or the product of agency expertise." *Id.* Accordingly, it determined that the City of Philadelphia could demonstrate success on the merits as to challenged conditions.

The court did not rest its decision on this likely success on the merits however. It found that Philadelphia's laws substantially complied with the Byrne JAG Program conditions. Further, it held that the City of Philadelphia was able to demonstrate irreparable harm and that the balance of equities and the public interest weighed in its favor. Accordingly, it enjoined the federal government from denying the City of Philadelphia's Byrne JAG Program grant for FY 2017. The court's order is also on appeal. *See City of Philadelphia v. Attorney General U.S.*, No. 18-01103 (3d Cir. Jan. 16, 2018)

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This has been interpreted as a four-part conjunctive test, not a four-factor balancing test. However, the Ninth Circuit has held that a plaintiff may also obtain an injunction if he has demonstrated "serious questions going to the merits" that the balance of hardships "tips sharply" in his favor, that he is likely to suffer irreparable harm, and that an injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

## DISCUSSION

## I.   JUSTICIABILITY

The federal government argues that the State's claims are not justiciable because the State cannot demonstrate the injury-in-fact necessary to establish standing and because its claims are not

ripe for review.  These principles of standing and ripeness go to whether this court has jurisdiction to hear the State's claims.  I conclude that the State has demonstrated Article III standing to challenge the Section 1373 certification condition and that its claims are ripe for review.

The federal government challenges the justiciability of the State's claims on standing and ripeness grounds.  It contends that because it has not withheld or threatened to withhold grant funding on any state statute except for the Values Act, the State lacks standing to seek a ruling on any other state statute.  It also asserts that there is not a ripe controversy because the federal government has not made a final decision as to whether the Values Act violates Section 1373.  (Its argument that the Values Act is not currently in effect and may never be in effect due to a proposed voter referendum is moot because the referendum failed due to lack of signatures on January 17, 2017.)  I address standing and ripeness in turn.

### A.  Standing

Article III, section 2 of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007); *see* U.S. Const. art. III, §, cl. 1.  "Standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing a plaintiff must demonstrate "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517 (citing *Lujan*, 504 U.S. at 560-61).  An entity facing enforcement action may establish standing by demonstrating a well-founded fear of enforcement and a threatened injury that is "sufficiently real and imminent" or that the well-founded fear is itself causing the present injury.  *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 519 (N.D. Cal. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1976)).

The State claims that it has standing to seek relief concerning the amended TRUST Act, TRUTH Act, and state confidentiality statutes because it has a well-founded fear of enforcement against its statutes and the requisite injury-in-fact.  It contends that (1) the federal government has repeatedly highlighted the State's laws as generally not in compliance with Section 1373; (2) the federal government has sought to enforce Section 1373 against laws and policies similar to its

United States District Court
Northern District of California

1    confidentiality statutes; and (3) the federal government expressly states that potentially

2    noncompliant laws "may not be limited to" the Values Act and "reserv[es] the right to identify

3    additional bases of potential violations of Section 1373."  RJN, Ex. P.

4        The State asserts that, because the federal government's interpretation of Section 1373 and

5    its certification requirement undermine the "exercise of its sovereign power to create and enforce a

6    legal code," it suffers the requisite injury-in-fact to satisfy the standing requirement.  It also argues

7    that the federal government's actions threaten the loss of Byrne JAG Program funds promised

8    under federal law as well as already awarded COPS funds, which is also sufficient to demonstrate

9    injury-in-fact.

10       The federal government responds that there is no "live controversy" regarding whether any

11   statutes other than the Values Act may comply with Section 1373 and no foreseeable injury-in-fact

12   arising out of the federal government's view of these statutes.  Additionally, it contends that any

13   assumption that the federal government will withhold grant funds based on any statute other than

14   the Values Act is purely speculative and therefore cannot be the basis for standing.

15       As I discuss below, the State has a well-founded fear of enforcement regarding the

16   amended TRUST Act, TRUTH Act, and state confidentiality statutes under the federal

17   government's Section 1373 interpretation and certification condition.  Such enforcement would

18   deprive it of federal grants to which it is otherwise entitled.  The State has demonstrated Article III

19   standing.

20       **1.     California Has Demonstrated a Well-founded Fear of Enforcement**

21        In assessing whether enforcement action is likely, courts look to the past conduct of the

22   government, as well as the government's statements and representations, to determine whether

23   enforcement is likely or simply "chimerical."  *Compare Steffel v. Thompson*, 415 U.S. 452, 459

24   (1947) (finding that petitioner who had been warned twice to stop handbilling, and whose

25   companion had been arrested for handbilling, had well-founded fear of enforcement), *with Poe v.*

26   *Ullman*, 367 U.S. 497, 508 (1961) ("we cannot accept, as the basis of constitutional adjudication,

27   other than as chimerical, the fear of enforcement of provisions that have during so many years

28   gone uniformly and without exception unenforced").  A plaintiff does not need to have been

United States District Court
Northern District of California

1   specifically threatened with enforcement action to show that enforcement action is likely.  *See*

2   *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (plaintiffs had credible threat of

3   enforcement even though newly enacted law had not become effective and no enforcement action

4   had been brought or threatened under it).  But "the threat of enforcement must at least be

5   'credible,' not simply 'imaginary or speculative.' "  *Thomas v. Anchorage Equal Rights Comm'n*,

6   220 F.3d 1134, 1140 (9th Cir. 2000) (en banc) (citing *Babbitt v. United Farm Workers Nat'l*

7   *Union*, 442 U.S. 289, 298 (1979)).

8       The federal government's contention that the State's fear of enforcement is speculative

9   bears little weight.  The federal government has actively sought to enforce Section 1373 against

10   jurisdictions whose laws are undeniably similar to the State's confidentiality statutes.  For

11   example, the federal government seeks to enforce Section 1373 against Vermont's Model Fair and

12   Impartial Policing Policy, in which officers are required to communicate that they will not report

13   immigrants or immigration status of victims or witnesses to crimes.  Letter to Vermont from Alan

14   R. Hanson, Acting Assistant Attorney General for the OJP at the DOJ, Supplemental RJN, Exh. H

15   (Dkt. No. 61). The requirements of Vermont's law closely mirror that of California's

16   confidentiality statutes.   The same is true of Philadelphia's policy regarding victims of crimes,

17   against which the federal government has also sought to enforce Section 1373.  *See* RJN, Exh. R,

18   Letter to Philadelphia from Alan R. Hanson, Acting Assistant Attorney General for the OJP at the

19   DOJ (Dkt. No. 27-3).  And in its November letter to the State regarding Section 1373's

20   relationship to the Values Act, the federal government indicated that it "reserves the right to

21   identify additional bases of potential violations of Section 1373."  RJN, Ex. P.

22       Members of the Executive Branch have made no secret of their hostility to the State's view

23   of its obligations under Section 1373.  Thomas Homan, the Acting Director of Immigration and

24   Customs Enforcement, recently threatened criminal prosecution of political leaders in sanctuary

25   jurisdictions.  *See* Interview by Fox News with Thomas Homan, Acting Director, Immigration and

26   Customs Enforcement (Jan. 2, 2018) (Stating "[w]e've got to start charging some of these

27   politicians with crimes" in reference to leaders in "sanctuary cities"); *see also Oversight of the*

28   *United States Department of Homeland Security: Hearing Before the S. Comm. on the Judiciary*

1   (2018) (statement of Kirstjen Nielsen, United States Department of Homeland Security Director)

2   (noting that DOJ is reviewing "what avenues might be available" to hold leaders accountable for

3   "sanctuary city" policies).  .  On June 13, 2017, Acting Director Homan testified before Congress

4   that jurisdictions that "have some sort of policy where they don't . . . allow [ICE] access to the

5   jails" violate Section 1373.  United States. Cong. House. Appropriations Committee on Home

6   Security. June 13, 2017 (statement of Thomas Homan, Acting Director of the Immigration and

7   Customs Enforcement), RJN, Ex. S at 35, 47-48 (Dkt. No. 27-3).  Further, Attorney General

8   Sessions has stated that "the State of California . . . [has] enacted statutes . . . designed to

9   specifically prohibit or hinder ICE from enforcing immigration law by . . . denying requests by

10  ICE officers and agents to enter prisons and jails to make arrests."  Letter from Jefferson B.

11  Sessions, Attorney General at the U.S. Dep't of Justice and John F. Kelly, then-Secretary of the

12  U.S. Dep't of Homeland Security to the Honorable Tani G. Cantil-Sakauye, Chief Justice of the

13  Supreme Court of California (March 29, 2017), RJN, Ex. T at 2 (Dkt. No. 27-3).   The President

14  himself has threatened to withdraw ICE agents from California because of the state's sanctuary

15  policies.  CNN, *Trump Considers Pulling ICE Agents to Punish California*, Youtube (Feb. 22,

16  2018), https://www.youtube.com/watch?v=1C3coXw2AI0.

17          Taken together, these facts establish that California has a well-founded fear of enforcement

18  concerning its amended TRUST Act, TRUTH Act, and state confidentiality statutes.  It has

19  demonstrated that other states that have similar statutes and practices have faced enforcement and

20  that the federal government has a contrary view of Section 1373's reach that would affect its

21  relevant statutes.  And it has established that the federal government has specifically identified the

22  State as having other policies that purportedly violate Section 1373 that were not mentioned in the

23  preliminary assessment letter.  Accordingly, the State has shown that the "threat of enforcement

24  [is] credible, not simply imaginary or speculative."  *Thomas,* 220 F.3d at 1140.

25                          **2.       California Has Demonstrated Injury-in-fact**

26          The State asserts that because the federal government's interpretation of Section 1373 and

27  its certification requirement undermine the "exercise of its sovereign power to create and enforce a

28  legal code," it suffers the requisite injury-in-fact to satisfy the standing requirement.  It also argues

United States District Court
Northern District of California

15

that the federal government's actions threaten the loss of Byrne JAG Program funds promised

under federal law as well as already awarded COPS funds, which is also sufficient to demonstrate

injury-in-fact.

### a.      California's claims implicate a constitutional interest

The State has broad police powers reserved to it under the Constitution to determine its

local policies and enforcement priorities pursuant to the Tenth Amendment.  *See Alfred L. Snapp*

*& Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (highlighting that states have

a sovereign interest in "the exercise of sovereign power over individuals and entities within the

relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and

criminal"); *see also New York v. United States*, 505 U.S. 144, 157-158 (1992) ("[T]he Tenth

Amendment confirms that the power of the Federal Government is subject to limits that may, in a

given instance, reserve power to the States.").  The State asserts that the relevant statutes here "are

designed to improve public safety of all Californians." Mot. at 2 (Dkt. No. 26).  The statutes

strengthen community policing efforts and improve public safety because immigrants are no more

likely to commit crimes than native-born Americans and because a clear distinction between local

law enforcement and immigration enforcement results in safer communities.  *Id.* at 6.

These statutes reflect the State's local judgment of what policies and practices are most

effective for maintaining public safety and community health. The State's claim is that the federal

government's interpretation of Section 1373 and the compliance condition conflict with its police

powers because the federal government seeks to compel it to change its policies in violation of the

Tenth Amendment.  *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011)

("when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce

a legal code' [] it inflict[s] on the state the requisite injury-in-fact."); *Ohio ex rel. Celebrezze v.*

*U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985) (Ohio had standing to litigate the

constitutionality of its own law where "effective enforcement of the Ohio statute" was rendered

"uncertain by the formal position of the [U.S. Department of Transportation] that the Ohio statute

is preempted" as "threatened injury to a State's enforcement of its safety laws" constitutes an

injury-in-fact).  This is sufficient to demonstrate injury-in-fact for Article III standing.

United States District Court
Northern District of California

### b.      California is threatened with the loss of federal grants

The State claims that the federal government threatens to penalize it for failing to comply with the federal government's interpretation of Section 1373 by withholding the COPS grant and the Byrne JAG Program grant.  The State previously received these grants in each year since their inception.  This threatened injury meets Article III's standing requirements.  A "loss of funds promised under federal law [] satisfies Article III's standing requirement."  *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).

In sum, the State has established both its well-founded fear of enforcement and a threatened injury that is "sufficiently real and imminent."  It has Article III standing.

### B.    Ripeness

The federal government asserts that the State's claims regarding the Values Act are not ripe for three reasons: (1) the Office of Justice Programs has not yet responded to the State's letter regarding the Values Act and has not determined administratively whether the Act violates Section 1373; (2) the Values Act is not currently in effect and, due to a referendum request, may never become effective; and (3) a ruling that the Values Act does not violate Section 1373 would not free the State from legal jeopardy unless all its laws, together with policies implementing those laws, are also consistent with Section 1373.

The State points out that those arguments focus on prudential, not constitutional, ripeness. The State contends that its claims are constitutionally ripe because (1) its response to the November 1 Letter effectively "articulated a concrete plan to violate the federal government's interpretation the law in question;" (2) the federal government made a "threat of prosecution" against the State in the letter and through public statements; and (3) the federal government has repeatedly sought to enforce Section 1373 over the past two months, including against the State. As to the prudential ripeness standards, the State believes that the issues in this case are fit for decision and that it will suffer hardship from delayed review.

