# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,

        Plaintiff,

        v.

THE STATE OF CALIFORNIA;
EDMUND GERALD BROWN, JR.,
Governor of California, in his Official
Capacity; and XAVIER BECERRA,
Attorney General of California, in his
Official Capacity,

        Defendants.

Case No. 18-cv-490

---

## **AMENDED DECLARATION OF THOMAS D. HOMAN**

I, Thomas D. Homan, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1.  I am the Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS), a position I have held since November 2017. From January 2017 until November 2017, I served as Acting Director of ICE.[1]  In both positions, I directly oversee ICE's core operational programs, as well as the agency's managerial and administrative support functions. I direct and oversee ICE's day-to-day work of enforcing the nation's immigration and customs laws; investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and outside of the United States; and supporting the DHS litigators who prosecute exclusion, deportation, and removal

---

[1] On November 14, 2017, President Trump nominated me to serve as the Director of ICE, and the confirmation process before the U.S. Senate remains ongoing.

proceedings, including against national security threats, criminal aliens, and other aliens posing a threat to public safety. ICE employs more than 20,000 federal civil servants and contract staff in more than 400 offices within the United States and 50 foreign countries.

2. I hold a Bachelor of Science degree in Criminal Justice from the State University of New York Polytechnic Institute (formerly SUNYIT) at Utica-Rome.

3. I am a 34-year veteran of law enforcement, having begun my career as a police officer in New York in 1983. In 1984, I became a U.S. Border Patrol Agent with the former Immigration and Naturalization Service (INS) in Campo, California.[2] In 1988, I became an INS Special Agent in Phoenix, Arizona, and was later promoted to Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I became the Assistant District Director for Investigations (ADDI) in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas.

4. Upon the creation of ICE in March 2003, I was named the Assistant Special Agent in Charge in Dallas, Texas. In August 2004, I was named the Deputy Special Agent in Charge (DSAC) in that same office. As DSAC, I directed the day-to-day operations of seven local offices, with more than 200 special agents and support personnel, conducting investigations related to terrorism, export enforcement, illicit financing, money laundering, human trafficking, intellectual property rights violations, and cybercrimes.

5. In March of 2009, I became Enforcement and Removal Operations (ERO) Assistant Director for Enforcement at ICE Headquarters. In that position, I was responsible for ICE's

---

[2] The INS was abolished by the Homeland Security Act of 2002, and ICE was created to perform many of its former enforcement functions, along with the investigative functions of the former U.S. Customs Service. *See* 6 U.S.C. § 252(c); *see also* Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 3-4 (2003) (set forth as a note to 6 U.S.C.A. § 542 (West 2018)).

2

enforcement initiatives and components through which ERO identifies and arrests removable aliens, including the Criminal Alien Program, the National Fugitive Operations Program, Field Training, the 287(g) Program,[3] the Law Enforcement Support Center (LESC), the Fugitive Operations Support Center (now the National Criminal Analysis and Targeting Center (NCATC)), the Detainee Enforcement and Processing Offenders by Remote Technology Center, and the Interoperability Response Centers.

6. In October of the following year, I was promoted to Deputy Executive Associate Director for ERO, and in May 2013, I was promoted to Executive Associate Director for ERO, a position I held until January 2017.

7. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

### *Overview of ICE Programs*

8. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. ICE's mission is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety. To carry out that mission, ICE focuses on enforcing immigration law, preventing terrorism, and combating transnational criminal threats.

9. Homeland Security Investigations (HSI), one of ICE's core operational directorates, employs ICE's special agents, who are both immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a, charged with investigating criminal and civil violations of the federal customs and immigration laws. HSI consists of more than 8,500

---

[3] This refers to section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g).

employees, of which more than 6,000 are special agents, assigned to more than 200 cities throughout the United States and 50 countries around the world. In fiscal year (FY) 2017, HSI made 32,958 criminal arrests; arrested 4,818 gang members, including 796 MS-13 members; seized $56 million in bulk cash; identified or rescued 904 child exploitation victims and 518 human trafficking victims; and seized 981,586 pounds of narcotics, including 2,370 pounds of fentanyl and 6,967 pounds of heroin. HSI operations in California alone accounted for 4,767 criminal arrests, identifications or rescues of 62 child exploitation victims and 204 human trafficking victims, and seizures of 238,224 pounds of narcotics, including 4,072 pounds of fentanyl and heroin.

10. HSI special agents handling national security and counterterrorism issues participate in Joint Terrorism Task Forces (JTTFs) throughout the country, working closely with federal, state, and local law enforcement agencies to investigate and eradicate terrorist networks. They also work with the U.S. Department of State to ensure that individuals who pose a security risk are not issued U.S. visas and to investigate those believed to have violated the terms of their admission to the United States. HSI also monitors schools, nonimmigrant students, and exchange visitors to ensure that legitimate students, researchers, and exchange visitors are welcomed while those who seek to harm the United States are excluded.

11. HSI works with other federal and foreign law enforcement agencies on investigations targeting transnational organized crime. HSI also conducts investigations related to bulk cash smuggling, commercial fraud, and other financial crimes, as well as worksite violations, immigrant document fraud, benefit fraud, and cybercrime.

12. Key to all HSI investigations is close collaboration with other federal, state, and local partners, from information-sharing to complex joint operations. A global law enforcement

mission that spans so many investigative disciplines simply cannot be advanced without institutional partners. Relatedly, in order to facilitate the prosecution, both federal and state, of aliens who violate our criminal laws, HSI uses its delegated authority pursuant to 8 U.S.C. § 1182(d)(5) to parole aliens into the United States as witnesses and defendants. This mechanism is critical to bringing investigations through to their conclusion and holding violators – both foreign nationals and U.S. citizens – accountable.

13. ERO, another core ICE operational directorate, consists of more than 7,600 employees, including more than 5,700 deportation officers assigned to 24 ERO field offices and overseas locations in 19 countries. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally – including those who cross the border illegally, a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, a federal felony, 8 U.S.C. § 1326 – or otherwise undermine the integrity of our immigration laws and our border control efforts.

14. While ERO has significant assets near the border, the majority of its immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody

without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

15. To accomplish ICE's immigration enforcement objectives, ERO coordinates closely with law enforcement partners within the United States and around the world. One of the most notable law enforcement coordination and partnership efforts within ERO is the 287(g) Program, which involves the identification of aliens who are incarcerated within state and local prisons and jails. This program enables a state or local law enforcement entity to receive delegated immigration officer authority, training, and technology resources for immigration enforcement under the oversight and direction of ICE.

16. ERO enhances multi-agency task forces through its authority to administratively arrest removable aliens who threaten public safety and national security. And, leveraging resources available through foreign law enforcement partners, including INTERPOL, and ICE HSI Attachés stationed abroad, ERO develops investigative leads and provides support in locating and arresting aliens who are wanted for crimes committed in other countries and are at-large in the United States.

17. ERO also administers the LESC, the NCATC, and the Pacific Enforcement Response Center (PERC). The LESC is a national clearinghouse providing timely immigration status, identity information, and real-time assistance to federal, state, and local law enforcement agencies regarding aliens suspected, arrested, or convicted of criminal activity. 8 U.S.C. § 1373(c). The NCATC serves as a national enforcement operations center, analyzing data, developing leads, and disseminating information to ERO law enforcement officials in order to locate and arrest aliens who pose a threat to U.S. communities nationwide. The PERC

6

operates around-the-clock, 365 days per year, and takes appropriate law enforcement action
against aliens suspected, arrested, or convicted of criminal activity across the United States,
including by sharing timely and relevant information with ERO field offices and law
enforcement partners nationwide and issuing immigration detainers for criminal aliens.

