# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| United States of America,<br>  *Plaintiff,*<br><br>v.<br><br>State of California, *et al.*,<br>  *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:18-cv-490-JAM-KJN |

## AMENDED DECLARATION OF TODD HOFFMAN

I, Todd Hoffman, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1.   I am the Executive Director, Admissibility and Passenger Programs (APP), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP).  In this position, I oversee nine Director-level program offices: the Admissibility Review Office; Electronic System for Travel Authorization Program Management Office; Fraudulent Document Analysis Unit; Traveler Entry Programs; Immigration Advisory Programs; Traveler Policy; Enforcement Programs Division; Trusted Traveler Programs; and the Traveler Call Center. I have served in this position since 2015.  Prior to serving in this role, I was the Port Director at Los Angeles International Airport.

2.   As Executive Director of APP, I am responsible for overseeing and coordinating all OFO programs related to the admission and processing of international visitors and travelers to the United States.

1

3.    CBP, a component of the Department of Homeland Security (DHS), is responsible for safeguarding the United States from dangerous people and materials, while facilitating legitimate trade and travel.  OFO, as the primary law enforcement agency responsible for securing the U.S. border at ports of entry (POEs), plays a critical role in executing CBP's mission.  In fiscal year 2017, for example, CBP (to include OFO and the United States Border Patrol) arrested 28,768 individuals with criminal convictions or who were wanted by law enforcement; and seized over 65,000 pounds of cocaine, over 4,000 pounds of heroin, over 1.1 million pounds of marijuana, over 45,000 pounds of methamphetamine, and over 1,000 pounds of fentanyl.  Specifically, OFO seized almost 450,000 pounds of narcotics (including cocaine, heroin, marijuana, methamphetamine, and fentanyl) at the POEs, and arrested more than 17,000 individuals with criminal convictions or active warrants.  In addition, on a typical day in fiscal year 2017, CBP seized 5,863 pounds of narcotics, seized $265,205 in undeclared currency, arrested 21 wanted criminals at POEs, and identified 1,607 individuals of suspected national security concern.

4.    At the POEs, CBP officers ensure that persons and merchandise seeking to enter the United States comply with all U.S. laws, including immigration, customs, and agriculture laws, as well as laws enforced on behalf of other federal agencies.  In addition, CBP officers inspect incoming cargo on a daily basis to ensure that it complies with all appropriate agricultural laws, trade laws (including intellectual property protections and the appropriate payment of duties), and other requirements.  CBP officers are thus the first line of protection at the POEs against people and goods that seek to do America harm – be that harm physical or economic.

5.  At POEs, all travelers, as well as their luggage and personal effects, arriving in the United States are subject to inspection, to determine admissibility under the immigration laws (for non-citizens), and to determine whether the traveler and his or her luggage or personal effects are in compliance with other requirements such as customs and agricultural laws.

6.  During an immigration inspection, a CBP officer may, in the course of determining whether the alien may be admitted, examine information in appropriate databases. Those systems may indicate that the alien has an outstanding warrant(s). If so, the officer may pause the inspection through a process known as deferred inspection. In other words, the CBP officer has not yet finished determining whether the alien may be lawfully permitted to enter in a process known as being "admitted." In these situations, the alien may physically leave the POE (and may be transferred to the custody of the arresting law enforcement agency), but must return to OFO to complete his or her immigration inspection for a final determination of admissibility. In other situations, OFO may complete the inspection of a particular alien, determine that the alien is inadmissible to the United States, but parole the alien into the custody of a requesting state law enforcement agency for appropriate court proceedings.

7.  In the situations described above, CBP officers may issue a detainer for that alien, to request that the receiving law enforcement agency return the alien to the custody of CBP at the end of any court proceedings. This permits OFO to complete any outstanding immigration processing, if needed, and, where appropriate, place the individual in removal proceedings. Aliens arriving in the United States who are found inadmissible at POEs are all subject to mandatory detention, although final detention decisions are made by U.S. Immigration and Customs Enforcement (ICE).

*Existing Cooperation with State and Local Partners in California*

8.  At POEs across the country, OFO works closely with its federal, state, and local partners. Much of this cooperation comes, as described above, in the form of ensuring that individuals with active criminal warrants (which can include U.S. citizens) are transferred to the appropriate law enforcement agency. Such cooperation is particularly important in California, which is home to the largest land POE in the western hemisphere (San Ysidro), as well as the second and fourth largest airports in the country (Los Angeles International and San Francisco International, respectively), as determined by the number of international passengers boarded.

9.  In 2017, the San Diego, Los Angeles, and San Francisco Field Offices turned over more than 2,300 individuals (both citizens and aliens) with active warrants to other law enforcement entities. This number includes approximately 170 aliens who were turned over from the POEs in and around San Diego.

