Julie B. Axelrod
California Bar No. 250165
Christopher J. Hajec
Mark S. Venezia
Immigration Reform Law Institute
25 Massachusetts Ave, Suite 335
Washington, DC 20001
(202) 232-5590 (Tel)
(202) 464-3590 (Fax)
jaxelrod@irli.org
chajec@irli.org
mvenezia@irli.org

Counsel for Prospective *Amici Curiae* National Sheriffs' Association, Advocates for Victims of Illegal Alien Crime, and Fight Sanctuary State

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff,* <br><br>     v. <br><br><br><br> STATE OF CALIFORNIA, *et al.,* <br>     *Defendants.* <br> ——————————————— | **No. 2:18-cv-00490-JAM-KJN** <br><br> **AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF** <br><br> Judge: Hon. John A. Mendez <br><br> NO HEARING NOTICED |

## SUMMARY OF THE ARGUMENT

In numerous ways, provisions of California law challenged in this action violate both the U.S. Constitution and federal statutory law.

First, by requiring Immigration and Customs Enforcement ("ICE") agents to obtain a warrant to enter employers' nonpublic areas, California's Assembly Bill 450 ("AB 450") intentionally frustrates the congressional purpose that immigration laws be enforced, and thus violates the Supremacy Clause of the Constitution.  Senate Bill 54 ("SB 54") does the same in provisions that both prohibit the sharing of release dates of aliens, and their personal information, with ICE, and forbid transfers of custody of aliens to ICE.  These provisions of SB 54 also frustrate the central congressional purpose of fostering cooperation between state or local and federal officials in the enforcement of immigration law.  In these provisions, SB 54 also violates the Supremacy Clause quite directly, by mandating interference with federal immigration officers in the performance of their duty—even to the point of creating the potential for armed confrontation between local and federal officers.

None of these challenged provisions is within the powers reserved to the states in the Tenth Amendment.  The power to impede, much less directly interfere with, the enforcement of federal law obviously is not so included; moreover, many of these provisions involve information sharing, an area in which federal requirements on states have never been held by the Supreme Court to constitute commandeering.

In addition, the purpose and effect of SB 54 is to release back on the streets of California categories of aliens that federal law requires to be placed in removal proceedings.  By thus enacting its own policy preferences, at variance with federal policy, about which aliens should remain in the United States, California usurps the exclusive federal authority over foreign policy.

Finally, the challenged provisions impact rights or interests of third parties that the federal government has standing to assert:  SB 54 compels cities to commit harboring, in

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

violation of federal statutory law, and AB 450 violates the First Amendment right of employers to petition the government for the redress of grievances by influencing law enforcement.

## ARGUMENT

I.  **BECAUSE THE CHALLENGED PROVISIONS INTENTIONALLY STAND AS OBSTACLES TO CONGRESSIONAL PURPOSES BEHIND IMMIGRATION LAW, AND DIRECTLY INTERFERE WITH FEDERAL ENFORCEMENT OF IMMIGRATION LAW, THEY VIOLATE THE SUPREMACY CLAUSE.**

Both AB 450 and SB 54 were enacted to "counterbalance" federal immigration enforcement efforts in California. Hearing on SB 54 before the Senate Standing Comm. on Public Safety (Jan. 31, 2017) (statement of Sen. Scott Wiener); California Committee on the Judiciary Report (Assembly), Apr. 22, 2017, at 1; Committee on the Judiciary Report (Senate), July 10, 2017, at 1. The challenged provisions of these laws go far in fulfilling that purpose, and in frustrating congressional ones. For this reason, they are preempted by the Immigration and Nationality Act ("INA").

SB 54 prohibits state and local law enforcement from "[p]roviding information regarding a person's release date or responding to requests for notification by providing release dates or other information" to immigration authorities, unless that information is already publicly available or the individual has been convicted of certain enumerated crimes. Cal. Gov't Code §§ 7284.6(a)(1)(C), 7282.5(a). SB 54 further prohibits state and local law enforcement from providing "personal information" about aliens, such as a work or home address, to federal immigration authorities, unless such information is already publicly available. Cal. Gov't Code § 7284.6(a)(1)(D). Also, under SB 54, state and local law enforcement may "[t]ransfer an individual to immigration authorities" only if the United States presents a "judicial warrant or judicial probable cause determination" or if the individual has been convicted of certain enumerated crimes. Cal. Gov't Code §§ 7284.6(a)(4), 7282.5(a). And, for its part, § 1 of AB 450, which added § 7285.1(a) to the Government Code, provides that "except as otherwise required by federal law, an employer [or agent thereof] shall not provide voluntary consent to an

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

immigration enforcement agent to enter any nonpublic areas of a place of labor . . . [unless] the immigration enforcement agent provides a judicial warrant." Cal. Gov't Code § 7285.1(a).

By standing as obstacles to the accomplishment of congressional purposes behind the INA, and by commanding that local officials impede or interfere with federal officers in the pursuance of their official business—namely, the enforcement of federal immigration law—these provisions violate the Supremacy Clause.

A.      *The challenged provisions stand as obstacles to the purposes of Congress.*

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress has the power to preempt state and local laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Lozano v. City of Hazleton*, 724 F.3d 297, 302 (3d Cir. 2013) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Conflict preemption can occur in one of two ways: where "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Lozano*, 724 F.3d at 303 (citing *Arizona*, 567 U.S. at 399) (internal quotation marks and citations omitted). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), *quoted in Hines v. Davidowitz*, 312 U.S. 52, 67 n.20 (1941). The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly.  As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system.  The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals.  Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s).  The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, the challenged provisions frustrate the INA in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement.  As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.  For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRAIRA"), which includes 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens.  The Senate Judiciary Committee Report accompanying IIRAIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government.  The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), *quoted in City of New York*, 179 F.3d at 32-33.  Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and federal law enforcement to enforce immigration law.

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRAIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of this law, now 8 U.S.C. § 1644, is nearly identical to § 1373. This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRAIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing Section 434: to bar *any* restriction on local police in their communications with ICE. The scope includes the *whereabouts* of illegal aliens, which obviously includes notice of their release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or *the presence, whereabouts, or activities of illegal aliens*. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.
> The conferees intend to give State and local officials the authority to communicate with the INS regarding *the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS.* The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that *illegal aliens do not have the right to remain in the United States undetected and unapprehended.*

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.) , *quoted in City of New York*, 179 F.3d at 32 (emphases added).

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities]

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

All of the challenged provisions frustrate, and are intended to frustrate, federal enforcement of immigration law. AB 540 forbids employers to give voluntary consent to ICE to enter nonpublic areas of their premises without a judicial warrant, and thus increases the difficulty of ICE's mission by forcing it to obtain a warrant every time it wishes to enter such premises. And SB 54, by design, keeps ICE in the dark about aliens' release dates and home and work addresses, sharply increasing the difficulty ICE has in locating removable aliens and taking them into custody. Furthermore, because SB 54, by its terms, mandates noncooperation with federal enforcement of immigration laws, it thwarts the congressional purpose of fostering such cooperation. By thus standing as obstacles to central purposes of the INA, the challenged provisions of both AB 450 and SB 54 violate the Supremacy Clause.

B.   *SB 54 mandates interference with federal officers in the performance of their duties.*

Under SB 54, in many cases, if a federal immigration officers asks when an alien in local custody will be released, or that alien's home or work address, local officials may not tell him. In many cases, if a federal immigration officer seeks to assume custody of an alien from local officials, local officials may not transfer custody to him. By thus forbidding the transfer of custody and refusing to provide information very germane to the federal enforcement mission, SB 54 patently interferes with federal officers in their enforcement of federal immigration law, and was designed to do just that.

Such interference violates the Supremacy Clause at a very basic level; the supremacy of federal law would be meaningless if states could block its enforcement within their territories. Especially egregious is the ban on transferring custody, as if the federal government were a

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

hostile foreign power.  One wonders if local officials would feel compelled to attempt to prevent such transfers by force, or to arrest federal officers who attempted to assume custody.  Such a shocking course would, of course, violate the Supremacy Clause, as the Supreme Court decided well over a century ago in a case in which California arrested a federal marshal for an act in the performance of his duty to protect a U.S. Supreme Court justice:

> "If, when thus acting, and within the scope of their authority, [federal] officers can be arrested and brought to trial in a state court, for an alleged offence against the law of the State, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection—if their protection must be left to the action of the state court—the operations of the general government may at any time be arrested at the will of one of its members.  *The legislation of a State may be unfriendly.  It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws.  It may deny the authority conferred by those laws.  The state court may administer not only the laws of the State, but equally federal law, in such a manner as to paralyze the operations of the government.*  And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, *and the exercise of acknowledged federal power arrested.*  We do not think such an element of weakness is to be found in the Constitution.  The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States.  While it is limited in the number of its powers, so far as its sovereignty extends it is supreme.  No state government can exclude it from the exercise of any authority conferred upon it by the Constitution; *obstruct its authorized officers against its will; or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it.*"

*In re Neagle*, 135 U.S. 1, 61-62 (1890) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)) (emphases added).  *See generally* Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J. 2195, 2236-37 (2003) (discussing *Neagle*).

But if, under the Supremacy Clause, local officials may not use force or legal process to block federal officers from performing their federal law enforcement duties by assuming custody of removable aliens, California has no legitimate authority, under that clause, to forbid local officials to transfer custody to them.  In this very basic way, SB 54 violates the Supremacy Clause.

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## II.   AUTHORITY TO ENACT THE CHALLENGED PROVISIONS IS NOT AMONG THE POWERS RESERVED TO THE STATES IN THE TENTH AMENDMENT.

It is not as though California were within its rights, under the Tenth Amendment, to deny its cooperation in the ways it has.  The seminal cases delimiting states' Tenth Amendment rights are *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997).  In *New York*, the Court took up a statute that required states to enact legislation to take possession and dispose of nuclear waste produced in their state.  In *Printz*, the Court considered the Brady Act, which required state employees to do background checks of firearm purchasers. The Court ruled that both of these two kinds of federal imperatives constituted commandeering in violation of the Tenth Amendment.  *New York*, 505 U.S. at 158; *Printz*, 521 U.S. at 935.

Obviously, California has no power reserved under the Tenth Amendment to frustrate or directly interfere with the enforcement of federal law.  Relevantly here, moreover, the Supreme Court has carved out a safe harbor for federal law controlling state activity when such law regulates information flow in or affecting a domain of federal authority.  In this realm, the Court has ruled favorably for federal law both mandating state actions and prohibiting state actions.

In *Reno v. Condon*, 528 U.S. 141 (2000), the Court considered a suit by the State of South Carolina enjoining enforcement of the Driver's Privacy Protection Act of 1994 ("the DPPA"), 18 U.S.C. §§ 2721-25.  The DPPA forbade state department of motor vehicles personnel from disclosing the personal information of drivers for most purposes, though in some circumstances it mandated such disclosure.  18 U.S.C. § 2721.  In a unanimous decision, the Court held that the DPPA was consistent with the federalism required by the Tenth Amendment, despite the heavy resource expenditure states needed to make to enforce the Act, and even states' need to pass laws to comply with it.  *Condon*, 528 U.S. at 150-151.

The Court distinguished the federal legislation in *Condon* from that in *Printz* and *New York*.  The statute in *Condon* regulated state activities, and the legislation required and man hours employed were a byproduct.  *Condon*, 528 U.S. at 150-151.  By contrast, the statute in *Printz* directly required state employers to fulfill a federal law enforcement function, and the statute in

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

*New York* directly commanded state legislative initiatives and expenditures to dispose of property (waste).  As the Court held:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of databases.  It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals.  We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in *New York* and *Printz*.

*Id.* at 151.

In affirming the validity of the DPPA, the Court noted that the statute *requires* the disclosure of certain information:

> The DPPA's prohibition of nonconsensual disclosures is also subject to a number of statutory exceptions.  For example, the DPPA requires disclosure of personal information for use in connection with matters of motor vehicle or driver safety and theft, to carry out the purposes of [federal statutes].

*Id.* at 145 (internal quotation marks and ellipses omitted).  The Court explained: "'That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.'"  *Id.* at 150-51 (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)).  *Cf. Arizona*, 567 U.S. at 412-13 (holding that an Arizona law making verification of immigration status by local officials mandatory was not preempted by federal immigration law because 8 U.S.C. § 1644 (a provision with wording almost identical to that of § 1373), the constitutionality of which the Court did not question, encouraged the sharing of such information).

Accordingly, insofar as the challenged provisions of SB 54 mandate the withholding of information relevant to the enforcement of immigration law from federal authorities, they are not within powers reserved to California under the Tenth Amendment.  *See also City of New York*, 179 F.3d at 33-35 (distinguishing *New York* and *Printz* and rejecting a Tenth Amendment challenge to § 1373).

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### III.   SB 54 URSURPS THE FEDERAL GOVERNMENT'S EXCLUSIVE AUTHORITY OVER FOREIGN RELATIONS.

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394 (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)).  This power derives not only from the federal government's constitutional authority to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, but from its inherent, sovereign power to conduct relations with foreign nations.  *Arizona*, 567 U.S. at 394-395 (citing *Toll*, 458 U.S. at 10 (citing *United States v. Curtis-Wright Export Corp.*, 299 U.S. 304, 318 (1936)).  Thus, the power to set immigration policy is a component of the federal government's foreign relations authority.  *Arizona,* 567 U.S. at 395.  "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."  *Id.*; *see also Hines*, 312 U.S. at 68 ("[alien registration] legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority.").

"No State can rewrite our foreign policy to conform to its own domestic policies." *United States v. Pink*, 315 U.S. 203, 233 (1942).  As is crucial here, decisions regarding the removal process "touch on foreign relations and must be made with one voice."  *Arizona*, 567 U.S. at 409; *see Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-484 (1999); *Jama* v. *Immigration and Customs Enf't*, 543 U.S. 335, 348 (2005) ("Removal decisions . . . may implicate [the Nation's] relations with foreign powers . . . ." (internal quotation marks omitted)); *Galvan* v. *Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."); *Harisiades v. Shaughnessy,* 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . .").  A decision on removability involves a determination of whether it is

appropriate to allow a foreign national to continue living in the United States. *Arizona*, 567 U.S. at 409.

By restricting cooperation and communication with ICE concerning some categories of aliens but not others, the State of California, in SB 54, has enacted its own policy preferences about which foreign nationals should stay within the nation's borders and which should be removed. Thus, for example, when California restricts certain types of cooperation to a subset of aliens convicted of crimes listed in Cal. Gov't Code § 7282.5(a), the state creates its own categories of immigration enforcement, and enacts its own removal priorities, at variance with federal ones. Such state policies "violate[] the principle that the removal process is entrusted to the discretion of the federal government" and "must be made with one voice." *Arizona*, 567 U.S. at 409.

The federal government already has its own removal priorities, which include certain categories of inadmissible and deportable aliens outlined by Congress, and no longer exempts any class or category of removable aliens from potential enforcement. *See* Memorandum from John Kelly, Sec'y of Homeland Sec. to Kevin McAleenan, Acting Comm'r of U.S. Customs and Border Patrol et al. on Enf't of the Immigration Laws to Serve the Nat'l Interest (Feb. 20, 2017). Thus, the federal government already has its own voice when it comes to which categories of aliens should depart from the United States, and it differs markedly from California's. Because, in both intent and effect, California has taken removal policy out of the hands of the federal government and into its own, this Court should find that SB 54 is an invalid usurpation of the national government's exclusive authority over foreign affairs.

## IV.   THE CHALLENGED PROVISIONS INFRINGE RIGHTS AND INTERESTS OF THIRD PARTIES THAT PLAINTIFF HAS STANDING TO ASSERT.

In this case, the United States has standing to assert the right and interests of third parties with which its activities are inextricably connected. *See Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976) (holding that third-party standing is present when the third party's interests are "inextricably bound up with the activity the litigant wishes to pursue"), *cited in Washington v.*

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

*Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017).  Here, the United States wishes to pursue

immigration enforcement with the cooperation of local jurisdictions, and also employers, in

California, and its activities in that regard necessarily involve the rights and interests of those

parties.  It therefore has standing to vindicate those rights and interests.

These rights and interests are infringed by the challenged provisions.  SB 54 compels

local jurisdictions to commit harboring in violation of federal law, and AB 450 violates

employers' right to petition protected in the First Amendment.

A.    *SB 54 compels local law enforcement to violate federal law by concealing,
      harboring, or shielding illegal aliens.*

What are generally referred to as the "anti-harboring" provisions of the INA—located at

Title II, Chapter 8, § 274 and codified at 8 U.S.C. § 1324—read in pertinent part:

**Bringing in and Harboring Certain Aliens**
**(a) Criminal penalties.—**
(1) (A) Any person who—
(iii)  knowing or in reckless disregard of the fact that an alien has come to, entered,
or remains in the United States in violation of law, conceals, harbors, or shields
from detection, or attempts to conceal, harbor, or shield from detection, such alien
in any place, including any building or any means of transportation; . . .
(v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids
or abets the commission of any of the preceding acts, shall be punished as provided
in subparagraph (B).
(B) A person who violates subparagraph (A) shall, for each alien in respect to whom
such a violation occurs—
(ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined
under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization."  8

U.S.C. § 1101(b)(3).  "The term 'organization' means, but is not limited to, an organization,

corporation, company, partnership, association, trust, foundation or fund; and includes a group

of persons, whether or not incorporated, permanently or temporarily associated together with

joint action on any subject or subjects."  8 U.S.C. § 1101(a)(28).  Thus, § 1324 applies to

municipal corporations and unincorporated areas alike, which, under the INA's sweeping

definition, are organizations, and thus persons.

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN
SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

By preventing state and local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, SB 54 compels local law enforcement to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii).  For example, when ICE requests the release date of an illegal alien from a local jail, and local authorities refuse to give that information to it, the local authorities are thereafter, at any given moment during the remainder of the alien's confinement, concealing from ICE whether the alien is inside or outside of the jail, and thus "conceal[ing]" the alien's presence "in . . . a[] building."  More drastically, if ICE agents arrive at or enter a local jail to assume custody of an illegal alien, and local authorities either refuse them entry or refuse to allow them to assume custody, as mandated by SB 54, the local officials are preventing the alien from being taken out of the jail, and thus "harbor[ing]" the alien "in . . . a[] building."  Even if local law enforcement claims that receiving a Form I-247A from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence.  Accordingly, SB 54 coerces local law enforcement to violate the federal anti-harboring statute.

B.    *AB 450 violates employers' petitioning rights.*

Lastly, by prohibiting employers from giving voluntary consent to ICE to enter nonpublic areas of their premises, AB 450 violates the petitioning rights of employers.

The right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights."  *United Mine Workers, Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).  It is "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press," *id.*, and is "an assurance of a particular freedom of expression."  *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  The right to petition "extends to all departments

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN
SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

of the government, including the executive." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

Here, when employers give voluntary consent to ICE to enter their nonpublic premises, often they do so to influence ICE not to arrest them for violating federal work authorization laws. *See* 8 U.S.C. § 1324a (providing criminal penalties for violations of such laws). Such attempts to influence government officials clearly constitute petitioning protected in the First Amendment. *See, e.g.*, *E. R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144 (1961) (holding that an "effort to influence . . . law enforcement practices" was immune from antitrust liability because it was petitioning); *Mirabella v. Villard,* 853 F.3d 641, 656-57 (3d Cir. 2017) (holding that banning a litigation adversary of a township from contacting officials of that township violated the Petition Clause); *Holzemer v. City of Memphis,* 621 F.3d 512, 519 (6th Cir. 2010) ("We find that requesting assistance from a city councilman—whether in writing or in person—constitutes petitioning activity entitled to the protection of the Petition Clause of the First Amendment."); *Van Deelen v. Johnson,* 497 F.3d 1151, 1159 (10th Cir. 2007) (finding it clearly established "that physical and verbal intimidation intended to deter a citizen from pursuing a private tax complaint violates that citizen's First Amendment right to petition for the redress of grievances").

By flatly prohibiting employers from petitioning government authorities, AB 450 violates their rights under the First Amendment.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for a preliminary injunction should be granted.

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN
SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Dated: April 6, 2018

Respectfully submitted,

/s/ Julie B. Axelrod

Julie B. Axelrod
California Bar No. 250165
Christopher J. Hajec
Mark S. Venezia
IMMIGRATION REFORM LAW
INSTITUTE
25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
(202) 232-5590
jaxelrod@irli.org
chajec@irli.org
mvenezia@irli.org

Attorneys for *Amici Curiae*

AMICI CURIAE BRIEF OF NATIONAL SHERIFFS' ASSOCIATION AND VICTIMS' ORGANIZATIONS IN
SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION