BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 1610
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Proposed Amici Curiae
Federal Law Enforcement Officers Association and
National Border Patrol Council

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>            Defendants. | Case No.: 2:18-cv-00490-JAM-KJN<br><br>~~MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF AND PROPOSED~~ **AMICI CURIAE BRIEF OF FEDERAL LAW ENFORCEMENT OFFICERS ASSOCIATION AND NATIONAL BORDER PATROL COUNCIL IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. John A. Mendez |

**PROPOSED *AMICI CURIAE* BRIEF**

**ARGUMENT**

California's AB 450, AB 103, and the detainee-transfer provisions of SB 54 are preempted under *Arizona v. United States*, 567 U.S. 387, 397 (2012). If Arizona didn't have the leeway to pursue policies that it believed would <u>assist</u> in the vindication of federal immigration enforcement when the federal government thought it was going too far, it should go without saying that California doesn't have the leeway to pursue policies that are expressly designed to <u>impede</u> federal immigration enforcement. FLEOA's and NBPC's members are on the ground throughout the United States enforcing the immigration laws. In no small part because of the laws passed by California and several of its cities and counties actively promoting the violation of those laws—the essence of "sanctuary" laws—California is a magnet for unlawful immigration.

*Amici*'s members interact daily with local law enforcement officers and large and small private employers in California, many of whom are bewildered by the pro-illegal-immigration laws passed by the State and some California local governments. Yet they are afraid of speaking out against these laws for fear of retribution, or, as in the case of AB 450, being targeted for fines. *See*, *e.g.*, *California Attorney General Threatens $10,000 Fine for Businesses that Share Information with Immigration Agents*, L.A. Times (Jan. 18, 2018), available at https://lat.ms/2E2EOTJ.

FLEOA's and NBPC's members are not so constrained, however, so *amici* offer this brief to provide perspective on the laws being challenged here:

**1.    SB 54 Radically Alters Federal Enforcement Programs And Places Federal Law Enforcement Officers At Risk.**

As detailed in the Declaration of Thomas Homan, one of ICE's core missions is identifying aliens who are "removable" under federal law. *See* Homan Decl., ¶¶ 13–19; *see also Arizona v. United States*, 567 U.S. at 397 (ICE "conducts criminal investigations involving the enforcement of immigration-related statutes," and ICE officers are responsible "for the identification, apprehension, and removal of illegal aliens from the United States."). ICE has established the Enforcement and Removal Operations ("ERO") agency to achieve this objective. ICE and ERO

work to identify such aliens who are incarcerated within state and local prisons and jails, among other places.

As the Homan Declaration demonstrates, ICE makes these determinations in a variety of different contexts. Often, ICE has received electronic transmissions of booking information (including fingerprints) as California jurisdictions process arrestees. ICE computers can then check this information against ICE's various databases to confirm whether, for example, the arrestees have overstayed their visa, are fugitive aliens, or are otherwise unauthorized residents. Then, if that cross-checking process identifies a California arrestee as a removable alien, ICE has historically issued a detainer to the state or local jurisdiction. This detainer instructs the state or local law enforcement agency to inform ICE when the alien will be released. *See* Homan Decl., ¶ 18 (ICE immigration detainers request that law enforcement agencies "provide advanced notification of the alien's release to allow for an orderly transfer of the individual into ICE custody," and maintain custody of the alien for up to 48 hours "so that ICE may respond to the prison or jail and assume custody").

Previously, state and local authorities routinely complied with ICE detainers and provided, among other things, the release dates of removable individuals in their custody. *See*, *e.g.*, Homan Decl. ¶¶ 23–29. Now, with the passage of SB 54, this information is no longer shared. *Id.*, ¶¶ 29–30.

When California jurisdictions used to press their computer buttons to inform ICE when releases were occurring, ICE agents could simply arrive at the state or local facility to usher the removable person into federal custody. This orderly process minimized the risk of altercation. Now that California facilities are no longer pressing their computer buttons to inform ICE about release dates as a result of SB 54, removable persons are being released into the population at large. *Id.*, ¶ 36.

Separate and apart from being concerned about the interference SB 54 poses on the effective enforcement of the immigration laws and the risks imposed on California civilians by this change of course, *amici* are alarmed at the grave risks SB 54 poses for the safety of its members located in California. To the extent ICE is even able to determine that a removable person has

been released into the general population, its agents must apprehend them wherever they can be found.  This obviously increases the operational risks exponentially.  The removable persons now have access to firearms and confederates, among other things.  *Id*., ¶ 37.

Under SB 54 moreover, local jurisdictions no longer participate in—or even respond to a simple phone call asking for information in advance of—these at-large operations, which further increases the risk to *amici*'s members and the general population.  Local law enforcement knows the local scene better than federal agents and historically provided valuable information (such as information about location, identification, and confederates, among other things) to aid these sorts of missions.  After SB 54, federal agents proceed with far less information than they did before.  Even such mundane matters as traffic control are no longer provided.  *Id.*, ¶¶ 36–37 (discussing dangers, safety risks, and practical difficulties encountered by federal law enforcement officers when conducting at-large arrests); *see id.*, ¶ 38 (detailing at-large arrest of a confirmed gang member who "had to be extracted from his vehicle at gun-point," and "was found with a loaded firearm on his person").  This local overreach needs to be corrected.

**2.    SB 54 Impairs The Ability Of U.S. Customs And Border Protection To Effectively Enforce Federal Immigration Laws.**

SB 54's restriction on information sharing and cooperation also impairs the work of U.S. Customs and Border Protection enforcing federal immigration laws and securing the border.  As the declaration of Chief Border Patrol Agent Rodney Scott explains, the bill's prohibition against complying with immigration detainers and hold requests compromises Border Patrol's ability to complete immigration processing and removal proceedings.  Scott Decl., ¶¶ 8–12.  The Scott Declaration identifies instances where, for example, the Border Patrol identifies a person as removable, but the state or local jurisdiction affirmatively wants to prosecute the individuals for state crimes.  *Id.*, ¶¶ 6–8.  In these cases, Border Patrol would turn over aliens to state and local law enforcement temporarily, with the clear expectation that the aliens would be returned to immigration custody once the state or local issue had been resolved.  *Id.*

But because state and local law enforcement agencies are prohibited from complying with a detainer, SB 54 has affected Border Patrol's ability to assist with the prosecution of aliens for

serious state criminal offenses. Just as described above, the local agencies' refusal to communicate has led to multiple instances of removable individuals being released into the general population after being delivered to local custody by Border Patrol. *Id.*, ¶¶ 23–24. Furthermore, in several instances Border Patrol Agents have determined that, due to their responsibility to enforce federal immigration law, they could not release a criminal alien to state or local law enforcement because there was no assurance that they would be returned to federal custody—a concern borne out by experience. *Id.*, ¶ 22 (detailing incidents where Border Patrol agents did not release a suspect to California law enforcement agencies). To be sure, the local authorities' refusal to communicate endangers the public: the Scott Declaration identifies instances where a suspect may not have committed a federal crime but has obviously committed a state crime (like drunk driving), but is released into the general population due to the local authorities' refusal to engage. *Id.*, ¶¶ 16–17. By erecting a wall between federal authorities and state law enforcement, SB 54 has already strained critical law enforcement partnerships, including the Border Patrol's relationship with the California Highway Patrol, county sheriffs' departments, and local police departments. *See id.*, ¶¶ 18–21, 23–26.

**3.    SB 54 Compromises National Security By Restricting State And Local Cooperation With ICE Investigations.**

SB 54 also compromises federal law enforcement officers' ability to conduct national-security-related criminal investigations. The bill restricts state and local authorities from releasing a removable alien unless ICE obtains a judicial warrant for a criminal violation of federal immigration law. Cal. Gov. Code § 7284.6(a)(4). This frustrates the scope of ICE's enforcement authority, which includes the authority to make civil immigration arrests. Homan Decl., ¶ 70; *see* Cal. Gov. Code § 7284.6(a)(1)(E) (prohibiting California law enforcement agencies from using resources to "[m]ak[e] or intentionally participat[e] in arrests based on civil immigration warrants."). SB 54's information-sharing restrictions likewise compromise ICE's ability to conduct homeland security investigations because it limits the agency's access to critical witnesses, and constrains its ability to manage aliens who are cooperating with criminal investigations and prosecutions. Homan Decl., ¶¶ 73, 75–78 (discussing SB 54's effect on

potential confidential informants and witnesses, and the "significant benefit parole program").

Restricting information sharing with federal law enforcement agencies threatens their ability to effectively conduct counter-terrorism work in the event of a terrorist attack or other national security emergency. As Homan explains, cooperation between state and local law enforcement and ICE was critical in the aftermath of the December 2, 2015 terrorist attack in San Bernardino. "[I]nformation-sharing between the San Bernardino Police Department and HSI agents . . . allowed for real-time sharing of essential DHS-held information, including information from alien files, and international travel histories of several subjects of interest in the investigation. . . . Within the first 72 hours post-attack, the ease of information-sharing between ICE and SBPD resulted in the identification of accomplices and the discovery of a marriage fraud conspiracy among the accomplices." Homan Decl., ¶ 72. This is but one example of how SB 54 poses an all-too-real threat to effective law enforcement in a time of crisis, when time is of the essence and access to information is paramount.

Indeed, SB 54's restrictions run counter to the post-9/11 federal policy of broader information sharing and cooperation among law enforcement agencies nationwide. As the 9/11 Commission Report concluded, "[t]he biggest impediment to all-source analysis—to a greater likelihood of connecting the dots—is the human or systemic resistance to sharing information." The Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* 416 (2004). To address this issue, the Federal government implemented intelligence reforms designed to foster cooperation and information sharing between law enforcement agencies, and adopted a national strategy for sharing and safeguarding information in the national security sphere. *See, e.g.*, Office of the Director of National Intelligence, *Information Sharing Environment Implementation Plan* (Nov. 2006), online at https://www.hsdl.org/?abstract&did=467681; The White House, *The National Strategy for Information Sharing: Successes and Challenges In Improving Terrorism-Related Information Sharing* (Oct. 2007), available at https://bit.ly/2uLPkh4; The White House, *National Strategy for Information Sharing and Safeguarding* (Dec. 2012), available at https://bit.ly/2Eksa0V. SB 54 discourages—and outright forbids—state and local law enforcement from actively sharing information with federal law enforcement officials, even though such

information could prove critical in a national security investigation.

FLEOA and NBPC, and their members, oppose California's effort to undermine this important pillar of the national government's national security policy.

## **CONCLUSION**

The Court should grant the Plaintiff's motion for a preliminary injunction.

Dated:  April 6, 2018                              BENBROOK LAW GROUP, PC

By  /s Bradley A. Benbrook
BRADLEY A. BENBROOK
Attorneys for *Amici Curiae*
Federal Law Enforcement Officers Association
National Border Patrol Council

## CERTIFICATE OF SERVICE

Case No. 2:18-cv-00490-JAM-KJN

I hereby certify that on April 06, 2018, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF AND PROPOSED AMICI CURIAE BRIEF OF FEDERAL LAW ENFORCEMENT OFFICERS ASSOCIATION AND NATIONAL BORDER PATROL COUNCIL IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kelly Rhodes*