XAVIER BECERRA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
MICHAEL L. NEWMAN
SATOSHI YANAI
Supervising Deputy Attorneys General
CHRISTINE CHUANG
ANTHONY R. HAKL
CHEROKEE DM MELTON
LEE I. SHERMAN
Deputy Attorneys General
State Bar No. 272271
 300 S. Spring Street
 Los Angeles, CA  90013
 Telephone:  (213) 269-6404
 Fax:  (213) 897-7605
 E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** | 2:18-cv-00490-JAM-KJN |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,** | Date:          June 20, 2018<br>Time:          10:00 a.m.<br>Courtroom:  6<br>Judge:         The Honorable John A. Mendez |
| Defendants. | Trial Date:   None set<br>Action Filed:  March 6, 2018 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ...................................................................... 2

    I.      Summary of Relevant State Laws ........................................................................ 2

            A.      SB 54 (The California Values Act) ........................................................ 2

            B.      Assembly Bill 450 (Immigrant Worker Protection Act) ....................... 5

            C.      Assembly Bill 103 (Review of Detention Facilities) ............................ 6

    II.     Summary of Federal Immigration Law ............................................................... 7

APPLICABLE LEGAL STANDARDS .............................................................................. 9

    I.      Standards for a Preliminary Injunction Motion .................................................. 9

    II.     Standards for Facial and As-Applied Challenges .............................................. 10

ARGUMENT ..................................................................................................................... 10

    I.      The United States Is Not Likely to Succeed on the Merits ................................. 10

            A.      The United States Will Not Succeed on Its Claim Against SB 54 ........... 10

                    1.      SB 54 Does Not Conflict with § 1373(a) ..................................... 10

                    2.      The United States' Interpretation of § 1373(a) to Preempt
                            SB 54 Violates the Tenth Amendment ......................................... 14

                            a.      The United States' Interpretation Constitutes
                                    Commandeering ............................................................... 14

                          b.      The United States' Interpretation of § 1373(a)
                                    Further Impermissibly Intrudes on the State's
                                    Sovereign Powers ............................................................ 17

                      3.      SB 54 Does Not Pose an Obstacle to the Objectives of the
                              INA ............................................................................................... 19

                      4.      SB 54 Does Not Violate Intergovernmental Immunity
                              Principles ...................................................................................... 22

            B.      The United States Will Not Succeed on Its Claim Against AB 450 ......... 25

                      1.      AB 450 Is Not Obstacle Preempted by IRCA .............................. 25

                      2.      AB 450 Does Not Violate the Intergovernmental Immunity
                            Doctrine ........................................................................................ 28

             C.      The United States Will Not Succeed on Its Claim Against AB 103 ......... 29

                      1.      AB 103 Is Not Preempted ............................................................ 29

                      2.      AB 103 Does Not Violate the Intergovernmental Immunity
                            Doctrine ........................................................................................ 31

    II.     The United States Fails to Demonstrate Irreparable Harm ................................ 33

            A.      There Is No Irreparable Harm from SB 54 .......................................... 33

             B.      There Is No Irreparable Harm from AB 450 ....................................... 37

             C.      There Is No Irreparable Harm from AB 103 ....................................... 38

i

**TABLE OF CONTENTS**
(continued)

**Page**

     D.    The United States' Delay Weighs Against a Finding of Irreparable Harm .................................................................................................... 39

III.    The Balance of Hardships and the Public Interest Weigh Against Granting Preliminary Relief ................................................................................. 39

CONCLUSION ....................................................................................................... 41

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

CASES

4

*Almeida-Sanchez v. United States*
 413 U.S. 266 (1973)................................................................................14

5

6

*Arizona v. United States*
 567 U.S. 387 (2012)..........................................................................*passim*

7

*In re Baker & Drake, Inc. v. Public Serv. Comm'n of Nevada*
 35 F.3d 1348 (9th Cir. 1994)..............................................................20, 28

8

9

*Barrientos v. 1801-1825 Morton*
 583 F.3d 1197 (9th Cir. 2009).................................................................22

10

*Blackburn v. United States*
 100 F.3d 1426 (9th Cir. 1996).................................................................31

11

12

*Boeing v. Movassaghi*
 768 F.3d 832 (9th Cir. 2014)..............................................................29, 32

13

14

*Bologna v. City & Cty. of San Francisco*
 192 Cal. App. 4th 429 (2011)..................................................................12

15

16

*Bond v. United States*
 134 S. Ct. 2077 (2014)............................................................................12

17

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*
 489 U.S. 141 (1989)................................................................................22

18

19

*Brovelli v. Superior Court*
 56 Cal.2d 524 (1961)..............................................................................6, 39

20

21

*California v. Sessions*
 No. 17-cv-4701 (N.D. Cal.)......................................................................39

22

*Californians for State & Competitive Dump Truck Transp. v. Mendonca*
 152 F.3d 1184 (9th Cir. 1998)..................................................................26

23

24

*Caribbean Marine Servs. Co. v. Baldridge*
 844 F.2d 668 (9th Cir. 1988)...................................................33, 35, 37, 38

25

26

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*
 840 F.2d 701 (9th Cir. 1988)...................................................................10

27

28

*Chamber of Commerce of the U.S. v. Whiting*
 563 U.S. 582 (2011)..........................................................................*passim*

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*City of Chicago v. Sessions*
2018 WL 1868327 (7th Cir. Apr. 19, 2018) ............................................................3, 15, 20

*City of El Cenizo v. Texas*
885 F.3d 332 (5th Cir. 2018)...............................................................................................15

*City of New York v. United States*
179 F.3d 29 (2d Cir. 1999)............................................................................................16, 17

*City of Philadelphia v. Sessions*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ..................................................................................17

*City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*
625 F.2d 231 (9th Cir. 1980)...............................................................................................38

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997).........................................................................................10, 40

*Ctr. for Competitive Politics v. Harris*
784 F.3d 1307 (9th Cir. 2015).............................................................................................10

*Cty. of Santa Clara v. Trump*
250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................................15

*Custis v. United States*
511 U.S. 485 (1994).............................................................................................................12

*Davis v. Mich. Dep't of Treasury*
489 U.S. 803 (1989).............................................................................................................24

*DeCanas v. Bica*
424 U.S. 351 (1976)...............................................................................................7, 18, 30

*Demore v. Kim*
538 U.S. 510 (2003).............................................................................................................21

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014).............................................................................................39

*English v. Gen. Elec. Co.*
496 U.S. 72 (1990)...............................................................................................................28

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*
545 U.S. 546 (2005).............................................................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page

*FERC v. Mississippi*
456 U.S. 742........................................................................17, 18, 26

*First Agricultural Bank v. State Tax Comm.*
392 U.S. 339 (1968)................................................................28

*Galarza v. Szalczyk*
745 F.3d 634 (3rd Cir. 2014) .................................................8, 15

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015)..................................................39

*Gartrell Construction Inc. v. Aubry*
940 F.2d 437 (9th Cir. 1991)..................................................30

*Goldie's Bookstore, Inc. v. Superior Court*
739 F.2d 466 (9th Cir. 1984)..................................................40

*Gregory v. Ashcroft*
501 U.S. 452 (1991)................................................................12

*Holmes v. Collection Bureau of Am., Ltd.*
2009 WL 3762414 (N.D. Cal. Nov. 9, 2009)........................39

*In re NSA Telecoms. Records Litig.*
633 F. Supp. 2d 892 (N.D. Cal. 2007) ......................31, 32, 33

*In re Tarble*
80 U.S. 397 (1871)................................................................30

*Incalza v. Fendi N. Am., Inc.*
479 F.3d 1005 (9th Cir. 2007)...............................................27

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*
799 F.2d 547 (9th Cir. 1986)..................................................27

*Int'l Paper Co. v. Ouelette*
479 U.S. 481 (1987)................................................................22

*Italian Colors Rest. v. Becerra*
878 F.3d 1165 (9th Cir. 2018)................................................10

*Jennings v. Rodriguez*
138 S. Ct. 830 (2018)............................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Koog v. United States*
79 F.3d 452 (5th Cir. 1996)..................................................................16

*League of United Latin Am. Citizens v. Wilson*
908 F. Supp. 755 (N.D. Cal. 1995) ........................................................21

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
*Connaughton*
752 F.3d 755 (9th Cir. 2014)..................................................................40

*Leslie Miller, Inc. v. State of Arkansas*
352 U.S. 187 (1956) ...............................................................................30

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980)..........................................................33, 36

*Lydo Enters. Inc. v. City of Las Vegas*
745 F.2d 1211 (9th Cir. 1984)..........................................................36, 38

*Maryland v. King*
133 S. Ct. 1 (2012) ................................................................................40

*Metro. Life Ins. Co. v. Mass.*
471 U.S. 724 (1985)...............................................................................26

*Miranda-Olivares v. Clackamas Cty.*
2014 WL 1414305 (D. Or. Apr. 11, 2014)..............................................8

*N.L.R.B. v. C & C Roofing Supply, Inc.*
569 F.3d 1096 (9th Cir. 2009).................................................................27

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Service*
886 F.3d 803 (9th Cir. 2018)...................................................................33

*New York v. United States*
505 U.S. 144 (1992).....................................................................14, 15, 17

*Nken v. Holder*
556 U.S. 418 (2009)................................................................................39

*North Dakota v. United States*
495 U.S. 423 (1990)........................................................................ *passim*

*Nutrition Dist. LLC. v. Enhanced Athlete, Inc.*
2017 WL 5467252 (E.D. Cal. Nov. 14, 2017) .......................................37

vi

**TABLE OF AUTHORITIES**
(continued)

Page

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*
762 F.2d 1374 (9th Cir. 1985)............................................................................................33, 34

*Perfect 10, Inc. v. Google, Inc.*
653 F.3d 976 (9th Cir. 2011)..................................................................................................34

*Petersburg Cellular P'ship. v. Bd. of Sup'rs of Nottoway Cty.*
205 F.3d 688 (4th Cir. 2000)..................................................................................................15

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*
361 U.S. 376 (1960)................................................................................................................24

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*
734 F.3d 406 (5th Cir. 2013)..................................................................................................40

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*
55 F. Supp. 2d 1070 (C.D. Cal. 1999)....................................................................................39

*Preap v. Johnson*
831 F.3d 1193 (9th Cir. 2016)..........................................................................................20, 21

*Printz v. United States*
521 U.S. 898 (1997)....................................................................................................14, 15, 16

*Reno v. Condon*
528 U.S. 141 (2000)................................................................................................................18

*Riegel v. Medtronic, Inc.*
552 U.S. 312 (2008)................................................................................................................11

*Roach v. Mail Handlers Ben. Plan*
298 F.3d 847 (9th Cir. 2002)..................................................................................................14

*Romero v. United States*
883 F.Supp. 1076 (W.D. La. 1994)........................................................................................19

*Salas v. Sierra Chem. Co.*
59 Cal.4th 407 (2014).............................................................................................................27

*Sampson v. Murray*
415 U.S. 61 (1974)............................................................................................................36, 38

*Sierra Forest Legacy v. Rey*
691 F. Supp. 2d 1204 (E.D. Cal. 2010)..................................................................................33

**TABLE OF AUTHORITIES**
(continued)

Page

*Siuslaw Concrete Constr. Co. v. WADOT*
    784 F.2d 952 (9th Cir. 1986)..........................................................................26

*Stanley v. Univ. of S. Cal.*
    13 F.3d 1313 (9th Cir. 1994)..........................................................................10

*Steinle v. City & Cty. of San Francisco*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) .....................................................11, 12, 21

*SWANCC v. U.S. Army Corps of Eng'rs*
    531 U.S. 159 (2001).....................................................................................19

*Television Educ., Inc. v. Contractors Intelligence Sch., Inc.*
    2017 WL 2958729 (E.D. Cal. July 11, 2017) ..........................................................39

*Thomas v. Cty. of Los Angeles*
    978 F.2d 504 (9th Cir. 1992)..........................................................................10

*Tracy Rifle and Pistol LLC v. Harris*
    118 F. Supp. 3d 1181 (E.D. Cal. 2015).............................................................10, 39

*United States v. City of Arcata*
    629 F.3d 986 (9th Cir. 2010)...............................................................23, 24, 25, 29

*United States v. Lewis Cty.*
    175 F.3d 671 (9th Cir. 1999)..........................................................................24

*United States v. Lopez*
    514 U.S. 549 (1995).....................................................................................18

*United States v. Morrison*
    529 U.S. 598 (2000)...........................................................................11, 18, 19

*United States v. New Mexico*
    455 U.S. 720 (1982).....................................................................................29

*United States v. O'Brien*
    391 U.S. 367 (1968).....................................................................................25

*United States v. Quintana*
    623 F.3d 1237 (8th Cir. 2010).........................................................................13

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013).........................................................................21

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Washington v. Trump*
  847 F.3d 1151 (9th Cir. 2017)................................................................39

4

*Wham-O Inc. v. Manly Toys, Ltd.*
  2009 WL 1353752 (9th Cir. May 15, 2009) .............................................35

5

6

*Winter v. Natural Res. Def. Council, Inc.*
  555 U.S. 7 (2008)................................................................................9, 10

7

*Woodfin Suite Hotels v. City of Emeryville*
  2006 WL 2739309 (N.D. Cal. Aug. 23, 2006)....................................37, 39

8

9

*Wyeth v. Levine*
  555 U.S. 555 (2009).........................................................................11, 22

10

*Zepeda v. U.S. I.N.S.*
  753 F.2d 719 (9th Cir. 1983)................................................................27

11

12

**STATUTES**

13

United States Code Title 8
  § 1103(11)(A)...........................................................................................9
  § 1103(a)(10)..............................................................................8, 22, 24
  § 1182(a)(9)(B)(ii) .................................................................................13
  § 1225(a)(5)...........................................................................................12
  § 1226...................................................................................................20
  § 1226(a) .....................................................................................9, 20, 21
  § 1226(c)...........................................................................................9, 13
  § 1231(a)(3)(C) .....................................................................................12
  § 1231(g)(1) ............................................................................................9
  § 1252c(a)......................................................................................8, 20, 22, 24
  § 1324(2).................................................................................................9
  § 1324a.........................................................................................9, 20, 25
  § 1324a(a)(1)............................................................................................9
  § 1324a(a)(1)(A) ...................................................................................26
  § 1324a(a) - § 1324(b)...........................................................................26
  § 1324a(b)(1) - § 1324 (2)........................................................................9
  § 1324a(b)(1)(A) ......................................................................................9
  § 1324a(e)(2).............................................................................................9
  § 1324a(e)(2)(A)...............................................................................26, 27

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                          (2:18-cv-00490-JAM-KJN)

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

United States Code Title 8 Cont.

4
    § 1357(a) .................................................................................................7, 24
    § 1357(d) ................................................................................................ *passim*

5
    § 1357(g)(1) ....................................................................................8, 22, 24
    § 1357(g)(10) ...............................................................................................13

6
    § 1360(c)(2) .................................................................................................12
    § 1367(a)(2) .................................................................................................12

7
    § 1373 ...............................................................................................5, 9, 11
    § 1373(a) .................................................................................................8, 14

8
    § 1373(b) ........................................................................................................9

9
    § 1373(c) ...............................................................................................12, 13
    § 1536 ............................................................................................................9

10

California Civil Code

11
    § 1798.3(a) ....................................................................................................5

12

Code of Civil Procedure

13
    § 1798.24 ...............................................................................................31, 38

14

Government Code

15
    § 6254(c) ...............................................................................................31, 38
    § 7282.5 .................................................................................................4, 24

16
    § 7282.5(a) ........................................................................................4, 23, 24
    § 7283 ............................................................................................................2

17
    § 7284 ...........................................................................................2, 28, 29
    § 7284.2(c) ...........................................................................................16, 17

18
    § 7284.2(f) .............................................................................................3, 24
    § 7284.4(a) ....................................................................................................3

19
    § 7284.4(c) ...........................................................................................4, 23
    § 7284.4(h)-(i) ..............................................................................................4

20
    § 7284.6(a)(1)(B .........................................................................................2
    § 7284.6(a)(1)(C) ................................................................................ *passim*

21
    § 7284.6(a)(1)(C) - § 7284.6(D) ....................................................15, 16, 23
    § 7284.6(a)(1)(D) ........................................................................................5

22
    § 7284.6(a)(4) ....................................................................................4, 5, 23, 24

23
    § 7284.6(b)(2) ....................................................................................3, 4, 13
    § 7284.6(b)(3) ...........................................................................................23, 36

24
    § 7284.6(b)(3)(A) .........................................................................................4

25
    § 7284.6(e) .......................................................................................... *passim*
    § 7284.6(f) ....................................................................................................4

26

27

28

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.          (2:18-cv-00490-JAM-KJN)

# TABLE OF AUTHORITIES
**(continued)**

**Page**

Government Code Cont.

§ 7285.1 ........................................................................................5, 26, 29

§ 7285.1(a) ..............................................................................6, 27, 28, 29

§ 7285.1(a)(1) ......................................................................................6

§ 7285.2 ..............................................................................................5

§ 7285.2(a)(1) ..........................................................................6, 27, 28, 29

§ 7285.2(a)(2) ...............................................................................6, 37

§ 7285.2(a) - § 7285.2(b) ...........................................................27

§ 7285.2(b) .......................................................................................26

§ 7285.3 ....................................................................................6, 27

§ 11180 .....................................................................................6, 38

§ 12532 ..............................................................................................6

§ 12532(a) - § 12532(b) ...............................................................7

§ 12532(b)(1)(A) - § 12532(C) ...................................................7

§ 12532(b)(2) .........................................................................7, 38

§ 12532(c) ..............................................................................7, 33

Labor Code

§ 90.2 ........................................................................................5, 26, 27

§ 90.2(a)(1) ...........................................................................6, 28, 29

§ 90.2(b)(1) ........................................................................................6

§ 90.2 (c) ..........................................................................................26

§ 1019.2 .............................................................................................26

§ 1019.2(a) .......................................................................................6, 28

§ 1019.2(c) .......................................................................................6, 27

§ 6300 ................................................................................................5

§ 6328 ................................................................................................5

Penal Code

§ 422.93 ............................................................................................2

§ 679.10 ............................................................................................2

§ 679.11 ............................................................................................2

§ 4497.04 .........................................................................................31

§ 6030 ..............................................................................................32

§ 6030(b) ..........................................................................................32

§ 6030(c) ..........................................................................................32

§ 6030(e) - § 6030(g) ...................................................................32

§ 6030 - § 6031.2 ............................................................................7

**CONSTITUTIONAL PROVISIONS**

California Constitution

Article V, § 13 .......................................................................6, 31, 38

Article XIII, § 36 .............................................................................31

Article XIV .......................................................................................5

xi

**TABLE OF AUTHORITIES**
(continued)

**Page**

United States Constitution
Tenth Amendment.............................................................................. *passim*

**OTHER AUTHORITIES**

Assembly Bill No.
103................................................................................................... *passim*
450................................................................................................... *passim*

Senate Bill
54..................................................................................................... *passim*

Calfornia Code of Regulations
§ 100............................................................................................................6

Code of Federal Regulations, Title 8
§ 236.6..............................................................................................30, 38
§ 287.7(d)....................................................................................................8

**INTRODUCTION**

In this suit, the United States stretches immigration law to its constitutional breaking point, and seeks to arrogate power to itself that has long been understood to belong to state governments. The federal government challenges specific provisions of three state laws—the California Values Act, or Senate Bill 54 (SB 54), Assembly Bill 450 (AB 450), and Assembly Bill 103 (AB 103). These laws allocate the use of limited law-enforcement resources, provide workplace protections, and protect the rights of its residents. They are consistent with applicable federal law and do not interfere with the federal government's responsibility over immigration.

The State acted squarely within its constitutional authority when it enacted the laws challenged here, which are based on the Legislature's considered views concerning the best interests of California's 40 million residents. SB 54 defines when local law-enforcement agencies (LEA) may use their resources to assist the federal government with immigration enforcement. AB 450 protects the privacy rights of California workers by requiring that employers give notice to employees when the federal government intends to inspect employment-eligibility forms (Form I-9) and permits workplace inspections by federal government officials with a judicial warrant. And AB 103 allows California's Attorney General to review detention facilities to assess the conditions of confinement. Prioritizing public-safety resources, protecting employee privacy, and monitoring conditions of confinement in detention facilities are all within the scope of the traditional police powers reserved to the States.

Unable to find a federal law with which these provisions credibly conflict, the federal government argues under the guise of preemption and intergovernmental immunity that the State laws interfere with the mission of federal immigration authorities. In fact, none of the State laws conflicts with federal law or undermines the federal government's authority or ability to undertake immigration enforcement, and all are consistent with the legislative framework in the Immigration and Naturalization Act (INA). SB 54 allows LEAs to comply with notification and transfer requests for people previously convicted of any one of hundreds of crimes, and AB 450 authorizes compliance with all federal laws and permits cooperation, even if not required by federal law. The State laws also do not treat federal immigration authorities differently; they

1

1    reflect neutral and rational determinations about the State's law-enforcement role, conditions of

2    confinement, and privacy—applied equally to federal, state, and local LEAs; private and public

3    detention facility operators; and employers. Not only are the federal government's arguments to

4    the contrary incorrect, but they raise significant constitutional concerns under the Tenth

5    Amendment, and should be rejected for this independent reason.

6        Finally, and critically for purposes of this motion, the United States cannot show any

7    irreparable harm flowing from the laws it challenges. The United States relies largely on alleged

8    events that occurred *before* the passage of the laws or on generalized, unsupported, and

9    speculative claims that do not justify the extraordinary relief requested here. Conversely, the State

10   and its residents would be irreparably harmed by a preliminary injunction, which would sow

11   confusion throughout the State and undermine the State's sovereignty in safeguarding its

12   residents' safety, privacy, and constitutional rights. The motion should therefore be denied.

13                              **LEGAL AND FACTUAL BACKGROUND**

14   **I.    SUMMARY OF RELEVANT STATE LAWS**

15       **A.    SB 54 (The California Values Act)**

16       In accordance with the State's long-established police powers, California enacted SB 54,

17   known as the California Values Act, effective January 4, 2018. Gov't Code[1] § 7284 *et seq*. SB 54

18   was enacted against a backdrop of recent state legislation that promotes cooperation and

19   community-policing principles to further public safety.[2] For years, local jurisdictions have

20   adopted similar laws or policies that limited their entanglement with immigration enforcement,

21   finding that such policies were critical to building trust with communities so that victims or

22   witnesses felt secure reporting crimes without fear of deportation. *See, e.g.*, Decl. of Arif Alikhan

23   (Alikhan Decl.) ¶¶ 6-8, 14-19; Decl. of Jim Hart (Hart Decl.) ¶¶ 6, 8, 11; Decl. of Jeffrey Rosen

24

25   [1] All references are to California Government Code, unless otherwise stated.

     [2] For example, several laws require the State's LEAs to safeguard the confidentiality of information provided by
26   immigrant victims and witnesses of crime. *See, e.g.*, Cal. Penal Code §§ 422.93 (2004) (hate crimes statute), 679.10
     (2016) (U-visa statute), 679.11 (2016) (T-visa statute). In 2013, the Legislature limited when local LEAs could hold
27   an individual for up to 48 hours after the person's ordinary release on the basis of an immigration detainer request—
     which SB 54 now prohibits. *Id.* § 7284.6(a)(1)(B). In 2016, the State increased transparency regarding requests by
     immigration authorities to interview someone in local custody. *Id.* § 7283 *et seq*.
28

                                                        2

(Rosen Decl.) ¶¶ 5-9; Decl. of Tom Wong (Wong Decl.) ¶¶ 11, 25-35, 37-41; *see also City of Chicago v. Sessions*, 2018 WL 1868327, at *4-*5 (7th Cir. Apr. 19, 2018) (recognizing legitimate reasons why some jurisdictions "have determined that their local law enforcement efforts are handcuffed by such unbounded cooperation with immigration enforcement").

SB 54 defines the circumstances under which LEAs may participate in immigration enforcement. The Act's focus is to "[e]nsure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2(f). The Act was informed by concerns that changes in federal immigration policy, particularly Executive Order No. 13,768 (Jan. 25, 2017) directing federal immigration authorities to enforce the immigration laws against "all removable aliens," could impose increased demands on state and local law-enforcement resources if compelled to assist in enforcing the federal government's plan for "more widespread and indiscriminate immigration enforcement." Req. for Judicial Notice (RJN), Exs. F, G at 1, 2, 9. The Legislature proved prescient, as the federal government's elimination of meaningful prioritization for removal led to a dramatic surge in demands on local agencies. While U.S. Immigration and Customs Enforcement (ICE) issued 15,601 immigration "detainers" (which, as discussed *infra* 8, request a range of actions from law enforcement) to California LEAs in FY 2016,[3] ICE issued more than 35,000 detainers to California LEAs in FY 2017. Am. Decl. of Thomas D. Homan (ECF No. 46-2) (Homan Decl.) ¶ 18; *see also* RJN, Ex. E at 9 (over 80 percent increase in detainers issued nationally after January 2017).

Importantly, SB 54 does not limit federal immigration authorities' use of their own resources to enforce immigration laws, does not apply to the California Department of Corrections and Rehabilitation, which houses state prisoners, Gov't Code § 7284.4(a), and preserves much of LEAs' discretion to work with immigration authorities. For example, SB 54 does not restrict an LEA from sharing criminal-history information from California law-enforcement databases accessible to immigration authorities. *Id.* § 7284.6(b)(2); Decl. of Joe

---

[3] *See* TRAC REPORTS, INC., Latest Data: Immigration and Customs Enforcement Detainers, California (2017), http://trac.syr.edu/phptools/immigration/detain/.

Dominic (Dominic Decl.) ¶ 10. It does not restrict LEAs from participating in task forces with immigration authorities or sharing confidential information if the "primary purpose" of the task force is not immigration enforcement. *Id.* § 7284.6(b)(3)(A). SB 54 expressly permits LEAs to share information regarding immigration and citizenship status with immigration authorities. *Id.* § 7284.6(e). SB 54 reaffirms that LEAs are not prevented from "asserting its own jurisdiction over criminal law enforcement matters." *Id.* § 7284.6(f). And it does not single out federal immigration authorities, but applies to LEA interactions with any "federal, state, or local officer, employee, or person performing immigration enforcement functions." *Id.* § 7284.4(c).

Yet the United States seeks to enjoin three provisions of SB 54 because those provisions limit the disclosure of information about individuals' home addresses and release dates, and the circumstances under which LEAs may transfer persons in their custody to immigration authorities. Even those three provisions are narrow in what they prohibit, and largely allow LEAs to assist immigration authorities, particularly for those convicted of serious or violent crimes. Under the first provision, LEAs may comply with "notification requests" from immigration authorities, which seek the release dates of persons in custody, if the subject of the request was: (1) convicted of any one of hundreds of serious felonies or misdemeanors under both federal and state law; (2) registered on the California Sex and Arson Registry (CSAR); (3) has been identified by ICE as the subject of an outstanding felony arrest warrant; or (4) arrested and the subject of a magistrate's finding of probable cause for a serious or violent felony identified in the statute. *Id.* §§ 7282.5, 7284.6(a)(1)(C). LEAs also have discretion to comply with notification requests if release dates are "available to the public," *id.* § 7284.6(a)(1)(C), meaning an LEA may adopt a practice of making release dates public, such as on its website. RJN, Ex. H at 3.

Under the second provision, LEAs may transfer an individual to immigration authorities if the person: (1) has been convicted of one of hundreds of serious felonies or misdemeanors; (2) is registered on CSAR; or (3) identified by ICE as the subject of a felony arrest warrant. Gov't Code §§ 7282.5(a), 7284.6(a)(4). LEAs may also transfer a person in custody to immigration authorities if the immigration authority produces a judicial warrant or a judicial probable-cause determination for violation of a federal criminal immigration offense. *Id.* §§ 7284.4(h)-(i),

4

7284.6(a)(4). Lastly, under the third provision, LEAs are prohibited from "providing personal information" about a person "for immigration enforcement purposes," unless that information is "available to the public." *Id.* § 7284.6(a)(1)(D).[4] As 8 U.S.C. § 1373 requires, this provision does not prohibit LEAs from exchanging information regarding a person's immigration or citizenship status to immigration authorities. Gov't Code § 7284.6(e).

### B.   Assembly Bill 450 (Immigrant Worker Protection Act)

California has a history of protecting employees in the workplace, including protecting their privacy and ensuring that they be informed of their rights. *See, e.g.*, Cal. Const. art. XIV; Lab. Code[5] §§ 6300 *et seq.*, 230.1 (notice for victims of domestic violence, sexual assault, or stalking in the workplace), 2810.5 (notice to new hires about their pay), 244(b) (barring employers from reporting or threatening to report suspected citizenship or immigration status of employees or their family members, to any federal, state, or local agency in retaliation for exercising rights under state law), 6328 (notice pertaining to safety rules, regulations, and rights).

Against this legal backdrop, the State adopted AB 450, effective January 1, 2018, "to ensure that all California workers enjoy the protections afforded to them under state law 'without fear of harassment, detention, or deportation.'" RJN, Ex. I at 2. AB 450 was informed by evidence that aggressive immigration enforcement harms employees, employers, and the enforcement of state laws. *E.g.*, RJN, Ex. J at 7 (raids "drive down wages and labor conditions for all workers, regardless of immigration status," "interfere with workers' ability to freely exercise their workplace rights," and "undermine" the enforcement of state labor and employment laws).

The United States seeks to enjoin four provisions of AB 450 as applied to private employers. Section 7285.1 of the Government Code limits employers from providing "voluntary consent to an immigration enforcement agent to enter any nonpublic areas of a place of labor." Section 7285.2 limits employers from providing "voluntary consent to an immigration enforcement agent to access, review, or obtain the employee's records." Section 90.2 of the Labor

---

[4] "Personal information" is defined in California Civil Code section 1798.3(a) as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history," including "statements made by, or attributed to, the individual."

[5] All references are to California Labor Code, unless otherwise stated.

5

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                    (2:18-cv-00490-JAM-KJN)

1    Code requires employers to provide notice of I-9 inspections to current employees, and any

2    authorized representative, within 72 hours of receiving a notice. Section 1019.2(a) of that Code

3    generally prohibits employers from re-verifying current employees' employment eligibility.

4         Each of these AB 450 provisions is operative "except as otherwise required by federal law."

5    Gov't Code §§ 7285.1(a), 7285.2(a)(1); Lab. Code §§ 90.2(a)(1), (b)(1), 1019.2(a). In addition,

6    AB 450 permits employers to provide immigration agents access to nonpublic areas of the

7    workplace if the agent produces a judicial warrant, Gov't Code § 7285.1(a)(1), and to employee

8    records if the agent produces a judicial warrant or administrative subpoena. *Id.* § 7285.2(a)(1).

9    AB 450 does not prohibit employers from cooperating with Form I-9 inspections to verify an

10   employee's eligibility for employment or from providing any documents requested as part of a

11   corresponding notice of inspection. *Id.* § 7285.2(a)(2). Furthermore, although employers are not

12   required to participate in the federal E-Verify program used to determine whether a person is

13   authorized to be employed in the United States, nothing in AB 450 "restrict[s] or limit[s] an

14   employer's compliance with a memorandum of understanding governing the use of the federal

15   E-Verify system." *Id.* § 7285.3; Lab. Code § 1019.2(c).

16        **C.    Assembly Bill 103 (Review of Detention Facilities)**

17        The United States also challenges AB 103, set forth at section 12532 of the Government

18   Code, effective July 1, 2017, which directs the California Attorney General to conduct reviews of

19   immigration detention facilities in California. AB 103 was enacted in response to growing

20   concern over egregious conditions in facilities housing civil detainees. *See* Decl. of Holly Cooper

21   (Cooper Decl.) ¶¶ 7-24; RJN, Exs. K-L. The State has a deeply rooted interest in the health and

22   welfare of all its residents, regardless of immigration status, including those who are detained. *See*

23   Penal Code[6] §§ 6030, 6031.1; 15 Cal. Code Regs. § 100 *et seq*. As the chief law officer of the

24   State, the Attorney General has broad constitutional powers to enforce all state laws and conduct

25   investigations "relating to business activities and subjects under" his jurisdiction, violations of

26   law, and any "other matters as may be provided by law." Cal. Const. art. V, § 13; Gov't Code

27   § 11180; *see also Brovelli v. Superior Court*, 56 Cal.2d 524, 529 (1961) (the Attorney General

28   ───────────────
     [6] All references are to the California Penal Code, unless otherwise stated.

6

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1  "can investigate merely on suspicion that the law is being violated, or even just because it wants

2  assurance that it is not") (quotations omitted).

3        AB 103 is not a regulatory scheme, and is much less onerous than the inspection and

4  enforcement regimes that apply to other prison facilities. *E.g.*, Penal Code §§ 6030-6031.2

5  (inspection of local detention facilities by Board of State and Community Corrections). Instead,

6  AB 103 simply authorizes funding for a review of "county, local, or private locked detention

7  facilities in which noncitizens are being housed or detained for purposes of civil immigration

8  proceedings in California." Gov't Code § 12532(a)-(b). Subject areas of the review include: the

9  conditions of confinement; the standard of care and due process provided to detainees; and the

10  circumstances around the apprehension and transfer of detainees to facilities. *Id.*

11  § 12532(b)(1)(A)-(C). The Attorney General is provided access to conduct the reviews,

12  "including, but not limited to, access to detainees, officials, personnel, and records." *Id.*

13  § 12532(c). By March 1, 2019, the Attorney General shall release a report with findings to the

14  Legislature and Governor, which will be made public. *Id.* § 12532(b)(2).

15        The Attorney General's Office began its site visits in December 2017. Decl. of Cherokee

16  Melton (Melton Decl.) ¶ 2. Of the nine active detention facilities in California, the Office has

17  completed initial site visits at all five county-owned facilities, but not the four privately-owned

18  facilities. *Id.* ¶¶ 3-4. Three of those four private facilities contract with cities. *Id.* ¶ 7, Exs. N-Q.

19  **II.   SUMMARY OF FEDERAL IMMIGRATION LAW**

20        The INA is "central[ly] concern[ed] … with the terms and conditions of admission to the

21  country and the subsequent treatment of aliens lawfully in the country." *DeCanas v. Bica*, 424

22  U.S. 351, 359 (1976). Under the INA, federal immigration officers have the primary

23  responsibility to enforce the immigration laws, 8 U.S.C. § 1357(a), which are generally civil,

24  rather than criminal, in nature. *Arizona v. United States*, 567 U.S. 387, 396, 407 (2012) ("As a

25  general rule, it is not a crime for a removable alien to remain present in the United States," and

26  removal proceedings are "civil, not criminal, matter[s].").

27        The INA allows—but does not require—state and local law-enforcement officials to

28  voluntarily participate in immigration enforcement under "limited circumstances." *Arizona*, 587

7

1    U.S. at 408-09. In this regard, the INA recognizes that each state has the power to determine the

2    extent to which its law-enforcement agencies will agree to assist in the enforcement of federal

3    immigration laws. In fact, in various instances, the INA makes clear Congress' intent that LEAs

4    only assist in immigration enforcement if allowed by their own state's laws.[7]

5         Likewise, for immigration "detainers," the INA acknowledges that state and local

6    governments retain discretion to allow their law enforcement officers to comply—or not— with

7    requests to hold individuals suspected by immigration authorities of being removable for up to 48

8    hours beyond ordinary release. *See* 8 U.S.C. § 1357(d); 8 C.F.R. § 287.7(d). Under its statutory

9    authority to issue detainers, in April 2017, the United States Department of Homeland Security

10   (DHS) revised its detainers to contain up to three requests on each form: (i) detain a person for up

11   to 48 hours after ordinary release ("detainer request"); (ii) notify DHS of a person's release from

12   custody "as early as practicable" ("notification request"); and (iii) transfer the person to DHS

13   upon release from custody ("transfer request"). RJN, Exs. A (Detainer Policy), B (I-247A).[8] As

14   courts have recognized, compliance with detainers, and the information requested therein, is

15   *voluntary*, as they must be or the requests would violate Tenth Amendment anti-commandeering

16   principles. *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 643-45 (3rd Cir. 2014); *Miranda-*

17   *Olivares v. Clackamas Cty.*, 2014 WL 1414305, at *4-*8 (D. Or. Apr. 11, 2014). The INA

18   implicitly recognizes the voluntary nature of these requests by requiring the federal government,

19   not state or local LEAs, to take custody "[i]f such a detainer is issued and the alien is *not*

20   *otherwise detained by . . . State, or local officials*." 8 U.S.C. § 1357(d) (emphasis added).

21        There is only one provision of the INA that the United States claims SB 54 conflicts with:

22   8 U.S.C. § 1373(a), which requires state and local governments to not prohibit another "entity or

23

24   [7] *See* 8 U.S.C. §§ 1103(a)(10) (allowing state and local law-enforcement assistance in the case of a "mass influx of aliens" only with "the consent of the head of the department, agency, or establish under whose jurisdiction the individual is serving"), 1252c(a) (allowing law-enforcement officers to arrest and detain certain categories of persons

25   illegally present, who have prior felony convictions, and who had left or were deported after the conviction, but only "to the extent permitted by relevant state and local law"), 1357(g)(1) (allowing the federal government to enter into

26   agreements with state and local law enforcement to function as immigration officers to investigate, apprehend, or detain individuals only "to the extent consistent with state law").

27   [8] A detainer request is accompanied by an administrative warrant, as opposed to a judicial warrant reviewed and approved by an Article III judge.

28

8

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                          (2:18-cv-00490-JAM-KJN)

1  official" from sending or receiving information "regarding the citizenship or immigration status

2  of any individual."[9]

3      Also relevant to the United States' claims is section 274A of the INA, as amended by the

4  Immigration Reform and Control Act (IRCA), 8 U.S.C. § 1324a. That statute makes it unlawful

5  to hire, recruit, refer for a fee, or continue to employ "unauthorized aliens." *Id.* § 1324a(a)(1), (2).

6  IRCA also establishes an "[e]mployment verification system" for determining whether an

7  individual hired, recruited, or referred for employment in the United States "is not an

8  unauthorized alien." *Id.* § 1324a(b)(1)(A). In general, the law requires the hiring entity to certify

9  that the employer examined the prospective employee's documentation and that he or she is

10  authorized for employment in the United States. *Id.* § 1324a(b)(1)-(2). The statute requires

11  reasonable access for immigration officers and administrative law judges to "examine evidence of

12  any person or entity being investigated." *Id.* § 1324a(e)(2). IRCA, however, was not intended "to

13  undermine or diminish in any way labor protections in existing law," leaving such discretion to

14  the states. H.R. Rep. No. 99-682(I) at 58 (1986).

15      Lastly, while the INA authorizes the United States to contract with state or local entities to

16  provide detention facilities (8 U.S.C. §§ 1103(11)(A), 1226(c), 1226a, 1231(g)(1), 1536), it does

17  not specify standards or restrict a state's independent assessment of facility conditions. The

18  contracts that govern those facilities contain numerous provisions requiring compliance with state

19  law. Melton Decl. ¶ 17, Ex. M.

20              **APPLICABLE LEGAL STANDARDS**

21  **I.   STANDARDS FOR A PRELIMINARY INJUNCTION MOTION**

22      A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

23  clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council,*

24  *Inc.*, 555 U.S. 7, 22 (2008). A plaintiff must establish (a) "that he is likely to succeed on the

25  merits;" (b) "that he is likely to suffer irreparable harm in the absence of preliminary relief;"

26  (c) "that the balance of equities tips in his favor;" and (d) "that an injunction is in the public

27  ───────────

[9] The United States does not challenge SB 54 under § 1373(b), Compl. ¶ 65, which contains overlapping and
additional restrictions on the exchange of information regarding immigration status. In any event, SB 54 also

28  complies with § 1373(b) for the same reasons as it complies with § 1373(a). *See, e.g.*, Gov't Code § 7284.6(e).

9

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

interest." *Id.* at 20. A plaintiff's burden is particularly heavy in cases seeking to enjoin state

statutes, because "a state suffers irreparable injury whenever an enactment of its people or their

representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997);

*Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992) ("[A] strong factual record is

necessary."). "The basic function of a preliminary injunction is to preserve the status quo." *Chalk*

*v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). Thus, mandatory

injunctions, like the one requested here, which go beyond "maintaining the status quo *pendente*

*lite*" are "particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994);

*see also Tracy Rifle and Pistol LLC v. Harris*, 118 F. Supp. 3d 1181, 1194-95 (E.D. Cal. 2015)

(injunction would alter the status quo where it would prevent enforcement of a statute).

## II.   STANDARDS FOR FACIAL AND AS-APPLIED CHALLENGES

The United States mounts a facial challenge to SB 54 and AB 103. Thus, the United States

must show "no set of circumstances exists under which [the challenged law] would be valid, or

that it lacks any plainly legitimate sweep." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307,

1314-15 (9th Cir. 2015) (quotation omitted). The United States' challenge to AB 450 is "as

applied," *see* Compl. ¶ 61, limiting the scope of any injunctive relief.[10] *Italian Colors Rest. v.*

*Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018) ("[A] successful as-applied challenge invalidates

only the particular application of the law.") (quotation omitted).

## ARGUMENT

## I.   THE UNITED STATES IS NOT LIKELY TO SUCCEED ON THE MERITS

### A.   The United States Will Not Succeed on Its Claim Against SB 54

#### 1.   SB 54 Does Not Conflict with § 1373(a)

Contrary to the United States' contention, the provisions of SB 54 that allow LEAs to

provide release dates only for those individuals who have been convicted of one of hundreds of

serious and violent crimes and the limitations on the release of "personal information" that is not

---

[10] Although the United States' complaint seeks to invalidate AB 450 "as applied to private employers," its motion
does not make such a distinction. Since AB 450 applies to all public and private employers, if the federal government
intends to mount a facial challenge, it is unlikely to succeed solely because, as discussed *infra* 14-19, federal law
cannot commandeer the State's governmental employees.

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                   (2:18-cv-00490-JAM-KJN)

1   otherwise public do not conflict with § 1373(a). Pl.'s Mot. for Prelim. Inj. (Mot.) (ECF No. 2) at

2   23-31. When analyzing preemption, courts assume that "the historic police powers of the States

3   are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567

4   U.S. at 400; *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Those police powers include the

5   "suppression of violent crime." *United States v. Morrison*, 529 U.S. 598, 618 (2000). The

6   "presumption against preemption is heightened where federal law is said to bar state action in

7   fields of traditional state regulation." *Riegel v. Medtronic, Inc*., 552 U.S. 312, 334 (2008). Under

8   a facial challenge, such as here, the Court should not interpret state laws in a manner that would

9   "create[] a conflict with federal law." *Arizona*, 567 U.S. at 415.

10      As a threshold issue, SB 54 cannot conflict with § 1373(a) on its face because of SB 54's

11   explicit savings clause, which expressly authorizes compliance with all aspects of 8 U.S.C.

12   § 1373. Gov't Code § 7284.6(e). The "authoritative statement" of a statute is its "plain text,"

13   including its "savings clause." *Chamber of Commerce of the U.S. v. Whiting*, 563 U.S. 582, 599

14   (2011). In light of its plain language, none of SB 54's provisions can be interpreted to restrict

15   communications of information regarding a person's immigration status with federal immigration

16   authorities. The existence of SB 54's savings clause should be determinative.

17      Further, by its terms, § 1373(a) only regulates "information regarding . . . citizenship or

18   immigration status." In its effort to invalidate SB 54, the United States adopts an expansive

19   interpretation of that language to encompass any information that might be "relevant" to

20   potentially assessing a person's immigration status, such as addresses and release dates. Mot. at

21   27-29. That interpretation is unsupported by the plain text of the statute, and has been rejected by

22   the one federal court that has analyzed the scope of § 1373(a). *Steinle v. City & Cty. of San

23   Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017), *appeal docketed*, No. 17-16283 (9th Cir.

24   June 21, 2017) ("[N]o plausible reading of 'information regarding . . . citizenship or immigration

25   status' encompasses the release date of an undocumented inmate.").

26      Because the federal government seeks to extend § 1373(a) into "traditionally sensitive

27   areas" of the state's police power that would "alter the usual constitutional balance between the

28   States and the Federal Government," Congress must make its intentions "unmistakably clear in

11

1    the *language of the statute.*" *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (emphasis added); *see*

2    *also Bond v. United States*, 134 S. Ct. 2077, 2089 (2014). Here, the United States asserts that

3    § 1373 prohibits California from protecting sensitive information collected by its LEAs, despite

4    California's legitimate concerns that allowing the disclosure of this information will severely

5    impair law enforcement's ability to work with the State's large immigrant communities. *See*

6    *supra* 2-3. If Congress wanted § 1373(a) to broadly cover the exchange of all information about

7    an individual, "it knew how to do so." *Custis v. United States*, 511 U.S. 485, 492 (1994). For

8    instance, in the same legislation that enacted § 1373(a), Congress used "any information which

9    relates to an alien" in § 384 (8 U.S.C. § 1367(a)(2)) to describe information that was protected

10   from disclosure.[11] As the *Steinle* court concluded, "[I]f the Congress that enacted [the Act] had

11   intended to bar *all* restrictions of communication between local law enforcement and federal

12   immigration authorities, or specifically to bar restrictions of sharing inmates' release dates, it

13   could have included such language in the statute." 230 F. Supp. 3d at 1015 (emphasis in original).

14       To justify reading § 1373(a) more broadly than the plain text permits, the United States first

15   relies on legislative history and dictum from a California Court of Appeal decision. *See* Mot. at

16   27 (citing *Bologna v. City & Cty. of San Francisco*, 192 Cal. App. 4th 429, 438-39 (2011)). The

17   court in *Steinle*, however, rejected such reliance on legislative history. *Steinle*, 230 F. Supp. 3d at

18   1014-15 (finding that "the authoritative statement is the statutory text, not the legislative history

19   or any extrinsic material") (quoting *Exxon Mobil Corp. v. Allapattah Servs*., *Inc*., 545 U.S. 546,

20   568 (2005)). The United States also argues that Congress' inclusion of the term "regarding" in

21   § 1373(a), while omitting the term in a different section, is dispositive. Mot. at 28. But § 1373(c)

22   is different for an understandable reason. Section 1373(c) governs the obligations of federal

23   immigration authorities, which presumably have an official record of a person's "citizenship or

24   _____

25   [11] Other provisions of the act similarly demonstrate that Congress knew how to use more sweeping and precise terminology when it wished to cover information about a person's address, nationality, or associations. *See, e.g.*, *id.* §
302, 8 U.S.C. § 1225(a)(5) (permitting immigration officers to ask "any information . . . regarding the purposes and

26   intentions of the applicant" including intended length of stay and the applicant's admissibility); *id.* § 241, 8 U.S.C. §
1231(a)(3)(C) (requiring information "about the alien's nationality, circumstances, habits, associations, and activities,

27   and other information the Attorney General considers appropriate"); *id.* § 414, 8 U.S.C. § 1360(c)(2) (Social Security Commissioner must provide "information regarding the name and address of the alien").

28

12

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1   immigration status." Thus, § 1373(c) would have no need to use the term "regarding." By

2   contrast, § 1373(a) covers immigration or citizenship status information that state and local

3   governments may have in their possession that is not part of the official record of a person's

4   immigration status held by the federal government. *See, e.g.*, *United States v. Quintana*, 623 F.3d

5   1237, 138 (8th Cir. 2010) (state highway patrol communicated to Customs and Border Protection

6   (CBP) immigration status information about a person not in CBP's database).

7        The United States also contends that 8 U.S.C. § 1357(g)(10) ties "immigration status" to

8   whether a person is "not lawfully present," Mot. at 28, or in other words, one's "unlawful

9   presence," and claims that addresses and release dates are "relevant" to that. *Id.* at 29. The INA,

10  however, defines "unlawful presence" narrowly as when one is "present . . . after the expiration of

11  the period of stay authorized by the Attorney General or is present . . . without being admitted or

12  paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). One's specific location in the United States, however,

13  does not impact whether he or she is "present . . . after the expiration of the period of stay

14  authorized." Neither does a person's release date fall within the scope of § 1373(a) because of its

15  relevance to the federal government's responsibility to take inadmissible immigrants into custody

16  upon release. Mot. at 28-29. While a criminal conviction, which may be disclosed under SB 54,

17  Gov't Code § 7284.6(b)(2), may alter one's immigration status, a person does not become more

18  or less "unlawfully present" upon release from state custody. *See* 8 U.S.C. §§ 1226(c), 1231(a)

19  (setting when immigration authorities may take a person into custody, without connecting release

20  dates to status).

21       Under the United States' theory, virtually any information about a person would be relevant

22  to an assessment of immigration status and would therefore be subject to disclosure. For instance,

23  the federal government claims that home addresses are information "regarding immigration

24  status" because they are "relevant" to whether an immigrant "evidenced an intent not to abandon

25  his or her foreign residence, or otherwise violated the terms of such admission." Mot. at 29.

26  Under that same rationale, whether a person receives a governmental service, such as

27  unemployment benefits or vehicle registration, would be just as relevant to one's immigration

28  status, confirming that the federal government's interpretation of § 1373(a), indeed, "stop[s]

13

1   nowhere." *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847, 849-50 (9th Cir. 2002) (limiting

2   scope of "relate to" in a contract so it did not supersede "the historic police powers of the States"

3   without Congress' clear intent). This analysis cannot be reconciled with § 1373(a)'s text.

4         **2.**     **The United States' Interpretation of § 1373(a) to Preempt SB 54
        Violates the Tenth Amendment**

5

6         **a.**     **The United States' Interpretation Constitutes Commandeering**

7        Allowing the United States to enforce its broad interpretation of § 1373(a) against SB 54

8   would also result in commandeering of the State's personnel and legislative processes in violation

9   of the Tenth Amendment. Under the Tenth Amendment to the United States Constitution, "[t]he

10  powers not delegated to the United States by the Constitution, nor prohibited by it to the States,

11  are reserved to the States respectively, or to the people." The Tenth Amendment directs the Court

12  "to determine . . . whether an incident of state sovereignty is protected by a limitation on an

13  Article I power." *New York v. United States*, 505 U.S. 144, 157 (1992). As part of that analysis,

14  the state must have a "legitimate choice" to "decline to administer the federal program," *id.* at

15  177, 185, to ensure that the states are accountable to their residents and to reduce the "risk of

16  tyranny and abuse" from the federal government. *Printz v. United States*, 521 U.S. 898, 920-21

17  (1997) (quoting *Gregory*, 501 U.S. at 458).

18       One way the Tenth Amendment preserves this dual-sovereignty structure fundamental to

19  the Constitution is by prohibiting the federal government from "commandeering" state and local

20  legislative processes and officials to support a federal program. *Printz*, 521 U.S. at 935; *New*

21  *York*, 505 U.S. at 176. The Framers "explicitly chose a Constitution that confers upon Congress

22  the power to regulate individuals, not States," and it "has never been understood to confer upon

23  Congress the ability to require the States to govern according to Congress' instructions." *New*

24  *York*, 505 U.S. at 162, 166. The Court, therefore, must read § 1373 narrowly so as not to exceed

25  Congress' authority and encroach on the State's police powers. *See Almeida-Sanchez v. United*

26  *States*, 413 U.S. 266, 272 (1973) ("[U]nder familiar principles of constitutional adjudication, our

27  duty is to construe the statute, if possible, in a manner consistent with the [U.S. Constitution].").

28

14

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.         (2:18-cv-00490-JAM-KJN)

1  The United States' interpretation would place California in a position where it "may not

2  decline to administer the federal program." *New York*, 505 U.S. at 176-77; *see also Petersburg*

3  *Cellular P'ship. v. Bd. of Sup'rs of Nottoway Cty.*, 205 F.3d 688, 703 (4th Cir. 2000) (J.

4  Niemeyer, alternative holding) ("Preemption [is] not a federal usurpation of state government or a

5  commandeering of state legislative or executive processes for federal ends."). Since Congress

6  could not have directly mandated that California assist with federal immigration enforcement, the

7  federal government cannot contort § 1373(a) to have that same effect. *City of El Cenizo v. Texas*,

8  885 F.3d 332, 348 (5th Cir. 2018) (acknowledging that "under the Tenth Amendment, Congress

9  could not compel local entities to enforce immigration law"); *Galarza*, 745 F.3d at 643-45; *Cty.*

10 *of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) (finding that "enforcement

11 action" provision of Executive Order violated the Tenth Amendment "[b]y seeking to compel

12 states and local jurisdictions to honor civil detainer requests"). As the Seventh Circuit recently

13 stressed in striking down a less-intrusive funding-related federal effort to enlist localities in

14 immigration enforcement: "The choice as to how to devote law enforcement resources—

15 including whether *or not* to use such resources to aid in immigration efforts—would traditionally

16 be one left to state and local authorities." *Chicago*, 2018 WL 1868327 at *6 (emphasis added).

17 The Supreme Court's decision in *Printz* is particularly instructive. There, the Court

18 considered the constitutionality of a federal law mandating that chief law enforcement officers

19 conduct background checks for gun purchases. Despite the important federal interests at stake, the

20 Supreme Court held that under the anti-commandeering doctrine, the federal government was

21 prohibited from "issu[ing] directives requiring the States to address particular problems." 521

22 U.S. at 935. Like in *Printz*, the "whole object" of the United States' interpretation of § 1373(a) is

23 to command the State to allow the unfettered use of its resources and personnel to provide

24 information for federal immigration-enforcement purposes. *Id.* at 932. Just as the background

25 check law in *Printz* regulated "information that belongs to the State and is available to them only

26 in their official capacity," *id.* at 932 n.17, the United States' enforcement of § 1373(a) to SB 54

27 applies only to information in the possession of law enforcement officials that is available to

28 them, but not "available to the public." *See* Gov't Code § 7284.6(a)(1)(C)-(D).

15

This prohibition on commandeering applies with maximum force here because the United States interprets § 1373(a) to direct the functioning of state and local law enforcement "within their proper sphere of authority," *i.e.* determining how best to address crime and public safety. 521 U.S. at 928; *see also Koog v. United States*, 79 F.3d 452, 457-60 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies."). The United States' application of § 1373(a) intrudes on the State's discretion to make nuanced policy decisions regarding the specific circumstances under which personal information and release dates are protected from disclosure. *See* Gov't Code § 7284.6(a)(1)(C)-(D). As a result, the State and its LEAs would be unjustly blamed if witnesses and victims are less inclined to report crimes and relationships between communities and law enforcement are strained. *See* Gov't Code § 7284.2(c); *supra* 2-3. In this way, the United States' interpretation would force the State "to absorb the financial burden of implementing a federal regulatory program" while the federal government would "take credit for 'solving' problems without . . . higher federal taxes" and put state and local officials "in the position of taking the blame for its burdensomeness and for its defects." *Printz*, 521 U.S. at 930. No less of a concern here is how "[t]he power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States." *Id.* at 922.

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) highlights the significant constitutional issue created by the federal government's broad extension of § 1373(a). The Second Circuit held that § 1373 was facially constitutional and determined that the city's Tenth Amendment arguments were not credible when its executive order "applie[d] only to information about immigration status and bar[red] City employees from voluntarily providing such information only to federal immigration officials." *Id.* at 37. In direct contrast, SB 54 authorizes the disclosure of immigration status information, Gov't Code § 7284.6(e), and only limits disclosure to immigration authorities if the information is not "available to the public." *Id.* § 7284.6(a)(1)(C)-(D). Thus, unlike the New York City ordinance, SB 54 does not selectively limit the exchange of release dates and personal information to immigration authorities "while

allowing [governmental] employees to share freely the information . . . with the rest of the world." *City of New York*, 179 F.3d at 37. The Second Circuit recognized that concerns about confidentiality of this type of information are "not insubstantial":

> The obtaining of pertinent information, which is essential to the performance of a wide variety of state and local governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved.  Preserving confidentiality may in turn require that state and local governments regulate the use of such information by their employees.

*Id.* at 36.

Because of the strong interests the State has in preserving the confidentiality of such information to promote the reporting of crime and perform essential government services, Gov't Code § 7284.2(c), enforcement of the United States' sweeping interpretation of § 1373(a) against SB 54 would impose "an impermissible intrusion on state and local power to control information obtained in the course of official business or to regulate the duties and responsibilities of state and local governmental employees." *City of New York*, 179 F.3d at 36. This interpretation would therefore make it impossible for the State to decline participation in immigration enforcement. *New York*, 505 U.S. at 177. One federal court already concluded that a city is likely to succeed on its claim that this interpretation of § 1373(a) violates the Tenth Amendment because it "thwart[s] policymakers' ability to extricate their state or municipality from involvement in a federal program." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 651 (E.D. Pa. 2017).

### b.   The United States' Interpretation of § 1373(a) Further Impermissibly Intrudes on the State's Sovereign Powers

Alternatively, and independent of the anti-commandeering doctrine, the United States' interpretation of § 1373(a) exceeds Congress' enumerated powers by indirectly regulating immigration while directly intruding on the State's ability to regulate its own law-enforcement officers, a core power of a sovereign state. As an initial matter, while "Congress may impose conditions on the State's regulation of private conduct in a pre-emptible area," the Supreme Court has explicitly recognized that the power "does not suggest that the Federal Government may impose conditions on state activities in fields that are not pre-emptible." *FERC v. Mississippi*, 456

17

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1  U.S. 742, 765, 769 n.32.[12] Since the federal government is enforcing § 1373(a) to the State's law

2  enforcement, it is acting in an area where Congress is limited in what it may preempt.

3      Even where the Constitution bestows broad powers on the federal government, courts

4  balance how directly Congress is furthering its delegated power against the level of intrusiveness

5  on the state's police power. For example, in *United States v. Lopez*, 514 U.S. 549 (1995), the

6  Court read "judicially enforceable outer limits" into the broad scope of the Commerce Clause

7  when it rejected part of a federal statute that criminalized possession of a firearm in a "school

8  zone." The Court said the law would erase the distinction between "what is truly national and

9  what is truly local." *Id.* at 565-68. Similarly, in *United States v. Morrison*, the Supreme Court

10  rejected parts of the Violence Against Women Act as outside the Commerce Clause power

11  because the "aggregate effect on interstate commerce" was insufficient to regulate conduct that is

12  "truly local:" "[t]he regulation and punishment of intrastate violence." 529 U.S. at 617. The Court

13  declared, "[W]e can think of no better example of the police power, which the Founders denied

14  the National Government and reposed in the States, than the suppression of violent crime and

15  vindication of its victims." *Id.* at 618.

16      In this case, the federal government's attempt to turn § 1373(a) against SB 54 triggers the

17  constitutional limits similar to those in *Lopez* and *Morrison* by exceeding Congress' delegated

18  immigration powers while encroaching on the State's sovereign powers to regulate its law

19  enforcement officers. *See DeCanas*, 424 U.S. at 355-56 (recognizing that Congress is "powerless

20  to authorize or approve" a statute in the arena of the state's police power that does not regulate

21  "determination[s] of who should or should not be admitted into the country, and the conditions

22  upon which a legal entrant may remain"). The federal government is not just seeking to control

23  "immigration" and "citizenship status" information, which goes to the federal government's

24  "determinations" and "conditions" of who is allowed in the United States. Rather, its

25  interpretation of § 1373 encompasses essentially all of the information that law enforcement

26  officers possess about the people they serve, regardless of how directly connected the information

27
28
---
[12] The Supreme Court has also upheld "generally applicable" federal statutes that regulate states in the same manner as private entities. *Reno v. Condon*, 528 U.S. 141, 151 (2000). Those statutes are distinguishable from § 1373, which "regulate[s] the 'States as States.'" *FERC*, 456 U.S. at 779.

18

is to a person's right to enter or remain in the country. With this interpretation, the United States intrusively interferes with the Legislature's considered judgment about how best to provide for the public safety, prioritize limited law-enforcement resources, and encourage the reporting of crimes. Congress could not extend a statute like § 1373(a) to so substantially interfere with the State's regulation of its law enforcement officers. *See Morrison*, 529 U.S. at 618; *Romero v. United States*, 883 F.Supp. 1076, 1086 (W.D. La. 1994) ("[I]t is possible to extrapolate at least one such incident of state sovereignty, without the necessity for defining all incidents, from the very nature of state sovereignty: maintenance of public order."). And the Executive Branch cannot interpret § 1373(a) in a way that Congress could not have achieved itself. *See, e.g.*, *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by [the federal government's] interpretation . . . .").

### 3. SB 54 Does Not Pose an Obstacle to the Objectives of the INA

Beyond the Tenth Amendment problems with interpreting Congress' scheme as prohibiting the State from regulating its law enforcement, SB 54 works in concert with, and does not "undermine the system that Congress designed." *Contra* Mot. at 25-27. Through the INA, Congress set a ceiling on what LEAs may do in connection with immigration enforcement. As the Supreme Court explained in *Arizona v. United States*, a state cannot create criminal penalties for federal immigration offenses if those penalties do not exist in federal law, 567 U.S. at 403-07, nor allow law enforcement to make warrantless arrests based on possible removability except when authorized under federal statute. *Id.* at 410. Section 1373 represents the floor with narrow limitations on how far removed state and local law enforcement may be in restricting voluntary cooperation with immigration authorities. The INA permits the state to legislate anywhere between that floor (§ 1373) and the ceiling (*Arizona v. United States*).

This is exactly what SB 54 does. While Congress prohibited restrictions on the exchange of information "regarding immigration status," it did not express a "clear and manifest purpose" to prohibit restrictions on cooperation with immigration authorities in other manners, such as

19

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1  complying with notification and transfer requests.[13] Instead, respectful of federalism principles,

2  Congress gave the power to every state government to decide the extent their LEAs will be

3  involved in federal immigration enforcement. *See supra* 7-8. In this respect, SB 54 is akin to the

4  Arizona licensing law imposing sanctions on employing unauthorized immigrants in *Whiting*,

5  which the Supreme Court upheld because it was permitted under 8 U.S.C. § 1324a. Like that law,

6  SB 54 is acting within an area in which Congress delegated discretion to state governments by,

7  for example, allowing cooperation in effectuating immigration arrests "to the extent permitted by

8  relevant State law." 8 U.S.C. § 1252c(a), and contemplating non-compliance with detainer

9  requests, § 8 U.S.C. 1357(d). "Given that Congress specifically preserved such authority for the

10  States, it stands to reason that Congress did not intend to prevent the States from using

11  appropriate tools to exercise that authority." *Whiting*, 563 U.S. at 584. Indeed, the Seventh Circuit

12  recently determined that jurisdictions that limit entanglement with immigration enforcement "do[]

13  not interfere with the federal government's lawful pursuit of its civil immigration activities."

14  *Chicago*, 2018 WL 1868327 at *5.

15      The United States is wrong that SB 54 interferes with immigration authorities' obligations

16  under the INA to "promptly" detain a person upon release from custody as required under 8

17  U.S.C. § 1226. *See* Mot at 24-25; *Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016), *cert. granted

18  sub nom. Nielsen v. Preap*, 138 S. Ct. 1279 (2018). First, failing to arrest a person promptly after

19  release from custody does not affect the ability of immigration authorities to proceed with

20  deportation proceedings once that person is arrested by immigration authorities. The only impact

21  is on potential eligibility for release from detention during the proceeding. 8 U.S.C. § 1226(a);

22  *Preap*, 831 F.3d at 1195. To the extent that this makes immigration authorities' job more difficult,

23  that is not a ground for preemption. *See, e.g.*, *In re Baker & Drake, Inc. v. Public Serv. Comm'n

24  of Nevada*, 35 F.3d 1348, 1354 (9th Cir. 1994) ("[s]imply making a reorganization more difficult

25  for a particular debtor, however, does not rise to the level of stand[ing] as an obstacle to the

---

26  [13] In 2017, Congress attempted to amend § 1373 to prohibit federal, state, or local provisions that "in any way"
restrict an entity or official "from assisting or cooperating with Federal law enforcement entities, officials, or other

27  personnel" regarding enforcement of the immigration laws. *See, e.g.*, No Sanctuary for Criminals Act, H.R. 3003,
115th Cong. (2017). Besides Tenth Amendment ramifications, this proposal underscores that now, there is no "clear

28  and manifest purpose" to preempt anything other than restrictions on information "regarding immigration status."

20

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1  accomplishment of the full purposes and objectives of Congress" in enacting Bankruptcy Act,

2  which does not mandate "every company be reorganized at all costs"). Second, the only

3  obligations imposed by the statute are plainly on the federal government to take a person into

4  custody, *see Preap*, 831 F.3d at 1203; 8 U.S.C. §§ 1226(a), 1231(a), not on state and local

5  government to participate in that process. Third, the *Preap* decision recognized the detention of

6  someone released from state or local custody need not occur "at the exact moment" someone is

7  released, *Preap*, 831 F.3d at 1207, meaning SB 54's regulation of compliance with transfer

8  requests does not upset that framework. Finally, SB 54 does not prohibit compliance with

9  notification requests, but confers discretion on jurisdictions to communicate release dates if they

10  make that information available to the public. Gov't Code § 7284.6(a)(1)(C); RJN, Ex. H at 3.[14]

11      In addition, SB 54 is unlike the state laws that the Supreme Court struck down in *Arizona*.

12  *See* Mot. at 3, 9-10, 27. *Arizona* and other preemption cases admonish that the states must refrain

13  from regulating immigration unless consistent with the INA's scheme. *See, e.g.*, *Arizona*, 567

14  U.S. at 406-10; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1027 (9th Cir. 2013); *League of*

15  *United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 777 (N.D. Cal. 1995). SB 54, however,

16  does not regulate immigration; it guides LEAs' interactions with immigration authorities in a

17  manner consistent with federal law.[15] *See* Gov't Code § 7284.6(e). Congress has plainly not

18  provided that state and local jurisdictions must allow their resources to be used to communicate

19  with immigration authorities on "all" matters, *see Steinle*, 230 F. Supp. 3d at 1015, or comply

20  with requests on every detainer form. *See* 8 U.S.C. § 1357(d). Where a state law, like SB 54, is

21  required to be "implemented in a manner consistent with federal laws regulating immigration," it

22  will withstand a preemption challenge. *Arizona,* 567 U.S. at 411.

23      For the same reasons, SB 54 does not interfere with federal immigration authorities'

24  "methods," *see* Mot. at 27, as "[t]he federal scheme thus leaves room for a [state] policy"

---

[14] *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) also does not impose any obligation on state and local governments, since it only speaks to the federal government's obligations to detain certain categories of unauthorized immigrants. And *Demore v. Kim*, 538 U.S. 510 (2003) discussed how Congress' amendments to the INA limited *immigration authorities*, not state and local law enforcement, from releasing someone from custody upon arrest. *Id.* at 519-20.

[15] The United States' claim that the exempted crimes under SB 54 do not match the crimes in the INA, Mot. at 26, is of no matter, since the State is not seeking to use that list to affirmatively enforce the immigration laws.

21

1  regulating when law enforcement may assist in immigration enforcement. *Arizona*, 567 U.S. at

2  413 (citing *Whiting*, 563 U.S. at 609-10). The "[i]mplied preemption analysis does not justify a

3  freewheeling judicial inquiry into whether a state statute is in tension with federal objectives;

4  such an endeavor would undercut the principle that it is Congress rather than the courts that

5  preempt state law." *Whiting*, 563 U.S. at 607. In the INA, Congress accepted "tension" by

6  acknowledging that state and local law enforcement assistance in immigration enforcement would

7  be "consistent with state law." 8 U.S.C. §§ 1103(a)(10), 1252c(a), 1357(g)(1); *cf. id.* § 1357(d);

8  *see also Whiting*, 563 U.S. at 611 (holding state's licensing law valid even if gives rise "to

9  impermissible conflicts" with federal immigration law where IRCA permitted the state to act in

10  the area); *Barrientos v. 1801-1825 Morton*, 583 F.3d 1197, 1212-13 (9th Cir. 2009) (upholding

11  local ordinance where federal government "permitted an action . . . that the state forbade," and

12  statutory language "contemplate[d] the interdependence of federal assisted housing law and state

13  and local housing law").[16] As the Supreme Court held, "The case for federal preemption is

14  particularly weak where Congress has indicated its awareness of the operation of state law in a

15  field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate

16  whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489

17  U.S. 141, 166-67 (1989); *see also Wyeth*, 555 U.S. at 575, 581. Because the INA gives a role for

18  the states to legislate, and accepts this tension with state law, SB 54 acts permissibly in that space,

19  and is not preempted.

20          **4.**    **SB 54 Does Not Violate Intergovernmental Immunity Principles**

21       SB 54 also does not violate the doctrine of intergovernmental immunity.[17] A state law is

22  invalid under intergovernmental immunity "only if it regulates the United States directly or

23  discriminates against the Federal Government or those with whom it deals." *North Dakota v.*

24  *United States*, 495 U.S. 423, 434 (1990). To survive, a state regulation is only required to be

25   
26  [16]Comparatively, in *Int'l Paper Co. v. Ouelette*, 479 U.S. 481 (1987), Mot. at 27, the Supreme Court held a state law preempted where it allowed common-law suits against pollution sources in other states undercutting uniform discharge standards set by Congress. *Id.* at 496-97.

27  [17] Because intergovernmental immunity is not found in the Constitution, and the State is acting within the scope of its police power reserved within it under the Tenth Amendment, particularly with respect to SB 54 and AB 450, intergovernmental immunity does not apply here for the reasons incorporated by referenced on page 7 of Defendants'

28  Motion to Dismiss filed concurrently.

"imposed equally on other similarly situated constituents of the State." *Id.* at 438. An indirect

burden on the federal government as a result of the overlap between state and federal jurisdiction

is insufficient to render a state law unconstitutional. *Id.* at 434-35. Instead, the Supreme Court has

"adopted a functional approach to claims of governmental immunity, accommodating of the full

range of each sovereign's legislative authority and respectful of the primary role of Congress in

resolving conflicts between National and State Government." *Id.* at 436.

The United States claims that SB 54 "appl[ies] only to requests made by federal entities"

and "have the purpose and effect of treating federal immigration officials worse than other

entities that might seek information," but these claims fail. Mot. at 31. SB 54 does not treat the

federal government differently from similarly situated constituents. *See North Dakota*, 495 U.S.

at 437-38. Two of the provisions regarding release dates and personal information allow sharing

information that is "available to the public." Gov't Code § 7284.6(a)(1)(C)-(D). That means an

LEA may share information with immigration authorities if the LEA allows for the similar

exchange of information with others. RJN, Ex. H at 3. All three provisions apply neutrally to

"immigration authorities," defined as "any federal, state, or local officer, employee, or person

performing immigration enforcement functions." Gov't Code § 7284.4(c).

In addition, SB 54 does not restrict the exchange of information with federal immigration

authorities for criminal investigative matters. *See, e.g.*, *id.* § 7284.6(b)(3). ICE's and CBP's

access to state law-enforcement databases remains unchanged under SB 54. Dominic Decl. ¶¶ 9-

13. LEAs can (and still do) work with ICE or CBP on task forces focused on law enforcement.

Decl. of Christopher Caligiuri (Caligiuri Decl.) ¶¶ 6-13. And, although the INA does not require

jurisdictions to comply with notification and transfer requests, SB 54 authorizes LEAs to comply

with such requests if the subject of the request was convicted of any one of hundreds of different

state and federal crimes. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C), 7284.6(a)(4); *cf. North*

*Dakota*, 495 U.S. at 439 ("A regulatory regime which so favors the Federal Government cannot

be considered to discriminate against it.").

Throughout its motion, the United States relies on *United States v. City of Arcata* (*Arcata*),

629 F.3d 986 (9th Cir. 2010). But, the ordinance in *Arcata* <u>directly regulated</u> the federal

23

1    government by prohibiting military recruitment for youth and restricted the conduct of only

2    federally employed military recruiters not "incidentally as the consequence of a broad, neutrally

3    applicable rule." *Id.* at 991. Here, the State is not regulating federal immigration authorities, nor

4    treating them differently from any other entity. Any differential "effect" on the federal

5    government, *see* Mot. at 31, is a product of the State acting rationally within the scope of "proper

6    domestic concerns" of providing for the public safety. *See supra* 2-3; *Phillips Chem. Co. v.*

7    *Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960). In such cases, the state's power to classify is

8    "extremely broad, and its discretion is limited only by constitutional rights and by the doctrine

9    that a classification may not be palpably arbitrary." *Id.* at 385; *cf. Davis v. Mich. Dep't of*

10   *Treasury*, 489 U.S. 803, 815-16 (1989) (a higher tax on those dealing with the federal government

11   could "be justified by significant differences between the two classes"). The State's limitations on

12   assisting in "immigration enforcement purposes" is justified by "significant differences" between

13   the enforcement of the immigration laws, which is the primary responsibility of the federal

14   government, 8 U.S.C. § 1357(a), and state and local criminal law enforcement. The State has also

15   acted rationally by allocating its resources to permit cooperation with immigration authorities for

16   those persons previously convicted of serious or violent criminal offenses. Gov't Code

17   §§ 7282.5(a); 7284.6(a)(1)(C), (a)(4). And through the INA, Congress has not prohibited

18   jurisdictions from restricting transfer and notification requests, and generally allows cooperation

19   with immigration authorities to the extent consistent with state or local law. *See, e.g.*, 8 U.S.C.

20   §§ 1103(a)(10), 1252c(a), 1357(g)(1), 1357(d). "Congress's action sufficiently qualifies the

21   intergovernmental immunity of the United States to permit the state to make the distinction it

22   has." *United States v. Lewis Cty.*, 175 F.3d 671, 676 (9th Cir. 1999).

23        Furthermore, SB 54 reflects the State's considered judgment regarding the effects of the

24   United States' escalating immigration enforcement efforts, which have more than doubled the

25   number of requests made of state and local law enforcement. *See supra* 3. SB 54 thus "direct[s]

26   the state's limited resources to matters of greatest concern"—namely, for those who have

27   committed serious criminal offenses. Gov't Code § 7284.2(f)*; see also id.* § 7282.5. ICE in fact

28   acknowledges that it is devoting additional enforcement resources to the State because of SB 54

24

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                   (2:18-cv-00490-JAM-KJN)

1   and is therefore treating California differently. Deposition of Thomas Homan (Homan Dep.)[18] at

2   36:5-37:25. This is exactly the type of parallel authority contemplated in our federal system:

3   California has decided to focus its limited law-enforcement resources on persons who pose a

4   serious criminal threat, and ICE has decided to place more immigration-enforcement resources in

5   the State to focus on those who do not. *See North Dakota*, 495 U.S. at 435 ("Whatever burdens

6   are imposed on the Federal Government by a neutral state law . . . are but normal incidents of the

7   organization within the same territory of two governments.").

8          Finally, the claim that SB 54's "purpose" is to "treat[] federal immigration officials worse

9   than other entities," Mot. at 31-32, is untrue and beside the point. The quotes that the United

10  States' motion relies on reflect SB 54's objective purpose to prioritize limited resources. *See* Mot.

11  at 32.[19] In any event, the State's "purpose" in enacting SB 54 is irrelevant—the question is

12  whether the state or local regulation based on the text of the statute "regulates the United States

13  directly or discriminates against the Federal Government." *North Dakota*, 495 U.S. at 435, 438;

14  *Arcata*, 629 F.3d at 991. And since the United States is unlikely (and unable) to show that SB 54

15  is not facially neutral, the Court "will not strike down an otherwise constitutional statute on the

16  basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968).

17  As such, the United States will not succeed on its claim against SB 54.

18      **B.    The United States Will Not Succeed on Its Claim Against AB 450**

19          **1.    AB 450 Is Not Obstacle Preempted by IRCA**

20          The federal government asserts that AB 450 poses an obstacle to the accomplishment of

21  IRCA, specifically 8 U.S.C. § 1324a, which makes it unlawful to hire, recruit, refer for a fee, or

22  continue to employ "unauthorized aliens." Mot. at 11-14, 17-18. It does not. "States possess broad

23

24  [18] Excerpts of the deposition transcripts of Thomas Homan and Todd Hoffman are attached as Exhibits A and E to the Melton Decl.

25  [19] The full referenced quote by the Act's author, Kevin De Leon, is: "This is an opportunity for us collectively, in a bipartisan fashion, to stand together and say that we will separate our local government from the federal government.

26  That we'll use our local tax dollars and invest our local tax dollars to protect and serve our community, irrespective of who you are and where you come from." *See* State Senate Floor Hr'g, Apr. 3, 2017, available at https://ca.digitaldemocracy.org/hearing/52288?startTime=1150&vid=910977abbea937bca7424c93fe3caf1c. State

27  Senator Weiner said that the "fundamental issue" of the bill is "that it is not our responsibility as a state or as cities to do the federal government's job for it." Cal. State Senate Standing Com. on Pub. Safety Hr'g, Jan. 31, 2017, available

28  at https://ca.digitaldemocracy.org/hearing/10091?startTime=275%vid=381a741e4e525e9efccbbf6062c67f3c.

25

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1    authority under their police powers to regulate the employment relationship to protect workers

2    within the State." *Whiting*, 563 U.S. at 588. IRCA establishes a regulatory and enforcement

3    scheme intended to prohibit employers from hiring unauthorized workers, which AB 450 does not

4    disrupt. As a law regulating the workplace, AB 450 falls squarely within areas where the State

5    has especially broad authority to regulate within its police powers. *See Metro. Life Ins. Co. v.*

6    *Mass.*, 471 U.S. 724, 756 (1985) (quoting *DeCanas*, 424 U.S. at 356) ("States possess broad

7    authority under their police powers to regulate the employment relationship within the State.");

8    *FERC*, 456 U.S. at 769 n.32 (noting the holding "does not foreclose a Tenth Amendment

9    challenge to federal interference with the State's ability to structure employer-employee

10   relationships"). The Ninth Circuit has applied this principle to uphold similar State employment-

11   related regulations in the face of federal law challenges. *E.g.*, *Californians for State &*

12   *Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1186-87 (9th Cir. 1998) (Federal

13   Aviation Administration Authorization Act did not preempt California's Prevailing Wage Law);

14   *Siuslaw Concrete Constr. Co. v. WADOT*, 784 F.2d 952, 958 (9th Cir. 1986) (state minimum

15   wage statute did not stand as obstacle to federal statutes and regulations).

16          Furthermore, IRCA was not intended to diminish states' labor protections. Rather, it sets

17   forth a compliance framework for regulating employers and their employment of unauthorized

18   workers. *See* H.R. Rep. No. 99-682(I), at 58; 8 U.S.C. § 1324a(a)-(b), (e). Thus, the investigations

19   that require "reasonable access to examine evidence of any person or entity being investigated,"

20   8 U.S.C. § 1324a(e)(2)(A), refers to the person or entity who "hire[d]" or "recruit[ed]" a person

21   unlawfully. *Id.* § 1324a(a)(1)(A). AB 450, in contrast, does not attempt to regulate the

22   employment of unauthorized workers or impinge upon IRCA's uniform employer-inspection

23   process. Rather, in the interest of protecting California workers, *see* RJN, Ex. J at 7, AB 450:

24   (a) regulates when employers may provide access to immigration authorities to nonpublic areas of

25   the workplace and employee records, Gov't Code §§ 7285.1, 7285.2; (b) requires notice to

26   workers of employment-record inspections, Lab. Code § 90.2; and (c) defines when it is

27   appropriate for an employer to re-verify an employee's eligibility, *id.* § 1019.2.

28

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1   In the context of IRCA, the Ninth Circuit has recognized that Congress has preserved

2 certain state powers even when it comes to dealing with the employment of unauthorized aliens.

3 *See N.L.R.B. v. C & C Roofing Supply, Inc*., 569 F.3d 1096, 1099 (9th Cir. 2009) (undocumented

4 workers can receive liquidated damages in wrongful-termination case without running afoul of

5 IRCA); *Incalza v. Fendi N. Am., Inc*., 479 F.3d 1005, 1012-13 (9th Cir. 2007) (IRCA does not

6 conflict-preempt California labor laws that forbid termination without good cause); *see also Salas*

7 *v. Sierra Chem. Co*., 59 Cal.4th 407, 426 (2014) (IRCA and federal immigration law do not

8 preempt state law that protects "all workers 'regardless of immigration status'").

9   The United States primarily takes issue with section 7285.1(a) of the Government Code.

10 Mot. at 12-13. That provision authorizes immigration-enforcement agents access to nonpublic

11 areas of a workplace if required by federal law. Gov't Code § 7285.1(a). It, therefore, does not

12 deny "reasonable access" for immigration-enforcement agents to examine evidence related to

13 employers. *See* 8 U.S.C. § 1324a(e)(2)(A). Further, it does not restrict access to nonpublic areas

14 when a judicial warrant is produced. Gov't Code § 7285.1(a).[20]

15   Similarly, AB 450 does not prevent federal agents from obtaining and reviewing employee

16 records, which remain accessible through either a subpoena, judicial warrant, or I-9 inspection.

17 *See id*. § 7285.2(a)-(b). Nor does it prohibit an employer from participating in the federal

18 government's E-Verify program or complying with an E-Verify memorandum of understanding.

19 *Id*. § 7285.3; Lab. Code § 1019.2(c). Notice requirements like section 90.2 of the Labor Code are

20 designed to increase information sharing between employers and employees; they do not prevent

21 enforcement officials from actually carrying out their duties. Finally, each of the provisions of

22 AB 450 at issue contain a savings clause, which makes the respective provision operative

23 "[e]xcept as otherwise required by federal law." Gov't Code §§ 7285.1(a), 7285.2(a)(1); Lab.

24 [20] The United States' reliance on *Zepeda v. U.S. I.N.S.*, 753 F.2d 719 (9th Cir. 1983), and *Int'l Molders' & Allied*
*Workers' Local Union No. 164 v. Nelson* (*Int'l Molders*), 799 F.2d 547 (9th Cir. 1986) is misplaced. Mot. at 12.

25 *Zepeda* addressed the authority of immigration officials to engage in consensual questioning of individuals regarding
their immigration status and did not speak about the conditions under which an official may access nonpublic areas of

26 workplaces. Furthermore, *Int'l Molders* affirmed a preliminary injunction placing restrictions on immigration
authorities entering factories, but did not address the issue of employer consent. Nothing in AB 450 affects

27 immigration officials' ability to question individuals about their immigration status and as *Int'l Molders*
demonstrates, immigration officials routinely obtain judicial warrants to enter workplaces and so there is nothing

28 burdensome about this requirement.

1    Code §§ 90.2(a)(1), 1019.2(a). AB 450 regulates exactly within the area where the State is

2    permitted to regulate. *See Whiting*, 563 U.S. at 600 (holding that Arizona law that allowed

3    suspension and revocation of business licenses for employing unauthorized aliens "falls well

4    within the confines of the authority Congress chose to leave to the States"). Similarly, the civil

5    penalties in AB 450 are permissible because, like the civil sanctions that the state law imposed on

6    employers in *Whiting*, the underlying regulation is permissible under IRCA. *Id.* at 611.

7        The United States argues that "AB 450 [makes] it more difficult for federal officers to

8    investigate both criminal and civil immigration violations at employment sites." Mot. at 13. But,

9    as discussed *supra* with respect to SB 54, whether AB 450 makes a job "more difficult" is

10   irrelevant. *See, e.g.*, *In re Baker*, 35 F.3d at 1354. Since AB 450 and IRCA can coexist, and the

11   State is acting within its broad police power to regulate workplace protections, AB 450 poses no

12   obstacle or conflict to the accomplishment of IRCA's objectives. *See English v. Gen. Elec. Co.*,

13   496 U.S. 72, 90 (1990) ("The teaching of this Court's decisions . . . enjoin[s] seeking out conflicts

14   between state and federal regulation where none clearly exists.").

15               **2.    AB 450 Does Not Violate the Intergovernmental Immunity Doctrine**

16       AB 450 also does not impermissibly intrude on the United States' sovereignty or

17   impermissibly regulate and discriminate against the United States. *See* Mot. at 14-17. AB 450's

18   provisions apply only to "an employer" or "a person acting on behalf of the employer." Gov't

19   Code. §§ 7285.1(a), 7285.2(a)(1); Lab. Code §§ 90.2(a)(1), 1019.2(a). AB 450 does not regulate

20   federal immigration enforcement officials, or any other "federally established instrumental[ies]"

21   that might enjoy governmental immunity. *First Agricultural Bank v. State Tax Comm.*, 392 U.S.

22   339, 350 (1968). Additionally, any indirect impacts of AB 450 on the federal government do not

23   violate intergovernmental immunity. AB 450 is analogous to the state law at issue in *North*

24   *Dakota v. United States*, which regulated the suppliers of liquor to military bases in the state.

25   Although those regulations indirectly affected the federal government's costs, the Court held that

26   they did not regulate the government directly in violation of intergovernmental immunity,

27   because the regulations operated only against the suppliers, as opposed to the military bases

28   themselves. *See North Dakota*, 495 U.S. at 435.

28

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                          (2:18-cv-00490-JAM-KJN)

1   AB 450 differs significantly from the laws at issue in *Arcata*. In *Arcata*, the ordinances did

2   not "affect the federal government incidentally as the consequence of a broad, neutrally

3   applicable rule" and "specifically target[ed] and restrict[ed] the conduct of military recruiters."

4   629 F.3d at 991. Here, AB 450 only impacts federal immigration officials as a consequence of its

5   direct application to all California employers. AB 450 does not single out any particular federal

6   entity or federal contractors; rather, its neutral terms apply generally to employers, and any

7   person or entity seeking to enforce the civil immigration laws, whether federal, state, or local. *Cf.*

8   *Boeing v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014). Moreover, immigration agents continue

9   to have access to the workplace and employee records through judicial warrants, subpoenas, and

10  the I-9 inspections. *See* Gov't Code §§ 7285.1, 7285.2. Possibly making immigration enforcement

11  agents' jobs "more difficult," *see* Mot. at 13, is simply not a basis for finding the United States

12  immune. *United States v. New Mexico*, 455 U.S. 720, 734 (1982).

13  Finally, it is hyperbolic for the United States to equate any of AB 450's provisions—which

14  are designed to protect workers and the workplace—to a requirement that "suspects be warned of

15  upcoming criminal investigations." Mot. at 17. The United States' citation to the State's wage,

16  hour, and workplace-safety laws as evidence that California "treats itself far better" than federal

17  immigration enforcement officials is misplaced. *Id*. The relevant question is whether AB 450

18  discriminates against federal officials, as compared to any other similarly situated person or

19  entity, *North Dakota*, 495 U.S. at 438, and it does not; AB 450 applies uniformly to "an

20  employer" or "a person acting on behalf of the employer." Gov't Code. §§ 7285.1(a),

21  7285.2(a)(1); Lab. Code § 90.2(a)(1). For these reasons, its claims against AB 450 will fail.

22  **C.   The United States Will Not Succeed on Its Claim Against AB 103**

23  **1.   AB 103 Is Not Preempted**

24  AB 103's review and reporting requirements for detention facilities are no obstacle to, and

25  have no impact on, federal immigration enforcement. AB 103 does not impose standards on the

26  conditions of facilities, nor does it mandate any policies or procedures.[21] It is silent on the federal

27  government's decision to admit or remove any individual, and it does not speak to who may be

28  _____
[21] Thus, there is no conflict with the national detention standards promulgated by ICE. *See* Homan Decl. ¶¶ 55-57.

29

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                              (2:18-cv-00490-JAM-KJN)

1    detained. It simply directs the Attorney General to review and report on the conditions of

2    confinement faced by residents of the State. Thus, AB 103 is easily distinguishable from the type

3    of "review" at issue in *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437, 439 (9th Cir. 1991) and

4    *Leslie Miller, Inc. v. State of Arkansas*, 352 U.S. 187, 188 (1956). Both cases concerned whether

5    a contractor performing services on a federal project, who had been deemed "responsible" by the

6    federal government, could be subject to a different set of state standards and forced to obtain a

7    license. *Gartrell Const. Inc.*, 940 F.2d at 438; *Leslie Miller, Inc.*, 352 U.S. at 190. Such a

8    "review" of a prior federal determination by the state's licensing board, and the subsequent

9    imposition of fines, was held to be preempted. *Gartrell Const. Inc.*, 940 F.2d at 438; *Leslie*

10    *Miller, Inc.,* 352 U.S. at 188. Here, there is no licensing scheme and no enforcement

11    mechanism.[22] *See DeCanas*, 424 U.S. at 360 (upholding state law where the federal government

12    at the time showed, at best, "a peripheral concern with employment of illegal entrants").

13        Contrary to the United States' allegations, there is no evidence that AB 103 "intrudes on the

14    orderly operations of facilities." *See* Mot. at 22; Homan Dep. 60:12-61:14. Given the purported

15    "robust inspections" and "daily on-site compliance reviews" conducted by ICE and other entities

16    like the American Bar Association's Immigration Commission, *see* Homan Decl. ¶¶ 56-57 and

17    Cooper Decl. ¶ 2, any disruption caused by AB 103 is *de minimis* at best. Nor has the federal

18    government explained how the hypothetical "assessment" by the State of the due process afforded

19    to immigrants will impose an obstacle to the federal government's scheme. *See* Mot. at 19.

20        The United States identifies just one regulation that it claims AB 103 conflicts with:

21    8 C.F.R. § 236.6. Mot. at 22.[23] That regulation, however, prohibits only the public disclosure of

22    information about detainees; it does not restrict the disclosure of information to other

23    governmental entities. The Attorney General conducts these reviews in his capacity as the chief

24

25    [22] The United States' reliance on *In re Tarble*, 80 U.S. 397, 407 (1871), which dealt with a state's lack of authority to issue a writ of habeas corpus to discharge a soldier whose enlistment may have been unlawful, is similarly misplaced.

26    [23] Mr. Homan alleges that the reviews violate DHS' Privacy Policy, Homan Decl. ¶ 64, but in 2017, DHS substantially reduced privacy protections for immigrants who are not legal permanent residents or U.S. citizens, and now expressly permits the sharing of personal information of immigrants and non-immigrants with federal, state, and

27    local law enforcement. *See* RJN, Exs. C, D at 3 (Q. 6). ICE is in the process of revising its privacy policy in accordance with DHS' policy changes. Homan Dep. 67:15-68:9.

28

30

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1  law officer of the State, constitutionally empowered to enforce state laws, and not as a member of

2  the public. *See* Cal. Const. art. V, § 13. And, AB 103, on its face, does not provide for the

3  disclosure of confidential detainee information to the public, much if not all of which remains

4  confidential under state law. Civ. Code § 1798.24; Gov't Code § 6254(c), (f).[24]

5          Finally, when the federal government contracts with municipalities and private companies

6  for detention space, these facilities are not immunized from state and local oversight. In addition

7  to immigration detainees, county detention facilities hold individuals convicted of state criminal

8  offenses, and are operated with state funds. *See* Cal. Const. art. XIII, § 36; Penal Code § 4497.04.

9  Moreover, detention facilities are expressly subject to state law evidenced, in part, by the very

10 contracts they execute with the federal government to hold immigration detainees. *See* Melton

11 Decl. ¶¶ 17-23, Exs. M-S. These are not "federal facilities" subject exclusively to federal control.

12 *See Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996).

### 2.     AB 103 Does Not Violate the Intergovernmental Immunity Doctrine

14         AB 103 neither "regulates the United States directly [n]or discriminates against the Federal

15 Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *see* Mot. at 20-21.

16 Courts will reject intergovernmental immunity challenges where the burden placed on non-federal

17 entities who contract with the federal government is not solely based on the entity's affiliation

18 with the federal government. *North Dakota*, 495 U.S. at 437; *In re NSA Telecoms. Records Litig*.

19 (*In re NSA*), 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007) (rejecting claim that state investigations

20 into telecommunications companies, including compelling documents and information shared

21 with federal government, were invalid under intergovernmental immunity). The facilities'

22 governing contracts demonstrate that the United States and California share concurrent

23 jurisdiction over the detention facilities because the contracts require that the facilities comply

24 with state law. *See, e.g.*, Melton Decl. ¶ 17, Ex. M.  The detention facilities are, thus, similar to

25 the alcohol suppliers of the military base in *North Dakota* that the Supreme Court determined

26 were validly subject to state reporting and labeling requirements. 495 U.S. at 434-35

27

28

---

[24] Separate and apart from AB 103, some facilities have made detainees' personal information publically available. Cooper Decl. ¶¶ 3-4, Ex. A.

1   ("accommodating . . . the full range of [the state's] sovereign legislative authority"). Furthermore,

2   as explained above, AB 103's requirements contemplate a review, but impose no standards.

3   "[I]ndeed, they impose no duty on the government." *In re NSA*, 633 F. Supp. 2d at 903.

4          Moreover, AB 103 does not discriminate against the federal government. Like the state

5   Attorneys General who conducted investigations of telecommunication carriers that disclosed

6   customer records to the National Security Agency, *id.* at 904, the Attorney General here is not

7   imposing a different standard on these facilities than are imposed on other detention facilities in

8   the State. "Although the present investigation, in targeting" detention facilities, "may appear to

9   treat the government differently, the regulatory regime as a whole treats any [detention facility]

10  the same." *Id.*; *see also North Dakota*, 495 U.S. at 435. Even the federal government

11  acknowledges, Mot. at 21, that "any legitimate state interest in the operation of detention facilities

12  within the state's borders" could be addressed by application of Penal Code §§ 6030, 6031.1. Yet

13  these Penal Code provisions are *far more exacting* than AB 103. They establish a biennial

14  inspection protocol, with no end date, and impose mandatory minimum standards on virtually

15  every aspect of a facility. *Id.* § 6030(b). They also directly regulate employees of the facilities. *Id.*

16  § 6030(c), (e)-(g). In contrast, AB 103 simply requires a review and a report, with no regulatory

17  authority. Thus, when AB 103 is viewed not in isolation but in a broader context, it is clear that it

18  does not disfavor the federal government. If anything, by subjecting these facilities to less

19  onerous requirements than govern other detention facilities, AB 103 treats the federal government

20  *better* than other entities. *See North Dakota*, 495 U.S. at 439.

21         The federal government's reliance in its motion on *Boeing* is therefore poorly placed. Mot.

22  at 21. At issue in *Boeing* was a California law that sought to regulate the cleanup of federal

23  nuclear sites by mandating more stringent cleanup procedures than were generally applicable

24  within the state. 768 F.3d at 836. The law in *Boeing* affected "nearly all of [the federal

25  government's] decisions with respect to the cleanup, including the environmental sampling that is

26  required, the cleanup procedures to be used, and the money and time that will be spent." *Id.* at

27  839. It interfered with the functions of the federal government because it "mandate[d] the ways in

28  which Boeing renders services that the federal government hired Boeing to perform." *Id.* at 840.

1    On the contrary, the only mandate in AB 103 is directed at the Attorney General, who is

2    required to review and then report his assessment of the conditions of confinement in the covered

3    facilities. To the extent AB 103 requires anything of anyone other than the Attorney General, it is

4    simply the access necessary to conduct the review. Gov't Code § 12532(c). Rather than

5    interference or discrimination, the United States appears to be seeking to preclude the Attorney

6    General from independently assessing the conditions under which the United States allows civil

7    immigration detainees to be confined, but there is no legal principle that provides for such relief.

8    The fact that AB 103 "relate[s] to federal government activities" is simply not enough. *In re NSA*,

9    633 F. Supp. 2d at 903. For these reasons, the United States' challenge of AB 103 fails.

10   **II.    THE UNITED STATES FAILS TO DEMONSTRATE IRREPARABLE HARM**

11   The United States has failed to demonstrate irreparable harm. On that basis alone, its

12   motion should be denied. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.* (*Oakland*), 762

13   F.2d 1374, 1376 (9th Cir. 1985). Furthermore, the federal government's claimed harms are

14   undermined by the purpose of the INA, which leaves substantial discretion to the states. *Nat'l*

15   *Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (irreparable harm

16   is "determined by reference to the purposes of the statute being enforced"). "Speculative injury

17   does not constitute irreparable injury[.]" *Caribbean Marine Servs. Co. v. Baldridge* (*Caribbean*),

18   844 F.2d 668, 674 (9th Cir. 1988). A plaintiff must set forth precise and detailed assertions, not

19   conclusory or unsupported statements, to establish irreparable harm. *See Caribbean*, 844 F.2d at

20   675-76; *Oakland*, 762 F.2d at 1377; *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football*

21   *League* (*Los Angeles*), 634 F.2d 1197, 1201 (9th Cir. 1980); *Sierra Forest Legacy v. Rey*, 691 F.

22   Supp. 2d 1204, 1210 (E.D. Cal. 2010).

23   **A.    There Is No Irreparable Harm from SB 54**

24   The United States argues that SB 54 has caused local jurisdictions to stop cooperating with

25   transfer and notification requests, leading to more "dangerous criminal aliens" in the community.

26   Its unsubstantiated statements regarding the dangerous nature of immigrants released from local

27   custody who "reoffend . . . at an alarming rate," Homan Decl. ¶ 43, are based simply on Mr.

28   Homan's subjective beliefs and unscientific interpretation of statistics that do not measure rates of

33

1    recidivism of immigrants. *Compare* Homan Dep. 121:14-24, 122:11-25, *with* Wong Decl. ¶¶ 8-

2    24, 36-37 (statistical analysis finding lower crime rates in jurisdictions that limit entanglement

3    with immigration enforcement).

4         To obtain any relief, the United States must show a sufficient causal connection between

5    the challenged conduct and the harm. *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 981-92 (9th

6    Cir. 2011).[25] The United States concedes that it is unable to provide evidence supporting even its

7    core allegation that SB 54 has led to a decline in cooperation by local jurisdictions. *Compare* ECF

8    No. 22 at 7 (the United States "*does not know* when California law enforcement agencies are

9    releasing criminal alien[s]") (emphasis in original) *with* Homan Dep. 99:11-102:10 (describing

10   tracking of compliance with ICE requests).[26] Indeed, the majority of county LEAs did not comply

11   with notification requests before SB 54, Wong. Decl. ¶ 11, and most of the United States'

12   anecdotal examples of noncooperation occurred before SB 54 came into effect, undercutting any

13   claim of irreparable harm. *See, e.g*., Homan Decl. ¶¶ 38, 44a-f, 45a-d, 74; Hoffman Decl. ¶ 15;

14   *see also Oakland*, 786 F.2d at 1377 ("[T]he district court was not required to issue a preliminary

15   injunction against a practice which has continued unchallenged for several years."); *Perfect 10,*

16   *Inc*., 653 F.3d at 981-92 (no irreparable harm where harm existed before challenged action).  Of

17   the eight examples of noncompliance that Officer Hoffman relies upon, five occurred before SB

18   54's effective date and two did not involve transfer or notification requests. *See* Hoffman Decl.

19   ¶ 15; Melton Decl. ¶¶ 10, 12-13, Exs. F, H, I; Hoffman Dep. 86:14-88:7 (describing four

20   incidents in Los Angeles in 2017), 89:24-90:4. The one example occurring after SB 54 came into

21   effect involves an individual charged with fraud and released without notification, but there is no

22   evidence of a criminal history to indicate that this person was a threat to public safety. *See* Melton

23   Decl. ¶ 11, Ex. G; Hoffman Dep. 74:7-77:16.

24        Similarly, Mr. Homan provides examples of noncompliance after the effective date of SB

25   54 that contain insufficient information to reach any conclusions regarding public safety or

---

26   [25] The United States alleges a number of harms relating to provisions of SB 54 or other laws not actually at issue in this lawsuit. *See, e.g.*, Homan Decl. ¶¶ 25-26 (prohibition on 287(g) agreements), 28, 32 (loss of office space), 31

27   (the TRUTH Act), 33-34, 79 (AB 90); Homan Dep. 98:23-99:10 (explaining his focus in ¶ 39 was on detainers).
     [26] In fact, the United States does not even know the number of individuals transferred to jurisdictions in 2018. *See*

28   Homan Dep. 103:18-104:10; Hoffman Dep. 41:7-15, 99:9-13; 103:14-25.

1   whether SB 54, in fact, prevented the jurisdiction from complying with the requests. For instance,

2   Mr. Homan claims that the San Diego Sheriff's Office did not provide notification of release of

3   119 individuals who were charged of crimes, but the United States has not produced evidence of

4   criminal convictions for these individuals. *See* Homan Decl. ¶ 42; Homan Dep. 120:19-121:8.

5   The United States did produce the exact release time of all 119 individuals, because that

6   information was available on the LEA's website. *See* Homan Decl. ¶ 30; Melton Decl. ¶ 6, Ex. B.

7   Thus, under SB 54, the LEA could have complied with the notification request for each individual

8   because that information was publicly available. Gov't Code § 7284.6(a)(1)(C); *see* RJN, Ex. H at

9   3. The LEAs could have done the same in the two other incidents occurring after the effective

10  date of SB 54. *See* Homan Decl. ¶¶ 44g (release dates publicly available and insufficient

11  information of criminal history to determine whether SB 54 prevented compliance) and 44h

12  (because release dates are public, it could have complied with notification request).[27]

13      The United States also argues that immigration officials are deterred from making transfer

14  requests and are processing individuals for removal instead. *See* Mot. at 36-37; Hoffman Dep.

15  46:19-47:5, 52:1-16. It is unclear how this more efficient removal process harms the federal

16  government, where the government itself can ameliorate any purported public-safety risks arising

17  from noncompliance with transfer requests. *See Wham-O Inc. v. Manly Toys, Ltd.*, 2009 WL

18  1353752, at * 1 (9th Cir. May 15, 2009). The United States also claims that during at-large

19  arrests, individuals have greater access to weapons, leading to a greater risk of harm. Mot. at 36;

20  Homan Decl. ¶¶ 36, 38. The United States relies on an example from 2017 where an individual

21  whose detainer was not honored was found with a weapon, *id.* ¶ 38, but any inference drawn from

22  this one example is "too remote and speculative to constitute irreparable injury[.]" *See Caribbean*,

23  644 F.2d at 675. Moreover, the increase in at-large arrests is due in large part to the United States'

24  broadened priorities issued in 2017. *See* RJN, Exs. C, E. The United States has presented no

25  evidence that SB 54 has contributed materially to an increase in at-large arrests and no

26  explanation as to why the possibility of violence that it claims to be inherent to at-large arrests is

27  any greater because of SB 54. In fact, Mr. Homan claims that because SB 54 allegedly

28  _____
[27] *See* Melton Decl., Ex. D (relating to 44g) and Exs. J-K (relating to 44h).

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1   necessitates that ICE arrest people in the community, ICE made "collateral arrests" of people who

2   it would not have arrested otherwise. *See* Homan Dep. 36:14-37:5.

3       The United States' speculation regarding national security and criminal investigative harms

4   are also based on generalities. Homan Decl. ¶ 72; *see, e.g.*, Homan Dep. 162:20-164:7 (regarding

5   counter-terrorism, "I don't have any specific examples, no."), 164:8-165:21. SB 54 does not bar

6   LEAs from working with federal immigration officials on criminal investigations. *See, e.g.*, Gov't

7   Code § 7284.6(b)(3); Caligiuri Decl. ¶¶ 6-13. There are no identified task forces that have ended

8   because of SB 54; in fact, LEAs in California are still partnering with ICE on task forces for law-

9   enforcement purposes. Homan Dep. 158:15-17, 160:13-15; Hoffman Dep. 53:11-15; Caligiuri

10  Decl. ¶¶ 6-13. Additionally, the United States has not identified any instance in which ICE

11  ultimately denied parole entry for an LEA request for extradition of a fugitive facing charges in

12  California. *See* Homan Decl. ¶ 78; Homan Dep. 145:3-6. Any harm caused by ICE denying

13  parole entry because of SB 54 is inflicted by the United States, as ICE never required assurances

14  from LEAs to grant parole entry in the past, and LEAs are able to provide the assurances that ICE

15  now demands, consistent with SB 54. *See* Decl. of Diana Carbajal ¶¶ 7, 10.

16      The crux of the federal government's argument appears to be that SB 54 requires

17  immigration officials to work harder or differently than they desire. *See* Mot. at 36; Homan Decl.

18  ¶¶ 23, 30, 35-37, 39. But injuries in the form of "money, time and energy" are not irreparable.

19  *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Lydo Enters. Inc. v. City of Las Vegas*, 745 F.2d

20  1211, 1213 (9th Cir. 1984); *Los Angeles*, 634 F.2d at 1202. The United States argues that it is

21  unable to obtain personally identifiable information directly from LEAs, Homan Decl. ¶ 23, but

22  ICE has access to California's law-enforcement databases that contain this information. Dominic

23  Decl. ¶¶ 9-13. The United States argues that SB 54's provision permitting compliance with

24  transfer requests if ICE produces a judicial warrant creates operational difficulties, Homan Decl.

25  ¶ 70, but this provision does not restrict LEAs from complying with requests in hundreds of

26  instances, and immigration officials obtain judicial warrants for criminal immigration offenses

27  every day. Homan Dep. 154:16-22. Indeed, there is no evidence of imminent harm to

28

36

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                    (2:18-cv-00490-JAM-KJN)

1  immigration-enforcement operations as a result of greater costs and burdens. *See Caribbean*, 844

2  F.2d at 675.

3      **B.      There Is No Irreparable Harm from AB 450**

4      There is also no irreparable harm from AB 450. The United States claims that AB 450 may

5  add confusion during a Form I-9 inspection and if agents cannot enter nonpublic areas, employee

6  information may be publicly disclosed. Homan Decl. ¶¶ 84-85, 87. The "employer confusion"

7  claim is based on one instance involving a company where there was a delay in the I-9 inspection,

8  but Mr. Homan did not know the length of the delay, and ICE ultimately completed the

9  inspection. Homan Dep. 38:19-40:9, 42:11-43:9. The other basis for this claim is from Mr.

10  Homan's review of news articles where "some employers seemed to be confused," but he could

11  not recall which ones. *Id.* at 43:10-44:7. In any event, AB 450 expressly authorizes compliance

12  with I-9 inspections. Gov't Code § 7285.2(a)(2). Furthermore, the threat of public disclosure of

13  employee information is merely a concern about inconvenience that does not rise to an imminent

14  threat to privacy. *See Caribbean*, 844 F.2d at 675. The United States cannot assert privacy harms

15  on behalf of third parties. *See Woodfin Suite Hotels v. City of Emeryville,* 2006 WL 2739309, at

16  *11-*12 (N.D. Cal. Aug. 23, 2006) (plaintiffs lacked standing to assert privacy harms on behalf

17  of employees); *Nutrition Dist. LLC. v. Enhanced Athlete, Inc.,* 2017 WL 5467252, at *2 (E.D.

18  Cal. Nov. 14, 2017). Moreover, nothing precludes discussions with employers occurring in

19  secluded areas or separate rooms, and there is nothing to suggest that AB 450 is likely to lead to

20  any disclosure of employee information. *See* Homan Dep. 58:11-16.

21      Finally, the United States argues that AB 450 could impede workplace operations and

22  prevent Border Patrol from detecting illegal activity. Homan Decl. ¶¶ 85, 86, 88; Scott Decl.

23  ¶¶ 27, 28. These harms are purely conjecture. *See Caribbean*, 844 F.2d at 675; *see, e.g.*, Homan

24  Dep. 54:11-55:7 (on instances of interference with obtaining evidence, "I'm not aware of any, but

25  we certainly wouldn't know what we don't know;" and "I think the reason why this affidavit is

26  worded the way it is [ ] based on our experience of what happens"). There has been no instance

27  where an employer did not comply with an I-9 inspection or where an employer's inability to

28  consent impeded enforcement operations. Homan Dep. 44:2-7, 53:3-54:17, 57:13-59:6.

37

### C.      There Is No Irreparable Harm from AB 103

The purported harms from AB 103 are likewise without merit.[28] The United States' argues

that AB 103 requires officials to violate federal privacy statutes,[29] exposes officials to liability,

and subjects officials or facilities to operational risk or harm. Mot. at 35; Homan Decl. ¶¶ 61-67.

As discussed above, the Attorney General's reviews do not conflict with 8 C.F.R. § 236.6 and are

conducted in accordance with his constitutional powers to enforce laws and conduct

investigations, not as a member of the public. *See* Cal. Const. art. V, § 13; Gov't Code § 11180 *et*

*seq*. Detainee information remains protected from public disclosure under other state statutes.

Gov't Code § 6254(c), (f); Civ. Code § 1798.24. Moreover, the threat of potential liability

resulting from disclosure of information is purely speculative. Five facilities have been reviewed

and none of the alleged privacy harms have occurred. *See* Homan Dep. 70:15-18; *see also*

*Caribbean*, 844 F.2d at 675 (rejecting civil liability claim where multiple contingencies would

have to occur); *City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*, 625 F.2d 231,

237-39 (9th Cir. 1980)*.* In any event, the Attorney General's report is not due to be released until

March 1, 2019, Gov. Code § 12532(b)(2), so any claims of possible harms stemming from the

report are not imminent.

The other purported harms arising from the full implementation of AB 103 are mere

administrative inconvenience and costs, which are not irreparable and thus far unsupported by

evidence. Homan Decl. ¶¶ 60, 68; *see Sampson*, 415 U.S. at 90 ("Mere injuries, however

substantial, in terms of money, time and energy . . . are not enough."); *Lydo Enters.*, 745 F.2d at

1213 (financial burdens in relocating business not irreparable). The United States alleges

"burdensome intrusions" into facility operations, but provides no evidence of facilities having

been burdened. *See* Homan Dep. 60:12-61:14. Claims regarding deterrence of private contractors

are based on nothing more than two conversations generally discussing the law, one of which

may not have been specific to California. Mot. at 35; Homan Dep. 73:19-76:12. There is no

evidence that private contractors have terminated contracts or intend to, *see* Homan Dep. 77:7-9,

---

[28] The United States also claims harm relating to parts of AB 103 not at issue here. Homan Decl. ¶¶ 52-53.
[29] In fact, as discussed above, DHS expressly permits the sharing of information about immigrants and non-immigrants with state, and local law enforcement. *See* Homan Dep. 67:15-68:9; *see* RJN, Ex. D at 3 (Q. 6).

38

1  but even if there was, this would not be irreparable because the federal government has not shown

2  that loss of the contract would prevent it from continuing to enforce immigration laws. *Tracy*

3  *Rifle and Pistol LLC*, 118 F. Supp. 3d at 1191 (no evidence plaintiffs would lose business);

4  *Woodfin Suite Hotels, LLC*, 2006 WL 2739309 at *11 (no showing that business would end if

5  subcontractors terminated contracts); *Los Angeles*, 632 F.2d at 1202-03. As the contracts show,

6  the facilities are subject to state law, so the United States is not harmed by the Attorney General

7  using his authority to review and report on the facilities. *See* Melton Decl. ¶¶ 17-23, Ex. M-S.

8  **D.   The United States' Delay Weighs Against a Finding of Irreparable Harm**

9  The United States' delay in filing this motion undercuts any claims of irreparable harm. *See*

10  *Television Educ., Inc. v. Contractors Intelligence Sch., Inc.*, 2017 WL 2958729, at *5 (E.D. Cal.

11  July 11, 2017) (delay "weighs heavily against a finding of irreparable harm"); *Garcia v. Google,*

12  *Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (months-long delay weighed against irreparable harm);

13  *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1080, 1090 (C.D. Cal.

14  1999) (five-month delay); *Holmes v. Collection Bureau of Am., Ltd.*, 2009 WL 3762414, at *3

15  (N.D. Cal. Nov. 9, 2009) (four-month delay). AB 103 was enacted nearly nine months ago, and

16  the United States waited two months to seek to enjoin AB 450 and SB 54.[30] The United States

17  cannot claim irreparable harm in light of its delay in seeking relief.

18  **III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH AGAINST**
19  **GRANTING PRELIMINARY RELIEF**

20  The balance of hardships and the public interest merge when the government is a party.

21  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

22  (9th Cir. 2014). The United States claims irreparable harm to the constitutional order and foreign

23  affairs. There is no basis for the United States' conclusory statements that its ability to

24  "communicate foreign policy in a single voice" has been harmed; thus, this claim fails. See Mot.

25  at 37-38; Risch Decl. ¶¶ 5, 11, 14-15. Moreover, institutional injuries are not irreparable. *See*

26  *Washington v. Trump,* 847 F.3d 1151, 1168 (9th Cir. 2017). Where a constitutional claim fails as

27  ────────────
[30] While taking its time after these laws were enacted, *see* Melton Decl. Ex. L (Jan. 16, 2018 entry), Plaintiff rushed
28  to file this motion a day after the court in *California v. Sessions*, No. 17-cv-4701 (N.D. Cal.) denied motions to
dismiss and a preliminary injunction regarding SB 54's compliance with § 1373(a). *See* ECF Nos. 18, 30.

39

Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.                                    (2:18-cv-00490-JAM-KJN)

1   a matter of law, like here, the alleged infringement is "too tenuous" to support the requested

2   relief. *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).

3       Conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by

4   representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct.

5   1, 3 (2012); *see also Coal. for Econ. Equity*, 122 F.3d at 719; *Planned Parenthood of Greater*

6   *Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). The public interest also

7   weighs heavily in favor of denying an injunction. An injunction would have immediate negative

8   impacts on public safety. Trust between law enforcement and the community it serves is eroded

9   when immigrants fear that interaction with police may lead to their deportation or of family

10  members. Witnesses and victims of crime are also less likely to come forward if they believe that

11  information will be used for federal immigration purposes. *See* Alikhan Decl. ¶¶ 6, 8, 10, 17-19;

12  Hart Decl. ¶¶ 5, 7-12; Rosen Decl. ¶¶ 5-9. An injunction would irreparably exacerbate the public-

13  safety concerns already posed by the federal government's indiscriminate immigration-

14  enforcement efforts.

15      The State also has a strong interest in protecting workers from regulating employers that

16  conduct business in California. RJN, Exs. I-J. An injunction would have detrimental impacts on

17  the workplace by increasing the potential for harassment of workers and decreasing productivity,

18  impacting all employees irrespective of immigration status. Lastly, the State has a public-health

19  interest in ensuring that facilities are safe and sanitary. An injunction would prevent the State

20  from reviewing facilities in its purview where systemic, inhumane conditions exist, *see* Cooper

21  Decl. ¶¶ 7-14, RJN, Exs. K-L, resulting in irreparable impacts on the physical and mental health

22  of people housed in these facilities. *Cf. League of Wilderness Defenders/Blue Mountains*

23  *Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (balance of equities tips

24  in favor of plaintiffs when harms they face if injunction is denied are permanent, while harms

25  faced by defendants if injunction is granted are temporary).

26                                    **CONCLUSION**

27      For the foregoing reasons, the Court should deny the United States' motion.

28

1    Dated:  May 4, 2018                          Respectfully Submitted,

2                                                 XAVIER BECERRA
                                                  Attorney General of California
3                                                 THOMAS S. PATTERSON
                                                  Senior Assistant Attorney General
4                                                 MICHAEL L. NEWMAN
                                                  SATOSHI YANAI
5                                                 Supervising Deputy Attorneys General

6                                                 /s/ Christine Chuang
                                                  /s/ Anthony R. Hakl
7                                                 /s/ Cherokee DM Melton
                                                  /s/ Lee I. Sherman
8
                                                  CHRISTINE CHUANG
9                                                 ANTHONY R. HAKL
                                                  CHEROKEE DM MELTON
10                                                LEE I. SHERMAN
                                                  Deputy Attorneys General
11                                                Attorneys for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

# CERTIFICATE OF SERVICE

Case Name:   The United States of America v.          No.   **2:18-cv-00490-JAM-KJN**
             The State of California, et al.

I hereby certify that on <u>May 4, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>May 4, 2018</u>, at Sacramento, California.


Tursun Bier                                    */s/ Tursun Bier*
Declarant                                       Signature

LA2018500720
13073763.docx