XAVIER BECERRA
Attorney General of California
THOMAS PATTERSON
Senior Assistant Attorney General
MICHAEL NEWMAN
SATOSHI YANAI
Supervising Deputy Attorneys General
CHRISTINE CHUANG
ANTHONY HAKL
CHEROKEE DM MELTON
LEE I. SHERMAN
Deputy Attorneys General
State Bar No. 272271
 300 S. Spring Street
 Los Angeles, CA  90013
 Telephone: (213) 269-6404
 Fax: (213) 897-7605
 E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,<br><br>Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**DECLARATION OF HOLLY S. COOPER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Honorable John A. Mendez<br>Action Filed:  March 6, 2018 |

I, Holly S. Cooper, declare as follows:

1. I am a resident of the State of California. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2. I have knowledge of the conditions in many immigration detention centers within the State of California. I have been a lawyer for almost 20 years and for the majority of my career, I have provided free legal representation and consultations to individuals in immigration detention centers. Over the course of my career, I have interviewed thousands of men and women in the custody of Immigration and Customs Enforcement (ICE) and unaccompanied children in the custody of the Office of Refugee Resettlement. I have also been permitted special access to certain detention centers to inspect detention centers in my capacity as the Co-director of the University of California, Davis School of Law's Immigration Law Clinic, counsel for the *Flores v. Reno* Settlement Agreement (Case No. CV85 4544 (C.D.Cal. 1996), and in my capacity as a former member and advisor of the American Bar Association's Immigration Commission.

3. I regularly visit with clients in the Yuba County Jail, the Rio Cosumnes Correctional Center ("RCCC") in Elk Grove, and the Contra Costa County Jail—sometimes as frequently as twice a week. For the 12 years that I have been visiting immigration detainees in Yuba County Jail and the Sacramento County Jail (both formerly at the downtown jail and currently at the RCCC jail), immigration detainees' information has been publicly available. Yuba County has maintained a webpage that makes available personal information of detainees such as names, booking date, ages, weight, gender, height, and whether the person is in county custody or immigration custody (or as Yuba County refers to it as "INS" custody). See Exhibit A, a true and correct redacted copy of a screenshot of the Yuba County website where detainee information is made available.

4. Sacramento County also lists whether the person is in county or immigration custody on its roster that is kept at the jail. The roster is publicly available on a desk in front of the jail's reception area. Anyone from the public can access this roster. I frequently use the publicly available lists to get an accounting of how many persons are in immigration custody at

1

each facility, to help families find loved ones, and to determine lengths of detention for my clients.

5. Department of Homeland Security ("DHS") also runs a program called Victims of Immigrant Crime Engagement ("VOICE"). VOICE releases detainees' information to: (1) a victim of crime(s); (2) a witness of crime(s); (3) an individual with a legal responsibility to act on behalf of a victim or witness (e.g., attorneys, parents, legal guardians, etc.); or (4) individuals acting at the request of a victim or witness.

6. DHS also maintains a publicly available online locator for every ICE detainee. One needs the "A" number (located in many public records like Ninth Circuit orders), and the person's country of birth; or one can search with the individual's name and country of birth.

7. For almost 18 years, I have documented, witnessed, and listened to detainees recount their experiences enduring systemic, sub-human conditions in immigration custody in public and private California immigration detention centers. I visit immigration detention centers in California almost every week and interview at least 30 individuals in immigration custody every month. The following are my observations and experiences from my visits and investigations of detention centers throughout my career:

- Spoken to detainees on the telephone who are contemplating suicide while they are describing feces smeared on their segregated cell;
- Inspected rape phone hotlines only to realize the phone was not even connected to a phone line;
- Witnessed almost universally inadequate law libraries;
- Witnessed retaliation against clients for demanding humane medical treatment;
- Witnessed many detention centers with attorney-client visit rooms that are not sound proof, where clients are afraid to speak for fear of being overheard;
- Heard detainees recount life threatening medical issues that are not being treated;
- Some detainees have told me they have been raped while in detention (one even as recent as last month);
- Some detainees have witnessed guards performing oral sex on other guards;

2

- Witnessed clients (both adults and children) suffer from inadequate food sources in detention centers;
- Clients and detainees have complained about being transported in shackles—which can be extraordinarily painful for elderly detainees and detainees with disabilities;
- Children have also been shackled during asylum interviews and suffered injuries from shackles being too tight around the wrists; and
- Women detainees had inferior recreational facilities at Mesa Verde Detention Center.

The issues are systemic, pervasive, and have not abated throughout the 18 years I have been working with adults and children in immigration detention centers.

8. Unsanitary and unsafe conditions continue to exist in detention facilities in California. For instance, during a visit to RCCC in January 2014, I observed that the facility was old, loud, and dirty. As we walked down the halls, the concrete was wet and dirty—like a thin sludge on the ground. Men were detained with other county inmates who were in criminal custody. Some pods were open with bunks out in the open, and other pods were double-tiered with locked down cells. Last year around March 2017, detainees at RCCC were evacuated due to high levels of lead and copper in the drinking water was discovered by local government inspection officials.

### Inadequate Mental Health Care

9. Suicidal ideation is a major issue for persons and children in prolonged detention. Children have called me from detention during the Christmas holidays crying in total despair that they just want to be with their mothers. Most detained children are hundreds of miles from family and often are only able to speak with parents less than an hour per week. Mothers and fathers who are detained have particularly profound trauma at being separated from their children. Detainees are not permitted to touch their children throughout their detention, and walking through the family visitation rooms I often see children and parents crying, placing their hands over the plexiglass dividers trying to touch. One very unique aspect of immigration detention is that many individuals are applying for immigration defenses that require them to provide detailed narratives about their past traumas. Many asylum seekers, abused children, and crime victims must provide

3

sworn testimony regarding their past rapes, past torture, past child abuse, and past traumas. Detailing past traumatic experiences in a public court takes a tremendous psychological toll on immigration detainees. This trauma is compounded by the fact that most do not have their traditional support networks to sustain them because they are detained. For example, a woman may be required to provide specific, graphic detail of all past rapes for her asylum hearing, and then must return alone to her cell at the detention center. Detainees have shown me where they self-mutilate due to the despair of prolonged detention and tell me of their suicidal thoughts. It is not uncommon to have to counsel individuals who are having suicidal ideations. One detainee told me how he witnessed one detainee cut his wrists and watched the blood spill out from the bathroom stall. He cried to me as he recounted how people were in complete despair and not getting adequate psychological care.

10. I have also represented clients with severe psychological issues who face extreme medical neglect. In one case, we obtained the client's prior psychiatric history evincing severe psychiatric history that was being treated with psychotropic medications. After receiving notice of the client's prior medical treatment, the advice nurse at the detention center prescribed Tylenol and more outdoor time, and ignored the client's prior treatment plan. When he was released from detention months later, neither his family nor I was notified. He was released in downtown San Francisco in a patient gown made from paper. It took hours for me and his family to find him. After he was found, he told us he had to beg for money so he could take the Bay Area Rapid Transit system home to Oakland.

### Inadequate Medical Care

11. Medical indifference to immigration detainees is pervasive and unabated. Detainees with medical or psychological issues rarely receive adequate medical care. Throughout my 18 years visiting immigration detention centers I have observed that detention centers: (1) fail to meet health care needs of individuals in a timely manner; (2) often fail to refer individuals to higher-level medical care providers when necessary (and in some cases this failure has resulted in death); (3) fail to provide adequate staff and medical personnel; (4) fail to communicate critically

4

important information about individuals' medical conditions between staff and especially during transfers; and (5) fail to adequately screen individuals for illnesses.

12. Almost every time I visit an immigration detention center, detainees complain of medical neglect. On a recent visit a man told me that he had severe pain in his mouth and believed his tooth was infected. He told me was going to pull out the tooth himself because he was not receiving medical attention and feared the infection would spread.

13. On or around May 11, 2015, I inspected the Mesa Verde Detention Facility in Bakersfield, California, because it had recently opened and a delegation of civil rights lawyers wanted to inspect the facility. I inspected the facility in my capacity as Co-director of the UC Davis Immigration Law Clinic. A prison official and ICE officers lead the "tour" of the facility and answered questions. I was concerned to learn that medical staffing included only 20 hours a week of a contract physician rather than having a doctor at the facility at all times. The planned 20 hours per week of psychiatric care on-site was also a concern given that approximately 400 detainees were in custody there. After our tour, we learned that there was a waiting list for appointments with the psychiatrist.

14. On or around May 22, 2015, I inspected the Otay Mesa Detention Facility near San Diego, California with a delegation from the American Bar Association. On this inspection, we were not permitted to speak with the ICE detainees, but we were permitted to ask questions to the detention center spokesperson and medical staff. Therefore, we had no access to the detainees' perspective on this visit. One issue of concern was the lack of confidentiality of medical records. We were told by the detention center spokesperson that ICE officers as well as the Office of Chief Counsel could access and inspect a detainee's medical file. This raised concerns that information that was given to medical staff for treatment purposes could be used to a person's detriment in deportation proceedings.

### Language Barriers

15. The overwhelming majority of immigration detainees do not speak, write, or read English. Spanish is the predominant language of most detainees. Other languages spoken by detainees are Tagalog, Vietnamese, Mandarin, Punjabi, French, Wolof, Somali, Haitian Creole,

5

Hindi, Urdu, Farsi, and indigenous languages from Guatemala and Mexico. Language barriers create enormous obstacles for non-English speakers. Although detainees have simultaneous translations during their removal hearings, they are not afforded a translator to prepare the legal forms required by the court. Immigration detainees also do not have the right to appointed counsel unless they have a serious mental disorder pursuant to *Franco-Gonzalez v. Holder*, No. CV 10-102211 DG (C.D. Cal). The vast majority of immigration detainees (most of whom do not speak, read, or write English) represent themselves without the assistance of a lawyer. In some California detention centers, only around 15% of the detainees have the assistance of a lawyer.

16. Most defenses in immigration court are enormously complicated and require submitting lengthy legal forms to the court. The immigration legal forms are akin to Internal Revenue Service tax forms—they are lengthy and incomprehensible to most persons. For example, if an immigration detainee asked an immigration judge for the opportunity to apply for political asylum, she would be given the Form I-589, a 10-page form in English that asks complex questions regarding persecution in her home country. The Form I-589 is required of anyone wishing to seek political asylum. If, for example, the detainee was a monolingual Mandarin speaker from China, she would need to complete the Form I-589 in English. If the person cannot read or write in English, they cannot complete the form. Most detainees who cannot afford a lawyer have no choice but to ask other detainees to assist them with the forms. This forces immigration detainees to disclose very personal details about their persecution, sexual orientation, or rape histories to other detainees. Detainees helping non-English speakers usually have no legal training—and even though well-intended—often miss critical details or facts that can have a serious prejudicial effect on the person's asylum application. Even as a trained lawyer, I can spend a minimum of 15 hours completing a Form I-589 with my clients—if I need to use a translator that timeframe can easily be doubled. Moreover, if a pro se detainee who cannot read or write in English must author a legal brief to the court of appeals, the legal process becomes a farce. To properly write a legal appellate brief, the detainee must be able to read lengthy transcripts in English, research case law in English, read relevant court cases in English, and write legal briefs in English analyzing the transcripts and case law applicable to their case.

6

1  Immigration detainees often stare at me in confusion, as I describe the appellate process in the
2  Board of Immigration Appeals and Ninth Circuit and what will be required in their legal briefs. I
3  can confidently say that a person who does not read or write English cannot represent themselves
4  in a court of appeals without assistance. Many immigration detainees give up valid claims for
5  relief because the language barriers make it extremely difficult to represent themselves in pro se.

6      17.    Language barriers also stymie access to medical treatment, as most detainees must
7  fill out "kites" or medical request forms in English to receive medical treatment. If an
8  immigration detainee cannot speak English, again they must rely on the benevolence of
9  immigration detainees who can write the medical requests in English for them. They must
10 disclose very personal information to complete strangers to request medical treatment.

**Lack of Access to Telephones**

12     18.    Telephone access has historically been an enormous issue for detainees and
13 lawyers who are trying to reach their clients. One near-common characteristic of immigration
14 detention is its remoteness from California's urban centers or distance from free legal service
15 providers. Over the years, ICE has contracted with detention centers located in El Centro,
16 Marysville, Elk Grove, California City, Bakersfield, and Adelanto, among other cities. Most of
17 these are distant from free legal services and major cities. Thus, phone access is critical to an
18 individual's legal case as many lawyers and nonprofit lawyers cannot afford the time and expense
19 to travel to remote detention centers. A part of this issue has been remediated through a class
20 action settlement called *Lyon, et al. v. United States Immigration Customs Enforcement*, No. 13-
21 cv-5878, that covers Northern California detention centers; however, many detention centers in
22 Southern California are not covered by the settlement. Persistent issues for Southern California
23 facilities are: (1) inability to call numbers with automated attendants; (2) inability to call legal
24 counsel on a confidential phone line; (3) inability of lawyers to reach clients on confidential
25 phone lines; (4) inability to leave messages (most detention center phones disconnect the detainee
26 call if no "live" person is there to receive the call); and (5) the high cost of phone calls. The lack
27 of inadequate phone access impedes a person's ability to gather evidence in support of their
28 claim, impacts a lawyer's ability to effectively represent their client, and impacts California

7

residents who must pay the high costs of the collect telephone calls from their family in friends in detention.

### Inadequate Access to Legal Resources and Counsel

19. Immigration law is extraordinarily complex yet law libraries in immigration detention centers are universally inadequate. Rarely are relevant forms available in immigration detention centers' law libraries. Immigrants in removal proceedings often apply for relief from removal. Typical forms used to apply for relief are: (1) applications for political asylum; (2) applications for U visas; (3) applications for cancellation of removal; (4) fee waivers; and (5) applications for adjustment of status. It is common for law libraries not to have any of these forms.

20. Immigrants also bear the burden of proof in applications for relief. For example, for political asylum, an applicant must show an objectively reasonable fear of persecution in her home country. This is typically demonstrated through human rights reports, newspaper articles, and State Department reports submitted by the applicant. However, law libraries in detention centers rarely contain relevant human rights materials and applicants cannot meet their burden without assistance outside of the detention center.

21. Legal materials are generally out-of-date and inadequate. Typically, the situation is so dire, that I donate my old legal treatises and compilations of current human rights reports to detention centers. I have even asked publishers to send me defective books (i.e. books with torn pages or spines) so that I can donate them to the detainees.

22. During my visit to Mesa Verde Detention Center in 2015, I noted that the law library was inadequate. During the inspection, I had the opportunity to log in and run a search on the legal database available to detainees, and had three concerns about the system. First, given that I – a trained attorney with considerable experience using different legal search engines – could not figure out how to conduct a search without significant guidance from the librarian, I doubted that most detainees could do the same. I queried the system on a basic deportation question and the system told me it could not find any cases that met a basic criteria. Detainees often do not have access to recent, critical information pertaining to their cases. Immigration law

8

can change from week-to-week and having up-to-date legal information is critical. Moreover, there were no immigration forms or relevant human rights reports available in the law library. A large number of immigration detainees apply for asylum, withholding of removal, and relief under the Convention Against Torture, all of which usually require immigrants to bear the burden of proof and present evidence about conditions in their home countries. Without access to current human rights reports, immigrants cannot present such evidence and meet their burdens. Further, we were told if a detainee wanted to print any documents, they had to be mailed to the law librarian and she would print them. This raised concerns about the privacy of the data as many detainees are recounting private information about torture and persecution that would have to be emailed to a third party for printing.

23. Around January 2014, I was given a "tour" of RCCC in Elk Grove. The law library was in a large cage in the middle of a larger room. The library had no relevant information for ICE detainees. The library appeared catered to persons in criminal custody.

24. The ability to confer with counsel in immigration detention centers is also limited. For instance, Mesa Verde Detention Facility did not have sound-proof rooms for attorneys. The attorney-client visitation rooms at RCCC were of varying sizes and were "first-come-first-serve." The smaller visitation rooms could not reasonably accommodate more than one person, thus, if the lawyer needed a translator, he or she would have to wait for the larger room. At the Otay Mesa Detention Facility, I also had concerns of the adequacy of the law library due to lack of relevant forms and legal resources, and concerns over phone access.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on ___April 30___, 2018 in Woodland, California.

HOLLY S. COOPER

9

Decl. of Holly S. Cooper in Supp. of Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.
(18-cv-00490-JAM-KJN)

# EXHIBIT A



