XAVIER BECERRA
Attorney General of California
THOMAS PATTERSON
Senior Assistant Attorney General
MICHAEL NEWMAN
SATOSHI YANAI
Supervising Deputy Attorneys General
CHRISTINE CHUANG
ANTHONY HAKL
CHEROKEE MELTON
LEE I. SHERMAN
Deputy Attorneys General
State Bar No. 272271
300 S. Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6404
Fax: (213) 897-7605
E-mail: Lee.Sherman@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**THE UNITED STATES OF AMERICA,**

Plaintiff,

**v.**

**THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,**

Defendants.

Case No. 2:18-cv-00490-JAM-KJN

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS**

| | |
|---|---|
| Date: | June 20, 2018 [Preliminary Injunction Hearing] |
| Time: | 10:00 a.m. |
| Courtroom: | 6 |
| Judge: | The Honorable John A. Mendez |
| Trial Date: | None set |
| Action Filed: | March 6, 2018 |

Defendants the State of California, Edmund Gerald Brown Jr., Governor of California, in his official capacity, and Xavier Becerra, Attorney General of California, in his official capacity (collectively, "Defendants"), hereby request, under Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the following items in connection with Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and Defendants' Motion to Dismiss:

1. Exhibit A: U.S. Immigration and Customs Enforcement (ICE) Detainer Policy effective April 2, 2017, available at https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf
2. Exhibit B: Department of Homeland Security (DHS) Form I-247A, Immigration Detainer—Notice of Action, available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf
3. Exhibit C: DHS Memorandum dated February 20, 2017 entitled "Enforcement of the Immigration Laws to Serve the National Interest," available at https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf
4. Exhibit D: DHS Privacy Policy 2017-1 Questions and Answers, available at https://www.dhs.gov/sites/default/files/publications/Privacy%20Policy%20Questions%20%20Answers%2C%2020170427%2C%20Final.pdf
5. Exhibit E: Fiscal Year 2017 ICE Enforcement and Removal Operations Report, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf
6. Exhibit F: Senate Committee Public Safety, Analysis of Senate Bill 54 (SB 54), January 31, 2017
7. Exhibit G: SB 54, Assembly Committee on Judiciary, Analysis of SB 54, July 5, 2017
8. Exhibit H: California Department of Justice, Division of Law Enforcement, Information Bulletin dated March 28, 2018, No. DLE-2018-01, "Responsibilities of

Law Enforcement Agencies Under the California Values Act, California TRUST Act, and the California TRUTH Act"

9. Exhibit I: Assembly Committee on Appropriations, Analysis of Assembly Bill (AB 450), May 17, 2017

10. Exhibit J: Senate Committee on Labor and Industrial Relations, Analysis of AB 450, June 28, 2017

11. Exhibit K: Office of Inspector General, Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California, OIG-17-43-MA, March 6, 2017, available at https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-mga-030617.pdf

12. Exhibit L:

- News article from NBC San Diego dated April 27, 2017, entitled "Advocacy Group: If you're Abused in Immigration Detention the Government Doesn't Care," available at https://www.nbcsandiego.com/news/local/Advocacy-Group-If-Youre-Abused-in-Immigration-Detention-the-Government-Doesnt-Care-420666314.html
- News article from The Sacramento Bee dated March 4, 2017, entitled "High levels of lead found in county correctional facility water," available at http://www.sacbee.com/news/local/article136502123.html
- News article from the Los Angeles Times dated March 24, 2017, entitled "Mexican man's widow sues, says immigration detention facility staff ignored pleas for help," available at http://www.latimes.com/local/lanow/la-me-detention-lawsuit-20170324-story.html
- New article from KQED News dated July, 5, 2017, entitled "Hunger Strike at California's Biggest Immigration Detention Center," available at https://www.kqed.org/news/11549587/hunger-strike-at-californias-biggest-immigration-detention-center

Facts subject to judicial notice include those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Information made publicly available by government entities is subject to judicial notice. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017). Exhibits A, B, C, D, E, H, and K are documents made available to the public by the United States Department of Homeland Security and the California Department of Justice.

In addition, "[l]egislative history is properly the subject of judicial notice." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012). Exhibits F, G, I, and J are legislative history reports made available by the California Legislature. Lastly, courts take judicial notice of news articles "to indicate what was in the public realm at the time," *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), and "adjudicative facts appearing in newspapers." *Crowder v. Kitagawa*, 81 F.3d 1480, 1491 n.10 (9th Cir. 1996) (taking judicial notice of reports of data in newspapers); *see also Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-59 (9th Cir. 1995) (judicial notice of widespread layoffs at company based on news article). Exhibit L contains news articles from 2017 that indicate the reporting by newspapers of conditions in immigration detention facilities in California and information in the public realm concerning those facilities.

/ / /

/ / /

/ / /

3

RJN in Supp. of Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. and Defs.' Mot. to Dismiss (18-cv-00490-JAM-KJN)

Thus, because the above items meet the requirements of Rule 201(b)(2) of the Federal Rules of Evidence, the Court must take judicial notice of them pursuant to Rule 201(c)(2) of the Federal Rules of Evidence.

Dated: May 4, 2018

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California

/s/ Lee Sherman
Lee Sherman
Deputy Attorney General
*Attorneys for Defendants*

4

RJN in Supp. of Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. and Defs.' Mot. to Dismiss (18-cv-00490-JAM-KJN)

# EXHIBIT A

# U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**Policy Number 10074.2:** **Issuance of Immigration Detainers by ICE Immigration Officers**

**Issue Date: March 24, 2017**
**Effective Date: April 2, 2017**
**Superseded:** Interim Policy No. 10074.1: *Detainers* (Aug. 2, 2010)
**Federal Enterprise Architecture Number:** 306-112-002b

1. **Purpose/Background.** This Directive establishes U.S. Immigration and Customs Enforcement (ICE) policy and procedures regarding the issuance of civil immigration detainers to federal, state, local, and tribal law enforcement agencies (LEAs). ICE issues detainers to federal, state, local, and tribal LEAs to provide notice of its intent to assume custody of a removable alien detained in federal, state, local, or tribal custody. The Department of Homeland Security's (Department or DHS) detainer authority, codified in section 287.7 of title 8 of the Code of Federal Regulations (C.F.R.), arises from the Secretary of Homeland Security's power under section 103(a)(3) of the Immigration and Nationality Act (INA) to provide regulations "necessary to carry out his authority," and from ICE's general authority to arrest and detain aliens subject to removal or removal proceedings, pursuant to sections 236, 241, and 287 of the INA. The use of immigration detainers, however, long pre-dates any reference to detainers in the statute or regulations.[1] In fact, the former Immigration and Naturalization Service first used the Form I-247 as early as 1952.

Detainers enable ICE to judiciously deploy its investigative, detention, and removal resources consistent with the immigration enforcement priorities of the Department and the executive branch of the U.S. Government. Detainers also allow ICE immigration officers to avoid the risks to public safety and officer safety associated with arrests outside the custodial environment.

2. **Policy.** It is ICE policy to ensure that ICE immigration officers exercise detainer authority in a manner consistent with all legal requirements and in a manner that ensures ICE's LEA partners may honor detainers.

**2.1.** The consolidated detainer form, Form I-247A (Immigration Detainer – Notice of Action), attached to this Directive shall be used as of the effective date of this Directive. Form I-247D (Immigration Detainer – Request for Voluntary Action), Form I-247N (Request

[1] *See, e.g.*, *Chung Young Chew v. Boyd*, 309 F.2d 857 (9th Cir. 1962); *Rinaldi v. United States*, 484 F. Supp. 916 (S.D.N.Y. 1977); *Slavik v. Miller*, 89 F. Supp. 575 (W.D. Pa. 1950), *aff'd*, 184 F.2d 575 (3d Cir. 1950), *cert. denied*, 340 U.S. 955 (1951); *Matter of Lehder*, 15 I&N Dec. 159 (BIA 1975).

for Voluntary Notification of Release of Suspected Priority Alien), and Form I-247X (Request for Voluntary Transfer), may no longer be issued. Detainers issued on prior versions of the detainer form remain active and need not be replaced with a Form I-247A. *See* Attachment 8.4 for guidance on how to complete the Form I-274A.

**2.2.** Only ICE immigration officers, including designated officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA, may issue immigration detainers.

**2.3.** Regardless of whether a federal, state, local, or tribal LEA regularly cooperates with DHS immigration detainers, ICE immigration officers shall issue a detainer to the LEA for an alien in the LEA's custody after the alien is arrested for a criminal offense and the officer has probable cause to believe that the subject is an alien who is removable from the United States.

**2.4.** ICE immigration officers must establish probable cause to believe that the subject is an alien who is removable from the United States before issuing a detainer with a federal, state, local, or tribal LEA. Further, as a matter of policy, all detainers issued by ICE must be accompanied by either: (1) a properly completed Form I-200 (Warrant for Arrest of Alien) signed by an authorized ICE immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by an authorized ICE immigration officer.[2]

**2.5.** Except for circumstances in which the alien is detained in ICE custody at the time the detainer is issued, an ICE immigration officer shall not issue an immigration detainer to an LEA unless the LEA has arrested the alien for a criminal offense in an exercise of the LEA's independent arrest authority.[3] ICE Immigration officers shall not issue an immigration detainer for an alien who has been temporarily detained or stopped, but not arrested, by another LEA. This does not preclude the LEA from temporarily detaining an alien while an ICE immigration officer responds to the scene.

**2.6.** An ICE immigration officer may not issue a detainer based upon the initiation of an investigation to determine whether the subject is a removable alien. An ICE immigration officer may not establish probable cause of alienage and removability, for purposes of detainer issuance, solely based on evidence of foreign birth and the absence of records in available databases ("foreign-born-no match").

---

[2] Although ICE maintains that this is not legally required, ICE is implementing this warrant measure as a nationwide policy in light of one district court's ruling that detention pursuant to an ICE detainer constitutes a warrantless arrest and that section 287(a)(2) of the INA only authorizes a warrantless arrest if there is reason to believe the alien will escape before an arrest warrant can be secured. *See Moreno v. Napolitano*, --- F. Supp. 3d ---, 2016 WL 5720465, at *8 (N.D. Ill. Sept. 30, 2016).

[3] Box 2 on Form I-247A (Immigration Detainer – Notice of Action) is used by ICE to ensure that an alien detained in ICE's custody is returned to ICE custody after being transferred to another LEA for a proceeding or investigation. Such detainers may be issued prior to the other LEA assuming custody of the subject of the detainer.

**2.7.** ICE immigration officers must promptly assume custody of an alien who is the subject of an immigration detainer. Further, ICE immigration officers should assume custody of an alien subject as soon as practicable, and as close as possible to the time at which the alien would otherwise have been released by the relevant LEA, but in no circumstances more than 48 hours after such time. If it becomes apparent that ICE cannot assume custody of the alien within 48 hours of when he or she would otherwise be released, the ICE immigration officer should immediately cancel the detainer.

**2.8.** In some cases, after issuing an immigration detainer for an individual in the custody of a federal, state, local, or tribal LEA, ICE may determine that it will not assume custody of the subject. In these cases, the ICE immigration officer must cancel the immigration detainer as soon as such determination is made.

**2.9.** As a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen.[4]

**3.** **Definitions.** The following definitions apply only for purposes of this directive.

**3.1.** **Detainer.** A notice that ICE issues to a federal, state, local, or tribal LEA to inform the LEA that ICE intends to assume custody of a removable alien in the LEA's custody.

**3.2.** **ICE Immigration Officer.** The term "ICE immigration officer" means Enforcement and Removal Operations (ERO) deportation officers and Homeland Security Investigations (HSI) special agents, including supervisory and managerial personnel who are responsible for supervising authorized immigration officers, as well as designated officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA. *See* 8 C.F.R. § 287.7(b).

**3.3.** **Probable Cause.** The facts and circumstances within the officer's knowledge and of which they have reasonably trustworthy information that are sufficient in themselves to warrant a person of reasonable caution in the belief that an individual is a removable alien.

**4.** **Responsibilities.**

**4.1.** **All ICE employees** are responsible for complying with the policy and procedures set forth in this Directive.

**4.2.** **ICE immigration officers**, including designated immigration officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA, are responsible for issuing and executing

---

[4] ICE immigration officers must comply with requirements of ICE Policy No. 16001.2, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (Nov. 10, 2015), when issuing detainers. In particular, footnote 1 of that policy specifically applies to prior versions of the detainer "and/or any successor form serving the same or substantially similar" purpose.

immigration detainers in accordance with the policy and procedures set forth in this Directive.

4.3. **ICE ERO Assistant Directors, Deputy Assistant Directors, Field Office Directors (FODs), and the Directors of the National Criminal Analysis and Targeting Center, the Pacific Enforcement Response Center, and the Law Enforcement Support Center,** and their designees, as well as the **ICE HSI Assistant Director for Domestic Operations** and **ICE HSI Special Agents in Charge (SACs)** and their designees, are responsible for disseminating and ensuring compliance with this Directive.

5. **Procedures.**

5.1. **Establishing Probable Cause.**

As a matter of policy, a detainer must be supported by probable cause based upon one of the following four categories of information:

1) A final order of removal against the alien;

2) The pendency of ongoing removal proceedings against the alien, including cases in which DHS has issued a charging document and served the charging document on the alien;

3) Biometric confirmation of the alien's identity and a records match in federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks lawful immigration status or, notwithstanding such status, is removable under U.S. immigration law; and/or

4) Statements made voluntarily by the alien to an ICE immigration officer and/or other reliable evidence that indicate the alien either lacks lawful immigration status or, notwithstanding such status, is removable under U.S. immigration law.

An ICE immigration officer may not issue a detainer prior to establishing probable cause to believe that the subject is a removable alien. Further, an ICE immigration officer may not issue a detainer based upon the initiation of an investigation to determine whether the subject is a removable alien. The pendency of ongoing removal proceedings refers to cases in which DHS has issued a charging document and served the charging document on the alien. As a matter of policy, an ICE immigration officer may not establish probable cause of alienage and removability, for purposes of detainer issuance, solely based on evidence of foreign birth and the absence of records in available databases ("foreign-born-no match").

5.2. **Issuing an Immigration Detainer and Administrative Warrant**. All immigration detainers (Form I-247A Immigration Detainer – Notice of Action) must be accompanied by either Form I-200 (Warrant for Arrest of Alien) or Form I-205 (Warrant of Removal/Deportation).

1) If the subject of the detainer is a removable alien who is not yet subject to a final order of removal, the ICE immigration officer who issues the detainer shall attach a Form I-200 (Warrant for Arrest of Alien) to the detainer.

   a. The Form I-200 shall be issued by any of the supervisory immigration officials listed at 8 C.F.R. § 287.5(e)(2).

2) If the subject of the detainer is also the subject of a final order of removal, including where the alien is subject to reinstatement of removal under section 241(a)(5) of the INA, the ICE immigration officer who issues the detainer shall attach a Form I-205 (Warrant of Removal/Deportation) to the immigration detainer.

   a. The Form I-205 shall be issued by any of the supervisory immigration officials listed in 8 C.F.R. § 241.2(a)(1).

**5.3.  Declined Immigration Detainers.**  When ICE becomes aware that an LEA failed to honor an immigration detainer issued by ICE, the ICE immigration officer shall document the declined detainer in the ENFORCE Alien Removal Module (EARM) through the use of the detainer lift code of "A – Declined by LEA."

**5.4.  Cancelling an Immigration Detainer.**  If after issuing an immigration detainer ICE determines that it will not assume custody of the subject, the ICE immigration officer must cancel the immigration detainer.

1) Form I-247A shall be issued to the relevant LEA requesting cancellation of the detainer; and

2) All cancelled detainers shall be documented in EARM through the use of the detainer lift code of "L - Lifted", or using another case-specific lift code requiring the cancellation of the detainer (e.g. "D – Died", "N – Alien not subject to deportation").

**6.  Recordkeeping.**  ICE maintains records generated pursuant to this policy, specifically Forms I-247A (Immigration Detainer-Notice of Action), Forms I-200 (Warrant for Arrest of Alien) and Forms I-205 (Warrant of Removal/Deportation) in the Alien File.

**7.  Authorities/References.**

**7.1.**  Immigration and Nationality Act of 1952, Pub. L. No. 82-414, as amended (codified at 8 U.S.C. §§ 1101 *et seq.*).

**7.2.**  8 C.F.R. §§ 236.1, 241.2, 287.3, 287.5, 287.7.

**7.3.**  *Moreno v. Napolitano*, --- F. Supp. 3d ---, 2016 WL 5720465 (N.D. Ill. Sept. 30, 2016).

**7.4.**  Executive Order 13768, *Enhancing Public Safety in the Interior of the United States* (Jan. 25, 2017).

**7.5.** Memorandum from DHS Secretary John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017).

**7.6.** ICE Policy No. 16001.2, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (Nov. 10, 2015).

**7.7.** ICE Policy No. 13001.1, *State Personnel Designated to Act as Immigration Officers for Immigration Enforcement Purposes* (Dec. 4, 2008).

**8. Attachments.**

**8.1.** Form I-247A (Immigration Detainer – Notice of Action).

**8.2.** Form I-200 (Warrant for Arrest of Alien).

**8.3.** Form I-205 (Warrant of Removal/Deportation).

**8.4.** ICE Guidance For Completing the Form I-247A.

**9.** **No Private Right Statement.** This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create or diminish any rights, substantive or procedural, enforceable at law or equity by any party in any criminal, civil, or administrative matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

# EXHIBIT B

DEPARTMENT OF HOMELAND SECURITY

# IMMIGRATION DETAINER - NOTICE OF ACTION

Subject ID:
Event #:

File No:
Date:

TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency)

FROM: (Department of Homeland Security Office Address)

Name of Alien: ____________________

Date of Birth: __________ Citizenship: __________ Sex: ______

**1. DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON *(complete box 1 or 2).***

☐ A final order of removal against the alien;
☐ The pendency of ongoing removal proceedings against the alien;
☐ Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or
☐ Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE ALIEN TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION *(complete box 1 or 2).***

☐ Upon completion of the proceeding or investigation for which the alien was transferred to your custody, DHS intends to resume custody of the alien to complete processing and/or make an admissibility determination.

**IT IS THEREFORE REQUESTED THAT YOU:**

- **Notify DHS** as early as practicable (at least 48 hours, if possible) before the alien is released from your custody. Please notify DHS by calling ☐ U.S. Immigration and Customs Enforcement (ICE) or ☐ U.S. Customs and Border Protection (CBP) at __________. If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.
- **Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien **must be served with a copy of this form** for the detainer to take effect. This detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters
- Relay this detainer to any other law enforcement agency to which you transfer custody of the alien.
- Notify this office in the event of the alien's death, hospitalization or transfer to another institution.

☐ If checked: please cancel the detainer related to this alien previously submitted to you on __________ (date).

(Name and title of Immigration Officer) (Signature of Immigration Officer) (Sign in ink)

**Notice:** If the alien may be the victim of a crime or you want the alien to remain in the United States for a law enforcement purpose, notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing or faxing a copy to __________.

Local Booking/Inmate #: ______ Estimated release date/time: __________

Date of latest criminal charge/conviction: __________ Last offense charged/conviction: __________

This form was served upon the alien on __________, in the following manner:

☐ in person ☐ by inmate mail delivery ☐ other (please specify): __________

(Name and title of Officer) (Signature of Officer) (Sign in ink)

SAMPLE

**NOTICE TO THE DETAINEE**

The Department of Homeland Security (DHS) has placed an immigration detainer on you. An immigration detainer is a notice to a law enforcement agency that DHS intends to assume custody of you (after you otherwise would be released from custody) because there is probable cause that you are subject to removal from the United States under federal immigration law. DHS has requested that the law enforcement agency that is currently detaining you maintain custody of you for a period not to exceed 48 hours beyond the time when you would have been released based on your criminal charges or convictions. **If DHS does not take you into custody during this additional 48 hour period, you should contact your custodian** (the agency that is holding you now) to inquire about your release. **If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

**NOTIFICACIÓN A LA PERSONA DETENIDA**

El Departamento de Seguridad Nacional (DHS) le ha puesto una retención de inmigración. Una retención de inmigración es un aviso a una agencia de la ley que DHS tiene la intención de asumir la custodia de usted (después de lo contrario, usted sería puesto en libertad de la custodia) porque hay causa probable que usted está sujeto a que lo expulsen de los Estados Unidos bajo la ley de inmigración federal. DHS ha solicitado que la agencia de la ley que le tiene detenido actualmente mantenga custodia de usted por un periodo de tiempo que no exceda de 48 horas más del tiempo original que habría sido puesto en libertad en base a los cargos judiciales o a sus antecedentes penales. **Si DHS no le pone en custodia durante este periodo adicional de 48 horas, usted debe de contactarse con su custodio** (la agencia que le tiene detenido en este momento) para preguntar acerca de su liberación. **Si usted cree que es un ciudadano de los Estados Unidos o la víctima de un crimen, por favor avise al DHS llamando gratuitamente al Centro de Apoyo a la Aplicación de la Ley ICE al (855) 448-6903.**

**AVIS AU DETENU OU À LA DÉTENUE**

Le Département de la Sécurité Intérieure (DHS) a placé un dépositaire d'immigration sur vous. Un dépositaire d'immigration est un avis à une agence de force de l'ordre que le DHS a l'intention de vous prendre en garde à vue (après celà vous pourrez par ailleurs être remis en liberté) parce qu'il y a une cause probable que vous soyez sujet à expulsion des États-Unis en vertu de la loi fédérale sur l'immigration. Le DHS a demandé que l'agence de force de l'ordre qui vous détient actuellement puisse vous maintenir en garde pendant une période ne devant pas dépasser 48 heures au-delà du temps après lequel vous auriez été libéré en se basant sur vos accusations criminelles ou condamnations. **Si le DHS ne vous prenne pas en garde à vue au cours de cette période supplémentaire de 48 heures, vous devez contacter votre gardien (ne)** (l'agence qui vous détient maintenant) pour vous renseigner sur votre libération. **Si vous croyez que vous êtes un citoyen ou une citoyenne des États-Unis ou une victime d'un crime, s'il vous plaît aviser le DHS en appelant gratuitement le centre d'assistance de force de l'ordre de l'ICE au (855) 448-6903**

SAMPLE

**NOTIFICAÇÃO AO DETENTO**

O Departamento de Segurança Nacional (DHS) expediu um mandado de detenção migratória contra você. Um mandado de detenção migratória é uma notificação feita à uma agência de segurança pública que o DHS tem a intenção de assumir a sua custódia (após a qual você, caso contrário, seria liberado da custódia) porque existe causa provável que você está sujeito a ser removido dos Estados Unidos de acordo com a lei federal de imigração. ODHS solicitou à agência de segurança pública onde você está atualmente detido para manter a sua guarda por um período de no máximo 48 horas além do tempo que você teria sido liberado com base nas suas acusações ou condenações criminais. **Se o DHS não leva-lo sob custódia durante este período adicional de 48 horas, você deve entrar em contato com quem tiver a sua custódia** (a agência onde você está atualmente detido) para perguntar a respeito da sua liberação. **Se você acredita ser um cidadão dos Estados Unidos ou a vítima de um crime, por favor informe ao DHS através de uma ligação gratuita ao Centro de Suporte de Segurança Pública do Serviço de Imigração e Alfândega (ICE) pelo telefone (855) 448-6903.**

**THÔNG BÁO CHO NGƯỜI BỊ GIAM**

Bộ Nội An (DHS) đã ra lệnh giam giữ di trú đối với quý vị. Giam giữ di trú là một thông báo cho cơ quan công lực rằng Bộ Nội An sẽ đảm đương việc lưu giữ quý vị (sau khi quý vị được thả ra) bởi có lý do khả tín quý vị là đối tượng bị trục xuất khỏi Hoa Kỳ theo luật di trú liên bang. Sau khi quý vị đã thi hành đầy đủ thời gian của bản án dựa trên các tội phạm hay các kết án, thay vì được thả tự do, Bộ Nội An đã yêu cầu cơ quan công lực giữ quý vị lại thêm không quá 48 tiếng đồng hồ nữa. Nếu Bộ Nội An không đến bắt quý vị sau 48 tiếng đồng hồ phụ trội đó, quý vị cần liên lạc với cơ quan hiện đang giam giữ quý vị dể tham khảo về việc trả tự do cho quý vị. Nếu quý vị là công dân Hoa Kỳ hay tin rằng mình là nạn nhân của một tội ác, xin vui lòng báo cho Bộ Nội An bằng cách gọi số điện thoại miễn phí 1(855) 448-6903 cho Trung Tâm Hỗ Trợ Cơ Quan Công Lực Di Trú.

被拘留者通知書

國土安全部(Department of Homeland Security，簡稱DHS)已經對你發出移民拘留令。移民拘留令為一給予執法機構的通知書，闡明DHS意欲獲取對你的羈押權(若非有此羈押權，你將會被釋放)；因為根據聯邦移民法例，並基於合理的原由，你將會被遞解離美國國境。DHS亦已要求現正拘留你的執法機構，在你因受到刑事檢控或定罪後，而在本應被釋放的程序下，繼續對你作出不超過四十八小時的監管。若你在這附加的四十八小時內，仍未及移交至**DHS**的監管下，你應當聯絡你的監管人(即現正監管你的機構)查詢有關你釋放的事宜。若你認為你是美國公民或為罪案受害者，請致電**ICE**執法部支援中心**(Law Enforcement Support Center)**知會**DHS**，免費電話號碼：**(855)448-6903**。

SAMPLE

# EXHIBIT C

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

Homeland
Security

February 20, 2017

MEMORANDUM FOR: Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM: John Kelly
Secretary

SUBJECT: **Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

**A. The Department's Enforcement Priorities**

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

[1] The November 20, 2014, memorandum will be addressed in future guidance.

**B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

**C. Exercise of Prosecutorial Discretion**

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

**D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office**

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

**E. Hiring Additional ICE Officers and Agents**

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

**F. Establishment of Programs to Collect Authorized Civil Fines and Penalties**

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

**G. Aligning the Department's Privacy Policies With the Law**

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

**H. Collecting and Reporting Data on Alien Apprehensions and Releases**

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

**I. No Private Right of Action**

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

# EXHIBIT D

**Privacy Policy 2017-01**
**Questions & Answers**

## U.S. Citizen Definitions

**Who is a U.S. citizen?**

A person may become a U.S. citizen at birth, if:

- **i.** He or she was born in the United States or certain territories or outlying possessions of the United States, and subject to the jurisdiction of the United States; or
- **ii.** She or he had a parent or parents who were citizens at the time of your birth (if you were born abroad) and meet other requirements.

A person may become a U.S. citizen after birth, if:

- **i.** She or he applies for "derived" or "acquired" citizenship through parents, or
- **ii.** He or she applies for naturalization.

**Who is a lawful permanent resident?**

A person is a lawful permanent resident if he or she enjoys the status accorded to an individual who has been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with immigration laws, and that status has not changed.

**Who is an immigrant?**

A person who is an alien in the United States, except one legally admitted under specific non-immigrant categories as discussed below in response to question 14. Additionally, a person who has entered without inspection, an illegal alien, is also considered an immigrant.

**Who is a non-immigrant?**

A person who is an alien seeking temporary entry to the United States for a specific purpose. The alien must have a permanent residence abroad (for most classes of admission) and qualify for the nonimmigrant classification sought. The nonimmigrant classifications include: foreign government officials, visitors for business and for pleasure, aliens in transit through the United States, treaty traders and investors, students, international representatives, temporary workers and trainees, representatives of foreign information media, exchange visitors, fiancé(e)s of U.S. citizens, intracompany transferees, NATO officials, religious

workers, and some others. Most nonimmigrants can be accompanied or joined by spouses and unmarried minor (or dependent) children.

1. **Why is the Policy changing?**
   a. The Department of Homeland Security (DHS) is changing its policy regarding the extension of Privacy Act protections to all persons as directed by section 14 of Executive Order 13768, which states, that "[a]gencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." Previously, DHS had provided the administrative protections of the Privacy Act to all persons, as permitted by regulatory guidance from the Office of Management and Budget. The policy of the current Administration is to grant Privacy Act protections only to those explicitly covered by the Privacy Act.

2. **What changes result from the new Policy?**
   a. Generally, the new policy clarifies that immigrants and non-immigrants may only obtain access to their records through the Freedom of Information Act and may not be granted amendment of their records upon request. The Executive Order limits the rights and protections of the Privacy Act, subject to applicable law, to U.S. citizens and lawful permanent residents. The new policy requires that decisions regarding the collection, maintenance, use, disclosure, retention, and disposal of information being held by DHS conform to an analysis consistent with the Fair Information Practice Principles, see questions 7 and 8.

3. **What changes to the analysis of records and information disclosure under the Freedom of Information Act result from the new Policy?**
   a. The new Policy does not change the analysis of records and information disclosure under the Freedom of Information Act (FOIA), an applicable law. Decisions to withhold information requested by third parties about immigrants and non-immigrants will be analyzed in accordance the FOIA exemptions at 5 U.S.C. § 552(b)(6) or (b)(7)(C), which balance the public's right to know about government operations against the personal privacy interests of the subject. With respect to FOIA requests about oneself, an immigrant or non-immigrant will receive those records that are not exempt under the FOIA, just like any other person.

4. **What is the impact of the new Policy on the Judicial Redress Act?**
   a. The new Policy has no effect upon the Judicial Redress Act, an applicable law. The Judicial Redress Act provides that "covered persons," who are citizens of covered foreign states, will have both administrative and judicial Privacy Act rights with respect to their information contained in "covered records," which are law enforcement in nature. This means that certain foreign nationals, currently citizens of the majority of European Union states, may seek access or amendment of their covered records held and covered by a DHS System of Records Notice (SORN), or pursue judicial redress for access, amendment, or wrongful disclosure of such records. For more information see, https://www.justice.gov/opcl/judicial-redress-act-2015.

5. **What changes to the sharing or disclosure of information with the Congress result from the new Policy?**
   a. The new Policy does not change the requirements for sharing information in full in response to a request from the Chairperson of Congressional Committee asking upon behalf of the Committee regarding a matter within the jurisdiction of the Committee. Such a response is normally confidential for use in support of the Committee's business and not a public disclosure. Similarly, the new Policy does not change how we respond to Congressional requests on behalf of constituents, who are U.S. citizens or lawful permanent residents, in that it is treated as a first-party Privacy Act request by consent of the constituent; nor does it change how we respond to Congressional requests on behalf of immigrants, non-immigrants, or other third parties (such as, state and local government, or the Congressperson asking in a personal capacity), in that it is treated as a Freedom of Information Act request.

6. **What changes to the sharing or disclosure of information with federal, state, and local law enforcement result from the new Policy?**
   a. The new Policy, subject to the Judicial Redress Act or confidentiality provisions provided by statute or regulation, permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement. The Policy requires that such sharing conform to an analysis based upon the Fair Information Practice Principles that demonstrates a consistent relationship between the purpose for collection of the information and intended use.

7. **What are the Fair Information Practice Principles (FIPPs)?**
   a. The Fair Information Practice Principles (FIPPs) are principles that were first promulgated by the Department of Health, Education, and Welfare in 1973 and have guided federal government information practices going forward. The concepts are integral to many privacy laws, including both the Privacy Act of 1974 and to the E-Government Act of 2002, which also governs agency use of new technology. The eight foundational principles are: Transparency, Individual Participation, Purpose Specification, Data Minimization, Use Limitation, Data Quality and Integrity, Security, and Accountability and Auditing. For a discussion see question 8.

8. **How do the FIPPs inform the use and protection of information by DHS?**
   a. The FIPPs inform the use and protection of information by DHS as follows:
      i. **Transparency** requires that DHS give public notice to its actions to collect information (e.g., System of Records Notices and Privacy Impact Assessments, which are located on the DHS Privacy Office Website, and signage [see, www.dhs.gov/privacy.]);
      ii. **Individual Participation** requires that, when appropriate, DHS involve the person in the decision whether or not to provide personal information to DHS (i.e., make a choice);
      iii. **Purpose Specification** requires that DHS inform the public of its authority to collect the information that it seeks—in other words, say what information is sought, why it is being sought, and whether or not it's submission is voluntary;
      iv. **Data Minimization** requires that DHS only seek to collect the information that it needs, based upon its authority and based upon the mission or operation that requires the information;
      v. **Use Limitation** requires that DHS use the information that it collects in a manner compatible with the purpose and authority that permit the collection;
      vi. **Data Quality and Integrity** require that DHS has means to ensure the accuracy of the information it collects, provides measures to maintain the data free from corruption, and allow for corrections to data that become inaccurate or stale;
      vii. **Security** requires that DHS ensure its data systems are protected against intrusion, that user access is determined by mission assignments, and that remedial procedures exist to address the possibility of breach or data spills;
      viii. **Accountability and Auditing** require that DHS maintains the integrity of its systems such that it may find, use, and report upon the data

residing in those systems, and so that it may allow for independent audits to verify the accuracy of its reporting and its satisfaction of the prior seven principles.

**9. What access to records is available to immigrants and non-immigrants?**

- **a.** Immigrants and non-immigrants may access their records through the Freedom of Information Act (FOIA). Any person, irrespective of immigration status, may file a FOIA request with DHS for information about him or herself that DHS has in its possession and systems; he or she is entitled to a response that details the search for information about the person and informs him or her whether or not the records about them are released in full, released with certain portions masked in accordance with exemptions under the FOIA, or withheld in full.

**10. May immigrants and non-immigrants amend their records, which are held by DHS?**

- **a.** Immigrants and non-immigrants may not request amendment of their records in accordance with the Privacy Act. DHS, however, as a matter of efficiency and accurate recordkeeping strives to keep all information in its possession current. When DHS becomes aware and is able to confirm that information in its possession is inaccurate or no longer relevant it may choose to update or dispose of such information in accordance with the terms of the Federal Records Act records disposition schedules that apply to the particular records under review.

**11. What impact does the new Policy have on immigrants and non-immigrants access to redress through the DHS Traveler Redress Inquiry Process (DHS TRIP)?**

- **a.** The new Policy has no impact upon an immigrant or non-immigrant's access to Redress through DHS TRIP. DHS TRIP provides traveler redress to all persons irrespective of immigration status. Individuals, including foreign nationals, or persons who believe they have been improperly denied entry, refused boarding for transportation, or identified for additional screening by DHS may submit a redress request through DHS TRIP. DHS TRIP is a single point of contact for persons who have inquiries or seek resolution regarding difficulties they experienced during their travel screening at transportation hubs such as airports, seaports and train stations, or at U.S. land borders. For more information see, www.dhs.gov/trip.

# EXHIBIT E



U.S. Immigration
and Customs
Enforcement

# Fiscal Year 2017 ICE Enforcement and Removal Operations Report

## Overview

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities in Fiscal Year (FY) 2017. ERO identifies, arrests, and removes aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. ICE shares responsibility for administering and enforcing the nation's immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services.

On January 25, 2017, the President Donald J. Trump issued Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States* (EO), which set forth the Administration's immigration enforcement and removal priorities. The Department of Homeland Security's (DHS) February 20, 2017 memorandum, *Enforcement of the Immigration Laws to Serve the National Interest* (implementation memorandum) provided direction for the implementation of the policies set forth in the EO. The EO and implementation memorandum expanded ICE's enforcement focus to include removable aliens who (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Department has directed that classes or categories of removable aliens are no longer exempted from potential enforcement.

The EO and implementation memorandum highlight the critical importance of interior enforcement in protecting national security and public safety and upholding the rule of law. This report presents and analyzes ICE ERO's FY2017 year-end statistics and illustrates how ICE ERO successfully fulfilled its mission in furthering the policies set forth in the EO and implementation memorandum.

## FY2017 Enforcement and Removal Statistics

As directed in the EO and implementation memorandum, ICE no longer exempts classes or categories of removable aliens from potential enforcement. This policy change is reflected in ERO's FY2017 enforcement statistics, which show increases in the following enforcement actions: (1) ICE ERO administrative arrests; (2) book-ins of aliens to ICE detention facilities resulting from ICE arrests; and (3) ICE ERO removals of aliens as a result of ICE's interior enforcement. The trend of increased enforcement actions began shortly after the change in administration on January 20, 2017, and this date is used throughout the report for the purposes of data reporting. In each of the aforementioned areas, there was a net increase over the prior fiscal year.

### ICE ERO Administrative Arrests

An administrative arrest is the arrest of an alien for a civil violation of the immigration laws, which is subsequently adjudicated by an immigration judge or through other administrative processes. With 143,470 administrative arrests in FY2017, ICE ERO recorded its greatest number of administrative arrests as compared with the past three fiscal years.[1] There were 33,366 more administrative arrests in FY2017 than in FY2016, representing a 30 percent increase, as seen in Figure 1.

**Figure 1. FY2015 – FY2017 ERO Administrative Arrests**

Administrative arrests began to increase after January 25, 2017, when the EO was issued, as shown in Figure 2. The analysis of administrative arrests conducted per week shows an elevated level of enforcement as compared with FY2016, beginning just after the new Administration took office during FY2017. This illustrates ERO's prompt response to the direction set forth by the EO.

**Figure 2. FY2016 and FY2017 ERO Administrative Arrests per week Comparison**

The increase in ERO administrative arrests following the EO accounts for the increase in total ERO FY2017 arrests. Figure 3 shows the total ERO arrests from the start of the new Administration to the end of FY2017 compared to the same timeframe in FY2016; the number of administrative arrests rose from 77,806 to 110,568, a 42 percent increase. In fact, ERO arrested more aliens in FY2017 over this period than in all of FY2016. According to ICE's system of record, of the 110,568 ERO administrative arrests

[1] ERO administrative arrests include all ERO programs. All statistics are attributed to the current program of the processing officer of an enforcement action.

from January 20 to September 30, 2017, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive, or were processed with a reinstated final order.[2]

**Figure 3. FY2016 and FY2017 ERO Administrative Arrests from January 20 to End of FY**

*Administrative Arrests of Criminal vs. Non-Criminal Aliens*

An administrative arrest of a criminal alien is the arrest of an alien with a known criminal conviction. ICE remains committed to targeting such aliens for arrest and removal. ERO arrested 105,736 criminal aliens in FY2017, resulting in a 12 percent (10,985) increase over FY2016, as seen in Figure 4.

**Figure 4. FY2015 – FY2017 ERO Administrative Arrests of Criminal Aliens**

Table 1 provides a breakdown of total administrative arrests for FY2017, by those with known criminal convictions, those without a known conviction and with criminal charges pending final disposition, and those without a known criminal conviction or pending charges. An alien with both criminal convictions and pending criminal charges is only counted in the criminal conviction category. The vast majority of ERO's arrests were of convicted criminals or aliens with criminal charges. A relatively small percentage (11 percent) of the arrested alien population had no known criminal convictions or charges. These results clearly reflect ERO's success in expanding its efforts to address all illegal aliens encountered in the course

[2] ICE ERO defines "fugitive" as any alien who has failed to depart the United States following the issuance of a final order of removal, deportation or exclusion, or who has failed to report to ICE after receiving notice to do so.

of its operations, while still prioritizing its enforcement resources on those who pose a known threat to national security and public safety.

Table 2 shows the criminal background of arrested aliens and includes criminal charges and convictions in ICE's system of record for those administratively arrested in FY2017. Only criminal charge categories with at least 1,000 total convictions and charges are included in this table. Because this was a new area of focus and a new measure in FY2017, comparison to previous fiscal years is not possible at this time.

**Table 1. FY2017 ERO Administrative Arrests by Criminality**

| ERO Administrative Arrests by Criminality | | |
|---|---|---|
| **Criminality** | **Arrests** | **% of Total** |
| Criminal Convictions | 105,736 | 73.7% |
| Pending Criminal Charges | 22,256 | 15.5% |
| No Known Criminal Charges or Convictions | 15,478 | 10.8% |
| Total Arrests | 143,470 | 100.0% |

**Table 2. FY2017 Total ERO Administrative Arrests Criminal Charges and Convictions[3]**

| Criminal Charge Category | Criminal Charges | Criminal Convictions | Total |
|---|---|---|---|
| Traffic Offenses - DUI | 20,562 | 59,985 | **80,547** |
| Dangerous Drugs | 19,065 | 57,438 | **76,503** |
| Immigration | 10,389 | 52,128 | **62,517** |
| Traffic Offenses | 24,438 | 43,908 | **68,346** |
| Assault | 16,535 | 31,919 | **48,454** |
| Larceny | 4,438 | 15,918 | **20,356** |
| Obstructing Judiciary, Congress, Legislature, Etc. | 9,623 | 11,655 | **21,278** |
| General Crimes | 6,623 | 10,702 | **17,325** |
| Burglary | 2,574 | 10,262 | **12,836** |
| Obstructing the Police | 4,640 | 9,976 | **14,616** |
| Fraudulent Activities | 3,476 | 8,922 | **12,398** |
| Weapon Offenses | 2,913 | 8,260 | **11,173** |
| Public Peace | 3,592 | 7,336 | **10,928** |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,631 | 5,033 | **6,664** |
| Invasion of Privacy | 1,904 | 4,830 | **6,734** |
| Stolen Vehicle | 1,496 | 4,678 | **6,174** |
| Robbery | 1,020 | 4,595 | **5,615** |
| Family Offenses | 1,985 | 3,934 | **5,919** |
| Forgery | 1,442 | 3,768 | **5,210** |
| Sexual Assault | 1,413 | 3,705 | **5,118** |
| Stolen Property | 1,168 | 3,176 | **4,344** |
| Damage Property | 1,421 | 2,681 | **4,102** |
| Flight / Escape | 937 | 2,319 | **3,256** |
| Liquor | 1,675 | 2,313 | **3,988** |
| Health / Safety | 539 | 1,548 | **2,087** |
| Homicide | 355 | 1,531 | **1,886** |
| Kidnapping | 710 | 1,317 | **2,027** |
| Commercialized Sexual Offenses | 577 | 995 | **1,572** |
| Threat | 495 | 847 | **1,342** |

3 The criminality displayed includes all criminal charges and convictions for FY2017 ERO administrative arrests entered into ICE's system of record at the time of the data run. An alien may have more than one criminal charge or criminal conviction in a fiscal year, and all relevant charges and convictions for each arrest are included. As such, the total number of criminal charges and convictions is greater than the total number of aliens administratively arrested.

***Notes:*** Immigration crimes include "illegal entry," "illegal reentry," "false claim to U.S. citizenship," and "alien smuggling." "Obstructing Judiciary& Congress& Legislature& Etc." refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include the following National Crime Information Center (NCIC) charges: Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

Administrative arrests of non-criminals (i.e., those aliens without a criminal conviction on record at the time of arrest) comprised 26 percent of total ICE ERO administrative arrests in FY2017. Table 3 shows a breakdown of non-criminal arrests with and without criminal charges. A total of 59 percent of non-criminal arrests during FY2017 had unresolved criminal charges at the time of their arrest. Table 4 illustrates that the percentage of non-criminal arrests with unresolved charges was higher (62 percent) in the time period after the EO was issued. Of non-criminal aliens arrested in FY2017, 57 percent were processed with a notice to appear, and 23 percent were ICE fugitives or subjects who had been previously removed and served an order of reinstatement.

**Table 3. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type**

| ERO Administrative Arrest Type | FY2017 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **37,734** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **22,256** | **59.0%** |
| *Notice to Appear* | *13,860* | *36.7%* |
| *Fugitives* | *1,808* | *4.8%* |
| *Reinstatement* | *2,994* | *7.9%* |
| *Other* | *3,594* | *9.5%* |
| **No Criminal Arrests/Charges** | **15,478** | **41.0%** |
| *Notice to Appear* | *7,643* | *20.3%* |
| *Fugitives* | *2,350* | *6.2%* |
| *Reinstatement* | *1,695* | *4.5%* |
| *Other* | *3,790* | *10.0%* |

**Table 4. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type from January 20, 2017 to End of FY**

| ERO Administrative Arrest Type | FY2017 01/20/17 - 09/30/17 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **31,888** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **19,757** | **62.0%** |
| *Notice to Appear* | *12,622* | *39.6%* |
| *Fugitives* | *1,585* | *5.0%* |
| *Reinstatement* | *2,572* | *8.1%* |
| *Other* | *2,978* | *9.3%* |
| **No Criminal Arrests/Charges** | **12,131** | **38.0%** |
| *Notice to Appear* | *5,927* | *18.6%* |
| *Fugitives* | *2,072* | *6.5%* |
| *Reinstatement* | *1,440* | *4.5%* |
| *Other* | *2,692* | *8.4%* |

*At-Large Arrests*

An ERO at-large arrest is conducted in the community, as opposed to in a custodial setting such as a prison or jail.[4] The total number of at-large arrests increased after the EO was issued, particularly in those areas that do not honor ICE detainers or limit or restrict ICE's access to their jail population. Figure 5 shows that total at-large arrests in FY2017 increased to 40,066 from 30,348 in FY2016. Figure 6 shows the increase in at-large arrests in the time period after January 20 for both FY2016 and FY2017. In this time frame, ICE ERO conducted 31,663 at-large arrests in FY2017 as compared to 22,094 in FY2016.

**Figure 5. FY2015 – FY2017 ERO At-Large Administrative Arrests**

[4] ERO administrative arrests reported as "at-large" include records from all ERO Programs with Arrest Methods of Located, Non-Custodial Arrest, or Probation and Parole.

**Figure 6. FY2016 and FY2017 ERO Administrative At-Large Arrests, from January 20 to End of FY**

**Table 5. FY2016 and FY2017 ERO Administrative At-Large Arrests by Criminality**

| FY2016-2017 ERO At Large Administrative Arrests by Criminality | | |
|---|---|---|
| **Criminality** | **FY2016** | **FY2017** |
| Convicted Criminal | 24,850 | 26,466 |
| Non-Criminal Immigration Violators | 5,498 | 13,600 |
| Total | 30,348 | 40,066 |

## Detainers

A detainer is a request that the receiving law enforcement agency both notify DHS as early as practicable, at least 48 hours, if possible, before a removable alien is released from criminal custody, and also maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise have been released to allow DHS to assume custody for removal purposes. ICE issues detainers to federal, state, and local law enforcement agencies only after establishing probable cause to believe that the subject is an alien who is removable from the United States and to provide notice of ICE's intent to assume custody of a subject detained in that law enforcement agency's custody. The detainer facilitates the custodial transfer of an alien to ICE from another law enforcement agency. This process helps avoid the potential risk of danger to ICE officers and to the general public by allowing arrests to be made in a controlled, custodial setting as opposed to at-large arrests in the community.

The cooperation ICE receives from other law enforcement agencies is critical to its ability to identify and arrest aliens who pose a risk to public safety or national security. While some jurisdictions do not cooperate with ICE as a matter of policy, others agree that increasing cooperation is beneficial, but decline to do so based upon litigation concerns. Although not legally required, as a matter of policy, all detainers issued by ICE must be accompanied by either: (1) a properly completed Form I-200 (Warrant

for Arrest of Alien) signed by a legally authorized immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by a legally authorized immigration officer. These forms help to mitigate future litigation risk and will further ICE's efforts to ensure that our law enforcement partners can honor detainers.

*Issued Detainers*

The number of detainers issued by ERO officers substantially increased following the EO. Figure 8 shows that ERO issued 112,493 detainers in the time period beginning with the new Administration, as opposed to 62,192 during the same time period from the previous fiscal year, an 81 percent increase. Figure 7 shows the number of detainers issued over the past three fiscal years. In FY2017, ERO issued 142,356 detainers, up 65 percent from 86,026 in FY2016, which demonstrates ERO's commitment to taking enforcement action on all illegal aliens it encounters, as directed by the EO. The rise in detainers issued shows a more active approach to interior enforcement, particularly for those aliens involved in criminal activity, despite continued opposition from some state and local jurisdictions.

**Figure 7. FY2015 – FY2017 ERO Detainers Issued**



**Figure 8. FY2016 and FY2017 ERO Detainers Issued from January 20 to End of FY**

*Declined Detainers*

ICE records a detainer as declined when a law enforcement agency fails to maintain custody of an alien for up to 48 hours, as requested on Form I-247A (Immigration Detainer – Notice of Action), and instead releases the alien into the community. ERO is working to ensure that these aliens, many of whom may reoffend, are not released from custody. For example, in a new approach, DHS and ICE, in coordination with the Department of Justice, have taken actions to support our state and local partners when they face legal challenges for lawfully cooperating with ICE detainers, including by filing statements of interest and amicus briefs before the courts.

In FY2017, law enforcement agencies declined 8,170 ERO detainers, as compared with 3,623 in FY2016, as seen in Table 5. This is the greatest number of declined detainers over the last three fiscal years. Despite intensified efforts to locate and arrest these aliens—many of whom are convicted criminals—ERO was only able to arrest 6 percent of them in FY17. While this is a 67 percent increase over FY2016, this further illustrates the public safety threat posed by those sanctuary jurisdictions that refuse to cooperate with ICE's enforcement efforts, as 7,710 illegal and criminal aliens remain at-large as a direct result of these policies.

**Table 5. FY2015 – FY2017 Declined Detainers and Subsequent ERO Administrative Arrests**

| Time Frame | Declined Detainers | Individuals with a Declined Detainer and a Later Arrest |
|---|---|---|
| FY 2015 | 7,369 | 1,045 |
| FY 2016 | 3,623 | 275 |
| FY 2017 | 8,170 | 460 |
| Between 1/20/2016 and 9/30/2016 | 2,267 | 181 |
| Between 1/20/2017 and 9/30/2017 | 7,232 | 376 |

### Initial Book-ins to ICE Custody

An initial book-in is the first book-in to an ICE detention facility to begin a new detention stay. This population includes aliens initially arrested by CBP and transferred to ICE for removal. While *overall* ICE initial book-ins declined in FY2017, the proportion of those book-ins resulting from ICE's interior enforcement efforts increased in FY2017, as seen in Figure 9. ICE book-ins since the new Administration were 42 percent higher in FY2017 than during the same time period in FY2016, rising from 75,946 to 108,077, as seen in Figure 10.

**Figure 9. FY2015 - FY2017 Initial Book-ins from ICE Interior Programs**

**Figure 10. FY2016 and FY2017 Initial Book-ins from ICE Interior Programs for January 20 to End of FY**

Figure 11 shows the number of book-ins resulting from interior and border enforcement efforts across the past three fiscal years.[5] Border enforcement book-ins dropped 25 percent in FY2017 compared to FY2016, while book-ins from ICE arrests increased 29 percent over that time.

[5] Border enforcement efforts represent records that were processed by Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea.

**Figure 11. FY2015 – FY2017 Initial Book-ins to ICE Detention by Arresting Agency**

## Removals

A removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal.[6] Similar to the trends of ERO administrative arrests and book-ins, removals tied to ICE arrests increased during FY2017, especially from the start of the new Administration. Figure 12 shows a 37 percent increase in removals tied to interior ERO arrests when comparing January 20, 2016 through end of FY2016 with the same time period in FY2017.

**Figure 12. FY2016 and FY2017 ICE Interior Removals for January 20 to End of FY**

[6] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VR after June 1st, 2013 and not detained by ICE are primarily processed by the U.S. Border Patrol. CBP should be contacted for those statistics.

Figure 13 shows the removals over the past three fiscal years as a result of an ICE arrest. While total removals declined from 240,255 in FY2016 to 226,119 in FY2017, the proportion resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals in FY2017. Despite the 6 percent decline in overall removals as shown in Figure 14, ICE removed 25 percent more aliens arrested during interior enforcement activities in FY2017 compared to the previous year. This surge in interior removals nearly offset the 17 percent decline in border removals, which mirrored the trend of fewer book-ins of border apprehensions.

The decrease in ICE's overall removal numbers from FY2016 to FY2017 was primarily due to the decline in border apprehensions in 2017. Many fewer aliens were apprehended at the border in FY2017 than in FY2016—possibly reflecting an increased deterrent effect from ICE's stronger interior enforcement efforts. The drop in border apprehensions contributed to a decrease in total ICE-ERO removal numbers, as the majority of aliens arriving at the border are processed under the provisions of expedited removal and are removed quickly, while aliens arrested in the interior are more likely to have protracted immigration proceedings and appeals, which delays the issuance of an executable final order of removal. These cases also frequently require a more complex and lengthy process to obtain travel documents, further delaying the process.

**Figure 13. FY2015 – FY2017 ICE Interior Removals**



**Figure 14. FY2015 – FY2017 ICE Removals**



Figure 15 provides a summary of ICE-ERO removals for the past three fiscal years, broken down by interior versus border arrests, as well as criminals versus non-criminals. The drop in border apprehensions offers important public safety benefits, as there was a 24 percent (18,511) decrease in criminal border removals from FY2016 to FY2017. At the same time, the renewed commitment to interior enforcement resulted in a 10 percent increase in ICE criminal removals from FY2016 to FY2017, with 53 percent of criminal removals resulting from ICE interior arrests.

**Figure 15. FY2015 – FY2017 Interior vs. Border Program Removals by Criminality**

## Conclusion

The FY2017 statistics clearly demonstrate ICE's continued commitment to identifying, arresting, and removing aliens who are in violation of U.S. law, particularly those posing a public safety or national security threat, while restoring fidelity to the rule of law. In FY2017, ICE ERO conducted 143,470 overall administrative arrests, which is the highest number of administrative arrests over the past three fiscal years. Of these arrests, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive or were processed with a reinstated final order. In FY2017, ICE conducted 226,119 removals. While this is a slight overall decrease from the prior fiscal year, the proportion of removals resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals, in FY2017. These results clearly demonstrate profound, positive impact of the EO. The 17 percent decrease in border removals shows the deterrent effect of strong interior enforcement, while the increase in interior removals restores the integrity of our nation's immigration system and enhances the safety and security of the United States.

***Appendix A: Methodology***

**Data Source:**
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

**Data Run Dates:**
FY2017: IIDSv1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017
FY2016: IIDSv1.22.1 run date 10/04/2016; ENFORCE Integrated Database (EID) as of 10/02/2016
FY2015: IIDSv1.19 run date 10/04/2015; ENFORCE Integrated Database (EID) as of 10/02/2015

**Removals**
ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ICE for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. FY2016 removals, excluding FY2015 "lag," were 235,524. The number of removals in FY2017, excluding the "lag" from FY2016, was 220,649.

ICE Removals include aliens processed for Expedited Removal (ER) and turned over to ERO for detention. Aliens processed for ER and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics.

**Criminality**
Criminality is determined by the existence of a criminal conviction in the ICE system of record.

***Appendix B: FY2016 and FY2017 Removals by Country of Citizenship***[7]

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Mexico | 149,821 | 128,765 |
| Guatemala | 33,940 | 33,570 |
| Honduras | 21,994 | 22,381 |
| El Salvador | 20,538 | 18,838 |
| Haiti | 310 | 5,578 |
| Dominican Republic | 1,981 | 1,986 |
| Brazil | 1,095 | 1,413 |
| Ecuador | 1,099 | 1,152 |
| Colombia | 1,156 | 1,082 |
| Nicaragua | 795 | 832 |
| Jamaica | 787 | 782 |
| China, People's Republic Of | 398 | 525 |
| Somalia | 198 | 521 |
| India | 353 | 460 |
| Peru | 406 | 458 |
| Canada | 417 | 353 |
| Nigeria | 242 | 312 |
| Ghana | 94 | 305 |
| Romania | 176 | 292 |
| Venezuela | 182 | 248 |
| Bangladesh | 128 | 203 |
| Senegal | 21 | 197 |
| Philippines | 183 | 182 |
| Pakistan | 79 | 177 |
| Spain | 101 | 172 |
| Cuba | 64 | 160 |
| Costa Rica | 157 | 151 |
| United Kingdom | 160 | 151 |
| Saudi Arabia | 106 | 139 |
| Guyana | 93 | 137 |
| Chile | 75 | 129 |
| Trinidad and Tobago | 128 | 128 |
| Russia | 94 | 127 |
| Poland | 115 | 120 |
| Italy | 55 | 117 |
| Hungary | 30 | 116 |
| South Korea | 77 | 113 |
| Micronesia, Federated States Of | 63 | 110 |
| Liberia | 27 | 107 |
| Kenya | 63 | 103 |
| Argentina | 76 | 102 |
| Jordan | 78 | 98 |
| Bahamas | 99 | 95 |
| Turkey | 50 | 93 |
| Guinea | 16 | 88 |
| Ukraine | 69 | 86 |
| Belize | 120 | 82 |
| France | 59 | 82 |
| Israel | 53 | 81 |
| Bolivia | 56 | 76 |
| Germany | 72 | 75 |

[7] Country of citizenship is reported as it appears in ICE's system of record at the time data is pulled, but may be updated as additional information is discovered or verified.

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Vietnam | 35 | 71 |
| Panama | 64 | 69 |
| Indonesia | 31 | 68 |
| Morocco | 22 | 67 |
| Portugal | 44 | 65 |
| Iraq | 48 | 61 |
| Cameroon | 29 | 58 |
| Egypt | 44 | 57 |
| Gambia | 2 | 56 |
| Albania | 32 | 55 |
| Afghanistan | 14 | 48 |
| Bosnia-Herzegovina | 49 | 47 |
| Ethiopia | 37 | 46 |
| Nepal | 25 | 45 |
| Korea | 46 | 44 |
| Sierra Leone | 18 | 44 |
| Eritrea | 13 | 41 |
| Sri Lanka | 35 | 41 |
| Netherlands | 25 | 40 |
| Uruguay | 22 | 38 |
| Lebanon | 36 | 35 |
| Democratic Republic of the Congo | 16 | 34 |
| Ireland | 26 | 34 |
| Mali | 7 | 34 |
| Moldova | 15 | 34 |
| Thailand | 22 | 33 |
| Burkina Faso | 8 | 31 |
| Czech Republic | 19 | 30 |
| Cambodia | 74 | 29 |
| Cape Verde | 11 | 29 |
| Algeria | 12 | 28 |
| Taiwan | 25 | 28 |
| Uzbekistan | 15 | 28 |
| Bulgaria | 17 | 26 |
| Lithuania | 17 | 26 |
| Unknown | 15 | 26 |
| Armenia | 21 | 24 |
| Mongolia | 6 | 23 |
| South Africa | 18 | 23 |
| St. Lucia | 15 | 23 |
| Australia | 24 | 22 |
| Georgia | 22 | 22 |
| Iran | 16 | 22 |
| Marshall Islands | 35 | 22 |
| Greece | 15 | 20 |
| Niger | 2 | 20 |
| Slovakia | 9 | 20 |
| Antigua-Barbuda | 14 | 19 |
| Barbados | 14 | 19 |
| Latvia | 8 | 19 |
| Sudan | 3 | 19 |
| Sweden | 18 | 19 |
| Togo | 4 | 19 |
| Serbia | 16 | 18 |
| Kyrgyzstan | 10 | 17 |
| New Zealand | 16 | 16 |
| St. Kitts-Nevis | 9 | 16 |
| Grenada | 10 | 15 |

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Palau | 10 | 15 |
| Kazakhstan | 19 | 14 |
| Fiji | 12 | 13 |
| Ivory Coast | 16 | 13 |
| Japan | 21 | 13 |
| Samoa | 3 | 13 |
| Tanzania | 16 | 13 |
| Tonga | 22 | 13 |
| Estonia | 9 | 12 |
| Kuwait | 13 | 12 |
| Zimbabwe | 6 | 12 |
| Uganda | 6 | 11 |
| Belarus | 8 | 10 |
| Burma | 3 | 10 |
| Dominica | 10 | 10 |
| Kosovo | 14 | 10 |
| Macedonia | 7 | 10 |
| Rwanda | 4 | 10 |
| St. Vincent-Grenadines | 13 | 10 |
| Yemen | 8 | 10 |
| Zambia | 8 | 10 |
| Belgium | 7 | 9 |
| Hong Kong | 5 | 9 |
| Libya | 3 | 9 |
| Montenegro | 5 | 9 |
| Tajikistan | 8 | 9 |
| Turkmenistan | 5 | 9 |
| Azerbaijan | 1 | 8 |
| Benin | 1 | 8 |
| Malaysia | 12 | 8 |
| Mauritania | 10 | 8 |
| Angola | 6 | 7 |
| Austria | 8 | 7 |
| Chad | 3 | 7 |
| Suriname | 2 | 7 |
| Tunisia | 9 | 7 |
| Burundi | 3 | 6 |
| Czechoslovakia | 3 | 6 |
| Congo | 2 | 5 |
| Croatia | 7 | 5 |
| Denmark | 4 | 5 |
| Laos | 0 | 5 |
| Paraguay | 8 | 5 |
| Switzerland | 11 | 5 |
| Guinea-Bissau | 2 | 4 |
| Malawi | 4 | 4 |
| Norway | 6 | 4 |
| Qatar | 2 | 4 |
| Singapore | 7 | 4 |
| Turks and Caicos Islands | 4 | 4 |
| Yugoslavia | 6 | 4 |
| Bermuda | 1 | 3 |
| Botswana | 1 | 3 |
| British Virgin Islands | 5 | 3 |
| Finland | 2 | 3 |
| Gabon | 2 | 3 |
| Oman | 2 | 3 |
| United Arab Emirates | 1 | 3 |

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Cayman Islands | 1 | 2 |
| Equatorial Guinea | 5 | 2 |
| Mozambique | 0 | 2 |
| Netherlands Antilles | 0 | 2 |
| Serbia and Montenegro | 1 | 2 |
| South Sudan | 1 | 2 |
| Syria | 9 | 2 |
| Andorra | 0 | 1 |
| Aruba | 0 | 1 |
| Bahrain | 0 | 1 |
| Central African Republic | 0 | 1 |
| Cyprus | 1 | 1 |
| Djibouti | 1 | 1 |
| French Guiana | 0 | 1 |
| Iceland | 2 | 1 |
| Luxembourg | 0 | 1 |
| Madagascar | 1 | 1 |
| Mauritius | 1 | 1 |
| Namibia | 2 | 1 |
| Papua New Guinea | 1 | 1 |
| San Marino | 0 | 1 |
| Slovenia | 1 | 1 |
| Swaziland | 1 | 1 |
| Anguilla | 1 | 0 |
| Guadeloupe | 1 | 0 |
| Lesotho | 1 | 0 |
| Macau | 1 | 0 |
| Montserrat | 2 | 0 |
| Seychelles | 1 | 0 |
| **Total** | **240,255** | **226,119** |

# EXHIBIT F

# SENATE COMMITTEE ON PUBLIC SAFETY

**Senator Nancy Skinner, Chair**
**2017 - 2018 Regular**

**Bill No:** SB 54 **Hearing Date:** January 31, 2017
**Author:** De León
**Version:** January 24, 2017
**Urgency:** Yes **Fiscal:** Yes
**Consultant:** MK

**Subject:** ***Law Enforcement: sharing data***

## HISTORY

Source: Author

Prior Legislation: AB 2792 (Bonta) – Chapter 768, Stats. 2016
AB 4 (Ammiano) – Chapter 570, Stats. 2013
AB 524 (Mullin) – Chapter 572, Stats. 2013

Support: Abriendo Puerta/Opening Doors; Alliance for Boys and Men of Color; Alliance San Diego; American Academy of Pediatrics, California; American Civil Liberties Union; Asian Americans Advancing Justice-California; Asian American Criminal Trial Lawyers Association; Asian Law Alliance; ASPIRE; Bill Wilson Center; California Adolescent Health Collaborative; California Association for Bilingual Education; California Central Valley Journey for Justice; California College and University Police Chiefs Associaiton; California Federation of Teachers (CFT), AFL-CIO; California La Raza Lawyers Association; California Partnership to End Domestic Violence; Californians for Justice Education Fund; Californians Together Coalition; Center for Gender and Refugee Studies; Central American Resource Center-Los Angeles; Centro Laboral de Graton; Children's Defense Fund-CA; Courage Campaign; CREDO; Equality California; Esperanza Immigrant Rights Project of Catholic Charities of Los Angeles; Evergreen Teachers Association; Faith in the Valley; Filipino Youth Coalition; Friends Committee on Legislation of California; Immigrant Legal Resource Center; Inland Coalition for Immigrant Justice; Inland Empire Immigrant Youth Coalition; Koreatown Immigrant Workers Alliance; La Raza Roundtable de California; Latino and Latina Roundtable; Latino Coalition for a Healthy California; Loyola Immigrant Justice Clinic; Mexican American Legal Defense and Educational Fund; Mi Familia Vota; Mixteco/Indigena Community Organizing Project; Monument Impact; Muslim Student Association West; National Lawyers Guild, Los Angeles; North County Immigration Task Force of San Diego; National Council of Jewish Women California; National Day Laborer Organizing Network; National Immigration Law Center; Nikkei for Civil Rights and Redress; Nikkei Progressives; Orange County Immigrant Youth United; Our Family Coalition; Pangea Legal Services; PolicyLink; RISE San Luis Obispo; San Diego Dream Team; San Diego Immigrant Rights Consortium; San Diego La Raza Lawyers Association; San Joaquin Immigrant Youth Collective; Santa Cruz County Immigration Project; Services, Immigrant Rights, and Education Network; SEIU California; SEIU Local 1021; Somos Mayfair; South Asian

Network; Tongan American Youth Foundation; The Children's Partnership; Training Occupational Development Educating Communities Legal Center; UNITE HERE; UPLIFT; Village Connect, Inc.; Voices for Progress Education Fund; Warehouse Worker Resource Center; Western Center on Law And Poverty; YWCA Glendale; one individual

Opposition: California State Sheriffs' Association

**PURPOSE**

***The purpose of this bill is to limit state and local law enforcement agencies involvement in immigration enforcement and to ensure that eligible individuals are able to seek services from and engage with state agencies without regard to their immigration status.***

*Existing federal law* provides that any authorized immigration officer may at any time issue Immigration Detainer-Notice of Action, to any other federal, state, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department of Homeland Security (DHS) seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the DHS, prior to release of the alien, in order for the DHS to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible. (8 CFR Section 287.7(a).)

*Existing federal law* states that upon a determination by the DHS to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the DHS. (8 CFR Section 287.7(d).)

*Existing federal law* authorizes the Secretary of Homeland Security under the 287(g) program to enter into agreements that delegate immigration powers to local police. The negotiated agreements between Immigration and Customs Enforcement (ICE) and the local police are documented in memorandum of agreements (MOAs). (8 U.S.C. Section 1357(g).)

*Existing federal law* states that notwithstanding any other provision of Federal, State or local law, a Federal, State or local government entity or official may not prohibit, or in any way restrict any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful of any individual. (8 US Code §1373(a))

*Existing federal law* states that notwithstanding any other provision of Federal, State or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States. (8US Code § 1644)

*Existing federal law* provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. (U.S. Const. 14th Amend.)

*Existing law* defines "immigration hold" as "an immigration detainer issued by an authorized immigration officer, pursuant to specified regulations, that requests that the law enforcement official to maintain custody of the individual for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays, and to advise the authorized immigration officer prior to the release of that individual." (Government Code, § 7282 (c).)

*Existing law* provides that a law enforcement official have the discretion to cooperate with federal immigration officials by detaining an individual on the basis of an immigration hold after that individual becomes eligible for release from custody only in if the continued detention of the individual on the basis of the immigration hold would not violate any federal, state, or local law, or any local policy and only under specified circumstances. (Government Code § 7282.5)

*Existing law* provides that before any interview between ICE and an individual in local law enforcement custody regarding civil violations law enforcement must provide the individual with specified information and requires specified notification to the individual if law enforcement intends to comply with an ICE hold or notify ICE that the individual is being released. (Government Code § 7283.1)

*Existing law* provides that where there is reason to believe that a person arrested for specified controlled substance related offenses may not be a citizen of the United Stated, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters. (Health and Safety Code § 11369)

*This bill* repeals Health and Safety Code § 11369.

*This bill* prohibits state and local law enforcement agencies and school police and security departments from using agency or department money, facility, property, equipment or personnel to investigate, interrogate, detain, detect or arrest persons for immigration enforcement purposes, including but not limited to any of the following:
- Inquiring into or collecting information about an individual's immigration status.
- Detaining an individual on the basis of a hold request.
- Responding to notification or transfer requests.
- Providing, or responding to requests for, nonpublicly available personal information about an individual, including, but not limited to, information about the person's release date, home address, or work address for immigration enforcement purposes.
- Making arrests based on civil immigration warrants.
- Giving federal immigration authorities access to interview individuals in agency or department custody for immigration enforcement purposes.
- Assisting federal immigration in conducting a search of a vehicle without a warrant.
- Performing the functions of an immigration officer, whether formal or informal.

*This bill* prohibits any state local law enforcement agencies and school police and security departments from making agency or department databases, including databases maintained for the agency or department by private vendors, or the information therein other than information regarding an individual's citizenship or immigration status, available to anyone or any entity for the purpose of immigration enforcement. It further provides that any agreements in place on the effective date of this bill that are in conflict with the bill shall be terminated on the effective date of the bill. Any person or entity provided access to agency or department databases must certify in writing that the database will not be used for the prohibited purposes.

*This bill* prohibits state and local law enforcement agencies and school police and security department from placing peace officers under the supervision of a federal agencies or employing peace officers deputized as special federal officers or special federal deputies except to the extent those peace officers remain subject to California law governing conduct of peace officers and the polices of the employing agency.

*This bill* provides that nothing in this section shall prevent the department or any state or local law enforcement agency, including school police or security departments, from responding to a request from federal immigration authorities for information about a specific person's previous criminal arrests or convictions where otherwise permitted by state law.

*This bill* provides that notwithstanding any other law, in no event shall state or local law enforcement agencies or school police or security departments transfer an individual to federal immigration authorities for the purposes of immigration enforcement or detain an individual at the request of federal immigration authorities for the purposes of immigration enforcement absent a judicial warrant.

*This bill* provides that in order to ensure that eligible individuals are not deterred from seeking services or engaging with state agencies, within six month of the effective date of this bill, all state agencies shall review their confidentiality polices and identify any changes necessary to ensure that information collected from individuals is necessary to perform agency duties and is not used or disclosed for any other purpose.

*This bill* provides that within three months after this bill goes into effect, the Attorney General shall publish model contractual provisions for all state agencies that partner with private vendors for data collection purposes to ensure that such vendors comply with the confidentiality policies established pursuant to this bill.

*This bill* provides that within three months after this bill goes into effect, the Attorney General, in consultation with the appropriate stakeholders, shall publish model policies limiting immigration enforcement to the fullest extent possible consistent with federal and state law at public schools, health facilities operated by the state or a political subdivision of the state, courthouses, and shelters to ensure that they remain safe and accessible to all California residents regardless of immigration status.

*This bill* provides that all public schools, health facilities operated by the state, and courthouses shall implement the model policy or an equivalent policy.

*This bill* provides that all other organizations and entities that provide services related to physical or mental health and wellness, education, or access to justice, including the University of California are encouraged to adopt the model policy.

*This bill* provides that nothing in the bill prohibits or restricts any state government entity or official from sending to, or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful.

*This bill* provides that provisions of the act are severable.

*This bill* makes Legislative findings and declarations.

*This bill* defines terms for the purpose of the Chapter created by this bill.

*This bill* provides that the Chapter it creates shall be known as the California Values Act.

**COMMENTS**

**1. Need for the Bill**

According to the author:

> The purpose of this bill is to protect the safety and well-being of all Californians by ensuring that state and local resources are not used to fuel mass deportations, separate families, and ultimately hurt California's economy.
>
> The President has stated publicly that he will order the increased deportation of a broad category of immigrants and that doing so will be a top priority. Any expansion of federal deportation efforts will have a significant effect on California's economy and society.
>
> A relationship of trust between California's immigrant residents and our state and local agencies, including police, schools, and hospitals, is essential to carrying out basic state and local functions. That trust is threatened when state and local agencies are involved in immigration enforcement.
>
> According to the President Obama's Taskforce on 21st Century Policing, "immigrants often fear approaching police officers when they are victims of and witnesses to crimes and when local police are entangled with federal immigration enforcement. At all levels of government, it is important that laws, policies, and practices not hinder the ability of local law enforcement to build the strong relationships necessary to public safety and community well-being. It is the view of this task force that whenever possible, state and local law enforcement should not be involved in immigration enforcement."[1] A study conducted by the University of Illinois similarly found that 44 percent of Latinos are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire about their immigration status or that of people they know.[2]
>
> California is already familiar with the harmful effects of entangling local law enforcement agencies with immigration enforcement. Prior to its termination, the discredited "Secure Communities" program (S-Comm) operated in California as an indiscriminate mass deportation program at great cost to California both financially and otherwise. According to a report prepared by Justice Strategies in 2012, when the Secure Communities program was still active, California taxpayers spent an estimated $65 million annually to detain people for ICE.[3]

---

[1] Final Report of the President's Taskforce on 21st Century Policing (May 2016).
[2] Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement, Nik Theodore, Dep't of Urban Planning and Policy, University of Illinois at Chicago (May 2013)
[3] *See* Judith Greene, "The Cost of Responding to Immigration Detainers in California," Justice Strategies Report, August 22, 2012.

For that reason, it is necessary to evaluate the appropriate use of state and local resources for immigration enforcement purposes and recognize the devastating impact deportations have on a state with thousands of mixed status families, and a heavily immigrant workforce.

**2. Prohibition on use of Property, Equipment etc. to Assist in Immigration Enforcement**

This bill prohibits state and local agencies and school police and security departments from using money, facilities, property, equipment or personnel to investigate, interrogate, detain, detect or arrest persons for immigration enforcement purposes. The prohibited actions include: inquiring into or collecting information about an individual's immigrations status; detaining an individual on the basis of an immigration hold; responding to notification or transfer requests; providing or responding to requests, for personal information that is not otherwise public; making arrest based on civil immigration warrants; giving federal immigration authorities to access to interview individuals in agency or department custody for immigration enforcement purposes; and, performing the functions of an immigration officer.

**3. No Sharing of Databases**

This bill prohibits any state or local law enforcement agency and school police and security departments from making any databases or the information therein other than information regarding an individual's citizenship or immigration status, available to anyone or any entity for the purpose of immigration enforcement. This includes any databases maintained by private vendors.

The bill also provides that any agreements that a local agency may have to share such information in conflict with these provisions will be terminated on the effective date of that section. This appears consistent with California Civil Code Section 1441 which provides "[a] condition in a contract, the fulfillment of which is impossible or unlawful, within the meaning of the article on the object of contracts, or which is repugnant to the nature of the interest created by the contract, is void."

**4. No Peace Officer Working for Federal Agencies**

This bill further prohibits state or local law enforcement from placing peace officers from placing peace officers under the supervision of federal agencies or employing peace officers deputized as special federal officer or special federal deputies except to the extent those peace officers remain subject to California law governing conduct of peace officers and the polices of the employing agency.

Should this provision be limited to situations when the purpose is immigration enforcement? Are there potentially other areas where it would be helpful for California peace officers to be loaned to a federal agency?

**5.  No Transfer to Federal Authority without Warrant**

This bill prohibits state and local law enforcement agencies or school police or security departments from transferring an individual to federal immigration authorities for the purpose of immigration enforcement without a judicial warrant.

**6.  Permits specific requests about arrests and convictions**

This bill clarifies that it is not intended to prevent any state or local law enforcement agency from responding to a request from federal immigration authorities for information about a specific person's previous criminal arrests or convictions where otherwise permitted by state law.

**7.  No Longer Requires Notification to ICE when a Person is Charged with Controlled Substance Offense**

Existing law provides that when there is reason to believe that a person arrested for a violation of one of specified controlled substance provisions may not be a citizen of the United States the arresting agency shall notify ICE. This bill would delete that provision.

**8. Confidentiality Policies**

This bill requires, within six months of the effective date of this bill, all state agencies to review and edit their confidentiality policies to ensure that eligible individuals are not deterred form seeking services or engaging with state agencies.  The policies shall ensure that information collected from individuals is limited to that necessary to perform the agencies duties and is not used or disclosed or any other purpose.

To assist with the adoption of polices the bill requires, within three months of the effective date of this bill,  the Attorney General to publish a model contractual provisions for all state agencies that partner with private vendors for data collection purposes to ensure those vendors comply with the confidentiality policies.

The bill also requires the Attorney General, within three months after the effective date, in consultation with appropriate stakeholders, shall publish model policies for limiting immigration enforcement to the fullest extent possible consistent with federal and state law at public schools, state operated health facilities, courthouses and shelters to ensure they remains safe and accessible to all California residents regardless of immigration status. All public schools, state operated health facilities, and courthouses shall implement the model policy and other organizations providing physical or mental health, education or accesses to justice are encouraged to adopt the model policy.

**9.  Federal Preemption**

This bill provides that nothing in this chapter prohibits or restricts any government entity or official from sending to, or receiving from, federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful of an individual under federal law.

Do any provisions of this bill conflict with this provision?

**10. Support**

Alliance for Boys and Men of Color supports this bill stating:

> California is already familiar with the harmful effects of entangling local law enforcement agencies with immigration enforcement. Prior to its termination, the discredited "Secure Communities" program (S-Comm) operated in California as an indiscriminate mass deportation program at great cost to California both financially and otherwise. According to a report prepared by Justice Strategies in 2012, under S-Comm, California taxpayers spent an estimated $65 million annually to detain people for ICE.1 Continuing to tangle state and local public safety resources with the dirty business of deportations threatens the civil rights and safety of all who reside in California. Such actions foster racial profiling, police mistreatment, and wrongful arrests, which further undermine trust between local communities and law enforcement.

The American Academy of Pediatrics supports this bill stating:

> It is our strongly held belief that all children should be afforded the right to attend school, visit a doctor's office, or approach a police officer for help without fearing for their safety. Parents should be able to attend school events and parent-teacher conferences, seek medical care, and request police assistance for themselves and their children without concern that their families will be torn apart as a result. Subjecting California families to programs and policies that threaten these central functions of parenting could pose innumerable, grave consequences to the social, psychological, and physical well-being of children.
>
> SB 54 (de León) would dramatically advance the health of California children by assuring that no child or parent need fear detention, separation, or deportation as a result of seeking an education or medical care. It would help to reduce the toxic burden of fear that many children across our state live with every day, in a time when that fear has grown substantially more severe. And it would affirm our commitment to doing right by each and every child in our diverse communities, no matter who they are or the circumstances that brought them here.

**11. Opposition**

The California State Sheriffs Association opposes stating:

> We understand and appreciate the sensitivity of this issue and stand ready to continue to discuss it further. Unfortunately, this bill restricts local agencies from working with our federal partners. SB 54 prohibits law enforcement from responding to federal requests for notification when a jail houses someone who might be the subject of an immigration enforcement action. State law, the TRUST Act, already governs when and how a local entity may detain a person subject to an immigration hold. That said, we believe it is inappropriate for the state to tell a

local agency that it cannot respond to a request for information from the federal government.

Additionally, by prohibiting law enforcement agencies from giving federal immigration authorities access to interview individuals in agency custody for immigration enforcement purposes, this bill creates a hurdle between governmental agencies that are all trying to fulfill their duties and obligations. This is not a comment on any particular policy, but rather relates to the desire and need for law enforcement to be able to work together at all levels of government.

Further, despite the bill's language that nothing prohibits law enforcement from sending to, or receiving from, federal immigration authorities information regarding an individual's citizenship or immigration status, we are concerned that the bill's provisions restricting communication and interaction with federal authorities could be construed in such a way that vital federal funding could be jeopardized.

**-- END –**

# EXHIBIT G

Date of Hearing: July 5, 2017

ASSEMBLY COMMITTEE ON JUDICIARY
Mark Stone, Chair
SB 54 (De León) – As Amended June 19, 2017

**SENATE VOTE**: 27-12

**SUBJECT**: LAW ENFORCEMENT: SHARING DATA

**KEY ISSUES**:

1) SHOULD STATE LAW PRIORITIZE THE USE OF STATE AND LOCAL LAW ENFORCEMENT RESOURCES FOR STATE AND LOCAL LAW ENFORCEMENT PURPOSES BY LIMITING THE USE OF THOSE PUBLIC RESOURCES FOR IMMIGRATION ENFORCEMENT PURPOSES?

2) SHOULD REPORTS ABOUT STATE AND LOCAL LAW ENFORCEMENT PARTICIPATION IN JOINT LAW ENFORCEMENT TASK FORCE OPERATIONS, WHERE STATE OR LOCAL LAW ENFORCEMENT MAY INCIDENTALLY PARTICIPATE IN IMMIGRATION ENFORCEMENT, BE SUBJECT TO THE CALIFORNIA PUBLIC RECORDS ACT?

**SYNOPSIS**

*It is a fundamental principle of federalism that state governments—as partners with the federal government in the system of "dual sovereignty" created by the U.S. Constitution in order to "reduce the risk of tyranny and abuse" (Gregory v. Ashcroft (1991) 501 U.S. 452, 457-58)--may allocate their public resources as they see fit. As a result, states may prioritize the use of such resources on activities which serve the greatest need and further the most pressing interests of the state and its residents. The federal government cannot force states to further its priorities in place of the state's. In fact, case law makes it clear that the federal government cannot do either of the following: (1) "commandeer" local officials by making them enforce federal laws (Printz v. U.S. (1997) 521 U.S. 898); or (2) force participation in a federal program by threatening to cut off federal funds, unless the funds are directly earmarked for that program. (NFIB v. Sibelius (2012) 132 S. Ct. 2566 (federal government cannot cut off all Medicaid funding for refusal to participate in Medicaid expansion under the Affordable Care Act).)*

*Nevertheless, as candidate for U.S. President, Donald Trump pledged to strip "all federal funding to sanctuary cities." On January 25, 2017, the president issued an Executive Order that makes sweeping changes to immigration enforcement in the interior of the United States, significantly broadening the categories of unauthorized immigrants who are priorities for removal, reviving the controversial Secure Communities program, and reinvigorating a federal-local partnership under which state and local law enforcement agencies can sign agreements and enforce certain aspects of federal immigration law. Whereas prior administrations had authorized immigration authorities to focus on priority groups (such as those with serious criminal histories), the present administration has directed federal authorities to employ "all lawful means" to enforce immigration laws against "all removable aliens." In a statement made on March 27, 2017, Attorney General Jeff Sessions condemned cities that refuse to honor*

*detainer requests and warned that such jurisdictions are "at risk of losing valuable federal dollars."*

*In response to such threats to both the state and its residents, this bill seeks to further the priorities of the State of California by prohibiting public resources, specifically law enforcement resources, from being used to further the federal government's recently heightened interest in more widespread and indiscriminate immigration enforcement. Specifically, this bill would prohibit state and local law enforcement (including school security) from doing any of the following: (1) using resources to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes that are specified in the bill, including entering into agreements authorized by federal law to delegate immigration powers to local police, and accepting designation as "immigration officers" pursuant to federal law; (2) making agency or department databases, including databases maintained for the agency or department by private vendors, or the information therein other than information within those databases regarding an individual's citizenship or immigration status, available to anyone or any entity for the purpose of immigration enforcement; (3) placing peace officers under the supervision of federal agencies or employ peace officers deputized as special federal officers or special federal deputies; (4) using federal immigration authorities as interpreters for law enforcement matters relating to individuals in agency or department custody; and (5) transferring an individual to federal immigration authorities unless authorized by a judicial warrant or judicial probable cause determination.*

*This bill does not appear to run afoul of federal law. Federal law provides that a state law "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. 1373.) It does not interfere with or obstruct the enforcement of federal immigration programs by federal law enforcement officers. Nothing in federal law requires state and local law enforcement officials to assist federal immigration enforcement efforts, or prohibits state and local officials from refusing to do so. Given that federal law only authorizes, but does not require, state and local officers to act as immigration officers, SB 54 does not conflict with federal law and can appropriately determine that such cooperation is not in the state's best interests. Finally, the bill is not otherwise preempted by federal immigration law.*

*The author proposes a number of amendments, most of which are technical and clarifying. As proposed to be amended, the bill would retain current law that provides public access to public records and remove confusing language about the California Public Records Act. Other amendments do the following: (1) ensure that confidential information in state databases remains confidential; and (2) clarify that all actions of law enforcement agencies relating to immigration which are specifically authorized under the bill must comply with local laws and policies of the jurisdiction in which an agency operates. These amendments are reflected and discussed in this analysis. The bill, which is author-sponsored, is supported by a very long list of immigrant and civil rights advocates; health organizations; labor unions; local governments; victim advocacy organizations; and elected officials. It is opposed by a number of local governments; a number of county sheriffs; and law enforcement organizations, including the California State Sheriffs Association and the California Police Chiefs Association. It was previously approved by the Public Safety Committee and, should it pass this Committee, it will be referred to the Appropriations Committee.*

**SUMMARY:** Prioritizes the use of public resources by law enforcement agencies in California for the enforcement of state laws by limiting the use of those resources for purposes of immigration enforcement. Specifically, **this bill**:

1) States that law enforcement agencies shall not do any of the following:

   a) Use agency or department moneys, facilities, property, equipment, or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including, but not limited to, doing any of the following:

      i) Inquiring into an individual's immigration status;

      ii) Detaining an individual on the basis of a hold request;

      iii) Responding to requests for notification by providing release dates or other information unless that information is available to the public;

      iv) Providing information regarding a person's release date unless that information is available to the public;

      v) Providing personal information about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public;

      vi) Making, assisting, or participating in arrests based on civil immigration warrants;

      vii) Giving federal immigration authorities access to interview an individual in agency or department custody, except pursuant to a judicial warrant, and in accordance with this bill;

      viii)    Assisting federal immigration authorities in the specified activities allowed under federal immigration law; and

      ix) Performing the functions of an immigration officer, as specified, whether formal or informal.

   b) Make agency or department databases, including databases maintained for the agency or department by private vendors, or the information within those databases regarding an individual's citizenship or immigration status, available to anyone or any entity for the purpose of immigration enforcement.

   c) Place peace officers under the supervision of federal agencies or employ peace officers deputized as special federal officers or special federal deputies except to the extent those peace officers remain subject to California law governing conduct of peace officers and the policies of the employing agency.

   d) Use federal immigration authorities as interpreters for law enforcement matters relating to individuals in agency or department custody.

   e) Transfer an individual to federal immigration authorities unless authorized by a judicial warrant, or for a violation of the federal crime of illegal reentry after removal subsequent

to conviction of an aggravated felony if the individual has been previously convicted of a specified violent felony.

2) Makes void any agreements in existence on the operative date of this chapter that conflict with the terms of this bill and requires all persons and entities provided access to agency or department databases to certify in writing that the database will be kept confidential and will not be used for the immigration purposes prohibited by this bill.

3) Specifies that this bill does not prevent any California law enforcement agency from doing any of the following that does not violate any local law or policy of the jurisdiction in which the agency is operating:

   a) Responding to a request from federal immigration authorities for information about a specific person's criminal history, including previous criminal arrests, convictions, and similar criminal history information accessed through the California Law Enforcement Telecommunications System (CLETS), where otherwise permitted by state law;

   b) Participating in a joint law enforcement task force, so long as the primary purpose of the joint law enforcement task force is not immigration enforcement;

   c) Making inquiries into information necessary to certify an individual who has been identified as a potential crime or trafficking victim for a T or U Visa, as specified, or to comply with specified federal laws regarding sale of firearms to non-citizens; or

   d) Responding to a notification request from federal immigration authorities for a person who is serving a term for the conviction of a misdemeanor or felony offense and has a current or prior conviction for a violent felony, as specified, or a serious felony.

4) Requires a California law enforcement agency that chooses to participate in a joint law enforcement task force, to submit a report every six months to the Department of Justice, as specified by the Attorney General, detailing each task force operation, the purpose of the task force, the federal, state, and local law enforcement agencies involved, the number of California law enforcement agency personnel involved, a description of arrests made for any federal and state crimes, and a description of the number of people arrested for immigration enforcement purposes.

5) Clarifies that all records described in 4), above, are public records for purposes of the California Public Records Act, including the exemptions provided by that act and, as permitted under that act, allows personal identifying information to be redacted prior to public disclosure.

6) Requires the Attorney General, by March 1, 2019, and twice a year thereafter, to report on the types and frequency of joint law enforcement task forces; requires the report to include a list of all California law enforcement agencies that participate in joint law enforcement task forces, a list of joint law enforcement task forces operating in the state and their purposes, the number of arrests made associated with joint law enforcement task forces for the violation of federal or state crimes, and the number of arrests made associated with joint law enforcement task forces for the purpose of immigration enforcement by all task force participants, including federal law enforcement agencies; and requires the Attorney General to post the reports required by this bill on the Attorney General's Internet Web site.

7) Specifies that to the extent disclosure of a particular item of information reported to the Attorney General in the report described in 6), above, would endanger the safety of a person involved in an investigation or would endanger the successful completion of the investigation or a related investigation, that information shall not be included in the Attorney General's report.

8) States that notwithstanding any other law, in no event shall a California law enforcement agency transfer an individual to federal immigration authorities for purposes of immigration enforcement or detain an individual at the request of federal immigration authorities for purposes of immigration enforcement absent a judicial warrant, except as specified in the bill.

9) States that this bill does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual pursuant to specified federal law.

10) States that the Attorney General shall publish model policies limiting assistance with immigration enforcement to the fullest extent possible consistent with federal and state law at public schools, public libraries, health facilities operated by the state or a political subdivision of the state, courthouses, Division of Labor Standards Enforcement facilities, and shelters, and ensuring that they remain safe and accessible to all California residents, regardless of immigration status.

11) Requires all public schools, health facilities operated by the state or a political subdivision of the state, and courthouses to implement the model policy, or an equivalent policy.

12) Encourages all other organizations and entities that provide services related to physical or mental health and wellness, education, or access to justice, including the University of California, to adopt the model policy.

13) Repeals existing law which required law enforcement to notify federal authorities when a person has been arrested for specified drug related offenses, and there is reason to believe the arrestee may not be a U.S. Citizen.

14) Defines "California law enforcement agency" as "a state or local law enforcement agency, including school police or security departments."

15) Defines "Civil immigration warrant" as "any warrant for a violation of federal civil immigration law, and includes civil immigration warrants entered in the National Crime Information Center database."

16) Defines "Federal immigration authority" as any officer, employee, or person otherwise paid by or acting as an agent of United States Immigration and Customs Enforcement or United States Customs and Border Protection, or any division thereof, or any other officer, employee, or person otherwise paid by or acting as an agent of the United States Department of Homeland Security who is charged with immigration enforcement.

17) States that "Hold request," "notification request," "transfer request," and "local law enforcement agency" have the same meaning as provided in elsewhere in this bill.

18) Specifies that hold, notification, and transfer requests include requests issued by United States Immigration and Customs Enforcement or United States Customs and Border Protection as well as any other federal immigration authorities.

19) Specifies that "Immigration enforcement" includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States.

20) States that "Immigration enforcement" does not include either of the following:

   a) Efforts to investigate, enforce, or assist in the investigation or enforcement of a violation of the federal crime of illegal reentry to the U.S. and that is detected during an unrelated law enforcement activity; or

   b) Transferring an individual to federal immigration authorities for a violation of the federal crime of illegal reentry after removal subsequent to conviction of an aggravated felony if the individual has been previously convicted of a specified violent felony.

21) Defines "Joint law enforcement task force" as "at least one California law enforcement agency collaborating, engaging, or partnering with at least one federal law enforcement agency in investigating federal or state crimes."

22) Defines "Judicial warrant" as "a warrant based on probable cause and issued by a federal judge or a federal magistrate judge that authorizes federal immigration authorities to take into custody the person who is the subject of the warrant."

23) Specifies that "School police and security departments" includes "police and security departments of the California State University, the California Community Colleges, charter schools, county offices of education, schools, and school districts."

**EXISTING FEDERAL LAW**:

1) Provides that any authorized immigration officer may at any time issue Immigration Detainer-Notice of Action, to any other federal, state, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department of Homeland Security (DHS) seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the DHS, prior to release of the alien, in order for the DHS to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible. (8 CFR Section 287.7(a).)

2) States that upon a determination by the DHS to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the DHS. (8 CFR Section 287.7(d).)

3) Authorizes the Secretary of Homeland Security under the 287(g) program to enter into agreements that delegate immigration powers to local police. The negotiated agreements

between ICE and the local police are documented in memorandum of agreements (MOAs). (8 U.S.C. Section 1357(g).)

4) States that notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual. (8 U.S.C. 1373(a).)

5) States that notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States. (8 U.S.C. 1644.)

**EXISTING STATE LAW**:

1) Defines "immigration hold" as "an immigration detainer issued by an authorized immigration officer, pursuant to specified regulations, that requests that the law enforcement official to maintain custody of the individual for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays, and to advise the authorized immigration officer prior to the release of that individual." (Government Code Section 7282 (c).)

2) Defines "Notification request" as an Immigration and Customs Enforcement request that a local law enforcement agency inform ICE of the release date and time in advance of the public of an individual in its custody and includes, but is not limited to, DHS Form I-247N. (Government Code Section 7283 (f).)

3) Defines "Transfer request" as an Immigration and Customs Enforcement request that a local law enforcement agency facilitate the transfer of an individual in its custody to ICE, and includes, but is not limited to, DHS Form I-247X. (Government Code Section 7283 (f).)

4) States that a law enforcement official shall have discretion to cooperate with federal immigration officials by detaining an individual on the basis of an immigration hold after that individual becomes eligible for release from custody only if the continued detention of the individual on the basis of the immigration hold would not violate any federal, state, or local law, or any local policy, and only under the following circumstances:

a) The individual has been convicted of a serious or violent felony;

b) The individual has been convicted of a felony punishable by imprisonment in the state prison;

c) The individual has been convicted within the past five years of a misdemeanor for a crime that is punishable as either a misdemeanor or a felony, or has been convicted at any time of a specified felony;

d) The individual is a current registrant on the California Sex and Arson Registry;

e) The individual is arrested and taken before a magistrate on a charge involving a serious or violent felony, a felony punishable by imprisonment in state prison, or other specified

felonies, and the magistrate makes a finding of probable cause as to that charge after a preliminary hearing; *and*

The individual has been convicted of a federal crime that meets the definition of an aggravated felony as specified, or is identified by the United States Department of Homeland Security's Immigration and Customs Enforcement as the subject of an outstanding federal felony arrest warrant. (Government Code Section 7282.5 (a).)

5) States that if none of the conditions listed above is satisfied, an individual shall not be detained on the basis of an immigration hold after the individual becomes eligible for release from custody. (Government Code Section 7282.5 (b).)

6) Requires that upon receiving any ICE hold, notification, or transfer request, the law enforcement agency must provide a copy of the request to the individual and inform him or her whether the law enforcement agency intends to comply with the request. (Government Code Section 7283.1 (b).)

7) States that if a local law enforcement agency provides ICE with notification that an individual is being, or will be, released on a certain date, the local law enforcement agency must promptly provide the same notification in writing to the individual and to his or her attorney or to one additional person who the individual shall be permitted to designate. (Government Code Section 7283.1 (b).)

8) Makes all records relating to ICE access provided by local law enforcement agencies, including all communication with ICE, public records for purposes of the California Public Records Act (Chapter 3.5 (commencing with Section 6250)), including the exemptions provided by that act and, as permitted under that act, personal identifying information may be redacted prior to public disclosure. (Government Code Section 7283.1 (c).)

9) Clarifies that records relating to ICE access include, but are not limited to, data maintained by the local law enforcement agency regarding the number and demographic characteristics of individuals to whom the agency has provided ICE access, the date ICE access was provided, and whether the ICE access was provided through a hold, transfer, or notification request or through other means. (*Ibid.*)

**FISCAL EFFECT**: As currently in print this bill is keyed fiscal.

**COMMENTS**: It is a fundamental principle of federalism that state governments—as partners with the federal government in the system of "dual sovereignty" created by the U.S. Constitution in order to "reduce the risk of tyranny and abuse" (*Gregory v. Ashcroft* (1991) 501 U.S. 452, 457-58)--may allocate their public resources as they see fit. As a result, states are allowed to prioritize the use of such resources on activities which serve the greatest need and further the most pressing interests of the state and its residents. The federal government cannot force states to further its priorities in place of the state's. In fact, case law makes it clear that the federal government cannot do either of the following: (1) "commandeer" local officials by making them enforce federal laws (*Printz v. U.S.* (1997) 521 U.S. 898); or (2) force participation in a federal program by threatening to cut off federal funds, unless the funds are directly earmarked for that program. (*NFIB v. Sibelius* (2012) 132 S. Ct. 2566 (federal government cannot cut off *all* Medicaid funding for refusal to participate in Medicaid expansion under the Affordable Care Act).)

Nevertheless, as candidate for U.S. President, Donald Trump pledged to strip "all federal funding to sanctuary cities." As president, he signed three executive orders the week of January 23, 2017 that threaten the rights of immigrants and refugees both in the United States and globally. On January 25th, at the Department of Homeland Security (DHS), Trump signed executive orders on border security and interior enforcement. On January 27th, he signed an executive order at the Pentagon on refugees and visa holders from designated nations.

Executive Order 13768 (E.O. 13768, 82 Fed. Reg. 8799), entitled Enhancing Public Safety in the Interior of the United States and signed on the 25th of January, makes sweeping changes to immigration enforcement in the interior of the United States, significantly broadening the categories of unauthorized immigrants who are priorities for removal, reviving the controversial Secure Communities program, and reinvigorating a federal-local partnership under which state and local law enforcement agencies can sign agreements and enforce certain aspects of federal immigration law. Whereas prior administrations had authorized immigration authorities to focus on priority groups (such as those with serious criminal histories), the present administration has directed federal authorities to employ "all lawful means" to enforce immigration laws against "all removable aliens." The Order also declared "sanctuary jurisdictions" that "willfully refuse to comply" with federal immigration enforcement efforts would be ineligible to receive federal grants at the discretion of the Attorney General or Secretary of the United States Department of Homeland Security:

> [J]urisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

A February 25, 2017 story in The New York Times reported that government agents report that they are "thrilled" and having "fun" in their jobs since, as press secretary Sean Spicer said, Trump has "taken the shackles off." Officers told reporters how ecstatic they were to be free to deport any undocumented immigrant they come across:

> [F]or those with ICE badges, perhaps the biggest change was the erasing of the Obama administration's hierarchy of priorities, which forced agents to concentrate on deporting gang members and other violent and serious criminals, and mostly leave everyone else alone. (Kulish, Nicholas, New York Times, February 25, 2017, *available at* https://www.nytimes.com/2017/02/25/us/ice-immigrant-deportations-trump.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region®ion=top-news&WT.nav=top-news&_r=0)

Reports of parents being arrested at their children's schools; restaurant operators having to bring meals in "to go" containers to customers in the parking lots who are too afraid of arrest to get out of their cars; and ICE agents trolling halls of courthouses have created fear and apprehension among those in the country without legal status, as well as their friends, families, and employers.

In a statement made on March 27, 2017, Attorney General Jeff Sessions condemned cities that refuse to honor detainer requests and warned that such jurisdictions are "at risk of losing valuable federal dollars." Furthermore, he threatened that "The Department of Justice will also

take all lawful steps to claw-back any funds awarded to a jurisdiction that willfully violates Section 1373." (Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions, Washington, DC, Monday, March 27, 2017, available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.)

***Need for the bill.*** According to the author:

> When local police enforce immigration laws, they rapidly lose the trust of the undocumented community. Crimes go unreported for fear of deportation. The perpetrators roam free to strike again. Our communities become less – not more – safe.
> . . .
> Senate Bill 54, the California Values Act, will prevent state and local law enforcement agencies from acting as agents of Immigration and Customs Enforcement. Instead, it will keep them focused on community policing, rather than rounding up hardworking, honest immigrants who in many instances assist police in solving crimes rather than committing them.

This bill seeks to further the priorities of the State of California by prohibiting public resources, specifically law enforcement resources, from being used to further the federal government's recently heightened interest in more widespread and indiscriminate immigration enforcement. Specifically, this bill would prohibit state and local law enforcement (including school security) from doing any of the following: (1) using resources to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes that are specified in the bill, including entering into agreements authorized by federal law to delegate immigration powers to local police, and accepting designation as "immigration officers" pursuant to federal law; (2) making agency or department databases, including databases maintained for the agency or department by private vendors, or the information therein other than information within those databases regarding an individual's citizenship or immigration status, available to anyone or any entity for the purpose of immigration enforcement; (3) placing peace officers under the supervision of federal agencies or employ peace officers deputized as special federal officers or special federal deputies; (4) using federal immigration authorities as interpreters for law enforcement matters relating to individuals in agency or department custody; and (5) transferring an individual to federal immigration authorities unless authorized by a judicial warrant or judicial probable cause determination.

***This bill does not appear to run afoul of federal law.*** Federal law provides that a state law "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. 1373.) Section 1373 does not require an agency to voluntarily share information about anyone's citizenship or immigration status with federal authorities. Nor does it prohibit laws of general application that protect personal information, which could include information about immigration status and nationality, from public disclosure. Section 1373 does not require California, or any state, to collect information about an individual's immigration status, to arrest individuals who are present in violation of immigration laws, or to hold individuals in custody based on requests from federal immigration officials. Most importantly, it does not prohibit a state from determining that state and local law enforcement engagement in such acts is not in the best interests of the state.

Section 1357 of Title 8 of the United States Code addresses the "performance of immigration officer functions by state officers and employees" and authorizes state and local officials to perform such functions, subject to a host of restrictions, upon approval of federal authorities. (8 U.S.C. Section 1357(g).) For example, Section 1357(g)(1) authorizes the Attorney General to "enter into a written agreement with a State" or political subdivision, under which its employees "may carry out [the] function" of "an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," *if* the Attorney General determines that the particular employee is qualified. (8 U.S.C. Section 1357(g)(1).) Furthermore, such authority may only be exercised "to the extent consistent with State and local law," implying that state and local laws can prohibit such conduct and reiterating that the authority is purely voluntary on the part of the state or local entity and under the ultimate control and authority of the federal government. (*Ibid.*)

*This bill does not interfere with or obstruct the enforcement of federal immigration programs by federal law enforcement officers*. One of this bill's most important (and controversial) provisions prohibits state and local law enforcement agencies from "making any database that contains information about an individual's citizenship or immigration status available to any person or entity for the purpose of immigration enforcement." At first blush this provision may appear to violate Section 1373. But such a conclusion would be erroneous. Federal law only prevents a state or local government from *prohibiting* its agencies or officials from "*sending to*" federal immigration authorities information about an individual's immigration or citizenship status. This bill, on the other hand, limits agencies from granting *access* to state databases. The bill would not prevent an agency or official from sending information to the federal immigration authorities upon request, but those authorities could not have direct access to the state database itself. In fact, the bill specifically states that its provisions do "not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual pursuant to specified federal law."

*Nothing in federal law requires state and local law enforcement officials to assist federal immigration enforcement efforts, or prohibits state and local officials from refusing to do so.* As explained above, federal law authorizes states to perform immigration officer functions upon approval of federal authorities. Performing such functions is not required, however. Section 1357(g)(9) states that, "Nothing shall be construed to require any State . . . to enter into an agreement" with the federal government to have its officers perform immigration officer functions. Nor are states or local governments required by federal law to perform immigration enforcement functions, such as detaining immigrants upon the request of federal immigration authorities, collecting immigration information, or affirmatively sharing immigration information with federal authorities. A recent guidance from the United States Department of Justice explained to state and local government recipients of Department of Justice funding that "Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information." (Dep't of Justice, Office of Justice Programs, Guidance Regarding Compliance with 8 U.S.C. § 1373, *available at* https://www.bja.gov/funding/8uscsection1373.pdf.)

Given that federal law only authorizes, but does not require, state and local officers to act as immigration officers, SB 54 does not conflict with federal law and can appropriately determine that such cooperation is not in the state's best interests. According to the author:

> California is familiar with the harmful effects of entangling local law enforcement agencies with immigration enforcement. Prior to its termination, the discredited "Secure Communities" program (S-Comm) operated in California as an indiscriminate mass deportation program at great cost to California both financially and otherwise. According to a report prepared by Justice Strategies in 2012, when the Secure Communities program was still active, California taxpayers spent an estimated $65 million annually to detain people for ICE. (*See* Judith Greene, "The Cost of Responding to Immigration Detainers in California," Justice Strategies Report, August 22, 2012.)

*The federal government has limited ability to withhold funds to, or otherwise financially punish, sanctuary jurisdictions.* Despite Attorney General Session's threat to "claw back" all federal funds paid to "sanctuary jurisdictions," the federal government has limited ability to punish state and local governments for non-cooperation and generally cannot withhold or withdraw federal funds as long as a state or local government is not in violation of the law. Significantly, a district court recently granted a nationwide injunction against the Executive Order 13768, *supra*, on the ground that it purported to condition all federal funds on compliance with Section 1373. (See *Cty. of Santa Clara v. Trump*; *City and Cty. of San Francisco v. Trump*, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017).) In that case, the federal district court ruled that plaintiffs were likely to succeed on their claims that the Order violated the Separation of Powers, Spending Clause, Tenth Amendment, and Fifth Amendment. (*Ibid.*) Following that preliminary injunction, the United States Attorney General issued a memorandum, which clarifies that compliance with Section 1373 is tied "solely to federal grants administered by the Department of Justice or the Department of Homeland Security, and not to other sources of federal funding." (*Implementation of Executive Order 13768*, Memo. from U.S. Att'y General to All Department Grant-Making Components (May 22, 2017), *available at* https://www.justice.gov/opa/press-release/file/968146/download.) Even more importantly, the memorandum clarified that "for purposes of enforcing the Executive Order, the term "sanctuary jurisdiction" will refer only to jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." A jurisdiction that does not willfully refuse to comply with section 1373 is not a "sanctuary jurisdiction." (*Ibid.*) Under SB 54, there is no reason to think that California would meet the definition of a "sanctuary jurisdiction."

*The bill is not otherwise preempted by federal immigration law.* When Congress acts under its constitutional powers, it may preempt state law through (1) an express preemption provision that "withdraw[s] specified powers from the States"; (2) by "preclud[ing] [States] from regulating conduct in a field that Congress . . . has determined must be regulated by its exclusive governance"; or (3) through conflict preemption when "compliance with both federal and state regulations is a physical impossibility," or the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Arizona v. United States* (2012) 567 U.S. ___, 132 S. Ct. 2492, 2500-01 [internal quotation marks omitted].)

The Supreme Court and other courts have held that state laws, like those at issue in *Arizona v. United States*, were preempted by federal immigration law when the States attempted to regulate immigration themselves and intruded on the federal government's authority.

This bill, unlike the Arizona law, has no similar risk of preemption because it leaves federal immigration enforcement to federal officials. Far from being preempted, SB 54 reinforces the federal framework set forth in Section 1357 that leaves the determination of whether to have their employees function as immigration officers to the states. Because States need not

participate in federal immigration enforcement, and because of the explicit non-preemptive text and structure of Section 1357, the bill clearly does not conflict with federal law.

***As proposed to be amended, the bill appropriately retains current law that provides public access to public records.*** As currently in print, the bill gives the reporting agency that sends task force information to the Attorney General, or the Attorney General himself, to do the following:

> [D]etermine a report, in whole or in part, shall not be subject to disclosure pursuant to subdivision (f) of Section 6254, the California Public Records Act to the extent that disclosure of a particular item of information would endanger the safety of a person involved in an investigation or would endanger the successful completion of the investigation or a related investigation.

This language is confusing because the task force information reported to the Attorney General would not seem to contain such information. The confusion is compounded by the fact that Government Code Section 6254 (f) itself is very confusing. It establishes a rule that investigative reports are not *required* to be disclosed, but then gives a series of exceptions and alternative rules for disclosure and non-disclosure of information within investigative reports. In order to clarify that reports of task force information made by state and local law enforcement agencies (and school security) to the Attorney General are public records (which they are, according to the CPRA's definition of that term in Government Code Section 6252 (e), because they are records possessed by a public agency) and are subject to the exemptions provided by that act, the author proposes to amend the bill to say just that. The author's proposed amendments also appropriately clarify that "personal identifying information may be redacted prior to public disclosure" of task force information provided to the Attorney General. Regarding the information reported *by the Attorney General* about task force information, the bill also requires the Attorney General to omit from his report any "particular information [that] would endanger the safety of a person involved in an investigation" or otherwise hinder an ongoing investigation. This provision is consistent with existing law, including Government Code Section 6255, which gives a public agency authority to withhold "any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."

***Other proposed author's amendments and other minor ambiguities that the author may wish to clarify in the future.*** The author proposes to make a number of clarifying amendments to the bill's language, including changes to provide more guidance to law enforcement agencies about how to comply with the requirements of the bill. Among other things, the amendments will do both of the following: (1) ensure that confidential information in state databases remains confidential; and (2) clarify that all actions of law enforcement agencies relating to immigration which are specifically authorized under the bill must comply with local laws and policies of the jurisdiction in which an agency operates.

*Ambiguity about when reports about task force operations are required to be submitted to the Attorney General and what period of time they are required to cover.* As currently in print, the bill requires law enforcement agencies that choose to participate in a joint law enforcement task force to "submit a report **every six months** to the Department of Justice" detailing the task force operation, including the following about each operation: the purpose of the task force, the federal, state, and local law enforcement agencies involved, the number of California law

enforcement agency personnel involved, a description of arrests made for any federal and state crimes, and a description of the number of people arrested for immigration enforcement purposes. The bill also requires the Attorney General, by March 1, 2019, and **twice a year thereafter**, to report on the types and frequency of joint law enforcement task forces. But the bill does not clarify when task force reports must be submitted to the Attorney General, or what time period the reports must cover.

*Ambiguity about law enforcement operations that do not constitute "immigration enforcement" but could fail in the catch-all category of prohibited "immigration enforcement" activities.* The bill broadly prohibits the use of law enforcement resources "to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes" including "but not limited to" a list of specific examples for how resources cannot be used. Because the list is non-exhaustive, presumably other uses of resources for immigration enforcement purposes are also prohibited.

The bill defines "immigration enforcement" as follows:

> "Immigration enforcement" includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States.

The bill then goes on to specify that "Immigration enforcement" does not include either of the following, which otherwise would clearly qualify as immigration enforcement under the bill's definition:

> (1) Efforts to investigate, enforce, or assist in the investigation or enforcement of a violation of Section 1326(a) of Title 8 of the United States Code that may be subject to the enhancement specified in Section 1326(b)(2) of Title 8 of the United States Code and that is detected during an unrelated law enforcement activity.
>
> (2) Transferring an individual to federal immigration authorities for a violation of Section 1326(a) of Title 8 of the United States Code that is subject to the enhancement specified in Section 1326(b)(2) of that title if the individual has been previously convicted of a violent felony listed in subdivision (c) of Section 667.5 of the Penal Code.

The bill also has a list of specific activities that state and local law enforcement agencies may perform, despite the fact that they may meet the definition of "immigration enforcement." The fact that these two activities that would otherwise meet the definition of "immigration enforcement" are exempted from the definition, while other similar activities are specifically allowed to be performed, despite meeting the definition could possibly create confusion among law enforcement agencies and officials about whether certain conduct is authorized.

*The author may wish to consider clarifying the dates on which task force reports must be submitted to the Attorney General and what time period the reports must cover. The author may also wish to consider consolidating either the exemptions from the definition of "immigration enforcement," or the law enforcement activities that are authorized, despite meeting the definition of that term.*

***ARGUMENTS IN SUPPORT**:* The Mario G. Obledo National Coalition of Hispanic Organizations writes in support of the bill that "using local police resources to support immigration law enforcement detracts from their primary goal of preserving the public order and ensuring that violent felons are apprehended and incarcerated in a timely manner." SB 54, it continues, "properly ensures that state and local law enforcement agencies, including school police agencies, will not engage in immigration enforcement. Further, SB 54 requires that California courts health facilities and schools remain safe and accessible regardless of immigration status. It is a compassionate bill designed to afford human rights to all of California's inhabitants." Similarly, Asian Americans Advancing Justice, write that "SB 54 would disentangle local law enforcement from the business of deportations" and as a result will "create safer spaces at schools, libraries, courthouses, shelters, DLSE facilities, and health care facilities, by limiting immigration enforcement at these locations." The ACLU of Northern California observes that "SB 54 upholds California's core values of equal treatment, community, family unity, and common humanity by ensuring that California's police departments, schools, healthcare facilities and courts remain accessible to Californians from all walks of life."

***ARGUMENTS IN OPPOSITION**:* Peace Officers Research Association of California writes that it opposes SB 54 for "three critical reasons" which it identifies as the requirement to report task force operations to the Attorney General; the unintended impact of detained immigrants likely being taken outside the state "thereby separating them from their families, communities and networks" and "the breakdown of local, state, and federal partnerships [that]will prevent our officers from being able to do their jobs; consequently, violent criminals will remain on the streets and our families will be in danger." The California State Sheriffs Association writes that although "Sheriffs do not wish to act as immigration police.. . .we need to continue to cooperate with our law enforcement partners to ensure that those who victimize our communities are not given unnecessary opportunities to do more harm." The association continues that "The bill, with limited exception, precludes law enforcement from sharing information that is not publicly available about persons in custody with federal authorities" so that "sheriffs would still be precluded from relaying information about people convicted of crimes like domestic violence and drunk driving unless they also had current or prior convictions for serious or violent felonies." The California Police Chiefs Association also opposes the bill, for the same general reasons as expressed by other law enforcement groups, and concludes about the bill that "SB 54 will make it more difficult to work with our federal law enforcement partners in apprehending dangerous criminals, and threatens to create more fear in our communities by forcing federal immigration operations out of our jails and into our communities."

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Abriendo Puertas / Opening Doors
ACLU of California
Advancement Project
Alliance San Diego
American Academy of Pediatrics, California
American Friends Service Committee's US-Mexico Border Program
Anti-Defamation League
Asian Americans Advancing Justice – California
Asian & Pacific Islanders Equality-LA

Asian  Pacific  Islander  Forward  Movement
Asian  Pacific  Policy & Planning  Council
Bay  Area  Community  Resources
CalAsian  Chamber
California  Association  for Bilingual  Education
California  Calls
California  Conference  for Equality  and Justice
California  Chapters of the American  Immigration  Lawyers  Association
California  Immigrant  Policy  Center
California  Latinas  for Reproductive  Justice
California  Partnership
California  Partnership  to End Domestic  Violence
California  School-Based  Health  Alliance
Californians  for Safety and Justice
Californians  Together
Canal Alliance
Center  for Gender & Refugee  Studies  – California
Central  American  Resource  Center-LA
Central  Coast Alliance  United  for a Sustainable  Economy
Central  Valley  Children's  Services  Network
Centro  Laboral de Graton
Child  Care Law Center
Children's  Defense  Fund
Community  Initiatives  for Visiting  Immigrants  in Confinement
CLEAN  Car Wash Campaign
CLUE: Clergy  and Laity  United  for Economic  Justice
Ventura  County  Clergy  and Laity  United  for Economic  Justice
Community  Coalition
Courage  Campaign
CREDO
Day Worker  Center in Santa Cruz County
Day Worker  Center of Mountain  View
Defending  Rights  and Dissent
Dream  Team – Los Angeles
Dolores  Huerta  Foundation
EBASE
Employee  Rights  Center
Empowering  Pacific  Islander  Communities
Environmental  Center of San Diego
Equal Justice  Society
Equal Rights  Advocates
Equality  California
Escondido  Indivisible
Esperanza  Community  Housing
Evergreen  Teachers  Association
Faith in the Valley
Filipino  Advocates  for Justice
Friends  Committee  on Legislation  of California
Garment  Worker  Center

IKAR
Immigrant  Defenders  Law  Center
Immigrant  Legal  Resource  Center
Indivisible  Conejo
Indivisible  Ventura
Inland  Coalition  for  Immigrant  Justice
Inland  Empire – Immigrant  Youth  Collective
Instituto  de Educacion  Popular  del Sur de California
Intercity  Struggle
Iranian  American  Bar  Association
Jus Semper  Global  Alliance
Justice  for Immigrants  of the Diocese  of San Bernardino
Khmer  Girls  in  Action
Korean Resource  Center
Koreatown  Immigrant  Worker's Alliance
La Raza  Centro Legal
Latino  and Latina  Roundtable
Latino  Coalition  for a Healthy  California
Little  Tokyo  Service  Center
Long  Beach  Immigrant  Rights  Coalition
Los Angeles  LGBT  Center
Loyola  Law  School Immigrant  Justice  Clinic
Mexican  American  Legal Defense  and Education  Fund
Mi Familia  Vota
Mom's  Rising
Monument  Impact
Mujeres  Unidas  y Activas
National  Asian Pacific  American  Families  Against  Substance  Abuse
National  Center for Lesbian  Rights
National  Council  of Jewish  Women
National  Day Laborer  Organizing  Network
National  Domestic  Workers  Alliances
Native  Hawaiian  & Pacific  Islander  Alliance
Nikkei  for Civil  Rights  & Redress
Nikkei  Progressives
North Bay Jobs  with  Justice
North County  Immigration  Task  Force
OCA – GLA
OneJustice
Orange County  Immigrant  Youth  United
Our Family  Coalition
Our Revolution
Parent  Voices  CA
People  Organizing  to Demand  Environmental  and  Economic  Right
PICO California
Pilipino  Workers Center
Public  Counsel
Restaurant  Opportunities  Center of Los Angels
Root & Rebound

Sacred Heart
San Diego Immigrant Rights Consortium
Social Action Committee of the Unitarian Universalist Fellowship of
Redwood City
Somos Mayfair
South Asian Network
South Bay People Power
Strategic Concepts in Organizing and Policy Education
Stronger California
Tahirih Justice Center
Thai Community Development Center
UDW/AFSCME Local 3930
UNITE HERE Local 30
UPLIFT
Vigilant Love
Vital Immigrant Defense Advocacy and Services
Warehouse Worker Resource Center
YWCA
Numerous Individuals

**Opposition**

Association for Los Angeles Deputy Sheriffs
Association of Deputy District Attorneys
California Police Chiefs Association
California State Sheriffs Association
City of Camarillo
City of Glendora
City of Torrance
Kern County Board of Supervisors
Los Angeles Police Protective League
Peace Officers Research Association of California
Shasta County Board of Supervisors
The Remembrance Project
We the People
West Covina City Council
Numerous individuals

**Analysis Prepared by**: Alison Merrilees / JUD. / (916) 319-2334

# EXHIBIT H

| **California Department of Justice**<br>**DIVISION OF LAW ENFORCEMENT**<br>**Kevin Gardner, Chief**  | | ***INFORMATION BULLETIN*** |
|---|---|---|
| *Subject:*<br>Responsibilities of Law Enforcement Agencies Under the California Values Act, California TRUST Act, and the California TRUTH Act | *No.*<br>DLE-2018-01<br>*Date:*<br>3/28/2018 | *Contact for information:*<br>Kevin Gardner, Chief<br>Division of Law Enforcement<br>(916) 210-6300 |

**TO: Executives of State and Local Law Enforcement Agencies**

This bulletin provides guidance to law enforcement agencies regarding Senate Bill 54, effective January 4, 2018 (Sen. Bill No. 54 (2017-2018 Reg. Sess.)). SB 54 makes significant changes to California's Transparency and Responsibility Using State Tools (TRUST) Act (Gov. Code, §§ 7282 and 7282.5), establishes California's Values Act (Gov. Code, §§ 7284, 7284.2, 7284.4, 7284.6, 7284.10, and 7284.12), and repeals Health and Safety Code section 11369. Together, these provisions define the parameters under which state and local law enforcement agencies may engage in immigration enforcement-related activities.

The Transparent Review of Unjust Transfers and Holds (TRUTH) Act, Government Code sections 7283, 7283.1, 7283.2, effective January 1, 2017, creates mandatory notice and procedural protections for individuals in the custody of local law enforcement agencies should federal immigration officers wish to contact them. This bulletin also provides guidance regarding local law enforcement agencies' obligations under the TRUTH Act, including similar provisions within SB 54 that apply to the California Department of Corrections and Rehabilitation (CDCR).

This bulletin replaces the previous law enforcement bulletins entitled "Responsibilities of Local Law Enforcement Agencies under Secure Communities and the TRUST Act," Information Bulletin No. 14-01 (June 25, 2014) and "Responsibilities of Local Law Enforcement Agencies under Secure Communities," Information Bulletin No. 2012-DLE-01 (Dec. 4, 2012). This bulletin does not provide guidance on the reporting obligations of law enforcement agencies to the California Department of Justice with respect to the activities of joint law enforcement task forces and transfers of individuals to immigration authorities; these reporting requirements are set forth in a separate information bulletin entitled California Values Act's Statistical Reporting Requirements (18-02-CJIS).

## SUMMARY

### I. Amendments to the TRUST Act

The TRUST Act previously described the circumstances under which a local California law enforcement agency could detain an individual past their scheduled release in response to a hold request from immigration authorities. As amended by SB 54, the TRUST Act no longer addresses detentions in response to hold requests because the Values Act prohibits such detentions. The TRUST Act, as amended by SB 54, now describes the circumstances under which a California law enforcement agency can respond to transfer and notification requests from immigration authorities.

### II. Overview of the Values Act

In enacting the Values Act, the Legislature made clear in its findings that immigrants are valuable and essential members of the California community. The Legislature further determined that "a relationship of trust between

California's immigrant community and state and local agencies is central to the public safety of the people of California." (Gov. Code, § 7284.2). Thus, the core purpose of the Values Act is to ensure effective policing and to protect the safety, well-being, and constitutional rights of the people of California. (*Ibid*.)

The Values Act does the following:

1. Sets the parameters under which California state and local law enforcement agencies may engage in "immigration enforcement," as defined, and requires certain information about joint law enforcement task forces and transfers of individuals to immigration authorities to be reported to the California Department of Justice.

2. Requires the CDCR to provide individuals in its custody with information about their legal rights should federal immigration officers request to make contact with them, similar to the requirements of the TRUTH Act (Gov. Code, § 7283 et seq.), which applies to local law enforcement agencies.

3. Requires the Attorney General's Office to issue model policies, to be adopted by public schools, state or locally operated health facilities, courthouses and other enumerated state and local facilities, that limit assistance with immigration enforcement to the fullest extent possible consistent with federal and state law. The Attorney General's Office will further provide guidance to agencies regarding ways to protect privacy and limit the dissemination of information contained in their databases for immigration enforcement purposes, as permitted under federal and state law.

It should be noted that the Values Act defines many terms, some of which may seem familiar to law enforcement officers, but have special meaning within the context of this new law. For example, the Values Act defines "California law enforcement agency" as "a state or local law enforcement agency, including school police or security departments." (Gov. Code, § 7284.4, subd. (a).) This term, however, does not include the CDCR. (*Ibid.*) Therefore, the provisions of Government Code sections 7284.6 and 7284.8 do not apply to the CDCR.

Further, the Values Act defines "immigration enforcement" as "any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States." (Gov. Code, § 7284.4, subd. (f).) And, under the Values Act, a "judicial warrant" means "a warrant based upon probable cause for a violation of *federal criminal immigration* law and issued by a federal judge or a federal magistrate judge that authorizes a law enforcement officer to arrest and take into custody the person who is the subject of the warrant." (Gov. Code, § 7284.4, subd. (i), emphasis added.) While this bulletin points out a few of the relevant definitions, individual agencies should review the law to ensure full understanding of all the key terms in the Values Act.

## III. The Discretion of California Law Enforcement Agencies to Participate in Immigration-Related Activities is Limited By SB 54 in the Following Ways:

**1. Prohibits use of resources to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including:**

    a.   Inquiring into an individual's immigration status;[1]

    b.   Detain an individual in response to a hold request[2];

    c.   Provide personal information, as defined in Civil Code section 1798.3, including but not limited to home or work addresses, unless this information is "available to the public." For purposes of this prohibition, "personal information" means "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history. It includes statements made by, or attributed to, the individual." (Civ. Code, § 1798.3, subd. (a).)

        Although not expressly defined in the act, the phrase "available to the public" refers to information where a law enforcement agency has a practice or policy of making such information public, such as disclosing the information on its website or if it has a practice or policy of providing the information to individuals in response to specific requests. Law enforcement agencies should, in addition to ensuring compliance with the Values Act, take care to ensure that they comply with applicable state or federal privacy laws.

        However, there is an important exception to this limitation on providing personal information: federal law (8 U.S.C. §§ 1373, 1644) prohibits restrictions on the exchange of information regarding a person's citizenship or immigration status, and all California law enforcement agencies should comply with these laws.

    d.   Make or intentionally participate in arrests based on "civil immigration warrants," which means any warrant for a violation of federal civil immigration law and includes civil immigration warrants entered in the National Crime Information Center database; and

    e.   Assist immigration authorities in immigration enforcement activities at the United States borders, as described in 8 U.S.C. § 1357(a)(3), or performing the functions of an immigration officer whether informally or formally, through an 8 U.S.C. § 1357(g) agreement or any other law, regulation or policy.

---

[1] This provision does not prohibit inquiries into an individual's immigration status to immigration authorities, or exchanging immigration status information with any other federal, state, or local government entity, pursuant to 8 U.S.C. §§ 1373 and 1644. (*See* Gov. Code, § 7284.6, subd. (e).)

[2] "Hold request" means a request by any immigration authority that a local law enforcement agency maintain custody of an individual currently in its custody beyond the time he or she would otherwise be eligible for release in order to facilitate transfer to an immigration authority. (Gov. Code, §§ 7283, subd. (b); 7284.4, subd. (e).)

"Notification request" means a request by any immigration authority that a local law enforcement agency inform an immigration authority of the release date and time in advance of the public of an individual in its custody. (Gov. Code, §§ 7283, subd. (f); 7284.4, subd. (e).)

"Transfer request" means a request by any immigration authority that a local law enforcement agency facilitate the transfer of an individual in its custody to an immigration authority. (Gov. Code, §§ 7283, subd. (g); 7284.4, subd. (e).)

Hold, notification, and transfer requests include requests issued by U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection as well as any other immigration authorities. (Gov. Code, § 7284.4, subd. (e).) "Immigration authority" means any federal, state, or local officer, employee or person performing immigration enforcement functions. (Gov. Code, § 7284.4, subd. (c).)

**2. California law enforcement agencies cannot honor transfer and notification requests or provide information regarding a person's release date except in certain circumstances:**

California law enforcement agencies are never *required* to respond to transfer or notification requests -- under the Values Act they retain the discretion to decline these requests for any reason. (Gov. Code, § 7282.5, subd. (a).) Thus, law enforcement agencies may honor transfer and notification requests as specified in the Values Act as follows:

a. **Transfer Requests**: Responding to transfer requests is permitted only if:

i. The transfer is authorized by a judicial warrant, as defined by Government Code section 7282.4, subdivision (i), or a judicial probable cause determination, as defined by Government Code section 7282.4, subdivision (h), regarding a violation of federal criminal immigration law;

or

ii. Where the transfer would not otherwise violate any federal, state, or local law, or local policy, and the individual in custody meets any one of the conditions set forth in the TRUST Act, Government Code section 7282.5, subdivision (a). These qualifying conditions are:

1) The individual has been convicted at any time of a serious or violent felony, as defined in Penal Code section 1192.7, subdivision (c), or Penal Code section 667.5, subdivision (c).

2) The individual has been convicted at any time of a felony that is presently punishable by imprisonment in state prison.

3) The individual was convicted within the past 15 years of a felony listed in Government Code section 7282.5, subdivision (a)(3), or within the past five years of a wobbler (i.e., a crime punishable as either a felony or a misdemeanor) listed in Government Code section 7282.5, subdivision (a)(3).

4) The individual is a current registrant on the California Sex and Arson Registry.

5) The individual has been convicted of certain specified federal aggravated felonies identified in section 101(a)(43)(A)-(P) of the federal Immigration and Nationality Act (8 U.S.C. § 1101(a)(43)(A)-(P)).

6) The United States Department of Homeland Security's Immigration and Customs Enforcement (ICE) identifies the person as the subject of an outstanding federal felony arrest warrant for any federal crime.

Furthermore, if a law enforcement agency does transfer an individual to immigration authorities, Government Code section 7284.6, subdivision (c)(2) requires the agency to report to the California Department of Justice the number of transfers it makes in a calendar year, as well as the offense that allowed for the transfer. For more information regarding these reporting obligations, please see Information Bulletin 18-02-CJIS (California Values Act's Statistical Reporting Requirements).

b. **Notification Requests**: Providing information regarding a person's release date or responding to notification requests from immigration authorities by providing an individual's release date or other information is permitted only if:

i. The information is available to the public;

or

ii. The individual is subject to (1) the qualifying conditions in the TRUST Act, Government Code section 7282.5, subdivision (a) described above with respect to transfer requests; or (2) the individual has been arrested and taken before a magistrate judge on the following types of charges, and the magistrate makes a probable cause determination (Pen. Code, § 872) for the charge: (i) a serious or violent felony (Pen. Code, §§ 1192.7, subd. (c) or 667.5, subd. (c)); or (ii) a felony that is punishable by imprisonment in state prison. (Gov. Code, § 7282.5, subd. (b)).

A conviction for a straight misdemeanor, i.e., a crime that is *presently* punishable *only* as a misdemeanor, is not listed in section 7285, subdivision (a), and therefore is not a valid justification for honoring a transfer or notification request. And misdemeanor convictions for crimes affected by Proposition 47 (2014), the "Safe Neighborhoods and Schools Act," including felony convictions that were reduced to misdemeanors or re-designated as misdemeanors by a court as a result of Proposition 47, cannot serve as the basis for transfers or providing release date information to immigration authorities. (Gov. Code, § 7285.5, subd. (a)(6)). The crimes affected by Proposition 47 include, but are not limited to: simple drug possession for personal use, shoplifting, forgery, writing bad check, petty theft, and receiving stolen property.

Before honoring a transfer or notification request on the basis of a qualifying conviction, California law enforcement agencies should carefully review an individual's Record of Arrests and Prosecutions to determine whether a listed felony conviction was reduced to a misdemeanor, or re-designated as a misdemeanor, by a court under Proposition 47. If so, cooperation with immigration authorities is prohibited, unless there is another valid basis for cooperation (for transfers, a judicial warrant; for notifications, if the information is publicly available).

### 3. Other Restrictions on Immigration Enforcement

California law enforcement agencies may not (1) allow officers to be supervised by federal agencies or deputized for immigration enforcement purposes; (2) use immigration authorities as interpreters for law enforcement matters relating to individuals in custody; (3) provide office space exclusively for immigration authorities in city or county law enforcement facilities; or (4) enter into a contract, after June 15, 2017, with the federal government to house or detain adult and minor noncitizens in a locked detention facility for purposes of immigration custody; agencies with existing federal contracts cannot renew or modify the contract if doing so would expand the number of contract beds available to detain noncitizens for purposes of civil immigration custody. (Gov. Code, §§ 7310, 7311).

## IV. If agency policy or local law or policy permit, a California law enforcement agency has discretion, but is not required, to perform the following immigration enforcement activities:

1. Investigate, enforce, detain persons upon reasonable suspicion of, or arrest, persons for violation of 8 U.S.C. § 1326(a), the federal criminal violation for reentry by a noncitizen after removal, but only if the individual was removed because of an aggravated felony conviction under 8 U.S.C. § 1326(b)(2) and the suspected violation was detected during an unrelated law enforcement activity. This is the one limited circumstance in which the Value Act permits a law enforcement official to exercise their discretion to

arrest or assist in the arrest of a person for a *federal immigration law violation*. Transfers of these individuals to immigration authorities are subject to the above restrictions regarding transfers.

2. Provide individual criminal history in response to a request from immigration authorities about a specific person's criminal history, including information obtained from CLETs or similar local databases, as long as it is otherwise permitted by state law.

3. Participate in a joint law enforcement task force, including the sharing of confidential information with task force participants, if all of the following conditions are met:

    a. The task force's primary purpose is not immigration enforcement;

    b. Enforcement or investigative duties are primarily related to violations of state or federal law unrelated to immigration enforcement; and

    c. The local law or policy that the agency is subject to permits such participation.

    Nothing in the Values Act prohibits a California law enforcement agency from asserting its own jurisdiction over criminal law enforcement matters, i.e., engaging in an investigation, detention or arrest for criminal activities based upon California state law, even when its activities may indirectly impact or assist a federal agency that is engaged in immigration enforcement as part of a joint task force or otherwise. (Gov. Code, § 7284.6, subd. (f).)  This includes circumstances in which an officer is responding to a call for service involving a violation of a state criminal law or during an immigration enforcement action where the safety of the public or a law enforcement officer, including an immigration enforcement officer, is in danger.  In these limited circumstances, a California law enforcement officer may assist any law enforcement official, even if those officials are engaged in immigration enforcement, but only when the California law enforcement officer is enforcing state law. This narrow public safety exception should not be used to avoid the prohibitions in the Values Act on using state resources to conduct immigration enforcement.

    If a California law enforcement agency has agreed to dedicate personnel or resources on an ongoing basis to a task force, it must report the information set forth in Government Code section 7284.6 subdivision (c)(1) concerning the activities of the task force to the Department of Justice, as explained in Information Bulletin 18-02-CJIS (California Values Act's Statistical Reporting Requirements).[3]

4. Ask for information necessary to certify potential victims of crime or human trafficking with respect to T-visas and U-visas (8 U.S.C. §§ 1101(a)(15)(T) and 1101(a)(15)(U)),[4] or to comply with 18 U.S.C. § 922(d)(5), which prohibits the sale or disposition of firearms or ammunition to a person who law enforcement knows or has reasonable cause to believe is not lawfully present in the United States. California Penal Code sections 679.10 and 679.11 mandate that certifying state and local agencies submit certifications for T- or U-Visa applicants when certain conditions are met.  Certifying law enforcement agencies are prohibited from disclosing the immigration status information of a victim or person requesting T- or U-visa certification forms except to comply with federal law or legal process, or if authorized by the victim.  For guidance regarding law enforcement agencies' obligations under

---

[3] An "ongoing basis" means more than one interaction with any federal, state, or local LEA on a task force to discuss task force operations.  Accordingly, isolated interactions with a federal law enforcement agency are not subject to these reporting requirements because the California LEA did not dedicate personnel or resources to the task force on more than one occasion.

[4] The Victims of Trafficking and Violence Prevention Act (VTVPA) of 2000 is a federal law that, among other things, provides temporary immigration benefits to individuals without immigration status who are victims of specified qualifying crimes including human trafficking.  (VTVPA, Pub. L. No. 106-386, 114 Stat. 1464-1548 (2000).)

California Penal Code section 679.10 with respect to U-Visas, see the Information Bulletin by California Department of Justice Division of Law Enforcement, dated October 28, 2015, available at https://oag.ca.gov/system/files/attachments/press_releases/dle-2015-04.pdf.

5. Provide ICE with access to interview an individual in custody, if the agency gives the notices required by the TRUTH Act (Gov. Code, § 7283 et seq.).  Local law or policy, or agency policy, may be more restrictive than the Values Act.  Agencies should determine whether, even if the Values Act permits assistance in immigration enforcement related activities, the agency's policy or local law or policies prohibit such activities.  Further, if a particular activity is prohibited by the agency or the agency's jurisdiction, the agency must comply with the more restrictive conditions of the agency or jurisdiction so long as the local law or policy complies with 8 U.S.C. §§ 1373 and 1644, governing restrictions on the exchange of a person's immigration and citizenship status with government officials.

In addition, if officers are working in a school district pursuant to a memorandum of understanding (MOU) between the law enforcement agency and the district, the officer must adhere to the requirements of the MOU, even if that MOU conflicts with agency policy with respect to immigration enforcement matters, so long as the MOU complies with 8 U.S.C. §§ 1373 and 1644.

## V. Additional Law Enforcement Activity Under the Values Act

1. The Values Act does not prohibit a law enforcement agency from exchanging information regarding a person's immigration status with governmental entities, including immigration authorities, and the Act specifically cites 8 U.S.C. § 1373 and 8 U.S.C. § 1644 as authority for that provision.  Under those federal statutes, law enforcement officers must be allowed to:

   a. Send to, or receive from, federal immigration authorities, information regarding the citizenship or immigration status, whether lawful or unlawful, of any individual;

   b. Request information from federal immigration authorities regarding any individual's immigration status, whether lawful or unlawful; and

   c. Maintain or exchange information regarding the immigration status of any individual with other governmental entities.

The Values Act also permits the disclosure of an individual's name for purposes of making or responding to an inquiry about an individual's immigration or citizenship status to other governmental entities.

2. One federal district court in California has ruled on the scope of 8 U.S.C. § 1373 and determined that Section 1373 does not bar *all* restrictions on communications between state and local law enforcement and the federal government, and specifically, does not bar restrictions on the sharing of inmates' release dates.  That court determined that Section 1373 "only" prohibits restrictions on the exchange of information regarding a person's citizenship or immigration status. (*Steinle v. City & Cty. of San Francisco* (N.D. Cal. 2017) 230 F. Supp. 3d 994, 1015.)  Thus, under the Values Act, the disclosure of all other personal information that does not encompass information regarding a person's citizenship or immigration status, including a person's home and work address, is prohibited from disclosure unless it is publicly available or permitted under Government Code section 7284.6, subdivision (b)(2).

## VI. The Requirements of the TRUTH Act

The TRUTH Act, Government Code sections 7283, 7283.1, 7283.2, provides individuals who are in the custody of local law enforcement agencies with information about their procedural and legal rights should ICE wish to contact them. Specifically, the statute requires:

1. Before any interview between ICE and an individual in custody of a local law enforcement agency regarding civil immigration violations, the local law enforcement entity shall provide the individual with a written consent form,[5] that explains all of the following:

    a. The purpose of the interview;

    b. That the interview is voluntary; and

    c. That the individual may decline the interview or may choose to be interviewed with only their attorney present.

2. Upon receiving any ICE hold, notification, or transfer request, the local law enforcement agency shall:

    a. Provide a copy of the request to the individual; and

    b. Inform the individual whether the law enforcement agency intends to comply with the request. However, with respect to ICE hold requests, the LEA may not hold an individual past the time that he or she normally would be released, as is now required under the Values Act. (Gov. Code, § 7284.6, subd. (a)(1)(B).)

3. If a local law enforcement agency chooses to provide ICE with notification that an individual will be released from custody on a certain date, the local law enforcement agency must promptly provide the same notification in writing to the individual and to his or her attorney or other person designated by the individual being held. (Gov. Code, § 7283.1, subd. (b).)

4. All records relating to ICE access provided by local law enforcement agencies, including all communication with ICE, shall be public records for purposes of the California Public Records Act (Chapter 3.5 (commencing with Section 6250)), including the exemptions provided by that Act. The TRUTH Act explicitly provides that personal identifying information may be redacted prior to public disclosure as provided under the California Public Records Act. When responding to such requests, law enforcement agencies should therefore keep in mind California's privacy laws and all applicable exemptions under the California Public Records Act that protect such personal information from disclosure.[6] (Gov. Code, § 7283.1, subd. (c).)

5. Beginning January 1, 2018, the local governing body of any county, city, or city and county in which a local law enforcement agency has provided ICE access to an individual during the last

[5] The local law enforcement agency is required to make the written consent form available in English, Spanish, Chinese, Tagalog, Vietnamese, and Korean, and any additional languages that meet the county threshold as defined in Health and Safety Code section 128552, subdivision (d), if certified translations in those languages are made available to the local law enforcement agency at no cost. In keeping with the spirit of the law to advise individuals of their rights, a local law enforcement agency should not pre-populate or presuppose the responses in the consent form.

[6] Records relating to ICE access as provided in the TRUTH Act include, but are not limited to, data maintained by the local law enforcement agency regarding the number and demographic characteristics of individuals to whom the agency has provided ICE access, the date ICE access was provided, and whether the ICE access was provided through a hold, transfer, or notification request or through other means.

year is required to hold at least one community forum open to the public during the following year. (Gov. Code, § 7283, subd. (d).)

## VII. SB 54 Requires State Prisons Provide Similar Information Required by the TRUTH Act

The Values Act requires CDCR to provide an individual in custody with a written consent form and other notifications before allowing an interview between ICE and the individual regarding civil immigration violations. Specifically, this form must explain the purpose of the interview, that the interview is voluntary, and that the individual may decline to be interviewed or may choose to be interviewed only with their attorney present. The consent form must be available in English, Spanish, Chinese, Tagalong, Vietnamese and Korean. The CDCR must also give a copy of an ICE hold, notification, or transfer request to the individual and inform the person whether the agency or CDCR intends to comply with the request. (Gov. Code, § 7284.10.)

In addition, CDCR cannot restrict access to certain opportunities based solely on an individual's citizenship or immigration status (Gov. Code, § 7284.10, subd. (b)(1)), and cannot consider citizenship or immigration status in determining an individual's custodial classification level. (Gov. Code, § 7284.10, subd. (b)(2).)

## VIII. Repeal of Health and Safety Code section 11369

SB 54 also repeals Health and Safety Code section 11369, which required an arresting law enforcement agency to notify the appropriate federal agency if it believed that a person arrested for certain drug violations may not be a United States citizen.

Sincerely,

KEVIN GARDNER, Chief
Division of Law Enforcement

For XAVIER BECERRA
Attorney General

# EXHIBIT I

Date of Hearing: May 17, 2017

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez Fletcher, Chair
AB 450 (Chiu) – As Amended April 27, 2017

| Policy Committee: | Labor and Employment | Vote: | 5 - 2 |
|---|---|---|---|
| | Judiciary | | 8 - 3 |

Urgency: No State Mandated Local Program: No Reimbursable: No

**SUMMARY**:

This bill imposes various requirements upon employers related to federal immigration worksite enforcement actions. In summary, this bill:

1) Prohibits an employer from providing federal immigration enforcement agents access either to certain work areas without a properly executed warrant, except as otherwise provided by federal law, or to employee records without a subpoena.

2) Requires an employer to provide certain notifications to an employee, or an employee's representative, regarding federal immigration worksite enforcement actions or the results of those actions, and requires an employer to notify the Labor Commissioner of these actions within a defined timeframe.

3) Prohibits employers from checking the employment eligibility of current employees, except as required by federal law, and requires them to notify Labor Commissioner before conducting these checks in instances when they have to as required by federal law.

4) Prescribes penalties against employers for failure to satisfy the requirements and prohibitions, specified of $10,000 to $25,000 for each violation.

**FISCAL EFFECT**:

Increased costs to the Division of Labor Standards and Employment (DLSE) in the range of $6.5 million to $11.5 million. While there is considerably uncertainty about the precise fiscal impacts of this bill, DLSE would likely need "on call" staff across the 17 DLSE regional office as well as significant legal resources to review worksite incidents and potentially seek remedies in civil court.

**COMMENTS**:

1) **Background.** Under existing federal law and regulations, immigration officers are prohibited from entering the non-public areas of a business or a farm for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States, unless the officer has either a warrant, or the consent of the owner, or some agent of the owner who has authority to grant consent. If the immigration officer is denied access to conduct a site inspection, a warrant may be obtained. Moreover, federal agents sometimes come to the workplace not to search the premises, but to inspect business and employee records. In such a

case, federal agents must provide the employer with a subpoena and a three-day notice before inspecting any records.

2) **Recent federal actions.** Recent executive actions from the new federal administration have signaled that all immigrants here without permission are now enforcement priorities for Immigration and Customs Enforcement (ICE). Nationwide, there are reports of ICE agents descending on worksites for mass round-ups of immigrants. Additionally, the Trump administration has called for hiring 10,000 more ICE agents to expedite deportations.

3) **Purpose.** This bill seeks to ensure that all California workers, regardless of immigration status, enjoy the protections afforded to them under state law "without fear of harassment, detention, or deportation." According to the author, AB 450 will help achieve this by insisting that federal immigration enforcement agents meet the full procedural requirements of federal law and by making affected workers aware of federal enforcement actions and cognizant of their rights during such actions.

**Analysis Prepared by**:   Luke Reidenbach / APPR. / (916) 319-2081

# EXHIBIT J

**SENATE COMMITTEE ON LABOR AND INDUSTRIAL RELATIONS**
**Senator Steven Bradford, Chair**
**2017 - 2018 Regular**

| | | | |
|---|---|---|---|
| **Bill No:** | AB 450 | **Hearing Date:** | June 28, 2017 |
| **Author:** | Chiu | | |
| **Version:** | June 21, 2017 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Gideon Baum | | |

**Subject:** Employment regulation: immigration worksite enforcement actions

## KEY ISSUES

Should the Legislature prohibit an employer from providing access to a federal government immigration enforcement agent to any non-public areas of a place of labor if the agent does not have a warrant?

Should the Legislature prohibit an employer from providing access to a federal government immigration enforcement agent to I-9 employment records if the agent doesn't have a subpoena?

Should the Legislature require notices to employees and the Labor Commissioner from the employer in the event of an immigration enforcement action at the worksite?

## ANALYSIS

**Existing law:**

1) Provides that all protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in California. (Labor Code §1171.5)

2) Provides that a State may provide that an individual who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible through the enactment of a State law which affirmatively provides for such eligibility. (8 U.S. Code § 1621(d))

3) Prohibits any attempt to reinvestigate or reverify an incumbent employee's authorization to work using an unfair immigration-related practice. (Labor Code §1019.1)

4) Requires that employers must attest, under penalty of perjury and on a form designated or established by the federal Attorney General by regulation, that it has verified that the individual is not an unauthorized alien by examining specified documents, which include a United States passport, resident alien card, and an identification card with a photograph that contains security features that prevents counterfeit or fraud. The worker must also attest, under the penalty of perjury, that he or she can legally work in the United States.

These attestations and records are commonly known as I-9 Employment Eligibility Verification forms/records. (8 U.S. Code § 1324a)

5) Requires that employers retain a copy of the attestations discussed above and make available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending with 1 year of a worker's termination. (8 U.S. Code § 1324a)

**AB 450** creates various requirements on public and private employers with regard to federal immigration agency worksite enforcement actions.

**Specifically, this bill:**

1) Prohibits an employer, except as otherwise provided by federal law, from providing a federal immigration enforcement agent access to nonpublic areas of a place of labor without a properly executed warrant.

2) Prohibits an employer, except as otherwise provided by federal law, from providing a federal immigration enforcement agent voluntary access to the employer's employee records without a subpoena.

3) Requires an employer, except as otherwise prohibited by federal law, to provide an employee, and the employee's representative, a written notice of an immigration worksite enforcement action to be conducted by a federal immigration agency at the employer's worksite. That notice must be in the language the employer normally uses to communicate employment information and contain:

   a) The name of the federal immigration agency conducting the immigration worksite enforcement action.

   b) The date that the employer received notice of the worksite enforcement action.

   c) The nature of the worksite enforcement action to the extent known.

   d) A copy of the notice of an immigration worksite enforcement audit or inspection of I-9 Employment Eligibility Verification forms or other employment records, worksite investigations, worksite interviews of employees, worksite raids, or any other immigration worksite enforcement action to be conducted.

   e) Any other information that the Labor Commissioner (LC) deems material and necessary.

   *This notice must be hand delivered or, if not possible, mailed or emailed to the employee within 24 hours.*

4) Requires an employer, except as otherwise prohibited by federal law, to provide to an affected employee, and to the employee's representative, a copy of the written federal immigration agency notice describing the results of an immigration worksite enforcement audit or inspection and written notice of the obligations of the employer and the affected employee arising from the action, as specified. The notice shall contain the following information:

    a) A description of any and all deficiencies or other items identified in the written federal immigration audit or immigration worksite enforcement action results notice.

b) The time period for correcting any potential deficiencies identified by the federal immigration worksite enforcement action.

c) The time and date of any meeting with the employer to correct any identified deficiencies.

d) Notice that the employee has the right to representation during any meeting scheduled with the employer.

e) Any other information that the Labor Commissioner deems material and necessary.

*This notice must be hand delivered or, if not possible, mailed or emailed to the employee within 24 hours.*

5) Requires an employer, except as otherwise prohibited by federal law, to notify the LC of a federal government immigration agency immigration worksite enforcement action within 24 hours of receiving notice of the action and, if the employer does not receive advance notice, to immediately notify the Labor Commission upon learning of the action, unless prohibited by federal law.

6) Requires an employer to notify the LC before conducting a self-audit or inspection of specified employment eligibility verification forms, and before checking the employee work authorization documents of a current employee, in a manner **not required** by federal law.

7) Prohibits an employer from re-verifying employment eligibility of a current employee, at a time or in a manner not required by specified federal law.

8) Requires the LC, upon a determination that an employee complainant or employee witness is necessary to conduct an investigation or prosecution, to issue a certification to the employee stating that he or she has submitted a valid complaint and is cooperating in the investigation and prosecution.

9) Prescribes penalties against employers for failure to satisfy the requirements and prohibitions described in this bill of $2,000-$5,000 for a first violation, or $5,000-$10,000 for each subsequent violation, to be recoverable by the LC.

10) Provides that the provisions of AB 450 are severable.

**COMMENTS**

1. **Immigration, Federal Policy, and the California Legislature:**

*"Not like the brazen giant of Greek fame,*
*With conquering limbs astride from land to land;*
*Here at our sea-washed, sunset gates shall stand*
*A mighty woman with a torch, whose flame*
*Is the imprisoned lightning, and her name*
*MOTHER OF EXILES. From her beacon-hand*
*Glows world-wide welcome; her mild eyes command*

*The air-bridged harbor that twin cities frame.*

*"Keep, ancient lands, your storied pomp!" cries she*
*With silent lips. "Give me your tired, your poor,*
*Your huddled masses yearning to breathe free,*
*The wretched refuse of your teeming shore.*
*Send these, the homeless, tempest-tost to me,*
*I lift my lamp beside the golden door*!"
- Emma Lazarus, "The New Colossus"

In popular culture, it is common to hear the United States of America be referred to as a "Nation of Immigrants". As many Americans can trace their roots to ancestors who voluntarily immigrated to this country, this sentiment has particular currency. Moreover, as touched on by Lazarus's poem, it evokes a powerful image: *oppressed and exiled*, *my ancestors were welcomed into a land of freedom and plenty*. *Today, because of their sacrifices, I am able to enjoy everything that America has to offer, and I will be able to extend that gift to those who come after me.*

Unfortunately, the historical record shows many instances where America fell short in extending the light of freedom to the exiled and huddled masses of the world. For example, in the Naturalization Act of 1790, which was passed by a Congress made up of many Founding Fathers and signed by President George Washington, naturalization was limited to "a free white person" who resided in the United States for two years. The Naturalization Act of 1795 kept the restriction of naturalization to "a free white person", but extended the residency period to 5 years. It wasn't until 1870 that individuals born in Africa could naturalize as American citizens. However, exclusions from naturalization were kept in place for Asians.

In 1913, building off of this exclusion, the California State Legislature passed the Alien Land Law, which excluded "aliens" who are not eligible for citizenship from owning land, specifically targeting Japanese farmers. The bill passed 35-2 in the Senate (where it was introduced) and 72-3 in the Assembly. The bill was signed into law by Governor Hiram Johnson. The bill that became law was actually a compromise measure, and the Legislature had considered several bills that were much more stringent. During the Senate Judiciary Committee hearing on one of the more stringent bills, farmers testified "with tears streaming down their faces" of white farmers being driven off the land by Japanese farmers and the inevitability of violence if nothing is done.[1] Prior to the passage of the final Alien Land Law, one Assemblyman offered amendments to make the measure more stringent, stating "This is not a question of dollars and cents but of civilization."[2]

Then, in 1920, the Alien Land Law was further strengthened by an initiative, which passed 668,483 (75%) to 222,086 (25%), that inhibited the ability of Japanese farmers to lease agricultural land. The California State Legislature went on to strengthen and expand the Alien Land Law in 1923 and 1927. Despite this, Japanese farmers circumvented the law by

[1] "We have a dead line at Elk Grove now, beyond with the brown man cannot pass. If we are denied relief from the situation that confronts us, I will not be responsible for what will surely happen. " M.A. Mitchell, Elk Grove farmer, March 19, 1913. From *Story of the Session of the California Legislature of 1913* by Franklin Hichborn, pg. 225.
[2] Ibid., Pg. 271.

developing complex ownership arrangements. These ownership arrangements, however, were illegal and could result in enforcement actions where the State would seize and sell the land or fine the Japanese immigrant due to the violation of the law. For example, the State Attorney General reported to the Legislature that, in the period between 1943 and 1945, he has secured a $100,000 penalty from one farming concern alone, which is the equivalent of approximately $1.45 million in today's dollars.

Upheld by the United States Supreme Court as constitutional in 1923 and 1933, the Alien Land Law continued to be enforced throughout the 1940s. As Japanese individuals were released from internment camps, Governor Earl Warren signed into law SB 415 (Chapter 1136, Statutes of 1945), which clarified that there was no statute of limitations on seizing "alien" land, while another bill passed the same year created a trust fund and appropriation for the enforcement of the Alien Land Act. Declared unconstitutional in 1948 and 1952 by the U.S. Supreme Court and California Supreme Court respectively, it wasn't until 1955 that the California State Legislature put on the ballot an initiative to repeal the Alien Land Law, which was overwhelmingly passed by the voters in 1956 (66.8% to 33.2%).

From the vantage point of contemporary California, it is difficult to comprehend how our government could privilege and enforce a system of naked racial animus upon a group of immigrants for more than 40 years. Forced to circumvent a fundamentally unjust law in order to make a living, Japanese farmers sought to improve their lives and the lives of their children, just like other immigrants. The difference, unfortunately, was that Japanese individuals not born in the United States were unable to become citizens due to federal immigration policy. Fortunately, this is no longer the case for Japanese immigrants: a federal immigration reform bill in 1952 created a path for Japanese immigrants to become naturalized citizens, ending decades of discrimination. Finally, after Congress took action, the lamp was raised a bit higher by the golden door.

2. Staff Comments:

*The Basic Components of AB 450*

Broadly speaking, AB 450 requires employers to do three things: *first*, ask immigration enforcement officers for a warrant before granting access to non-public areas of employment; *second*, requiring immigration enforcement officers to have a subpoena before accessing employee records; and *third*, requiring that notice of immigration enforcement actions be communicated to the Division of Labor Standards Enforcement and workers, including affected workers if necessary. Each provision will be discussed in detail below.

*Warrants*

As noted above, AB 450 requires employers to request a judicial warrant before granting access to non-public areas of a workplace. Under federal regulations, an immigration officer needs to secure either the consent of the employer or a warrant in order to access a non-public area of the workplace, with certain exceptions (such as exigent circumstances). As with other warrants, an immigration officer would need to show probable cause of the presence of an illegally employed worker before securing a warrant from a judge. However, unlike other judicial warrants, immigration officers have a relaxed standard for a valid warrant, and it does not need to include the names of the individuals who are employed at the

specific location or factory. This is frequently referred to as a "Blackie's warrant" after the case which originated it (*Blackie's House of Beef v. Castillo,* 659 F. 2d 1211 (D.C. Cir. 1981)). In short, the impact of AB 450 is to require that the employer request a judicial warrant before granting immigration enforcement officials access to non-public areas to ensure that the immigration enforcement action is lawful, rather than consenting to an immigration enforcement action without ascertaining legality.

*Subpoenas*

Unlike warrants, Immigration and Customs Enforcement (ICE), which is part of the U.S. Department of Homeland Security, can issue its own subpoenas under federal law. As such, the requirement in AB 450 that a request to inspect I-9 documents be accompanied with a subpoena would not require ICE to contact a judge. Moreover, an employer must comply with a subpoena from ICE. If an employer does not comply, ICE can compel compliance through the court system.

*Notice*

As discussed above, AB 450 has four separate notice requirements: one for workers when ICE inspects I-9 employment records; one for affected workers after ICE inspects I-9 employment records; one for the Labor Commissioner when ICE conducts an enforcement action, including the inspection of I-9 employment records; and one for the Labor Commissioner when the employer self-audits I-9 **OR** when the employer checks I-9 verification in a manner not required by federal law. Each of these notices must be provided within 24 hours. Otherwise, an employer would face penalties of $2,000 to $10,000 per violation, depending on prior violations.

Noting that an employer is getting ready for the ICE enforcement action, reaching out to workers, contacting the Labor Commissioner AND operating the business in as normal a manner as possible, such truncated timelines may not be feasible for many employers. Additionally, as an employer may wish to shred expired I-9 employment information, requiring a notice be given to the Labor Commissioner prior to the destruction of sensitive, out-of-date documents may not lead to superior policy outcomes. Finally, while AB 450 requires the Labor Commissioner be notified if the employer is checking I-9 verification forms outside of federal requirements, it does not require such notice be given to the employee's labor representative, who may be in a position to give assistance to the worker.

*Possible Amendments*

Therefore, the Committee may wish to consider the following amendments:

1) In Labor Code Section 90.25(a) of the bill, lengthening the timeline for an employer to notify his or her employees of an upcoming inspection of I-9 employment records from "within 24 hours" to "within 72 hours";

2) In Labor Code Section 90.25(b) of the bill, lengthening the timeline for an employer to notify his or her employees affected by an I-9 employment records from "within 24 hours" to "within 48 hours"; and

    3) In Labor Code Section 90.9(b) of the bill, strike "before conducting a self-audit of, inspection of, or review of, I-9 Employment Eligibility Verification forms and" from the bill and insert "employee's labor representative".

3. Proponent Arguments:

Proponents argue that "immigration raids undermine workers' rights in significant ways: they drive down wages and labor conditions for all workers, regardless of immigration status; they interfere with workers' ability to freely exercise their workplace rights; they incentivize employers to employ undocumented workers in substandard conditions because the threat of immigration enforcement prevents workers from complaining; they undermine the efforts of the state to enforce labor and employment laws." The author also notes that "past experience with worksite raids demonstrates the likelihood of raids violating employee due process. ICE has routinely violated basic constitutional rights, such as the 4th amendment's protections against unreasonable search and seizure. ICE has detained all workers, without any individualized suspicion, regardless of status when conducting workplace raids. For example, in prior worksite raids, ICE has used individual arrest warrants and administrative warrants to question and detain every single worker - including U.S. citizens & lawfully present workers - in a workplace without individualized suspicion." Proponent argue that AB 450, through notices to the employees and Labor Commissioner, will ensure that workers understand their rights and are aware of what enforcement actions are taking place. Further, by requiring a warrant or subpoena before certain ICE enforcement actions, proponents argue that AB 450 will ensure that ICE's enforcement actions do not violate the due process rights of both employers and employees.

4. Opponent Arguments:

The Society for Human Resource Management (SHRM) opposes AB 450, arguing:

"Compliance with the provision in the bill requires multiple employees at the employers' place of work to understand fully federal law regarding ICE agents' access and puts employers in a bind. For example, an administrative assistant who is approached by an ICE agent is likely to comply with what the uniformed officer asks. If the ICE officer is asking for access beyond what is provided for in federal law, it is highly unlikely that the administrative assistant will be aware. It is unreasonable to expect many people within organizations (administrative, HR professionals, security staff, etc.) to have such detailed knowledge of federal law that would be required to comply. Training these employees would require major resource expenditures from employers."

SHRM also argues that the I-9 notices to the employee and the Labor Commissioner are burdensome, noting: "This could be the entire workforce for the company, as well as those who have left the company in the last year. Federal law requires the retention of I-9s for three years after hire or one year after termination of employment, whichever is later. Getting notice out in a 3-day window would be an administrative challenge requiring significant resources, particularly for large employers who have thousands in their workforce."

SHRM also argues that the requirement to notify the Labor Commissioner before a self-audit of I-9 verification forms "to mean that an employer is required to notify the state every time they re-verify an employee who needs to be re-verified for a legitimate reason, such as an H-

1B visa holder who receives an extension. This is highly burdensome because the new requirement is on-going and could happen more than once with the same employee. Additionally, self-audits of I-9 files performed by our members are reasonable and should be encouraged, not discouraged. There is a distinction to be made between an audit of forms to ensure they are filled out correctly in compliance with federal law, and situations where employers actually go back and look at documents again or ask employees for new documentation – practices that are already prohibited by law."

5. Double Referral:

   This bill has been double-referred and, if approved by this committee, will be sent to the Senate Judiciary Committee for a hearing.

6. Prior Legislation:

   SB 1001 (Mitchell), Chapter 782, Statutes of 2016, prohibits, among other things, any attempt to reinvestigate or reverify an incumbent employee's authorization to work using an unfair immigration-related practice.

   SB 624 (Lara), Chapter 290, Statutes of 2015, restates and reinforces existing law on the right of undocumented workers to be eligible for benefits from the Uninsured Employers Benefits Trust Fund (UEBTF) and the Subsequent Injuries Benefit Trust Fund (SIBTF).

   SB 666 (Steinberg), Chapter 577, Statutes of 2013, prohibits employer from making, adopting, or enforcing any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, as provided, and would extend those prohibitions to preventing an employee from, or retaliating against an employee for, providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry.

**SUPPORT**

California Labor Federation (Co-sponsor)
SEIU California (Co-sponsor)
Alliance for Boys and Men of Color
Asian Americans Advancing Justice – California
Bet Tzedek Legal Services
Brightline Defense
California Association of Local Conservation Corps
California Domestic Workers Coalition
California Federation of Teachers
California Immigrant Policy Center
California Professional Firefighters
California Rural Legal Assistance Foundation
CHIRLA
City and County of San Francisco
San Francisco Labor Council
San Mateo Labor Council

State Building and Construction Trades Council
UAW Local 5810
United Domestic Workers
United Farm Workers
Western Center on Law and Poverty
Worksafe

**OPPOSITION**

Agricultural Council of California
Associated General Contractors of California
Association of California Egg Farmers
California Association of Wheat Growers
California Association of Winegrape Growers
California Bankers Association
California Bean Shippers Association
California Building Industry Association
California Business Properties Association
California Chamber of Commerce
California Citrus Mutual
California Cotton Ginners and Growers Association, Inc.
California Employment Law Council
California Farm Bureau Federation
California Framing Contractors Association
California Fresh Fruit Association
California Grain and Feed Association
California League of Food Processors
California Manufacturers and Technology Association
California Pear Growers Association
California Pool & Spa Association
California Professional Association of Specialty Contractors
California Restaurant Association
California Retailers Association
California Seed Association
California Trucking Assn
California Warehouse Association
Camarillo Chamber of Commerce
Chambers of Commerce Alliance of Ventura and Santa Barbara Counties
Construction Employers' Association
El Centro Chamber of Commerce and Tourist Bureau
Family Business Association of California
Family Winemakers of California
Greater Riverside Chambers of Commerce
Greater San Fernando Valley Chamber of Commerce
Grower-Shipper Association of Central California
Long Beach Area Chamber of Commerce
Murrieta Chamber of Commerce
National Federation of Independent Businesses

North Orange County Chamber of Commerce
Oceanside Chamber of Commerce
Official Police Garages of Los Angeles
Oxnard Chamber of Commerce
Redondo Beach Chamber of Commerce and Tourist Bureau
Santa Maria Chamber of Commerce
Society for Human Resource Management
South Bay Association of Chambers of Commerce
Southwest California Legislative Council
The Chamber of Commerce of the Santa Barbara Region
Tulare Chamber of Commerce
Vacaville Chamber of Commerce
Ventura County Agricultural Association
Western Agricultural Processors Association
Western Carwash Association
Western Growers Association
Wine Institute
Yuba-Sutter Chamber of Commerce

**-- END --**

# EXHIBIT K

OFFICE OF INSPECTOR GENERAL

# Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California


Homeland Security

**March 6, 2017**

**OIG-17-43-MA**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

March 6, 2017

MEMORANDUM FOR: Thomas D. Homan
Acting Assistant Secretary
U.S. Immigration and Customs Enforcement

FROM: John Roth
Inspector General

SUBJECT: *Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California*

A November 16, 2016 unannounced Office of Inspector General (OIG) inspection of the Theo Lacy Facility (TLF) in Orange, California, raised serious concerns, some that pose health risks and others that violate U.S. Immigration and Customs Enforcement's (ICE) 2008 *Performance-Based National Detention Standards* (PBNDS) and result in potentially unsafe conditions at the facility. Because of concerns raised during the inspection, we recommended that ICE take immediate action to ensure compliance with the 2008 PBNDS and strengthen its oversight of TLF. Specifically, we expressed the following concerns about:

- Food handling at TLF poses health risks. Detainees were being served, and reported being regularly served, meat that appeared to be spoiled. Orange County Sheriff's Department (OCSD) staff members are not handling meat safely, including meat being sent to other ICE detention facilities.
- Unsatisfactory conditions and services at the facility, including moldy and mildewed shower stalls, refuse in cells, and inoperable phones.
- Some "high-risk" detainees are in less restrictive barracks-style housing and some "low-risk" detainees are in more restrictive housing modules; the basis for housing decisions is not adequately documented.
- Contrary to ICE detention standards, inspectors observed high-risk detainees and low-risk detainees together in parts of TLF. Although detainees were purportedly identified by classification level, this was not apparent to the inspectors.
- Moves from less restrictive barracks to more restrictive housing modules are not explained to detainees, nor are detainees given the opportunity to appeal changes, as required by ICE detention standards.



- OCSD's more restrictive disciplinary segregation violates ICE detention standards.
- Neither ICE nor OCSD properly documents grievances from detainees to ensure resolution, notification of resolution, and opportunities to appeal.

After inspecting this facility on November 16, 2016, the OIG team briefed local OCSD and ICE management on these concerns. To address the concerns detailed in the alert, we recommended that, as soon as possible, ICE prevent further health risks by ensuring that OCSD follow U.S. Department of Agriculture guidelines for safe food handling. We also recommended that ICE undertake a full review of TLF and OCSD's management of the facility to ensure its compliance with ICE's 2008 PBNDS. Finally, we recommended that ICE develop a comprehensive oversight plan for TLF to ensure OCSD's future compliance with ICE's 2008 PBNDS.

We provided a draft of this alert to ICE for management comments and corrective actions. ICE concurred with the intent of all three recommendations and is implementing corrective actions to address our concerns. All three recommendations are resolved and open. We have included ICE's comments, proposed corrective actions, and our analysis in the alert, and we have attached a copy of the ICE response.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of this alert to appropriate congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post a version of the alert on our website.

You may call me with questions, or your staff may contact Laurel Loomis Rimon, Acting Assistant Inspector General for Inspections and Evaluations, at (202) 254-4100.

Attachment



# Management Alert

Figure 1. Entrance to Theo Lacy Facility
*Source*: OCSD

The Theo Lacy Facility (TLF), operated by the Orange County Sherriff's Department (OCSD), houses U.S. Immigration and Customs Enforcement (ICE) detainees through an Intergovernmental Service Agreement. TLF has the capacity to house 3,442 males, all with some degree of criminal history. Some detainees have been convicted of crimes, served their prison sentence, and have been transferred to TLF to await deportation by ICE or an immigration court hearing. Other detainees have violated immigration laws and are also awaiting either deportation or an immigration court hearing. At the end of October, 478 detainees were housed at Theo Lacy. That detainee count typically changes daily as new detainees enter the facility and others are released.

Prior to detention, ICE reviews each detainee's criminal record and assigns a risk level of high, medium/high, medium/low, or low. ICE bases its risk levels on the severity of past criminal charges and convictions, including immigration violations and other security risks, such as gang affiliation or a history of substance abuse. For example, individuals convicted of major drug offenses, national security crimes, and violent crimes such as murder, manslaughter, rape, robbery, or kidnapping are assessed as having a higher risk level than those convicted of minor drug and property offenses such as burglary, larceny, fraud, and money laundering.

Facilities such as TLF that are maintained for ICE through an Intergovernmental Service Agreement are to comply with ICE's 2008 *Performance-Based National Detention Standards* (ICE detention standards).

**Poor Conditions at the Theo Lacy Facility**

*Problems with Food Handling*

In the TLF kitchen, we identified a host of potential food safety problems, which could endanger the health of detainees at TLF and in other facilities serviced by the TLF kitchen. Of deepest concern, when inspecting the refrigeration units, we observed slimy, foul-smelling lunch meat that appeared to be spoiled.



According to kitchen staff, this meat was slated to be served to detainees for lunch the day of our site visit. Detainees reported being repeatedly served lunch meat that smelled and tasted bad, which they rinsed with water before eating.

We also observed careless and potentially unsafe handling of food:

- Meat that was marked as "keep frozen" on the manufacturing label was stored in a refrigerator with no indication of how long it had been thawing.
- Lunch meat and ground beef was stored uncovered in large walk-in refrigerators.
- Different types of unwrapped, sliced lunch meat were mingled in containers and not identified; for example, a container labeled as bologna contained bologna and sliced turkey.
- Unwrapped lunch meat was stored in unlabeled, uncovered containers with no information describing contents, processing dates, or expiration dates.

Figure 2. Thawing meat with no dates; different lunch meats stored together with no labels; label from bologna in refrigerator for 7 days past the prepared date; all observed by the Office of Inspector General (OIG) at TLF on November 17, 2016
*Source*: OIG

Further, ICE staff informed us:

- Loaves of lunch meat were delivered frozen, thawed in the refrigerator for several days, sliced, refrozen, and sent to other detention facilities in the area.
- Loaves of lunch meat were delivered frozen, thawed in the refrigerator for several days, then sliced and refrigerated for more than a week before being served.

According to the U.S. Department of Agriculture (USDA), the safe storage time in a refrigerator for opened packages of lunch meat is 3-5 days. The practice of thawing, slicing, then refreezing meat for transport would make it difficult for TLF kitchen staff to adhere to those food safety recommendations. Further, by

not labeling the sliced, open lunch meat in the refrigeration unit, the kitchen staff has no way of knowing how long the portion packs have been in the containers. These practices could lead to detainee illness from ingesting spoiled meat.

**Recommendation 1**: We recommend that, as soon as possible, ICE ensure that the Orange County Sherriff's Department is following U.S. Department of Agriculture safe food handling guidelines to prevent health risks to detainees at the Theo Lacy Facility and other detention facilities that receive food from the Theo Lacy Facility.

**ICE Response:** ICE concurs. OCSD reported that it follows the California Code of Regulations, Title 15 for Local Detention Facilities. Although ICE indicated that Theo Lacy kitchen facilities, sanitation, and food preparation, service, and storage must comply with standards set forth in the California Health and Safety and Retail Food Codes, it also acknowledged that it must have safe food handling practices to prevent health risks to detainees as outlined in the reporting of spoiled food slated for service to detainees. ICE reported that Theo Lacy food handling guidelines follow USDA methods or protocols for safe food handling. TLF has been using these food service handling guidelines prior to the contract with ICE (for over 5 years). Although, USDA's methods or protocols for safe food handling are not a requirement of ICE's 2008 PBNDS, ICE concurs that OCSD must have safe food handling practices and guidelines to prevent health risks to detainees or other individuals in their custody.

The standard from the 2008 PBNDS on *Food Service* requires, in part, that each facility has a food service program under the direct supervision of an experienced food service administrator (FSA) who is responsible for:

- planning, controlling, directing, and evaluating food service;
- establishing standards of sanitation, safety and security; and
- developing specifications for the procurement of food, equipment, and supplies.

According to ICE, TLF has a certified FSA (as well as two food service managers) and, in addition to ICE detention standards, follows the Orange County, California's *Health Care Agency's Environmental Health Services* guidelines for food safety. County health inspectors routinely inspect OCSD facilities, including TLF.

ICE also reported that OCSD is in the process of re-competing its pre-packaged lunch meat vendor, which was expected to be posted for bids before the end of January 2017. The procurement process is projected to take approximately 4

months. Although the contract re-compete is part of OCSD's routine procurement process, the sack lunches that are currently being prepared at TLF will be replaced with pre-packaged box lunches with set expiration dates that will be brought in from an outside vendor. Estimated completion date: May 2017.

Although ICE reported that TLF does not provide food to any other detention facility, this was reported in error. ICE revised its statement and indicated that it still provides food to other detention facilities; it is addressing its food handling issues by moving to a vendor that will provide pre-sliced and individually packaged lunch meat, which will address concerns at all affected facilities.

**OIG Analysis**: ICE's response to this recommendation addresses the intent of the recommendation. This recommendation is resolved and will remain open until ICE provides evidence that current food handling complies with USDA standards or similar standards that prevent health risks to detainees. Once completed, ICE should also provide a copy of the new pre-packaged box lunch contract that shows requirements ensuring set expiration dates are documented and followed.

*Lack of Cleanliness in Common Showers and Individual Cells*

In two modules housing detainees, common area showers were not clean. We found trash, mildew, and mold in the shower stalls. According to OCSD staff, detainees are required to clean their showers daily; however, detainees are only given a scrub brush and an all-purpose cleaner, which does not combat mold and mildew. Additionally, requiring detainees to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area.

Figure 3. Moldy, mildewed shower stalls observed by OIG at TLF on November 16, 2016 *Source:* OIG

Also, in two of the modular housing units, we observed individual detainee cells that did not appear to be well-maintained or clean. In two cases, detainees had large collections of empty food containers and newspapers. According to ICE detention standards, garbage and refuse are to be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards. Collections of items in individual cells could potentially attract vermin and present a health hazard for detainees.

Figure 4. Broken plug on phone observed by OIG at TLF on November 16, 2016 *Source:* OIG

*Unusable Telephones*

An ICE Office of Professional Responsibility, Office of Detention Oversight report from a 2013 inspection of TLF identified telephone problems, including low volume and inoperable phones. In three modules we visited, the telephones were not operable. Detainees interviewed also confirmed that some phones did not work and the low volume on others prevented them from using the phones.

**Failure to Properly Document Detainee Classification Decisions and Comply with ICE Detention Standards**

*Inadequate Documentation of Decisions on Detainee Classification*

ICE detention standards require detention facilities to implement a system to classify detainees based on past criminal convictions, including immigration violations, and other security risk factors. Facilities must physically house detainees according to their classification level. Through our observations and interviews with OCSD staff, we determined that OCSD is not properly documenting its detainee classification process, and its housing reclassifications do not comply with ICE detention standards.

Before in-processing at TLF, ICE gives OCSD a classification form for each detainee that contains ICE's classification risk assessment of high, medium/high, medium low, or low. Facilities are permitted to develop local classification systems, as long as the classification criteria are objective and uniformly applied and procedures meet ICE requirements. OCSD staff informed us that they do not change ICE's initial classification level, but they consider

the ICE's classification along with their own detainee classification interview to determine the level of "criminal sophistication"[1] and assign housing.

Although OCSD personnel showed us examples of completed questionnaires from classification interviews, OCSD does not document these interviews in the detainee's file. Through our review of detainee files, we found detainees identified by ICE as high risk who were housed in the least restrictive barracks and detainees identified by ICE as medium/low risk housed in more restrictive modular housing. Even though OCSD officials said they use ICE's initial classification, we found no detainee file documentation showing they took this classification into consideration when determining initial housing assignments. Additionally, we found no correlation between ICE's initial classification and OCSD's assessment.

*High-risk and Low-risk Detainees Are Allowed to Mix*

ICE detention standards also specify that facilities may not mingle low-risk detainees with high-risk detainees. During the facility tour, we observed that detainees of all risk levels were housed in the barracks. OCSD staff explained that detainees of different classification levels do not "program" together, meaning they do not eat or attend religious services or recreation activities at the same time. Fundamentally, this setup satisfies the ICE detention standards' prohibition against mingling high-risk detainees and low-risk detainees. However, while touring the barracks area, we noted that detainees of all risk levels were able to roam the entire area, accessing the phones, law library, and outdoor space, and entering and exiting the housing bays freely. Although OSCD personnel said each detainee is issued an armband and identification card indicating risk classification, these were not readily apparent to the OIG team. Some detainees were not wearing an armband at all. This type of mingling may allow a less restrictive living environment for detainees, but it skirts the ICE detention standards' prohibition, which is designed to "protect the community, staff, contractors, volunteers, and detainees from harm."

*Changes to Detainee Housing Do Not Comply with ICE Detention Standards*

During our review of detainee files, we determined that OCSD staff were not informing detainees of their reasons for moving detainees from barracks to more restrictive modules. There was also no evidence of a process for detainees to formally appeal such a move. OCSD staff told the OIG team that detainees

[1] OCSD staff referred to criminal sophistication as an overall assessment of a detainee's criminal background, including gang affiliation, past incarceration record, and types of violations on criminal history.

housed in the modules were there because they needed closer supervision than the barracks allowed, but we determined the reasons behind the need were not properly documented in detainee files. OCSD also does not review detainees' classifications before moving them from barracks to modules.

According to ICE detention standards, facility classification systems must include procedures for detainees to appeal their classification levels, but OCSD staff said they never, for any reason, change ICE's initial classification of detainees. Because they do not change classification levels, OIG concluded that OCSD is able to avoid the requirement for allowing detainees to appeal housing decisions. We also concluded that, as a result, OCSD staff can move detainees at will without technically violating ICE detention standards, and detainees are stripped of their right to appeal housing decisions, which should be based on their classification level.

**OCSD's More Restrictive Disciplinary Segregation Violates ICE Detention Standards**

OCSD is violating ICE detention standards for disciplinary segregation. Detainees at TLF are placed in disciplinary segregation in a special management unit as punishment for violations of facility rules. According to OCSD staff and the OCSD-provided detainee handbook, disciplinary segregation at TLF means a person is isolated for 24 hours a day in a cell with no access to visitors, recreation, or group religious services. The detainees are released briefly every other day to shower. In contrast, ICE detention standards require that detainees placed in disciplinary segregation receive a minimum of 1 hour of recreation five times per week, opportunities for general visitation, religious guidance, and limited access to telephones and reading material. However, through observation and interviews, we determined that detainees are not allowed any recreation time, visitation, religious guidance, or telephone access. They were permitted to access one book from the library for the duration of their stay in solitary, lasting up to 30 days.

**ICE Does Not Track Detainee Grievances**

We identified problems with processes for filing both written and oral grievances with ICE and OCSD. Detention standards require facilities to have a procedure for formal grievances to ensure detainees are being treated fairly. Detainees may file grievances related to the conditions of confinement, including medical care, staff misconduct, food, telephones, visiting procedures, and disability discrimination. TLF has two grievance processes, one overseen by ICE and one by OCSD. Detainees wishing to file a written grievance with ICE fill out an ICE form and place it in ICE's box in their living area, which is picked up by a contractor daily. Detainees wishing to file a written grievance

with OCSD fill out a different form, which is placed in a different box and is picked up by supervising deputies after each shift.

Through interviews with the ICE Grievance Officer we identified the following problems with the ICE grievance process:

- ICE does not track written grievances from detainees in the facility to ensure the grievances are received, resolved, and that detainees receive a response. Grievances are maintained in a database owned by a private contractor, and the ICE Grievance Officer said ICE does not have access to this database.
- ICE personnel do not document or track oral grievances from detainees, and detainees do not receive a documented response.
- Detainees said they were not given the opportunity to appeal their grievances with ICE.
- When ICE receives a written grievance that OCSD must address, ICE forwards the grievance to OCSD or the medical staff for response. However, after forwarding these grievances, ICE does not track them to ensure they are resolved and that detainees receive a response.

Through interviews with OCSD officials and detainees, as well as document review, we identified the following problems with the OCSD grievance process:

- ICE does not track these grievances or have visibility into these grievances filed with OCSD to ensure they are resolved and detainees receive a response.
- OCSD sends ICE an email summarizing the grievance received and the resolution, but ICE personnel have no assurance they have been notified of all grievances or that all grievances have been fully resolved. We reviewed some of these emails and confirmed they did not include full details of detainees' grievances, a description of the resolution, or confirmation that the detainee had been notified about the resolution.
- Detainees said they were not given the opportunity to appeal grievances. We reviewed all 46 detainee grievances filed with OCSD in 2016, and found that there were no documented appeals.

**Recommendation 2**: We recommend that ICE undertake a full review and inspection of the Theo Lacy Facility and the Orange County Sherriff's Department's management of the facility to ensure compliance with ICE's 2008 *Performance-Based National Detention Standards.*

**ICE Response**: ICE concurs. ICE reported to us that the TLF is inspected yearly by ICE's contract inspector, the Nakamoto Group, and is scheduled for

its next full inspection to ensure compliance with the 2008 PBNDS during the week of October 23, 2017. In the interim, TLF will undergo an inspection by the ICE Office of Detention Oversight within the Office of Professional Responsibility, beginning February 7, 2017. At the end of the inspection, the Office of Detention Oversight will conduct an onsite out-briefing of facility staff and local field office management regarding any deficiencies identified during the review, followed by an official report of findings to ICE leadership. The Los Angeles Field Office (LAFO) will work with the facility to put in place any necessary corrective action plans, should deficiencies be identified. Estimated completion date: November 2017

**OIG Analysis**: ICE's response to this recommendation addresses the intent of the recommendation. In ICE's corrective actions, we will look specifically at the handling and management of grievances and at the segregation processes used at TLF. This recommendation is resolved and will remain open until ICE provides evidence that it is in full compliance with the 2008 PBNDS, based on the results of an independent contractor's full inspection and Office of Detention Oversight inspection. Once completed, ICE should provide a copy of the completed inspections identifying compliance with the standards.

**Recommendation 3**: We recommend that ICE develop a comprehensive oversight plan for the Theo Lacy Facility to ensure the Orange County Sherriff's Department's future compliance with both the intent and the implementation of ICE's 2008 *Performance-Based National Detention Standards*.

**ICE Response**: ICE concurs. ICE reported that it recently instituted a group meeting at TLF for onsite ICE staff and facility leadership, including food service managers, for the purpose of discussing facility compliance issues and other areas of concern. In addition, the group has developed a facility-specific form that will be used to document routine and recurring inspections of the food service areas and food-related processes at the facility.

According to ICE, its Detention Standards Compliance Officer is onsite at TLF 3 weeks per month to work with facility staff and other onsite ICE supervisory personnel to monitor facility compliance and implement any necessary corrective action. ICE will continue to monitor and evaluate whether additional oversight staff should be deployed to TLF for additional coverage.

LAFO will continue to engage with OCSD and monitor any developing issues to expeditiously remedy and correct any compliance deficiencies. In addition, LAFO management has continued to conduct independent onsite spot inspections of any notable problematic areas or areas of concern. The results of the spot inspections are immediately addressed with OCSD for any necessary

corrective action in order to ensure compliance with the 2008 PBNDS. Estimated completion date: November 2017

**OIG Analysis**: ICE's response to this recommendation addresses the intent of the recommendation. This recommendation is resolved and will remain open until ICE provides evidence it has modified its oversight of the facility to ensure the intent of the 2008 PBNDS is being met and the standards are being implemented. We will look specifically for changes in handling grievances and segregation at TLF. Corrective actions completed must include all areas of concern identified in the report, not just proper food handling. Once completed, ICE should provide a copy of its revised oversight plan to ensure ongoing monitoring of compliance at TLF.

**Scope and Methodology**

During our inspection, we interviewed the following ICE staff members: ICE Supervisory Detention and Deportation Officer, Orange County Detainee Program; ICE Assistant Field Office Director, Detention Management and Compliance; and Medical Oversight at Theo Lacy facility. We interviewed three employees of the Orange County Sheriff's Office: Orange County Administrative Manager, ICE Detention Custody Division; OCSD Classification Deputy, ICE Compliance; and Lieutenant, ICE Compliance. We also interviewed five detainees.

As part of our inspection we toured the following areas of the facility:

- General medical unit for detainees housed in barracks-style housing
- Medical modular housing detainees who require more frequent medical assistance
- Kitchen, including food preparation, food storage, and equipment cleaning areas, intake/out-processing area
- Special Management Unit (commonly known as solitary confinement)
- Modular housing units, including individual cells, common showers, and medical units within modules
- Barracks-style housing
- Control room

During the unannounced inspection, we interviewed ICE and OCSD staff from the facility and five detainees. We reviewed documentation from a previous ICE inspection and documentation of grievances.

We used ICE's 2008 PBNDS to conduct our inspection, as these are the standards the facility reported currently operating under. These standards, which were developed in coordination with component stakeholders, prescribe

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the expected outcomes of each standard and the expected practices required to achieve them. ICE detention standards were also designed to improve safety, security, and conditions of confinement for detainees.

*www.oig.dhs.gov* 13 OIG-17-43-MA

*Office of the Chief Financial Officer*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration
and Customs
Enforcement

January 13, 2017

MEMORANDUM FOR: John Roth
Inspector General
Office of the Inspector General

FROM: Jonathan Carver
Chief Financial Officer

SUBJECT: Management Response for "Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange California", dated January 6, 2017.

U.S. Immigration and Customs Enforcement's (ICE) wishes to express our appreciation for your staff's work on the referenced Management Alert.

On January 6, 2017, the Department of Homeland Security, Office of Inspector General (OIG), issued a draft management alert titled ***"Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California"***, OIG Report 17-XX-MA. Following an unannounced inspection, OIG concluded that conditions at the Theo Lacy Facility (TLF) posed health risks and violated ICE's 2008 Performance Based National Detention Standards (PBNDS).

Specifically, OIG's concerns centered on conditions such as food handling, serving potentially spoiled meat at TLF, and other unsatisfactory conditions. The inspectors found some "high-risk" detainees were housed in less restrictive barracks-style housing while some "low-risk" detainees were in more restrictive housing modules. The inspectors determined that there was no adequate documentation for housing decisions.

Finally, the report emphasized the fact that Orange County Sheriff's Department's (OCSD) more restrictive disciplinary segregation violates ICE's detention standards. Also, neither ICE nor OCSD properly documents grievances from detainees to ensure resolution, notification of resolution, and opportunities to appeal.

ICE concurs with each of the three recommendations made in the Management Alert.

www.ice.gov

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Management Response "Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange California"
Page 2

***Recommendation 1: Ensure OCSD follows U.S. Department of Agriculture's safe food handling guidelines to prevent health risks to detainees at TLF and other detention facilities that receive food from TLF.***

***Response 1***: ICE concurs. OCSD follows the California Department of Corrections and Rehabilitation (CDCR) Title 15 for Local Detention Facilities, Section 1254, (Kitchen Facilities, Sanitation, and Food Storage. (a) Kitchen facilities, sanitation, and food preparation, service, and storage shall comply with standards set forth in Health and Safety Code, Division 104, Part 7, Chapters 1-13, Sections 113700 et seq. California Retail Food Code.) CDCR food handling guidelines follow U.S. Department of Agriculture's (USDA) methods or protocols for safe food handling. TLF has been using CDCR Title 15 food service handling guidelines prior to the contract with ICE (for over 5 years). However, USDA's methods or protocols for safe food handling are not a requirement of the ICE 2008 performance based national detention standards (PBNDS). ICE concurs that OCSD must have safe food handling practices and guidelines to prevent health risks to detainees or other individuals in their custody.

The 2008 standard on *Food Service* requires, in part, that each facility has a food service program under the direct supervision of an experienced food service administrator (FSA) who is responsible for:

Planning, controlling, directing and evaluating food service

Establishing standards of sanitation, safety and security; and

Developing specifications for the procurement of food, equipment and supplies.

TLF has a certified FSA (as well as two food service managers) and, in addition to the ICE detention standards, follows the County of Orange, California's "Health Care Agency Environmental Health Services" guidelines for food safety. OCSD facilities, including TLF, are routinely inspected by county health inspectors.

OCSD is in the process of re-competing its pre-packaged lunch meat vendor, which is expected to be posted for bids before the end of January 2017. The procurement process is projected to take approximately four months. Although the contract re-compete is part of OCSD's routine procurement process, the sack lunches that are currently being prepared at TLF will be replaced with pre-packaged box lunches with set expiration dates that will be brought in from an outside vendor.

TLF does not provide food to any other detention facility.

Estimated Completion Date: May 2017

***Recommendation 2: Undertake a full review and inspection of TLF and OCSD's management of TLF to ensure compliance with ICE's 2008 PBNDS.***

www.oig.dhs.gov 15 OIG-17-43-MA



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Management Response "Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange California"
Page 3

**Response 2:** ICE concurs. TLF is inspected yearly by the ICE's contract inspector, the Nakamoto Group, and is scheduled for its next full inspection to ensure compliance with the PBNDS 2008 standards during the week of October 23, 2017. In the interim, the TLF will undergo an inspection by the ICE Office of Detention Oversight (ODO), within the Office of Professional Responsibility (OPR), beginning February 7, 2017. At the end of the inspection, ODO will conduct an on-site out-briefing of facility staff and local field office management regarding any deficiencies identified during the review, followed by an official report of findings to ICE leadership. The Los Angeles Field Office (LAFO) will work with the facility to put in place any necessary corrective action plans, should deficiencies be identified. Estimated Completion Date: November 2017

***Recommendation 3: Develop a comprehensive oversight plan for TLF to ensure OCSD's future compliance with both the intent and the implementation of ICE's 2008 PBNDS.***

**Response:** ICE concurs. Beginning recently, a group meeting has been instituted at TLF for on-site ICE staff and facility leadership, to include food service managers, for the purpose of discussing facility compliance issues and other areas of concern. In addition, the group has developed a facility-specific form that will be used to document routine and recurring inspections of the food service areas and food-related processes at the facility. ICE's Detention Standards Compliance Officer is on site at TLF three weeks per month to work with facility staff and other on-site ICE supervisory personnel to monitor facility compliance and implement any necessary corrective action. ICE will continue to monitor and evaluate whether additional oversight staff should be deployed to the TLF for additional coverage.

LAFO will continue to engage with OCSD and monitor any developing issues to expeditiously remedy and correct any compliance deficiencies. In addition, LAFO management has continued to conduct independent onsite spot-inspections of any notable problematic or areas of concern. The results of the spot-inspections are immediately addressed with OCSD for any necessary corrective action in order to ensure compliance of ICE's 2008 PBNDS. Estimated Completion Date: November 2017

Should you have any questions, please contact Michael Moy, Senior Portfolio Manager, at (202) 732-6263.

cc: DHS GAO/OIG Liaison Office

*www.oig.dhs.gov* 16 OIG-17-43-MA

**ADDITIONAL INFORMATION AND COPIES**

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.  Follow us on Twitter at: @dhsoig.



**OIG HOTLINE**

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

       Department of Homeland Security
       Office of Inspector General, Mail Stop 0305
       Attention: Hotline
       245 Murray Drive, SW
       Washington, DC  20528-0305

# EXHIBIT L





# Advocacy Group: If You're Abused in Immigration Detention, the Government Doesn't Care

## Community Initiatives for Visiting Immigrants in Confinement (CIVIC) reports Otay Mesa Detention Center ranks in the top five facilities in the United States related to complaints of sexual and physical assault

**By Mari Payton**

Published at 5:26 PM PDT on Apr 27, 2017 | Updated at 8:23 AM PDT on Apr 28, 2017

NBC 7 Investigates' Mari Payton spoke with a young man, who claims he was abused, humiliated and violated at a local detention center.

(Published Friday, April 28, 2017)

Yordy Cancino moved to California as a child.

He graduated at the top of his high school class at Jackie Robinson High School in Los Angeles and was accepted to numerous colleges, including UCLA and UC Santa Cruz.

“My ultimate dream is to be a fashion designer,” he said with a smile.

Cancino said he couldn't afford to pay for college and as an undocumented immigrant, couldn't get financial aid. “They didn't have funding for undocumented students. Unfortunately, when I graduated in 2011, DACA wasn't present.”

Deferred Action for Childhood Arrivals (DACA) is a United States immigration policy founded in June 2012. DACA allows certain undocumented immigrants who entered the country as minors, to receive a renewable two-year period of deferred action from deportation and eligibility for a work permit.

*Read more about DACA here.*

Cancino said without another option to pay for college, he returned to Mexico.

"The risks I knew," he said. "I wasn't going to be able to come back, it's like me leaving my family behind, for me fulfill my dream."

After two years studying in Mexico City, Cancino said he wanted to return to California.

In 2014, he turned himself in at the Otay Mesa border, seeking asylum, swearing under penalty of law that he'd been beaten and stalked in Mexico. He said he was targeted because he was gay.

Cancino was held at the Otay Mesa Detention Center, a Department of Homeland Security and ICE facility managed by a private company, CoreCivic.

Cancino said he never thought he'd be harassed by the guard who was supposed to uphold order. He said that guard gave him pet names and ridiculed his sexuality.

"He was always looking at me, so I didn't even feel comfortable taking a shower," he said. "He was always approaching me in different ways I shouldn't be approached. As an officer, he should have been taking care of me, he wasn't taking care of me."

According to Cancino, he complained to the guard's supervisor but his complaints were not taken seriously or documented correctly.

"I think by not investigating each allegation, each complaint of sexual assault our government is sending a message that sexual assault of immigrants will be tolerated," said Christina Fialho, co-founder of Community Initiatives for Visiting Immigrants in Confinement (CIVIC). "These are thousands of human beings who are being sexually assaulted, raped, either because the government has been unwilling or unable to protect them or because the government has been the perpetrator of these sexual assaults."

According to CIVIC, the Department of Homeland Security Office of the Inspector General Received 1,016 complaints related to sexual abuse or assault on detainees, from May 2014 to July 2016. Details on individual cases were not disclosed, including whether the alleged perpetrators were corrections officers, or detainees themselves.

Fialho said the number of complaints is likely much higher, noting the Inspector General reported more than 33,000 allegations of a broader range of abuse from January 2010 to July 2016, including 702 complaints of coerced sexual contact, 714 complaints of physical or sexual abuse and 589 complaints of sexual harassment. Fialho said the majority of those complaints were filed against ICE and the inspector general investigated less than "1 percent" of those complaints.

"In California, there were 4,500 complaints lodged with the Inspector General, but only 45, a very small number, were investigated by OIG," she said. "With the current climate under President Trump, it is very concerning. He is planning on expanding immigration detention system by 30,000 on any given day. Right now, there are about 40,000 people in immigration detention on any given day."

On April 11, CIVIC sent a letter to homeland security demanding a thorough investigation of all complaints, including Cancino's.

*Read the letter here.*

The group said it has not received a response.

A spokeswoman with DHS, Gillian M. Christensen, told NBC 7 Investigates the department will review the letter "to determine if further action or recommendations are warranted." Christensen also noted the allegations represent a tiny percentage of the more than 2 million admissions to ICE detention facilities in the six-year period covered in the report and the agency has a "zero-tolerance policy" related to sexual abuse.

Recalling his time in custody, Cancino said, "I suffered a lot. I would cry. It was a nightmare. Mentally and physically, my family didn't know what was going on with me. You are not just a human to them you are an object ."

He spent three months at the Otay Mesa Detention Center, which CIVIC ranks the 5th highest for sexual abuse complaints, out of 211 ICE Immigration detention facilities.

Cancino now has a 5-year work visa, but his permanent status is still in question.

He knows speaking out is risky, but he said he won't stay silent, "You have to have some type of respect."

Lauren Mack, a spokeswoman for ICE in San Diego would not provide an interview to NBC 7 Investigates for this story. Repeated emails and phone calls to CoreCivic, the company that manages the Otay Mesa facility, were not returned.

Fialho said she wants Congress to create a bipartisan commission to investigate sexual assault complaints in ICE immigration facilities. Her group also wants the Department of Homeland Security to publish details about all documented sexual assaults and investigations.

If that's not done, Fialho said her group may sue DHS, to force changes.

**Find this article at:**
https://www.nbcsandiego.com/news/local/Advocacy-Group-If-Youre-Abused-in-Immigration-Detention-the-Government-Doesnt-Care-420666314.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

LOCAL

# High levels of lead found in county correctional facility water

BY PHILLIP REESE
*preese@sacbee.com*

March 04, 2017 03:49 PM
Updated March 06, 2017 10:05 AM

Water at the Rio Cosumnes Correctional Center in southern Sacramento County has tested positive for high levels of lead and copper, but there is no immediate health risk, county officials said Saturday.

"Out of an abundance of caution," county public health officials have advised the Sacramento County Sheriff's Department to provide drinking water that does not pass through the center's existing plumbing, according to a county statement.

"Public Health is working closely with Environmental Management, the Sheriff's Department and Water Resources to ensure the health and safety of inmates and staff," said Dr. Olivia Kasirye, Sacramento County public health officer. "Though some test sites exceeded the action levels, we consider this low risk."

U.S. Immigration and Customs Enforcement officials transferred all 134 immigration detainees held at RCCC to a detention facility near Los Angeles because of the water issues, said Virginia Kice, an ICE spokeswoman. ICE contracts with the Sacramento County Sheriff's Department to house immigration detainees.

**Breaking News**

Be the first to know when big news breaks

Enter Email Address

Close

I'm not a robot

reCAPTCHA
Privacy - Terms

SIGN UP

"ICE anticipates being able to return the detainees to the Sacramento-area center soon," Kice said in an email. "In the meantime, ICE … has begun notifying detainees' private attorneys about the transfers."

Children and pregnant women are most at risk for lead poisoning, which can delay physical and mental development of children. But Rio Cosumnes does not house children or pregnant inmates.

*Phillip Reese: 916-321-1137, @PhillipHReese*

COMMENTS

By NextAdvisor

SPONSORED CONTENT

An Incredible $200 Intro Bonus Just For Using This Card

A leading bank just upped the intro bonus on its top cash back card to an insane $200. Plus get unlimited 1.5% cash back, no annual fee and more

Close



Customer Service

eEdition

Vacation Hold

Pay Your Bill

Rewards

**SITE INFORMATION**

About Us

Contact Us

Newsletters

News in Education

Photo Store

**SOCIAL, MOBILE & MORE**

Text News Alerts

Mobile & Apps

Facebook

Twitter

YouTube

**ADVERTISING**

Place a Classified Ad

Place a Legal Notice

Place a Digital Ad

Place a Newspaper Ad

Shopping

**MORE**

Copyright

Commenting Policy

Privacy Policy

Terms of Service



TOPICS
SEARCH
SUBSCRIBE
4 weeks for only 99¢
LOG
TRIAL OFFER | 4 weeks for 99¢
Fewer people are visiting Las Vegas. One insider thinks hotel resort and parking fees are to
Christopher Nolan restores Kubrick sci-fi masterpiece '2001: A Space Odyssey' the old-
Electronics-recycling innovator is going to prison for trying to extend computers' lives
More than 800 West Hollywood buildings could collapse in a big quake
ADVERTISEMENT
AdChoices

L.A. NOW

# Mexican man's widow sues, says immigration detention facility staff ignored pleas for help

By KRISTINA DAVIS MAR 24, 2017 | 7:30 PM | SAN DIEGO

ADVERTISEMENT

ENDLESS POOLS
THE DREAM OF
SWIMMING AT HOME
STARTS HERE
YEAR-ROUND
INDOORS OR OUT
REQUEST A FREE IDEA KIT

Detainees at the Otay Mesa Detention Center wait in the medical section. (Nelvin C. Cepeda / San Diego Union-Tribune) (Nelvin C. Cepeda / San Diego Union-Tribune)

The widow of a Mexican man who crossed into the U.S. illegally in the trunk of a car is suing the U.S. government, alleging that staff at a detention facility in Otay Mesa repeatedly ignored his pleas for medical care, causing him to die from complications of pneumonia weeks later.

The lawsuit, filed in San Diego federal court, is among a string of cases alleging negligence when it comes to the medical problems of immigrants held at detention centers across the country. A 2007 lawsuit filed by the American Civil Liberties Union, which was settled in 2010, addressed similar issues in Otay Mesa.

"If these facts in the complaint are true, then this would violate the core principles not only of the Constitution but of the settlement," said David Loy, legal director for the ACLU of San Diego and Imperial Counties. The prior lawsuit "addressed precisely this kind of problem of people begging for care and not getting care."

LATEST L.A. NOW

LA TIMES
Golden State Killer suspect must provide new DNA samples and fingerprints, judge rules
14m
LA TIMES
Costa Mesa joins Orange County rebellion against California's

TOPICS SEARCH
SUBSCRIBE
4 weeks for only 99¢
LOG
TRIAL OFFER | 4 weeks for 99¢
Fewer people are visiting Las Vegas. One insider thinks hotel resort and parking fees are to
Christopher Nolan restores Kubrick sci-fi masterpiece '2001: A Space Odyssey' the old-
Electronics-recycling innovator is going to prison for trying to extend computers' lives
More than 800 West Hollywood buildings could collapse in a big quake

Most of those in the Otay Mesa Detention Center are being detained by U.S. Immigration and Customs Enforcement. The facility also houses criminal detainees and material witnesses for the U.S. Marshals Service.

The lawsuit names the federal government, as well as CoreCivic — the private company contracted to run the Otay Mesa center — and a guard identified as C.O. Langdon.

Healthcare at the facility is provided by ICE's health service corps and the federal Public Health Service, according to the lawsuit. A San Diego ICE spokeswoman declined to comment on the case last week, saying she didn't have enough information. A CoreCivic spokesman in Tennessee, where the company is headquartered, said officials had not yet reviewed the lawsuit.

According to court records, Gerardo Cruz-Sanchez, 32, tried to cross into the U.S. in the trunk of a car on Feb. 4, 2016, at the Otay Mesa Port of Entry. The driver, Juan Carlos Ortega-Gonzalez, had presented someone else's U.S. passport to the Customs and Border Protection officer. Cruz-Sanchez and two other immigrants in the U.S. illegally were then found in the trunk.

Cruz-Sanchez wasn't charged with a crime but was held as a material witness in the case against the smuggler, agreeing to testify against him. Cruz-Sanchez was granted bail — $15,000 with a 10% cash deposit — but was unable to pay so he remained detained, according to court records.

Cruz-Sanchez was healthy when he was arrested but contracted pneumonia later, according to the complaint.

"He would be alive today if authorities had honored their legal and moral duty to care for their own witness," according to the lawsuit.

The illness began with flulike symptoms, and Cruz-Sanchez's requests for medical attention were rebuffed, the complaint said. He then started coughing up blood, "saturating his clothing and bed sheets." He pleaded with Langdon and medical staff members for intervention but received none, the suit said. His condition deteriorated so that he could not talk, move or swallow food. He also suffered from respiratory distress and wheezing.

His cellmate, Alejandro Chavez, called the Mexican consulate 20 to 30 times asking for assistance, and on Feb. 22 a Spanish interpreter visited Cruz-Sanchez. It was unclear from the lawsuit if the interpreter tried to take action.

The cellmate repeatedly begged Langdon — a Spanish-speaking officer — to help Cruz-Sanchez, but Langdon mocked him, told the two to stop "complaining" and told Cruz-Sanchez to "man up" and "stop being a chicken," the lawsuit said.

On Feb. 26, Cruz-Sanchez was taken to the emergency room at Scripps Mercy Hospital in Chula Vista, where he died three days later.

The lawsuit alleges Cruz-Sanchez was never examined by a doctor while in custody. His widow, Paula Garcia Rivera, requested her husband's medical records from the detention center but was ignored, the complaint said.

The driver who had brought Cruz-Sanchez across the border pleaded guilty to human smuggling and was sentenced to time served, which was about three months.

kristina.davis@sduniontribune.com

LA TIMES
About a third of caravan migrants enter U.S., but 'we won't be happy until the last one of us gets through'
2h

LA TIMES
More than 800 West Hollywood buildings could collapse in a big quake
4h

LA TIMES
Arrest of Golden State Killer suspect could unlock other cold case mysteries
5h

ADVERTISEMENT



THE CALIFORNIA REPORT

# Hunger Strike at California's Biggest Immigration Detention Center

A guard escorts an immigrant detainee from his 'segregation cell' back into the general population at the Adelanto Detention Facility on November 15, 2013 in Adelanto, California. **(John Moore/Getty Images)**

Activists say that more than 30 people began a hunger strike at the Adelanto Detention Facility on Tuesday, seeking better medical care and release pending their immigration court dates.

In the last five years, six people have died while being detained -- three of them since March 22 -- at the San Bernardino County facility, the largest immigration detention center in California. It can hold about 1,900 detainees

and was almost at capacity in March, according to data from Immigration and Customs Enforcement.

Detainees say this is the fourth hunger strike they've conducted at the facility since June 12. During breakfast that morning nine men, mostly asylum-seekers from El Salvador, linked arms and refused to return to their cells until they could speak to guards about their concerns. Guards used pepper spray and physically removed the men to solitary cells, according to Tristan Call, a spokesman for the detainees, and ICE spokeswoman Virginia Kice.

Then they began the hunger strike.

NSORED BY

"We are not anyone's toys," said Isaac Lopez Castillo, a 27-year-old from El Salvador, in a Facebook video about the strike.

The men filed a complaint with the Department of Homeland Security's Office for Civil Rights and Civil Liberties alleging that they were beaten and denied medical care and access to their attorneys.

GEO Group, the private prison company that owns and operates the facility, is investigating the incident, and ICE officials will review that probe, according to Kice.

"The claim the men involved in this disturbance were beaten is a gross and regrettable exaggeration," wrote Kice in an email.

On June 14, a group of nearly 30 women refused to eat for about 24 hours -- asking for medical care, "basic respect" from jail guards, lower bond rates and to be reunited with their families. Call said that they ended the strike after many of the women received medical care on June 15.

Then, on June 22, eight of the same men from the June 12 action began a new hunger strike, after one was deported. Call said that detainees throughout the facility have refused food periodically since they began striking on June 12.

**Immigration Detention in California**

As State Lawmakers Look to Change Immigration Policy, What Will Happen to Adelanto?

What Happens to Immigrants Detained by ICE? A Cartoon Explainer

Trump Wants to Detain More Immigrants. He Could -- With California's Help

Kice says that the agency will implement hunger strike protocols, including medical supervision, if detainees refuse food for more than 72 hours.

## Ongoing Problems with Medical Care

While the city of Adelanto holds the contract with ICE to detain immigrants in the facility, the city also has a contract with GEO Group to run it. Early last year, GEO Group stopped providing its own medical care and subcontracted with Correct Care Solutions, keeping on many of the same staff.

ICE's own investigators found problems at the facility, including health care delays, poor record keeping and failures to properly report sexual assaults.

In a federal investigation into one of the California deaths, inspectors noted that the person who died had waited more than a year to see a specialist, that the high turnover of medical staff led to inadequate care and that a dearth of laboratory services led to delays in treatment.

Independent medical experts for Human Rights Watch analyzing ICE's investigation found that the man probably suffered from symptoms of cancer for two years.

## Long Stays in Detention

Detainees are also requesting to be released on their own recognizance, on bond or to receive a monitoring device.

Immigrant detainees, including asylum-seekers, can wait weeks, months and even years for their day in immigration court. There are currently 326 immigration judges nationwide — and they're handling nearly 600,000 pending cases, according to the Department of Justice and data from Syracuse University's TRAC research

center. Even if the immigration courts didn't accept a single additional case, it would take longer than two years to go through the backlog, according to TRAC.

Both ICE and immigration judges can release people. ICE officers make an initial determination about whether people should be detained while their immigration cases are pending.

"ICE makes such determinations on an individual basis taking into account all facets of the person's situation, including the individual's immigration history and criminal record, if applicable. Likewise, the agency also considers an alien's family ties, any humanitarian issues that may be involved, and whether the person is a potential flight risk," wrote Kice.

Detainees who have been convicted of criminal activity are mandatorily held in detention.

Currently, the U.S. Supreme Court is set to rehear a case that could require immigration courts to conduct bond hearings every six months. The named plaintiff in the case, Alejandro Rodriguez, spent three years in ICE detention without a hearing for his release.

Court records analyzed by TRAC showed that at least half -- and in some years upward of two-thirds -- of people are held in ICE detention while the DHS begins court proceedings to deport them. The median immigration bond was set at $8,000 in fiscal year 2016. About one in five people granted bond stayed in detention, presumably because they can't afford it.

In a statement during the first hunger strike, the men wrote that they cannot afford bail:

"We are from El Salvador, Honduras, and Guatemala. We ask for your attention, because Adelanto is one of the prisons which exists for those who are seeking political asylum, and in reality our records are clean, none of us have prior criminal records. The bail is set impossibly high, and it's a humiliating joke because we are poor, we don't have that kind of money."

COPYRIGHT © 2018 KQED INC. ALL RIGHTS RESERVED. | TERMS OF SERVICE | PRIVACY POLICY | CONTACT US

# CERTIFICATE OF SERVICE

Case Name: The United States of America v. The State of California, et al.    No. **2:18-cv-00490-JAM-KJN**

I hereby certify that on May 4, 2018, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 4, 2018, at Sacramento, California.

| Tursun Bier | */s/ Tursun Bier* |
| --- | --- |
| Declarant | Signature |

LA2018500720
13073765.docx