ABIGAIL K. COURSOLLE (Bar # 266646)
coursolle@healthlaw.org
*Counsel of Record*
MARTHA JANE PERKINS (Bar # 104784)
perkins@healthlaw.org
SARAH GRUSIN*
grusin@healthlaw.org
JOSEPH MCLEAN*
mclean@healthlaw.org
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Blvd, Suite 750
Los Angeles, CA 90010
Telephone: (310) 204-6010
Facsimile: (213) 368-0774
*Attorneys for Amici Curiae*
NHeLP et al.

*Not admitted in this jurisdiction

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>　　　　　　　　Plaintiff,<br>v.<br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br>　　　　　　　　Defendants. | Case No: 2:18-cv-00490-JAM-KJN<br><br>BRIEF OF *AMICI CURIAE* NHELP *ET AL.* IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION<br><br>Hearing Date: June 5, 2018<br><br>Time: 1:30 p.m.<br><br>Location: Courtroom 6, 14th floor<br>United States District Court,<br>Robert T. Matsui Courthouse<br>501 I Street<br>Sacramento, CA 95814 |

# CORPORATE DISCLOSURE STATEMENT

The undersigned counsel certifies that the *amici curiae* National Health Law Program (NHeLP); African Services Committee; American Federation of Teachers, AFL-CIO; Asian Law Alliance; Association of Reproductive Health Professionals (ARHP); California Center for Rural Policy; California Food Policy Advocates; California National Organization for Women; California Pan-Ethnic Health Network; Center for Law and Social Policy (CLASP); Community Catalyst; Congregation of Our Lady of Charity of the Good Shepherd, US Provinces; Disability Rights Education and Defense Fund (DREDF); Disability Rights Legal Center; Equality California; Human Impact Partners; Illinois Coalition for Immigrant and Refugee Rights; In Our Own Voice: National Black Women's Reproductive Justice Agenda; Legal Aid Society of San Mateo County; Legal Services of Southern Piedmont; Maternal and Child Health Access; Medical Students for Choice; National Asian Pacific American Families Against Substance Abuse (NAPAFASA); National Center for Law and Economic Justice; National Hispanic Medical Association; National Institute for Reproductive Health; National Latina Institute for Reproductive Health; National Network of Abortion Funds; National Organization for Women Foundation; Nevada County Citizens for Choice; Northwest Health Law Advocates (NoHLA); Physicians for Reproductive Health; Planned Parenthood Affiliates of California; Positive Women's Network – USA; Public Justice Center; Sargent Shriver National Center on Poverty Law; Service Employees International Union (SEIU); The National Viral Hepatitis Roundtable; The New York Immigration Coalition; The Praxis Project; Western Center on Law & Poverty; Young Women United; and YWCA San Francisco & Marin (collectively, "NHeLP *et al.*"), are not subsidiaries of any other corporation and no publicly held corporation owns 10 percent or more of any *amici curiae* organization's stock.

/s/ Abigail K. Coursolle
Abigail K. Coursolle

STATEMENT OF INTEREST[1]

The *amici curiae* are National Health Law Program (NHeLP); African Services Committee; American Federation of Teachers, AFL-CIO; Asian Law Alliance; Association of Reproductive Health Professionals (ARHP); California Center for Rural Policy; California Food Policy Advocates; California National Organization for Women; California Pan-Ethnic Health Network; Center for Law and Social Policy (CLASP); Community Catalyst; Congregation of Our Lady of Charity of the Good Shepherd, US Provinces; Disability Rights Education and Defense Fund (DREDF); Disability Rights Legal Center; Equality California; Human Impact Partners; Illinois Coalition for Immigrant and Refugee Rights; In Our Own Voice: National Black Women's Reproductive Justice Agenda; Legal Aid Society of San Mateo County; Legal Services of Southern Piedmont; Maternal and Child Health Access; Medical Students for Choice; National Asian Pacific American Families Against Substance Abuse (NAPAFASA); National Center for Law and Economic Justice; National Hispanic Medical Association; National Institute for Reproductive Health; National Latina Institute for Reproductive Health; National Network of Abortion Funds; National Organization for Women Foundation; Nevada County Citizens for Choice; Northwest Health Law Advocates (NoHLA); Physicians for Reproductive Health; Planned Parenthood Affiliates of California; Positive Women's Network – USA; Public Justice Center; Sargent Shriver National Center on Poverty Law; Service Employees International Union (SEIU); The National Viral Hepatitis Roundtable; The New York Immigration Coalition; The Praxis Project; Western Center on Law & Poverty; Young Women United; and YWCA San Francisco & Marin (collectively, "NHeLP *et al.*").

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money to fund preparation or submission of this brief. No person, other than *amici* and *amici*'s counsel, contributed money to fund preparation or submission of this brief.

While each *amicus* has particular interests, together they share the mission of advancing public health and removing barriers to health care for all people, including immigrants and their families. *Amici* NHeLP *et al.* work on behalf of low-income populations and immigrants in California and throughout the country to remove barriers to health care using various tools such as direct legal and health services, policy advocacy, education, and litigation. *Amici* submit this brief to provide the Court with additional information about the important public health protections that SB 54, AB 450, and AB 103 provide to California residents.

*Amici* submit this brief pursuant to the Court's March 27 and March 29, 2018 Orders (ECF Nos. 37, 41). *Amici* NHeLP *et al.* obtained consent of both parties to file an amicus brief in this matter. Under Federal Rule of Appellate Procedure (FRAP) 29(a)(2) and this court's order of March 27, 2018, adopting FRAP 29(a), no motion for leave to file is required.

## INTRODUCTION^

Fear of detention and deportation is a nearly ubiquitous experience for immigrants and their families living in the United States.[2] Immigrants and their families are highly sensitive to changes in immigration policies, and awareness that state and local entities cooperate with

---

^ The authors of this brief thank Brian Brooks of the National Health Law Program for his invaluable research assistance.

[2] *See, e.g.*, Alexia Elejalde-Ruiz, *Fear, anxiety, apprehension: Immigrants fear doctor visits could leave them vulnerable to deportation*, Chicago Trib., Feb. 22, 2018, http://www.chicagotribune.com/business/ct-biz-immigration-fears-hurt-health-care-access-0225-story.html; Alameda Cty. Pub. Health Dep't, *Immigration and Public Health* 3-5 (2017), http://www.acphd.org/media/470384/immigration.pdf; Lilli Mann et al., *Reducing the Impact of Immigration Enforcement Policies to Ensure the Health of North Carolinians*, 77 N. Carolina Med. J. 240, 240-41 (2016), http://www.ncmedicaljournal.com/content/77/4/240.full; Consuelo Arbona et al., *Acculturative Stress Among Documented and Undocumented Latino Immigrants in the United States*, 32 Hisp. J. Behav. Sci. 362, *13 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4254683/pdf/nihms609057.pdf.

federal immigration officials greatly exacerbates these fears.[3] The negative consequences of living with such chronic stress, anxiety, and fear on the health and well-being of immigrants and their families have been well documented.[4]

In California, where 27 percent of the population are immigrants, changes in immigration enforcement policies, therefore, have sweeping public health consequences.[5] The consequences are not limited to the immigrant population. More than 4.6 million California residents (approximately 12 percent of the total population) live with at least one undocumented family member.[6] The numbers are especially high for children: Approximately 2 million (close to one in five) live with at least one undocumented family member, and nearly half of all children in the

---

[3] *See, e.g.*, Elisabeth Poorman, *Houston Lesson: Anti-Immigrant Moves Put Public Health at Greater Risk*, WBUR CommonHealth Blog (Sep. 7, 2017), http://www.wbur.org/commonhealth/2017/09/07/houston-immigrant-public-health; Alameda Cty. Pub. Health Dep't, *supra*, note 2, at 3-5; Mark L. Hatzenbuehler et al., *Immigration Policies and Mental Health Morbidity Among Latinos: A State-Level Analysis* 174 J. Soc. Sci. Med. 169, *4, *9-10 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5258771/pdf/nihms840324.pdf; Russell B. Toomey et al., *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-Origin Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28, S31 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3924594/pdf/AJPH.2013.301655.pdf; Angela S. Garcia & David G. Keyes, Ctr. Am. Prog., *Life as an Undocumented Immigrant* 2-3 (2012), https://cdn.americanprogress.org/wp-content/uploads/issues/2012/03/pdf/life_as_undocumented.pdf; U.S. Dep't Health & Hum. Servs., *Barriers to Immigrants' Access to Health and Human Services Programs* 12 (2012), https://aspe.hhs.gov/system/files/pdf/76471/rb.pdf; Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA* 73 Soc. Sci. Med. 586, *7 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3159749/pdf/nihms308839.pdf; Tara Watson, Nat'l Bureau of Econ. Res., *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation* 16 (2010), http://www.nber.org/papers/w16278.
[4] *See infra*, Section II.
[5] *See* U.S. Census Bureau, Quick Facts: California, https://www.census.gov/quickfacts/CA; Hans Johnson & Sergio Sanchez, *Public Pol'y Inst. Cal.*, *Immigrants in California* 1 (2018), http://www.ppic.org/wp-content/uploads/jtf-immigrants-in-california.pdf.
[6] *See* Silva Mathema, Ctr. Am. Prog., *State-by-State Estimates of the Family Members of Unauthorized Immigrants* (2017) (California "Total Population"), https://www.americanprogress.org/issues/immigration/news/2017/03/16/427868/state-state-estimates-family-members-unauthorized-immigrants; Am. Imm. Council, *Immigrants in California* 1 (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_california.pdf.

state (roughly 4.5 million) live in immigrant families.[7] The vast majority of these children are U.S. citizens.[8] But they too suffer health consequences from hostile immigration policies.

California has a strong interest in protecting the health and well-being of all of its residents, and that interest tips strongly against an injunction in this case. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) ("[A] State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents."); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 613, 655-56 (E.D. Pa. 2017) (noting that public health goals of city policies supported enjoining DOJ policy barring such "sanctuary city" policies for grant recipients). These widespread and evidence-based harms to a huge swath of California residents are not counterbalanced by any of the purported, and speculative, harms that the federal government asserts. In short, the balance of harms and the public interest both tip strongly in favor of California, and *amici* urge the Court to deny the Plaintiff's motion for a preliminary injunction.

I. Enjoining SB 54 Will Increase Fear of Interactions with Local Law Enforcement, Causing Immigrants to Forgo Treatment, Thereby Jeopardizing the Health of All Californians.

Coordination between local law enforcement and federal immigration authorities means that even low-stakes interactions with police—like traffic stops—can result in deportation.[9] When cooperation is prevalent, immigrants are reluctant to drive, causing them to delay or forgo

---

[7] *See* Mathema, *supra*, note 6 (California "Total Population"); Am. Imm. Council, *supra*, note 6 at 1.
[8] Mathema, *supra*, note 6 (compare California's "Total Population" number of children with at least one unauthorized family member (1,967,756), with California's "U.S.-born Population," number of children with at least one unauthorized family member (1,658,456)).
[9] *E.g.*, Urban Institute, *State Immigration Enforcement Policies: How They Impact Low-Income Households* 2 (2017), https://www.urban.org/sites/default/files/publication/90091/state-immigration-enforcement-policies.pdf.

all kinds of health appointments, including "regular doctor visits, diabetes education, vaccines, prenatal care, HIV education, and procurement of medications."[10] This problem has been well documented nationally,[11] in surveys of providers,[12] and locally in immigrant communities in Massachusetts,[13] North Carolina,[14] and Arizona.[15] Because deportation is such a serious consequence, some immigrant communities become extremely cautious about going out in public, even where there is no risk of deportation.[16] Some immigrants have stated that the fear of deportation means they would not seek care or drive even to obtain necessary health care.[17]

Immigrants' reluctance to seek treatment has a negative impact on their personal health. But it also has consequences for the health of Californians as a whole. Infectious diseases pay no regard to immigration status. The prevention plan for many highly contagious diseases relies on the concept of "population immunity"—if enough of the population is vaccinated, the entire population becomes protected. However, if not enough people receive the vaccine, the community is at risk. For example, the population is at risk of a measles outbreak if the vaccine reaches less than 92 to 95 percent of the population.[18] Similarly, for HIV, prevention and

---

[10] Lisa J. Hardy et al., *A Call for Further Research on the Impact of State-Level Immigration Policies on Public Health*, 102 Am. J. of Public Health 1250, 1252 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3477996/pdf/AJPH.2011.300541.pdf.
[11] *Id.*
[12] Karen Hacker et al., *Provider's Perspectives on the Impact of Immigration and Customs Enforcement (ICE) Activity on Immigrant Health*, 23 J. Health Care Poor & Underserved 651, *5-6 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3753075.
[13] Hacker et al., *supra* note 3, at *3.
[14] Mann et al., *supra* note 2, at 240-41 (2016), *available at* http://www.ncmedicaljournal.com/content/77/4/240.full; Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 322-36 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4318326/.
[15] Hardy et al., *supra* note 10, at 1251.
[16] Hacker et al, *supra* note 3, at *7.
[17] Mann, *supra* note 2, at 241.
[18] Kimberly Gittings & Kelly L. Matson, *Establishing Herd Immunity Against Ebola Through Vaccination*, 34 Vaccine 2664, 2664 (2016), attached as Exhibit A.

adherence to regular treatment are important not just for an individual's health, but for the population as a whole.[19]

The cure for these avoidance behaviors is a broad, public assurance to immigrants that trivial interactions with law enforcement will not lead to detention or deportation.[20] Sanctuary cities have used similar policies to reduce health disparities between non-citizens and citizens.[21] They have also created an understanding among undocumented immigrants that it is safe to take care of their health.[22] However, the efforts of sanctuary cities are "imperfect substitutes," and eventually run up against barriers created by state and federal law.[23]

---

[19] World Health Organization, *Consolidated Guidelines on the Use of Antiretroviral Drugs for Treating and Preventing HIV Infection* 255 (2d ed. 2016), https://www.ncbi.nlm.nih.gov/books/NBK374294; Jared M. Baeten, *Amplifying the Population Health Benefits of PrEP for HIV Prevention*, 217 J. of Infectious Diseases 1509, 1510 (2018), attached as Exhibit B ("HIV prevention is about a best prevention plan for an individual, but must also be about prevention for … the population more generally.").

[20] Much of the research cited in this brief recommends such a solution, *see* Hacker et al., *supra* note 3, at *10; Mann et al., *supra* note 2, at 244. A global survey of anti-immigrant laws reached the same conclusion: "[I]mmigration policy should recognize the public health risks associated with undocumented persons not receiving medical care [and] should encourage all residents to obtain clinically effective vaccinations and screening for prevalent infectious diseases." Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minority Health 947, *13 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4074451/.

[21] A. Elizabeth Iten et al., *Undocumented Immigration Status and Diabetes Care Among Mexican Immigrants in Two Immigration "Sanctuary" Areas*, 16 J. Immigr. Minority Health 229, 232-34 (2014), attached as Exhibit C (finding that in San Francisco and Chicago, two self-designated sanctuary cities, there was no significant difference in clinical outcomes of diabetic Mexican-Americans, whether they were undocumented immigrants, documented immigrants, or citizens).

[22] Sheyada M. Aboii, *Undocumented Immigrants and the Inclusive Health Policies of Sanctuary Cities*, Harv. Pub. Health Rev, Apr. 2016, http://harvardpublichealthreview.org/undocumented-immigrants-and-the-inclusive-health-policies-of-sanctuary-cities/ (finding based on dozens of interviews at an immigrant shelter in a sanctuary city in Texas: "[T]he self-understanding of undocumented immigrants is impacted by the tone of public policy and rhetoric addressing their presence. Whether they view themselves to be members; to be worthy of due consideration; to have a claim to the community or its resources; or to have a say regarding their own health and well-being is influenced by the character of their surroundings.").

[23] Helen B. Marrow, *The Power Of Local Autonomy: Expanding Health Care To Unauthorized Immigrants In San Francisco*, 35 Ethnic & Racial Studies 72, 86 (2012), attached as Exhibit D (noting that providers' efforts to treat the public regardless of immigration status would "break down" when forced to deal directly with "a more restrictive federal and state policy climate").

SB 54 represents an important effort by California to mimic the success of these sanctuary cities. By declaring that information about individuals held in local or state custody will not be turned over to federal immigration enforcement, California is proclaiming to immigrants that a routine traffic stop is not likely to end in deportation. As seen in sanctuary cities, this makes immigrants feel safe to participate in the community, including to access health services. The public health of Californians, and the public interest, therefore favors sustaining the existing law.

## II. The Balance of Harms and Public Interest Counsel the Court Against Enjoining AB 450, Since it Protects California Residents from Chronic Fear of Deportation and Employer Raids.

AB 450, which protects employees in the workplace and vindicates the Fourth Amendment rights of employers by requiring judicial warrants, likewise helps immigrants feel safe in their daily lives. The law was enacted to "assert[] the state's right and obligation to protect all California residents who call California home, raise families here, and work and contribute mightily to the state's economic prosperity and rich cultural tapestry."[24] The legislature has a particular interest in protecting the rights of immigrant workers since 64 percent of California's 10 million immigrants are in the labor force.[25] The balance of harms and the public interest both favor allowing AB 450 to stand.

AB 450 protects California residents by reducing the stress caused by fear of immigration raids and deportation. Raids are often surprising, invasive, and violent. The after-shocks of these

---

[24] Assemb. Comm. Jud., *AB 450 (Chiu) – As Amended March 23, 2017, As Proposed to be Amended* 1-2 (2017), http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180AB450.

[25] Johnson & Sanchez, *supra* note 5, at 1.

types of traumatic experience have lasting negative impacts for the health of workers.[26] Numerous studies establish that fear of raids and deportation is associated with chronic stress.[27] Moreover, the research establishes that this stress not only affects undocumented immigrants, but also documented immigrants, citizen family members, and citizens in their communities more broadly.[28] Chronic stress is associated with long-term poor health outcomes among immigrants and their families.[29] It can exacerbate their existing health conditions.[30] Immigrants who experience chronic stress are also more likely to have depression and other mental health

---

[26] Nicole L Novak *et al.*, *Change in Birth Outcomes Among Infants Born to Latina Mothers After a Major Immigration Raid*, 17 Int'l J. Epidemiology 1, 8 (2017), attached as Exhibit E (finding that infants born to Latina mothers (immigrant and US-born) were more likely to be born with low birth weights—which can be caused by maternal stress—in the nine-month period following a nearby immigration raid, compared to a comparable period in which there was no raid).

[27] *See, e.g.*, William D. Lopez *et al.*, *Health Implications of an Immigration Raid: Findings from a Latino Community in the Midwestern United States*, 19 J. Immigr. Minority Health 702, 705 (2017), http://psycnet.apa.org/record/2017-18207-023; Martinez et al., *supra* note 19, at *7-9; Hacker *et al*, *supra*, note 3, at *3.

[28] Hacker *et al*, *supra* note 3, at *3; Am. Imm. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* 2 (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/us_citizen_children_impacted_by_immigration_enforcement.pdf; Randy Capps et al., Nat'l Council of La Raza, *Paying the Price: The Impact of Immigration Raids on America's Children*, 35-36 (2007) [hereinafter Capps et al., Paying the Price], https://www.urban.org/sites/default/files/publication/46811/411566-Paying-the-Price-The-Impact-of-Immigration-Raids-on-America-s-Children.PDF; Randy Capps *et al.*, Urban Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families* 8 (2015) [hereinafter Capps et al., Implications], https://www.migrationpolicy.org/research/implications-immigration-enforcement-activities-well-being-children-immigrant-families.

[29] Hacker *et al*, *supra* note 3, at *7, *9; Rhodes et al., *supra* note 14, 331. The literature on the impact of chronic stress on immigrants is consistent with the larger body of research on the health effects of chronic stress. *See, e.g.*, Ronald Glaser & Janice K. Kiecolt-Glaser, *Stress-Induced Immune Dysfunction: Implications for Health*, 5 IMMUNOLOGY 243, 244-49 (2005), attached as Exhibit F (chronic stress associated with lower immunity, increased susceptibility to infectious disease, slower wound healing, increased inflammation); Vivette Glover, *Maternal Stress or Anxiety in Pregnancy and Emotional Development of the Child*, 871 British J. Psych. 105, 105 (1997), https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/maternal-stress-or-anxiety-in-pregnancy-and-emotional-development-of-the-child (maternal stress associated with lower birth weight).

[30] Hardy et al., *supra* note 10, at 1251.

conditions.[31] Chronic stress also deteriorates physical health; among immigrants, it is associated with worse maternal and birth outcomes for pregnant women.[32] Chronic fear in children is especially harmful. It is associated with an increased risk of developmental delays, emotional and behavioral issues, and mental health disorders, including Post-Traumatic Stress Disorder (PTSD) for children with immigrant parents or caretakers.[33]

Raids also routinely result in family separation and detention, even for documented immigrants who are not subject to deportation proceedings.[34] These family separations, even when brief, have lasting effects on the mental and behavioral health of the whole family.[35] By contrast, where immigrants feel a greater sense of security, health outcomes improve.[36] The public interest thus militates towards preserving AB 450, as it provides increased security and eases fear among California residents, reducing their risk of adverse health consequences.

---

[31] Martinez *et al*, *supra*, note 19 at *9; Joshua Breslau *et al.*, *Migration from Mexico to the United States and Subsequent Risk for Depressive and Anxiety Disorders*, 68 Arch. Gen. Psych. 428, 431 (2011), https://www.ncbi.nlm.nih.gov/pubmed/21464367.
[32] Novak et al., *supra*, note 26, at 8; Rhodes *et al*, *supra*, note 14, at 333.
[33] Capps et al., Paying the Price, *supra* note 28, at 51; Lisseth Rojas-Flores et al., *Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation*, 9 Psych. Trauma 352, 358-59 (2017), attached as Exhibit G.
[34] Capps et al., Paying the Price, *supra* note 28, at 35-36.
[35] Ajay Chaudry et al., Urban Inst., *Facing Our Future: Children in the Aftermath of Immigration Enforcement* ix, 43-44 (2010), http://www.urban.org/research/publication/facing-our-future (behavioral changes, such as trouble sleeping or changes in eating habits, were wide-spread in children more than six months after a parent experienced an immigration raid); Sara Satinsky et al., *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families*, Human Impact Partners, 6-8, 11-12, 36 (2013), https://www.familyunityfamilyhealth.org/uploads/images/FamilyUnityFamilyHealth.pdf.
[36] Atheendar S Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2 Lancet Pub. Health e175, e178-79 (2017), https://www.sciencedirect.com/science/article/pii/S2468266717300476; Shakeh Momartin et al., *A Comparison of the Mental Health of Refugees with Temporary Versus Permanent Protection Visas*, 185 Med. J. Aust. 357, 360 (2006), https://www.ncbi.nlm.nih.gov/pubmed/17014402.

### III. AB 103 Protects California's Interest in Safeguarding the Health and Safety of its Residents in Detention Centers.

Finally, California has a strong interest in ensuring that detention centers in the State protect the health and safety of its residents. It cannot rely on the federal government to do so. Rather, immigration detention centers have proven unwilling or incapable of meeting the most basic needs of the highly vulnerable population of immigrants in detention, exacerbating the threats to health that initially compelled many to depart from their home countries.[37]

The history of health care in U.S. immigration detention facilities is checkered with institutional neglect and harm of migrants and asylum seekers, which has caused fatal health outcomes.[38] In May of 2017 alone, the most current month for which the U.S. Immigration and Customs Enforcement (ICE) has published data, three migrants died while in ICE custody, including one at California's Adelanto Correctional Facility, which itself reported three deaths within a two-month period in 2017.[39] At least 100 migrants died in ICE detention from 2007 to 2017, including 15 deaths in California facilities.[40] Many of these deaths were a result of medically treatable conditions, diseases, and infections that went ignored by ICE.[41]

Despite recent assertions from ICE that it has improved its standard of care, evidence suggests otherwise. According to a 2017 Inspector General report, at a facility in Orange,

---

[37] Stacey A. Tovino, *The Grapes of Wrath: On the Health of Immigrant Detainees*, 57 B.C. L. Rev. 167, 170 (2016).
[38] This is a product of ICE officials consistently delaying and refusing medically necessary treatments and denying access to critical mental and physical health care, even for the child asylum seekers being detained in adult facilities. Tovino, *supra* note 37, at 174, 176, 181; Det. Watch Network, *Expose & Close: Theo Lacy Detention Center* 5 (2012), https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN%20Expose%20and%20Close%20Theo%20Lacy.pdf.
[39] U.S. Imm. Customs Enf't, *List of Deaths in Ice Custody* (2018), https://www.ice.gov/doclib/foia/reports/detaineedeaths-2003-2017.pdf.
[40] *Id.*; *see also* Jeanne Kuang, *Immigration Detention Deaths Reach Highest Total Since 2009*, Houston Chron., Jan. 12, 2018, https://www.houstonchronicle.com/news/houston-texas/houston/article/Immigration-detention-deaths-reach-the-highest-12494624.php
[41] Tovino, *supra* note 37, at 169-170, 179.

California, detained individuals were regularly served expired and moldy meat and were expected to use moldy and mildewed shower stalls, while facility officials failed to properly record grievances from the detained migrants and violated ICE standards by improperly using disciplinary segregation.[42] More troubling is that the number of deaths in these facilities has been trending upwards. Fiscal Year 2017 saw the most deaths in detention facilities in nearly a decade; 25 percent of these deaths occurred in California.[43]

Moreover, ICE fails to have or enforce health care standards specific to women. Pre- and post-natal care in detention facilities remains inadequate and threatens to cause irreparable harm to the women and their children.[44] In 2017, a pregnant woman detained in a California facility miscarried after detention officials repeatedly denied her medical care despite numerous requests for help.[45] Even after the miscarriage, facility administrators refused to let her see a doctor despite her persisting health needs.[46] In March of 2018, ICE publicly announced the end of its policy that forbade the detention of pregnant women except in "extraordinary circumstances" and eliminated reporting requirements that record their treatment of pregnant

---

[42] Office Inspect. Gen., *Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange*, California 1,3,5,6,9,10 (2017), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-mga-030617.pdf. Similarly, an investigation of California's Theo Lacy Detention Center found moldy food and an absence of fruits and vegetables. Det. Watch Network, *supra* note 38, at 5.

[43] U.S. Imm. Customs Enf't., *supra* note 39.

[44] Am. College of Obstets. & Gyn., *Committee Opinion: Health Care for Pregnant and Postpartum Incarcerated Women and Adolescent Females*, 118 Obstetrics & Gynecology 1198, *2, *3 (2011), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co511.pdf; Hum. Rights Watch, *Detained and Dismissed: Women's Struggles to Obtain Health Care in United States Immigration Detention* 4,17,52,53 (2009), https://www.hrw.org/sites/default/files/reports/wrd0309webwcover_1.pdf; Michael T. Kinsella & Catherine Monk, *Impact of Maternal Stress, Depression & Anxiety on Fetal Neurobehavioral Development*, 52 Clinical Obstetrics & Gynecology 425, *3, *4, *7 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3710585/.

[45] Letter from Am. Civ. Lib. Union *et al.* to Cameron Quinn & John Roth, Dep't Homeland Sec. 8, 9 (Nov. 13, 2017), https://americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_increasing_numbers_of_pregnant_women_facing_harm_in_detention.pdf.

[46] *Id.* at 9.

women—actions that will only increase similar occurrences as ICE detains more women during their pregnancies.[47]

For those who acquire care, individual reports recount facility staff superseding doctors' directives by unilaterally denying recommended treatments and seizing vital prescription medications from patients.[48] Independent medical doctors have cited this widespread practice of patient neglect and "systemic indifference" as an apparent cause of several injuries in California detention facilities, namely the loss of vision, the loss of mobility, and a preventable death.[49]

For migrants, many of whom are fleeing war, conflict, or natural disaster, the immense stress of detention in these facilities can deteriorate their mental health.[50] Medical experts report that separation from loved ones, fear of deportation, and general conditions in detention facilities are clear causes of frustration and anxiety, which often progress into lifelong psychological issues, such as clinical depression and PTSD.[51] The detrimental effects of

---

[47] U.S. Imm. Customs Enf't, *ICE Directive 11032.3: Identification and Monitoring of Pregnant Detainees* (Dec. 14, 2017), https://www.ice.gov/sites/default/files/documents/Document/2018/11032_3_PregnantDetaines.pdf; U.S. Imm. Customs Enf't, FAQs: Identification and Monitoring of Pregnant Detainees, https://www.ice.gov/faqs-identification-and-monitoring-pregnant-detainees (last visited May 11, 2018) ("ICE has ended the presumption of release for all pregnant detainees."); *see also* Letter from 18MillionRising.org to Thomas D. Homan, U.S. Imm. Customs Enf't (Apr. 11, 2018), https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/ICE%20sign-on%20letter%20FINAL%204.11.18.pdf.

[48] Hum. Rights First, *Ailing Justice: New Jersey Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, 6-7 (2018) https://www.humanrightsfirst.org/sites/default/files/Ailing-Justice-NJ.pdf.

[49] *Id.* at 2; Hum. Rights Watch, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention* 1, 27, 38-40, 54-56 (2017), [hereinafter Hum. Rights Watch, Systemic Indifference], https://www.hrw.org/sites/default/files/report_pdf/usimmigration0517_web_0.pdf.

[50] Kenneth E. Miller & Andrew Rasmussen, *War Exposure, Daily Stressors, and Mental Health in Conflict and Post-Conflict Settings*, 70 Soc. Sci. Med. 7, 11-12 (2010), attached as Exhibit H.

[51] Derrick Silove, Zachary Steel & Richard F. Mollica, *Detention of Asylum Seekers: Assault on Health, Human Rights, and Social Development*, 357 The Lancet 1436, 1436-37 (2001), https://pdfs.semanticscholar.org/00c0/35b22fc12fadb531fe5371c7111342d7eeaa.pdf; Hum. Rights First, *supra* note 48, at 1, 8; Physicians Hum. Rights et al., *From Persecution to Prison: The Health Consequences of*

detention on the mental health of migrants and asylum seekers intensifies with time.[52] Detention officials, including those in California, use solitary confinement to quarantine medical patients, as well as to punish, which actually worsens health and can increase the likelihood of patient death.[53] In one survey of asylum seekers in U.S. detention, 77 percent had clinically significant symptoms of anxiety, 86 percent had symptoms of depression, and 50 percent had symptoms of PTSD, all of which increased in prevalence with the length of detention.[54] In a follow-up survey, participants who were no longer detained had reduced psychological symptoms, while individuals still in custody were more distressed than before.[55]

Several investigations have also found inconsistent medical documentation of detained patients and incomplete administrative information on medical costs.[56] Among numerous

---

*Detention for Asylum Seekers* 55-56, 83-85 (2003), https://s3.amazonaws.com/PHR_Reports/persecution-to-prison-US-2003.pdf; Martinez *et al*, *supra* note 19, at *9; Etienne V Langlois et al., *Refugees: Towards Better Access to Health-Care Services*, 387 The Lancet 319, 320 (2017), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(16)00101-X/fulltext; Zachary Steel et al., *Impact of Immigration Detention and Temporary Protection on the Mental Health of Refugees*, 188 British J. Psychiatry 58, 61, 63 (2006) https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/impact-of-immigration-detention-and-temporary-protection-on-the-mental-health-of-refugees.

[52] Hum. Rights First, *supra*, note 48, at 8. Physicians Hum. Rights et al., *supra* note 51, at 55-56; Steel *et al.*, *supra* note 51, at 58-60, 63.

[53] Hum. Rights First, *supra* note 48, at 5-6; Det. Watch Network, *supra* note 38, at 5; Hum. Rights Watch, Systemic Indifference, *supra* note 49, at 40-41, 73-76, 96. A DHS review reported insufficient recording of individual segregation of individuals with mental health conditions and no institutional ability to review the safety of this practice. Office Inspect. Gen., *ICE Field Offices Need to Improve Compliance with Oversight Requirements for Segregation of Detainees with Mental Health Conditions*, 1, 4-5 (2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-11/OIG-17-119-Sep17.pdf.

[54] Allen S. Keller et al., *Mental Health of Detained Asylum Seekers*, 362 Lancet 1721, 1722 (2003), attached as Exhibit I. Over one-quarter of these detained migrants reported suicidal thoughts while detained, some having attempted it, a troubling, pervasive issue that is underreported by ICE despite being a leading cause of death in these facilities. *Id.* at 1722; *see also* Tovino, *supra* note 37, at 181-87; Megan Granski et al., *Death Rates among Detained Immigrants in the United States*, 12 Int'l J. Env. Res. & Pub. Health 14414, 14416 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4661656/.

[55] Keller *et al.*, *supra* note 54, at 1722.

[56] John V. Kelly, Office Inspect. Gen., Dep't Homeland Sec., *Concerns about ICE Detainee Treatment and Care at Detention Facilities* 7 (2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf; Hum. Rights Watch, Systemic Indifference, *supra* note 49, at 24; U.S. Gov't Account. Office,

administrative errors, ICE's refusal to appropriately collect basic information has allowed negative health outcomes to go unseen.[57] In one investigation of HIV/AIDS care in ICE-supervised facilities, including a California facility, detention centers did not deliver consistent care, risking a drug resistance that could inflict tremendous harm on the patients and the general public.[58] The facilities also improperly handled medical records and failed to protect medical confidentiality, exposing patients to harassment due to their health status.[59]

The inadequate health services and conditions in U.S. immigration detention facilities are well documented and are due in large part to the absence of accountability and oversight.[60] In 2017, the Inspector General reported long waits for medical services, even for urgent or necessary care, in numerous facilities.[61] ICE has resisted calls to improve the conditions of its facilities, despite reports of abuse from the Office for Civil Rights and Civil Liberties.[62]

Given the high risk of harm that detention facilities pose to California residents, and the lack of accurate reporting and documentation from ICE itself, California has a compelling interest in investigating facilities within its borders to ensure that they are protecting the health and welfare of California residents.

---

*Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care*, ii, 12 (2016), https://www.gao.gov/assets/680/675484.pdf.
[57] Silove, Steel & Mollica, *supra*, note 51, at 1437.
[58] Hum. Rights Watch, *Chronic Indifference: HIV/AIDS Services for Immigrants Detained by the United States*, 38-39 (2007), https://www.hrw.org/report/2007/12/05/chronic-indifference/hiv-aids-services-immigrants-detained-united-states.
[59] *Id.* at 2, 20, 46, 60.
[60] Hum. Rights Watch, Systemic Indifference, *supra* note 49, at 79-92.
[61] Kelly, *supra* note 56, at 7; *see also* Hum. Rights Watch, Systemic Indifference, *supra* note 49, at 45.
[62] *See generally*, Office Civil Rights & Civil Liberties, Dep't Homeland Sec., *Fiscal Year 2015 Annual Report to Congress* (2016), https://www.dhs.gov/sites/default/files/publications/crcl-fy-2015-annual-report.pdf.

## CONCLUSION

California's laws help create a safe and inclusive community for immigrants in the State, which protects the immigrant population and the State as a whole against a myriad of detrimental health consequences. In light of these crucial public health concerns, the balance of harms and the public interest advise that the Federal Government's request for an injunction against portions of SB 54, AB 450, and AB 103 be denied.

DATED: May 18, 2018

Respectfully submitted,

NATIONAL HEALTH LAW PROGRAM

By: /s/ Abigail K. Coursolle
ABIGAIL K. COURSOLLE (Bar # 266646)
coursolle@healthlaw.org
MARTHA JANE PERKINS (Bar # 104784)
perkins@healthlaw.org
SARAH GRUSIN*
grusin@healthlaw.org
JOSEPH MCLEAN*
mclean@healthlaw.org
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Blvd, Suite 750
Los Angeles, CA 90010
Telephone: (310) 204-6010
Facsimile: (213) 368-0774
*Attorneys for Amici Curiae
National Health Law
Program et al.*

*Not admitted in this jurisdiction

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed on May 18, 2018, through the ECF system, and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Abigail K. Coursolle<br>
Abigail K. Coursolle<br>
Senior Attorney<br>
NATIONAL HEALTH LAW PROGRAM