PILLSBURY WINTHROP SHAW PITTMAN LLP
KIRKE M. HASSON #61446
kirke.hasson@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:  415.983.1077
Facsimile:   415.983.1200

ELAINE Y. LEE #293452
elaine.lee@pillsburylaw.com
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:  213.488.7100
Facsimile:   213.629.1033

Attorneys for Amici Curiae,
IMMIGRANT LEGAL RESOURCE CENTER,
HUMAN RIGHTS WATCH,
& FREEDOM FOR IMMIGRANTS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN, JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>　　　　Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**BRIEF OF AMICI CURIAE IMMIGRANT LEGAL RESOURCE CENTER, HUMAN RIGHTS WATCH, AND FREEDOM FOR IMMIGRANTS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: _June 20, 2018<br>Hearing Time:  10:00 a.m.<br>Courtroom:      6<br><br>The Honorable John A. Mendez |

# TABLE OF CONTENTS

**PAGES**

I.    INTRODUCTION ............................................................................ 1

II.   CONDITIONS IN CALIFORNIA IMMIGRATION DETENTION
CENTERS NEED REVIEW ........................................................... 3

    A.   Lack of Adequate Medical Care ......................................... 3

    B.   Problems Faced by Particularly Vulnerable Populations .................... 9

        1.   Failure to Treat Mental Health Issues and Prevent
Suicides ................................................................. 9

        2.   Problems Faced by Other Vulnerable Populations.................. 12

    C.   Limited Access to Counsel and Legal Services................................. 14

III.  CONCLUSION ............................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ...........................................................................3

*Hedrick v. Grant*,
  No. 76-162 (E.D. Cal. 2016) ..............................................10, 11, 12

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ...........................................................................3

## Other Authorities

*"I still Need You": The Detention and Deportation of Californian Parents*,
  Human Rights Watch (May 15, 2017),
  https://www.hrw.org/report/2017/05/15/i-still-need-you/detention-and-
  deportation-californian-parents ..........................................................1

*"We don't feel okay here": Detainee Deaths, Suicide Attempts, and Hunger
  Strikes Plague California Immigration Facility,* Los Angeles Times (Aug.
  8, 2017), http://www.latimes.com/local/lanow/la-me-ln-adelanto-
  detention-20170808-story.html ..........................................................9

8 Witkin, Summary 11th Const. Law
  Section 1098 (2017) ............................................................................3

*A Call for Change: Protecting the Rights of LGBTQ Detainees*, Just
  Detention International (Feb. 2009), https://justdetention.org/wp-
  content/uploads/2015/10/Call-for-Change-Protecting-the-Rights-of-
  LGBTQ-Detainees.pdf ......................................................................13

*Abuse in Adelanto: An Investigation into a California Town's Immigration
  Jail*, CIVIC and Detention Watch Network (October 2015),
  https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da
  d7be4966b064c98e07c/1520283004817/CIVIC_DWN-Adelanto-
  Report_old.pdf.............................................................................11, 14

*Advocacy Group: If You're Abused in Immigration Detention, the Government Doesn't Care,* NBC San Diego (April 27, 2017, updated on April 28, 2017), https://www.nbcsandiego.com/news/local/Advocacy-Group-If-Youre-Abused-in-Immigration-Detention-the-Government-Doesnt-Care-420666314.html ...........................................................13

*California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants,* The California Coalition for Universal Representation (June 2016), http://www.publiccounsel.org/tools/assets/files/0783.pdf ......................14

*California's governor vetoed a bill that would stop privately run migrant detention. What now?* Virginia's Public Radio (Sept. 30, 2016), http://wvtf.org/post/californias-governor-vetoed-bill-would-stop-privately-run-migrant-detention-what-now#stream/0 ...........................................................1

*Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons,* Human Rights Watch (May 12, 2015), https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and .................................................11

*CIVIC Files Civil Rights Complaint Alleging Frequent Denial of Visits at Adelanto Since Trump's Election,* CIVIC (Jan. 18, 2017), http://www.endisolation.org/blog/archives/1170 .............................................15

*Complaint to the Office for Civil Rights & Civil Liberties within the Department of Homeland Security,* FREEDOM FOR IMMIGRANTS (April 11. 2017), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da297419202ab8be09c92/1520280217559/SexualAssault_Complaint.pdf ..........13

*Conditions worsen for some ICE detainees at Richmond jail,* San Francisco Chronicle (Nov. 10, 2017), https://www.sfchronicle.com/news/article/Conditions-worsen-for-some-ICE-detainees-at-12346066.php .......................................................13

*Contra Costa sheriff stonewalls officials who want to tour troubled jail,* San Francisco Chronicle (April 21, 2018), https://www.sfchronicle.com/news/article/Contra-Costa-sheriff-stonewalls-officials-who-12854365.php ...........................................................15

-iii-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Deportation chosen over Richmond jail; complaints under investigation,* San
    Francisco Chronicle (Nov. 2, 2017),
    https://www.sfchronicle.com/news/article/Deportation-chosen-over-
    Richmond-jail-complaints-12324755.php...........................................................13

*Detained, Then Violated,* The Intercept (April 11, 2018),
    https://theintercept.com/2018/04/11/immigration-detention-sexual-abuse-
    ice-dhs/.............................................................................................................14

*Detention by the Numbers*, Freedom For Immigrants,
    https://www.freedomforimmigrants.org/detention-statistics/ (last accessed
    May 13, 2018)....................................................................................................1

*ICE Violates First Amendment Rights of 60+ Attorneys and Faith Leaders*,
    CIVIC (June 27, 2017), http://www.endisolation.org/blog/archives/1265........15

*Invisible in Isolation: The Use of Segregation and Solitary Confinement in
    Immigration Detention*, National Immigrant Justice Center and Physicians
    for Human Rights (Sept. 2012)
    https://www.immigrantjustice.org/sites/immigrantjustice.org/files/Invisible
    %20in%20Isolation-
    The%20Use%20of%20Segregation%20and%20Solitary%20Confinement
    %20in%20Immigration%20Detention.September%202012_7.pdf..................11

*Letter to Thomas D. Homan, Director, U.S. Immigration and Customs
    Enforcement*, et al., CIVIC (April 11, 2017),
    https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da
    297419202ab8be09c92/1520280217559/SexualAssault_Complaint.pdf..........13

*Letter to Timothy S. Aitken, Field Office Director, U.S. Immigration and
    Customs Enforcement re: Violations of Policy Regarding Detention,
    Shackling, and Care of Pregnant Women at Mesa Verde Detention
    Facility,* American Civil Liberties Union of Southern California (June 18,
    2015), https://www.aclusocal.org/sites/default/files/wp-
    content/uploads/2015/06/Mesa-Verde-Ruiz-Letter-FINAL.pdf.........................5

*Lifeline on Lockdown: Increased US Detention of Asylum Seekers,* Human
    Rights First (July 2016),
    http://www.humanrightsfirst.org/sites/default/files/Lifeline-on-
    Lockdown.pdf.....................................................................................................2

-iv-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*New Data on 637 Detention Facilities Used by ICE in FY 2015*, TRAC
Immigration, http://trac.syr.edu/immigration/reports/422/#f2 (last accessed
May 13, 2018)......................................................................................................1

*One Year Longitudinal Study of the Psychological Effects of Administrative
Segregation,* submitted to the National Institute of Justice (Oct. 31, 2010),
https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf ...................................11

*Systemic Indifference: Dangerous & Substandard Medical Care in US
Immigration Detention*, Human Rights Watch (May 8, 2017),
https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-
substandard-medical-care-us-immigration-detention............................4, 7, 8, 10

*Top Complaints in California Immigration Detention Facilities*, Community
Initiatives for Visiting Immigrants in Confinement ("CIVIC") (Aug. 28,
2015), http://www.endisolation.org/blog/archives/1278.....................................3

*Torture and other cruel, inhuman or degrading treatment or punishment,
A/66/268*, United Nations General Assembly (Aug. 5, 2011),
https://documents-dds-
ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElem
ent ....................................................................................................................11

*US: Transgender Women Abused in Immigration Detention,* HUMAN RIGHTS
WATCH (March 23, 2016), https://www.hrw.org/news/2016/03/23/us-
transgender-women-abused-immigration-detention ..........................................14

-v-

## I.      INTRODUCTION

Amici Curiae Immigrant Legal Resource Center ("ILRC"), Human Rights Watch ("HRW"), and Freedom For Immigrants ("FFI," formerly Community Initiatives for Visiting Immigrants in Confinement) (collectively, "Amici") respectfully submit this brief in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.  Amici urge denial of Plaintiff's Motion in light of the tragic state of the general welfare, health, and safety conditions in immigration detention centers in California.

At present, the ten immigration detention centers in California hold an average of over 4,500 people on a given day, or approximately 15% of all immigration detainees nationwide.[1]  Each year, approximately 100,000 people in immigration detention—or a quarter of all people detained—pass through a California detention facility.[2]  These detention facilities hold asylum seekers and long-term residents of California, many of whom are parents of citizens.[3]  They hold men, women, and children, sometimes for days, sometimes for months or years.  Many people are held without individualized bond hearings, lacking the ability to even ask a judge whether they may fight their case out of detention.

Those detained in immigration detention centers in California are exposed to a host of inhumane conditions, from serious, sometimes deadly, lack of adequate medical care to sexual abuse to everyday indignities.  The true extent of inhumane conditions in immigration detention centers in California is impossible for the State

---

[1] *"I still Need You": The Detention and Deportation of Californian Parents*, HUMAN RIGHTS WATCH (May 15, 2017), https://www.hrw.org/report/2017/05/15/i-still-need-you/detention-and-deportation-californian-parents; *see also Detention by the Numbers*, Freedom For Immigrants, https://www.freedomforimmigrants.org/detention-statistics/ (last accessed May 13, 2018).

[2] Reynaldo Leanos Jr., *California's governor vetoed a bill that would stop privately run migrant detention. What now?* VIRGINIA'S PUBLIC RADIO (Sept. 30, 2016), http://wvtf.org/post/californias-governor-vetoed-bill-would-stop-privately-run-migrant-detention-what-now#stream/0; *see also New Data on 637 Detention Facilities Used by ICE in FY 2015*, TRAC Immigration, http://trac.syr.edu/immigration/reports/422/#f2 (last accessed May 13, 2018).

[3] *Supra* fn. 1.

BRIEF OF AMICI CURIAE ILRC, HRW, & FFI
IN SUPPORT OF DEFENDANTS' OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

to determine without access to inspect these centers, but even the limited anecdotal evidence that is available to Amici is horrific.  One person bled to death after an attempt to remove "the largest abdominal mass" a doctor had ever seen, which went undetected by detention center staff even though the detained person constantly complained of pain and requested treatment over the course of two years.  Another person suffered a miscarriage when she fell on her stomach while shackled at her hands and feet, and then was denied the necessary medical and mental health follow-up care.  Detained persons suffer serious mental health and languish in detention centers where the suicide rate is more than triple that of the general prison population, and yet do not have access to mental health professionals or are placed in solitary confinement.  Particularly vulnerable populations such as women and LGBTQ individuals are subject to unique degradation and sex abuse.  Instead of finding refuge, torture victims who fled to the United States precisely because they were seeking asylum from persecution elsewhere are locked away in abusive and dangerous detention centers.[4]  Detained persons have even gone on hunger strikes for new underwear.

This brief offers examples of the conditions of immigration detention centers in California based on stories learned by Amici through their interactions with detained persons.  Amici seek to underscore the vital importance of the State of California's goals in empowering itself to learn in a systematic way whether, as Amici suspect, the problems made evident by these stories are widespread.  AB 103 is needed for the State to review the general welfare, health, and safety conditions of the immigration detention centers within its borders.  It seeks to ensure that California's immigration detention centers are compatible with the fundamental

---

[4] In 2014, 84% of asylum seekers who suffer a positive credible fear of persecution in their home countries were detained.  Olga Byrne, Eleanor Acer, and Robyn Barnard, *Lifeline on Lockdown: Increased US Detention of Asylum Seekers,* HUMAN RIGHTS FIRST (July 2016), http://www.humanrightsfirst.org/sites/default/files/Lifeline-on-Lockdown.pdf.

rights of its residents and the concept of basic human dignity.  Amici urge the Court to accord these factors appropriate weight in deciding the Plaintiff's Motion for Preliminary Injunction.

## II.   CONDITIONS IN CALIFORNIA IMMIGRATION DETENTION CENTERS NEED REVIEW

Conditions in immigration detention centers in California desperately need review.  AB 103 allows the State of California to exercise its inherent power to regulate the general welfare, health, and safety of individuals within its borders, an exercise of its police power.  *See* 8 Witkin, Summary 11th Const. Law § 1098 (2017); *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006), citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("[T]he structure and limitations of federalism […] allow the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'").  Anecdotal facts indicate systemic issues with the general welfare, health, and safety of those detained in California's immigration detention centers.

### A.   Lack of Adequate Medical Care

One of the top complaints by immigration detainees in California is lack of access to adequate medical care.[5]  In the individual stories presented below, individuals suffered because of unreasonable delay in receiving care, treatment by unqualified staff, and inappropriate treatment and care.  Amici believe the State of California, upon review and inspection, will find many more such cases, indicating substandard medical care in immigration detention centers in California.  Systemic failure to provide adequate medical care is likely given that staff providing medical care at the immigration detention centers are unqualified (as in the case of Carlos H.,

---

[5] *Top Complaints in California Immigration Detention Facilities*, COMMUNITY INITIATIVES FOR VISITING IMMIGRANTS IN CONFINEMENT ("CIVIC") (Aug. 28, 2015), http://www.endisolation.org/blog/archives/1278.

BRIEF OF AMICI CURIAE ILRC, HRW, & FFI
IN SUPPORT OF DEFENDANTS' OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

below) or untrained.[6]

**Raul Ernesto Morales-Ramos**, a 44-year old man, died in April 2015 while detained in the Adelanto Detention Facility from organ failure and suffering widespread signs of cancer.[7]  Despite the fact that he had complained of pain and exhibited cancer symptoms over the course of two years, and had a large, clearly visible abdominal mass, Mr. Morales-Ramos did not receive adequate medical care until just a month before he died.  His death resulted from a critical lapse of care: had he been diagnosed and treated sooner, Mr. Morales-Ramos' cancer may have been treatable.

Likely already suffering from symptoms of cancer, Mr. Morales-Ramos was first referred for follow-up with a doctor for gastrointestinal symptoms in April 2013 while detained at the Theo Lacy Facility in Orange County, California.  More than a year later, in May 2014, this consultation had not yet occurred and Mr. Morales-Ramos was transferred to Adelanto with no documentation of his gastrointestinal symptoms.  There, he was seen by registered nurses several times over the next nine months after submitting sick call requests for body aches, weight loss, pain in his joints, knees, and back, and diarrhea.  No one thought to diagnose or treat him for cancer.

In February 2015, having suffered for a year without proper treatment, Mr. Morales-Ramos submitted a grievance in which he pled, "To who receives this.  I am letting you know that I am very sick and they don't want to care for me.  The

---

[6] U.S. Immigration and Customs Enforcement's Office of Detention Oversight itself noted that in Adelanto, for instance, "approximately 50 percent of ADF's medical staff hires are new graduates" with a "definite difference between their skills and those of more experienced nurses."  Clara Long and Grace Meng, *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, HUMAN RIGHTS WATCH (May 8, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention.

[7] All facts in this story are from HRW's review of U.S. Immigration and Customs Enforcement records detailed in *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention, supra* fn. 6.

BRIEF OF AMICI CURIAE ILRC, HRW, & FFI
IN SUPPORT OF DEFENDANTS' OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

nurse only gave me ibuprofen and that only alleviates me for a few hours.  Let me know if you can help me.  I only need medical attention."  Four days later, a nurse practitioner saw Mr. Morales-Ramos but missed all symptoms of cancer, instead instructing him to increase his water intake and exercise and documenting that his symptoms were resolved.  A few weeks later, on March 2, 2015, another nurse saw Mr. Morales-Ramos and noted a distended abdomen but "did not detect a mass or protrusion."

A consultation with a doctor finally occurred on March 6, 2015.  This doctor—observing Mr. Morales-Ramos just four days after a nurse failed to detect a mass—documented the "largest [abdominal mass] she had ever seen in her practice," which was "notably visible through the abdominal wall."  She scheduled Mr. Morales-Ramos for a colonoscopy, which did not occur until about one month later. During the colonoscopy, Mr. Morales-Ramos began to experience abdominal bleeding after a doctor attempted to remove the mass.  Mr. Morales-Ramos was transferred to the hospital and died three days later after a surgical attempt to stop his bleeding.

**Monserrat Ruiz Cuevas** suffered a miscarriage while detained at Mesa Verde Detention Center in Bakersfield.[8]  After her miscarriage, Ms. Ruiz said that she was further denied access to adequate follow-up medical and mental health care.

When Ms. Ruiz first arrived at Mesa Verde on May 8, 2015 after seeking asylum based on a credible fear of persecution or torture, staff conducted a pregnancy test.  However, Ms. Ruiz said that she was not informed of the result. Instead, Ms. Ruiz only learned she was pregnant several days later after she experienced heart and breathing complications, was transported to a hospital for

---

[8] *Letter to Timothy S. Aitken, Field Office Director, U.S. Immigration and Customs Enforcement re: Violations of Policy Regarding Detention, Shackling, and Care of Pregnant Women at Mesa Verde Detention Facility,* AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA (June 18, 2015), https://www.aclusocal.org/sites/default/files/wp-content/uploads/2015/06/Mesa-Verde-Ruiz-Letter-FINAL.pdf.

urgent care (while fully shackled), and examined by a doctor who informed her she was pregnant and had severe dehydration.

After her pregnancy was confirmed, Ms. Ruiz said she was still not provided with access to specialized medical care. On May 12, 2015, she complained of back pain and other distressing symptoms but waited two days until staff determined she should be sent to a hospital. On May 14, 2015, while walking to the transportation van to go to the hospital, Ms. Ruiz was shackled in both leg and arm restraints. She tripped over her shackles and fell on her stomach while being transported to a hospital to receive urgent medical care related to her pregnancy. Once at the hospital, Ms. Ruiz said she was kept in shackles the entire time and the doctor did not take any steps to address her concerns about harming her baby because of the fall.

The following day, on May 15, 2015, Ms. Ruiz began bleeding heavily and experiencing other symptoms of miscarriage. She said she was transported to the hospital in handcuffs, waited several hours to see the doctor while handcuffed to the stretcher, and then transferred to the hospital bed and handcuffed to the bed. After she was evaluated, the doctor told Ms. Ruiz that she had lost her child. Ms. Ruiz said she was then transported back to Mesa Verde that same day, once again in handcuffs.

After her miscarriage, Ms. Ruiz said that she did not receive any necessary follow-up gynecological care or mental health services. Despite the fact that she continued to experience ongoing bleeding and vaginal irritation, she said there were no efforts to ensure that she had not contracted an infection or that her hemorrhaging had ceased. Even after Mesa Verde medical staff determined that she needed urgent care from a gynecologist, Ms. Ruiz was never provided with this care, she said. Instead, she only received Tylenol and milk of magnesia.

Ms. Ruiz also said that she did not receive any mental health care (further discussed in Section II.B.1, below) although she was visibly weeping and depressed

-6-

for several days.  Ms. Ruiz said she was eventually taken to see a psychiatrist who chuckled and said that all he could do for her was prescribe sleeping medication. Ms. Ruiz was subsequently granted asylum and released to live with her partner, a legal permanent resident.

**Jose L.** lost the ability to walk more than just short distances, and perhaps also lost sight in his right eye, due to failure to receive adequate medical care while detained at Adelanto Detention Facility.[9]  Jose, a 54-year old former green card holder who had lived in the U.S. for 32 years, had a history of lower back pain and diabetes.  In mid-2013, Jose was working in the facility kitchen when he slipped and fell, hitting his hip and back.  After his pain became uncontrollable and he could not stand up for more than five minutes, Jose asked to see a doctor but had to wait 18 months before seeing a surgeon.  This unreasonable delay left Jose in pain and with decreased function.  Jose was eventually scheduled for surgery but was deported before he could have the surgery.

Unreasonable delays in receiving care may have also resulted in Jose becoming legally blind in his right eye.  In July 2014, Jose began to complain about losing vision in his right eye and severe pain, which was eventually diagnosed as proliferative diabetic retinopathy, a common complication of diabetes.  From the time he first complained, it took five days for Jose to receive an initial evaluation by a physician, who thought he might have a retinal detachment, which according to medical experts should have been deemed an emergency.  Forty-eight hours later, the optometrist found Jose's eye had hemorrhaged and recommended that he see a retinal specialist as soon as possible.  It then took the facility doctor four days to submit a request for authorization stating, "needs retinal specialist ASAP," and over a month before Jose was seen by a retinal specialist.  Afterward, numerous

---

[9] All facts in this story are from HRW's review of U.S. Immigration and Customs Enforcement records detailed in *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, *supra* fn. 6.

recommendations for follow-up appointments with a retinal specialist were delayed. For example, a follow-up scheduled for one week later occurred four weeks later. At one point, the retinal specialist cancelled the appointment due to non-payment, presumably by U.S. Immigration and Customs Enforcement ("ICE").

Because proliferative diabetic retinopathy does not develop overnight, symptoms should have been observed during Jose's annual eye exam in February 2014. Jose's diabetes does not appear to have been managed well overall, and although his sugar level was high, the doctors did not make changes to his insulin dosages.

**Carlos H.** tore his anterior cruciate ligament ("ACL") and possibly broke a bone in February 2015 while detained at Yuba County Jail in California when he fell in the shower.[10] Carlos' injuries were not properly diagnosed or treated for five months because he was seen only by licensed vocational nurses ("LVNs") who did not refer him to a doctor, and then because ICE continually delayed his scheduled surgery without providing any clinical reason. His medical records show long delays at each stage of the process and he essentially endured pain that could have been treated or ameliorated for almost a year.

Carlos requested medical care for his knee five times over three months. For his first four requests, Carlos was not seen by a doctor or a registered nurse; instead, he was seen by a LVN who did not refer him to a doctor until the fifth visit, even though this constituted practice outside the scope of a LVN's license. Once Carlos was seen by a doctor, his knee was appropriately examined and he was sent for an X-ray and MRI, which revealed a torn ACL and possibly a meniscus tear. Carlos was referred to an orthopedist who recommended surgery and the facility submitted a request to ICE for approval at the end of July.

---

[10] All facts in this story are from HRW's review of U.S. Immigration and Customs Enforcement records detailed in *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, *supra* fn. 6.

What followed then was unexplained delay by ICE in scheduling the surgery. ICE twice requested delays without explanation, first from mid-August to the end of August, and then again until the first week of October. Carlos continued to endure pain during these delays. Medical records show that Carlos may have even had a broken bone and was forced to walk around on it during the five-month delay.

Even after his surgery, Carlos's ordeal was not over. The surgeon had ordered narcotic pain medications, but the facility doctor changed the order to a non-narcotic without explanation and without setting up a mechanism to monitor post-operation pain. Two days after surgery, Carlos collapsed with shortness of breath, possibly from not having adequate pain control, which would have been prevented by the medications ordered by the surgeon. The LVN who managed the emergency response measured his pulse and oxygen, but not his respiration or blood pressure, and did not involve the facility physician, which was troubling given the risk of blood clot and pulmonary embolism.

## B. Problems Faced by Particularly Vulnerable Populations

Many immigration detainees are survivors of violence and torture. These detainees are unusually vulnerable and may often fall victim to additional harms while in detention, a particularly ironic circumstance given that they have often entered the country seeking, as intended by federal policy, asylum from persecution in their home countries. This is sadly reflected in the fact that there is a high number of attempted and completed suicides at immigration detention centers.[11] "I think doing something like that is something that has crossed the mind of all of us who are locked up here," a detainee at Adelanto said of suicide.[12]

### 1. Failure to Treat Mental Health Issues and Prevent Suicides

---

[11] Paloma Esquivel, *"We don't feel okay here": Detainee Deaths, Suicide Attempts, and Hunger Strikes Plague California Immigration Facility*, L.A. TIMES (Aug. 8, 2017), http://www.latimes.com/local/lanow/la-me-ln-adelanto-detention-20170808-story.html.

[12] *Id.*

The high rate of suicide at California's immigration detention centers must be understood within the context of a system that has a track record of failure to treat mental health issues and suicide risk.

First, suicide risks are not addressed: a person detained at Yuba County Jail attempted suicide in October 2014 by hanging himself in the shower.[13]  At the time of his intake in June 2014, he reported anxiety problems and depressive symptoms but was not flagged as any sort of suicide risk, despite the fact that his mother called the same day and expressed concern about her son's mental health, and that his chief complaint in his previous psychiatric evaluation was that his brother committed suicide by hanging himself the previous year.

Second, immigration detention centers attempt to treat detained persons suffering from mental health problems by putting them in solitary confinement. Two attorneys of clients with mental health conditions detained in Adelanto Detention Center told HRW their clients were regularly put into isolation because adequate mental health care was unavailable.[14]  In one particular case, a detained person had done well in a psychiatric facility, but when she was returned to the detention center, she did not receive the same medication she had received in the hospital.  She became unstable and suicidal and was repeatedly put in isolation.[15] Another attorney working with detained persons stated, "I've had clients, very mentally ill clients ... who've suffered from schizophrenia and various psychotic episodes, and the way [detention center operators] responds to that is to put people in solitary."[16]  At one point, eight percent of people in immigration detention

---

[13] Plaintiffs' Mot. to Enforce Consent Decree in *Hedrick v. Grant,* No. 76-162 (E.D. Cal. Oct. 24, 2016) (ECF. No. 163 at 22-32).

[14] *Supra* fn. 6.

[15] *Id.*

[16] Alexis Perlmutter and Mike Corradini, *Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention*, NATIONAL IMMIGRANT JUSTICE CENTER AND PHYSICIANS FOR HUMAN RIGHTS (Sept. 2012) https://www.immigrantjustice.org/sites/immigrantjustice.org/files/Invisible%20in%20Isolation-

1  interviewed by FFI at Adelanto reported that they had been held in solitary

2  confinement.[17]

3      Studies suggest that solitary confinement may severely exacerbate previously

4  existing mental health issues.  Because of this, the United Nations special rapporteur

5  on torture believes that solitary confinement of any duration of time for those with

6  psychosocial disabilities is cruel, inhuman, or degrading treatment.[18]  The Special

7  Rapporteur cites to studies that have found that spending seven days in solitary

8  confinement can lead to a decline in brain activity, and that over seven days, the

9  decline may be irreversible.[19]

10      The conditions at Yuba County Jail provide insight.  There, a group of

11  prisoners and immigration detainees brought suit and obtained a consent decree to

12  address mental health care and suicide prevention.[20]  Pursuant to the consent decree,

13  a grand jury reviewed conditions at Yuba County Jail and found the following in

14  2015: (1) "the extended stay of ICE prisoners … have increased the medical and

15  mental health needs of inmates [referring to both criminal and immigration

16  detainees]"; (2) "[t]he Mental Health Professional (psychiatrist) although available

17  by phone, is on site only one day per week mainly to evaluate incoming inmates and

18

19  The%20Use%20of%20Segregation%20and%20Solitary%20Confinement%20in%20Immigration%20Deten
20  tion.September%202012_7.pdf.

21  [17] Christina Fialho and Victoria Mena, *Abuse in Adelanto: An Investigation into a California Town's Immigration Jail*, CIVIC AND DETENTION WATCH NETWORK (October 2015),
22  https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9dad7be4966b064c98e07c/1520283004817/CIVIC_DWN-Adelanto-Report_old.pdf.

23  [18] Juan E. Mendez, Special Rapporteur of the Human Rights Council, *Torture and other cruel, inhuman or degrading treatment or punishment, A/66/268*, UNITED NATIONS GENERAL ASSEMBLY (Aug. 5, 2011),
24  https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement; *see also*, Jamie Fellner, *Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails*
25  *and Prisons*, HUMAN RIGHTS WATCH (May 12, 2015), https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and; *and* Maureen L.O'Keefe, et al., *One Year*
26  *Longitudinal Study of the Psychological Effects of Administrative Segregation*, submitted to the National Institute of Justice (Oct. 31, 2010), https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf.

27  [19] *Supra* fn. 17, *citing* Stuart Grassian, "Psychiatric Effects of Solitary Confinement" (1993), p. 1.

28  [20] *Supra* fn. 13.

update prescriptions"; (3) "[t]here are no non-emergency or ongoing mental health services available to the inmates"; [and] (4) "[i]nmates diagnosed as needing treatment at a state mental hospital wait for months to transfer. Suicidal inmates can stay in padded cells, with little or no comforts, for weeks…"[21]

In 2016, prisoners and immigration detainees brought a motion to enforce the consent decree at Yuba County Jail, citing the high sustained rate of suicide at the jail.[22]  In thirty months, there had been at least forty-one suicide attempts at Yuba County Jail.  The risk of suicide in Yuba County Jail is more than three-and-a-half times higher than the suicide rate for the general prison population.[23]  Plaintiffs seeking to enforce the consent decree also describe a "deliberate indifference to suicide hazards," "segregation of the mentally ill including in unsanitary 'rubber rooms' covered in blood and feces," and prisoners with mental illness who have been regularly placed in isolation cells with shuttered windows for days at a time and deprived of access to outdoor exercise for weeks on end.

## 2.    *Problems Faced by Other Vulnerable Populations*

In addition to the lack of mental health care and issues faced by the general population of detained persons, certain groups of unusually vulnerable detained persons such as women and LGTBQ individuals suffer additional problems.

Because there are fewer women than men in detention facilities, their particular needs are often overlooked.  They are often consolidated, with lower security risk women housed along with higher security risk women, resulting in more constrictive conditions for all women than their male counterparts.  For instance, women detained at Contra Costa West County Detention Facility report being locked in their cells for up to 23 hours a day and are told to use bio bags in

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

their cell when they need to use the bathroom.[24]

Sexual and physical abuse is a serious problem in California's immigration detention centers, and certain populations such as LGBTQ detained persons face higher risks of abuse.  Data obtained by FFI from the Department of Homeland Security Office of the Inspector General shows at least 1,016 reports of physical and sexual abuse filed by people in detention nationwide between May 2014 and July 2016.[25]  Two California facilities—Adelanto and Otay Mesa Detention Center—are among the five facilities with the most sexual assault complaints in the nation.[26]  At Otay, Yordy Cancino, a gay man, reported that he experienced consistent sexual harassment by guards.[27]  Mr. Cancino said that when he took showers, one of the male guards would position himself so that he could see Mr. Cancino naked and guards would call him over the detention facility radio, "Cancino, my royal princess, wake up."

LGBTQ detained persons are fifteen times more likely than the general population of detained persons to be sexually assaulted in detention centers.[28]

---

[24] Otis R. Taylor Jr., *Deportation chosen over Richmond jail; complaints under investigation,* SAN FRANCISCO CHRONICLE (Nov. 2, 2017), https://www.sfchronicle.com/news/article/Deportation-chosen-over-Richmond-jail-complaints-12324755.php; *see also* Otis R. Taylor Jr.*, Conditions worsen for some ICE detainees at Richmond jail,* SAN FRANCISCO CHRONICLE (Nov. 10, 2017), https://www.sfchronicle.com/news/article/Conditions-worsen-for-some-ICE-detainees-at-12346066.php

[25] Letter to Thomas D. Homan, Director, U.S. Immigration and Customs Enforcement, *et al.*, CIVIC (April 11, 2017), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da297419202ab8be09c92/1520280217559/SexualAssault_Complaint.pdf.

[26] *Id.*

[27] Complaint to the Office for Civil Rights & Civil Liberties within the Department of Homeland Security, FREEDOM FOR IMMIGRANTS (April 11. 2017), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da297419202ab8be09c92/1520280217559/SexualAssault_Complaint.pdf; *see also* Mari Payton, *Advocacy Group: If You're Abused in Immigration Detention, the Government Doesn't Care,* NBC SAN DIEGO (April 27, 2017, updated on April 28, 2017), https://www.nbcsandiego.com/news/local/Advocacy-Group-If-Youre-Abused-in-Immigration-Detention-the-Government-Doesnt-Care-420666314.html.

[28] *A Call for Change: Protecting the Rights of LGBTQ Detainees*, JUST DETENTION INTERNATIONAL (Feb. 2009), https://justdetention.org/wp-content/uploads/2015/10/Call-for-Change-Protecting-the-Rights-of-LGBTQ-Detainees.pdf.

Transgender women detained persons often suffer abuse because they are housed with men.  Even when housed exclusively with other transgender detained persons, however, as they were in Santa Ana City Jail, some detained persons told HRW that they were regularly subjected to humiliating and abusive strip searches by male guards.[29]  Many say they were not able to get adequate medical services including hormone replacement therapy, and spent unreasonably long periods of time in solitary confinement.[30]

Because of factors including homophobia, detainees who are victims of sexual abuse often do not report the abuse.  Those who do report abuse may face retaliation.  "A lot of people don't complain," said Gretta Soto Moreno, a transgender woman who was held in detention centers in Arizona and California.[31]  "As soon as you make a grievance, if you defend yourself, you become a personal enemy of the system.  Even if the system stinks and is corrupt…Grievances only go to the next officer, and they take care of each other."

## C.  Limited Access to Counsel and Legal Services

The harmful, abusive, and even life-endangering conditions of confinement described above are exacerbated by the fact that most detained persons have no access to counsel.  An estimated 68 percent of immigration detainees in California are unrepresented by counsel.[32]  Studies at Adelanto suggest that as few as 12.3% of detainees are represented.[33]  Access to counsel is restricted due to several factors including costly telephone access, limited visitation, and frequent and distant

---

[29] *US: Transgender Women Abused in Immigration Detention,* HUMAN RIGHTS WATCH (March 23, 2016), https://www.hrw.org/news/2016/03/23/us-transgender-women-abused-immigration-detention.

[30] *Id.*

[31] Alice Speri, *Detained, Then Violated,* THE INTERCEPT (April 11, 2018), https://theintercept.com/2018/04/11/immigration-detention-sexual-abuse-ice-dhs/.

[32] *California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants,* THE CALIFORNIA COALITION FOR UNIVERSAL REPRESENTATION (June 2016), http://www.publiccounsel.org/tools/assets/files/0783.pdf.

[33] *Supra* fn. 17.

-14-

1  transfers.  Telephone calls are extremely expensive for detainees.  Prior to 2013,

2  calls could be as exorbitant as $5.00 per minute.  Since then, the FCC set interstate

3  caps for rates charged to detainees, but rates can still be as high as 25 cents per

4  minute.  Visitation is also unreasonably restricted.  In January 2017, FFI filed a

5  complaint against Adelanto, documenting visit denials and unreasonable visitation

6  waiting times.[34]  Recently, over 60 faith leaders and attorneys were denied visits to

7  Adelanto without any reason.[35]  On top of this, current restrictions make it difficult if

8  not impossible to bring interpreters to detention centers, limiting the ability of legal

9  workers to communicate with detainees.  Some facilities, such as the West County

10  Detention, have ignored requests from local government officials to tour the

11  facilities.[36]

12  **III.  CONCLUSION**

13  The anecdotal evidence available to Amici from their sources suggest a

14  picture of dire general welfare, health, and safety conditions in immigrant detention

15  centers in California.  Amici respectfully urge the Court to weigh the urgency of

16  these considerations and the State of California's strong interest in learning more

17  about the conditions of the immigration detention centers within its borders, as it

18  considers the Plaintiff's Motion for Preliminary Injunction.

19

20

21

22

23

24

---

25  [34] *CIVIC Files Civil Rights Complaint Alleging Frequent Denial of Visits at Adelanto Since Trump's Election*, CIVIC (Jan. 18, 2017), http://www.endisolation.org/blog/archives/1170.

26  [35] *ICE Violates First Amendment Rights of 60+ Attorneys and Faith Leaders*, CIVIC (June 27, 2017), http://www.endisolation.org/blog/archives/1265.

27  [36] Otis R. Taylor Jr., *Contra Costa sheriff stonewalls officials who want to tour troubled jail,* SAN FRANCISCO CHRONICLE (April 21, 2018), https://www.sfchronicle.com/news/article/Contra-Costa-sheriff-stonewalls-officials-who-12854365.php.

28

1

2    Dated:  May 17, 2018                      PILLSBURY WINTHROP SHAW
                                               PITTMAN LLP
3

4                                                   /s/ Kirke M. Hasson
                                          By:       Kirke M. Hasson
5
                                          Attorneys for Amici Curiae,
6                                         IMMIGRANT LEGAL RESOURCE
                                          CENTER,
7                                         HUMAN RIGHTS WATCH,
                                          & FREEDOM FOR IMMIGRANTS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE ILRC, HRW, & FFI
                                                                  IN SUPPORT OF DEFENDANTS' OPP. TO
                                                                  MOTION FOR PRELIMINARY INJUNCTION