JOSHUA A. GELTZER (DC #1018768)
MARY B. MCCORD (DC#427563)
DANIEL B. RICE (DC # 888273343)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
Phone: (202) 662-9042
Email: jg1861@georgetown.edu

MATTHEW J. PIERS (IL #2206161)
CHIRAG G. BADLANI (IL #6308523)
CARYN C. LEDERER (IL #6304495)
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 West Madison St., Suite 4000
Chicago, IL 60602
Phone: (312) 580-0100
Fax: (312) 604-2623
Email: mpiers@hsplegal.com

*Counsel for Amici Curiae Current and Former Prosecutors and
Law Enforcement Leaders*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity, <br><br> Defendants. | Case No. 2:18-cv-00490 (JAM) (KJN) <br><br> **BRIEF OF *AMICI CURIAE* CURRENT AND FORMER PROSECUTORS AND LAW ENFORCEMENT LEADERS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTEREST AND IDENTITY OF AMICI CURIAE..................................................................... 1

INTRODUCTION ......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 4

I.   Trust and Respect Between Communities and Law Enforcement Officials Are Essential to Public Safety and Are Thwarted When Victims and Witnesses Fear Deportation Consequences of Cooperating. ........................................................................ 4

II.  Policies Limiting Local and State Involvement in Federal Immigration Enforcement Are Critical to Building and Maintaining Trust Between the Community and Law Enforcement While Preserving Local Resources. .......................................................... 12

CONCLUSION ............................................................................................................................ 15

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

# TABLE OF AUTHORITIES

**Cases**

*Galarza v. Szalczyk*, No. 10-cv-06815, 2012 WL 1080020 (E.D. Pa. Mar. 30, 2012)............12

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)..................................................13

*Mendoza v. Osterberg*, No. 13CV65, 2014 WL 3784141 (D. Neb. July 31, 2014) ...............12

*Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305 (D. Or. Apr. 11, 2014) .........................................................................................12

*Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D. R.I. 2014), *aff'd on appeal*, 793 F.3d 208 (1st Cir. 2015) ...............................................................................12

*Uroza v. Salt Lake Cnty.*, No. 11CV713DAK, 2013 WL 653968 (D. Ut. Feb. 21, 2013) ......12

*Vohra v. United States*, No. 04-cv-00972-DSF-RZ, 2010 U.S. Dist. LEXIS 34363 (C.D. Cal. Feb. 4, 2010), *adopted*, 2010 U.S. Dist. LEXIS 34088 (C.D. Cal. Mar. 29, 2010) ...........................................................................................12

*Villars v. Kubiatowski*, 45 F. Supp. 3d 791 (N.D. Ill. 2014) ....................................12

**Statutes**

Cal. Gov't Code § 7282 et seq. ................................................................14

Cal. Gov't Code § 7284 et seq. .........................................................1, 3, 14

Cook County, IL Code § 46-37(b) ..............................................................12

Or. Rev. Stat. Ann. § 181A.820....................................................................13

**Other Authorities**

American Immigration Council, *Immigrants in California* (2017) *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/ immigrants_in_california.pdf (2017) ............................................................1

Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230 (2005) ................11

Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post, Apr. 4, 2017, https://www.washingtonpost.com/world/ national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html .........8

ii

Stephen Rex Brown, *Courthouse Arrests of Immigrants by ICE Agents Have Risen 900% in New York This Year: Immigrant Defense Project*, N.Y. Daily News, Nov. 15, 2017, http://www.nydailynews.com/new-york/ice-courthouse-arrests-immigrants-900-n-y-2017-article-1.3633463 ...............................................................8

Jacob Bucher, Michelle Manasse, & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010) ....................................................................10

Letter from Tani G. Cantil-Sakauye, Chief Justice of the Supreme Court of California, to Jeff Sessions, Att'y Gen. of the U.S., and John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 16, 2017), *available at* http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to- immigration-enforcement-tactics-at-california-courthouses ..........................................................9, 10

Steve Coll, *When a Day in Court is a Trap for Immigrants*, New Yorker, Nov. 8, 2017, https://www.newyorker.com/news/daily-comment/when-a-day-in-court-is-a-trap-for-immigrants ..............................................................................8

Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, Boston Globe, June 16, 2017, https://www.bostonglobe.com/metro/2017/06/15/ice-arrests-and-around-local-courthouses-worry-lawyers-prosecutors/xxFH5vVJnMeggQa0NMi8gI/story.html...........................................10

Robert C. Davis, Edna Erez, & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183 (2001) .................................................................6, 7

*Detainer Policies*, Immigrant Legal Res. Ctr. (Mar. 21, 2017), *available at* https://www.ilrc.org/detainer-policies ..................................................14

Letter from Mary E. Fairhurst, Chief Justice of the Supreme Court of Washington, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 22, 2017), *available at* https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/KellyJohnDHSICE032217.pdf .....................................................9

James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News, Aug. 2, 2017, http://www.nydailynews.com/new-york/dad-2-testified-brooklyn-murder-cases-detained-ice-article-1.3378899 ...........................................................8

Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 610 (2011)...................................10

Michael John Garcia & Kate M. Manuel, Cong. Research Serv., R43457, State and Local "Sanctuary" Policies Limiting Participation in Immigration Enforcement 9 (July 10, 2015), *available at* https://www.fas.org/sgp/crs/homesec/R43457.pdf...........13, 14

iii

Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR, Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/ fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver ............9

Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, The Statesman (Austin), Mar. 8, 2017, http://www.statesman.com/news/local/deportation-fears-keep-victim-from- cooperating-domestic-violence-case-travis-says/rdZAjFEAxjHWnxXV1LlpjM/ ........8

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (Apr. 2009), *available at* https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of- Local-Police-Narrative.pdf .......................................................................................5, 6

*Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends, Feb. 23, 2017, http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump- administration/ .............................................................................................................4

Letter from Law Enforcement Task Force to Hon. Trey Gowdy and Hon. Zoe Lofgren (July 20, 2015), *available at* https://immigrationforum.org/wp-content/uploads/ 2015/07/072015-LEITF-Letter-House.pdf .................................................................13

Jasmine C. Lee, Rudy Omri, and Julia Preston, *What Are Sanctuary Cities?*, N.Y. Times, Feb. 6, 2017, http://www.nytimes.com/interactive/2016/09/02/us/sanctuary- cities.html....................................................................................................................14

*Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement*, Nat'l Immigration Law Ctr. (Aug. 2013) (statement of Chief Acevedo), *available at* https://www.nilc.org/wp-content/uploads/2017/02/Law- Enforcement-Opposition-to-Mandates-2013-08-30.pdf ..............................................7

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015)...............................................................................................5, 11

Katie Mettler, *"This is Really Unprecedented": ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post, Feb. 16, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/02/16/this-is- really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at- texas-courthouse/ .........................................................................................................8

Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), https://www.tdcaa.com/journal/new-ice-age .............................................................6

*Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before*

iv

*the S. Comm. on the Judiciary* (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf. ..................................................................3, 7, 10

Phoenix, AZ, Police Dep't Operations Order Manual (Jan. 2011) *available at* https://www.phoenix.gov/policesite/Documents/089035.pdf......................................13

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times, Oct. 9, 2017, http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html...............6

Letter from Stuart Rabner, Chief Justice of the Supreme Court of New Jersey, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Apr. 19, 2017), *available at* https://www.documentcloud.org/documents/3673664-Letter-from-Chief-Justice-Rabner-to-Homeland.html#document/p1 ......................................................9

Angelica S. Reina, Brenda J. Lohman, & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013)........................11

Sarah Stillman, *When Deportation Is a Death Sentence*, *New Yorker*, Jan. 15, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence..................................................................................................................9

S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ, June 5, 2017, http://www.nj.com/politics/index.ssf/2017/06/advocates_say_ice_courthouse_arrests_are_hurting_i.html....................................9

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (May 2013), *available at* www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ........................5

Washington, DC, Mayor's Order 2011-174: Disclosure of Status of Individuals: Policies and Procedures of District of Columbia Agencies (Oct. 19, 2011) *available at* https://www.scribd.com/document/69470234/Disclosure-Status-of-Individuals-D-C.................................................................................................................13

Chuck Wexler, *Commentary: Why Police Support Sanctuaries*, Phila. Inquirer, Mar. 10, 2017, http://www.philly.com/philly/opinion/20170310_Commentary__Why_police_support_sanctuaries.html..................................................14

Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, Gothamist, June 22, 2017, http://gothamist.com/2017/06/22/ice_immigrants_courts.php...........................................................................9

Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," Center for American Progress (Jan. 26, 2017), *available at*

v

https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ......................14

Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime.*, Wash. Post., Apr. 24, 2018, https://www.washingtonpost.com/news/monkey-cage/wp/2018/04/24/sanctuary-cities-dont-breed-crime-they-encourage-people-to-report-crime..................5

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici Current and Former Prosecutors and Law Enforcement Leaders file this brief as Amici Curiae in support of Defendants.[1] Amici are criminal justice leaders who have extensive expertise in law enforcement, prosecution, and cooperative federal-state law enforcement activities. They are intimately familiar with the challenges of performing critical law enforcement and governance functions in communities where immigrants fear the police and are vulnerable to exploitation and crime. Amici represent jurisdictions from across the country that understand the challenges of protecting local community needs and public safety.

Amici's experience in keeping their communities safe has underscored the critical importance of bringing immigrants and their families "out of the shadows." Community trust and cooperation are essential to public safety, and sound police work as well as successful prosecutorial efforts are undermined by undocumented immigrants' and their communities' fears of interacting with law enforcement and the justice system. This dynamic, moreover, leaves undocumented immigrants more vulnerable to crime and exploitation, and undocumented immigrant victims less likely to come forward or cooperate with investigations and prosecutions, leading to more violence in the communities amici are and have been charged with protecting. In the State of California, where more than a quarter of the population are immigrants,[2] these problems have a particularly profound impact.

Amici believe that enjoining Senate Bill 54, commonly known as the "California Values Act," Cal. Gov't Code § 7284 *et seq.* ("SB 54"), would precariously impact public safety in California.  By ensuring that jurisdictions throughout the state uniformly prioritize public safety

---

[1] A full list of amici is attached as Exhibit A.

[2] American Immigration Council, *Immigrants in California* (2017) *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_california.pdf (2017) (in 2015 immigrants comprised 27.3 percent of California's population).

1

over civil immigration enforcement, SB 54 aims to reduce fear and uncertainty in California communities regarding engagement with law enforcement and preserve limited state and local resources—at a time when aggressive federal immigration enforcement has impacted each of these issues.

Local involvement in immigration enforcement, including honoring transfer requests or civil detainers—requests from Immigration and Customs Enforcement ("ICE") to hold an individual in local governmental custody to allow ICE to take the individual into federal custody—or providing information about release dates and custody status, causes community members to distrust the police and justice system officials. This dwindling of trust results in a decrease in cooperation, hindering the ability of local law enforcement and local prosecutors to keep their communities safe. Such involvement also drains scarce resources that would otherwise be used to enhance public safety measures. SB 54 ensures that localities throughout the state will refrain from adopting certain policies that could jeopardize public safety in their own and neighboring jurisdictions, or that could subject them to liability for unconstitutional practices.

Amici believe that the injunction sought by the federal government is misguided and would eliminate important public safety protections established by the State of California after having carefully evaluated the needs of its residents.

## INTRODUCTION

The lessons amici have learned in protecting their communities shed important light on the issues raised in this case. When community residents live in constant fear that interactions with local law enforcement officials could result in deportation, there is a fundamental breakdown in trust that threatens public safety and impedes justice system leaders from doing their jobs. Extensive evidence shows that undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police and cooperating with prosecutors could

2

bring adverse immigration consequences. As a result, immigrant communities are less willing to report crimes and cooperate with criminal investigations and prosecutions. This fundamental breakdown in trust poses a major challenge both to the investigation and prosecution of individual crimes and to the proper allocation of public safety resources.

SB 54 is one of many policies designed to address this issue of trust by limiting local and state involvement in federal immigration enforcement. Under SB 54, local law enforcement entities cannot ask an individual about his or her immigration status for immigration enforcement purposes, cannot hold individuals past their release dates pursuant to a warrantless detainer request, and are limited in providing release date information for individuals or transferring such individuals in local custody.[3] Like similar policies, SB 54 aims to preserve state and local resources and improve public safety by promoting cooperation between law enforcement and the communities they serve.[4] SB 54's uniform approach enhances its effectiveness by reducing the fear and confusion that exist when neighboring jurisdictions employ varying practices that the public does not fully understand. The injunction sought by the federal government, if granted, would upend important protections the State of California has deemed necessary for its residents at a time when federal immigration enforcement practices have exacerbated the already-challenging task of cultivating trust between immigrant communities and local law enforcement.

---

[3] Cal. Gov't Code § 7284 *et seq.*
[4] *See Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, at 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

**ARGUMENT**

I.    **Trust and Respect Between Communities and Law Enforcement Officials Are Essential to Public Safety and Are Thwarted When Victims and Witnesses Fear Deportation Consequences of Cooperating.**

The experience of policing cities across the country has taught law enforcement officers that "[t]o do our job, we must have the trust and respect of the communities we serve."[5] In order to stop crime, police officers "need the full cooperation of victims and witnesses."[6]

This common-sense philosophy is sometimes called "community policing." Community policing is an approach to policing whereby local law enforcement engages communities in a working partnership to reduce crime and promote public safety.[7] It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation with the police department.[8] When that relationship of trust is missing—as it is when people believe that contacting police or cooperating with prosecutors could lead to deportation for themselves or others—community policing breaks down and the entire community is harmed.

According to a recent Pew survey, 67 percent of Hispanic immigrants and 47 percent of all Hispanic adults in the United States worry about deportation—of themselves, family members, or close friends.[9] This fear necessarily affects cooperation and communication with police and prosecutors. Immigrants—and their family members and neighbors who may be U.S. citizens or lawfully present—often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.

---

[5] *Id.* at 2.

[6] *Id.*

[7] *See* Anita Khashu, *The Role Of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (Apr. 2009), *available at* https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.

[8] *Id.*

[9] *Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends, Feb. 23, 2017, http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/.

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

As a result, immigrant communities in general, and undocumented immigrants in particular, are less likely to trust and cooperate with local police and prosecutors. One survey of Latinos in four major cities found that 70 percent of undocumented immigrants and 44 percent of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask them or people they know about their immigration status; and 67 percent of undocumented immigrants and 45 percent of all Latinos would be less likely to voluntarily offer information about, or report, crimes because of the same fear.[10] And a recent survey of undocumented individuals in San Diego County found that if local law enforcement officials were working together with ICE, 60.8 percent of survey respondents would be less likely to report a crime they witnessed, and 42.9 percent would be less likely to report being a victim of a crime.[11]

These studies (among others) highlight that fears of immigration enforcement and the resulting damage to law enforcement cooperation affect not just undocumented community members but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[12]

---

[10] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5–6 (May 2013), *available at* www.policylink.org/sites/default/ files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF; *see also id.* at 1 ("Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").

[11] Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime.*, Wash. Post., Apr. 24, 2018, https://www.washingtonpost.com/news/monkey-cage/ wp/2018/04/24/sanctuary-cities-dont-breed-crime-they-encourage-people-to-report-crime/.

[12] An estimated 85% of immigrants live in mixed-status families. *See* Khashu, *supra* note 7, at 24; *see also* Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) ("The results indicate that for each 1-point increase in fear of deportation [e.g., from 'not

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

This problematic atmosphere of mistrust is felt by police as well. In one study, two-thirds of the law enforcement officers polled expressed the view that recent immigrants reported crimes less frequently than others.[13] Those surveyed also indicated that the crimes underreported by immigrants are most often serious ones, with domestic violence and gang violence at the top.[14] These trends have only worsened in recent months. According to the Houston Police Department, rape reporting by members of the Hispanic community fell over 40 percent from the first quarter of 2016 to the same period in 2017, despite an overall *increase* in city-wide crime reports.[15] Los Angeles, San Francisco, and San Diego also witnessed lagging sexual assault and domestic violence reporting by Hispanic persons—but not other ethnic groups—in the first half of 2017.[16] According to Los Angeles County Sheriff's Deputy Marino Gonzalez, "[t]hey're afraid of us. And the reason they're afraid of us is because they think we're going to deport them."[17]

Immigrants' widely recognized fear of interacting with law enforcement and prosecutors poses a fundamental challenge for community policing. Police cannot prevent or solve crimes if victims or witnesses are unwilling to talk to them or prosecutors because of concerns that they,

---

much' to 'some' worry, or from 'some' to 'a lot'], Latina participants were 15% less willing to report being victim of a violent crime to police.").

[13] Robert C. Davis, Edna Erez, & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 187 (2001).

[14] *Id.* at 188–89.

[15] Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys Ass'n, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), https://www.tdcaa.com/journal/new-ice-age.

[16] James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times, Oct. 9, 2017, http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

[17] *Id.*

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

their loved ones, or their neighbors will face adverse immigration consequences. As the president of the Major Cities Chiefs Association has explained to Congress, "[c]ooperation is not forthcoming from persons who see their police as immigration agents."[18] As cautioned by one official, "immigrants will never help their local police to fight crime once they fear we have become immigration officers."[19]

The underreporting of crimes by recent immigrants is a problem for the entire criminal justice system.[20] The most immediate consequence, of course, is that serious crimes go unreported and unpunished. As one official explained, when criminal behavior goes unreported, "[c]rime multiplies" and "[u]nresolved resentments grow in the community."[21] Another added that the underreporting of crime "keeps fear at very high levels and diminishes quality of life."[22] Even beyond the underreporting of crime, undocumented immigrant victims and witnesses may refuse to come to court to testify in important criminal cases because of their fear of being detained and deported.

These concerns are anything but hypothetical. Over the past several months, they have manifested in ways that threaten long-term harm to criminal justice system operations. A Department of Homeland Security official recently illustrated why many immigrants hesitate to cooperate with law enforcement. In a briefing to reporters, he stated that "[j]ust because they're a victim in a certain case does not mean there's not something in their background that could cause

---

[18] Statement of Tom Manger, *supra* note 4, at 2.
[19] *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement*, Nat'l Immigration Law Ctr. (Aug. 2013), at 2 (statement of Chief Acevedo), *available at* https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf.
[20] Davis et al., *supra* note 13, at 188.
[21] *Id.*
[22] *Id.*

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

them to be a removable alien."[23] An immigrant woman living in Texas learned that lesson all too perversely when she arrived at a courthouse seeking a protective order against her abusive boyfriend, only to leave under arrest—likely due to a tip from her abuser.[24] In August 2017, federal agents detained an undocumented immigrant who had provided key testimony in two homicide cases.[25] And weeks later, ICE agents arrested a victim of domestic violence as he left a county courthouse.[26] The Immigrant Defense Project reports that the number of arrests or attempted arrests by ICE agents at courthouses throughout New York rose by a staggering 900 percent from 2016 to 2017.[27]

Precisely because victims and witnesses fear similar treatment from immigration authorities, some violent crimes have gone unreported, and pending prosecutions have disappeared from courts' dockets. A Texas district attorney confirmed that a victim of domestic violence had become uncooperative because she feared deportation.[28] Denver prosecutors were

---

[23] Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post, Apr. 4, 2017, https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-a5314b56a08_story.html.

[24] Katie Mettler, *"This is Really Unprecedented": ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, Wash. Post, Feb. 16, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/02/16/this-is-really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at-texas-courthouse/.

[25] James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. Daily News, Aug. 2, 2017, http://www.nydailynews.com/new-york/dad-2-testified-brooklyn-murder-cases-detained-ice-article-1.3378899.

[26] Steve Coll, *When a Day in Court Is a Trap for Immigrants*, New Yorker, Nov. 8, 2017, https://www.newyorker.com/news/daily-comment/when-a-day-in-court-is-a-trap-for-immigrants.

[27] Stephen Rex Brown, *Courthouse Arrests of Immigrants by ICE Agents Have Risen 900% in New York This Year: Immigrant Defense Project*, N.Y. Daily News, Nov. 15, 2017, http://www.nydailynews.com/new-york/ice-courthouse-arrests-immigrants-900-n-y-2017-article-1.3633463.

[28] Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, The Statesman (Austin), Mar. 8, 2017, http://www.statesman.com/

forced to drop four domestic abuse cases when similar worries deterred the victims from testifying;[29] in 2017, more than a dozen Latina women in Denver dropped their own civil cases against domestic abusers, citing fear of deportation.[30] An immigrant mother in New Jersey, fearing that interaction with the court system could trigger removal, declined to report that her son had been assaulted on his way to school.[31] And a victim of domestic violence in New York City "did not think it was in her best interest" to pursue a protective order.[32] In addition to their particular deportation concerns, undocumented immigrant victims and witnesses may understandably recoil more generally from a system that allows participants to walk freely into a courthouse to fulfill a civic responsibility to testify, only to be detained by immigration authorities and prevented from returning to their lives.

In response to these incidents, the chief justices of three state supreme courts have written top federal authorities to emphasize that preserving trust with immigrant communities is essential to the administration of justice.[33] As the Chief Justice of California has explained, enforcement

---

news/local/deportation-fears-keep-victim-from-cooperating-domestic-violence-case-travis-says/rdZAjFEAxjHWnxXV1LlpjM/.

[29] Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR, Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver.

[30] Sarah Stillman, *When Deportation Is a Death Sentence*, New Yorker, Jan. 15, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[31] S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ, June 5, 2017, http://www.nj.com/politics/index.ssf/2017/06/advocates_say_ice_courthouse_arrests_are_hurting_i.html.

[32] Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, Gothamist, June 22, 2017, http://gothamist.com/2017/06/22/ice_immigrants_courts.php.

[33] Letter from Tani G. Cantil-Sakauye, Chief Justice of the Supreme Court of California, to Jeff Sessions, Att'y Gen. of the U.S., and John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 16, 2017), *available at* http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to-immigration-enforcement-tactics-at-california-courthouses; Letter from Mary E. Fairhurst, Chief Justice of the Supreme Court of Washington, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 22, 2017), *available at* https://www.courts.wa.gov/content/publicUpload/Supreme%20

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

policies that include arresting immigrants at courthouses, "the vast majority of whom pose no risk to public safety, are neither safe nor fair."[34] Other leaders around the country have stated that using local court systems as levers for federal immigration enforcement "undercuts local law enforcement's ability to develop the critical trust needed to keep communities safe."[35]

Distrust between immigrants and law enforcement also results in greater victimization of immigrants. "When immigrants come to view their local police and sheriffs with distrust because they fear deportation, it creates conditions that encourage criminals to prey upon victims and witnesses alike."[36] This phenomenon has been termed the "deportation threat dynamic," whereby individuals who fear removal from the United States do not report the crimes they suffer.[37] Nearly two-thirds of undocumented migrant workers participating in a study in Memphis, Tennessee, reported being the victim of at least one crime, with the most common being theft and robbery.[38] Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[39]

---

Court%20News/KellyJohnDHSICE032217.pdf; Letter from Stuart Rabner, Chief Justice of the Supreme Court of New Jersey, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Apr. 19, 2017), *available at* https://www.documentcloud.org/documents/3673664-Letter-from-Chief-Justice-Rabner-to-Homeland.html#document/p1.

[34] Cantil-Sakauye Letter, *supra* note 33.

[35] Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, Boston Globe, June 16, 2017, https://www.bostonglobe.com/metro/2017/06/15/ice-arrests-and-around-local-courthouses-worry-lawyers-prosecutors/xxFH5vVJnMeggQa0NMi8gI/story.html (citing Massachusetts Attorney General Maura Healey).

[36] Statement of Tom Manger, *supra* note 4, at 2.

[37] Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 610 (2011).

[38] Jacob Bucher, Michelle Manasse, & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).

[39] *Id.* at 165.

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

Undocumented immigrants are especially vulnerable to domestic violence. A number of studies have shown that abusive partners may exploit the threat of deportation in order to maintain power and control.[40] Financial dependence on an abusive partner with stable immigration status may facilitate violence in this way.[41] Seventy percent of participants in one study of domestic abuse victims said that immigration status was a major factor keeping them from seeking help or reporting their abuse to the authorities—and thereby permitting the violence to continue.[42] In another study, immigration status was identified as the single largest factor independently affecting the rate at which battered Latina immigrants called the police.[43]

SB 54 aims to improve public safety by reducing fear of immigration enforcement and promoting cooperation between law enforcement and the communities they serve. Moreover, in a state where more than a quarter of its residents are immigrants, statewide uniformity enhances the impact of individual communities' policies by reducing the uncertainty and fear created when localities adopt varying approaches to immigration enforcement requests.

---

[40] *See, e.g.*, Messing et al., *supra* note 12, at 330 (citing several studies); Angelica S. Reina, Brenda J. Lohman, & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013). The latter study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do . . . but he threatened me . . . . [H]e told me that if I called the police I was going to lose out . . . because [police officers] . . . would . . . take me, because I didn't have legal documents." Reina, Lohman, & Maldonado at 601.

[41] *See, e.g.*, Messing et al., *supra* note 12, at 330.

[42] Reina, Lohman, & Maldonado, *supra* note 40, at 600.

[43] Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

## II.   Policies Limiting Local and State Involvement in Federal Immigration Enforcement Are Critical to Building and Maintaining Trust Between the Community and Law Enforcement While Preserving Local Resources.

In limiting local and state involvement in federal immigration enforcement, many jurisdictions aim to enhance community trust as well as preserve local resources. For example, like SB 54, some state and local policies seek to limit local involvement in immigration enforcement by prohibiting local law enforcement from providing release date information or holding individuals after their release date based on an ICE detainer request for purposes of transfer to ICE custody.[44] Eliminating these protections serves no justifiable goal, particularly when doing so substantially undermines other important public safety efforts. Moreover, communities need significant resources including funds, training, and personnel to best serve local law enforcement needs; redistribution to immigration enforcement siphons limited

---

[44] *See, e.g.*, Cook County, IL Code § 46-37(b): Policy for Responding to ICE Detainers. Under long-standing Fourth Amendment precedent, numerous federal courts have found that continued detention under an ICE detainer gives rise to a claim for a violation of the Fourth Amendment, and subjects the detaining officer or jurisdiction to civil liability. *See Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D. R.I. 2014), *aff'd on appeal*, 793 F.3d 208 (1st Cir. 2015) (plaintiff stated Fourth Amendment claim where she was held for 24 hours on ICE detainer issued without probable cause); *Galarza v. Szalczyk*, No. 10-cv-06815, 2012 WL 1080020, at *10, *13 (E.D. Pa. Mar. 30, 2012) (plaintiff stated a Fourth Amendment claim against both federal and local defendants where he was held for 3 days after posting bail based on an ICE detainer), *rev'd on other grounds*, 745 F.3d 634 (3d Cir. 2014); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *10 (D. Or. Apr. 11, 2014) (plaintiff's detention on an ICE detainer after she would otherwise have been released "constituted a new arrest, and must be analyzed under the Fourth Amendment"); *Mendoza v. Osterberg*, No. 13CV65, 2014 WL 3784141, at *6 (D. Neb. July 31, 2014) (recognizing that "[t]he Fourth Amendment applies to all seizures of the person," and thus, "[i]n order to issue a detainer[,] there must be probable cause") (internal quotation marks, ellipses, and citations omitted); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 808 (N.D. Ill. 2014) (plaintiff stated a Fourth Amendment claim where he was held on an ICE detainer that "lacked probable cause"); *Uroza v. Salt Lake Cnty.*, No. 11CV713DAK, 2013 WL 653968, at *5–6 (D. Ut. Feb. 21, 2013) (plaintiff stated a Fourth Amendment claim where ICE issued his detainer without probable cause); *Vohra v. United States*, No. 04-cv-00972-DSF-RZ, 2010 U.S. Dist. LEXIS 34363, at *25 (C.D. Cal. Feb. 4, 2010) (magistrate's report and recommendation), *adopted*, 2010 U.S. Dist. LEXIS 34088 (C.D. Cal. Mar. 29, 2010).

resources away from where they are most needed while simultaneously damaging community engagement and protection.[45]

Policies limiting local law enforcement involvement in federal immigration matters are not limited to California, and the policies embedded in SB 54 and challenged in this suit can be found in jurisdictions around the country. Some administrative policies or laws include formal restrictions on local law enforcement's ability to apprehend or arrest an individual for federal immigration violations, including restrictions on arrests for civil violations of federal immigration law.[46] Other policies include restrictions on local law enforcement inquiries or investigations into a person's immigration status or the gathering of such information at the local level.[47] Additionally, many jurisdictions have adopted policies against continued detention of an

---

[45] *See* Letter from Law Enforcement Task Force to Hon. Trey Gowdy and Hon. Zoe Lofgren (July 20, 2015), *available at* https://immigrationforum.org/wp-content/uploads/2015/07/072015-LEITF-Letter-House.pdf.

[46] *See* Michael John Garcia & Kate M. Manuel, Cong. Research Serv., R43457, State and Local "Sanctuary" Policies Limiting Participation in Immigration Enforcement 9 (July 10, 2015), *available at* https://www.fas.org/sgp/crs/homesec/R43457.pdf; *see also* OR. REV. STAT. ANN. § 181A.820 ("No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."); Washington, DC, Mayor's Order 2011-174: Disclosure of Status of Individuals: Policies and Procedures of District of Columbia Agencies, at 2 (Oct. 19, 2011) ("No person shall be detained solely on the belief that he or she is not present legally in the United States or that he or she has committed a civil immigration violation."), *available at* https://www.scribd.com/document/69470234/Disclosure-Status-of-Individuals-D-C  [hereinafter DC Order]; Phoenix, AZ, Police Dep't Operations Order Manual, at 1.4 (Jan. 2011) ("The investigation and enforcement of federal laws relating to illegal entry and residence in the United States is specifically assigned to [Immigration and Customs Enforcement within DHS]."), *available at* https://www.phoenix.gov/policesite/Documents/089035.pdf; *see also Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) ("[The sheriff] may not detain individuals solely because of unlawful presence.").

[47] *See, e.g.*, DC Order, *supra* note 46 (public safety employees "shall not inquire about a person's immigration status . . . for the purpose of initiating civil enforcement of immigration proceedings that have no nexus to a criminal investigation").

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

individual based on immigration detainer requests to facilitate transfer to ICE custody for at least some categories of noncitizens.[48] Several states, like California, limit the extent to which local police can cooperate with detainer requests, and more than 400 counties have policies limiting cooperation with detainers.[49]

Recent incidents in localities with policies limiting local involvement in federal immigration enforcement demonstrate the public safety benefits of such policies. For example, in 2016, Los Angeles Police Department officers had an encounter with a suspected gang member that resulted in a vehicle chase, a foot pursuit, and shots fired. An undocumented immigrant helped police locate the suspect by providing a description and vehicle information.[50] In Tucson, Arizona, an undocumented man confronted and struggled with a man who tried to steal a car with children inside. The immigrant held the individual until police arrived, then cooperated with detectives in the follow-up investigation, resulting in charges of kidnapping, auto theft, and burglary.[51] These examples show why crime is lower to a statistically significant degree in counties that limit local involvement in federal immigration enforcement, as by declining to hold individuals in local custody simply because ICE requests it.[52]

---

[48] Garcia & Manuel, *supra* note 46, at 14.

[49] Jasmine C. Lee, Rudy Omri, and Julia Preston, *What Are Sanctuary Cities?*, N.Y. Times, Feb. 6, 2017, http://www.nytimes.com/interactive/2016/09/02/us/sanctuary-cities; *Detainer Polices*, Immigrant Legal Res. Ctr. (Mar. 21, 2017), *available at* https://www.ilrc.org/detainer-policies. The California TRUST Act, Cal. Gov't Code § 7282 *et seq.*, enacted in 2013, placed limitations on local jurisdictions' compliance with detainer requests. SB 54, recognizing that many courts have held that ICE detainers can give rise to Fourth Amendment violations, prohibits detention on the basis of a detainer request. *Id.* §§ 7284.2(e), 7284.6(a)(1)(b).

[50] Chuck Wexler, *Commentary: Why Police Support Sanctuaries*, Phila. Inquirer, Mar. 10, 2017, http://www.philly.com/philly/opinion/20170310_Commentary__Why_police_support_sanctuaries.html.

[51] *Id.*

[52] Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," Center for American Progress (Jan. 26, 2017), *available at* https://www.americanprogress.org/issues/

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

The injunction sought by the federal government threatens to disrupt the California legislature's effort to ensure that immigrants do not fear interactions with local law enforcement or face unconstitutional treatment, and that jurisdictions within the state do not divert resources from effective public safety efforts. In short, eliminating these protections would send a dangerous signal to witnesses and victims within immigrant communities: cooperate with local law enforcement at your own risk.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendants' Brief, this Court should deny Plaintiff's Motion for Preliminary Injunction.

May 18, 2018                    Respectfully Submitted,

                               /s/ Joshua A. Geltzer

                               Joshua A. Geltzer
                               Mary B. McCord
                               Daniel B. Rice
                               INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                               AND PROTECTION
                               Georgetown University Law Center
                               600 New Jersey Avenue NW
                               Washington, DC 20001

                               Matthew J. Piers
                               Chirag G. Badlani
                               Caryn C. Lederer
                               HUGHES SOCOL PIERS RESNICK & DYM, LTD.
                               70 West Madison St., Suite 4000
                               Chicago, IL 60602
                               Phone: (312) 580-0100

                               *Counsel for Amici Curiae*

---

immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ("The results of the CEM analysis show that there are, on average, 35.5 fewer crimes per 10,000 people in sanctuary counties—a result that is highly statistically significant.").

15

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of BRIEF OF AMICI CURIAE CURRENT AND

FORMER PROSECUTORS AND LAW ENFORCEMENT LEADERS was served on May 18,

2018 via this Court's ECF filing system, whereupon all counsel of record were served.

<u>/s/ Joshua A. Geltzer</u>
Joshua A. Geltzer

# EXHIBIT A

# EXHIBIT A: LIST OF AMICI[*]

**Law Enforcement Action Partnership (LEAP)**

**Roy L. Austin**
Former Deputy Assistant to the President for Urban Affairs, Justice and Opportunity, White House Domestic Policy Council
Former Deputy Assistant Attorney General, Civil Rights Division, U.S. Department of Justice
Former Assistant U.S. Attorney, District of Columbia

**Carmen Best**
Police Chief, Seattle, Washington

**Sherry Boston**
District Attorney, Stone Mountain Judicial Circuit (DeKalb County), Georgia

**Chris Burbank**
Police Chief (Ret.), Salt Lake County, Utah
Director, Law Enforcement Engagement, Center for Policing Equity

**Jerry L. Clayton**
Sheriff, Washtenaw County, Michigan

**Randy Gaber**
Assistant Police Chief, Madison, Wisconsin

**Mark Gonzalez**
District Attorney, Nueces County (Corpus Christi), Texas

**Ronald Haddad**
Police Chief, Dearborn, Michigan

**Michael Haley**
Former Sheriff, Washoe County, Nevada

**Jim Hart**
Sheriff, Santa Cruz County, California

**John Hummel**
District Attorney, Deschutes County (Bend), Oregon

---

[*]Individual affiliations are provided for identification purposes only.

Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders
Case No. 2:18-00490

**Miriam Aroni Krinsky**
Executive Director, Fair and Just Prosecution
Former Assistant U.S. Attorney, Central District of California
Former Criminal Appellate Chief and Chief, General Crimes, Central District of California
Former Chair, Solicitor General's Criminal Appellate Advisory Group

**William Landsdowne**
Former Police Chief, San Diego County, California
Former Police Chief, San Jose County, California
Former Police Chief, Richmond, California

**Chris Magnus**
Chief, Tucson Police Department, Arizona

**Beth McCann**
District Attorney, 2nd Judicial Circuit (Denver), Colorado

**Mary B. McCord**
Former Acting Assistant Attorney General and Principal Deputy Assistant Attorney General for National Security, U.S. Department of Justice
Former Assistant U.S. Attorney and Chief, Criminal Division, U.S. Attorney's Office for the District of Columbia

**Bill McCarthy**
Sheriff, Polk County (Des Moines), Iowa

**Stephanie N. Morales**
Commonwealth's Attorney, Portsmouth Judicial Center, Portsmouth, Virginia

**Marilyn J. Mosby**
State's Attorney, Baltimore City, Maryland (2015-Present)

**Andy Norris**
Lieutenant (Ret.), Tuscaloosa, Alabama

**Joe Pelle**
Sheriff, Boulder County, Colorado

**Mark Prosser**
Director, Department of Public Safety, Storm Lake, Iowa

**Celestino Rivera**
Police Chief, Lorain, Ohio

**Daniel Satterberg**
Prosecuting Attorney, King County (Seattle), Washington

**Ronal Serpas**
Co-Chairman, Law Enforcement Leaders to Reduce Crime & Incarceration
Former Superintendent, New Orleans Police Department, Louisiana
Former Chief, Metropolitan Nashville Police Department, Tennessee
Former Chief, Washington State Patrol

**Carol A. Siemon**
Prosecuting Attorney, Ingham County (Lansing), Michigan

**Michael Tupper**
Police Chief, Marshalltown, Iowa

**Cyrus R. Vance, Jr.**
District Attorney, New York County (Manhattan), New York