1  MICHAEL N. FEUER (SBN 111529)
   City Attorney
2  JAMES P. CLARK (SBN 64780)
   Chief Deputy City Attorney
3  LEELA A. KAPUR (SBN 125548)
   Executive Assistant City Attorney
4  VALERIE L. FLORES (SBN 138572)
   Managing Assistant City Attorney
5  HARIT U. TRIVEDI (SBN 217282)
   Deputy City Attorney
6  STREFAN FAUBLE (SBN 247653)
   Deputy City Attorney
7  200 North Main St., City Hall East Suite 800
   Los Angeles, California 90012
8  Harit.Trivedi@lacity.org
   Telephone: (213) 978-7100
9  Facsimile: (213) 978-8250

10  *Attorneys for Proposed Amicus Curiae*
    *City of Los Angeles*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,<br><br>Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**AMICUS CURIAE BRIEF OF THE CITY OF LOS ANGELES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:   June 20, 2018<br>Hearing Time:   10:00 a.m.<br>Location:            Courtroom 6<br><br>Judge: Honorable John A. Mendez<br>Action Filed:   March 6, 2018 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ....................................................... 1

ARGUMENT ................................................................................................................ 3

    I.    California and Los Angeles Share a Commitment to Policing Policies that Build Trust with Immigrant Communities and Provide Security to All Residents. .............................................................................................. 3

        A.    Los Angeles Has for Decades Implemented Strategies Designed to Promote Cooperation Between the LAPD and the City's Immigrant Communities. ........................................................................... 3

        B.    Los Angeles' Long-Standing Policies Have Reduced Crime in the City and Improved Cooperation with Immigrant Communities. ................ 5

    II.    The Court Should Reject the Federal Government's Attempt to Impede Successful Policing Policies That Are Consistent with the United States Constitution and Federal Immigration Statutes. ....................................................... 7

        A.    SB 54 is an Exercise of the State's Core Sovereign Powers Vis-à-vis the Federal Government. ............................................................... 7

        B.    SB 54 is Protected Under the Tenth Amendment's Anti-Commandeering Doctrine. ............................................................... 8

        C.    SB 54 is Consistent With Section 1373. .................................................. 10

        D.    SB 54 Does Not Obstruct Enforcement of Federal Immigration Laws. ................................................................................... 12

    III.    AB 450 and AB 103 Support Los Angeles' Efforts to Improve Trust, Safety and Security in its Immigrant Communities. ............................................. 14

CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alden v. Maine*,
  527 U.S. 706 (1999) .................................................................................................... 9

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................................. 13

*FERC v. Mississippi*,
  456 U.S. 742 (1982) .................................................................................................... 8

*Gartrell Constr. v. Aubry*,
  940 F.2d 437 (9th Cir. 1991) .............................................................................. 12, 13

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) .................................................................................................. 13

*Georgia v. Ashcroft*,
  501 U.S. 452 (1991) ............................................................................................ 2, 7, 11

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................................................... 13

*International Paper Co v. Ouellette*,
  479 U.S. 481 (1987) .................................................................................................. 14

*Lewis v. Clarke*,
  137 S. Ct. 1285 (2017) ................................................................................................ 9

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) .................................................................................................... 9

*Murphy v. NCAA*,
  No. 16-476 (U.S. May 14, 2018), slip op. ........................................................ *passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................................ 7, 8

*New York v. United States*,
  505 U.S. 144 (1992) .............................................................................................. 9, 12

*Printz v. United States*,
  521 U.S. 898 (1997) ................................................................................................ 2, 9

*Steinle v. City and County of San Francisco*,
  230 F.Supp.3d 994, 1015 (N.D. Cal. 2017) ............................................................. 11

*Sturgeon v Bratton*,
   174 Cal. App. 4th 1407 (Cal. Ct. App. 2009) .......................................................................... 11

*United States v. Lopez*,
   514 U.S. 549 (1995) ............................................................................................................. 2, 8

*United States v. McCoy*,
   323 F.3d 1114 (9th Cir. 2003) .............................................................................................. 8, 11

*United States v. Morrison*,
   529 U.S. 598 (2000) .................................................................................................................. 8

*Valle Del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ................................................................................................. 13

**FEDERAL STATUTES**

8 U.S.C. § 1325 ............................................................................................................................ 4, 5

8 U.S.C. § 1373 ........................................................................................................... 9, 10, 11, 12

**CALIFORNIA STATUTES**

Assembly Bill 103 ................................................................................................................ 2, 14, 15

Assembly Bill 450 ................................................................................................................ 2, 14, 15

Cal. Gov. Code § 7283 ..................................................................................................................... 5

Cal. Gov. Code § 7284.2 .................................................................................................................. 1

Cal. Gov. Code § 7284.2(c) ............................................................................................................. 3

Cal. Gov. Code § 7284.6(a)(1)(C) & (D) ...................................................................................... 10

Cal. Gov. Code § 7284.6(e) ........................................................................................................... 10

Cal. Gov. Code § 7285.1 ............................................................................................................... 14

Cal. Gov. Code §7285.2 ................................................................................................................ 14

Cal. Gov. Code § 12532 ................................................................................................................ 15

Senate Bill 54 ........................................................................................................................ *passim*

iii

CITY OF LOS ANGELES' *AMICUS CURIAE* BRIEF


Case 2:18-cv-00490-JAM-KJN   Document 128   Filed 05/21/18   Page 5 of 20


## OTHER AUTHORITIES

Andrea Castillo, *ICE Arrests Farmworkers, Sparking Fears in the Central Valley Over Immigrants and the Economy*, L.A. Times, March 31, 2018 .......................... 14

Brittny Mejia, Andrea Castillo and Kate Mather, *In Trump Era, LAPD Strengthens Bonds With Immigrants Here Illegally*, L.A. ................................................................ 7

Deepa Fernandes, *Undocumented Workers Fight Wages Under Threat of Deportation*, Public Radio International, March 20, 2018 ........................................ 15

Gallup, *Trust in Government Tracking Poll*, Sept. 10, 2017 ............................................. 8

LAPD Chief of Police, *Memorandum re Reporting of Sexual Assault and Domestic Violence Crimes in Immigrant Communities*, April 18, 2018 ............................... 6, 7

LAPD Chief of Police, *Notice re Immigration Enforcement Procedures*, Dec. 29, 2017 ................................................................................................................ 4, 5, 10

LAPD, *2015-2016 Crime and Initiatives Report*, Part 1 crimes include aggravated assault, rape, murder, robbery, arson, burglary, larceny-theft, and motor vehicle theft .................................................................................................................. 6

LAPD, *Community Policing Unit Mission Statement* ....................................................... 4

LAPD, *Compstat Profile* .................................................................................................... 6

Paige St. John and Joel Rubin, *ICE held an American Man in Custody for 1,273 Days*, L.A. Times, April 27, 2018 .............................................................................. 14

Paloma Esquivel, *We Don't Feel Safe Here: Detainee Deaths, Suicide Attempts and Hunger Strikes Plague California Immigration Facility*, L.A. Times, Aug. 8, 2017 ........................................................................................................................ 15

The Federalist No. 45 (J. Madison) .................................................................................... 8

U.S. Census Bureau, *Place of Birth by Nativity and Citizenship Status, 2012-2016 American Community Survey 5-Year Estimates* ......................................................... 1


iv

CITY OF LOS ANGELES' *AMICUS CURIAE* BRIEF

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*

This case is about preserving trust and rejecting fear. The City of Los Angeles ("City" or "Los Angeles") has chosen for decades to build the relationship between its police and its immigrant communities on trust – a choice to which Los Angeles is constitutionally entitled. Nearly forty years ago, the Los Angeles Police Department ("LAPD") adopted Special Order 40, a formal policy restricting LAPD officers from initiating police action based on immigration status. Special Order 40 was intended to encourage all individuals, regardless of their immigration status, to report criminal activity and cooperate with their local police.

Los Angeles has adopted numerous other policing strategies over the past several decades also based upon the notion that trust is built and public safety best served when the City's police officers are not involved in the enforcement of federal civil immigration laws. These strategies have proven to be effective in establishing trust between LAPD officers and the people they serve – including the 1.5 million immigrants living in Los Angeles[1] – and protecting and enhancing the safety of all communities in the City.

Senate Bill 54 ("SB 54") is based on these same principles – that "a relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California" and that building trust requires minimizing the entanglement of local police in federal immigration enforcement. Cal. Gov. Code § 7284.2.

Plaintiff's attack on SB 54 is an attempt to supplant trust-based policing with a regime based on fear, where residents have cause to worry their neighborhood police officer is actually part of a national deportation force. Plaintiff's argument undermines public safety in Los Angeles and lacks support in either the Constitution or federal immigration statutes.

Policing policies like those embodied in SB 54 have improved cooperation with immigrant communities and reduced crime for all residents. In the past forty years since adopting its initial immigration-related policies, Los Angeles has seen crime rates plummet to record lows.

---

[1] U.S. Census Bureau, *Place of Birth by Nativity and Citizenship Status, 2012-2016 American Community Survey 5-Year Estimates*, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR_B05002&prodType=table

At the same time, LAPD officers have benefited from the cooperation of witnesses and victims of crime in the City's immigrant communities. These positive trends will not continue if immigrant communities see LAPD officers as agents of federal immigration authorities.

SB 54's efforts to improve public safety are constitutionally protected exercises of core police powers over which state and local governments retain sovereignty vis-à-vis the federal government. *United States v. Lopez*, 514 U.S. 549, 564 (1995). Courts should only tolerate federal encroachment into these traditional areas of local authority based on an "unmistakably clear" statute that "regulates private actors." *Georgia v. Ashcroft*, 501 U.S. 452, 460-463 (1991); *Murphy v. NCAA*, No. 16-476 (U.S. May 14, 2018), slip op. at 21. Courts have rejected previous federal attempts to conscript and commandeer local police to implement federal regulatory programs, as Plaintiff seeks to do here. *Printz v. United States*, 521 U.S. 898, 925 (1997).

SB 54 also comports with federal immigration statutes. SB 54 expressly allows local police departments to share information in their possession regarding any individual's immigration status, precisely what federal law requires. Plaintiff wants more information – such as home and work addresses – but the federal statutes do not require more. Nor does SB 54 interfere with any other unmistakably clear enforcement mandates of federal immigration law sufficient to justify upending constitutionally sacrosanct decisions of local law enforcement officials regarding local public safety.

Assembly Bill 450 ("AB 450") and Assembly Bill 103 ("AB 103") also foster trust between immigrant communities and state and local government. AB 450 bolsters many protections for Los Angeles workers, including those who work in sweatshops or substandard conditions and fear their employers will invite a workplace raid if they complain to authorities. AB 103 ensures Los Angeles residents that the State Attorney General will protect the rights of their family members and loved ones who are held in detention facilities far from home.

Los Angeles has a compelling interest in maintaining the collaborative relationship it has developed with its immigrant communities and the public safety of all its residents. The three State statutes at issue here serve that same interest. The Court should reject Plaintiff's attempt to enjoin those laws.

CITY OF LOS ANGELES' *AMICUS CURIAE* BRIEF

# ARGUMENT

## I. California and Los Angeles Share a Commitment to Policing Policies that Build Trust with Immigrant Communities and Provide Security to All Residents.

SB 54 is part of the State's efforts to improve public safety by promoting trust between the people and their police. State lawmakers know trust is cultivated best in an environment where local police officers are not involved in enforcing federal civil immigration laws. As the State Legislature found in adopting SB 54, "trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes … ." Cal. Gov. Code § 7284.2(c).

Los Angeles has embraced these same principles for decades. Nearly forty years ago, the LAPD Board of Police Commissioners adopted the City's initial policies limiting the role its officers play in immigration enforcement based on "the principle that effective law enforcement depends on a high degree of cooperation between the Department and the public it serves." Declaration of Arif Alikhan (ECF No. 75-2) ("Alikhan Decl."), ¶ 18. LAPD has followed these principles ever since. Los Angeles' policing policies and long experience are particularly relevant to understanding the efficacy and legality of SB 54.

### A. Los Angeles Has for Decades Implemented Strategies Designed to Promote Cooperation Between the LAPD and the City's Immigrant Communities.

For over forty years, Los Angeles has exercised its constitutionally protected powers over local law enforcement to adopt policing policies designed to encourage <u>all</u> victims of and witnesses to crime to collaborate with the LAPD. Alikhan Decl., ¶¶ 6, 8.[2] Central to these policies has been the decision by LAPD leadership and its civilian overseers to leave federal civil immigration enforcement to the federal government.

In 1979, the LAPD began a policy known as Special Order 40 – adopted by the Los Angeles Board of Police Commissioners and signed by then-Chief of Police Daryl Gates. Alikhan Decl., ¶ 7. Special Order 40 restricts an officer from initiating a police action with the

---

[2] Arif Alikhan is the LAPD Director of the Office of Constitutional Policing and Policy and the highest-ranking civilian in the Department. Alikhan Decl., ¶ 2.

objective of discovering a person's immigration status, and also prohibits misdemeanor arrests for violations of Title 8 of United States Code Section 1325 (Improper Entry).[3]  Special Order 40 is based on the principle that undocumented immigration status in itself is not a matter for police action and that LAPD personnel are required to enforce the law and serve members of the public equally without regard to immigration status.  The City adopted this policy to ensure that individuals, regardless of their civil immigration status, would report crimes to the LAPD and assist the LAPD in apprehending and prosecuting those responsible for criminal acts.  Alikhan Decl., ¶ 8.

After the civil disturbances of 1992, the LAPD implemented robust community policing strategies in all of its diverse neighborhoods.  Alikhan Decl., ¶ 6.  Community policing "is based upon a partnership between the police and the community whereby the police and the community share responsibility for identifying, reducing, eliminating and preventing problems that impact community safety and order."  As part of these efforts, "the community and police work as partners to identify and prioritize problems of crime and disorder and share the responsibility for the development and implementation of proactive problem-solving strategies to address identified issues."[4]

In 2014, the LAPD adopted a practice of not detaining individuals otherwise eligible for release from custody based on requests from U.S. Immigration and Customs Enforcement ("ICE").  Alikhan Decl., ¶ 10.  LAPD does not detain individuals based on ICE detainer requests unless accompanied by a judicial determination of probable cause that the arrestee was involved in a criminal offense or an otherwise valid warrant from a judicial officer.[5]

LAPD provides U.S. Department of Homeland Security ("DHS") and ICE personnel access to interview individuals in LAPD custody consistent with State law.  Individuals arrested by the LAPD may be detained in LAPD jail facilities for a short period of time only – often for

---

[3] See LAPD Chief of Police, *Notice re Immigration Enforcement Procedures*, Dec. 29, 2017, http://clkrep.lacity.org/onlinedocs/2017/17-1198_misc_03-12-2018.pdf (summarizing the LAPD's immigration-related policies and practices).
[4] LAPD, *Community Policing Unit Mission Statement*, http://www.lapdonline.org/support_lapd/content_basic_view/731
[5] LAPD Chief of Police, *Notice re Immigration Enforcement Procedures*, Dec. 29, 2017, http://clkrep.lacity.org/onlinedocs/2017/17-1198_misc_03-12-2018.pdf

only a few hours and generally not more than 96 hours – and then must be transferred to the County Sheriff's Department or released. Alikhan Decl., ¶ 11. LAPD permits personnel from DHS and ICE access to interview individual arrestees, but only after obtaining the arrestee's informed, written consent, as required under State law. *Id*., ¶ 12; Cal. Gov. Code § 7283 *et seq*. If the arrestee declines the interview, the LAPD does not provide DHS or ICE personnel access to its facilities in order to interview that individual.[6]

LAPD's policies also regulate treatment of information regarding individuals in LAPD custody. For example, the LAPD does not send an arrestee's home or work address information to federal immigration officials unless the information is subject to disclosure already under the California Public Records Act. Nor does LAPD share information about an arrestee's release date unless it is public or the arrestee has been convicted of a serious or violent felony as defined under State law.[7]

LAPD also has a policy against participating with ICE to enforce civil immigration law. Alikhan Decl., ¶ 13. LAPD does not participate in the federal government's voluntary program authorized under Section 1357(g) of Title 8 of the United States Code, which permits local law enforcement officers to perform civil immigration enforcement if the agencies meet the qualification and training requirements and are granted the civil enforcement authority by the federal government.[8]

### B. Los Angeles' Long-Standing Policies Have Reduced Crime in the City and Improved Cooperation with Immigrant Communities.

LAPD's policies regarding immigrant communities are rooted in a commitment to fair, constitutional policing and to the principle that all of Los Angeles is safer when our officers maintain a relationship of respect and cooperation with residents of the City's many diverse neighborhoods. Alikhan Decl., ¶ 17.

This era of trust has seen a dramatic fall in crime in Los Angeles. Through the City's

---

[6] *Id*.
[7] *Id*.
[8] *Id*. These LAPD policies did not change in any meaningful way following the enactment of SB 54 because SB 54's various mandates regarding the involvement of local agencies in immigration enforcement generally track existing LAPD practices. Alikhan Decl., ¶¶ 15-16.

community policing policies, the LAPD and community members have driven down the City's crime rate in neighborhoods with high numbers of immigrants as well as across the City. Overall crime levels in the Los Angeles are historically low. In 1979, when Special Order 40 was issued, the LAPD reported nearly 350,000 total Part 1 crimes.[9] The total crime rate peaked in the early 1990s. But by the end of 2016, following decades of cultivating trust between police and residents and a robust community policing strategy, the total number of Part 1 crimes in the City had fallen by nearly half, to 125,430.[10] Violent crime has fallen to record lows. And the level of gang violence also has decreased, especially in areas with large concentrations of immigrant communities. Alikhan Decl., ¶ 6.

Trust between the LAPD and residents also elicits greater cooperation from victims of and witnesses to crime. In particular, cooperation of immigrants in reporting crimes and assisting in the investigation and prosecution of criminals is critical to the fair and effective enforcement of the law and the safety of all members of the community. Alikhan Decl., ¶ 17. When people feel confident that they can come forward as victims or witnesses to a crime, irrespective of immigration status and without fear of jeopardizing their status or that of their family members, the LAPD's ability to reduce violent crimes, especially those involving violent gang members, significantly improves. *Id.*

Conversely, fear of the police reduces cooperation. And, more specifically, fear that the City's police are serving as immigration officers stifles the cooperation of immigrant communities. One stark example in Los Angeles was the sharp decrease in the reporting of sexual assault and domestic violence related crimes within Latino communities during the first few months of the new presidential administration. In the first four months of 2017, reports of sexual assault amongst Hispanic victims fell over 23% compared to the same period the year before. Reports of domestic violence from the same community fell over 8%.[11]

---

[9] LAPD, *2015-2016 Crime and Initiatives Report*, http://assets.lapdonline.org/assets/pdf/crimes-and-initiatives2015.pdf. Part 1 crimes include aggravated assault, rape, murder, robbery, arson, burglary, larceny-theft, and motor vehicle theft.

[10] LAPD, *Compstat Profile*, http://assets.lapdonline.org/assets/pdf/123116cityprof.pdf

[11] LAPD Chief of Police, *Memorandum re Reporting of Sexual Assault and Domestic Violence Crimes in Immigrant Communities*, April 18, 2018, http://www.lapdpolicecom.lacity.org/042418/BPC_18-0141.pdf

CITY OF LOS ANGELES' *AMICUS CURIAE* BRIEF

These alarming statistics raised concerns that deportation fears were preventing victims in immigrant communities from reporting crimes. In response, the LAPD launched a series of measures designed to abate this fear and restore the confidence of the City's immigrant communities in their police officers. Central to the LAPD's efforts was ensuring residents that the LAPD does not, and will not, undertake the enforcement of civil immigration laws.[12]

The benefits of trust-based community policing are not hypothetical. Nor are the regressive, negative effects of rekindling immigrants' fear that local police are in fact deportation officers. The experience of Los Angeles over the past several decades demonstrates that trust, respect and cooperation are essential to public safety in Los Angeles. Alikhan Decl., ¶ 19. Immigration experts and civil rights advocates agree.[13] LAPD's long-standing policies and practices seek to promote and maintain those principles, as do the provisions of SB 54. On the other hand, if immigrant communities fear that LAPD officers are acting as agents of federal immigration authorities, the relationship between the police and these communities very likely will erode. Immigrant communities will be less willing to report crimes and cooperate with criminal investigations, threatening the public safety of all who live and work in Los Angeles. *Id*.

**II.   The Court Should Reject the Federal Government's Attempt to Impede Successful Policing Policies That Are Consistent with the United States Constitution and Federal Immigration Statutes.**

    **A.   SB 54 is an Exercise of the State's Core Sovereign Powers Vis-à-vis the Federal Government.**

The Constitution establishes "a system of dual sovereignty between the States and the Federal Government." *Georgia v. Ashcroft*, 501 U.S. 452, 457 (1991); see *Murphy*, slip op. at 14. Under this system, the federal government has "limited powers" and the states "retain substantial sovereign authority" over important aspects of the everyday lives of their residents. *Id*. States and their political subdivisions have broad authority over many elements of government, including education, land use, health and safety, and, importantly, law enforcement.[14]

---

[12] *Id*.
[13] Brittny Mejia, Andrea Castillo and Kate Mather, *In Trump Era, LAPD Strengthens Bonds With Immigrants Here Illegally*, L.A. Times, May 17, 2018.
[14] "[T]his general power of governing, possessed by the States but not by the Federal Government," is known as the "police power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535-536 (2012).

SB 54 is a proper exercise of the State's police power because control over local law enforcement exists at the core of powers over which state and local governments retain sovereignty vis-à-vis the federal government. The Supreme Court has acknowledged as much: "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); see also *United States v. Lopez*, 514 U.S. 549, 564 (1995) (describing "criminal law enforcement" as an area "where States historically have been sovereign"); *United States v. McCoy*, 323 F.3d 1114, 1124 (9th Cir. 2003) ("the field of criminal law enforcement" is one "where state power is preeminent" and national authority "limited").

Trust in local leaders is one of the primary reasons why the Framers placed local law enforcement in the sovereign hands of state and local government. The reservation of police power to the states, and in turn to local jurisdictions, reflects the Framer's wise judgment that "punishing street crime" and many other "vital functions of modern government" should be administered by "smaller governments closer to the governed." *Sebelius*, 567 U.S. at 535-536. "The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and priorities of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Id.* (quoting The Federalist No. 45 (J. Madison)). The Framers' faith in the close bond between local governments and their residents was well founded, as polls continue to show Americans trust their local governments significantly more than the federal government.[15]

**B.     SB 54 is Protected Under the Tenth Amendment's Anti-Commandeering Doctrine.**

In codifying California's decision about how to allocate its limited resources in the exercise of its police powers, SB 54 implicates central elements of California's exercise of its sovereign powers under the Tenth Amendment. See *FERC v. Mississippi*, 456 U.S. 742, 761 (1982) ("having the power to make decisions and set policy is what gives the State its sovereign

---

[15] See, e.g., Gallup, *Trust in Government Tracking Poll*, Sept. 10, 2017, http://news.gallup.com/poll/5392/trust-government.aspx

nature. It would follow that the ability of a state legislative [body] … to consider and promulgate regulations of its choosing must be central to a State's role in the federal system.").

First, California's exercise of it police powers to make law enforcement decisions is central to its state sovereignty. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (police powers have been "[t]hroughout our history" "primarily, and historically…matter[s] of local concern" over which states have had "great latitude"). Second, California's allocation of its limited resources also is essential to its sovereignty. See *Murphy*, slip op. at 18 ("the anticommandeering principle prevents Congress from shifting the cost of regulation to the States."); *Lewis v. Clarke*, 137 S. Ct. 1285, 1294-95 (2017) ("one of the underlying rationales for state sovereign immunity … [is] a government's ability to make its own decisions about 'the allocation of scarce resources,'") (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

The federal government's attempt to commandeer California's resources and compel local officers to enforce federal immigration law in contradiction of California's sovereign decisions found in SB 54 directly violates California's Tenth Amendment rights. See *Printz v. United States*, 521 U.S. 898, 925 (1997) ("The federal government may not compel the States to implement, by legislation or executive action, federal regulatory programs."); *New York v. United States*, 505 U.S. 144, 166 (1992) ("We have always understood that where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

The anticommandeering doctrine applies with equal force when a federal statute purports to prohibit a State from enacting legislation, as Plaintiff alleges Section 1373 does here. In *Murphy*, the Supreme Court recently discussed the history and virtues of the doctrine and applied it to invalidate a federal law that prohibited states from authorizing sports gambling schemes. The Court found the distinction between a federal statute compelling a state to act (as in *Printz* and *New York*) and one prohibiting a state from acting (as in *Murphy* and this case) to be an "empty" one – either way, "Congress cannot issue direct orders to state legislatures." *Murphy*, slip op. at 18-19.

### C. SB 54 is Consistent With Section 1373.

SB 54 complies with 8 U.S.C. § 1373, which prohibits restrictions on sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." In addition to the many reasons set forth in the State's brief, Los Angeles below highlights the following further proof that Section 1373 does not conflict with or preempt SB 54.

First, SB 54 expressly requires compliance with Section 1373: "This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual … ." Cal. Gov. Code § 7284.6(e). LAPD's policies also expressly require compliance with Section 1373.[16] Thus, SB 54, LAPD policy, and Section 1373 all agree that the LAPD may inform DHS and ICE of the immigration status, lawful or unlawful, of individuals in LAPD custody.

Second, SB 54 does not allow – and Section 1373 does not require – sharing information *other* than immigration status. For example, under SB 54 local law enforcement agencies generally may not disclose non-public information regarding an arrestee's home or work address or non-public release date information except for violent offenders. See Cal. Gov. Code § 7284.6(a)(1)(C) & (D). Section 1373 also does not require disclosure of that information because an arrestee's personal contact or release date is not "information regarding the citizenship or immigration status, lawful or unlawful."

Notably, in making its untenable argument, Plaintiff omits and ignores the important words "lawful or unlawful" contained in the text of Section 1373: "information regarding the citizenship or immigration status, *lawful or unlawful*, of any individual."[17] By including these words, Congress made clear that local agencies must share information about whether an individual's immigration status is lawful or unlawful. An individual's home or work address or release date has no bearing on whether a person's immigration status is lawful or not. Plaintiff

---

[16] LAPD Chief of Police, *Notice re Immigration Enforcement Procedures*, Dec. 29, 2017, http://clkrep.lacity.org/onlinedocs/2017/17-1198_misc_03-12-2018.pdf

[17] Plaintiff twice omits those words when directly quoting Section 1373 in its Complaint (see Complaint at 5:25, 15:5-6), and replaces those words with an ellipsis in its memorandum in support of its present motion (see Motion at 25:16-18).

seeks this information because it would help federal authorities locate and seize individuals. But Section 1373 is not intended to be an instrument for locating and seizing individuals for immigration crimes. Section 1373 allows the sharing of information possessed by local government regarding the "immigration status, lawful or unlawful" of individuals, only. Release date and personal contact information do not fall within that definition under any reasonable interpretation of the language.

Third, Plaintiff's overbroad interpretation of Section 1373 fails because the statute does not contain "unmistakably clear" language sufficient to usurp the State's exercise of its core police powers. *Georgia v. Ashcroft*, 501 U.S. at 460-463 (requiring "unmistakably clear" statute to alter the usual constitutional balance between state and federal government). State and local governments operate at the zenith of their sovereign powers when implementing local law enforcement decisions such as SB 54. *McCoy*, 323 F.3d at 1124 ("the field of criminal law enforcement" is one "where state power is preeminent" and national authority "limited"). At the very least, courts should demand "unmistakably clear" statutory language in obvious conflict with local law to justify upending the constitutionally protected decisions California and Los Angeles have made regarding how best to maintain public safety.

Fourth, courts in Los Angeles and elsewhere have held that the policies embodied in SB 54 do not conflict with Section 1373. See *Steinle v. City and County of San Francisco*, 230 F.Supp.3d 994, 1015 (N.D. Cal. 2017) (holding that Section 1373 does not require local police to send release date information to ICE: "no plausible reading of 'information regarding … citizenship or immigration status' encompasses the release date of an undocumented inmate."); see also *Sturgeon v Bratton*, 174 Cal. App. 4th 1407 (Cal. Ct. App. 2009) (upholding LAPD's Special Order 40 against a facial challenge under Section 1373).

Fifth, Plaintiff's preemption claim fails even if Section 1373 is construed to be in conflict with SB 54. As the Supreme Court recently reiterated, "since the Constitution 'confers upon Congress the power to regulate individuals, not States,' the [federal statutory] provision at issue must be best read as one *that regulates private actors*" in order to support preemption. *Murphy*, slip op. at 21 (emphasis added) (quoting *New York*, 505 U.S. at 166). Section 1373 does not

impose any duties or rights on private individuals. As the Court found in *Murphy*, "there is no way in which this provision can be understood as a regulation on private actors." *Id*. at 24. Thus, Section 1373 cannot preempt SB 54.

### D. SB 54 Does Not Obstruct Enforcement of Federal Immigration Laws.

SB 54 does not interfere with the enforcement of federal immigration laws in an unlawful manner. To the contrary, SB 54's policies increase victim and witness cooperation with police and reduce crime for everyone. See, *infra*, Section I.B. Federal immigration laws should not be construed to preempt non-conflicting local law enforcement measures in a manner that will increase local crime.

While the brief passages quoted from various cases in its Motion appear to support Plaintiff's argument that SB 54 obstructs immigration enforcement, closer inspection shows the cases prohibit only *direct* conflict, and no such direct conflict exists here. Plaintiff misreads these cases to create the appearance that states may not direct their police powers or allocate their resources in ways that even indirectly frustrate federal goals. The cases do not stand for this broad assertion.

Plaintiff's cases fall into two categories: those where state law directly conflicts with an explicit provision of federal law (as Plaintiff incorrectly contends California's laws conflict with Section 1373), and those directly conflicting with a scheme of federal law that occupies a field.

Only one case Plaintiff cites falls into the first category: *Gartrell Constr. v. Aubry*, 940 F.2d 437 (9th Cir. 1991). Plaintiff quotes *Gartrell* for the proposition that a state law is preempted and invalid if it "results in interference with federal government functions." Motion at 13 (quoting *Gartrell*). The context undercuts Plaintiff's quotation. In *Gartrell*, California's labor code required contractors to satisfy state-determined contractor-responsibility requirements and receive state licenses to perform work on federal contracts. The Ninth Circuit held the Federal Acquisition Regulations, which had its own standards for contractor-responsibility, preempted state law and, as such, California law was attempting to review the federal government's responsibility determination. *Id.* at 439. California law thus *directly* contradicted federal provisions on a federal matter.

CITY OF LOS ANGELES' *AMICUS CURIAE* BRIEF

Plaintiff's other cases involve direct conflicts with comprehensive, field-occupying systems that exclude any state legislation.  Plaintiff cites *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) for the proposition state enactments cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Motion at 3, 10.  The quotations are accurate, but again the context undercuts Plaintiff's point.  *Valle* concerns an Arizona statute criminalizing the transporting, concealing, or harboring of an unauthorized alien, or attempting to do so, with a minimum $1,000 fine.  The court concluded federal legislation had already occupied the field.  Thus, any provisions that went beyond the federal scheme, such as the fine, directly contradicted Congress's scheme.

*Hines* concerns a Pennsylvania law passed in 1939 which required every alien 18 years or over to carry and present to police an identification card.  In 1940, Congress enacted the Alien Registration Act, which did not require aliens to carry an identification card.  The *Hines* court concluded the federal Act was a comprehensive plan occupying the field and Pennsylvania's law was in direct conflict with the federal Act.  Importantly, the court did not say Pennsylvania's law was improper because it was in indirect tension with or failed to facilitate federal law.

Plaintiff cites *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 865 (2000), which quotes the passage in *Hines* examining the existence of standing as an "obstacle" to the "objective of Congress."  Motion at 10.  In *Geier*, the Court concluded the petitioner's lawsuit alleging a car manufacturer negligently failed to include a driver-side airbag was preempted by the National Traffic and Motor Vehicle Safety Act of 1966, which occupied the field and did not require driver-side airbags.

Plaintiff cites *Arizona v. United States*, 567 U.S. 387, 406 (2012), for the proposition that state law addressing immigration enforcement is preempted when it "diminish[ed]" and "detract[ed] from the federal government's enforcement of federal immigration law."  Motion at 13.  The Court determined that federal immigration law occupied the entire field, having created a "comprehensive and unified system" (*id*. at 402-03).  Thus, Arizona's law, which made it a misdemeanor for an unauthorized alien to work in Arizona, was inconsistent with federal law.

Plaintiff cites *International Paper Co v. Ouellette*, 479 U.S. 481, 494 (1987) for the proposition "state law…is preempted if it interferes with the methods by which the federal statute was designed to reach [its] goal." Motion at 27. Context again undercuts Plaintiff's use of the quotation. In *International Paper*, the Court held the Clean Water Act dominated the field except for a limited savings clause permitting state law to apply to in-state point sources. *Id.* at 984-95, 500. Thus, Vermont's preempted state laws which went beyond in-state point sources were found inconsistent with the occupied-field of federal law. This, again, is a direct conflict; the Court did not say or suggest Vermont's law was preempted because it indirectly frustrated a federal goal.

### III. AB 450 and AB 103 Support Los Angeles' Efforts to Improve Trust, Safety and Security in its Immigrant Communities.

AB 450 prevents employers from providing voluntary consent to federal immigration agents who, without a warrant or judicial subpoena, attempt to enter non-public areas of an employer's workplace, or seek to access or review employee records at the employer's establishment. Cal. Gov. Code §§ 7285.1, 7285.2. AB 450 serves two important purposes in Los Angeles. First, the statute protects Los Angeles workers from unlawful treatment during workplace immigration raids by federal agents. Los Angeles and other parts of the State have seen many cases of federal agents detaining immigrant workers not for being targets of ICE operations, but for having an appearance similar to an ICE target.[18] Workers in Los Angeles also have been subject to federal workplace raids based on assumptions of illegal status or on flawed databases with inaccurate information regarding citizenship status.[19] AB 450, in preventing employers from consenting to entry and searches without warrants, ensures workers in Los Angeles are afforded due process rights and the right to work without fear of unlawful harassment, detention, or deportation.

Second, AB 450 bolsters protections for Los Angeles workers suffering sweatshop or substandard workplace conditions but fearful their employers will invite or threaten an ICE

---

[18] Andrea Castillo, *ICE Arrests Farmworkers, Sparking Fears in the Central Valley Over Immigrants and the Economy*, L.A. Times, March 31, 2018, http://www.latimes.com/local/lanow/la-me-farmworkers-ice-20180316-htmlstory.html.

[19] Paige St. John and Joel Rubin, *ICE held an American Man in Custody for 1,273 Days*, L.A. Times, April 27, 2018, http://www.latimes.com/local/lanow/la-me-citizens-ice-20180427-htmlstory.html.

workplace raid if they complain. Many immigrants in Los Angeles and across the State endure poor working conditions, wage theft and other unlawful employment practices. Unfortunately, immigrant workers often do not confront their employers over these violations because employers may threaten to report them to federal immigration authorities.[20] AB 450 curbs abusive employers who threaten ICE interrogation and seizure of personnel records to silence employees.

AB 103 authorizes the State Attorney General to conduct reviews of county, local, and private detention facilities that house noncitizen individuals within the state of California. Cal. Gov. Code § 12532. While no covered detention facility is located in Los Angeles, residents of Los Angeles have been detained at these facilities and the City has a strong interest in protecting their rights while in custody. Conditions in federal immigration detention centers are suspect. Watchdog groups and news agencies have reported delays in medical treatment, hunger strikes, sexual assaults, and attempted suicides.[21] AB 103 helps ensure Los Angeles residents that State officials are monitoring conditions at federal detention centers and protecting the rights of their family members and loved ones who may be held in facilities far from home.

## CONCLUSION

For these reasons, and those provided by the State and other *Amici Curiae*, the City of Los Angeles respectfully urges the Court to deny Plaintiff's motion for preliminary injunction.

Dated: May 18, 2018          Respectfully submitted,

**MICHAEL N. FEUER**, City Attorney


By:  /s/Harit U. Trivedi
     HARIT U. TRIVEDI
     Deputy City Attorney
     *Attorneys for Amicus Curiae City of Los Angeles*

---

[20] Deepa Fernandes, *Undocumented Workers Fight Wages Under Threat of Deportation*, Public Radio International, March 20, 2018, https://www.pri.org/stories/2018-03-20/undocumented-workers-fight-wages-under-threat-deportation.

[21] Paloma Esquivel, *We Don't Feel Safe Here: Detainee Deaths, Suicide Attempts and Hunger Strikes Plague California Immigration Facility*, L.A. Times, Aug. 8, 2017, http://www.latimes.com/local/lanow/la-me-ln-adelanto-detention-20170808-story.html