MARGARET L. CARTER (S.B. #220637)
mcarter@omm.com
DANIEL R. SUVOR (S.B. #265674)
dsuvor@omm.com
DANIEL J. TULLY (S.B. #309240)
dtully@omm.com
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213.430.6000
Facsimile: 213.430.6407
*Attorneys for Amicus Curiae
County of Los Angeles*

BARBARA J. PARKER (S.B. #069722)
City Attorney
MARIA BEE (S.B. #167716)
ERIN BERNSTEIN (S.B. #231539)
ebernstein@oaklandcityattorney.org
MALIA MCPHERSON (S.B. #313918)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California
Telephone: 510.238.3601
Facsimile: 510.238.6500
*Attorneys for Amicus Curiae
City of Oakland*

JAMES R. WILLIAMS (S.B. #271253)
County Counsel
GRETA S. HANSEN (S.B. #251471)
KAVITA NARAYAN (S.B. #264191)
LAURA S. TRICE (S.B. #284837)
JAVIER SERRANO (S.B. #252266)
javier.serrano@cco.sccgov.org
70 West Hedding Street, E. Wing, 9th Floor
San José, CA 95110
Telephone: 408.299.5900
Facsimile: 408.292.7240
*Attorneys for Amicus Curiae
County of Santa Clara*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,<br><br>Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**[PROPOSED] BRIEF OF AMICI CURIAE 25 CALIFORNIA COUNTIES, CITIES, AND LOCAL OFFICIALS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 74)**<br><br>Judge: Honorable John A. Mendez |

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ................................................................. 1

ARGUMENT ............................................................................................... 3

    I.     SB 54 PROMOTES PUBLIC SAFETY, HEALTH, AND WELFARE................. 3

    II.    THE FEDERAL GOVERNMENT'S PREFERRED AGENDA FOR LOCAL IMMIGRATION ENFORCEMENT UNDERMINES PUBLIC SAFETY BY DISCOURAGING POLICE-COMMUNITY COOPERATION AND CIVIC PARTICIPATION ................................................. 5

          A.    State and Local Control of Law Enforcement Is Integral to Promoting Public Safety and Fostering Trust Between Immigrant Communities and Police ................................................. 5

          B.    State and Local Sanctuary Policies Promote the Health and Welfare of California Residents ................................................. 10

               1.    Sanctuary policies support improved public health. ..................... 11

               2.    Jurisdictions adopting sanctuary policies have stronger economies ................................................................. 12

CONCLUSION ........................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ............................................................................. 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ............................................................................... 3

*Rice v. Santa Fe Elevator Corp.,*
331 U.S. 218 (1947) ............................................................................... 3

*Terrace v. Thompson,*
263 U.S. 197 (1923) ............................................................................... 4

*United States v. Lopez,*
514 U.S. 549 (1995) ............................................................................. 13

*United States v. Morrison,*
529 U.S. 598 (2000) ............................................................................... 3

**Statutes**

Cal. Gov't Code § 7284 *et seq.* ................................................................ 3

Cal. Gov't Code § 7284.2(a)-(e) .............................................................. 4

Cal. Gov't Code § 7284.2(b)-(d) ............................................................ 10

Cal. Gov't Code § 7284.2(f) .................................................................... 4

**Other Authorities**

Aboii, Sheyda*, Undocumented Immigrants and the Inclusive Health Policies of
Sanctuary Cities*, Harvard Public Health Review (2014) ...................... 11

*Advanced Search: Place of Birth By Nativity and Citizenship Status – 2012-2016
American Community Survey 5-Year Estimates*, U.S. Census Bureau, *available
at* https://goo.gl/EcKh5P (last visited Apr. 20, 2018) ............................. 1

Angela S. Garcia, *The Sanctuary Cities Debate*, University of Chicago, 23 SSA
Magazine 1 (2016), *available at* https://goo.gl/tnZU2f ........................... 7

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration
Enforcement and Civil Liberties*, Police Foundation (Apr. 2009), at 24,
*available at* https://goo.gl/DoKdWs ......................................................... 8

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4

Bernice Yeung, *Police: Immigration Policies Making It Harder to Catch
Criminals*, RevealNews.Org (Feb. 5, 2018), *available at*
https://goo.gl/hNMaBW ................................................................................ 8

5

6

Christopher Lyons, et al., *Neighborhood immigration, violence, and city-level
immigrant political opportunities*, 78 Am. Sociological Rev. 604 (2013) .......................... 6, 7

7

8

Chuck Wexler, *Police chiefs across the country support sanctuary cities because
they keep crime down*, L.A. Times (Mar. 6, 2017), *available at*
https://goo.gl/Fut52T .................................................................................... 7

9

10

Community Policing Dispatch, Office of Community Oriented Policing Services
(Feb. 2013), *available at* https://goo.gl/RfdtXC ........................................ 9

11

12

Craig E. Farrell, Jr., et al., *M.C.C. Immigration Committee Recommendations For
Enforcement of Immigration Laws by Local Policy Agencies*, Major Cities
Chiefs Ass'n (2006) ....................................................................................... 5

13

14

Elina Treyger, et. al, *Immigration Enforcement, Policing, and Crime*, 13
Criminology 285, 305–06 (2014) ................................................................. 6

15

16

*Estimates of unauthorized immigrant population, by metro area, 2014*, Pew
Research Center (Feb. 3, 2017), *available at* https://goo.gl/ZwBgda ....................................... 1

17

*Facts About Los Angeles*, Discover Los Angeles, 2017 LA Tourism & Convention
Board (Dec. 15, 2017), *available at* https://goo.gl/KtVZWn .................................................. 2

18

19

Final Report of the President's Task Force on 21st Century Policing, President's
Task Force on 21st Century Policing, Office of Community Oriented Policing
Services (May 2015), *available at* https://goo.gl/SJXSaL ................................................... 9

20

21

Helen B. Marrow, *The power of local autonomy: expanding health care to
unauthorized immigrants in San Francisco, Ethnic and Racial Studies* (2012) ...................... 11

22

23

Jacqueline Fox, *Zika and the Failure to Act Under the Police Power*, 49 Conn. L.
Rev. 1211, 1222, 1224 n.51 (May 2017) ...................................................... 12

24

25

Joseph Hayes and Laura Hill, *Undocumented Immigrants in California*, Public
Policy Institute of California (March 2017), *available at*
https://goo.gl/41CVyK ................................................................................... 4

26

27

Judith Walzer Leavitt, *Chinatown*, N.Y. Times (Apr. 27, 2003), *available at*
https://goo.gl/s1Ce4s ..................................................................................... 12

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Letter from Law Enforcement Immigration Task Force to Congress (June 28, 2017), *available at* https://goo.gl/Pn94ai ................................................................... 9

*Los Angeles*, Center for the Study of Immigration Integration, USC Dornsife College Of Letters, Arts and Sciences, *available at* https://goo.gl/wzroXy (last visited May 16, 2018) ............................................................................................... 2

Memorandum for Heads of Department Components and United States Attorneys: Supporting Federal, State, Local, and Tribal Law Enforcement, Off. of Att'y Gen. (Mar. 31, 2017), *available at* https://goo.gl/xSJsvs ........................................ 10

Michael L. Light, et al., *Undocumented Immigration, Drug Problems, and Driving Under the Influence in the United States, 1990-2014*, Am. J. Public Health (July 20, 2017) ...................................................................................................... 12

Michael Light and Ty Miller, *Does Undocumented Immigration Increase Violent Crime?*, Criminology (2018), *available at* https://goo.gl/YJbs2V ........................... 7

Michelangelo Landgrave and Alex Nowrasteh, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin*, CATO Institute, Immigration Research and Policy Brief No. 1 (Mar. 15, 2017), at 2, *available at* https://goo.gl/PqQtmR .......................................................................................... 6

Motion by Supervisor Hilda L. Solis, *Protecting Los Angeles County Residents Regardless of Immigration Status* (Dec. 6, 2016), at 1, *available at* https://goo.gl/oNczH5 .............................................................................................. 2

Nik Theodore, *Insecure Communities:  Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. Chicago (May 2013), at 5–6, *available at* https://goo.gl/wK3O7o ..................................................................... 7, 8

Oakland Resolution No. 63950, adopted July 8, 1986 ..................................................... 1

Oakland Resolution No. 86498, adopted November 29, 2016 ......................................... 1

Oakland Resolution No. 87036, adopted January 16, 2018 ............................................. 1

*Quick Facts: Oakland City*, U.S. Census Bureau (July 1, 2016), *available at* https://goo.gl/2kHE3n .............................................................................................. 1

Randy Capps, et al., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement*, Migration Policy Institute (Jan. 2011) ................. 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Ruth D. Peterson and Lauren J. Krivo, *National Neighborhood Crime Study (NNCS)*, Inter-university Consortium for Political and Social Research (2000), *available at* https://goo.gl/7XjyhH ............................................................................ 6

Salvador Rizzo, *Trump's Claim that Immigrants Bring 'Tremendous Crime' Is Still Wrong*, Wash. Post (Jan. 18, 2018), *available at* https://goo.gl/5NTnqS ........................ 6

Sampson, Robert, et al., *Neighborhoods and Violent Crime: A Multilevel Study of Collective Efficacy,* at 1, Science Magazine (Aug. 15, 1997), *available at* https://goo.gl/BgMim4 ............................................................................................. 7

Sarah Stillman, *When Deportation Is a Death Sentence*, The New Yorker (Jan. 15, 2018), *available at* https://goo.gl/4s1P6N ........................................................... 8, 9

Scott H. Decker, et al., *Immigration and Local Policing: Results from a National Survey of Law Enforcement Executive*, Police Foundation (June 2015), at 174, *available at* https://goo.gl/WsPwsh ............................................................... 8

State of Cal. Assembly Comm. on Judiciary, Employment Regulation: Immigration Worksite Enforcement Issues, A.B. 450 (Apr. 19, 2017) .................................... 5

The Federalist No. 45 ............................................................................................... 3

Tom Wong, *The effect of sanctuary policies on crime and the economy*, Center for American Progress (Jan. 26, 2017), *available at* https://goo.gl/UFUtnk ............................ 6, 12

**Constitutional Provisions**

Cal. Const. art. XI, § 7 ........................................................................................... 4

1

## **INTEREST OF AMICI CURIAE**

2      State and local jurisdictions bear primary responsibility for ensuring the safety and well-

3 being of their communities.  This principle is neither novel nor controversial; it is at the core of

4 our federalist system of government.  In exercising their sovereign duty to promote public safety,

5 states and local governments throughout the United States—including Amici California

6 Localities,[1] which include 25 counties, cities, and local officials throughout California,

7 representing 18,000,000 residents—have adopted laws and policies reflecting their careful

8 judgment of what policies and practices best serve their communities.  These communities hail

9 from all corners of the state, including counties of over 10 million people and cities of under

10 20,000.

11    • The City of Oakland is the largest city in Alameda County.[2]  Roughly 27.3% of the City's

12       420,000 residents are foreign born,[3] and the greater Oakland metropolitan area is home to

13       approximately 240,000 undocumented immigrants.[4]  Oakland seeks to ensure that its

14       diverse communities can participate equally in civic life and access city services designed

15       to ensure the public's safety and health without fear that coming into contact with local

16       government will result in deportation.  In furtherance of these goals, the City of Oakland

17

---

18 [1] Amici California Localities represent local jurisdictions and officials that have taken steps to improve public health and safety in their communities by encouraging immigrant communities to
19 interact with local government employees.  While some Amici identify as "cities of refuge," "sanctuary cities," or "sanctuary jurisdictions," many do not use a specific term to describe their
20 local policies.  All Amici California Localities have taken certain efforts to allocate their local law enforcement resources to community safety and crime prevention, rather than enforcement of
21 federal civil immigration law, or have otherwise adopted policies that support community safety by engaging with immigrant communities.  For the purposes of this brief, the phrases "Amici
22 California Localities" or "local jurisdictions" will be used to collectively refer to this diverse array of localities, which are listed at the end of this brief.
23

24 [2] *Quick Facts: Oakland City*, U.S. Census Bureau (July 1, 2016), *available at* https://goo.gl/2kHE3n.

25 [3] *See Advanced Search: Place of Birth By Nativity and Citizenship Status – 2012-2016 American Community Survey 5-Year Estimates*, U.S. Census Bureau, *available at* https://goo.gl/EcKh5P
26 (last visited Apr. 20, 2018).

27 [4] *Estimates of unauthorized immigrant population, by metro area, 2014*, Pew Research Center
28 (Feb. 3, 2017), *available at* https://goo.gl/ZwBgda.

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

has been a City of Refuge since July 8, 1986, and has repeatedly reaffirmed that status and its commitment to its immigrant communities.[5]

- The County of Los Angeles is the largest county in the nation, with over 10.2 million residents.[6]  Nearly 3.5 million immigrants, comprising 35% of the County's total population, call Los Angeles County home.[7]  Additionally, 57% of children in Los Angeles have a noncitizen parent.[8]  As in Oakland, immigrants are an integral part of Los Angeles County's economic and cultural life, interwoven into the County's social fabric as neighbors, family, and friends.  Immigrants are integral to our community; whether at school, on the job, in church, or at home, they are indistinguishable from their native-born family members and neighbors who have been granted citizenship or legal permanent residence.  By creating its Office of Immigrant Affairs and pursuing immigration-focused programs and policies, Los Angeles County has made engagement, integration, and cooperation with its immigrant communities a top priority.

- Home to a multi-cultural population of over 1.9 million residents, the County of Santa Clara is the most populous county in Northern California.  In recent years, the County's immigrant population has grown significantly and now comprises approximately 38% of the region's total population, the highest share since the late 1800s.  The County of Santa Clara is responsible for providing essential services and safety-net programs, including health care, law enforcement, emergency planning and response services, care for the youth and elderly, and many other critical social services to *all* residents, regardless of immigration status.  The County of Santa Clara has adopted policies and practices that

---

[5] Oakland Resolution No. 63950, adopted July 8, 1986; Oakland Resolution No. 86498, adopted November 29, 2016; Oakland Resolution No. 87036, adopted January 16, 2018.

[6] *Facts About Los Angeles*, Discover Los Angeles, 2017 LA Tourism & Convention Board (Dec. 15, 2017), *available at* https://goo.gl/KtVZWn.

[7] *Los Angeles*, Center for the Study of Immigration Integration, USC Dornsife College Of Letters, Arts and Sciences, *available at* https://goo.gl/wzroXy (last visited May 16, 2018).

[8] Motion by Supervisor Hilda L. Solis, *Protecting Los Angeles County Residents Regardless of Immigration Status* (Dec. 6, 2016), at 1, *available at* https://goo.gl/oNczH5.

reflect the judgment of its elected officials and law enforcement agencies that assistance with federal civil immigration enforcement would undermine the County's ability to fight crime and make the entire community less safe.

This litigation involves the federal government's challenge to three California laws, including SB 54,[9] which aim to promote public safety by limiting state and local entanglement with federal immigration enforcement.  SB 54, also known as the California Values Act, manifests a commitment to integrating immigrants into communities and promoting public safety, public health, and a robust economy throughout the State.  Amici share the State's goals of protecting the well-being of all Californians and offer a critical perspective on how state and local jurisdictions are best equipped to address the unique needs of their communities.

SB 54 protects the State's residents in a manner *consistent with* federal law.  The careful delineation of state and federal powers is precisely what the Constitution requires, and what Amici California Localities' considered judgment respects.  And, as extensive research studies show, jurisdictions adopting policies similar to those of the State of California and Amici—in which scarce local law enforcement resources are allocated to investigation of crimes, rather than enforcement of federal civil immigration laws—have safer, healthier, and more economically resilient communities.

## ARGUMENT

## I.   SB 54 PROMOTES PUBLIC SAFETY, HEALTH, AND WELFARE

The United States Supreme Court has long emphasized that local control over the health and safety of residents ensures that matters "'concern[ing] the lives, liberties, and properties of the people'" are determined "by governments more local and more accountable than a distant federal bureaucracy."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).  Enshrined in the Constitution and a core part of American democracy ever since, such local control respects the "historic police powers of the

---

[9] Cal. Gov't Code § 7284 *et seq.* (hereinafter "SB 54").

States." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also United States v. Morrison*, 529 U.S. 598, 618 (2000) (noting there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims").  Local governments and officials have "wide discretion in determining [their] own public policy and what measures are necessary for [their] own protection and properly to promote the safety, peace, and good order of [their] people." *Terrace v. Thompson*, 263 U.S. 197, 217 (1923).  California counties and cities likewise possess the power to enforce "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  Cal. Const. art. XI, § 7.

SB 54 fits well within these established constitutional principles, aiming to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments."  Cal. Gov't Code § 7284.2(f).  Exercising its police powers over public safety, the State determined that indiscriminately devoting local resources to federal civil immigration enforcement is detrimental to community trust and, therefore, to public safety.  *See generally id.* § 7284.2(a)-(e) (detailing legislative findings that building trust with immigrant communities furthers law enforcement aims, that "entangling" state agencies with federal immigration enforcement diverts local resources and blurs lines of accountability, and that state and local participation would create constitutional concerns).  California's laws reflect sound public policy:  here, the State concluded, as had many California localities prior to the passage of SB 54 (including those represented by Amici), that local involvement in federal immigration enforcement would be harmful to the safety and well-being of its residents, including the nearly 2.6 million undocumented immigrants who reside and participate in communities throughout California.[10]

---

[10] *See* Joseph Hayes and Laura Hill, *Undocumented Immigrants in California*, Public Policy Institute of California (March 2017), *available at* https://goo.gl/41CVyK.

The federal government's attempt to pressure California—and localities within the state—to comply with its preferred immigration enforcement agenda harms Amici in two distinct ways: First, by eroding community trust in law enforcement, thereby reducing community cooperation and making it more difficult for local sheriffs and police officers to effectively protect the public; and second, by preventing immigrant communities from participating in our economies and communities.

II.    **THE FEDERAL GOVERNMENT'S PREFERRED AGENDA FOR LOCAL IMMIGRATION ENFORCEMENT UNDERMINES PUBLIC SAFETY BY DISCOURAGING POLICE-COMMUNITY COOPERATION AND CIVIC PARTICIPATION**

    A.    **State and Local Control of Law Enforcement Is Integral to Promoting Public Safety and Fostering Trust Between Immigrant Communities and Police**

Law enforcement officials throughout California and the nation agree that building community trust is integral to promoting public safety.  The State of California, like many Amici California Localities, has acted on that principle, enacting laws—particularly SB 54—aimed at encouraging cooperation and participation in the law enforcement and criminal justice system to promote justice for all.

Amici recognize the importance of building and maintaining trust between police and immigrants.  If immigrants fear that interaction with law enforcement may lead to deportation for themselves or a loved one, they are less likely to assist law enforcement as witnesses and/or victims, and public safety will suffer.[11]  These concerns are not theoretical.[12]  Regardless of immigrations status, all community residents serve an important role in assisting local law

---

[11] *See, e.g.*, Craig E. Farrell, Jr., et al., *M.C.C. Immigration Committee Recommendations For Enforcement of Immigration Laws by Local Policy Agencies*, Major Cities Chiefs Ass'n (2006) ("Immigration enforcement by local police would likely negatively affect and undermine the level of trust and cooperation between local police and immigrant communities . . .").

[12] In a similar vein, maintaining trust between employers and employees is critical to ensuring that immigrants' rights are protected in the workplace.  As the Legislature recognized in analyzing AB 450, the threat of immigration raids in the workplace "decreased the likelihood that workers will report labor violations or exercise workplace rights."  *See* State of Cal. Assembly Comm. on Judiciary, Employment Regulation: Immigration Worksite Enforcement Issues, A.B. 450 (Apr. 19, 2017), at 5.

1   enforcement and the justice system—state and local governments should not be forced to

2   participate in a federal immigration enforcement agenda that ignores community safety and well-

3   being.  Amici's collective experience makes clear that trust between law enforcement and the

4   communities they are sworn to protect is weakened when local law enforcement officers are

5   viewed as de facto immigration enforcers.

6          Jurisdictions with sanctuary policies are on average more—not less—safe.  Empirics

7   confirm that jurisdictions with policies limiting their participation in immigration enforcement

8   have comparatively lower crime rates than those without such policies.  The Center for American

9   Progress found that counties with sanctuary policies had statistically significantly lower crime

10  than other counties—on average 35.5 fewer crimes committed per 10,000 people.[13]  Another

11  study found that higher immigrant concentrations were associated with reduced homicide rates

12  and reduced robbery rates.[14]  In cities that limited local enforcement of federal immigration laws,

13  this correlation was even stronger.[15]  Other studies have found that certain cities with the lowest

14  levels of targeted immigration enforcement have statistically significant reductions in larceny (by

15  2–3%) and motor vehicle theft (by 5-6%).[16]  Indeed, contrary to the federal government's

16  rhetoric,[17] immigrants are in fact *less likely* to commit crimes and be incarcerated than American-

17  born individuals; specifically, undocumented immigrants are 44% less likely to be incarcerated

18

19  [13] Tom Wong, *The effect of sanctuary policies on crime and the economy*, Center for American
20  Progress (Jan. 26, 2017), *available at* https://goo.gl/UFUtnk.

21  [14] Christopher Lyons, et al., *Neighborhood immigration, violence, and city-level immigrant
    political opportunities*, 78 Am. Sociological Rev. 604, 615–17, 620 (2013).  The National
22  Neighborhood Crime Study (NNCS) compiled crime and sociodemographic data for census tracts
    in a representative sample of large United States cities for 2000 and was funded by the National
23  Science Foundation.  *See* Ruth D. Peterson and Lauren J. Krivo, *National Neighborhood Crime
    Study (NNCS)*, Inter-university Consortium for Political and Social Research (2000), *available at*
24  https://goo.gl/7XjyhH.

25  [15] Lyons *supra* n.14, at 617.

26  [16] Elina Treyger, et al., *Immigration Enforcement, Policing, and Crime*, 13 Criminology 285,
    305–06 (2014) (for the list of 335 included cities, see Appendix 1).

27  [17] *See, e.g.*, Salvador Rizzo, *Trump's Claim that Immigrants Bring 'Tremendous Crime' Is Still
28  Wrong*, Wash. Post (Jan. 18, 2018), *available at* https://goo.gl/5NTnqS.

1  compared with native-born citizens.[18]  Additionally, a recent longitudinal analysis between 1990

2  and 2014 analyzed the effect of unauthorized immigration on violence and concluded that

3  undocumented immigration is generally associated with decreasing violent crime.[19]

4        These studies are not flukes, nor are their results accidental.  When large populations of

5  undocumented immigrants "fear[] that interaction with police leads to arrest and deportation, they

6  will be reluctant to report crimes, make statements, or testify in court.  This chilling effect leaves

7  cities less safe for everyone."[20]  Sanctuary policies allow local governments to create a "spiral of

8  trust" that fosters communications between government officials and immigrants, reduces social

9  isolation and cynicism toward government, and increases neighborhood attachment.[21]  This social

10  cohesion and "collective efficacy" has been associated with reduced violence and greater

11  stability, which makes communities generally safer for all.[22]

12        It is well-documented that as immigration enforcement and the threat of deportation

13  increase, the likelihood of undocumented immigrants reporting crimes decreases significantly.[23]

14  In a 2013 survey, for example, 67% of undocumented individuals reported that they were less

15  likely to offer information to law enforcement as a witness if they feared officers would inquire

16  about their or others' immigration status.[24]  Seventy percent reported being less likely to contact

17

18

---

19  [18] Michelangelo Landgrave and Alex Nowrasteh, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin*, CATO Institute, Immigration Research and Policy Brief No. 1 (Mar. 15, 2017), at 2, *available at* https://goo.gl/PqQtmR.

20  [19] Michael Light and Ty Miller, *Does Undocumented Immigration Increase Violent Crime?*, Criminology (2018), *available at* https://goo.gl/YJbs2V.

21  [20] Angela S. Garcia, *The Sanctuary Cities Debate*, University of Chicago, 23 SSA Magazine 1 (2016), *available at* https://goo.gl/tnZU2f.

22  [21] Lyons, *supra* n.14, at 609–10.

23  [22] Sampson, Robert, et al., *Neighborhoods and Violent Crime: A Multilevel Study of Collective Efficacy,* Science Magazine (Aug. 15, 1997), at 1, *available at* https://goo.gl/BgMim4.

24  [23] *See, e.g.*, Chuck Wexler, *Police chiefs across the country support sanctuary cities because they keep crime down*, L.A. Times (Mar. 6, 2017), *available at* https://goo.gl/Fut52T.

25

26

27  [24] Nik Theodore, *Insecure Communities:  Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. Chicago (May 2013), at 5–6, *available at* https://goo.gl/wK3O7o.

28

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

law enforcement authorities *even if they were victims of a crime*.[25]   In a survey conducted by the Police Foundation, responding law enforcement personnel and public officials widely reported that aggressive enforcement of immigration law would decrease community trust of police (74% of respondents), trust between community residents (70%), and reporting of crime victimization (85%) and criminal activity (83%).[26]   Moreover, a more recent Police Foundation survey showed that more than 70% of police chiefs reported that immigrants in their communities are somewhat or much less likely to contact law enforcement when they are victims of or witnesses to crime.[27] And a 2018 study conducted by the National Immigrant Women's Advocacy Project found that approximately 40% of the 232 law enforcement officials who responded confirmed that "federal immigration policies have affected their relationships with immigrant communities in 2017 compared with 2016, and 71% said that because immigrants face barriers to engaging with law enforcement, officers were less able to hold criminals accountable."[28]

Reports from California since President Trump took office are stark.  In the first three months of 2017, reports of sexual assault among the Latino population in the City of Los Angeles declined 25%, and domestic-violence reports dropped 10%.[29]   At the same time, reporting among non-Latino victims was virtually unchanged.[30]

---

[25] *Id.*; *see also* Randy Capps, et al., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement*, Migration Policy Institute (Jan. 2011), at 43 (study that looked at the impact of 287(g) of the Immigration and Nationality Act on 7 counties and found that in four of the counties that were involved in traffic operations, "community respondents were likely to report that immigrants were venturing into public places with less frequency, failing to report crimes or interact with police, interacting less with schools and other institutions, patronizing local businesses less often, and changing their driving patterns.").

[26] Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Foundation (Apr. 2009), at 24, *available at* https://goo.gl/DoKdWs.

[27] Scott H. Decker, et al., *Immigration and Local Policing: Results from a National Survey of Law Enforcement Executive*, Police Foundation (June 2015), at 174, *available at* https://goo.gl/WsPwsh.

[28] Bernice Yeung, *Police: Immigration Policies Making It Harder to Catch Criminals*, RevealNews.Org (Feb. 5, 2018), *available at* https://goo.gl/hNMaBW.

[29] *See* Sarah Stillman, *When Deportation Is a Death Sentence*, The New Yorker (Jan. 15, 2018), *available at* https://goo.gl/4s1P6N.

[30] *Id.*

The DOJ itself has previously recognized what these studies make clear—that federal entanglement in state and local law enforcement negatively affects community safety.  In 2015, a DOJ Task Force released a report that recommended "[d]ecoupl[ing] federal immigration enforcement from routine local policing" in an effort to build relationships of trust with immigrant communities.[31]  The DOJ has further described how "[c]ultural and language barriers, immigrants' fear of deportation or detention, and immigrants' mistrust of law enforcement are some of the factors that can challenge police-immigrant relations" to the detriment of public safety.[32]

In reaching these conclusions, the study drew directly from state and local experiences that show fear of deportation leads to underreporting of crime, failure to access needed government services, and refusal to cooperate with criminal prosecutions.[33]  Even for some immigrant victims who had the courage to report crime, the fear of deportation ultimately interfered with their cooperation in prosecutions.[34]  As a result, the Law Enforcement Immigration Task Force, comprised of many state and local law enforcement officials from across the country, determined that state and local law enforcement "can best serve [their] communities by leaving the enforcement of immigration laws to the federal government."[35]

The State of California has aimed to make its communities safer by cultivating the trust of all residents—citizens and non-citizens alike—through limiting local entanglement with immigration enforcement.  As explained above, sound public policy and longstanding Supreme Court precedent protects—and indeed endorses—state and local governments' exercise of such

---

[31] Final Report of the President's Task Force on 21st Century Policing, President's Task Force on 21st Century Policing, Office of Community Oriented Policing Services (May 2015), *available at* https://goo.gl/SJXSaL.

[32] Community Policing Dispatch, Office of Community Oriented Policing Services (Feb. 2013), *available at* https://goo.gl/RfdtXC.

[33] *Id.*

[34] *Id.*

[35] *See* Letter from Law Enforcement Immigration Task Force to Congress (June 28, 2017), *available at* https://goo.gl/Pn94ai.

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

discretion when it comes to the health and safety of their residents.[36]

### B. State and Local Sanctuary Policies Promote the Health and Welfare of California Residents

In addition to promoting public safety, states and localities have relied upon their broad police powers to implement policies which, in lawmakers' considered judgment, protect public health and improve the public welfare. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 300 (2006) (protection of public health and safety is generally enforced through state and local police powers). Indeed, like the State itself,[37] numerous counties, cities, and towns in California have adopted "sanctuary" laws or policies to promote public health, safety, and well-being in their respective jurisdictions.[38] Social science confirms the positive impacts of sanctuary policies on communities as soundly based in the best interests of California cities and counties' public health and economic welfare.

---

[36] To be sure, the federal government is fully aware that effective community policing requires local control over law enforcement policy decisions. In practice, however, the federal government supports state and local governments' exercise of such discretion when it proves politically expedient. Indeed, just last year, in an attempt to justify his decision to rescind consent decrees between the Justice Department's Civil Rights Division and local police departments—a decision Amici in no way condone—Attorney General Sessions touted the importance of local control over law enforcement decisions, writing that addressing rising crime rates and securing public safety "are, first and foremost, tasks for state, local, and tribal enforcement," and that "[l]ocal control and local accountability are necessary for effective local policing. The federal government does not manage, nor does it set policy for local law enforcement agencies." Memorandum for Heads of Department Components and United States Attorneys: Supporting Federal, State, Local, and Tribal Law Enforcement, Off. of Att'y Gen. (Mar. 31, 2017), *available at* https://goo.gl/xSJsvs. This lawsuit turns that position on its head.

[37] For example, the legislative findings of the California Values Act explain that a "relationship of trust" between immigrants and state and local agencies is central to the "public safety of the people of California" and is threatened by entanglement with immigration enforcement, with the result that "immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school." §§ 7284.2(b)-(d).

[38] As used herein, "sanctuary laws" or "sanctuary policies" encompasses the broad range of policies, laws, or regulations that state or local governments may implement, consistent with the police powers reserved to them under the Constitution, aimed at limiting local entanglement with federal civil immigration enforcement efforts and serving to promote public health, safety, and well-being throughout their communities.

### 1. Sanctuary policies support improved public health.

Sanctuary policies support public health and safety goals by ensuring access to and encouraging utilization of basic government services, which improves public health outcomes. The disparities in access to care and care utilization based on lawful immigration status are well documented.[39]  Undocumented immigrants and their family members are significantly less likely to utilize government services, including health care, due in large part to fear that their interactions with healthcare providers or government entities will lead to deportation.

For localities that provide health care and other social services through public health departments and safety-net hospitals, like Amici California Localities, sanctuary policies are one way to address these disparities.[40]  To address the fears that often keep undocumented immigrants from seeking healthcare, providers in localities with sanctuary policies use "buffering" strategies, such as (i) advertising "safe" spaces where information regarding immigration status will not be collected in a manner inconsistent with state or federal law, or (ii) having individual conversations to reassure applicants that they will not be asked about their status except as required by state or federal law.[41]  Such strategies allow healthcare providers to foster trust with their patients and provide much needed medical care to a traditionally underserved segment of the community.

Public health strategies, by their nature, are only successful when they address the needs of *entire* communities.  As history demonstrates, the exclusion of any segment of the community from screening services related to sexual health, disease prevention, or prenatal care can have

---

[39] Helen B. Marrow, *The power of local autonomy: expanding health care to unauthorized immigrants in San Francisco, Ethnic and Racial Studies* (2012), at 73; *see also* Aboii, Sheyda, *Undocumented Immigrants and the Inclusive Health Policies of Sanctuary Cities*, Harvard Public Health Review (2014) (noting that undocumented immigrants are less likely to be insured, and that few undocumented immigrants have a primary care physician or first point-of-contact in the healthcare system aside from the emergency room.)

[40] Marrow, *supra* n.40, at 73.

[41] *Id.* at 79.

1    significant consequences on the greater community.[42]  By improving access and utilization of

2    healthcare services to undocumented immigrants, sanctuary policies have salutary effects on the

3    health and well-being of the community as a whole.[43]

4              **2.     Jurisdictions adopting sanctuary policies have stronger economies.**

5              Research strongly suggests that "[w]hen local law enforcement focuses on keeping

6    communities safe, rather than becoming entangled in federal immigration enforcement efforts,

7    communities are safer and community members stay more engaged in the local economy.  This in

8    turn brings benefits to individual households, communities, counties, and the economy as a

9    whole."[44]  A notable study by the Center for American Progress found that "economies are

10   stronger in sanctuary counties—from higher median household income, less poverty, and less

11   reliance on public assistance to higher labor force participation, higher employment-to-population

12   ratios, and lower unemployment."[45]  On average, median household income is $4,353 higher in

13   counties with sanctuary policies or laws than in counties without such policies.[46]

14             State and local governments' attempts to improve economic status for their residents

15   through limited immigration enforcement is a guiding principle of the general police power—the

16   power for jurisdictions to decide which policies and practices will improve the lives of their

17

---

18   [42] One example includes the plague outbreaks that swept through San Francisco at the beginning

19   of the twentieth century.  Public health officials discriminated against residents of San
     Francisco's Chinatown district during the epidemic abatement, which led to a larger health crisis

20   than had healthcare officials adopted a public health strategy addressing the needs of all
     communities.  *See generally* Jacqueline Fox, *Zika and the Failure to Act Under the Police Power*,

21   49 Conn. L. Rev. 1211, 1222, 1224 n.51 (May 2017); Judith Walzer Leavitt, *Chinatown*, N.Y.
     Times (Apr. 27, 2003), *available at* https://goo.gl/s1Ce4s.

22   [43] Moreover, emerging research suggests that undocumented immigration in communities may be

23   associated *directly* with reductions in public health concerns.  For example, a recent study found
     that increased undocumented immigration was associated with statistically significant decreases

24   in drug arrests, drug overdose deaths, and DUI arrests at the state level.  Michael L. Light, et al.,
     *Undocumented Immigration, Drug Problems, and Driving Under the Influence in the United*

25   *States, 1990-2014*, Am. J. Public Health (July 20, 2017).

26   [44] Wong, *supra* n.13.

27   [45] *Id.*

28   [46] *Id.*

1    residents and the safety of their communities.

2                                **CONCLUSION**

3           State and local governments are duty-bound to promote the safety and welfare of *all*

4    *residents* in their communities, regardless of immigration status.  As the Supreme Court has

5    recognized, state and local governments are uniquely suited for the task given their intimate

6    knowledge of and close connection to their diverse communities.  Here, California exercised its

7    sovereign duty to promote public safety and well-being.  The Court should reject the federal

8    government's attempt to prevent the state from "exercising [its] own judgment in an area to which

9    States lay claim by right of history and expertise."  *United States v. Lopez*, 514 U.S. 549, 583

10   (1995) (Kennedy, J., concurring).  Consistent with long-standing precedent and constitutional

11   principles, it is state and local governments that are best able and most accountable to determine

12   the policies that will best protect their communities, not the federal government.  After all, they

13   know their communities' needs and how best to serve them.

14          For all these reasons, Amici California Localities support the State of California's

15   opposition to the federal government's motion for preliminary injunction and respectfully submit

16   that the motion should be denied.

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

Dated: May 18, 2018

Respectfully submitted,

By: ___/s/  Margaret L. Carter_____
Margaret L. Carter

MARGARET L. CARTER (S.B. #220637)
mcarter@omm.com
DANIEL R. SUVOR (S.B. #265674)
dsuvor@omm.com
DANIEL J. TULLY (S.B. #309240)
dtully@omm.com
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone:     213.430.6000
Facsimile:     213.430.6407
*Attorneys for Amicus Curiae*
*County of Los Angeles*

By:/s/ Barbara J. Parker (as authorized on 5/18/18)
Barbara J. Parker

BARBARA J. PARKER (S.B. #069722)
City Attorney
MARIA BEE (S.B. #167716)
ERIN BERNSTEIN (S.B. #231539)
ebernstein@oaklandcityattorney.org
MALIA MCPHERSON (S.B. #313918)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California
Telephone: (510) 238-3601
Facsimile: (510) 238-6500
*Attorneys for Amicus Curiae*
*City of Oakland*

By: /s/ Javier Serrano (as authorized on 5/18/18)
Javier Serrano

JAMES R. WILLIAMS (S.B. #271253)
County Counsel
GRETA S. HANSEN (S.B. #251471)
KAVITA NARAYAN (S.B. #264191)
LAURA S. TRICE (S.B. #284837)
JAVIER SERRANO (S.B. #252266)
javier.serrano@cco.sccgov.org
70 West Hedding Street, E. Wing, 9th Floor
San José, CA 95110
Telephone:  (408) 299-5900
Facsimile:  (408) 292-7240
*Attorneys for Amicus Curiae*
*County of Santa Clara*

*Full List of Amici Curiae and Additional Counsel for Amici Curiae Provided Below*

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

**LIST OF AMICI CURIAE**

County of Alameda, California

City of Albany, California

City of Arvin, California

City of Berkeley, California

City of Culver City, California

City of Davis, California

City of East Palo Alto, California

County of Los Angeles, California

County of Marin, California

County of Monterey, California

City of Morgan Hill, California

City of Mountain View, California

City of Oakland, California

City of Palm Springs, California

City of Richmond, California

City of Sacramento, California

City of San Diego, California

City of San José, California

City of Santa Ana, California

County of Santa Clara, California

County of Santa Cruz, California

City of Santa Monica, California

County of Sonoma, California

Mayor Michael Tubbs, City of Stockton, California

City of West Hollywood, California

**ADDITIONAL COUNSEL FOR AMICI CURIAE**

Donna R. Ziegler
County Counsel, County of Alameda
1221 Oak Street, Suite 450
Oakland, CA 94612

*Attorney for the County of Alameda,*
*California*

Edward Z. Kotkin
City Attorney, City of Palm Springs
3200 E. Tahquitz Canyon Way
Palm Springs, CA  92262

*Attorney for the City of Palm Springs,*
*California*

Craig Labadie
City Attorney, City of Albany
1000 San Pablo Avenue
Albany, CA 94706

*Attorney for the City of Albany, California*

Bruce Reed Goodmiller
City Attorney, City of Richmond
450 Civic Center Plaza
Richmond, CA 94804

*Attorney for the City of Richmond, California*

Shannon L. Chaffin
City Attorney, City of Arvin
200 Campus Drive, PO Box 548
Arvin, CA 93203

*Attorney for the City of Arvin, California*

Susana Alcala Wood
City Attorney, City of Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814

*Attorney for the City of Sacramento,*
*California*

Farimah Brown
City Attorney, City of Berkeley
2180 Milvia Street, 4th Floor
Berkeley, CA 94074

*Attorney for the City of Berkeley, California*

Mara W. Elliot
City Attorney, City of San Diego
1200 Third Ave., Suite 1620
San Diego, CA 92101

*Attorney for the City of San Diego, California*

Carol Schwab
City Attorney, City of Culver City
9770 Culver Boulevard
Culver City, CA 90232

*Attorney for the City of Culver City,*
*California*

Richard Doyle
City Attorney, City of San José
200 East Santa Clara St., 16th Floor
San José, CA 95113

*Attorney for the City of San José, California*

Harriet Steiner
City Attorney, City of Davis
Best Best & Krieger LLP
500 Capitol Mall, Suite 1700
Sacramento, CA 95814

*Attorney for the City of Davis, California*

Sonia R. Carvalho
City Attorney, City of Santa Ana
20 Civic Center Plaza, M-29
P.O. Box 1988
Santa Ana, CA 92702

*Attorney for the City of Santa Ana, California*

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN

Rafael E. Alvarado Jr.
City Attorney, City of East Palo Alto
2415 University Ave.
East Palo Alto, CA 94303

*Attorney for the City of East Palo Alto,*
*California*

Dana McRae
County Counsel, County of Santa Cruz
701 Ocean Street, Room 505
Santa Cruz, CA 95060

*Attorney for the County of Santa Cruz,*
*California*

Brian Washington
County Counsel, County of Marin
3501 Civic Center Drive, Rm 275
San Rafael, CA 94903

*Attorney for the County of Marin, California*

Lane Dilg
City Attorney, City of Santa Monica
1685 Main Street, Third Floor
Santa Monica, CA 90401

*Attorney for the City of Santa Monica,*
*California*

Charles J. McKee
County Counsel, County of Monterey
168 West Alisal St, 3rd Fl
Salinas, CA 93901

*Attorney for the County of Monterey,*
*California*

Bruce D. Goldstein
County Counsel, County of Sonoma
575 Administration Drive, Suite 105A
Santa Rosa, CA 95403

*Attorney for the County of Sonoma,*
*California*

Donald A. Larkin
City Attorney, City of Morgan Hill
17575 Peak Avenue
Morgan Hill, CA  95037

*Attorney for the City of Morgan Hill,*
*California*

Michael Jenkins
City Attorney, City of West Hollywood
JENKINS & HOGIN, LLP
1230 Rosecrans Avenue, Suite 110
Manhattan Beach, CA 90266

*Attorney for the City of West Hollywood,*
*California*

Jannie L. Quinn
City Attorney, City of Mountain
500 Castro St., 3rd Floor
Mountain View, CA 94041

*Attorney for the City of Mountain View,*
*California*

BRIEF OF AMICI COUNTIES & CITIES
ISO DEFS' OPP. TO MTN. FOR PI
2:18-CV-00490-JAM-KJN