JAMIE S. GORELICK (*pro hac vice*)
jamie.gorelick@wilmerhale.com
CATHERINE M.A. CARROLL
catherine.carroll@wilmerhale.com
CHRISTOPHER E. BABBITT (SBN: 225813)
christopher.babbitt@wilmerhale.com
CLAIRE M. BERGERON
claire.bergeron@wilmerhale.com
SHEILA E. MENZ
sheila.menz@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: 202 663 6000
Facsimile: 202 663 6363

*Attorneys for Amici Curiae*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., GOVERNOR OF CALIFORNIA, IN HIS OFFICIAL CAPACITY; AND XAVIER BECERRA, ATTORNEY GENERAL OF CALIFORNIA, IN HIS OFFICIAL CAPACITY,<br><br>          Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**PROPOSED BRIEF FOR TAHIRIH JUSTICE CENTER, ET AL., AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:   June 20, 2018<br>Hearing Time:  10:00 a.m.<br>Location:       Courtroom 6<br><br>Judge: Hon. John A. Mendez<br>Action Filed:  March 6, 2018 |

## <u>TABLE OF CONTENTS</u>

INTERESTS OF AMICI CURIAE.................................................................................................1

SUMMARY OF ARGUMENT ....................................................................................................2

ARGUMENT ...............................................................................................................................4

I.      California's Community Trust Laws Enhance Survivor Safety .................................4

II.     California's Community Trust Laws Enhance Public Safety ....................................9

III.    California's Community Trust Laws Align With, And Enhance The Effectiveness Of, State And Federal Laws Intended To Protect Survivors...........................................13

        A.      Violence Against Women Act ......................................................................13

        B.      Trafficking Victims Protection Act ..............................................................14

CONCLUSION..........................................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Arizona v. United States*,
 567 U.S. 387 (2012).......................................................................................................3, 15

*City of Chicago v. Sessions*,
 888 F.3d 272 (7th Cir. 2018) ...........................................................................................10, 12

*United States v. Morrison*,
 529 U.S. 598 (2000).........................................................................................................12

### DOCKETED CASES

Statement of Interest on Behalf of the United States, *City of El Cenizo v. Texas*, No.
 5:17-cv-404-OLG (W.D. Tex. June 23, 2017), ECF No. 90 .................................................12

### FEDERAL STATUTES

8 U.S.C. § 1101(a)(15)(T)...............................................................................................14

8 U.S.C. § 1101(a)(15)(U)...............................................................................................14

### CALIFORNIA STATUTES

A.B. 450, California Immigrant Workers Protection Act .......................................................2, 4

A.B. 103, California omnibus bill......................................................................................2

S.B. 54, California Values Act.........................................................................................2, 5

Cal. Gov't Code § 7284.2(b)...........................................................................................4, 5

Cal. Gov't Code § 7284.2(c)...........................................................................................4, 5

### PUBLIC LAW

Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114
 Stat. 1464 (Oct.28, 2000)..........................................................................................3, 13, 14, 15
 Pub. L. No. 106-386, § 107..........................................................................................13
 Pub. L. No. 106-386, §§ 1501-1513 ...........................................................................13
 Pub. L. No. 106-386 § 1502(a)(1)...............................................................................15
 Pub. L. No. 106-386 § 1512..........................................................................................14
 Pub. L. No. 106-386 § 1513(a)(2)(A)..........................................................................4, 15
 Pub. L. No. 106-386 § 1513(a)(2)(B) ..........................................................................4, 15

Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, 108 Stat.
 1796 (Sept. 13, 1994)..................................................................................................3, 6, 13, 14, 15
 Pub. L. No. 103-322, tit. IV, §§ 40701-40703..............................................................13, 14

## LEGISLATIVE HISTORY

159 Cong. Rec. H705 (daily ed. Feb. 28, 2013) .................................................................13

159 Cong. Rec. S597 (daily ed. Feb. 12, 2013) ................................................................13

H.R. Rep. No. 103-395 (1993) .................................................................................4, 14

## REGULATIONS

Enhancing Public Safety in the Interior of the United States, Exec. Order No. 13768,
      82 Fed. Reg. 8799 (Jan. 25, 2017) ............................................................................7

## OTHER AUTHORITIES

Elizabeth M. McCormick, *Rethinking Indirect Victim Eligibility for U Non-Immigrant
      Visas to Better Protect Immigrant Families and Communities*, 22 STAN. L. &
      POL'Y REV. 587 (2011) ...........................................................................................9

Emma E. Fridel, *A Multivariate Comparison of Family, Felony, and Public Mass
      Murders in the United States,* SAGE Journals, Journal of Interpersonal
      Violence (Nov. 8, 2017), https://doi.org/10.1177%2F0886260517739286 ...........................11

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering
      Clear of Police and Courts*, L.A. Times (Oct. 9, 2017),
      http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-
      20171009-story.html ........................................................................................8, 9

Jane Mayer, *The Link Between Domestic Violence and Mass Shootings*, The New
      Yorker (June 16, 2017), https://www.newyorker.com/news/news-desk/the-
      link-between-domestic-violence-and-mass-shootings-james-hodgkinson-
      steve-scalise .................................................................................................11

John Burnett, *New Immigration Crackdowns Creating "Chilling Effect" On Crime
      Reporting*, NPR (May 25, 2017),
      https://www.npr.org/2017/05/25/529513771/new-immigration-crackdowns-
      creating-chilling-effect-on-crime-reporting .................................................................10

Letter from the Major County Sheriffs' Association and Major Cities Chiefs
      Association Opposing S. 2146 (Oct. 19, 2015),
      http://www.aila.org/infonet/letter-county-sheriffs-opposing-s-2146 ......................................9

Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Efforts to Fight
      Gangs*, N.Y. Times (Feb. 22, 2017),
      https://www.nytimes.com/2017/02/22/nyregion/police-fear-trump-
      immigration-orders-may-handcuff-effort-to-fight-gangs.html ...........................................9-10

Mai Thi Nguyen & Hannah Gill, *Interior Immigration Enforcement: The Impacts of
      Expanding Local Law Enforcement and Authority*, 53 Urb. Stud. J. 302 (2015).....................7

Michael E. Miller, *'People Here Live in Fear': MS-13 Menaces a Community Seven Miles from the White House*, Wash. Post (Dec. 20, 2017), https://www.washingtonpost.com/local/people-here-live-in-fear-ms-13-menaces-a-community-seven-miles-from-the-white-house/2017/12/20/6cebf318-d956-11e7-b859-fb0995360725_story.html?noredirect=on&utm_term=.bc8c964d93e5 .................................11

Michael Runner et al., Family Violence Prevention Fund, *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations*, Robert Wood Johnson Foundation (Mar. 2009), https://www.futureswithoutviolence.org/userfiles/file/ImmigrantWomen/IPV_Report_March_2009.pdf.................................................................................4, 5

Michael Samsel, *Warning Signs: Escalation, Abuse and Relationships*, https://www.abuseandrelationships.org/Content/Basics/escalation.html (last visited May 15, 2018) ............................................................................10

National Immigrant Women's Advocacy Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, Am. Univ., Wash. Coll. Of Law (May 3, 2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf ....................................................................8

Nik Theodore, Dep't of Urban Planning and Policy, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. at Chi. (May 2013), http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ...............................................................7

Orde F. Kittrie, *Federalism, Deportation, and Crime Victims Afraid to Call the Police*, 91 Iowa L. Rev. 1449 (2006) ....................................................7

Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013), https://www.washingtonpost.com/local/for-immigrant-women-domestic-violence-creates-a-double-shadow/2013/12/02/5626b85e-55e6-11e3-8304-caf30787c0a9_story.html?utm_term=.cbd37f3285d4 ............................4

Press Release, No Más, New Study of Domestic Violence and Sexual Assault in the U.S. Latin@ Community Reveals Barriers to Reporting and High Willingness to Intervene to Help Survivors (Apr. 21, 2015), https://nomore.org/press-release/no-mas-study-pr/......................................5

PRI's The World, *Some Immigrant Women, Victims of Domestic Violence, Afraid to Seek Help* (Mar. 21, 2013), https://www.pri.org/stories/2013-03-21/some-immigrant-women-victims-domestic-violence-afraid-seek-help...............5

Randy Capps, et al., *Revving Up The Deportation Machinery: Enforcement and Pushback Under Trump*, Migration Policy Institute (May 2018), https://www.migrationpolicy.org/sites/default/files/publications/ImmigrationEnforcement-FullReport-FINAL-WEB.pdf.................................................................8

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (Feb. 2015). .................................................................................................7

T. J. Raphael & Dana Roberson, *How Gun Laws Let Domestic Violence Offenders Slip Through the Cracks*, PRI (Nov. 16, 2017), https://www.pri.org/stories/2017-11-16/how-gun-laws-let-domestic-violence-offenders-slip-through-cracks .................................................................................11

Tahirih Justice Center, *2017 Advocate and Legal Service Survey Regarding Immigrant Survivors*, http://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf (last visited May 16, 2018) .................................................................2

Tahirih Justice Center, *Nationwide Survey: A Window Into the Challenges Immigrant Women and Girls Face in the United States and the Policy Solutions to Address Them* (Jan. 31, 2018), https://www.tahirih.org/wp-content/uploads/2018/01/Tahirih-Justice-Center-Survey-Report-1.31.18.pdf .................1, 5, 8

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ .......................................10

Virginia Fay, *Back Into the Shadows: Immigrants Retreat from Needed Services as Deportation Fears Loom*, Peninsula Press (June 12, 2017), http://peninsulapress.com/2017/06/12/back-into-the-shadows/..................................................9

Washington State Institute for Public Policy, *Recidivism Trends of Domestic Violence Offenders in Washington State* (Aug. 2013), http://www.wsipp.wa.gov/ReportFile/1541/Wsipp_Recidivism-Trends-of-Domestic-Violence-Offenders-in-Washington-State_Full-Report.pdf...................................11

1

### INTERESTS OF AMICI CURIAE

2

3      The Tahirih Justice Center ("Tahirih") is the largest multi-city direct-services and policy-

4 advocacy organization in the United States specializing in assisting immigrant women and girls who

5 survive gender-based violence, including human trafficking, forced labor, domestic violence, rape

6 and sexual assault, and female genital cutting/mutilation.  Tahirih serves clients at five offices,

7 including in San Francisco, and has provided free legal assistance to more than 25,000 individuals.

8      Additional amici ASISTA, Asian Pacific Institute on Gender-Based Violence, Immigration

9 Center for Women and Children, and CASA de Esperanza are immigration service providers that

10 serve survivors of gender-based crimes in California, as well as national policy organizations that

11 advocate for legal and other protections for survivors.[1]

12

13     Based on their experience serving and advocating for survivors of gender-based violence,

14 amici have a special understanding of how the California laws at issue in this case promote

15 community safety, and advance the State of California's sovereign interests, by encouraging

16 immigrant survivors of gender-based violence to seek protection from and treatment for the effects

17 of violence.  Similarly, amici have a unique understanding of the harms that an injunction of these

18 laws would cause to immigrant women and girls who are survivors of gender-based violence.

19     As amici's experience with their clients demonstrates, many immigrant women who

20 experience domestic violence are hesitant to contact the police or seek child custody or other relief in

21 courts out of fear that doing so will lead to intervention by immigration authorities.[2]  Such fear has

22 been amplified in recent months as the federal government has stepped up its immigration

23 enforcement efforts, including through policies that seek to harness state and local authorities'

24

25

26 [1]     Amici's full names and addresses appear at Appendix 1.

27 [2]     *See* Tahirih Justice Center, *Nationwide Survey: A Window Into the Challenges Immigrant Women and Girls Face in the United States and the Policy Solutions to Address Them* 8 (Jan. 31, 2018), https://www.tahirih.org/wp-content/uploads/2018/01/Tahirih-Justice-Center-Survey-Report-1.31.18.pdf.

28

participation in immigration enforcement.  In response to an April 2017 national survey of over 700 service providers, three out of four respondents reported that survivors had expressed concerns about going to court for matters relating to their abusers, and many respondents reported that their clients were expressing increased fear in light of new federal immigration policies. [3]

In amici's experience, the California laws at issue here, which limit state and local entanglement in immigration enforcement, promote the safety of immigrant survivors of gender-based violence by providing some assurance that a survivor can call the police or reach out to a state or local agency for help without risking deportation proceedings or detention.  These laws enhance the safety of survivors, by making them more likely to seek help, and may also assist survivors in learning about the federal immigration protections available to them.  The challenged laws also improve overall community safety by encouraging immigrant victims and witnesses to report crimes and other activity that may threaten society at large.  As the experiences of amici's clients illustrate (*see infra* Part II), survivors who contact the police are critical to the investigation and prosecution of criminal activity on a broader scale.

## SUMMARY OF ARGUMENT

Amici respectfully submit this brief to assist the Court in analyzing the public benefits of the California Values Act (S.B. 54), California omnibus bill A.B. 103, and the California Immigrant Workers Protection Act (A.B. 450) (collectively referred to in this brief as the California "Community Trust Laws") as they relate to immigrant survivors of gender-based violence.  These benefits confirm that the challenged laws fall squarely within the broad scope of California's police powers, and that the public interest weighs in favor of denying the Department of Justice's motion

---

[3]   *2017 Advocate and Legal Service Survey Regarding Immigrant Survivors*, http://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf (last visited May 16, 2018).

for a preliminary injunction. *See Arizona v. United States*, 567 U.S. 387, 404 (2012).[4]

The public-safety concerns that prompted the California legislature to adopt the Community Trust Laws apply with unique force to immigrant women who are survivors of gender-based violence. This is true for three main reasons. *First*, by limiting state and local entanglement with federal immigration enforcement, the Community Trust Laws encourage and make it safe for survivors to seek protection from, and treatment for, the effects of gender-based violence. These laws provide valuable protections to immigrant survivors of gender-based violence, particularly at a time when the federal government has stepped up its immigration enforcement efforts in a manner that has chilled immigrants' willingness to interact with state and local authorities, as the experiences of amici's own clients demonstrate.

*Second*, by facilitating the reporting of gender-based violence, the Community Trust Laws strengthen public safety for the whole community. Survivors of domestic violence may have firsthand information relating to a variety of criminal activity. If they are afraid to report it, abusers remain free to continue to act violently toward survivors and others, jeopardizing public safety.

*Finally*, far from conflicting with federal immigration laws, California's Community Trust Laws directly align with federal laws enacted to protect immigrant survivors of gender-based violence. Congress enacted the Violence Against Women Act ("VAWA") and the Trafficking Victims Protection Act ("TVPA") to provide legal protections to immigrant survivors of gender-based violence and to encourage survivors to report abuse. As the text and legislative history of these two laws make clear, Congress desired to: "permit[] battered immigrant women to leave their batterers without fearing deportation"; "encourage law enforcement officials to better serve

---

[4] *See also* Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction ("Opp."), *United States v. California*, No. 2:18-cv-00490-JAM-KJN (E.D. Cal. May 4, 2018), ECF No. 74 at 1, 40.

immigrant crime victims and to prosecute crimes committed against aliens"; and to "facilitate the reporting of crimes to law-enforcement officials by trafficked, exploited, victimized, and abused aliens who are not in lawful immigration status."  *See* Pub. L. No. 106-386 §§ 1513(a)(2)(A)-(B), 114 Stat. at 1533-1534; H.R. Rep. No. 103-395, at 25 (1993).  The California Community Trust Laws—which were enacted to foster a relationship of trust between state authorities and California's immigrant residents—are fully in accord with those federal mandates.[5]

## ARGUMENT

### I.    California's Community Trust Laws Enhance Survivor Safety

Of the many women in the United States who are raped or physically assaulted each year, "immigrant and refugee women are especially vulnerable."[6]  Immigrant women face unique obstacles in seeking protection from gender-based violence, including language barriers, lack of familiarity with social services and law-enforcement systems, and fear of the police based on experiences with law enforcement in their countries of origin.[7]  Survivors of gender-based violence may also fear that contacting authorities to report abuse will put the survivor or a family member at risk of deportation.[8]  In a 2015 survey of 800 Latinos and Latinas nationwide, 41 percent of

---

[5] *See* Cal. Gov't Code § 7284.2(b), (c) (setting forth legislative findings that "a relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California" and that the erosion of this trust results in "immigrant community members fear[ing] approaching police when they are victims of, and witnesses to, crimes"); *see also* Opp. at 5 (noting that the state adopted A.B. 450 in order to "ensure that all California workers enjoy the protections afforded to them under state law 'without fear of harassment, detention, or deportation'" (internal citation omitted)).

[6] Michael Runner, et al., Family Violence Prevention Fund, *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations* 11, Robert Wood Johnson Foundation (Mar. 2009), https://www.futureswithoutviolence.org/ userfiles/file/ImmigrantWomen/IPV_Report_March_2009.pdf.

[7] *Id.* at 4-5.

[8] Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013), https://www.washingtonpost.com/local/for-immigrant-women-domestic-violence-creates-a-double-shadow/2013/12/02/5626b85e-55e6-11e3-8304-caf30787c0a9_story.html?utm_term=.cbd37f3285d4.

respondents cited fear of deportation as the number-one barrier preventing Latino and Latina survivors of domestic violence from seeking help.[9]

Many abusers are well aware of this chilling effect and will deliberately use a survivor's immigration status against her, threatening to contact immigration authorities and report the survivor if she discloses abuse.[10]  While this tool of exploitation and control is especially prominent when the survivor is undocumented, an abuser may also use the threat of deportation to control a survivor who actually holds lawful status by isolating the survivor to prevent her from learning that she has lawful immigration status and capitalizing on her belief that her status is within his control.[11]

California's Community Trust Laws are designed to combat some of the barriers that prevent survivors from seeking help.  As the California legislature explained in its statement of intent accompanying S.B. 54, the express purpose of this law is to build "a relationship of trust" between "California's immigrant community and state and local agencies."  Cal. Gov't Code § 7284.2(b).  Such a relationship is threatened, the legislature found, when "state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes," and when "seeking basic health services."  Cal. Gov't Code § 7284.2(c).  To that end, the law places several carefully tailored limitations on the ability of state and local officials to act as an arm of federal immigration

---

[9] Press Release, No Más, New Study of Domestic Violence and Sexual Assault in the U.S. Latin@ Community Reveals Barriers to Reporting and High Willingness to Intervene to Help Survivors (Apr. 21, 2015), https://nomore.org/press-release/no-mas-study-pr/.

[10] Runner, *supra* note 6, at 4; PRI's The World, *Some Immigrant Women, Victims of Domestic Violence, Afraid to Seek Help* (Mar. 21, 2013), https://www.pri.org/stories/2013-03-21/some-immigrant-women-victims-domestic-violence-afraid-seek-help (quoting Sister Rosemary Welsh, Executive Director of Casa de Misericordia in Laredo, Texas, as follows:  "One of the ways men would keep [immigrant women] in a domestic violence situation was saying that 'I am a U.S. citizen' or 'I am a legal permanent resident, and you call the police, they will deport you and I will stay with the kids[.]"); Tahirih Justice Center, *Nationwide Survey, supra* note 2, at 8 (observing that "[m]any women are hesitant to contact the police or seek child custody or other relief in courts because abusers threaten to call immigration authorities if they do").

[11] *See* Runner, *supra* note 6, at 12.

authorities.  By doing so, the Community Trust Laws ensure that survivors can safely access immediate benefits like protection from abuse and emergency medical care, as well as longer-term benefits, such as restraining orders, without fear of triggering immigration consequences.  Taking those steps, once a survivor feels secure in doing so, may also help her to learn about federal legal protections specifically designed to protect immigrant survivors of domestic violence.  *See infra*, Part III.

The example of one of Tahirih's clients is illustrative: "P" was living in Gibraltar when she met and married a U.S. citizen.  After they had a son together, P's husband convinced her to sell her home, quit her job, and move with him to the United States.  Over time, P's husband grew verbally and physically abusive.  On one occasion, he intentionally crashed the couple's car as he was driving with P and their baby.  The abuse escalated, culminating in an incident in which P's husband screamed at her, strangled her, and scratched her face and eye.  P did not immediately call the police, fearing violent retaliation from her husband.  Finally, after P's husband threw her and their child out of the house during a snowstorm, P's friend encouraged her to call the police, and after doing so, P was able to get a protective order.  According to P, she never would have reported the abuse if she thought there were a chance that she would be detained, deported, or separated from her son, who has autism and requires ongoing special care.  Through assistance from Tahirih, P obtained lawful permanent residence in 2015 based on a federal Violence Against Women Act "self-petition," and she will soon be eligible for citizenship.  Her son is thriving now that he is not regularly witnessing (or being subjected to) domestic violence.

Studies have shown that when local officials enforce federal immigration law, immigrants are deterred from contacting local officials—be it in an emergency room or by dialing 911—out of fear that doing so will result in detention or deportation.  One study illustrates the stark impact such a policy had in North Carolina on women's and children's health:  In jurisdictions where state and

local authorities entered into immigration enforcement agreements with federal authorities,

Hispanic/Latina mothers sought prenatal care later than non-Hispanic/Latina mothers.[12]  The study

noted that "participants reported profound mistrust of health services, avoiding health services, and

sacrificing their health and the health of their family members."[13]  Another study of similar North

Carolina policies found that "the majority of Hispanic interviewees stated that they would hesitate

before reporting crime to authorities out of fear that a friend, neighbour, or family member might be

placed in danger of deportation [proceedings]."[14]  Survey results confirm these findings.  In a 2012

survey of 2,000 Latinos in Chicago, Houston, Los Angeles, and Phoenix, 45 percent of respondents

reported that as a result of increased cooperation between the police and immigration authorities,

they were less likely to contact law enforcement if they were victims of a crime.[15]

This is not an abstract fear.  Since January 2017, when the White House released an

Executive Order declaring it to be the "policy of the executive branch to empower State and local

law enforcement agencies across the country to perform the functions of an immigration officer …

to the maximum extent permitted by law," a series of studies, surveys, and media reports have found

evidence that immigrant survivors of gender-based violence are increasingly fearful about contacting

state and local authorities.[16]  In response to an April 2017 survey of more than 700 legal advocates

---

[12] Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (Feb. 2015).

[13] *Id.*

[14] Mai Thi Nguyen & Hannah Gill, *Interior Immigration Enforcement: The Impacts of Expanding Local Law Enforcement and Authority*, 53 Urb. Stud. J. 302, 15 (2015); *see also* Orde F. Kittrie, *Federalism, Deportation, and Crime Victims Afraid to Call the Police*, 91 Iowa L. Rev. 1449, 1451 (2006) ("to the extent [survivors of domestic violence] believe that [the] police will report them to immigration authorities …, 'women and children will continue to endure ongoing abuse rather than call for help.'"(internal citations omitted)).

[15] Nik Theodore, Dep't of Urban Planning and Policy, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. at Chi. (May 2013), http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.

[16] *See* Enhancing Public Safety in the Interior of the United States, Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

and legal-services organizations, three out of four respondents reported that their clients had expressed concerns about contacting the police or going to court for matters related to crimes committed against them.[17]  In response to a more recent survey of prosecutors conducted by American University Washington College of Law's National Immigrant Women's Advocacy Project, survey respondents reported a drop in the level of cooperation in cases of immigrant crime victims, particularly for those involving domestic abuse, sexual assault, and child abuse.[18]  And a May 2018 report by the Migration Policy Institute observed that victim advocates and service providers nationwide have witnessed recent "declines in immigrant participation in their services" and a "drop in the number of clients pursuing protection from abusers."[19]

This chilling effect has also been felt in California.  In Los Angeles, reports by Latinos of incidents of spousal abuse dropped by 3.5% in the first six months of 2017 compared to 2016, while reporting among non-Latino survivors remained unchanged.[20]  San Francisco and San Diego reported even steeper declines in Latino spousal abuse reporting during the same time period, of 18% and 13%, respectively.[21]  Beyond law enforcement, many immigrants are disengaging from other critical services in response to stepped-up immigration enforcement.  Some families are keeping their children home from school and others have ceased seeking treatment for chronic

---

[17] Tahirih Justice Center, *Nationwide Survey, supra* note 2.

[18] National Immigrant Women's Advocacy Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* 72, Am. Univ., Wash. Coll. Of Law (May 3, 2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

[19] Randy Capps, et al., *Revving Up The Deportation Machinery: Enforcement and Pushback Under Trump* 69, Migration Policy Institute (May 2018), https://www.migrationpolicy.org/sites/default/files/publications/ImmigrationEnforcement-FullReport-FINAL-WEB.pdf.

[20] James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

[21] *Id.*

illnesses from local clinics for fear of Immigration and Customs Enforcement ("ICE") raids.[22]  In addition, fewer immigrant survivors of gender-based violence are seeking out critical legal services. For example, the legal director of a domestic violence shelter in Orange County observed that after a February 2017 incident in which ICE agents entered a courthouse in Texas to arrest an immigrant woman who was seeking a restraining order, "[w]e went from half our clients being undocumented, to zero undocumented clients."[23]

## II.    California's Community Trust Laws Enhance Public Safety

By encouraging immigrant survivors to seek help from state and local agencies, California's Community Trust laws also increase public safety for the whole community.  As state officials and immigrant advocates have observed, when immigrants are afraid to contact the police, they "become targets for other crimes."[24]  Former New York City Mayor Rudy Giuliani has emphasized that the public safety at issue is wider than the immigrant community:  "If you are an illegal immigrant … and a crime is committed against you, I want you to report that, because lo and behold, the next time a crime is committed, it could be against a citizen or a legal immigrant."[25]  Thus, laws that chill immigrants' reporting of abuse and other crimes may lead to increased overall criminal activity. That is one reason why major policing groups, including the Major Cities Chiefs Association ("MCCA"), Major County Sheriffs Association, and International Association of Chiefs of Police have opposed efforts to defund so-called "sanctuary" jurisdictions.[26]  One recent report concluded

---

[22] Virginia Fay, *Back Into the Shadows: Immigrants Retreat from Needed Services as Deportation Fears Loom*, Peninsula Press (June 12, 2017), http://peninsulapress.com/2017/06/12/back-into-the-shadows/.

[23] Queally, *supra* note 20.

[24] *Id.*

[25] Elizabeth M. McCormick, *Rethinking Indirect Victim Eligibility for U Non-Immigrant Visas to Better Protect Immigrant Families and Communities*, 22 STAN. L. & POL'Y REV. 587, 599-600 (2011).

[26] Letter from the Major County Sheriffs' Association and Major Cities Chiefs Association Opposing S. 2146 (Oct. 19, 2015), http://www.aila.org/infonet/letter-county-sheriffs-opposing-s-2146; Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Efforts to Fight Gangs*,

that, on average, 35.5 fewer crimes are committed per 10,000 people in so-called "sanctuary" counties than non-"sanctuary" counties.[27]

At the same time, when immigrants are afraid to contact the police, the police are deprived of valuable information about criminal activity.[28]  After passage of a Texas law last year banning so-called "sanctuary" jurisdictions, members of the Houston Police Department described how the law affected the immigrant communities they work with and made it more difficult to investigate criminal activity in the community.  For example, an eyewitness to a burglary said that she would not talk to police about what she saw because she feared being deported.  Another woman in Houston reported that she knew her neighbors were selling drugs, but she was too afraid to give the police information about it because she feared talking to them while undocumented.  As one member of the Houston Police Department said, "People are afraid to talk to the police, and how does that help us as police do our job?"[29]

As the United States Court of Appeals for the Seventh Circuit recently explained, the consequences of this chilling effect are "magnified" in cases involving domestic violence.  *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018).  Unless and until they are stopped, perpetrators of domestic violence often continue to act abusively and, in many instances, escalate their levels of violence.[30]  Studies show that rates of recidivism for domestic-violence offenders may

---

N.Y. Times (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/nyregion/police-fear-trump-immigration-orders-may-handcuff-effort-to-fight-gangs.html (quoting a statement by the International Association of Chiefs of Police).

[27] Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

[28] John Burnett, *New Immigration Crackdowns Creating "Chilling Effect" On Crime Reporting*, NPR (May 25, 2017), https://www.npr.org/2017/05/25/529513771/new-immigration-crackdowns-creating-chilling-effect-on-crime-reporting.

[29] *Id.*

[30] *See* Michael Samsel, *Warning Signs: Escalation, Abuse and Relationships*, https://www.abuseandrelationships.org/Content/Basics/escalation.html (last visited May 15, 2018).

be higher than for other crimes and that perpetrators of sexual violence often go on to commit other violent acts with tragic results that could have been avoided.[31]  It is no surprise to many researchers that "what perpetrators of terrorist attacks turn out to often have in common more than any particular religion or ideology, are histories of domestic violence."[32]  One recent study found that approximately 20% of all of mass murders committed in the U.S. between 2006 and 2016 involved a perpetrator with a history of domestic violence.[33]

When local laws ensure that immigrant survivors of gender-based violence feel safe reporting abuse, survivors may therefore assist local officials in investigating and prosecuting not only gender-based violence, but also other serious criminal activity.[34]  For example:

- One Tahirih client was severely abused by a United States Citizen who was also engaged in sex trafficking of young girls.  She reported him to the police and went on to serve as a key witness and even wore a wire to help federal prosecutors secure a conviction.  The client's abuser is currently serving a prison sentence.

- Another Tahirih client called the police to report abuse at the hands of her husband, also a United States Citizen.  Her call led to the successful prosecution of that abuser

---

[31] *See* Washington State Institute for Public Policy, *Recidivism Trends of Domestic Violence Offenders in Washington State* (Aug. 2013), http://www.wsipp.wa.gov/ReportFile/1541/ Wsipp_Recidivism-Trends-of-Domestic-Violence-Offenders-in-Washington-State_Full-Report.pdf.

[32] *See, e.g.*, Jane Mayer, *The Link Between Domestic Violence and Mass Shootings*, The New Yorker (June 16, 2017), https://www.newyorker.com/news/news-desk/the-link-between-domestic-violence-and-mass-shootings-james-hodgkinson-steve-scalise; T. J. Raphael & Dana Roberson, *How Gun Laws Let Domestic Violence Offenders Slip Through the Cracks*, PRI (Nov. 16, 2017), https://www.pri.org/stories/2017-11-16/how-gun-laws-let-domestic-violence-offenders-slip-through-cracks.

[33] Emma E. Fridel, *A Multivariate Comparison of Family, Felony, and Public Mass Murders in the United States,* SAGE Journals, Journal of Interpersonal Violence (Nov. 8, 2017), https://doi.org/10.1177%2F0886260517739286.

[34] *See* Michael E. Miller, *'People Here Live in Fear': MS-13 Menaces a Community Seven Miles from the White House*, Wash. Post (Dec. 20, 2017), https://www.washingtonpost.com/local/people-here-live-in-fear-ms-13-menaces-a-community-seven-miles-from-the-white-house/2017/12/20/6cebf318-d956-11e7-b859-fb0995360725_story.html?noredirect=on&utm_term=.bc8c964d93e5.

on a wide array of criminal charges in addition to domestic abuse, including grand larceny, DWI, burglary, and assault on a police officer.

In short, ample evidence supports the California legislature's determination that public safety is strengthened—a key element of the State's broad police powers—by laws that foster trust between police and the communities they serve by limiting state and local entanglement in immigration enforcement. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power … than the suppression of violent crime and vindication of its victims."). As the DOJ itself recently argued when it *supported* state legislative action in the immigration field, "[a] state may exercise its sovereign police powers to implement a state-wide policy concerning cooperation with federal [immigration] authorities … as [the state] has done here."[35]

The public interest weighs heavily against enjoining these laws, as an injunction would chill the willingness of survivors to report crime, and, in turn, have a detrimental impact on public safety. As the Seventh Circuit recently explained:

> [T]he impact on localities forced to comply with [federal measures prohibiting "sanctuary" jurisdictions] could be devastating. Those local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities. Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored.

*City of Chicago*, 888 F.3d at 291.

---

[35] Statement of Interest on Behalf of the United States at 25-26, *City of El Cenizo v. Texas*, No. 5:17-cv-404-OLG (W.D. Tex. June 23, 2017), ECF No. 90.

### III.   California's Community Trust Laws Align With, And Enhance The Effectiveness Of, State And Federal Laws Intended To Protect Survivors

Finally, as they relate to immigrant survivors of gender-based violence, the California Community Trust Laws do not "obstruct[]" enforcement of federal immigration laws, as the DOJ contends,[36] but rather directly align with congressional directives to provide protection and legal relief for immigrant survivors of gender-based violence, as expressed in the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, §§ 40701-40703, 108 Stat. 1796, 1902, 1953-1955 (Sept. 13, 1994), and the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, §§ 107, 1501-1513, 114 Stat. 1464, 1474-1480, 1518-1537 (Oct.28, 2000). For more than two decades, Congress has recognized that immigrant women are uniquely vulnerable to abuse because their abusers can exploit their immigration status as a means of manipulation and control.  To ensure that immigrant women feel safe reporting crimes to local police, Congress has enacted multiple laws that provide assistance and protection to immigrant survivors of gender-based violence, sexual assault, and human trafficking.  VAWA's and TVPA's immigration provisions were designed to encourage survivors to seek out the array of victim protections provided for in both state and federal laws, including emergency services, and protection orders, and to encourage victims to report crimes, and cooperate with local law enforcement in investigations and prosecutions without fear of being turned over to federal immigration authorities.  Both statutes, and their subsequent reauthorizations, have enjoyed long-standing and widespread bipartisan support in Congress.[37]

#### A.   Violence Against Women Act

In passing VAWA, Congress acknowledged that "[m]any immigrant women live trapped and

---

[36] *See* Notice of Motion and Motion for Preliminary Injunction at 1, United States v. California, No. 2:18-cv-00490-JAM-KJN (Mar. 6, 2018). ECF No. 2.

[37] The most recent reauthorization of VAWA, which included TVPA reauthorization, passed the Senate by a vote of 78-22 and the House of Representatives by a vote of 286-138.  *See* 159 Cong. Rec. H705, H800 (daily ed. Feb. 28, 2013); 159 Cong. Rec. S597, S616 (daily ed. Feb. 12, 2013).

isolated in violent homes, afraid to turn to anyone for help.  They fear both continued abuse if they stay with their batterers and deportation if they attempt to leave." H.R. Rep. No. 103-395, at 26.  For some, deportation may involve additional trauma such as forced separation from children.  One purpose of VAWA, therefore, was to "permit[] battered immigrant women to leave their batterers without fearing deportation." *Id* at 38.

VAWA fulfilled this purpose in two important ways.  First, it prevented abusers who are U.S. citizens or lawful permanent residents from exploiting their spouses' lack of immigration status.  An immigrant married to a citizen or lawful permanent resident formerly had to depend on her spouse to petition for lawful permanent residence on her behalf.  This provided a highly effective tool for abusers to deter survivors from reporting abuse.  VAWA, however, allowed immigrant survivors of domestic violence and sexual assault to "self-petition" for lawful permanent residence on behalf of themselves and their children without the knowledge or involvement of an abusive spouse or family member.  *See* Pub. L. No. 103-322 § 40701, 108 Stat. at 1953-1955.  Second, VAWA permitted certain survivors who were already in immigration proceedings to seek cancellation of removal, effectively shielding them from deportation.  *See id.* § 40703, 108 Stat. at 1955.

### B.      Trafficking Victims Protection Act

In 2000, Congress strengthened VAWA's protections for immigrant women with the passage of TVPA.  Pub. L. No. 106-386, 114 Stat. 1464.  This law not only improved access to VAWA's existing forms of relief, but also established two additional visa classifications for noncitizens: the "U" visa for immigrant victims of violent crime, 8 U.S.C. § 1101(a)(15)(U), and the "T" visa for immigrant victims of severe forms of human trafficking, 8 U.S.C. § 1101(a)(15)(T).  In addition, TVPA expanded access to services for noncitizen survivors of gender-based violence and sexual assault and enhanced funding opportunities for local law enforcement to respond to their unique needs.  Pub. L. No. 106-386 § 1512, 114 Stat. at 1533.

1
2
3
4
5
6
7
8
9
10
11

Like VAWA, these provisions were designed "to remove immigration laws as a barrier that kept battered immigrant women and children locked in abusive relationships."  Pub. L. No. 106-386 § 1502(a)(1), 114 Stat. at 1518.  To that end, TVPA fosters and relies on greater collaboration between law enforcement and immigrant victims of crimes.  The purpose of these protections, as stated in the statutory text, is to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes"; to "encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens"; and to "facilitate the reporting of crimes to law enforcement officials by trafficked, exploited, victimized, and abused aliens who are not in lawful immigration status."  *Id.* § 1513(a)(2)(A)-(B), 114 Stat. at 1533-1534.

12
13
14
15
16
17
18
19

Congress thus recognized that local law enforcement succeeds in protecting public health and safety when all members of the community are willing to come forward and cooperate with authorities.  It also affirmed that these protections were "in keeping with the humanitarian interests of the United States."  Pub. L. No. 106-386 § 1513(a)(2)(A), 114 Stat. at 1533-1534.  Far from "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, California's Community Trust Laws are in harmony with and further Congress's expressed goals in VAWA and TVPA.

20

## **CONCLUSION**

21
22
23

The Court should deny the United States' motion for a preliminary injunction and grant California's motion to dismiss.

24
25
26
27
28

DATED: May 18, 2018          Respectfully submitted,

By:   /s/JAMIE S. GORELICK
JAMIE S. GORELICK (*pro hac vice*)
jamie.gorelick@wilmerhale.com
CATHERINE M.A. CARROLL
catherine.carroll@wilmerhale.com
CHRISTOPHER E. BABBITT (SBN: 225813)
christopher.babbitt@wilmerhale.com
CLAIRE M. BERGERON
claire.bergeron@wilmerhale.com
SHEILA E. MENZ
sheila.menz@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: 202 663 6000
Facsimile:  202 663 6363

**Attorneys for Amici Curiae**

1

**APPENDIX**

2

**LIST OF AMICI CURIAE**

3

**TAHIRIH JUSTICE CENTER**
881 SNEATH LANE

4
SUITE 115
SAN BRUNO, CA 94066

5

**ASISTA**

6
P.O. BOX 12
SUFFIELD, CT  06078

7

**ASIAN PACIFIC INSTITUTE ON GENDER-BASED VIOLENCE**

8
500 12TH STREET
SUITE 330

9
OAKLAND, CA  94607

10

**CASA DE ESPERANZA**
P.O. BOX 40115

11
ST. PAUL, MN  55104

12

**IMMIGRATION CENTER FOR WOMEN AND CHILDREN**
634 SOUTH SPRING STREET

13
SUITE 727
LOS ANGELES, CA  90014

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28