A dispute is ripe in the constitutional sense if it "present[s] concrete legal issues, presented in actual cases, not abstractions."  *Colwell v. HHS*, 558 F.3d 1112, 1123 (9th Cir.2009) (internal quotation marks omitted).  In the context of a declaratory judgment suit, the inquiry "depends

17

1   upon 'whether the facts alleged, under all the circumstances, show that there is a substantial

2   controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

3   warrant the issuance of a declaratory judgment.' " *United States v. Braren*, 338 F.3d 971, 975 (9th

4   Cir.2 003) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941)).

5        Ripeness and standing are closely related because they "originate from the same Article III

6   limitation."  *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 n. 5 (2014) (internal

7   quotation marks omitted) ("[T]he Article III standing and ripeness issues in this case boil down to

8   the same question." (internal quotation marks omitted)).  As a result, the Ninth Circuit has

9   recognized that "in many cases, ripeness coincides squarely with standing's injury in fact prong."

10  *Thomas*, 220 F.3d at 1138 ("The constitutional component of the ripeness inquiry is often treated

11  under the rubric of standing . . . .  Indeed, because the focus of our ripeness inquiry is primarily

12  temporal in scope, ripeness can be characterized as standing on a timeline.").

13       In order to be constitutionally ripe, the State must demonstrate that the injury is

14  "imminent."   An injury is imminent "if the threatened injury is 'certainly impending,' or there is a

15  " 'substantial risk" that the harm will occur.' " *Susan B. Anthony List*, 134 S.Ct. at 2341 (quoting

16  *Clapper v. Amnesty Int'l USA*, 133 S.Ct. at 1147, 1150 n. 5 (2013)).  The State asserts that it will

17  be harmed by the federal government's interpretation of Section 1373 because the State's laws

18  violate the federal government's broad interpretation of Section 1373, open up the State to

19  prosecution and endanger its future grant funds.  Through the federal government's November

20  letter to the State, it showed that it intends to prosecute any entities that do not comply with its

21  interpretation of Section 1373.  The federal government has also sought to enforce the compliance

22  condition with respect to other laws that mirror those of the State.  And finally, the federal

23  government has explicitly stated that receipt of both the Byrne JAG Program and COPS funds are

24  conditioned on the Section 1373 certification.  Accordingly, the State has demonstrated both that

25  the threatened injury is "certainly impending" and that there is a "substantial risk" that harm will

26  occur.  *See id.*  This is sufficient to establish constitutional ripeness.

27       The Ninth Circuit has previously declined to reach prudential ripeness when constitutional

28  ripeness is satisfied.  *See Susan B. Anthony List*, 134 S.Ct. at 2347 (refusing to "resolve the

United States District Court
Northern District of California

18

continuing vitality of the prudential ripeness doctrine"). I follow its direction. The State has

demonstrated that its claims are ripe for review. I now move to the merits of its motion for

preliminary injunction.

## II.      LIKELIHOOD OF SUCCESS ON THE MERITS

The State challenges the Section 1373 certification condition on four grounds: (1) the

imposition of the condition is arbitrary and capricious in violation of the Administrative Procedure

Act ("APA"); (2) the condition violates the Spending Clause because it is unrelated to the purpose

of the JAG Byrne Program; (3) the State's statutes do not violate Section 1373; and (4) the Tenth

Amendment does not allow for Section 1373 to "commandeer" the State's control over

governmental employees and its residents' confidential personal information. The federal

government responds that the Section 1373 condition is consistent with the APA and the spending

clause; the State cannot demonstrate that none of its laws would violate the Section 1373

compliance condition; and the State cannot show that the Section 1373 compliance condition

violates the Tenth Amendment.

### A.      APA Claim

The State argues that the Section 1373 certification condition is "arbitrary and capricious"

under the APA. The federal government contends that the APA claim cannot go forward because

it does not challenge "final agency action" given that the federal government has not made a final

determination that the State violates the certification condition. 5 U.S.C. § 704. The federal

government also asserts that even if APA review is available at this point in time, the challenged

condition is well supported by a reasoned explanation. I address each argument in turn.

#### 1.      Imposition of the Certifying Condition Is Final Agency Action

For agency action to be final, the action must (1) "mark the consummation of the agency's

decisionmaking process," meaning not "tentative or interlocutory" and (2) "be one by which rights

or obligations have been determined, or from which legal consequences will flow." *Bennett v.*

*Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted). To satisfy the first prong of the *Bennett*

test, an agency must have "rendered its last word on the matter." *Whitman v. Am. Trucking Ass'n*,

531 U.S. 457, 478 (2001) (quotation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The imposition of the certification condition on the Byrne JAG program meets this

2   requirement.  By imposing the certification condition, the federal government has articulated that

3   certain funds, namely the COPS grants and the Byrne JAG Program grants, will require adherence

4   to the certification condition.  It has rendered its final word, satisfying the first prong of the

5   *Bennett* test.

6   As to the second prong of the *Bennett* test, legal consequences clearly flow from the

7   imposition of the certification condition.  Receipt of the grants is conditioned on certifying

8   compliance with the federal government's interpretation of Section 1373.  *See Appalachiam*

9   *Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding that a EPA guidance document

10   gives "marching orders" to be final agency action despite explicit language disclaiming that

11   information provided was merely guidance).  Further, the State must certify compliance to the

12   federal government's interpretation of Section 1373 under penalty of perjury.  Given the parties'

13   diverging interpretation of the breadth of Section 1373, the certifying condition clearly opens up

14   the State to potential legal consequences.

15           **2.      It Is Too Soon To Determine Whether the Federal Government's
16                    Imposition of the Certifying Condition Is Arbitrary and Capricious**

17   The APA requires that courts "hold unlawful and set aside agency action, findings, and

18   conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

19   accordance with law."  5 U.S.C. § 706(2)(A).  The justification for an agency's final action is

20   typically apparent as the result of formal rulemaking, notice-and-comment requirements, and

21   associated hearings.  But because the State's challenge is to grant conditions, these administrative

22   procedures were not required prior to the federal government's decision to impose the certification

23   condition.  *See id.* § 553(a)(2) (exempting "matter(s) relating to agency management or personnel

24   or to public property, loans, grants, benefits, or contracts" from rulemaking requirements).

25   The State argues that the identification of Section 1373 as an "applicable law" for the

26   Byrne JAG Program grant is arbitrary and capricious in violation of the APA.  It contends that the

27   federal government has failed to identify a good reason for the policy change as required by the

28   APA.  The federal government responds that it has met its burden to demonstrate that its reasons

20

1    for imposing the condition were rational.

2            In order to demonstrate these "rational" reasons, the federal government points only to a

3    press release that it issued on July 25, 2017.   *See* Press Release, U.S. Dep't of Justice,

4    Backgrounder on Grant Requirements ("Backgrounder") (July 25, 2017), *available at*

5    https://www.justice.gov/opa/ press-release/file/984346/download.  The Backgrounder highlights

6    three of the federal government's concerns as they pertain to Section 1373 compliance condition:

7    (1) jurisdictions that refuse to cooperate with federal immigration authorities in information

8    sharing about undocumented immigrants who commit crimes; (2) the use of federal funds for

9    policies that frustrate federal immigration enforcement; and (3) jurisdictions that jeopardize the

10   safety of their residents and undermine the Department's ability to protect the public and reduce

11   crime and violence.  *City of Philadelphia v. Sessions*, --- F.Supp.3d ---, 2017 WL 5489476, at *31

12   (E.D. Pa. Nov. 15, 2017).  The federal government could place conditions on grants with these

13   goals in mind if there is a "rational connection between the facts found and the choice made" to

14   achieve these goals.  *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co*, 463 U.S. 29, 43

15   (1983).

16           It is not clear, however, that the certifying condition has the requisite rational connection to

17   the facts articulated in the Backgrounder.  As the court in *City of Philadelphia* explains, the plain

18   language of Section 1373 is too broad to achieve the information sharing goal listed in the first

19   concern.  2017 WL 5489476, at *3.  The immigration information implicated by Section 1373

20   captures the immigration status of all people in the United States, not merely those who are

21   present unlawfully.  *See* 8 U.S.C. §1372.  Its language does not limit its mandate to merely

22   immigrants who have committed crimes.  *Id.*  Section 1373's language captures so broad a

23   category of individuals that requiring compliance cannot further the goal of better information-

24   sharing between the federal government and local law enforcement regarding illegal immigrants

25   who commit crimes.

26           As to the federal government's second concern, the funds from the Byrne JAG Program

27   are used for purposes unrelated to immigration enforcement, such as funding task forces focused

28   on criminal drug enforcement, violent crime, and gang activity.  Jolls Decl. ¶ 10.  Consequently,

United States District Court
Northern District of California

1   withholding the grant funds because of the certification condition does not further the federal

2   government's goal of prohibiting "use of federal funds for policies that frustrate federal

3   immigration enforcement."  Instead, the certification condition amounts to a way to target

4   jurisdictions that do not comply with the federal government's interpretation of Section 1373.

5        Its third concern—jurisdictions that jeopardize the safety of their residents and undermine

6   the Department's ability to protect the public and reduce crime and violence—is unsupported.

7   The federal government presents no evidence that there is any link between increases in crime and

8   violence and imposing the certification condition, especially given that Section 1373's language

9   captures the immigration status of both criminal and non-criminal immigrants.

10        The State points to evidence that keeping the immigration status of undocumented

11   immigrants confidential in certain circumstances improves the community's relationship with law

12   enforcement, making immigrants, both documented and undocumented, more likely to report

13   crimes.  California Assembly Committee on Public Safety's analysis of AB 2792 ("the TRUTH

14   Act"), RJN, Ex. F at 5 (Dkt. No. 27-2).  It also highlights studies that concluded that first

15   generation immigrants, including undocumented immigrants, were considerably less likely to

16   commit violent acts than third-generation Americans.  This study also revealed that living in

17   neighborhoods of concentrated immigration was associated with lower violence.  California

18   Senate Committee on Public Safety's analysis of AB 4 ("the TRUST Act"), RJN, Ex. G at 8.

19   Given the State's evidence that immigration status is not linked to pervasive criminal activity and

20   violence and the federal government's lack of evidence supporting such an assertion, there does

21   not appear to be rational connection between imposing the certification condition and "the

22   Department's ability to protect the public and reduce crime and violence."

23        All that said, criminal law impacts the INA in a variety of ways, and, as discussed below,

24   the relationship the government needs to add conditions to the receipt of grants does not need to be

25   close.  While the federal government fails to identify any goal set out in the Backgrounder that is

26   furthered by the imposition of the certification condition, I am not prepared at the moment to find

27   that the certification condition is arbitrary and capricious under the APA.  5 U.S.C. § 706(2)(A).

28   The change in policy might "be ascribed to a difference in view," *Motor Vehicle*, 463 U.S. at 43.

United States District Court
Northern District of California

An issue that needs to be tied down is whether the federal government's interpretation of Section 1373 is unconstitutional because it is so broad that it violates the State's police powers under the Tenth Amendment.

## B.   Spending Clause

In authorizing the Byrne JAG Program, Congress indicated its intent to require "applicant[s]" to "comply with . . . all other applicable Federal laws." *See* 34 U.S.C. § 10153(a)(5)(D).  The federal government contends that there is a clear relationship between the Section 1373 condition and the Byrne JAG Program goals.  Relying on *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), it argues that the condition "satisfies the 'low-threshold' relatedness inquiry."

The State responds that, even at a low bar, the condition requiring compliance with Section 1373, an immigration statute, is unrelated to the funding of local "criminal justice" programs that JAG is intended to support.  The State argues that Section 1373 has no nexus to the purpose of the implicated funds.  To bolster its position, it points to *City of Philadelphia,* where the court found that "federal interest in enforcing immigration laws falls outside of the scope of the Byrne JAG program."  2017 WL 5489476, at *48.

The State's reliance on the statement from *City of Philadelphia* ignores that the court also declared that "the Certification Condition appears to have some relationship with the JAG Program" and that "the 'relatedness issue' is a close call." *Id.* at *50.  In *New York v. United States,* 505 U.S. 144, 167 (1992), the U.S. Supreme Court stated that "[s]uch conditions must . . . bear *some relationship* to the purpose of the federal spending."  (emphasis added). This language does not support a demanding reading of the relatedness requirement.  Rather, it appears to enforce a rather low-threshold relatedness test.  Given this, the Section 1373 certification condition may have a sufficient nexus to the purpose of the implicated funds, depending on the breadth of the federal government's interpretation of Section 1373.

## C.   Tenth Amendment and Section 1373

The State contends that the federal government's enforcement of Section 1373 against its statutes constitutes commandeering of the State's oversight of governmental employees and

23

handling of its residents' confidential personal information.  In its view, the relevant question is whether Section 1373 can be enforced against the state's statutes under the Tenth Amendment of the Constitution.

The federal government argues that it is not violating the Tenth Amendment by arguing that the Values Act does not comply with Section 1373.  It provides three justifications for its position: (1) the dispute here does not involve a federal statutory mandate that directly regulates the State, but rather a condition on receipt of federal funds that the State and its subdivisions are free to accept or reject; (2) the purpose and effect of Section 1373 and the challenged grant conditions are to further the express goals of the INA, not to "commandeer" state officials; and (3) a mere requirement not to prohibit individuals from providing information would not violate the Tenth Amendment.

"The Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188.  "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).  "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 132 S.Ct. at 2602.

I agree with the courts in *City of Philadelphia*, 2017 WL 5489476, at *48, and *City of Chicago,* 264 F. Supp. 3d at 949, that whether the certification condition violates the Tenth Amendment is "a unique and novel constitutional question."  No cited authority holds that the scope of state sovereignty includes the power to forbid state or local employees from voluntarily complying with a federal program.  Section 1373 "does not require" that the State "enact any laws or regulations.  And it does not require state officials to assist in the enforcement of federal statutes regulating private individuals."  *See Reno v. Condon*, 528 U.S. 141, 151 (2000).  It does prohibit the State from restricting its officials from assisting a federal program.

There is an interpretation of Section 1373 that is consistent with the constitutional principles discussed in *New York* and *Printz*.  *See Printz*, 521 U.S. at 935; *New York*, 505 U.S. at

United States District Court
Northern District of California

161–63.  Section 1373 can be interpreted not to import an affirmative duty at all.  But it is not clear that the federal government has adopted such an interpretation.  The question is whether the federal government's interpretation exceeds the constitutional reach of Section 1373.

Section 1373 requires the sharing of information with the federal government "regarding immigration status."  The meaning of that phrase is ambiguous.  The federal government has not tried to define that phrase, and has not settled on a definition now, even though some of its officials are threatening criminal prosecution against political leaders whose understanding of the constitutional reach of Section 1373 differs from theirs.  Under the INA, almost every bit of information about an individual could be relevant to status, particularly with respect to the right to asylum or as a defense to removal.  The State reads the phrase narrowly, as requiring only information whether a person is a citizen of the US, present here in some other capacity, or undocumented, which is literally what "status" is.  *See Steinle v. City & Cnty. of San Francisco*, 230 F.Supp.3d 994, 1015-16 (N.D. Cal. 2017) (finding that city policy would only violate Section 1373 by "restricting the provision of inmates' citizenship and immigration status to ICE").

At this time, only the State's obligation to communicate "personal information" and release dates of detainees is in dispute with respect to the Values Act.  There is a nationwide injunction against the federal government regarding the effect of Section 1373 on other aspects of the Byrne grants.  *City of Chicago,* 264 F. Supp. 3d at 952.  The personal information and dates of release from jail of undocumented detainees are of obvious interest to the federal government for purposes of immigration enforcement, but not so obviously for immigration status.  It is valuable to ICE to cross-check names and addresses of detainees to insure that it only targets persons eligible for removal, and to pick them up from local jails before their release.  But ICE's enforcement interest conflicts with the reason the State passed the Values Act, which was to encourage cooperation between law enforcement and immigrant communities.

As I understand it, the disagreement here involves a subset of detained, undocumented people.  The State's statutes do not impact the free flow of this information regarding those accused of hundreds of the most serious state crimes; it exempts those arrested or convicted of less serious, largely non-violent, offenses.  The State's law enforcement strategy depends on keeping

United States District Court
Northern District of California

the trust of immigrant communities so that, among other things, they will report crimes and rely on law enforcement, not criminal gangs, for protection. The state statutes also explicitly keep confidential information in juvenile records and regarding those people federal law also protects who are eligible for "U" and "T" visas. The government has not articulated its position regarding the confidentiality statutes in this litigation.

DOJ is apparently processing the COPS grant according to its usual administrative procedure and has yet to make a final pronouncement, although all indications are that it will find the State out of compliance with Section 1373 because of the personal information and release date provisions. The federal government has authority to set immigration policy. But where that policy collides with the State's constitutional police powers, it is important to understand the parameters of the federal government's interpretation of Section 1373. Does DOJ assert that the State's confidentiality statutes should not be respected? How does it square that with the INA statutes requiring confidentiality concerning the same subject matter? If personal information and release dates of detainees are encompassed within Section 1373's sweep as "regarding immigration status," what are the contours of DOJ's definition; does it include every fact about a detainee's life, or something else? How does that square with the language and intent regarding Section 1373? The State has been transparent about the purpose of its statues, but the Values Act has just been implemented. What is the burden on a local enforcement agency to provide personal information and release dates for persons the agency knows are undocumented (recognizing the Values Act precludes officers from requesting information on status for less serious offenses, so this information may not be readily available unless it is determined that Section 1373 requires the agency to maintain and disclose status information)? How does the State comply with Section 1373 in providing information regarding immigration status?

Those are a few of the issues that should be clarified. I find that the record is not sufficient at this stage to determine that State has shown a likelihood of success on the merits.

## III.   IRREPARABLE HARM

The State asserts two ways in which it will suffer imminent and irreparable harm if I deny its motion for a preliminary injunction: (1) it will suffer a constitutional injury to its sovereignty if

1    the fellow government follows its interpretation of Section 1373 and requires certification of such

2    interpretation from applicants of the Byrne JAG Program funds; and (2) construing Section 1373

3    to invalidate its statutes would either cause harm to its communities, eroding trust between law

4    enforcement and immigrant communities, or force the State to lose the Byrne JAG Program

5    funding, which would leave law enforcement programs detrimentally impacted.  The federal

6    government argues that the State has failed to demonstrate immediate and irreparable harm

7    because (1) the amount of potential funding at stake is not coercively high; and (2) the State's

8    claim is belied because its long delay in bringing a legal challenge despite the certification

9    requirement was required for FY 2016.

10       At the moment, the merits of the State's constitutional claim are uncertain and its injury is

11   the delay of a $1 million grant.  While delay in funding is potentially injurious, the amount is not

12   so great that the State could not cover it while the litigation continues.  At this point, the injury is

13   not irreparable.

14   **IV.    PUBLIC INTEREST AND BALANCE OF EQUITIES**

15       The remaining two factors in the preliminary injunction calculus are considered together in

16   litigation in where the federal government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

17   The State's evidence demonstrates how its statutes related to the confidentiality of and release of

18   immigration status information are consistent with the exercise of its police powers.  It also shows

19   the important criminal law enforcement measures for which it intends to use the grant funds.  The

20   federal government does not address how declining to enforce the certification condition against

21   the State would affect it.

22       On this record, the public interest would appear to be better served if the State did not have

23   to choose between the Byrne JAG Program grant funds to assist its criminal law enforcement

24   efforts and the health of its relationship with the immigrant community.  But in light of the

25   uncertainty of the merits and the current lack of irreparability of the injury, these factors do not tip

26   the scale sufficiently to require injunctive relief.

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

The issues in this case will benefit from further development.  It is unclear to me whether the State's or federal government's interpretation of Section 1373 and the Tenth Amendment will prevail on the personal information and release date issues; moreover, this lawsuit addresses a plethora of other issues besides those discrete ones.  While the State to date has suffered an injury, it is only in the delay of $1 million of a federal grant that it previously received, not in the refusal to pay.  I find that the State has not demonstrated that I should issue a preliminary injunction at this time.  Its motion is DENIED.[2]

**IT IS SO ORDERED.**

Dated: March 5, 2018

William H. Orrick
United States District Judge

---

[2] To the extent that I rely on the documents in this docket of which California requests judicial notice, its requests for judicial notice are GRANTED.  *See* Dkt. Nos. 27, 61, 79.  All other requests for judicial notice are DENIED AS MOOT.

28

# EXHIBIT F

Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,            )<br>                                )<br>          Plaintiff,            )<br>                                )<br>  VS.                           )<br>                                )<br>JEFFERSON B. SESSIONS III,      )<br>Attorney General of the United  )<br>States, *et al.*,               )<br>                                )<br>          Defendants.           )<br>_____)<br>STATE OF CALIFORNIA, ex rel.    )<br>XAVIER BECERRA, Attorney        )<br>General of the State of         )<br>California,                     )<br>                                )<br>          Plaintiff,            )<br>                                )<br>  VS.                           )<br>                                )<br>JEFFERSON B. SESSIONS III,      )<br>Attorney General of the United  )<br>States, *et al.*,               )<br>                                )<br>          Defendants.           )<br>_____)  | **NO. C 17-04642 WHO**<br><br><br><br><br><br><br><br><br><br><br>**NO. C 17-04701 WHO** |

San Francisco, California
Wednesday, February 28, 2018


**TRANSCRIPT OF PROCEEDINGS**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1    **APPEARANCES**:

2    For Plaintiff City and County of San Francisco:
                     City and County of San Francisco
3                    Office of the City Attorney
                     1390 Market Street, Sixth Floor
4                    San Francisco, California 94102
                     (415) 554-4700
5              BY:   **SARA JENNIFER EISENBERG**
                     **MOLLIE M. LEE**
6                    **AILEEN MARIE MCGRATH**

7    For Plaintiff State of California:
                     California Department of Justice
8                    Office of the Attorney General
                     Bureau of Children's Justice
9                    1515 Clay Street, Suite 2100
                     Oakland, CA   94612-1492
10                   (510) 879-0009
                     (510) 622-2270 (fax)
11             BY:   **SARAH ELIZABETH BELTON**
                     **LISA CATHERINE EHRLICH**
12
     For Plaintiff State of California:
13                   California Department of Justice
                     Office of the Attorney General
14                   Civil Rights Enforcement Section
                     Bureau of Children's Justice
15                   300 S. Spring Street
                     Los Angeles, CA   90013
16                   (213) 269-6404
                     (213) 897-7605 (fax)
17             BY:   **LEE ISAAC SHERMAN**

18   For Defendants Jefferson Beauregard Sessions, III; Acting
     Assistant AG Alan R. Hanson; United States Department of
19   Justice:
                     U.S. Department of Justice
20                   Federal Programs Branch, Room 7210
                     Civil Division
21                   20 Massachusetts Avenue, NW
                     Washington, D.C.   20530
22                   (202) 514-3495
                     (202) 616-8470 (fax)
23             BY:   **AUGUST E. FLENTJE**
                     **CHAD A. READLER**
24                   **STEVEN J. SALTIEL**

25

1  **Wednesday - February 28, 2018**                    **2:00 p.m.**

2                    **P R O C E E D I N G S**

3                          **---oOo---**

4          **THE CLERK:**  We're calling the combined Cases 17-4642,

5  City and County of San Francisco versus Sessions, *et al.*, and

6  17-4701, State of California versus Sessions, *et al.*

7      Counsel, if you would please come forward and state your

8  appearance for the record.  Here, to the podiums.

9          **THE COURT:**  Let's start with the State.

10          **MS. EHRLICH:**  Lisa Ehrlich, for the State of

11  California.

12          **MS. BELTON:**  Sarah Belton, for the State of

13  California.

14          **MR. SHERMAN:**  Lee Sherman, for the State of

15  California.

16          **THE COURT:**  All right.  How about for the City?

17          **MS. MC GRATH:**  Good afternoon, Your Honor.

18  Aileen McGrath, for the City and County of San Francisco.

19          **MS. EISENBERG:**  Sara Eisenberg, for the City and

20  County of San Francisco.

21          **MS. LEE:**  Mollie Lee, also for the City and County of

22  San Francisco.

23          **THE COURT:**  Welcome.

24          **MR. READLER:**  Good afternoon, Your Honor.

25  Chad Readler, on behalf the United States.

1    The first is that for a cooperative federal law

2 enforcement grant, certainly the United States is authorized to

3 require the sharing of information regarding criminal aliens

4 that are being held by the grantees.  And so we think that any

5 claim regarding a lack of authorization should be dismissed.

6 There's clear statutory authority for that.

7    And, second, both the City and the State, based upon the

8 face of their ordinances and State laws, appear to be not in

9 compliance with 1373.  And so any claim that seeks a

10 declaration that they are in compliance, we think, should be

11 dismissed, as well.

12    There are a couple of threshold ripeness issues that I

13 think we can sort of dispense with right away.  One is that the

14 State has cited a number of statutes that it's asked for

15 declaratory judgment on, and asked for a judgment on in this

16 case.  And there was only one, as we discussed at the last

17 hearing -- the Values Act -- where the Government has contended

18 that the State may not be in compliance with 1373.  So we think

19 the Court should dismiss claims as to any other statute,

20 because the Government's not contended that the State might not

21 be in compliance with 1373.

22    Also, both the State and the City have suggested that

23 there should be a ruling that, on its face, there's facial

24 compliance with 1373 with respect to the local ordinance and

25 the State law at issue.  And we think that's not the right

1   test.  It's certainly possible that the -- and we think that

2   the plaintiffs are not in compliance on their face; but even if

3   the face of the ordinance suggests they might be, we also need

4   to look at the actual conduct, and how the policies are being

5   implemented and followed.  So we also don't think there would

6   be a basis to sort of grant judgment on the facial issue.

7       And, third, I just want to remind the Court there's still

8   an administrative process going on with respect to the 1373

9   compliance.  The Department has written to both of the

10  plaintiffs.  The plaintiffs have provided information.  And

11  they're still in the process of, at the administrative level,

12  assessing whether there is compliance.  So again, we think that

13  this case has really sort of gotten out in front of that

14  administrative process, and that there is no final agency

15  determination yet on 1373 compliance.

16          **THE COURT:**  So with respect to the standing issues

17  and justiciability issues, what impact do you think I should

18  consider from the statements of the President last week,

19  threatening to take ICE enforcement out of the State, or the

20  Acting ICE Director's threat to prosecute criminally public

21  officials whose view about Section 1373 differs from his?

22          **MR. READLER:**  Well, I'm familiar with the statements.

23  I really don't think those have anything to do with the grants

24  that are at issue.

25      We're really talking about a narrow issue here, which is

1  one federal grant administered by the Department of Justice

2  that places conditions that the City -- City and State can

3  voluntarily agree to, or they don't have to accept.  And I

4  think those are really sort of separate issues.

5       But I would acknowledge that immigration issues have been

6  in the news a lot recently locally, nationally.  And there's

7  certainly been a lot of debate.

8       But I think it's worth keeping in mind that historically

9  the immigration system has really been built on cooperation

10 between the Federal Government and the State Government.  And

11 that's true, I think, from the perspective of the Federal

12 Government, of every branch of Government.

13      Of course, the Congress puts in lots of schemes in lots of

14 areas -- not just immigration; but health care, education --

15 where it requires information sharing back and forth between

16 the State and Federal Government to administer programs.  And

17 the Congress has done that here with respect to immigration.

18      Perhaps the most significant area is with respect to the

19 holding of criminal aliens, where it allows aliens who are

20 sentenced by a local government to serve their time before

21 they're then turned over to the Federal Government to be

22 removed.  And that's a cooperative procedure.

23      The Executive, of course, embraces the cooperative

24 aspects, too, because it's certainly less expensive for the

25 Federal Government to detain a criminal alien when they're

1   revisited -- visited this issue, and upheld the application of

2   1373.

3        So it's not an instance where the cities are being

4   compelled to perform background checks to help employ the

5   regulatory scheme, and are sort of a critical part, in terms of

6   affirmative obligations to go out and perform duties that would

7   further the federal scheme.

8        What they're doing voluntarily, because they agreed to the

9   condition, is to not restrict certain information.

10        And I'd be happy to talk about, then, our interpretation

11   of 1373, and what we think it requires.  We discussed a little

12   bit of this in December.  So -- and I think maybe one before --

13        **THE COURT:**  Well, I'm happy to hear it.  I'm not sure

14   that it's going to be useful in the analysis on the motion to

15   dismiss; but I'm very interested in knowing what the Government

16   thinks with respect to the term "regarding"; how far the

17   definition is stretching; and whether the Department's sort of

18   come to ground on that.

19        **MR. READLER:**  Well, I think the Court is correct to

20   focus on the word "regarding," because in the plaintiffs'

21   papers they talk about immigration status, but that's not the

22   test.  The test is information regarding immigration status;

23   obviously, a broader term.

24        1373, in another place in Section C, uses the more narrow

25   phrase "immigration status"; but in the key provision here,

1  1373(a), it talks about "information regarding," so beyond just

2  information that would be the course of immigration status.

3       And in our view, what the Congress had in mind here was

4  that the cities would not be foreclosed from providing

5  information to the Federal Government -- to DHS -- that lets it

6  do its job.  They're not on a fishing expeditions where they're

7  trying to get all kinds of information, but what they're trying

8  to get is the core information they need to do their jobs.

9       And the two areas that we've identified -- very narrow,

10  but the two areas we've identified are, one, personal

11  information, which would be name and address, primarily; and

12  also the release date when the individual's released from

13  incarceration, so the Federal Government and DHS can detain

14  those individuals and deport them, as appropriate.  So --

15            THE COURT:  And so if I -- when I look at 1373, I can

16  just focus on those two things; and the Federal Government is

17  not asserting that 1373 requires anything else, besides those

18  two pieces of information?

19            MR. READLER:  In this case, no.  I'm not going to

20  foreclose us from some future opportunity.  If there's a

21  statute at issue that we think might run afoul of 1373,

22  somebody would raise that to a locality that we think might be

23  in violation.

24       But with respect to the California and San Francisco

25  statutes and ordinance at issue, the issues that we've

1  identified -- and we've written to them in the administrative

2  process -- as violating 1373 are the personal information, and

3  the release date.  And my friends on the other side have not

4  identified anything that they think "information regarding

5  immigration status" means, other than immigration status.  And

6  it obviously can't be that narrow.

7       We've identified two things that we think naturally fall

8  within the definition.  And I'm happy just to talk about those

9  briefly.

10      Personal information helps DHS further the immigration

11 regulatory scheme in a couple of ways.  Sometimes your

12 immigration status includes a residency requirement.  So for

13 certain statuses -- and I think the B-2 nonimmigrant visitor

14 status is one -- you're required to have a permanent address

15 outside of the United States, because that's a temporary

16 visitation period in the country.  And if you have established

17 a permanent address in the United States, that could be

18 evidence that you've violated the status of your immigration;

19 of your permission to be in the country.  So your place of

20 residence might qualify an alien as a nonresident visitor under

21 certain aspects of the immigration laws.

22      Second, obviously, address is critical information for the

23 Federal Government to find a criminal alien.  If they have been

24 already released from incarceration by a local or state

25 government, and they weren't detained at that time, then the

1   address is obviously the best possible way for the Federal

2   Government to find those individuals.  So in that sense, the

3   address is critical to your immigration status, because if

4   you're removable, the Federal Government has an obligation to

5   do that.  They obviously can only do that if they can locate

6   you.

7          **THE COURT:**  That's enforcement -- that's not

8   status -- isn't it?

9          **MR. READLER:**  The definition of "status" includes

10  presence.  And whether your presence is legal or illegal, I

11  think, is bound up in the question of your immigration status.

12  And your presence is partially determined by the address that

13  you're staying at, and that you've disclosed to the Government.

14  So I think all of those issues are closely tied, in terms of

15  the immigration system, and appropriate notice, and execution

16  of the system by the United States.

17      And second is release dates.  And release dates, I think,

18  is a natural component of information regarding your

19  immigration status, for a couple of reasons.

20      One, historically, cities have shared that information.

21  And I think I mentioned this point when I was here last time;

22  but the *City of New York* case was not about -- was not about

23  the City not complying with disclosing information regarding

24  criminal aliens.  Their ordinance made it clear that the City

25  should disclose that information.

1          **THE COURT:**  I don't think I need any.  Thank you.

2          **MS. MC GRATH:**  Thank you, Your Honor.

3          **MS. EISENBERG:**  Good afternoon, Your Honor.

4      I think I can be as brief as my colleague.

5          **THE COURT:**  Excellent.

6          **MS. EISENBERG:**  I think there seems to be very little

7   question that there is a live controversy over whether or not

8   San Francisco complies with Section 1373, as Your Honor

9   indicated before.  Unless you have questions for us in that

10  regard, I'm happy to leave that be.

11         **THE COURT:**  That seems quite obvious to me,

12  Ms. Eisenberg.

13         **MS. EISENBERG:**  Okay.  Thank you.

14     And similarly, this is a motion to dismiss.  There have

15  been some comments today and in the briefs that we haven't

16  established our right to a judgment on our compliance with

17  1373, but we're not here on a motion for summary judgment.

18  It's a motion to dismiss.  And there seems to actually be very

19  little disagreement even from defendants at this point that

20  dismissal is not the appropriate result on this claim at this

21  time.

22     So although I have a page of notes prepared to talk to you

23  about the proper interpretation of "regarding immigration

24  status," I'm happy to save that for another day, unless

25  Your Honor has specific questions.

1        **THE COURT:**  No.  I do think there will another day

2   when we come to the merits.

3        **MS. EISENBERG:**  I welcome that day.

4        **THE COURT:**  Thank you.

5        **MS. EISENBERG:**  Thank you, Your Honor.

6        **THE COURT:**  Mr. Readler.

7        **MR. READLER:**  Just a couple of points.  First of all,

8   on the ripeness question, I think my friend from California

9   confirmed that the administrative process is not yet complete.

10  And that's one of the reasons why we say this dispute is

11  actually not ripe.  And I think he confirmed that there are

12  still negotiations going on with respect to that issue.  So we

13  agree, and we would dismiss the case on that ground.

14       But we'd also, again, dismiss the authorization claims;

15  that we weren't authorized to administer these conditions.

16       And I know the Court suggested that maybe it doesn't agree

17  with our position, but one thing I'd certainly like to

18  highlight.  In my presentation I spent a fair amount of time

19  talking about the priority-purpose aspect of the Government's

20  powers to impose restrictions and limitations on grants to

21  identify a priority purpose, which they did -- immigration --

22  and impose those.

23       And my friend said nothing about that provision this

24  morning.  I don't think they have an answer to that aspect.

25       We heard a lot about the special conditions, which we

1  time frame that I'm thinking about for hearing there is in the

2  sort of six-months-from-now range.

3      That may be too fast.  It may be too long from now.  You

4  can tell me on March 27th.  I'll ask you to give me a joint

5  status statement on the 20th.  If you've agreed on what the

6  schedule is, then we don't need to have the case-management

7  conference, unless somebody has an issue that they want to

8  raise with me.  And we'll proceed that way.  And I'll get an

9  Order out promptly.

10      All right.  Good to see you all.

11          **MR. SHERMAN:**  Thank you, Your Honor.

12          **MS. BELTON:**  Thank you, Your Honor.

13      (At 3:08 p.m. the proceedings were adjourned.)

14  I certify that the foregoing is a correct transcript from the

15  record of proceedings in the above-entitled matter.

16

17

18  _____    March 2, 2018
    Signature of Court Reporter/Transcriber    Date
19  Lydia Zinn

20

21

22

23

24

25

# EXHIBIT G

DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:      (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:          brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,<br><br>Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1.      In blatant disregard of the law, the President of the United States seeks to coerce local authorities to bend to his will and abandon "Sanctuary City" laws and policies. To that end, on January 25, 2017, the President issued an Executive Order entitled "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order"). The Executive Order announces that it is the Executive Branch's policy to withhold federal funds from "sanctuary jurisdictions," directs the Attorney General and Secretary of Homeland Security to ensure that sanctuary jurisdictions do not receive federal grants, and directs the Attorney General to take enforcement action against any local entity that "hinders the enforcement of Federal law." The Executive Order undermines established principles of federalism and separation of powers, violates the United States Constitution, and impermissibly threatens cities with catastrophic financial consequences.

2.      The President and San Francisco agree that the City and County of San Francisco ("San Francisco") is a Sanctuary City, but disagree about what that means. San Francisco laws limit when city employees and agencies may assist with the enforcement of federal immigration law. These laws generally prohibit city employees from using city funds or resources to assist in the enforcement of federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") detainer requests, which are voluntary, and limit when local law enforcement officers may give ICE advance notice of a person's release from local jail.

3.      Like many other cities, San Francisco is a city of immigrants—many of whom are undocumented—who come here to live, work, and raise families. San Francisco's Sanctuary City laws make San Francisco safer, healthier, and economically stronger. San Francisco is safer when all people, including undocumented immigrants, feel safe reporting crimes. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. And San Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. Using city and county resources for federal immigration enforcement breeds distrust of local government and officials who have no power to change federal laws, and can

also wrench apart family and community structures that support residents and thus conserve resources. For these reasons, among others, San Francisco has directed its employees and officers not to assist the Federal government in enforcing federal immigration law, with limited exceptions.

4.      San Francisco faces the imminent loss of more than $2 billion in federal funds and impending enforcement action if it does not capitulate to the President's demand that it help enforce federal immigration law. At least one jurisdiction has already succumbed to this presidential fiat.

5.      The threat San Francisco faces now is particularly troubling given that San Francisco already complies with all federal immigration laws. The Executive Order relies on Title 8, Section 1373 of the United States Code ("Section 1373"), which provides that local governments may not prohibit or restrict any government entity or official from "sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual."

6.      San Francisco's laws comply with Section 1373. San Francisco previously prohibited employees and officials from sharing information regarding immigration status but amended this language to ensure compliance with Section 1373. Under current law, San Francisco does not prohibit or restrict its employees from sharing information about the citizenship or immigration status of any individual with federal immigration officials.

7.      The Constitution establishes a balance of power between the state and Federal governments, as well as among the coordinate branches of Federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office. In so doing, the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This state sovereignty extends to political subdivisions of the State, including cities and counties such as San Francisco.

8.      The Executive Order invades San Francisco's sovereignty and seeks to commandeer state and local officials to enforce federal law. Under the Constitution and established principles of federalism, state and local governments have the autonomy to devote resources to local priorities and to control the exercise of their own police powers, rather than being forced to carry out the agenda of

the Federal government. The Executive Order purports otherwise to wrest this autonomy from state and local governments.

9.      In addition to violating the Tenth Amendment, the Executive Order violates the Constitution's separation of powers and the Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress. Congress, not the Executive Branch, has the authority to determine how federal funds will be spent.

10.      San Francisco recognizes that there will be additional developments related to the Executive Order in the weeks and months to come. But the consequences threatened by the Executive Order are too severe for San Francisco to wait. The Executive Order threatens funds that support vital services, the loss of community trust, and the loss of San Francisco's sovereign authority to set and follow its own laws on matters appropriately and historically within the control of local government. San Francisco has no choice but to seek the intervention of this Court to ensure that its rights and residents are protected, and that the Administration complies with Federal law and the Constitution.

**JURISDICTION AND VENUE**

11.      The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

12.      Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. § 1391(e).

**PARTIES**

13.      Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

14.      Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

15.      Defendant United States of America is sued under 28 U.S.C. Section 1346.

//

16.     The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States Federal government with the primary mission of securing the United States. Defendant John F. Kelly is the Secretary of DHS. Secretary Kelly is responsible for executing relevant provisions of the Executive Order. Secretary Kelly is sued in his official capacity.

17.     The Attorney General ("AG") is a cabinet department of the United States Federal government overseeing the Department of Justice. Defendant Jefferson B. Sessions is the Attorney General. Attorney General Sessions is responsible for executing relevant provisions of the Executive Order. Attorney General Sessions is sued in his official capacity.[1]

18.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

## I.     SAN FRANCISCO'S SANCTUARY CITY LAWS

19.     San Francisco has been a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

20.     Numerous other municipalities have also enacted Sanctuary City laws. Although the details of their ordinances differ, all of these jurisdictions have adopted laws or policies that limit using local resources to implement and enforce federal immigration laws.

21.     Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not protect criminals or prevent people from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented

---

[1] Attorney General Sessions assumed office on February 9, 2017, thereby replacing Acting Attorney General Dana J. Boente as a defendant, pursuant to Fed. R. Civ. P. 25(d).

immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

22.     San Francisco Administrative Code Chapter 12H—the full text of which is attached as Exhibit 1—prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

23.     Chapter 12H previously prohibited disseminating information regarding the immigration status of any individual, but the Board of Supervisors amended Chapter 12H in July 2016 to, *inter alia*, delete that prohibition in order to ensure compliance with Section 1373.

24.     San Francisco Administrative Code Chapter 12I—the full text of which is attached as Exhibit 2—prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.[2]

25.     A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City laws. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

26.     Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the Federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o

---

[2] Section 287.7 of Title 8 of the Code of Federal Regulations allows ICE to issue detainer requests to local jurisdictions. Section 287.7 provides that such a detainer "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." Subsection (d) provides that "[u]pon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."

1    detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal

2    obligation on the part of the Department." 8 C.F.R. § 287.7(e).

3        27.    Further, complying with civil immigration detainer requests, in the absence of a

4    probable cause determination, violates the Fourth Amendment to the United States Constitution and

5    could subject San Francisco to civil liability. *See Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir.

6    2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also*

7    *Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (applying the Fourth Amendment to

8    immigration arrests).

9        28.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to

10   a federal immigration officer's request for advance notification of the date and time an individual in

11   San Francisco's custody is being released, unless the individual in question meets certain criteria. *See*

12   S.F. Admin. Code § 12I.3(c), (d).

13       29.    Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall

14   not arrest or detain an individual, or provide any individual's personal information to a federal

15   immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil

16   immigration document based solely on alleged violations of the civil provisions of immigration laws."

17   *See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information

18   about an individual, including, but not limited to, home or work contact information, and family or

19   emergency contact information." *See* Section 12I.2.

20       30.    Chapter 12I makes clear that its purpose and effect are limited to matters "relating to

21   federal civil immigration detainers, notification of release of individuals, transmission of personal

22   information, or civil immigration documents, based solely on alleged violations of the civil provisions

23   of immigration laws." Chapter 12I expressly states that "[i]n all other respects, local law enforcement

24   agencies may continue to collaborate with federal authorities to protect public safety." *See* Section

25   12I.4.

26       31.    San Francisco's Sanctuary City laws arise from San Francisco's commitment and

27   responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's

28   legislative body, found that public safety is "founded on trust and cooperation of community residents

and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Legislature stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.* ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies."). Indeed, a recent study shows that crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties. *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-ofsanctuary-policies-on-crime-and-the-economy/.

32.    The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Legislature declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

33.    The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

34.    Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are]

1    not limited to, extended detention time, the administrative costs of tracking and responding to

2    detainers, and the legal liability for erroneously holding an individual who is not subject to a civil

3    immigration detainer." *Id.* In short, the Board of Supervisors concluded that "[c]ompliance with civil

4    immigration detainers and involvement in civil immigration enforcement diverts limited local

5    resources from programs that are beneficial to the City." *Id.*

6         35.    California law incorporates local Sanctuary City laws such as Chapters 12H and 12I.

7    The TRUST Act states that local law enforcement officials may comply with ICE detainer requests

8    only if (1) the continued detention would not violate any federal, state, or local law, or any local

9    policy, and (2) the defendant's criminal history meets specified conditions. Cal. Gov't Code §§ 7282,

10   7282.5. Thus, because in San Francisco ICE detentions are prohibited under local law, they are also

11   prohibited under state law.

12   **II.    SECTION 1373**

13        **A.    San Francisco Complies With Section 1373 By Not Prohibiting Its Employees
               From Sharing "Citizenship Or Immigration Status" Information With The
14             Federal Government**

15        36.    Section 1373 provides that a "local government entity or official may not prohibit, or in

16   any way restrict, any government entity or official from sending to, or receiving from, [federal

17   immigration officials] information regarding the citizenship or immigration status . . . of any

18   individual." 8 U.S.C. § 1373(a). This restriction exclusively regulates government entities.

19        37.    Section 1373 requires San Francisco to allow its employees to use city resources,

20   including San Francisco tax dollars, to respond to requests for information about citizenship and

21   immigration status.

22        38.    San Francisco complies with Section 1373.

23        39.    Nothing in San Francisco Administrative Code Chapters 12H or 12I limits

24   communications regarding citizenship or immigration status in any way.

25        40.    And, indeed, under ICE's recently restored Secure Communities program (also known

26   as "S-Comm"), whenever an individual is taken into custody, the person is digitally fingerprinted and

27   those fingerprints are sent to the California Department of Justice and ultimately the FBI. The FBI

28   //

1   forwards the fingerprints to DHS, which allows ICE to determine the immigration status of everyone

2   in San Francisco custody.

3       41.     Under Chapter 12I and the TRUST Act, San Francisco does not enforce detainer

4   requests (*see* ¶26, *supra*), and does not respond to notification requests from the Federal government

5   unless certain conditions are met (*see* ¶30, *supra*). But compliance with such requests is not required

6   by Section 1373, which speaks only to communications regarding *citizenship and immigration status*.

7       42.     San Francisco has affirmatively instructed personnel regarding the substance of Section

8   1373 in a recent memorandum to all San Francisco employees from the San Francisco Human

9   Resources Director.

10      **B.      The United States Improperly Interprets Section 1373 To Require Compliance
            With Detainer Requests**

11

12      43.     On May 31, 2016, in response to a request from the Office of the Attorney General, the

13  Office of the Inspector General ("OIG") of the Department of Justice issued a memorandum ("OIG

14  Memo") regarding potential violations of Section 1373 by recipients of funding from the

15  Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). Memorandum from

16  Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice

17  Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by*

18  *Grant Recipients* (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf.[3]

19      44.     In analyzing the local laws and policies of ten selected state and local jurisdictions, OIG

20  demonstrated how the Federal government interprets Section 1373.

21      45.     Although Section 1373 does not expressly address immigration detainers, OIG

22  expressed concern that local laws concerning the handling of detainer requests "may have a broader

23  practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore,

24  be inconsistent with at least the intent of Section 1373." OIG Memo at 7. It went on to state that local

25  laws and policies that "purport to be focused on civil immigration detainer requests [and say nothing

26

27      [3] The authorizing legislation for the JAG program requires that all grant applicants certify
    compliance with the provisions of the authorizing legislation and all other "applicable federal laws."
28  42 U.S.C. § 3750 *et seq.* The U.S. Department of Justice, Office of Justice Programs has recently
    announced that Section 1373 is an "applicable" law under the JAG authorizing legislation.

1   about sharing immigration status with ICE] . . . may nevertheless be affecting ICE's interactions with

2   the local officials regarding ICE immigration status requests." *Id.*

3       46.     OIG also stated that such immigration detainer request policies "may be causing local

4   officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE

5   in all respects . . . . [which], of course, would be inconsistent with and prohibited by Section 1373." *Id.*

6   at 8.

7       47.     In the OIG Memo, the Federal government also endorses the view that local

8   jurisdictions hinder the enforcement of Federal immigration law if they do not honor detainer requests

9   or if they place any other limitations on cooperation with ICE. *See, e.g.*, *id.* at 4 (stating that even

10  though Section 1373 does not specifically address restrictions by state or local entities on cooperation

11  with ICE regarding detainers, "[a] primary and frequently cited indicator of limitations placed on

12  cooperation by state and local jurisdictions with ICE is how the particular state or local jurisdiction

13  handles immigration detainer requests issued by ICE").

14      48.     Yet, San Francisco cannot lawfully comply with ICE detainer requests. Complying with

15  civil immigration detainer requests, in the absence of a determination of probable cause, would violate

16  the Fourth Amendment to the United States Constitution and could subject San Francisco to civil

17  liability for this harm. *See Arizona v. United States*, 132 S. Ct. 2492, 2509 (2012) (noting that

18  "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns");

19  *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*,

20  2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th

21  Cir. 2012) (applying the Fourth Amendment to immigration arrests).

22      49.     In the OIG Memo, OIG recommended that the U.S. Department of Justice, Office of

23  Justice Programs ("OJP") provide JAG recipients clear guidance on their obligation to comply with

24  Section 1373 and require them to certify that they comply with that section. *See* OIG Memo at 9.

25      50.     In response to these recommendations, in July and October 2016 OJP issued guidance

26  regarding compliance with Section 1373. *See* Office of Justice Programs, *Guidance Regarding*

27  *Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (July 7, 2016) ("OJP July Guidance"); Office of

28  //

Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (October 6, 2016) ("OJP October Guidance").

51.     In the OJP July Guidance, OJP reads Section 1373 to impose an affirmative obligation on state and local governments. The Guidance states that to comply with Section 1373, "[y]our personnel *must* be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials." OJP July Guidance at 1 (emphasis added). Accordingly, OJP reads into the law an affirmative obligation to instruct personnel regarding the substance of Section 1373.

52.     In the October 2016 Guidance, OIG stated that all JAG applicants must comply with— and certify their compliance with—Section 1373. OJP October Guidance at 1.

53.     As a grantee of JAG grants, San Francisco is required to certify its compliance with Section 1373.

**III.     THE EXECUTIVE ORDER**

**A.     The Executive Order Cuts Off Federal Funding From Sanctuary Jurisdictions And Directs Enforcement Action Against Them**

54.     On January 25, 2017, President Donald J. Trump issued the Executive Order attached as Exhibit 3.

55.     The Executive Order declares, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order at 8799.

56.     To address the purported harm caused by Sanctuary Cities, the Executive Order establishes the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

57.     Specifically, Section 9(a) of the Executive Order states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

58.     Section 9(a) of the Executive Order establishes a funding restriction (the "Funding Restriction"):

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

*Id.*

59.     Section 9(a) of the Executive Order also mandates enforcement action (the "Enforcement Directive"):

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

*Id.*

60.     Section 9(a) of the Executive Order defines "sanctuary jurisdictions" as those jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." But Section 9(b) indicates that Defendants in fact define that category quite broadly as including any jurisdiction that declines to comply with ICE detainer requests:

> To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

61.     The Executive Order thus attempts to mandate compliance with detainer requests as part of Section 1373 compliance, with the consequence that a jurisdiction such as San Francisco that does not comply with ICE detainer requests will lose federal funds under the Executive Order.

62.     A jurisdiction that fails to comply with detainer requests also faces enforcement action under Section 9(a)'s Enforcement Provision. As discussed further below, Defendants view the local decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."

**B.     Defendants Have Labeled San Francisco A Sanctuary Jurisdiction Within The Meaning Of The Executive Order**

63.     As discussed above, San Francisco *does* comply with Section 1373, properly construed. Nonetheless, Defendants deem San Francisco a sanctuary jurisdiction pursuant to their overly broad definition of that term.

64.     If there were any question about whether Defendants deem San Francisco as a "sanctuary jurisdiction," that question is answered by Defendants' own statements, which clearly characterize San Francisco as a Sanctuary City.

65.     For example, in a written campaign speech, then-candidate Donald J. Trump gave in Phoenix, Arizona on August 31, 2016, he expressly referred to San Francisco as a Sanctuary City. *See Donald J. Trump: Address on Immigration*, Donald J. Trump for President (Aug. 31, 2016), https://www.donaldjtrump.com/press-releases/donald-j.-trump-address-on-immigration ("Another victim is Kate Steinle, gunned down in the Sanctuary City of San Francisco by an illegal immigrant deported five previous times.").

66.     Further, Defendants have repeatedly identified Sanctuary Cities, and specifically San Francisco, as those that decline detainer requests and otherwise do not affirmatively support federal immigration enforcement.

- In statements to the Daily Caller on July 7, 2015, Congressman Darrell Issa and now-Attorney General Sessions criticized San Francisco and other sanctuary jurisdictions for failing to honor detainers. Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes against all traditions of law enforcement. Laws and courtesies within departments— if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . . So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them. They finished paying for the crime they committed in our city— we've released them.'" Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily Caller (July 7, 2015, 10:07 PM),

1        http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-

2        immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

3      • On July 8, 2015, Sessions gave a speech to Congress describing San Francisco as "a

4        jurisdiction that is known to release illegal immigrants back into the public," and

5        one which refused to "honor" a detainer sought by federal authorities. News

6        Release, Office of Senator Jeff Sessions, Senator Sessions Calls on Congress To

7        Take Up Immigration Reform for Americans (July 9, 2015),

8        http://www.sessions.senate.gov/public/index.cfm/news-releases?ID=B7A98B63-

9        8ECA-4A4E-B5C8-4A665F2343DE.

10     • In an interview with Breitbart News in May 2016, then-candidate Donald J. Trump

11       stated, "Sanctuary cities are a disaster . . . . They're a safe-haven for criminals and

12       people that should not have a safe-haven in many cases. It's just unacceptable.

13       We'll be looking at sanctuary cities very hard." Matthew Boyle, *Exclusive —*

14       *Donald J. Trump to San Francisco: Sanctuary Cities 'Unacceptable,' A 'Disaster'*

15       *Creating 'Safe-Haven for Criminals'*, Breitbart News (May 16, 2016),

16       http://www.breitbart.com/2016-presidential-race/2016/05/16/exclusive-donald-j-

17       trump-to-san-francisco-sanctuary-cities-unacceptable-a-disaster-creating-safe-

18       haven-for-criminals/. This Breitbart news report further stated that "Trump's

19       comments . . . come in response to efforts by far left progressive organizations in

20       San Francisco to expand that city's sanctuary city laws." *Id.*

21     • Another Breitbart News article published on November 21, 2016 regarding

22       Sanctuary Cities quoted Texas Republican Congressman John Culberson as stating,

23       "The law requires cooperation with immigration officials 100 percent of the time."

24       Bob Price, *Sanctuary Cities Risk Losing DOJ Funds in 2017, Texas Congressman*

25       *Says*, Breitbart News (Nov. 21, 2016),

26       http://www.breitbart.com/texas/2016/11/21/sanctuary-cities-risk-losing-doj-funds-

27       2017-texas-congressman-says/.

28  //

67.     Defendants have also repeatedly stated their intent to strip federal funding from Sanctuary Cities.

- In a statement by White House Press Secretary Sean Spicer on January 25, 2017 announcing the issuance of the Executive Order, Spicer stated, "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws." White House, 1/25/17: White House Press Briefing, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

- A press release from the Office of the Press Secretary for the White House issued on January 28, 2017 detailing President Trump's First Week of Action, reads in relevant part: "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities." Press Release, The White House, Office of the Press Secretary, President Trump's First Week of Action (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/president-trumps-first-week-action.

- Press Secretary Sean Spicer reiterated this goal on February 1, 2017, stating "I think the President's goal in ending sanctuary cities is pretty clear. . . . [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities." Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-pressoffice/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

68.     Indeed, Defendants have explicitly stated their intent to use federal funding cuts as a "weapon" against Sanctuary Cities, in an attempt to coerce jurisdictions to bend to their will.

//

- In an interview with Bill O'Reilly on February 5, 2017, President Trump called the efforts of California lawmakers to propose legislation that could stop state police and sheriffs from enforcing federal immigration laws "ridiculous." Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary States as 'Weapon'*, ABC News (Feb. 5, 2017, 6:01 PM), http://abcnews.go.com/Politics/trump-threatens-defunding-sanctuary-states-weapon/story?id=45286642. He stated: "I don't want to defund anybody. I want to give them the money they need to properly operate as a city or a state." But he said, "If they're going to have sanctuary cities, we may have to do that. Certainly that would be a weapon." *Id.* "Sanctuary cities, as you know I'm very much opposed to sanctuary cities -- they breed crime, there's lots of problems." *Id.* "We give tremendous amounts of money to California," Trump said. "Obviously the voters agree or otherwise they wouldn't have voted for me." *Id.*

- When asked at a press briefing whether Cincinnati would face sanctions for voting to become a Sanctuary City, Sean Spicer, the President's press secretary stated:

  > As I've noted before, at the end of the day, this order is about two things: one, keeping our cities safe, and two, respecting the hard-earned taxpayers who send their money to the federal government. And the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it -- counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order.  I think more areas like Miami-Dade, down in Florida, understand the importance of this order, and we hope cities like Cincinnati and other communities around the country follow their lead and comply with that.

  Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10* (Feb. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/press-briefing-press-secretary-sean-spicer-282017-10.

69.    The White House's public website states that President Trump "is dedicated to enforcing our border laws, ***ending sanctuary cities***, and stemming the tide of lawlessness associated with illegal immigration." *Standing Up For Our Law Enforcement Community*, The White House,

//

https://www.whitehouse.gov/law-enforcement-community (last visited on Feb. 27, 2017) (emphasis added).

70.     Defendants' statements demonstrate their belief that Sanctuary Cities, like San Francisco, violate Section 1373 and their intent that Sanctuary Cities will lose federal funding— apparently all or almost all federal funding—and be subject to enforcement action under the Executive Order.

71.     There is a "credible threat" that Defendants will seek to enforce the unconstitutional Executive Order against San Francisco.

## IV.    SECTION 1373 AND THE EXECUTIVE ORDER HARM SAN FRANCISCO

### A.     Constitutional Injury

#### 1.     The Executive Order Violates The Tenth Amendment, Separation Of Powers, And The Spending Clause

##### a.     The Executive Order Funding Restriction Is Unconstitutional

###### i.     Separation of Powers

72.     As a threshold matter, the Funding Restriction purports to exercise Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress.

73.     The Executive Order violates the separation of powers by creating a penalty for Section 1373 that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress. The Executive Order effectively legislates a sanction for violations of Section 1373 by using the statute as a basis to broadly deny federal grants to municipalities that have made a policy decision to focus law enforcement resources on local problems and limit their entanglement with federal immigration enforcement. The President's unilateral imposition of this new sanction and condition on spending is not supported by any act of Congress, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, or by the Constitution.

74.     The Funding Restriction additionally violates the separation of powers by imposing a new restriction on jurisdictions' eligibility to receive federal funds: "jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants,

//

---

except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." Executive Order at 8801.

75.     The President may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

76.     Congress has spoken to reject the imposition of such funding restrictions, including when it declined to enact Senate Bill 1842, "Protecting American Lives Act," introduced in July 2015 by then-Senator Attorney General Jeff Sessions. The bill would in part have expanded Section 1373 to deprive jurisdictions having "in effect a statute, policy, or practice that prohibits law enforcement officers of the State, or of a political subdivision of the State, from assisting or cooperating with Federal immigration law enforcement in the course of carrying out the officers' routine law enforcement duties" of "any . . . law enforcement or Department of Homeland Security grant."  S. 1842, 114th Cong. § 3 (2015). Senate Bill 1842 did not make it out of committee, nor did the identical House of Representatives Bill 3437. Where the President "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

77.     By imposing conditions or limitations on federal spending without express statutory authority, the Executive Order also unlawfully exceeds the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), and (ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause).

//

### ii.     Spending Clause and Tenth Amendment

78.     Further, the Funding Restriction purports to exercise Spending Power in ways that even Congress could not.

79.     The Funding Restriction violates the Spending Clause by imposing new funding conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.*

80.     The Funding Restriction also violates the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, the Funding Restriction conditions eligibility for federal funding on compliance with Section 1373, without regard for whether Section 1373 is germane to any federal funds at issue. In fact, the Funding Restriction specifically exempts those federal funds—funds "deemed necessary for law enforcement purposes"—that might arguably be germane to Section 1373.

81.     The Funding Restriction also imposes conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2603 (2012) (opinion of Roberts, C.J.); *New York v. United States*, 505 U.S. 144, 175 (1992). The Funding Restriction "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 132 S. Ct. at 2604 (opinion of Roberts, C.J.). The Funding Restriction threatens a substantial percentage of San Francisco's overall budget—approximately 13% of its total annual operating budget, even without considering federal multi-year grants. Threatened funds include the entire funding stream for programs, such as Medicaid, that are critical to the lives of San Francisco's residents. Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id.* at 2605.

82.     Finally, because Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers, the Funding Restriction imposes a new funding condition that requires jurisdictions to act unconstitutionally. Under the Fourth Amendment, detention of an individual must be supported by a determination of probable cause. *See Morales v. Chadbourne*, 793 F.3d 208, 215–17 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014). Requiring state and local governments (including San Francisco) to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's Spending Power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

83.     This concern is heightened by the fact that state and local governments, including San Francisco, generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 132 S. Ct. 2492, 2506 (2012). It is further heightened by the prospect that "ICE's issuance of detainers that seek to detain individuals without a warrant goes beyond its statutory authority to make warrantless arrests." *Moreno v. Napolitano*, No. 11-C-5452, 2016 WL 5720465, at *8 (N.D. Ill. Sept. 30, 2016).

84.     For all these reasons, the Funding Restriction violates the Constitution's separation of powers (and, in particular, the Constitution's grant of legislative power to Congress in Article I, Section 1); the Spending Clause of Article I, Section 8; and the Tenth Amendment.

**b.      The Executive Order Enforcement Directive Is Unconstitutional**

85.     The Executive Order's Enforcement Directive violates the Tenth Amendment. The Enforcement Directive commandeers state and local governments by, *inter alia*, compelling them to enforce federal law under threat of legal action.

86.     The Enforcement Directive mandates that "[t]he Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373." Executive Order at 8801. As discussed above, Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers.

87.     The Enforcement Directive also mandates "enforcement action against any entity that . . . has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal

law." Executive Order at 8801. As discussed above, Defendants interpret a state or local government's

decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or

hinders the enforcement of Federal law."

88.     The Enforcement Directive thus mandates that the Attorney General take enforcement

action against state and local governments that do not detain individuals at the behest of the Federal

government.

89.     Compelling state and local governments to detain individuals at the behest of the

Federal government violates the Tenth Amendment. "[T]he Federal Government may not compel the

States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United*

*States*, 521 U.S. 898, 925 (1997). To "command state or local officials to assist in the implementation

of federal law" is to engage in impermissible commandeering. *Id.* at 927.

**B.     Community Injury**

90.     The Executive Order fosters an atmosphere of fear and distrust between undocumented

immigrants and local government officials in San Francisco. Its sweeping terms, combined with recent

ICE activity in San Francisco, and compounded by the Trump administration's statements about

immigration enforcement, have generated a maelstrom of fear and confusion that San Francisco

agencies have had to move quickly to contain.

91.     The Executive Order is designed to—and does—create public confusion about whether

San Francisco is and will remain a Sanctuary City, and what that means.

92.     San Francisco has been forced to spend resources to counteract the effect of the

Executive Order. Since the Executive Order issued, San Francisco officials and employees have

responded to questions from San Francisco departments, non-profit partners, and members of the

public about topics such as whether the Executive Order modifies ICE's authority to enter public

facilities, jails, and residences; whether individuals' personal identifying information on applications

for benefit programs remains protected; and whether the Executive Order changes the way

San Francisco law enforcement officers interact with ICE. San Francisco departments have held

numerous meetings discussing the impact of the Executive Order and have developed new educational

materials about San Francisco Chapters 12H and 12I.

93.     Given the Executive Order's broad language, even San Francisco's extensive and ongoing efforts to offer clear answers leave the public far from reassured.

94.     By heightening undocumented immigrants' concerns that any interaction with San Francisco officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with San Francisco programs and services. This threat harms public safety, public health, and San Francisco's ability to act in what San Francisco has determined to be the best interest of its residents, consistent with federal and state law.

95.     The Executive Order undermines San Francisco's ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

96.     As a result, the Executive Order causes the very harms San Francisco's Sanctuary City laws were designed to prevent. The Executive Order destroys rather than "foster[s] respect and trust between law enforcement and residents," wastes rather than "protect[s] limited local resources," and discourages rather than "encourage[s] cooperation between residents and City officials, including especially law enforcement and public health officers and employees." S.F. Admin. Code § 12I.1.

**C.     Budgetary Injury**

**1.     San Francisco Relies On Federal Funding For Essential Public Services.**

97.     San Francisco is home to about 865,000 residents and has a total daytime population of about 1,250,000. People who live in, work in or visit San Francisco rely on—in addition to other public services—law enforcement provided by the San Francisco Police Department; public infrastructure projects such as roads, bridges and public transit; and the availability of high quality emergency care from San Francisco General Hospital. Residents also rely on public health programs such as Medi-Cal and public assistance programs like CalWORKS. While San Francisco has benefitted from a recent economic boom, over 12% of San Franciscans live in poverty, and depend on public assistance to make ends meet and put food on the table.

98.     San Francisco contributes disproportionately to national economic growth and job creation. Between 2010 and 2015, San Francisco ranked second among all U.S. counties in percentage change in employment, generating over 125,000 new jobs, a growth rate of 28%. A significant portion of this growth has been in the technology sector, a source of high wage jobs with important multiplier effects and potential for future growth.

99.     The State of California, including San Francisco, pays more to the Federal government in taxes than it receives in federal spending. In 2014, California residents and businesses paid a total of $369.2 billion in federal business and personal income, estate, gift, and excise taxes to the Internal Revenue Services and were the beneficiaries of $355.8 billion in federal expenditures. California ranked 38th among states in the ratio of federal spending to collections.

100.     In turn, San Francisco relies on federal funding to provide essential services and build and maintain public infrastructure projects.

101.     San Francisco budgets by a fiscal year that runs from July 1 to June 30. The current fiscal year began July 1, 2016, and will end June 30, 2017 ("FY16-17"). The next fiscal year will run from July 1, 2017 to June 30, 2018 ("FY17-18").

102.     San Francisco's annual operating budget for FY16-17 includes over $1.2 billion in federal funds. This is approximately 13% of the total annual operating budget.

103.     On top of the federal funds allocated in the annual operating budget, San Francisco expects to receive an additional $800 million in federal multi-year grants, largely for public infrastructure projects.

104.     The programs, projects, and services described below are just a few examples of how San Francisco uses federal funds.

### a.     Human Services Agency

105.     San Francisco's Human Services Agency ("HSA") provides critical services to San Francisco's most vulnerable residents. It works with over 200,000 residents each year to provide needed nutrition assistance, income support, and child welfare services, among other support services. Approximately one in four San Franciscans is a client of HSA. HSA also manages numerous programs

//

1  that serve young children and their families, older adults, and individuals with disabilities. HSA relies

2  on federal funding to provide these services.

3      106.    For example, the In-Home Supportive Services ("IHSS") program assists about 23,000

4  low-income elderly, disabled, or blind San Franciscans to live safely in their own homes and

5  communities. For some recipients, the IHSS program reduces acute health care and institutional long-

6  term care costs that would otherwise be incurred by the state and Federal governments through Medi-

7  Cal. About 19,000 individuals work as independent providers for IHSS recipients. For FY16-17, the

8  County's IHSS program is budgeted to receive approximately $64 million in federal funds, accounting

9  for nearly 40% of the program's budget. Virtually all of these funds are provided as reimbursements.

10  This amount does not include the approximately $200 million of federal funds that the State of

11  California pays directly to independent IHSS providers.

12      107.    HSA also provides financial assistance and services to San Francisco's neediest

13  residents, including children and families living in poverty. For example, through California Work

14  Opportunity and Responsibility to Kids (CalWORKS), HSA provides financial assistance, family

15  stabilization, case management, vocational counseling, job readiness assistance, behavioral health

16  treatment, transportation, and other services designed to help parents of low-income families meet

17  welfare-to-work requirements, secure and retain employment, and become self-sufficient.

18  San Francisco's CalWORKS program is budgeted to receive approximately $58 million in federal

19  funding in FY16-17, accounting for over 50% of the County's CalWORKS and Welfare-to-Work

20  FY16-17 budget. Virtually all of these funds are provided as reimbursements.

21      108.    HSA offers numerous other social services, including child welfare programs and

22  services, early childhood care and education services, adult protective services and a County Veteran's

23  Service Office that helps veterans and their families receive benefits to which they are entitled.

24      109.    In FY16-17, HSA expects to receive a total of approximately $286 million in federal

25  funding. This represents approximately 33% of its FY16-17 budget.

26      110.    HSA directly employs nearly 2,000 employees.  It also funds hundreds of additional

27  jobs through contracts to service providers. Loss of federal funds would threaten many of these jobs,

28  as well as the underlying services, that depend on HSA funds.

### b.   Department of Public Health

111.    The Zuckerberg San Francisco General Hospital ("ZSFGH") is a licensed general acute care hospital owned and operated by San Francisco. ZSFGH has 284 beds and provides a full complement of inpatient, outpatient, emergency, skilled nursing, diagnostic, mental health, and rehabilitation services for adults and children. ZSFGH is the largest safety net provider in San Francisco and is the designated trauma center for the 1.5 million residents of San Francisco and northern San Mateo County. In FY16-17, ZSFGH expects to receive approximately $450 million in federal funding for Medi-Cal and Medicare patient services. This accounts for over half of the ZSFGH FY16-17 budget of nearly $840 million. Virtually all of these funds are provided as reimbursements.

112.    Laguna Honda Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia. In FY16-17, Laguna Honda Hospital expects to receive approximately $160 million in federal funding for Medi-Cal and Medicare patient services, accounting for nearly 60% of its budget. Virtually all of these funds are provided as reimbursements.

113.    The San Francisco Department of Public Health ("DPH") also provides direct services through its primary care clinics, HIV/AIDS health services, mental health and substance abuse treatment, housing and homelessness assistance, maternal and child healthcare, and jail health services.

114.    Additionally, the DPH Population Health Division addresses public health concerns, including consumer safety, health promotion, and disease prevention. DPH also monitors threats to public health.

115.    Overall, in FY16-17, DPH expects to receive approximately $800 million in federal funding. This represents almost 40% of the Department's FY16-17 budget.

116.    DPH has approximately 6,800 full-time equivalent employees, and it funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of the thousands of jobs that depend on DPH funds.

//

### c.     Department of Emergency Management

117.     The Department of Emergency Management ("DEM") leads San Francisco in planning, preparedness, communication, response, and recovery for daily emergencies, large scale citywide events, and major disasters. DEM is the vital link in emergency communication between the public and first responders.

118.     One of the programs DEM administers is the Bay Area Urban Areas Security Initiative ("UASI"), which sustains and improves regional capacity to prevent, mitigate, respond to, and recover from terrorist attacks and catastrophic disasters. UASI funds training exercises and regional emergency management and disaster response. This program is funded entirely by federal funds.

119.     In FY16-17, DEM anticipates receiving about $25 million in federal funding, mostly supporting the UASI program. This represents nearly 30% of the Department's FY16-17 budget.

### d.     San Francisco Municipal Transportation Agency's Vehicle Replacement Program

120.     San Francisco Municipal Transportation Authority ("SFMTA") operates over 1,000 vehicles across 75 transit lines, carrying on average 700,000 passengers each workday. Replacing and rehabilitating vehicles as they near the end of their useful life helps avoid costly repairs and service interruptions. Growing the vehicle fleet also alleviates overcrowding and enables the transit system to carry more passengers.

121.     Nearly 80% of SFMTA's vehicle replacement and rehabilitation funding comes from the Federal government. Based on the latest Metropolitan Transportation Commission's Transportation Improvement Program, which is a comprehensive spending plan for the Bay Area region, SFMTA expects to receive over $500 million for this purpose from FY 2016-17 through FY 2019-20. These funds are subject to "Buy American" provisions.  For example, San Francisco's most recently purchased light-rail vehicles are manufactured in Sacramento, California and New Flyer trolley buses are manufactured in Minnesota.  The funds are expected to replace the system's approximately 1,000 aging vehicles over the four-year period.

//

//

### D.    Federal Funding Streams

122.    San Francisco receives federal funds in the form of grants, as well as though payments for entitlement programs. These entitlement programs include Medicaid and Medicare, Temporary Assistance for Needy Families, Supplemental Nutrition Assistance Program, Foster Care, and various child welfare programs. Undocumented immigrants are not eligible to receive benefits from most entitlement programs. Approximately 80% of the federal funds budgeted for FY16-17 are for entitlement programs.

123.    San Francisco receives federal funds directly from the Federal government, as well as indirectly through the State of California and other pass-through entities. For FY16-17, San Francisco's budget includes over $1.1 billion in pass-through funds, the vast majority of which is passed through the State of California. President Trump has identified California as a possible sanctuary jurisdiction.  Because California does not prohibit voluntary communications about immigration status, it should be deemed to comply with Section 1373. If Defendants nonetheless cut off funds to California, this could result in the loss of pass-through funds to San Francisco.

124.    San Francisco receives most federal funds—for both grants and entitlement programs—as reimbursements. San Francisco is currently providing services and benefits that the Federal government has agreed to reimburse. San Francisco is also building major transit expansions and other public infrastructure projects, as well as running programs across a variety of San Francisco agencies, based on the Federal governments' commitment to pay for these projects and programs. The Executive Order calls into question whether the Federal government will in fact reimburse San Francisco for these funds.

125.    Congress has established numerous conditions governing eligibility for federal funds. For instance, to receive Medicaid funds, a state must create a state plan that includes assurances to the Federal government that the state will provide specified types of care and that the state regulates health insurance providers to ensure access to medical assistance, among many other requirements. 42 U.S.C. § 1396(a).

126.    In another example, the United States Department of Housing and Urban Development Community Development Block Grants fund many projects to combat unlawful evictions, maintain

stable housing occupancy and supply, and incentivize affordable unit construction. These grants

require the grantee to prepare a statement of community development objectives and projected use of

funds, provide a citizen participation plan, and certify other enumerated criteria. 42 U.S.C. § 5304.

127.   No federal funds received by San Francisco have statutory conditions specifically

requiring compliance with Section 1373.

**E.   Coercive Effect Of The Executive Order**

128.   The Executive Order threatens not to pay San Francisco over $2 billion in federal funds

that is money already spent by San Francisco—money San Francisco is spending today and money

San Francisco has reasonably relied on receiving. As set forth in this Complaint, the Executive Order

is unconstitutional in numerous respects. Nonetheless, San Francisco currently faces the prospect of

sweeping cuts in necessary federal funding.

129.   It would be catastrophic for San Francisco to lose all federal funds. It would not be

possible for San Francisco to backfill the loss of $1.2 billion with local revenue sources.

130.   San Francisco's reserves are insufficient to cover the loss of all federal funds.

San Francisco currently has contingency reserves of approximately $350 million, in a Rainy Day Fund

and a Stabilization Fund, which were created and funded over the last decade for the purpose of

managing local tax revenue volatility created by economic conditions. These reserve levels, totaling

less than 8% of general fund revenues, remain below levels recommended by the Government Finance

Officers Association for local governments and the 10% target established by San Francisco law.

There are restrictions on the use of these reserves, and even if entirely depleted, their levels would be

inadequate to cover a shortfall in federal funds for even a single year. To fully absorb the loss of all

federal funds, San Francisco would also have to suspend capital projects—causing significant job

loss—and make drastic service cuts in order to maintain a balanced budget, as it is legally required to

do.

131.   Even a loss of 10% of annual federal funds would be calamitous for San Francisco. A

cut of $120 million would lead to severe public health and public safety impacts. San Francisco

currently has approximately 1,971 police officers, a level mandated by the Charter, but a $120 million

cut would likely require San Francisco to reduce that number significantly, with similar reductions in

1  the number of firefighters. Capital programs would be postponed, resulting in lost jobs, and social

2  service programs would be reduced or eliminated. General Fund Departments have identified specific

3  programs and services that they will need to cut if they must reduce their General Fund Support for

4  FY17-18 to help the Mayor's Office balance the budget. These include, for example, services for

5  women that are domestic violence survivors, programming for low-income children and families, and

6  housing programs to support low-income residents.

7       132.    The Executive Order's threat to cut federal funds is manifestly coercive. This is why at

8  least one jurisdiction has already changed its policy about immigration detainers in response to the

9  Executive Order. The day after the Executive Order was issued, Miami-Dade County Mayor Carlos

10 Giménez instructed the county's interim corrections director to "fully cooperate" with the Federal

11 government and comply with all immigration detainer requests, eliminating a previous requirement

12 that the Federal government reimburse detainer costs. "It's really not worth the risk of losing millions

13 of dollars to the residents of Miami-Dade County in discretionary money from the feds," said Mayor

14 Giménez. Ray Sanchez, *Florida's Largest County to Comply with Trump's Sanctuary Crackdown*,

15 CNN Politics (Jan. 27, 2017, 6:34 PM ET), http://www.cnn.com/2017/01/27/politics/miami-dade-

16 mayor-sanctuary-crackdown/. There is little doubt that is exactly what the President intends this

17 coercive effect with his promise to defund Sanctuary Cities.

18      **F.**    **Budget Impact of the Executive Order**

19      133.    For FY16-17, San Francisco's annual operating budget is approximately $9.6 billion.

20 Of this, approximately $1.2 billion is money provided by the Federal government for entitlement

21 programs, grants, and contracts, and other items. For the vast majority of the federal funds received by

22 San Francisco, there is no nexus between the purpose of the funds and immigration enforcement. Only

23 a small percentage of all federal funds received by San Francisco relate to either immigration or law

24 enforcement.

25      134.    The concern about losing federal funds is so acute that the Board of Supervisors has

26 established the Budget and Finance Federal Select Committee, a new committee that will consider

27 issues related to the possible loss of federal funds as a result of the Executive Order and other federal

28 action.

135. San Francisco has already begun the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2017. On December 13, 2016, the Mayor and the Controller (San Francisco's chief financial officer) issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests. Most San Francisco departments held public hearings on their budget proposals in January and February and submitted their budget requests for the coming fiscal year to the Controller by February 21. San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.

136. To meet the June 1 deadline, the Mayor must make fundamental budget decisions by May 15, and input these decisions into San Francisco's budget software by May 24. During the last week of May, the Controller's Office reconciles and confirms all financial calculations in the Mayor's proposed budget, while the Mayor's Budget Office finalizes the narrative publication that accompanies the proposed budget.

137. The budget for the fiscal year beginning July 1, 2017 will be approximately $10 billion, approximately $5 billion of which is in San Francisco's General Fund. The remainder of the budget is comprised of self-supporting activities at San Francisco's enterprise departments, which focus on city-related business operations and include the Port, the Municipal Transportation Agency, the Airport, the Public Utilities Commission, and others. The use of funds in these operations is legally restricted and cannot be redirected to backfill a shortfall in the General Fund. Money in San Francisco's General Fund is used to support public services such as public health, human services, police and fire services, and public works. Approximately $2 billion of General Fund money is legally dedicated for specific purposes, leaving approximately $3 billion in discretionary funds.

138. One of the fundamental budget decisions the Mayor must make by May 15, 2017, is whether to create a budget reserve to account for the possible loss of federal and state funds in the coming fiscal year. This presents a Hobson's choice. San Francisco, facing possible reductions, could place funds into reserve at the beginning of the fiscal year, harming the public by reducing the amount of money in San Francisco's General Fund. Or San Francisco could budget based on the continued

1   receipt of federal and state funds, knowing that cuts could come suddenly, outside of the budget

2   process.

3        139.   If unanticipated cuts come mid-year, the General Fund will take an even bigger hit at

4   that time, as there will be less time to absorb the loss of funds. Depending on the nature of the cuts,

5   they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated

6   penalties.

7        140.   If current levels of uncertainty remain by May 15, 2017, the Mayor will be forced to

8   propose a federal and state budget reserve. The final amount of the reserve will depend on the Mayor's

9   assessment of the amount of funding at risk and the likelihood that federal or state funds will be cut.

10  Money used to fund the reserve is money that will not be available for General Fund programs and

11  services.

12       141.   A May 15, 2017, decision to set the reserve at a specified amount will have a real world

13  impact when the new fiscal year begins on July 1, 2017. Beginning on this date, funds allocated for the

14  reserve will sit in the reserve instead of being available for General Fund services and programs. Once

15  funds are placed in a federal and state budget reserve, they will remain there for the entire fiscal year

16  unless they are released in response to reliably detailed information about the timing and size of

17  federal or state funding cuts.

18       142.   The Mayor must make a trade-off between putting money into a reserve and using it for

19  other San Francisco priorities, some of which are currently unfunded. For instance, the Department of

20  Homelessness and Supportive Housing needs an additional $19.5 million in the next two fiscal years

21  to make an impact in reducing homelessness in San Francisco. This money would fund a family

22  shelter expansion, youth housing subsidies, a resource center, and shelter maintenance and security. A

23  reserve would set money aside instead of using it for purposes like this.

24       143.   Since the Executive Order issued, San Francisco has received inquiries from credit

25  rating agencies about the impact of the Executive Order on San Francisco's finances. If credit rating

26  agencies downgrade their assessment of San Francisco, it will increase San Francisco's borrowing

27  costs.  The Executive Order imposes a "substantial contingent liability" to the extent that it

28  //

"immediately and directly affects the borrowing power, financial strength, and fiscal planning" of San Francisco. *See Clinton v. City of N.Y.*, 524 U.S. 417, 430-31 (1998).

## CAUSES OF ACTION

### COUNT ONE

### DECLARATORY RELIEF – SAN FRANCISCO LAW COMPLIES WITH 8 U.S.C. § 1373

144.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

145.    San Francisco contends that its laws comply with Section 1373. San Francisco Administrative Code Chapters 12H and 12I do not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, immigration officials information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

146.    Defendants contend that San Francisco's laws do not comply with Section 1373.

147.    An actual controversy presently exists between San Francisco and Defendants about whether San Francisco's laws comply with Section 1373.

148.    A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TWO

### TENTH AMENDMENT, SEPARATION OF POWERS, AND SPENDING CLAUSE – EXECUTIVE ORDER SECTION 9(A)'S FUNDING RESTRICTIONS ARE UNCONSTITUTIONAL

149.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

150.    Executive Order Section 2(c) states: "It is the policy of the executive branch to . . . Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order at 8799.

151.    Executive Order Section 9 states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

//

152.     Executive Order Section 9(a) contains a Funding Restriction stating: "In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.  The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction." *Id.*

153.     The Funding Restriction violates the Tenth Amendment, the Spending Clause, and Article I, sec. 1 of the United States Constitution by:

        a.   Exercising Spending Power that the Constitution grants to Congress;

        b.   Imposing new funding conditions on existing federal funds;

        c.   Imposing funding conditions not germane to the purpose of the funds;

        d.   Imposing funding conditions so severe as to coerce compliance; and

        e.   Imposing funding conditions that require jurisdictions to act unconstitutionally.

### COUNT THREE

### TENTH AMENDMENT – EXECUTIVE ORDER SECTION 9(A)'S ENFORCEMENT DIRECTIVE IS UNCONSTITUTIONAL

154.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

155.     Executive Order Section 9(a) contains an Enforcement Directive stating: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order at 8801.

156.     The Federal government has taken the position that a state or local jurisdiction that fails to affirmatively assist federal immigration officials—by, for example, refusing to comply with a detainer request issued under Section 287.7 of Title 8 of the Code of Federal Regulations—hinders the enforcement of federal law and violates Section 1373.

//

157.     Accordingly, the Enforcement Directive commandeers state and local governments, violating Tenth Amendment to the United States Constitution by, *inter alia*, compelling them to enforce a federal program by imprisoning individuals subject to removal at the request of the Federal government when those individuals would otherwise be released from custody.

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

San Francisco Laws Comply With Section 1373 (Count One)

1.     Declare that San Francisco laws comply with Section 1373;

Executive Order Section 9(a)'s Funding Restriction Is Unconstitutional (Count Two)

2.     Declare the Funding Restriction in Executive Order invalid;

3.     Preliminarily and permanently enjoin Defendants from enforcing the Funding Restriction in the Executive Order;

Executive Order Section 9(a)'s Enforcement Directive Is Unconstitutional (Count Three)

4.     Declare the Enforcement Directive in Executive Order invalid;

5.     Preliminarily and permanently enjoin unconstitutional applications of the Enforcement Directive in Executive Order Section 9(a);

Other Relief

6.     Award San Francisco reasonable costs and attorney's fees; and

//
//
//
//
//
//
//
//
//

7.      Grant any other further relief that the Court deems fit and proper.

Dated:  May 23, 2017

                                    DENNIS J. HERRERA
                                    City Attorney
                                    RONALD FLYNN
                                    JESSE C. SMITH
                                    YVONNE R. MERÉ
                                    MOLLIE M. LEE
                                    SARA J. EISENBERG
                                    Deputy City Attorneys


                              By: */s/ Dennis J. Herrera*
                                    DENNIS J. HERRERA
                                    City Attorney


                              By: */s/ Mollie M. Lee*
                                    MOLLIE M. LEE
                                    Deputy City Attorney

                                    Attorneys for Plaintiff
                                    CITY AND COUNTY OF SAN FRANCISCO

1

## **FILER'S ATTESTATION**

2

   I, Mollie M. Lee, am the ECF user whose identification and password are being used to file

3

this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.

4

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in

5

this filing.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

**U.S. District Court — Judicial Caseload Profile**

**CALIFORNIA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Dec 31 2012 | Dec 31 2013 | Dec 31 2014 | Dec 31 2015 | Dec 31 2016 | Dec 31 2017 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 8,046 | 7,385 | 6,749 | 7,501 | 8,328 | 8,510 | | |
| | | Terminations | 8,037 | 7,756 | 7,277 | 6,717 | 6,892 | 7,707 | | |
| | | Pending | 7,267 | 6,744 | 6,244 | 7,046 | 8,404 | 9,199 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 5.8 | 15.2 | 26.1 | 13.5 | 2.2 | | 29 | 5 |
| | | Number of Judgeships | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | | Vacant Judgeship Months [2] | 37.0 | 34.4 | 5.7 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 575 | 528 | 482 | 536 | 595 | 608 | 21 | 5 |
| | | Civil | 488 | 440 | 404 | 449 | 523 | 525 | 13 | 3 |
| | | Criminal Felony | 60 | 56 | 46 | 50 | 35 | 41 | 85 | 13 |
| | | Supervised Release Hearings | 27 | 32 | 33 | 37 | 37 | 42 | 41 | 10 |
| | Pending Cases | | 519 | 482 | 446 | 503 | 600 | 657 | 17 | 4 |
| | Weighted Filings [2] | | 557 | 527 | 485 | 512 | 515 | 556 | 20 | 6 |
| | Terminations | | 574 | 554 | 520 | 480 | 492 | 551 | 28 | 6 |
| | Trials Completed | | 13 | 10 | 12 | 11 | 11 | 9 | 84 | 13 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.1 | 10.6 | 12.8 | 13.1 | 14.9 | 20.8 | 92 | 13 |
| | | Civil [2] | 6.3 | 7.8 | 7.9 | 7.6 | 7.3 | 7.2 | 19 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 29.8 | 31.0 | 25.6 | 27.7 | 31.2 | 26.7 | 30 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 454 7.5 | 406 7.3 | 430 8.3 | 537 9.2 | 471 6.5 | 469 5.8 | 42 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.3 | 1.4 | 1.6 | 1.4 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 61.8 | 59.1 | 61.3 | 61.1 | 70.1 | 65.0 | | |
| | | Percent Not Selected or Challenged | 40.1 | 40.0 | 41.9 | 40.3 | 47.8 | 41.4 | | |

| **2017 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7,351 | 246 | 755 | 1,433 | 16 | 221 | 493 | 606 | 483 | 483 | 1,283 | 88 | 1,244 |
| Criminal [1] | 568 | 3 | 165 | 41 | 105 | 93 | 32 | 27 | - | 19 | 22 | 27 | 34 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# EXHIBIT I

**U.S. District Court — Judicial Caseload Profile**

**CALIFORNIA EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Dec 31 2012 | Dec 31 2013 | Dec 31 2014 | Dec 31 2015 | Dec 31 2016 | Dec 31 2017 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 6,580 | 5,971 | 6,057 | 5,495 | 5,614 | 5,281 | | |
| | | Terminations | 7,257 | 6,186 | 6,213 | 5,775 | 5,524 | 5,536 | | |
| | | Pending | 8,347 | 8,136 | 7,952 | 7,630 | 7,713 | 7,477 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -19.7 | -11.6 | -12.8 | -3.9 | -5.9 | | 59 | 12 |
| | | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | | Vacant Judgeship Months [2] | 7.9 | 14.6 | 8.9 | 12.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 1,097 | 995 | 1,010 | 916 | 936 | 880 | 8 | 2 |
| | | Civil | 858 | 786 | 834 | 761 | 815 | 732 | 6 | 1 |
| | | Criminal Felony | 179 | 154 | 112 | 107 | 74 | 96 | 35 | 6 |
| | | Supervised Release Hearings | 60 | 56 | 63 | 48 | 47 | 52 | 27 | 7 |
| | Pending Cases | | 1,391 | 1,356 | 1,325 | 1,272 | 1,286 | 1,246 | 6 | 1 |
| | Weighted Filings [2] | | 956 | 836 | 884 | 784 | 799 | 764 | 5 | 1 |
| | Terminations | | 1,210 | 1,031 | 1,036 | 963 | 921 | 923 | 3 | 1 |
| | Trials Completed | | 14 | 16 | 14 | 16 | 15 | 19 | 34 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 13.5 | 14.7 | 17.4 | 20.0 | 23.3 | 23.1 | 93 | 14 |
| | | Civil [2] | 7.9 | 9.2 | 7.9 | 9.0 | 9.1 | 10.0 | 62 | 12 |
| | From Filing to Trial [2] (Civil Only) | | 46.8 | 51.2 | 44.2 | 36.5 | 50.3 | 39.8 | 60 | 7 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 766 13.0 | 775 13.5 | 841 14.3 | 785 13.8 | 807 13.4 | 744 13.0 | 78 | 14 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.4 | 1.4 | 1.6 | 1.6 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 41.0 | 39.7 | 41.2 | 38.4 | 36.6 | 36.9 | | |
| | | Percent Not Selected or Challenged | 45.9 | 40.1 | 40.3 | 37.3 | 39.9 | 34.8 | | |

| **2017 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4,394 | 474 | 47 | 1,720 | 19 | 196 | 159 | 246 | 193 | 53 | 857 | 2 | 428 |
| Criminal [1] | 576 | 43 | 219 | 31 | 81 | 88 | 5 | 40 | 6 | 9 | 10 | 6 | 38 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."