18. Acting principally through ERO (both through the PERC and its 24 field offices across the
country), ICE issues immigration detainers to federal, state, and local law enforcement
agencies to provide notice of its intent to assume custody, at the time of their release from
state or local custody, of aliens detained in these agencies' custody, based on their violation
of federal immigration law. In 2017, in California alone, ICE issued over 35,000 detainers
which request that the law enforcement agency in whose custody the alien is currently held:
provide advance notification of the alien's release to allow for an orderly transfer of the
individual into ICE custody; and maintain custody of the alien for up to 48 hours after the
time he or she would otherwise have been released, so that ICE may respond to the prison or
jail and assume custody. That number is a significant percentage of the 142,356 detainers
issued by ICE nationwide during the same time period.

19. In FY 2017, ERO maintained an average daily capacity of 38,125 detention beds nationwide
and conducted 143,470 administrative arrests, 105,736 of which were of aliens with at least
one known criminal conviction and 22,256 of which were for aliens with a pending criminal
charge at the time of arrest. Of these arrests, 40,666 were conducted at-large, meaning that
the arrest did not occur in a custodial setting such as a prison or jail. In FY 2017, ICE
apprehended 20,201 aliens in California alone, or roughly 14% of the aliens apprehended
nationwide, 5,943 of which occurred at-large. Thus far in FY 2018, ICE has apprehended
8,588 aliens in California, or roughly 14% of the aliens apprehended nationwide. In FY

2018 to date, ERO has conducted 14,849 at-large arrests nationwide, of which 2,566 occurred in California. In FY 2017, ERO booked a total of 323,591 aliens into custody, 41,880 of whom were detained in California, and removed 226,119 aliens from the United States, of which 127,699 had at least one known criminal conviction. Of the aliens apprehended by ERO in 2016, 2017, and in 2018 to date, 92%, 90%, and 87%, respectively, were criminal aliens.

### *Overview of California Legislation Impacting ICE Operations*

20. California has enacted a series of laws designed to obstruct enforcement of federal immigration law – California Assembly Bill No. 103 (AB 103), which went into effect on June 27, 2017; and Senate Bill No. 29 (SB 29); Senate Bill No. 54 (SB 54); Assembly Bill No. 450 (AB 450); and Assembly Bill No. 90 (AB 90), all of which became effective on January 1, 2018. These laws affect all aspects of ICE's operations, but they have the most profound impact on ICE's ability to conduct criminal investigations and participate in cooperative efforts with both state and other federal agencies; identify and apprehend removable aliens, especially criminal aliens; and manage the congressionally authorized detention of removable aliens.

21. California's laws impact three ICE geographic Areas of Responsibility (AORs): Los Angeles, San Diego, and San Francisco. The Los Angeles ERO Field Office footprint encompasses seven southern California counties: Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara, and San Luis Obispo. The San Diego ERO Field Office encompasses San Diego and Imperial Counties, both of which include the border between the United States and Mexico. The San Francisco ERO Field Office encompasses the remaining 49 counties in California.

8

*Impact on ICE's Ability to Identify Removable Criminal Aliens – SB 54*

22. The limitations imposed by SB 54 on the discretion of state and local law enforcement agencies in California to cooperate with ICE have served as an obstacle to ICE's enforcement of the immigration laws, including by limiting ICE's ability to determine which individuals detained in state or local criminal custody are removable from the United States. They also largely prevent state and local law enforcement from exercising discretion to notify ICE prior to releasing criminal aliens into the community or to allow ICE law enforcement officers access to secure space within prisons and jails to serve documents or effectuate arrests. In effect, these laws shield from detection removable aliens detained in California prisons and jails and obstruct ICE's efforts to take these aliens into custody for removal purposes. The lack of access to state and local information requires ICE to expend greater time and resources to identify removable criminal aliens.

23. Historically, ICE officers could obtain alien information (including personally identifiable information (PII)) directly from state and local law enforcement agencies to assist in determining whether prisoners or inmates were removable. However, given recent laws and policies enacted at the state and local level in California, ICE officers must now rely on the publicly available information provided by the prisons and jails. This has complicated the process, requiring that ICE cross-check the limited information provided in such public state and local records against federal databases to determine alienage and criminal history. It is not, however, always possible to determine based on the limited public information whether the individual taken into custody by the state (including for serious crimes) is a removable alien. Moreover, since ICE officers no longer have direct computer access or have only

limited computer access in the jails, and portable devices may not always work in the facilities, records searches may need to be conducted remotely, requiring an even greater expenditure of officer time and resources. Overall, not only is this a more burdensome process than otherwise would be available with better cooperation from state and local law enforcement agencies, but also many removable criminal aliens cannot be identified by this process.

24. In the Los Angeles AOR, ICE maintained cooperative relationships with state and local law enforcement agencies prior to the enactment of the state laws referenced above. Generally, state and local law enforcement agencies provided ICE with access to local jails by providing inmate information and notification of release, temporarily housing inmates for ICE, and honoring detainers – including by providing ICE with advance notice of release information, thereby enabling an orderly transfer of custody to ICE, or briefly maintaining custody of the alien. California law enforcement agencies also participated in the 287(g) Program, pursuant to which ICE enters into agreements with state, local, and tribal law enforcement agencies for those agencies to perform certain limited federal immigration functions at the direction and under the supervision of federal officials. The 287(g) Program enables ICE to achieve more apprehensions and removals than would be possible with existing resources.

25. Previously, ICE had four active 287(g) programs, through which the agency partnered with the Sheriffs of Los Angeles, Orange, Riverside, and San Bernardino Counties. Through the 287(g) Program, ICE had office space and computer access at the local jails in all four counties, including Los Angeles County and Orange County. The jails would also share

detainee information directly with ICE, making it possible for ICE to efficiently investigate and identify criminal aliens.

26. SB 54 now prohibits state and local law enforcement agencies from performing the functions of an immigration officer, whether pursuant to the 287(g) Program or any other law, regulation, or policy. On or about December 27, 2017, the Orange County Sheriff's Department (OCSD) terminated its 287(g) agreement with ICE, the last in the Los Angeles AOR, due to SB 54. The loss of the OCSD 287(g) program will result in a significant reduction in the number of criminal aliens identified and removed. In FY 2013, with four active 287(g) programs, the programs had approximately 5,500 encounters with criminal aliens, resulting in approximately 2,600 removals. In FY 2017, the OCSD 287(g) program had approximately 227 encounters with criminal aliens, resulting in approximately 104 removals. An additional six deportation officers would be required to fill the gap left by the loss of the OCSD 287(g) program. With the termination of the OCSD 287(g) program, ICE lost its office space and access to computer equipment, including data lines it had installed at the Intake Release Center of the Orange County Jail.

27. In the San Diego AOR, ICE maintained cooperative relationships with state and local law enforcement agencies prior to the enactment of SB 54. One example of this cooperative relationship between ICE ERO and the Escondido Police Department was the creation of "Operation Joint Effort," which commenced in May 2010, and produced effective enforcement results year after year. In FY 2017 alone, more than 333 removable aliens were arrested by ICE officers assigned to this operation. This partnership allowed for information-sharing between ICE and local law enforcement that resulted in the successful identification of individuals through the use of technology to remotely identify and arrest

11

removable criminal aliens.  Local law enforcement and the California public benefited from ICE assistance when investigating crimes leading to more convictions and case closures. Prior to SB 54, ERO San Diego received notification on all jail releases for which an immigration detainer was lodged, allowing ICE to assume custody in a controlled area of the jail.  The enactment of SB 54 ended Operation Joint Effort and decreased public safety by allowing criminal aliens to remain in the community.

28.  SB 54 also prevents ICE from having dedicated work space inside the San Diego County jails, resulting in operational inefficiencies, ongoing relocation costs, increased equipment purchases, and strained manpower resources.  ERO San Diego was required to remove permanent computer workstations, including desktop computers, printers, scanners, and other items used by ICE officers.  In order to maintain a presence at San Diego County jails, ERO instead was forced to purchase new laptop computers and mobile printers and scanners at additional government expense.  The new law has also forced the Escondido and Oceanside Police Departments to remove ICE's permanent presence within those departments.

29.  Prior to the enactment of SB 54 and similar legislation, most counties in the San Francisco AOR generally cooperated with ICE in providing access to prisoners and inmates, booking information, and release dates.  They would generally allow ERO personnel access to secure areas within their jail facilities in order to effectuate arrests, rather than forcing ERO to effectuate those arrests in non-secure locations.  Since the enactment of SB 54, Monterey, Sacramento, San Joaquin, and Fresno counties have denied ICE access to relevant booking information, including the names, places of birth, addresses, and criminal histories of aliens in their custody.  Access to this information is critical to identifying and removing criminal

aliens who have been arrested by local and county officials. Prior to December 22, 2017, Monterey County Jail permitted ICE to assign an officer on-site daily to access inmate booking records. An ICE officer is no longer allowed access. Prior to January 4, 2018, Sacramento County Jail provided booking information and lists of foreign-born inmates. Now, due to SB 54, Sacramento County Jail will provide ICE access only to information that is available to the general public. Prior to January 24, 2018, San Joaquin County Jail provided ICE inmate-booking information, including lists of foreign-born inmates, but will no longer do so. Prior to enactment of SB 54, Fresno County Jail provided ICE complete access to the jail and its automated systems for booking information and lists of foreign-born inmates. Since January 4, 2018, Fresno County Jail provides ERO only with information that is available to the public.

30. Because SB 54 prevents county jails from notifying ICE of release unless that information is publicly available, the San Diego Sheriff's Office (SDSO) made pending release information available on its public website. However, whereas ICE previously received such information directly from SDSO and could send personnel to the facilities to take custody of the inmate(s) in a secure area without undue delay, ICE must now expend additional officer time actively monitoring the SDSO's webpage to identify release dates for removable aliens. The notification of pending release may be as short as twenty to thirty minutes on "book-and-release" cases or up to eight to ten hours for other releases. Rather than being able to have one officer go directly to the facility, pick up the alien in a secure environment, and travel to the next location as part of an orderly and planned effort, multiple ICE officers must now wait in a public area for an undetermined amount of time and make

an at-large arrest outside the facility, at greater cost to the government and with needless risks to the safety of officers and the general public.

31. Starting January 1, 2018, California state prisons began denying ICE access to state prisoners to conduct interviews regarding their immigration status unless the prisoners have provided written consent. Before then, only some county jails required written consent before providing ICE access to county inmates. These consent requirements make it difficult for ICE to conduct enforcement operations. For example, the Wasco State Prison requires written consent from the state prisoners before it will allow ICE access even to serve administrative warrants and removal documents. Thus, ICE is prevented from exercising its authorities under the Immigration and Nationality Act (INA) to initiate removal proceedings and execute removal orders, due to the consent requirement. Because ICE officers are unable to access state prisoners, the Criminal Alien Program (CAP) has been impacted, forcing those officers to conduct at-large arrests out in the community, which poses greater risk to them and the community, while also requiring expenditure of additional resources to achieve the same result (i.e., apprehension of a criminal alien subject to removal from the United States under our immigration laws).

32. SB 54's restrictions on having dedicated space within the police departments have also impacted criminal investigations. The lack of an ICE presence at state police departments has reduced the ability of police detectives from the gang, sex crimes, and violent crimes departments to directly engage with ICE officers to request assistance and share information. Historically, local law enforcement partners would seek ICE assistance and technology to identify individuals with no identification documents or who refused to provide identification, often revealing that individuals had provided false identification to homicide

14

detectives and the gang unit. This ICE technology was previously utilized approximately 30 times each month.

33. ICE's ability to identify removable aliens who are public safety risks was further limited by AB 90. Leading up to the effective date of AB 90, California terminated ICE's access to the CalGang database in October 2017. It is my understanding that the access of other federal law enforcement agencies has not been terminated. The CalGang database is the largest state repository of information concerning suspected and confirmed gang members and is accessed by over 6,000 law enforcement officers in over 56 counties. ICE can no longer effectively identify confirmed gang members in California as a result of AB 90. The CalGang database has been a very important law enforcement tool for ICE in carrying out its mission of enforcing the nation's immigration laws, and keeping the country safe by identifying, locating, and removing criminal aliens who pose a public safety or national security threat. ICE has dedicated gang units that are tasked exclusively with identifying and removing known gang members from the United States. Gang violence is a significant public safety issue in California and across the country. The CalGang database was used to generate leads for immigration law enforcement by screening known gang members in the database against the identity of an encountered subject. The CalGang database was also used by ICE officers upon arrest, or prior to an encounter, while a subject was still in local law enforcement custody. ICE's Fugitive Operations officers routinely ran checks on suspected gang members to identify any potential threats prior to an operation or enforcement action. The CalGang database also allowed for checks on detainees in custody with gang-related tattoos to verify gang membership status and last known contact with

police, and was helpful in confirming or corroborating ICE's information about a gang member.

34. The loss of access to information on confirmed gang members and their affiliations also poses an officer and public safety risk. The CalGang database is an important tool for all law enforcement officers who need to follow trends and gang member affiliations within known gang areas, as well as the number of arrests and other law enforcement encounters of known gang members. The CalGang database allows law enforcement officers to obtain photographs of subjects, in addition to identifying characteristics such as facial scars and tattoos; location information such as reported addresses, locations of arrests, and locations where interviewed; information from field interviews conducted by local police, such as location of the interview, the subject's attire, and persons and vehicles associated with the subject.

35. When ICE lacks access to state and local prisons and jails or communication with state and local officials, ICE is less able to identify criminal aliens who are subject to removal from the United States and must spend more time apprehending those aliens at large. As a result, ICE officers have less time to address other enforcement priorities – for example, they have less time to manage caseloads with respect to aliens not detained in ICE custody, leading to delays in resolving those cases. They also have less time to meet with detained aliens regarding detention concerns or post-order custody issues, such as securing identity documents for removal. Ultimately, the more time and resources ICE officers must spend on at-large apprehensions, the fewer criminal illegal aliens they will be able to place into removal proceedings, leaving those criminals and the high recidivism risk they pose at large in the United States.

*Impact on ICE Operations to Apprehend Removable Criminal Aliens – SB 54*

36. The inability to identify removable criminal aliens prior to release from state or local custody inhibits the safe and effective apprehension of criminal aliens for removal. SB 54's prohibition on notification of criminal release information hinders apprehension of criminal aliens before they are released into the community. Having advance notice of a criminal alien's release from detention is exceptionally important to ICE's ability to enforce the immigration laws and remove dangerous criminal aliens from the United States. There is a serious threat to community safety when criminal aliens are released into the community, and also a very real safety risk for ICE officers who must then re-apprehend these aliens at large. Rather than having these sometimes violent and dangerous offenders transferred to ICE custody in a controlled, law enforcement setting, where they have been searched for weapons and contraband, ICE officers must now search for them at-large in the community. During such encounters, other people may be present, the surroundings are not secure, and individuals may be armed or ready to flee. The inability of state and local law enforcement agencies to cooperate with ICE also means that ICE is unable to obtain information regarding whether additional criminals reside at or frequent the location of the planned ICE arrest, heightening the risk that is already inherent in at-large operations. Additionally, prior to these limitations on cooperation, state and local officers would accompany ICE officers to residences in order to provide a uniformed presence and serve as a deterrent to resistance to ICE's enforcement efforts, as well as allowing for the arrest of individuals who illegally interfered with such efforts.

37. At-large arrests of removable aliens generally require five officers to be present for officer safety reasons. When ICE is able to effect an orderly transfer from state or local custody by arresting a removable alien within a prison or jail, only one officer is needed, because the alien will have been subject to search and be known to be unarmed; the encounter will be in a controlled environment with law enforcement officers available in the event there is a need for assistance; and there will be no opportunity for innocent bystanders or potential associates who mean to harm a law enforcement officer to be present. On the other hand, during an at-large arrest, the target may be armed; the officers have no physical control over the location; and there is always the potential for disruption of the ICE officers' enforcement action by family members, associates of the target, or members of the public who oppose immigration law enforcement. Thus, at a minimum, the manpower requirement for an at-large arrest is generally at least five times that required for arrests within state or local detention facilities. Also, the cost of training and equipping five officers for an at-large apprehension team is significantly greater than the resources required for an officer making an in-custody arrest (e.g., the costs of weeks of additional training related to at-large arrests, vehicle costs, fuel costs, and tactical communication equipment costs). Moreover, while a single ICE officer in a state or local detention facility can encounter, lodge detainers against, and arrest multiple aliens each day, each team of ICE officers must engage in time-consuming work (e.g., data-base searches, visits to address(es) associated with the target, deconfliction with the activities of other law enforcement agencies, and surveillance), in order to locate each at-large alien, compounding the inefficiencies created by SB 54.

38. At-large arrests unquestionably involve a greater possibility that the target will resist or resort to violence against ICE officers, particularly given that he or she will now have greater access to weapons. For example, in September 2017, while a Los Angeles ERO Fugitive Operations team (FOT) was conducting a vehicle stop to arrest a confirmed gang member for whom a detainer was not honored by Ventura County, the alien placed his vehicle in reverse and attempted to collide with the FOT vehicle behind him. The FOT member in the vehicle slammed on his brakes and veered left to avoid the gang member, who then proceeded forward, driving around one FOT vehicle and colliding into another FOT vehicle, which immobilized the vehicles of both the alien and the FOT member. The gang member subsequently had to be extracted from his vehicle at gun-point. He was found with a loaded firearm on his person.

39. Since January 2018, ERO Los Angeles has repurposed at-large teams to focus on aliens released into the community by state and local law enforcement. The original focus of these at-large teams was to arrest fugitive aliens who had been issued a final order of removal. However, due to the increase in detainers not being honored, including refusal to provide release dates and prohibitions on the transfer of removable aliens to ICE in a secure custodial setting, ERO Los Angeles has been forced to direct some of the teams to focus on aliens released into the communities from state custody. This shift in resources will lead to an increased backlog of fugitive aliens in the community.

40. Although Fresno County Jail does provide ERO advance notification of pending releases and allows ERO officers to make arrests in the release vestibule area, since January 1, 2018, it has denied ICE physical access to its secured booking and processing area to effectuate arrests of aliens upon their release from the jail. Instead, ICE officers are forced to make

19

arrests in public areas of the jail, significantly increasing the risk to officer safety and public safety, and necessitating multiple officers. Upon making an arrest in the release vestibule at Fresno County Jail, ICE officers must exit via a public area. This is a reversal of prior policy, which allowed ICE personnel access to non-public areas in order to effectuate arrests.

41. Since January 1, 2018, Sacramento County Jail will release an alien to ICE in the secure area of the jail only if the alien meets certain criteria under SB 54, such as convictions for specific serious crimes or inclusion on the California Sex and Arson Registry. For aliens who do not meet these narrow criteria, however, the jail will release the alien into a public area irrespective of the existence of an ICE detainer requesting advance notification of release and orderly transfer of custody. Even if ICE is aware in advance of the release, ICE officers must take custody of the alien in public areas of the jail, significantly increasing the risk to officer safety and public safety, and necessitating the presence of multiple ICE officers.

42. In the short time since SB 54 went into effect, SDSO has refused to provide advance notification of release in the cases of more than 119 aliens against whom ICE ERO San Diego issued detainers seeking such notification. Some of these aliens were released with serious criminal charges pending, including 8 arrested for spousal battery, 32 arrested for driving under the influence, 5 arrested for drug crimes, and 1 for possession of a weapon. Aiming to be a cooperative partner, ICE transferred one alien in its custody to the San Diego Police Department on a warrant for possession of a firearm silencer, but rather than transfer the alien back to ICE after it completed its work on the case, SDSO simply allowed him to bond out of custody without notifying ICE of the release.

43. When California law enforcement agencies release these aliens into the community, rather than enabling ICE to enforce the federal immigration laws against them, they reoffend in the communities at an alarming rate. By way of reference, of 533 criminal aliens who were released pursuant to *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *rev'd and remanded sub nom., Jennings v. Rodriguez*, 583 U.S. ---, 2018 WL 1054878 (2018) (No. 15-1204), in the Los Angeles ERO Field Office AOR from October 2012 through December 2013, ICE records indicate that 223 were subsequently re-arrested by other law enforcement agencies, for a total of 651 crimes as of December 15, 2017. The arrests include arrests for murder, rape, kidnapping, burglary, domestic abuse, and crimes involving child sexual assault, abuse, or cruelty. More generally, I understand based upon statistics from the Department of Justice's Bureau of Justice Statistics that approximately two-thirds of prisoners released from state prisons were arrested for a new crime within 3 years.[4]  Given these recidivism rates, ICE has a very strong interest in removing criminal aliens from the United States, and it is remarkable that California would decline to provide release information or transfer these aliens for removal or removal proceedings.

44. There are numerous examples in which state and local law enforcement agencies failed to honor detainers, requesting advance notification of release and the transfer of custody upon release, in cases of aliens convicted of serious offenses, including willful cruelty to a child, drug offenses, sexual battery, and lewd and lascivious acts with a minor.

    a. On January 12, 2017, ICE lodged a detainer against an alien who had been arrested and was later convicted of felony child cruelty and felony possession/purchase for sale of narcotics/controlled substance, among other

---

[4] Bureau of Justice Statistics, Recidivism of Prisoners Released in 30 States in 2005, https://www.bjs.gov/index.cfm?ty=pbdetail&iid=4986.

offenses.  On July 12, 2017, Santa Clara County Jail (SCCJ) released the alien
without notification to ICE.

b.   On June 19, 2017, an alien twice removed from the United States was booked into
the SCCJ, and ICE issued a detainer for the alien the same day.  This alien had
prior convictions for domestic violence and burglary, and Santa Clara County had
failed to honor six prior detainers against the alien.  On July 2, 2017, the alien was
again released from custody by SCCJ without notification to ICE.

c.   On October 30, 2017, the San Jose Police Department arrested a previously
removed alien on the charge of assault with a firearm.  The alien was booked into
the SCCJ, and ICE issued a detainer.  The next day, SCCJ released the alien
without notification to ICE.  This alien has prior convictions for possession of a
controlled substance and carrying a loaded firearm.

d.   On April 26, 2016, the Stockton Police Department arrested an alien on a charge
of lewd or lascivious act with a child under 14.  The alien was booked into San
Joaquin County Jail, and ICE issued an immigration detainer against the alien.
On February 21, 2017, the alien was convicted of the charge of lewd or lascivious
acts with a child under fourteen.  On an unknown date, the alien was released
without notification to ICE.

e.   On May 31, 2017, the Stockton Police Department arrested an alien on the charge
of unlawful sexual intercourse with a minor and booked him into the San Joaquin
County Jail.  The alien had previously been granted voluntary return to Mexico.
On the day of the arrest, ICE lodged a detainer.  On August 8, 2017, the alien was

convicted of unlawful sexual intercourse with a minor, and was subsequently released from custody without notification to ICE.

f.  On January 2, 2018, a detainer was placed on an alien while he was in custody at the Ventura County Jail based on an arrest for continuous sexual abuse of a minor. On or about January 2, 2018, the detainer was declined by Ventura County Jail and no notification was sent to ERO. The alien was released without notification to ERO.

g.  On February 6, 2018, an alien was booked into the Sacramento County Jail for the offenses of violation of probation, taking a vehicle without consent, and presenting false identification to peace officers. He was previously convicted on April 13, 2011 for taking a vehicle without consent, a felony, and was sentenced to 487 days jail on March 29, 2012, following multiple probation violations. ICE lodged a detainer against him. On February 14, 2018, ICE ERO was notified that the Sacramento County Jail would not honor ICE's detainer due to SB 54.

h.  On February 7, 2018, an alien was arrested for felony possession of a controlled substance while armed and booked into Santa Rita, Alameda County Jail. On February 8, 2018, ICE lodged a detainer with Alameda County. The alien has prior convictions, including a January 2006 conviction for possession of narcotics for sale, for which he was sentenced to 333 days in jail and 5 years of probation. On an unknown date following his arrest, the alien posted bond and was released from Santa Rita, Alameda County Jail without notification to ICE.

45. There have been egregious consequences to California's refusal to notify ICE of a criminal alien's release or transfer such aliens to ICE custody upon release, including the following:

a.  On September 1, 2017, ICE lodged a detainer with the San Francisco County Jail
    (SFCJ) for an alien detained on the charge of petty theft. The SFCJ released the
    alien without even providing ICE advance notification of release. After his
    release, on December 6, 2017, he was arrested for first degree murder, second
    degree robbery, and participating in a criminal gang.

b.  On August 2, 2017, the Santa Rosa Police Department arrested a previously
    removed alien on the charge of inflicting bodily injury on a spouse/cohabitant and
    booked him into the Sonoma County Jail (SCJ). On the same day, ICE lodged a
    detainer with the SCJ. SCJ released the alien from custody without providing ICE
    an opportunity to assume custody. Approximately two weeks after his release by
    SCJ, the alien was re-arrested for second degree murder and booked back into
    SCJ.

c.  On May 24, 2017, the San Francisco Police Department (SFPD) arrested an alien
    who illegally entered the United States in 2013, on charges of marijuana sales,
    conspiracy to commit crime, and possession of brass knuckles. The SFPD booked
    the alien into the SFCJ. The next day, ICE lodged a detainer. The SFCJ
    subsequently released the alien without notifying ICE. On September 11, 2017,
    SFPD arrested the same alien and booked him into the SFCJ on charges of second
    degree burglary, three counts of robbery in the first degree, conspiracy to commit
    crime, and accessory to commit a crime.

d.  On June 20, 2015, ICE lodged a detainer with the Buena Park Police Department
    on an alien following his arrest for driving under the influence. The alien had
    been removed from the United States on two prior occasions and had prior

24

criminal convictions for cruelty to a child, infliction of corporal injury on a spouse or cohabitant, damage to power lines, DUI, spousal battery, and violation of a protective order. The detainer was not honored, and the alien was released back into the community. On February 18, 2018, the alien was arrested for homicide after he struck and killed a six-year-old girl while driving under the influence and then tried to leave the scene.

46. Rather than promoting security, California's laws increase the risk to public safety by making it more likely that thousands of criminal aliens will be released into the community and reoffend. The laws also reduce efficiency of federal immigration enforcement efforts and expenditures and increase the risk to law enforcement officers by effectively requiring ICE to conduct at-large arrests.

*Impact on ICE Detention Operations – AB 103*

47. In addition to ICE's authority to identify and apprehend aliens for removal, Congress has authorized, and in some circumstances mandated, detention of aliens, placing particular emphasis on detention of criminal aliens, during removal proceedings and pending effectuation of a final order of removal. AB 103 prohibits state and local law enforcement agencies from entering into immigration detention contracts with the federal government if they did not have such a contract on June 15, 2017.

48. ICE is authorized to contract for detention services, and Congress appropriates funding for this purpose. Pursuant to the Competition in Contracting Act and the Federal Acquisition Regulation, ICE regularly awards contracts through negotiated procurements for detention space and detention services across the United States. ICE operates Service Processing Centers that are owned by the U.S. government, and contracts for support services at these

facilities. ICE also utilizes Contract Detention Facilities, which are owned and operated by private contractors for detaining aliens.

49. ICE also has specific statutory authority, 8 U.S.C. § 1103(a)(11)(A), to enter into Intergovernmental Service Agreements (IGSAs). Under this authority, ICE may enter into agreements with a state or its subdivisions, "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE] pursuant to Federal law . . . ." ICE relies on this authority for many detention contracts.

50. Finally, ICE also utilizes U.S. Marshals Service (USMS) Intergovernmental Agreements (IGAs) for detention bed space. The tradition of shared detention space between USMS prisoners, federally sentenced inmates, and immigration detainees is longstanding, dating back to the era of the former INS. The USMS enters into IGAs pursuant to 18 U.S.C. § 4013(a), and ICE is often an authorized agency user on these IGAs.

51. ICE has 20 active contracts, IGSAs, or IGAs in California and regularly uses 9 of those facilities, allowing ICE to access approximately 5,700 detention beds in California. These contractors employ approximately 1,903 Californians. Since FY 2013, ICE has spent $687,735,308 on detention beds in California. Average daily ICE detainee populations in California were 4,847 in FY 2016, 5,172 in FY 2017, and 5,209 so far in FY 2018.

52. The enactment of AB 103 has already prevented ICE from entering into new detention contracts and expanding the scope of existing detention contracts with county sheriffs. In addition to adversely impacting the local economy and preventing the creation of additional jobs in California, these laws limit ICE's ability to respond to the demand for detention capacity in California, including reopening any former facilities or contracting with new facilities if a need to accommodate a future surge of illegal immigration arises, and may

ultimately require that aliens apprehended in California be detained in other states, far from their family, friends, and legal representatives. This need to transport detainees across the country would also impose a great fiscal cost on taxpayers.

53. ICE's efforts to expand its detention capacity in Sutter, Solano, Placer, Shasta, Fresno, Stanislaus, and San Mateo counties, have been completely frustrated by the enactment of AB 103. ICE was informed by officials in those counties that they were prohibited from negotiating any new contracts with ICE to house detainees in their county facilities. Further, ICE's efforts to modify existing contracts with its current partners – Theo Lacy and James Musick Facilities in Orange County, West County Detention Center in Contra Costa County, Yuba County Jail, and Rio Cosumnes Correctional Center in Sacramento County – were likewise refused. Many of these declinations directly cited a willingness to expand, but the inability to do so under SB 54 or AB 103.

54. Section 12 of AB 103 requires the California Attorney General to review immigration detention facilities, including with regard to: (1) conditions of confinement; (2) "the standards of care and due process provided" to the detainees; and (3) the "circumstances around the immigrants' apprehension and transfer to the facility." It also purports to allow the California Attorney General "all necessary access for the observations necessary to effectuate reviews" including, "but not limited to, access to detainees, officials, personnel, and records." Prior to AB 103, California did not engage in such review.

55. ERO is already responsible for ensuring a safe and secure environment for aliens detained in its custody, including by monitoring contract facilities for compliance with applicable laws, regulations, policies, and ICE detention standards; and renovating or acquiring new facilities as necessary. ICE takes very seriously the health, safety, and welfare of individuals in its

custody. ICE's National Detention Standards 2000 and the Performance-Based National Detention Standards, dated 2008 and 2011, establish consistent conditions of confinement, program operations, and management expectations across the agency's detention system. These standards were designed with the unique nature of civil immigration detention in mind and were developed with input from agency employees, stakeholders, subject matter experts, and nongovernmental organizations. ICE has also established policy and procedures for the prevention of sexual abuse and assault of individuals in ICE custody. ICE is committed to operating facilities that provide effective medical and mental health services, access to legal services and religious opportunities, improved communication with detainees with limited English proficiency, timely resolution of complaints and grievances, and increased recreation and visitation.

56. All ICE facilities undergo robust inspections to ensure they meet applicable ICE detention standards. ICE uses a multi-pronged approach to oversee conditions in its facilities, including inspections by local field office compliance teams; contract performance reviews conducted on an ongoing basis by the Contracting Officers' Representatives who manage facility contracts; and annual inspections conducted by ICE ERO via a contractor. Additionally, ICE has Detention Service Managers stationed at facilities housing nearly 80% of its detained population, who conduct daily on-site compliance reviews to quickly identify and resolve issues that arise during facility operations.

57. Facilities are also subject to oversight by the ICE Office of Professional Responsibility's Office of Detention Oversight (ODO), which conducts inspections focused solely on compliance with ICE detention standards tied directly to detainee life, health, safety, civil rights, and civil liberties. These targeted inspections focus on local policies and practices

that may have long lasting and meaningful impacts on ICE detainees.  ODO inspection

teams consist of subject matter experts from the private and public sectors, many of whom

have 20-30 years of experience operating detention facilities.  ODO provides its findings to

ICE executive management and releases its final inspection reports publicly via ICE's

Freedom of Information Act (FOIA) reading room at https://www.ice.gov/foia/library.  ICE

detention facilities are also subject to compliance visits and investigations by the DHS

Office for Civil Rights and Civil Liberties and DHS Office of the Inspector General.

58. Representatives from the California Department of Justice, Office of the Attorney General

(OAG) inspected the James A. Musick facility and the Intake and Release Center of the

Orange County Jail on December 13, 2017 and the Theo Lacy facility on December 14,

2017.  These facilities are maintained and operated by OCSD.  ICE officials were notified

that the inspection was conducted pursuant to California Government Code section 12532,

as well as the Attorney General's authority under the California Constitution, article V,

section 13.  OCSD conducted the tours with local ICE management in attendance.  Prior to

the tour, Los Angeles ICE management objected to allowing the California OAG to conduct

detainee interviews and to the release of PII.  The OAG lead inspector noted the objection,

cited California law, and continued with the inspection.  OCSD staff permitted the OAG to

interview federal immigration detainees over ICE's objections.

59. Representatives from the California OAG have also inspected the West County Detention

Center in Contra Costa County, the Yuba County Jail, and the Rio Cosumnes Correctional

Center in Sacramento County.

60. These inspections have caused the facilities  to expend resources otherwise necessary for

ensuring the safety and security of the detainees.  Each inspection presents a burdensome

intrusion into facility operations and pulls scarce resources away from other sensitive law enforcement tasks.  These burdens are ongoing.

61. Moreover, as a federal agency subject to federal statutes, regulations, and policies on information disclosure, enforcement of AB 103's provisions allowing the California OAG to perform reviews of immigration detention facilities, including wide-ranging access to facilities, individuals, and records conflict with ICE's ability to comply with federal information disclosure laws, regulations, and policies.

62. Information obtained or developed as a result of the agreement with the detention facility are federal records under the control of ICE for purposes of disclosure and are subject to disclosure pursuant to applicable federal information laws, regulations, and policies.

63. In the first instance, AB 103 on its face allows the State of California to circumvent the provisions of the FOIA by providing for access to federal records outside the parameters of this statutory framework.  The FOIA has specific requirements as to how third parties must seek access to records and information maintained by federal agencies.  The FOIA also has specific exemptions that the federal government can apply to withhold certain types of information.

64. Notwithstanding the requirements of the FOIA, the broad allowances made by AB 103 for the California OAG to perform reviews of immigration detention facilities to include wide-ranging access to facilities, individuals, and records, if enforced by the state, will conflict with ICE's ability to comply with other federal information disclosure laws, regulations, and policies.  For example, ICE is unable to provide such wide-ranging access to detainees in person or access to detainee information as would be required by AB 103, absent consent from the individual.  For those individuals who are lawful permanent residents, ICE may

30

only release personal information pursuant to the federal Privacy Act. For other aliens, ICE

must comply with other DHS policies that generally prohibit the disclosure of information

about persons to third parties. Both the Privacy Act and the DHS Privacy Policy require that

there be a valid exception (one of which is consent) to release any information pertaining to

an individual.

65. In addition to compliance with the Privacy Act and DHS Privacy Policy, ICE is also

required to comply with several confidentiality statutes and regulations that prohibit

disclosure of information about persons who are applicants for or beneficiaries of certain

types of immigration statuses. For example, 8 U.S.C. § 1367 prohibits disclosure of *any*

information about an individual who is an applicant for or beneficiary of immigration

benefits under the Violence Against Women Act or a T or U visa applicant, unless one or

more specific statutory exceptions apply. The California OAG review under AB 103 would

not fall under one of the statutory exceptions. Thus, ICE would be prohibited by law from

disclosing any information about detainees that have these particular confidentiality

protections. This places the access to information and records provisions of AB 103 in

conflict with ICE's ability to comply with other federal information disclosure laws,

regulations, and policies.

66. Further, AB 103 contemplates allowing the California OAG broad access to the facilities,

records, and personnel in furtherance of their reviews. This access is in direct conflict with

the law enforcement privilege that ICE routinely asserts over such records pertaining to the

operations of ICE facilities. ICE routinely withholds such information in response to FOIA

requests, responses to third-party requests for information, and other public disclosures, as

law enforcement sensitive to the extent such records or access to information would disclose

details regarding facility operations (e.g., information such as how many guards are at the facility at any given time, shift changes, hours of guard duty, staffing and incident response plans, blueprints or layout of the facility).

67. Finally, section 12 of AB 103 provides that the California Attorney General will report to the State Legislature, Governor, and public on his findings. The law, as drafted, makes no allowance for the protection from disclosure of law enforcement sensitive information or statutorily protected information about individuals, or for any other information considered by the government to be privileged. This provision exacerbates the information-sharing issues mentioned above relating to individualized detainee access/information and access/information to law enforcement sensitive material or other privileged material. As written, not only will AB 103 place ICE in potential conflict with federal information law statutes, regulations, and policies, but if any of the above information was then released to the state legislature, Governor, and the public as part of the California OAG's findings, it may subject ICE to potential liability from individuals, and potentially subject ICE officers or facility personnel to operational risk or harm.

68. The imposition of burdensome new requirements on private contractors by AB 103, including reviews of detention conditions by the California OAG and the requirement that all facilities used to detain aliens for immigration purposes be subject to the California Public Records Act (CPRA), may also deter private contractors from working with ICE. For example, the Adelanto Detention Facility has already received an extensive request for records under the CPRA.

69. In addition, SB 29, a separate law, builds on AB 103 by extending the contracting prohibitions to apply to ICE contracts with private entities. SB 29 also requires all

immigration detention facilities in California to be subject to CPRA, rendering all of the private corporation's records subject to release.

*Impact on ICE National Security and Investigative Operations – SB 54*

70. In addition to their significant impact on ICE removal operations, California's laws encroach upon ICE's investigative authorities—adversely impacting ICE's national security and criminal investigation missions. SB 54 only permits local and state authorities to accept a judicial warrant that is based on probable cause for a violation of federal criminal immigration law before turning a removable alien over to ICE for processing under federal immigration law. Congress, however, provided authority to ICE officers and agents to arrest on administrative civil immigration warrants. ICE makes hundreds of thousands of civil immigration arrests each year. Requiring ICE to first seek out a federal judge would create operational difficulties and burdens for both ICE and the federal courts, significantly impeding ICE's ability to fulfill its Congressional charge to issue administrative warrants for the arrest of aliens believed to be removable. Requiring criminal immigration violations as a predicate to cooperating with ICE also prevents ICE from setting its own immigration enforcement priorities. And, SB 54 proceeds from a flawed assumption, as I am unaware of any authority for a federal court to issue a warrant for a civil immigration arrest under the INA.

71. Although SB 54 provides a carve-out to its limitations for participation in joint law enforcement task forces where "the primary purpose" of the task force is not "immigration enforcement," and other requirements are met, many jurisdictions have read this exception exceedingly narrowly. While HSI continues to contribute the second largest number of personnel to JTTFs nationwide, certain California law enforcement agencies now refuse to

share information directly with HSI and, rather, require that the request for such information come directly from the Federal Bureau of Investigation (FBI).

72. The lack of prompt information-sharing will impede HSI's counter-terrorism work on a day-to-day basis and could have a significant negative impact on national security in the event of a crisis when the need for such sharing is most critical. For example, following the December 2, 2015, terrorist attack in San Bernardino, California, information-sharing between the San Bernardino Police Department (SBPD) and HSI agents assigned to the local JTTF allowed for real-time sharing of essential DHS-held information, including immigration history, information from alien files, and international travel histories of several subjects of interest in the investigation. SBPD led the investigation in the first 72 hours post-attack, at which point the FBI declared the San Bernardino attack an international terrorism event and took lead of the investigation. Within the first 72 hours post-attack, the ease of information-sharing between ICE and SBPD resulted in the identification of accomplices and the discovery of a marriage fraud conspiracy among the accomplices. Today, if a similar terrorist attack were to occur within California, the SB 54 prohibitions on information-sharing between local law enforcement agencies and ICE could significantly delay a time-sensitive investigation, the identification of additional targets, and the ability for DHS to place lookouts in systems to prevent outbound travel via air carrier should a target attempt to flee the United States.

73. SB 54 has also limited ICE access to aliens who may assist in building criminal cases, thus interfering with ICE's ability to pursue the prosecution or removal of aliens who pose particularly significant threats to public safety or national security. Aliens unlawfully in the United States may have important information about criminals they encounter—from

transnational narco-terrorists to alien smugglers and beyond—and routinely support ICE's enforcement activities by serving as confidential informants (CIs) or witnesses. When ICE's witnesses or CIs are removable aliens, ICE can exercise its discretion to ensure the alien is able to remain in the United States to assist in an investigation, prosecution, or both.

74. In addition, lack of cooperation among California law enforcement agencies and ICE jeopardizes public safety, as well as the safety of our nation's law enforcement officers. For example, in May 2017, HSI San Jose notified the Santa Cruz County Sheriff's Office (SCCSO) of an impending child exploitation search warrant to be executed at a residence behind a local elementary school. In light of the possibility that HSI may encounter illegal aliens in executing the warrant, the SCCSO denied HSI San Jose's request for marked units to be parked outside the subject's residence, during the execution of the warrant, to ensure public and officer safety. As a result, HSI San Jose was forced to acquire assistance outside of the Santa Cruz County jurisdiction. Throughout FY 2017, similar denials of cooperation with HSI occurred in Los Angeles during an enforcement action against 18th Street gang members, and in Long Beach during a criminal narcotics investigation. The lack of cooperation and delays in enforcement action not only place the local community at risk, but also create an increasing risk to officer safety.

75. SB 54 has also had adverse implications for state criminal prosecutions. Federal law, 8 U.S.C. § 1182(d)(5)(A), authorizes DHS to parole into the United States aliens who are otherwise inadmissible for urgent humanitarian reasons or a significant public benefit. Pursuant to that authority as delegated within DHS, a federal, state or local law enforcement agency may request that HSI grant a "significant public benefit parole" (SPBP) to allow inadmissible aliens to enter the United States, for a brief period of time, if their limited

presence would be beneficial to enforcing public safety. This frequently occurs in the context of paroling into the United States criminal defendants or important witnesses needed for trial or investigations but who are otherwise inadmissible. Of note, such witnesses or defendants may be inadmissible due to a violent criminal history, or for having engaged in terrorist activity or human rights violations. Allowing a criminal defendant into the United States for prosecution may ensure that justice is done because one or more criminal investigations or prosecutions are successful. However, public safety demands that the paroled alien be monitored and removed from the country when the criminal proceedings, or sentence, is complete. To this end, law enforcement agencies requesting SPBP are required to adhere to HSI protocols with regard to requesting, vetting, supervising, and tracking individuals for whom HSI has granted a SPBP. In the interest of public safety, cooperation from the law enforcement agency that is granted a SPBP is necessary to allow ICE to ensure that the parolee is subsequently removed from the United States upon termination of the SPBP. SB54 makes it impossible for state and local law enforcement agencies to meet their obligation to return parolees to DHS custody, frustrating our ability to authorize them to come to the United States for prosecution.

76. While SPBP is a vital tool for furthering law enforcement in the United States, ICE takes into consideration the serious risks associated with SPBPs and the possibility that an otherwise inadmissible alien may permanently remain in the United States, for instance, if the state or local law enforcement agency fails to notify ICE that a defendant has been acquitted or released on bail by a state court judge overseeing the criminal case.

77. HSI has approved approximately 45 SPBP requests each of the past three FYs from California for state prosecutions. While the total number of SPBP requests granted annually

36

has remained constant since FY 2015, SB 54 interferes with the ability to grant SPBPs for the purpose of California criminal prosecutions. Specifically, the prohibitions on California law enforcement agencies to cooperate with ICE to ensure the transfer of custody of a parolee to ICE for removal at the conclusion of the SPBP period stand in the way of this important law enforcement and foreign policy tool.

78. In fact, HSI previously denied a California law enforcement agency's request for a parole to bring into the United States a Guatemalan native charged with multiple counts of child abuse because the requesting law enforcement agency could not confirm that it would notify ICE if the alien were released from state or local custody. In light of the recent enactment of SB 54, ICE must weigh the benefit of a potentially successful prosecution with the very likely risk that the relevant California law enforcement agencies cannot, due to SB 54, notify ICE of an impending release or transfer the alien to ICE custody for removal upon completion of criminal proceedings. The law's prohibition on advance notification of release or transfer of custody would result in the alien being released, without legal status in the United States or effective monitoring, among the public in California, and with the possibility of becoming a repeat criminal offender. Upon receipt of the January 5, 2018, parole denial, the offices of the county sheriff and prosecutor seeking the parole submitted a letter providing assurances, despite their apparent conflict with SB 54, that, should the alien be released from criminal custody, including due to a lack of probable cause finding, acquittal, or release on bail, the county would immediately notify ICE. On or about February 13, 2018, the letter was submitted to ICE with a new parole request. The new parole request was approved on or about February 20, 2018. On February 27, 2018, the alien was paroled into the United States to face the pending criminal charges.

79. The harms caused by SB 54's prohibitions on information sharing are compounded by AB 90, which, as discussed above, precludes ICE access to the CalGang database, hampering state and local criminal law enforcement efforts. Previously, ICE not only accessed the database, but also provided information for inclusion therein, including new or updated photographs of the subject showing the face, tattoos, scars, and style of dress; aliases; associates; change in gang membership (e.g., switching to a different gang, or dropping out of a gang); and information important to officer safety such as whether the individual is violent, uses controlled substances, or possesses a weapon. As ICE has now lost access to CalGang, it will no longer be able to search, update, or add subjects and their information. Consequently, AB 90 deprives state and local law enforcement agencies in California of information in ICE's possession that it once provided freely.

### *Impact on ICE Worksite Enforcement Operations – AB 450*

80. In a combination of criminal and civil interference, California has targeted ICE's ability to conduct investigations regarding unlawful employment. Unlawful employment is a magnet for illegal immigration. Accordingly, ICE is committed to combating violations of federal law by both employers and employees. AB 450 prohibits public and private employers from providing voluntary consent for ICE to enter any nonpublic area of a place of labor without a judicial warrant except where otherwise provided by federal law or to access to records other than Employment Eligibility Verification Form I-9 (Form I-9) documents. AB 450 also imposes requirements on employers to notify employees of information pertaining to a notice of inspection.

81. Section 274A(b) of the INA, 8 U.S.C. § 1324a(b), requires employers to verify the identity and employment eligibility of all individuals hired in the United States after November 6,

38

1986. An implementing regulation, 8 C.F.R. § 274a.2, designates the Form I-9 as the primary means of documenting this verification. Employers are required by law to maintain for inspection original Forms I-9 for all current employees. In the case of former employees, retention of Forms I-9 is required for a period of at least three years from the date of hire or for one year after the employee is no longer employed, whichever is longer.

82. ICE's worksite enforcement efforts are not only related to unlawful employment and document fraud. Employment violations can relate to numerous other areas of criminal activity including those that pose grave danger to American communities. Unlawful employment can increase the risk to, and vulnerabilities of, high-value target worksites, including chemical facilities, communications, critical manufacturing, dams, emergency services, government facilities, information technology, nuclear reactors and materials and waste and transportation systems. As such, ICE focuses its criminal investigations on the most egregious violators and concentrates its worksite inspection efforts on employers conducting business in these critical infrastructure and national security interest industries and sectors Further, ICE prioritizes employers who abuse and exploit their workers, aid in the smuggling or trafficking of their alien workforce into the United States, create false identity documents or facilitate document fraud, or create an entire business model using an unauthorized workforce. ICE also investigates employers who use force, threats, or coercion – such as threatening to have employees deported – to keep unauthorized alien workers from reporting substandard wages or unsafe working conditions.

83. The Form I-9 inspection process is an essential component of ICE's overall worksite enforcement efforts. The Notice of Inspection initiates the Form I-9 administrative inspection process. Employers are provided with at least three business days to produce the

Forms I-9. ICE conducted approximately 1,300 I-9 inspections in FY 2017 across the country, including approximately 230 in California. If conditions are appropriate, any of those I-9 inspections could lead to a worksite inspection with the consent of the employer, and employers are often very willing to provide consent in order to alleviate and address concerns that arise during the inspection process. AB 450 may directly interfere with this cooperative process.

84. While Section 2(a)(2) of AB 450 exempts I-9 Employment Eligibility Verification forms and other documents for which a Notice of Inspection has been provided to an employer, the overall language of the law may add confusion about what an employer is and is not permitted to do during a Form I-9 inspection. While service of the Notice of Inspection may not be impacted, the law may create confusion on behalf of an employer when HSI agents or auditors return to the place of business to retrieve the Forms I-9 and other supporting documentation. This documentation may be located in a non-public area of a business. However, under AB 450, an employer may violate the law if he or she permits HSI agents to enter into the private areas of the business to retrieve these documents. Preventing ICE officers or agents from entering a non-public area to have discussions with employers has negative consequences. The ability to communicate freely in private benefits both ICE and the employer, including when the PII of employees or other sensitive information is being discussion. In practice, the prohibition of ICE officers from entering a non-public area places the employer in an extremely difficult situation. Even employers complying with all laws and regulations related to the Forms I-9 may not want the public, including their customers or clients, to see ICE reviewing their records.

85.  During a Form I-9 inspection, HSI often has cause to serve additional notices upon an
employer, to include a Notice of Technical/Procedural Failures, Notice of Discrepancies,
Notice of Suspect Documents, Warning Notice and a Notice of Intent to Fine.  Service of
these documents usually occurs in person at the place of business, in an office or private area
to allow the employer some discretion and to permit HSI to answer any questions that the
employer may have.  AB 450 would prohibit HSI from entering the private areas for the
service of these additional documents.  HSI agents and auditors routinely conduct in-depth
interviews with business owners, managers and human resource personnel in connection
with a Form I-9 inspection, either during service of the Notice of Inspection or during a
follow-up interview at a previously arranged time.  These interviews often involve sensitive
discussions regarding particular employees, hiring practices, and information that may
contain PII.  AB 450 would prohibit an employer from admitting HSI agents/auditors into
non-public areas of a business to conduct this interview in a private setting.  This prohibition
could impede HSI from obtaining valuable evidence (e.g., statements from business owners,
employees and/or human resource managers) to be used in the prosecution of an employer
found to be committing egregious employment violations.  This prohibition may also
prevent HSI from obtaining sufficient information to determine the existence of aggravating
or mitigating factors used in the process of determining any civil monetary sanctions
contemplated against an employer in connection with a Form I-9 audit, as an employer may
be hesitant to cooperate with HSI agents for fear of being prosecuted under AB 450.

86.  In enforcing civil and criminal violations of federal law, consent can be a valuable tool,
especially when an investigation has not proceeded to the point where a judicial warrant is
available.  In warrantless situations, AB 450 would become problematic where an employer

41

wishes to grant consent to enter but cannot do so because of the civil penalties he or she would face due to AB 450. This impedes ICE's ability to conduct operations in a manner which would be permissible in any non-immigration-related civil or criminal investigation by any other federal agency. In many cases, consensual entry and encounters occur at the beginning of civil and criminal investigations with the information gleaned acting to further the investigation. Not being able to commence an investigation in this manner could be extremely detrimental to ICE's enforcement efforts, particularly in the realm of human smuggling and trafficking.

87. While the stated purpose of AB 450 is to protect employees, the practical effect of AB 450 will likely be that discussions that have historically been, and should be, conducted in private between ICE and the employer will now be conducted in a public area. This may cause the disclosure of an employee's PII, which is not in the employee's best interest and jeopardizes the employee's privacy.

88. AB 450 could also cause the workforce, authorized and unauthorized, undue panic and adversely affect ICE's worksite enforcement investigations. Employees whom ICE would identify for potential interview may now think when ICE comes to interview them that they are going to be arrested. This could lead to a violent confrontation, which would put the agent, the individual, and others in the vicinity at risk. Finally, AB 450 would also potentially prohibit employers from joining the ICE Mutual Agreement between Government and Employers (IMAGE) program. This voluntary program allows employers to partner with ICE to ensure the integrity and stability of their workforce. Partnership in the IMAGE program requires an employer to voluntarily submit to a Form I-9 audit, and requires close, repeated interaction between HSI agents and a business. By necessity, this

interaction would normally occur in a private area of a business and may include training on Form I-9 completion, use of the E-Verify system, and an analysis of an employer's hiring policies and practices.  Many issues discussed during the IMAGE process may involve sensitive personnel issues and may include PII of employees.  While entirely voluntary, the IMAGE program will be negatively impacted by AB 450.

89.  As illustrated by these examples, SB 54, AB 90, and AB 450 extend well beyond immigration-related enforcement to target national security operations and investigations regarding potential violations of federal law.  The combined effect of these laws is to impede the entirety of ICE's mission set, jeopardizing agency operations and public safety throughout the United States, not simply California.

*General Impact of Mosaic of Anti-Immigration Enforcement Legislation on ICE Operations*

90.  In addition to the concrete adverse effects on ICE's law enforcement operations, the attitudinal climate in California has fostered hostility towards ICE's congressionally authorized mission and obligations. For example, on February 24, 2018, Oakland County Mayor Libby Schaaf issued a press release warning of upcoming ICE immigration enforcement actions, noting that California state law prohibits federal agents from accessing employee-only areas of business and concluding that "immigrants and families [ ] deserve to live free from the constant threat of arrest and deportation." These irresponsible actions, explicitly premised in part on state law, serve only to impede federal law enforcement and place federal law enforcement officials at risk.

91.  Although not directly attributable to a specific California law, the mosaic of anti-immigration enforcement legislation enacted by California has created an atmosphere of defiance, which places the safety of ICE officers and employees at risk. The increase in the

43

number of assaults on ICE law enforcement officers and contract personnel is particularly

concerning. The number of such incidents increased from 15 in FY 2015 to 73 in FY 2017,

nationwide. As of January 10, 2018, there have already been 34 incidents. In California

alone, the incidents increased from 4 in FY 2015 to 17 in FY 2017, with 2 reported as of

January 10, 2018.

## *Conclusion*

92. California's efforts to put into place its own immigration law regime are frustrating ICE's

ability to identify, apprehend, detain, and remove criminal aliens from the United States and

hindering ICE's enforcement missions in other arenas, including national security, criminal

investigations and prosecutions, and worksite enforcement. In addition, California's

legislative obstructions to enforcement of federal law have jeopardized officer and public

safety by requiring unnecessary at-large arrests, limiting sharing of valuable law

enforcement information, and promoting a culture of hostility toward ICE's mission and

personnel. As long as these laws remain in effect, the safety of the people of California,

including ICE employees and contractors who reside in the state, is subject to unnecessary

and inappropriate risk.

93. The information in this declaration is current and accurate as of March 6, 2018.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct

to the best of my knowledge, information, and belief.


Executed in Washington, D.C. on this 2nd day of April, 2018.


Thomas D. Homan
Deputy Director and Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security