10. Cooperation with state and local partners is not limited to the transfer of criminal aliens. For example, CBP has an agreement with Fresno County near San Francisco, whereby the county jail provides services related to custody for certain arriving aliens who are subject to removal during the short period of time that these aliens remain in CBP custody. In addition, CBP often works with local universities and schools and employers in the San Diego, San Francisco, and Los Angeles areas to verify that any aliens traveling to the United States with visas to attend these universities or schools or work at these employers are actual bona fide students or employees associated with these entities. In general, OFO has enjoyed a good working relationship with many of these schools and universities, as this cooperation benefits the schools by ensuring that they maintain their existing SEVIS

4

accreditation, and ensures that local schools and universities and employers can be certain that all individuals whom the entities wish to bring to the United States are lawfully traveling to this country.

11.  CBP also relies heavily on its state and local partners to provide vital assistance in the execution of other aspects of CBP's mission.  Such collaboration often takes the form of participation in task forces with state and local law enforcement partners, usually for purposes of investigating state, local, or federal criminal laws.  The full cooperation of state and local partners is critical for the success of these task forces.  For example, OFO in California works extensively with state and local partners on the Joint Terrorism Task Force (JTTF); the Border Enforcement Security Team, which investigates a wide range of criminal activity with a nexus to the border; DHS-led Maritime Task Forces in the San Diego, Los Angeles, and San Francisco areas; the Joint Regional Intelligence Center, a fusion center focused on preventing terrorist attacks in the Los Angeles area; and the Los Angeles Airport Criminal Enterprise Task Force.

12.  Even outside of such formal collaboration, CBP cooperates with its state and local partners. For example, state and local law enforcement are often the first to respond to a significant incident, such as an interdiction of narcotics, and thus can provide important, time-sensitive information to help CBP interdict contraband.  This is particularly true in areas in which CBP does not have a large presence, such as the northern California coastline.  This is an area where small vessels, often operated by aliens without lawful status in the United States, often land and unload illegal narcotics into the United States.  Local law enforcement officers are often the first to respond to these arrivals, and alert CBP of the incident.  Due to CBP's limited presence in this area, it may take some time for CBP

officers to respond.  Thus, local law enforcement officers play a vital role in holding both
the perpetrators and the narcotics until CBP officers can arrive.

*SB 54*

13.   I understand that California recently passed a law, known as Senate Bill No. 54 ("SB 54"),
which limits the authority of law enforcement officials in that state to cooperate with
federal immigration authorities.  Specifically, I understand that, pursuant to this law,
California law enforcement agencies are not required to cooperate with both CBP and ICE,
and are specifically prohibited from, among other things, (1) inquiring into an individual's
immigration status; (2) detaining or holding an individual on the basis of a DHS detainer;
(3) providing information about an individual's date of release from criminal custody or
responding to any request for notification from DHS, except in certain limited
circumstances (in which case a response is always discretionary); (4) providing any
personal information about an individual to DHS; or (5) making, or assisting in, an arrest
based on an immigration warrant.  California law enforcement officials are also prohibited
from transferring any individual to DHS unless a judge, as opposed to an immigration
officer, has issued a warrant or otherwise found probable cause.

14.   The restrictions and limitations in this state law threaten to severely impact, and indeed
already have had an impact on, OFO's ability to execute its mission.  Most fundamentally,
this bill has the potential to severely impact OFO's ability to turn aliens with criminal
warrants over to the state of California or any of its subdivisions.  While this problem did
arise in some jurisdictions prior the passage of SB-54, the explicit restrictions on
information sharing contained in the bill threaten to make this problem more pronounced in
the future.  Specifically, the bill prohibits any state law enforcement official from holding

6

an alien pursuant to a DHS detainer and notifying OFO of an alien's release or transferring of an alien back to OFO, absent a judicial warrant.  In reality, what this means is that law enforcement entities in the state of California are prohibited from notifying CBP of an alien's release or transferring that individual back to CBP's custody, even aliens who have been convicted of a crime, so that OFO can regain custody and effectuate removal. Therefore, under the strictures of this bill, if OFO paroles an alien into the custody of a law enforcement agency in California for criminal prosecution, the state law actively inhibits the type of cooperation necessary for OFO to regain custody, including simply gaining information about the alien's release date.  Thus, the state or local law enforcement entity will likely actually release the individual at the end of the criminal process, rather than returning the alien to OFO custody.

15. For example, in several recent situations in which I am aware (some dating back to before the passage of SB 54), OFO placed a detainer on an alien with an active criminal warrant from the state, paroled the alien into the custody of a local California law enforcement agency, attempted to coordinate with the law enforcement entity, but learned, from publicly available information, that the alien was released from the custody of the local law enforcement agency, rather than turned back over to OFO for removal.  OFO was not informed of the aliens' release dates, and, in fact, in some situations, learned that the aliens had been released when the aliens arrived at the Los Angeles Deferred Inspections Office. Similarly, in two instances in January 2018 of which I am aware, the San Diego Field Office arrested inadmissible aliens, and turned the aliens over to the U.S. Marshals Service, for eventual prosecution for illegal entry/reentry, pursuant to 8 U.S.C. §§ 1325/1326. Because the U.S. Marshals Service itself contracts with state and private detention

facilities, the aliens were detained in the Imperial County Jail pending their prosecution. After the aliens completed prosecution, the Imperial County Jail released the aliens without notifying OFO of their release date.  OFO was only able to take these aliens back into custody and remove them after an anonymous phone caller from the jail informed OFO that the aliens would be released, prompting CBP officers to arrive at the parking lot of the jail and arrest the aliens upon their release.  While some of these incidents occurred before the passage of SB 54, the additional restrictions on transfer contained in SB 54 make it more likely that this situation will continue to occur.  Without knowing the date on which a paroled alien is to be released from state or local custody, CBP officers have no way of knowing when to arrive at the jail to take the alien back into custody for appropriate immigration action.  Similarly, without receiving a paroled alien back in OFO custody for appropriate immigration action, CBP officers normally have no way of removing such an alien, who may have been convicted of a crime.  Even if information is provided to allow OFO to know that an alien may be released, contrary to SB 54's restrictions, the only way to effectuate a removal is to arrest such an alien upon their release, which may require CBP officers to conduct an arrest in a public place, putting the safety of the officers at risk and taking OFO resources away from the agency's primary mission of protecting the border.

16.    Therefore, SB 54's restrictions on information sharing virtually ensure that OFO either will not be able to remove individuals who has been convicted of a crime – even though these individuals potentially pose a danger to public safety– or must put officer safety at risk in order to do so. This impact is particularly egregious in the OFO context, where the alien normally would have been subject to mandatory detention or immediate removal from the port of entry.  OFO generally transfers custody of an individual on the assumption that the

state or local law enforcement agency will exchange relevant information with OFO and, eventually, return the individual to CBP for such mandatory detention and eventual removal. The restrictions on information sharing contained in SB 54 make it unlikely that OFO will receive relevant information and will therefore be able to effectuate the requirements of the law related to detention and removal.

17. Thus, in order to put CBP's mission of protecting the homeland at the forefront, it has become necessary for OFO, in certain situations, to limit the transfer of aliens to localities in California for prosecution. There have been instances when OFO in Los Angeles, for example, has not turned over aliens over to a state or local law enforcement agency if the state or local agency indicates that it will not honor a detainer, and simply processes the alien for removal.

18. Similarly, as described above, CBP relies heavily on local law enforcement in northern California to interdict small vessels carrying dangerous narcotics. Under SB 54, however, the apprehending local law enforcement officers are prohibited from inquiring into the immigration status of the operators of these boats. Law enforcement officers are also prohibited from turning any of these aliens who are not lawfully present over to CBP, absent a judicial warrant. Thus, the operators of these vessels – who attempt to introduce illegal and dangerous narcotics into the United States – are unlikely to be subject to removal from the United States, and so will be able to continue to bring drugs into the country.

19. Given the wide restrictions on information sharing contained in SB 54, it is also possible that state and local partners may decrease their participation in some of the task forces described above, specifically those that may implicate immigration enforcement.

Specifically, I understand that the Los Angeles Police Department (LAPD) currently prohibits its officers from engaging in any task force in which the primary purpose is to enforce civil immigration laws. However, the LAPD does permit its officers to participate in a CBP or ICE task force if the purpose of the task force is to investigate criminal laws. Given the sweeping prohibitions on information-sharing presented by SB 54, however, there is a very real concern that this law will have a chilling effect on existing relationships with state and local partners, such as the LAPD and the San Francisco Police Department, with the potential to negatively impact the work of the task forces that investigate non-immigration related offenses and criminal organizations.

20.   Lastly, given CBP's broad operations at both airports and seaports, it is possible that SB 54 may impact some of OFO's non-immigration functions, as well. CBP vets all airline employees seeking access to the most security sensitive areas of an airport, including the aircraft, cargo, and passenger areas, for all international flights. Permission to enter these areas is provided in a form known colloquially as a "seal." I am concerned that the overarching impact of the law may be that SB 54's restriction on information sharing could impact this process as well. That could have a detrimental impact on the overall safety and security of the airports.

21.   In summary, SB 54 threatens to severely impact, and has already had a significant impact on, OFO's ability to successfully execute its mission at ports of entry in California. Such impacts have far ranging consequences, given the number and size of the ports of entry in California, and the amount of individuals and merchandise that pass through these ports every day. The ripple effects to public safety and to the orderly enforcement of the law will be felt throughout the nation.

22.   I declare that the foregoing is true and correct to the best of my knowledge, information,

and belief.

Executed this _____ day of April, 2018.

Todd Hoffman
Executive Director
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection