1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Harry Sandick (*pro hac vice* pending)
Email: hsandick@pbwt.com
Jamison Davies (*pro hac vice* pending)
Email: jmdavies@ pbwt.com
Michael D. Schwartz (*pro hac vice* pending)
Email: mschwartz@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone:   (212) 336-2000

Kevin A. Calia (SB# 227406)
Email: kevin@calialaw.com
LAW OFFICE OF KEVIN A. CALIA
1478 Stone Point Drive, Suite 100
Roseville, CA 95661
Telephone: (916) 547-4175

*Attorneys for Amici Curiae*

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA**, et al.,<br><br>Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>**BRIEF OF *AMICI CURIAE* ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, CRIMINAL LAW AND IMMIGRATION LAW SCHOLARS IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>NO HEARING NOTICED<br><br>Complaint Filed:    March 6, 2018 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ......................... 1

ARGUMENT ............................................................................................ 2

I.    THE ADMINISTRATION'S EFFORTS TO FORCE THE
      ENTANGLEMENT OF LOCAL CRIMINAL JUSTICE SYSTEMS WITH
      IMMIGRATION ENFORCEMENT ARE HISTORICALLY
      ANOMALOUS AND CONSTITUTIONALLY SUSPECT .................................. 2

II.   THE STATE'S DECISION TO DISENTANGLE ITS LOCAL CRIMINAL
      JUSTICE SYSTEM FROM FEDERAL IMMIGRATION
      ENFORCEMENT IS NOT PREEMPTED BY FEDERAL LAW ......................... 8

      A.    Federal Law Should Not be Construed to Facially Preempt State
            Law Where Doing So Would Supersede the Historic Police Powers
            of the States and Raise Serious Constitutional Questions ........................... 8

      B.    Neither 8 U.S.C. § 1373 Nor the INA Should Be Construed To
            Preempt SB 54 ................................................................................. 10

CONCLUSION ........................................................................................ 15

APPENDIX A ..................................................................................... A-1

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Arizona v. United States,*
5
    567 U.S. 387 (2012) ....................................................................................*passim*

6

*Bond v. United States,*
7
    134 S. Ct. 2077 (2014) ........................................................................................8

8

*City of Chicago v. Sessions,*
9
    — F.3d —, 2018 U.S. App. LEXIS 9862 (7th Cir. April 19, 2018) ..............................7

10

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999) .....................................................................................13
11

12

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017)......................................................................7
13

14

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017), *reconsideration denied,* 267 F.
15
    Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom.*
    *City & Cty. of San Francisco v. Trump,* 17-16886, 2018 U.S. App.
16
    LEXIS 239 (9th Cir. Jan. 4, 2018) .................................................................7

17

*Demore v. Kim,*
18
    538 U.S. 510 (2003) .........................................................................................13

19

*Galarza v. Szalczyk,*
20
    745 F.3d 634 (3d Cir. 2014) ...........................................................................6, 14

21

*Gregory v. Ashcroft,*
22
    501 U.S. 452 (1991) ...........................................................................................9

23

*Kelley v. Johnson,*
    425 U.S. 238 (1976) ...........................................................................................3
24

25

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ...........................................................................................9
26

27

*Morales v. Chadbourne,*
    996 F. Supp. 2d 19 (D. R.I. 2014), *aff'd* 793 F.3d 208 (1st Cir. 2015)..........................6

28

II

BRIEF OF *AMICI CURIAE*
Case No. 2:18-cv-00490-JAM-KJN

*Moreno v. Napolitano*,
213 F. Supp. 3d 999 (N.D. Ill. 2016)........................................................6

*Murphy v. NCAA*,
No. 16-476, 2018 U.S. LEXIS 2805 (May 14, 2018) ...........................*passim*

*New York v. United States*,
505 U.S. 144 (1992) ..............................................................9, 12, 14

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ..........................................................................9

*North Dakota v. United States*,
495 U.S. 423 (1990) ..........................................................................9

*Printz v. United States*,
521 U.S. 898 (1997) ..............................................................9, 12, 14

*Steinle v. City & Cnty. of San Francisco*,
230 F. Supp. 3d 994 (N.D. Cal. 2017).......................................................11

*United States v. Morrison*,
529 U.S. 598 (2000) ...............................................................9, 12

*Vargas v. Swan*,
854 F.2d 1028 (7th Cir. 1988) .............................................................6

**Statutes**

8 U.S.C. § 1103(a) ..........................................................................4, 5

8 U.S.C. § 1226 .......................................................................*passim*

8 U.S.C. § 1231 .......................................................................*passim*

8 U.S.C. § 1252c ..............................................................................4

8 U.S.C. § 1324(c) ............................................................................6

8 U.S.C. § 1357(g) ............................................................................4

8 U.S.C. § 1373 .......................................................................*passim*

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207
(Oct. 27, 1986)................................................................................4

III

10392183

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat.
  4469-70 (Nov. 18, 1988) ................................................................................4

Cal. Gov't Code § 7284 ..............................................................2, 10, 11, 13

**Other Authorities**

U.S. Const. amend. X...................................................................................*passim*

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime
  Control and National Security*, 39 Conn. L. Rev. 1827 (2007) ....................4

César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU
  L. Rev. 1457 (2013)........................................................................................4

Anil Kalhan, *Immigration Policing and Federalism Through the Lens of
  Technology, Surveillance, and Privacy*, 74 Ohio St. L.J. 1105 (2013)...................3, 12

Gillian E. Metzger, *Federalism and Federal Agency Reform*, 111 Colum. L.
  Rev. 1, 57 (2011) ............................................................................................9

Robert A. Mikos, *Can the States Keep Secrets from the Federal
  Government?*, 161 U. Pa. L. Rev. 103 (2012) ..............................................12

S. Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of
  the Political in Immigration Federalism*, 44 Ariz. St. L.J. 1431 (2012)......................5

Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power
  over Immigration,* 86 N.C. L. Rev. 1557 (2008)..........................................3

Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a
  "Post-Racial" World*, 76 Ohio St. L.J. 599 (2015).......................................4

Michael J. Wishnie, *State and Local Police Enforcement of Immigration
  Laws*, 6 U. Pa. J. Const. L. 1084 (2004).......................................................5

Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy*,
  Nat'l Immigration Law Ctr. (Jan. 26, 2017)................................................*12*

Memorandum for Assistant U.S. Attorney, S.D. Cal., from Teresa Wynn
  Roseborough, Dep. Assistant Attorney General, Office of Legal
  Counsel, Re: Assistance by State and Local Police in Apprehending
  Illegal Aliens (Feb. 5, 1996),........................................................................5

IV

Memorandum for the Att'y Gen., from Jay S. Bybee, Assistant Attorney
   General, Office of Legal Counsel, Non-preemption of the authority of
   state and local law enforcement officials to arrest aliens for immigration
   violations 8 (April 3, 2002). ...........................................................................5

Memorandum for Joseph R. Davis, Ass't Director, FBI, from Douglas W.
   Kmiec, Assistant Attorney General, Office of Legal Counsel, Re:
   Handling of INS Warrants of Deportation in Relation to NCIC Wanted
   Person File (Apr. 11, 1989) ...........................................................................5

10392183

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The United States' challenge to the State of California's decision to disentangle its local criminal justice system from federal immigration enforcement presents a question of statutory construction that is easily answered at this stage of the litigation:  Federal statutory law does not preempt Senate Bill 54 on its face.  *Amici*, who are listed in Appendix A, are 83 scholars of administrative law, constitutional law, criminal law, and immigration law.  They have an interest in the proper resolution of conflicts between federal immigration law and state law based upon application of fundamental principles of statutory construction and constitutional law.  *Amici* submit this brief to address these fundamental principles and to explain their constitutional and historical foundations.

California's decision to disentangle its law enforcement resources from federal immigration enforcement does not threaten federal supremacy in matters of immigration policy.  To the contrary, the Administration's efforts to entangle local criminal justice systems with immigration enforcement are historically anomalous and exceed its statutory and constitutional authority.  For most of the Nation's history, state and local law enforcement played little to no role in the enforcement of federal immigration laws.  In the modern era, Congress has authorized state and local officials to participate in enforcing immigration law in limited ways.  But Congress has never *required* state and local governments to do so.  Instead, where Congress has created a role for state and local jurisdictions to participate, Congress has consistently taken care to offer them a *choice*. In enacting SB 54, California has simply chosen to exercise that choice in the negative.

Nothing in federal statutory law preempts California's choice.  The United States claims that because parts of SB 54 withhold assistance, they stand as an obstacle to federal immigration enforcement under the detention and removal provisions of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1226 & 1231.  *See* U.S. PI Mot. 23-27, 29-31 (discussing Cal. Gov't Code §§ 7284.6(a)(1)(C)-(D), (a)(4)).  And the United States claims that parts of SB 54 directly conflict with 8 U.S.C. § 1373(a), even though

1

SB 54 contains a savings clause that expressly authorizes state and local officials to share information with federal immigration officials to the extent that Section 1373 limits state law.  *See id.* at 27-28 (discussing Cal. Gov't Code §§ 7284.6(a)(1)(C) & (D)); *see also* Cal. Gov't Code § 7284.6(e) (savings clause).  SB 54 need not, and indeed should not, be construed to stand as an obstacle to implementation of the INA or to conflict directly with 8 U.S.C. § 1373.  The detention and removal provisions of the INA impose obligations on *federal* officials; they were not intended to disturb state and local authority over the allocation of state and local law enforcement resources.  And Section 1373 and SB 54 would conflict on their face only if they are read without regard to SB 54's savings clause, the plain meaning of Section 1373's terms, and the serious constitutional questions that the United States' construction of Section 1373 would create, including those under the Supreme Court's recent decision in *Murphy v. NCAA*, No. 16-476, 2018 U.S. LEXIS 2805 (U.S. May 14, 2018), which reaffirmed the ban on federal commandeering of states.

At this stage, this Court should not construe SB 54 and federal law to conflict. Rather, where, as here, "[t]here is a basic uncertainty about what the law means and how it will be enforced," the Supreme Court has instructed that a court "should assume that 'the historic police powers of the States' are not superseded."  *Arizona v. United States*, 567 U.S. 387, 400, 415 (2012) (internal citation omitted).

**ARGUMENT**

**I.   THE ADMINISTRATION'S EFFORTS TO FORCE THE ENTANGLEMENT OF LOCAL CRIMINAL JUSTICE SYSTEMS WITH IMMIGRATION ENFORCEMENT ARE HISTORICALLY ANOMALOUS AND CONSTITUTIONALLY SUSPECT**

The United States argues that federal immigration law preempts SB 54 based on its view of the INA, which, it argues, "codifies the Executive Branch's constitutional and inherent authority" to arrest and detain undocumented individuals.  U.S. PI Mot. 23.  To the contrary, Congress has never granted the

2

1   Executive Branch such sweeping power to preempt state and local law. More

2   specifically, Congress has never bestowed upon federal authorities an unchecked

3   right to entangle local criminal justice systems with the Executive Branch's

4   immigration enforcement in the ways that the United States now demands.

5   Congress's approach through the INA has been to invite specific, limited

6   cooperation from state and local governments, not to require it.[1]

7          Across most of United States history, at least after the enactment of the first

8   federal immigration statutes in the late nineteenth century, there has been a sharp

9   demarcation of spheres of responsibility for state and local law enforcement

10  agencies, on the one hand, and federal immigration enforcement authorities, on the

11  other.  State and local law enforcement bore much of the responsibility for the

12  administration of criminal laws.  Indeed, "[t]he promotion of safety of persons and

13  property [has been] unquestionably at the core of [the states'] police power"

14  reserved by the Tenth Amendment.  *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

15  Enforcement of immigration laws was reserved for federal officials.  *See* Juliet P.

16  Stumpf, *States of Confusion: The Rise of State and Local Power over Immigration*,

17  86 N.C. L. Rev. 1557, 1571–78 (2008) (describing court decisions distinguishing

18  civil immigration enforcement from criminal enforcement and allocating the

19  former exclusively to the federal government while recognizing the states' primary

20  role in the latter); *Arizona*, at 409 (noting that immigration enforcement decisions

21  "touch on foreign relations and must be made with one voice").

---

25  [1] *See* Anil Kalhan, *Immigration Policing and Federalism Through the Lens of*

26  *Technology, Surveillance, and Privacy,* 74 Ohio St. L.J. 1105, 1120–21 (2013)
    (observing that notwithstanding federal efforts to enlist state and local officials in

27  immigration enforcement, "immigration federalism . . . presumes some level of self-
    conscious, calibrated, and negotiated choice by states and localities concerning the extent

28  to enmesh their law enforcement agencies with immigration policing activities.").

3

In the 1980s and 1990s, Congress enacted several anti-drug statutes that contained immigration-related provisions.  For example, as part of the Anti-Drug Abuse Act of 1986, Congress enacted the Narcotics Traffickers Deportation Act, which expanded the categories of individuals who would be deported for controlled substance convictions.  *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct. 27, 1986).  The Anti-Drug Abuse Act of 1988 introduced the term "aggravated felony" and made the commission of such crimes grounds for deportation.  *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat. 4469-70 (Nov. 18, 1988).  Around this time, Congress also introduced the first statutory mention of an immigration detainer. *See* Anti-Drug Abuse Act of 1986, *supra*, § 1751(d) (creating 8 U.S.C. § 1357(d)).[2]

These changes to federal law, however, were directed at federal authorities. Congress did not attempt to require states and local governments to assist the Executive Branch with carrying out its duties.  In 1996, Congress added Section 287(g) to the INA, allowing the Attorney General to enter into written agreements with State or localities that *chose* to allow their officers to carry out the "function of an immigration officer."  8 U.S.C. § 1357(g).  In addition, Congress authorized states and localities to permit their officers to make civil immigration arrests in certain narrow instances, *see* 8 U.S.C. § 1252c; 8 U.S.C. § 1103(a)(10), and to

---

[2] Commentators have observed that policymakers are still struggling to disentangle immigration law from anti-crime legislation, an entanglement that reflected a myth of immigrant criminality "reimagin[ing] noncitizens as criminal deviants and security risks."  César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. Rev. 1457, 1458 (2013); Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control and National Security*, 39 Conn. L. Rev. 1827 (2007); Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 Ohio St. L.J. 599, 637–42 (2015).

4

contract with the Attorney General to house federal immigration detainees if they desired, *see* 8 U.S.C. § 1103(a)(11)(A).  Throughout, Congress never *required* states and localities to assist the federal government.

Nevertheless, after 9/11, the federal Executive Branch began to see state and local law enforcement agencies as a potential "force multiplier" for the enforcement of federal immigration law. The push to involve local criminal agencies in immigration enforcement became more insistent and the Executive Branch began to merge criminal justice concerns with immigration concerns in an attempt to enlist state and local officers in the federal immigration fight.[3]  In 2002, for example, the Office of Legal Counsel reversed its previous view that state and local officers did not have "inherent authority" to enforce civil immigration laws, paving the way for more states and localities to lend their officers to the federal effort.[4]  However, the 2002 opinion was later discredited by the Supreme Court's

---

[3] *See* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. Pa. J. Const. L. 1084, 1084-88 (2004) (describing the "federal effort to enlist, or even conscript, state and local police in routine immigration enforcement"); *see also* S. Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 Ariz. St. L.J. 1431, 1475 (2012) (explaining that linking of immigration and crime suggested that "states and cities could and should be part of the solution").

[4] Memorandum for the Att'y Gen., from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations* 8 (April 3, 2002); *cf.* Memorandum for Joseph R. Davis, Ass't Director, FBI, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation in Relation to NCIC Wanted Person File* (Apr. 11, 1989),  https://www.scribd.com/document/24732201/DOJ-Memo-on-INS-Warrants-of-Deportation-in-Relation-to-NCIC-Wanted-Person-File-4-11-89; Memorandum for Assistantt U.S. Attorney, S.D. Cal., from Teresa Wynn Roseborough, Dep. Assistant Attorney General, Office of Legal Counsel, *Re: Assistance by State and Local Police in Apprehending Illegal Aliens* (Feb. 5, 1996), https://www.justice.gov/file/20111/download.

5

10392183

decision in *Arizona.* In that case, the Supreme Court pointed to only three "limited circumstances" in which Congress had allowed State and local officers to make civil immigration arrests. *Arizona*, 567 U.S. at 408–09.[5] It held that Arizona's attempt (premised on the "inherent authority" argument) to authorize state and local participation beyond the "system Congress created" violated the Supremacy Clause. *Id.* at 408–10 (citations omitted).

The Executive Branch has also overreached in its attempt to leverage immigration detainers to enlist the participation of local jail officials in federal immigration enforcement. Before April 1997, the detainer form in use by federal immigration officials did not request detention at all. *See Vargas v. Swan*, 854 F.2d 1028, 1035 (7th Cir. 1988) (appendix showing Form I-247 in use from March 1983 to April 1997). In 1997, the Executive Branch changed the form, suddenly insisting that local jails receiving detainers were *required* to detain persons otherwise entitled to release. Form I-247 (Apr. 1997), *available at* http://bit.ly/2y7qVyS. The federal courts, however, have since held that Congress never authorized mandatory detainer compliance. *Galarza v. Szalczyk*, 745 F.3d 634, 641–45 (3d Cir. 2014).[6, 7]

---

[5] The *Arizona* Court noted a fourth example of Congress authorizing State and local officers to perform immigration functions, which pertained to enforcement of *criminal* anti-harboring laws. 8 U.S.C. § 1324(c).

[6] The federal government's use of immigration detainers has resulted in widespread Fourth Amendment violations and violations of the INA. *See, e.g., Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D. R.I. 2014), *aff'd* 793 F.3d 208 (1st Cir. 2015) ("One needs to look no further than the detainer itself . . . The fact that an investigation had been initiated is not enough to establish probable cause because the Fourth Amendment does not permit seizures for mere investigations."); *Moreno v. Napolitano,* 213 F. Supp. 3d 999 (N.D. Ill. 2016) (holding federal detainer practices routinely exceeded immigration officers' arrest authority under the INA).

10392183

While the participation of state and local law enforcement officials in federal immigration efforts, including through the exchange of information and transfers from local jails, is no longer anomalous, states like California retain the authority to consider the consequences of entanglement with federal immigration enforcement and determine that it is in the best interests of their residents to opt out of participating in federal deportation efforts.  The United States' bid to force California to participate in the current Administration's immigration enforcement plans should fare no better than previous instances of executive branch overreach. Congress has respected the distinct spheres of responsibility of the Federal government and the State and local governments.  In all of its legislative enactments concerning civil immigration arrests and detention, Congress has refrained from coopting State and local governments. This Court should hold federal authorities to the same principle in this case.

---

[7] A third example of executive branch overreach has been the Trump Administration's attempts to attach immigration-related funding conditions to law enforcement grants.  *See, e.g., Cnty. of Santa Clara v. Trump,* 250 F. Supp. 3d 497 (N.D. Cal. 2017), *reconsideration denied,* 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom. City & Cty. of San Francisco v. Trump,* 17-16886, 2018 U.S. App. LEXIS 2391401847 (9th Cir. Jan. 4, 2018) (striking down executive order threatening defunding on grounds of, *inter alia,* separation of powers, Spending Clause violation, and violation of the Tenth Amendment); *City of Chicago v. Sessions,* — F.3d —, 2018 U.S. App. LEXIS 9862 (7th Cir. April 19, 2018) (affirming, on separation of powers grounds, district court's grant of nationwide injunction as to funding conditions imposed by Attorney General); *City of Philadelphia v. Sessions,* 280 F. Supp. 3d 579 (E.D. Pa. 2017) (issuing preliminary injunction as to funding conditions imposed by Attorney General on grounds, *inter alia,* that such conditions were arbitrary and capricious).

7

10392183

**II.     THE STATE'S DECISION TO DISENTANGLE ITS LOCAL CRIMINAL JUSTICE SYSTEM FROM FEDERAL IMMIGRATION ENFORCEMENT IS NOT PREEMPTED BY FEDERAL LAW**

In *Arizona*, the Supreme Court explained that federal courts should not aggressively wield preemption as a scythe to facially preempt state law.  *See* 567 U.S. at 400, 415.  While state law cannot stand as an obstacle to the implementation of federal statutory law, "[i]n pre-emption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  *Id.* at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  This presumption against preemption has particular force where the federal government has brought a facial challenge to state law and "[t]here is a basic uncertainty about what the law means and how it will be enforced."  *Id.* at 415.  Construing 8 U.S.C. § 1373 and the INA to preempt SB 54 on its face would supersede the historic police powers of the states and unnecessarily raise serious constitutional questions under the Tenth Amendment.  To avoid these constitutional problems, this Court should decline the United States' invitation to enter a preliminary injunction against SB 54.

**A.     Federal Law Should Not be Construed to Facially Preempt State Law Where Doing So Would Supersede the Historic Police Powers of the States and Raise Serious Constitutional Questions**

In an era where Congress sets the metes and bounds of federal regulation, statutory interpretation has become a safeguard of federalism.  When construing federal statutes, federal courts presume that "Congress legislates against the backdrop of certain unexpressed presumptions," including "those grounded in the relationship between the Federal Government and the States."  *Bond v. United States*, 134 S. Ct. 2077, 2088 (2014) (internal quotation marks omitted).  Construing federal statutes in light of these presumptions is crucial to preserving federalism "inasmuch as [the Supreme] Court . . . has left primarily to the political process the protection of the States against intrusive

8

1  exercises of Congress' Commerce Clause powers." *Gregory v. Ashcroft*, 501 U.S. 452,

2  464 (1991).[8]

3      Several background presumptions regarding the federal system have long

4  informed statutory construction.  The Tenth Amendment provides that "[t]he powers not

5  delegated to the United States by the Constitution, nor prohibited by it to the States, are

6  reserved to the States respectively, or to the people."  U.S. Const. amend. X.  This

7  amendment reserves police powers to the states, including over matters of local criminal

8  justice.  *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618 (2000).  It also reflects a

9  structural principle that prohibits the federal government from commandeering state

10  legislatures and executive officials or coercing them to implement federal law.  *See NFIB

11  v. Sebelius*, 567 U.S. 519, 576 (2012); *Printz v. United States*, 521 U.S. 898, 933 (1997);

12  *New York v. United States*, 505 U.S. 144, 175-76 (1992).  When construing statutes,

13  federal courts seek to preserve the states' reserved authority.  As the Supreme Court has

14  put it, "Congress does not cavalierly pre-empt" state law.  *Medtronic, Inc. v. Lohr*, 518

15  U.S. 470, 485 (1996).  Instead, out of respect for "the States [as] independent sovereigns

16  in our federal system," courts should presume that federal law does not preempt state law

17  "'unless that was the clear and manifest purpose of Congress.'"  *Id.* (quoting *Rice*, 331

18 

19 

20  _____

21      [8] Today, Congress plays the primary role in deciding whether federal law

22  displaces state law.  *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) ("[T]he
Court has . . . adopted a functional approach to claims of governmental immunity,
accommodating the full range of each sovereign's legislative authority and *respectful of

23  the primary role of Congress* in resolving conflicts between National and State

24  Government.") (emphasis added).  For this reason, doctrines of implied
intergovernmental immunity necessarily play a lesser role where federal statutory law

25  governs conflicts between the states and the federal government.  Gillian E. Metzger,

26  *Federalism and Federal Agency Reform*, 111 Colum. L. Rev. 1, 57 (2011) ("Much of the
resultant doctrine of federal intergovernmental immunity has been cut back over time,

27  with such concerns now addressed largely under the aegis of preemption.").  Questions of
federal-state conflict are answered today primarily by reference to Congress's intent, not

28  by judicial elaboration of the implications of the Supremacy Clause.  *Id.*

9

U.S. at 230); *see also Arizona*, 567 U.S. at 400.  And rather than adopt a construction that would raise serious constitutional concerns, federal courts will seek to avoid a conflict between federal and state law—particularly where, as here, the United States challenges state law as preempted on its face.  *See Arizona*, 567 U.S. at 415; *cf. Murphy*, 2018 U.S. LEXIS 2805, at *23–24 (explaining that canon of constitutional avoidance does not apply where any plausible interpretation would still violate Tenth Amendment commandeering ban).

**B.** **Neither 8 U.S.C. § 1373 Nor the INA Should Be Construed To Preempt SB 54**

The United States seeks to enjoin several provisions of SB 54, specifically those that prohibit state and local officers from (i) providing notification of inmate release dates in some instances, *see* Cal. Gov't Code. § 7284.6(a)(1)(C); (ii) releasing individual's "personal information," including their home and work address, *see id.* § 7284.6(a)(1)(D); and (iii) "transferring" individuals to federal immigration officials in some instances, *id.* § 7284(a)(4).  According to the United States, Congress preempted these provisions on their face through 8 U.S.C. § 1373 and 8 U.S.C. §§ 1226 & 1231. But Section 1373 plainly does not *require* states and localities to assist in immigration enforcement and Sections 1226 and 1231 are detention and removal statutes that impose obligations exclusively on *federal* officials.  Neither Section 1373 nor the detention and removal provisions of the INA should be construed to preempt SB 54. Doing so would supersede the historic police powers of the states and raise serious constitutional questions under the Tenth Amendment.

The United States places great weight upon 8 U.S.C. § 1373, arguing that it directly conflicts with SB 54.  U.S. PI Mot. 27.  Section 1373 provides, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration

10392183

authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Adopting a breathtakingly broad interpretation of this statute, one that would effectively prevent states and localities from declining to share any and all information the federal Executive deems relevant to any "immigration status issue[]," the United States argues that Section 1373 preempts SB 54 on its face. *See* U.S. PI Mot. 28-29. This argument fails for two reasons.

First, construing 8 U.S.C. § 1373 as the United States now does is simply implausible. Its statutory construction should be rejected on that basis alone. *See Arizona*, 567 U.S. at 400 (explaining that courts should presume state law is not preempted on its face when it is plausible to construe statutory law to avoid conflict). SB 54's savings clause expressly authorizes state and local officials to share information with federal immigration officials where such authorization is actually required by 8 U.S.C. § 1373. *See* Cal. Gov't Code § 7284(e). Even without the savings clause, moreover, SB 54 would not stand as an obstacle to implementation of Section 1373. Contrary to the United States' current construction, Section 1373 plainly reaches no further than to preempt state or local prohibitions on the sharing of "information regarding . . . **citizenship or immigration status**." (emphasis added). As a federal district court has held, there is "no plausible reading" of this statute that would "encompass[] the release date of an undocumented inmate," much less an individual's home or work address or anything else the federal Executive deems possibly relevant to immigration status. *Steinle v. City & Cnty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017). Section 1373 cannot plausibly be read to preempt facially SB 54's prohibition on the sharing of an individual's "personal information," including a home or work address, Cal. Gov't § 7284(a)(1)(D); nor can it be read to preempt the other challenged provisions of SB 54 on their face.

Reading Section 1373 and SB 54 together in this way avoids a statutory construction that would supersede California's careful exercise of its core police powers.

10392183

California's legislature determined that SB 54 would improve public safety by promoting cooperation between police and local communities. *See* Cal. Opp. 2. This determination is not only reasonable,[9] it is also well within the core of the State's prerogative over matters of local criminal justice. As the Supreme Court has put it, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and the vindication of its victims." *Morrison*, 529 U.S. at 618.

Second, construing Section 1373 to preempt SB 54 on its face would raise serious constitutional questions under structural principles reflected in the Tenth Amendment. As the Supreme Court recently reaffirmed in *Murphy*, the Constitution "withhold[s] from Congress the power to issue orders directly to the States." 2018 U.S. LEXIS 2805, at *24. The United States' interpretation of Section 1373 would deny states and localities the ability to supervise their officials and could cripple their ability to "regulate in accordance with the views of the local electorate," in violation of the constitutional ban on commandeering. *See New York*, 505 U.S. at 169. In particular, this interpretation of Section 1373 would deny states and localities the prerogative to decline "to provide information that belongs to the State and is available to [state and local officials] only in their official capacity."[10] *Printz*, 521 U.S. at 932 n.17 (striking down federal statute with information-sharing provision); *cf. Murphy*, 2018 U.S. LEXIS 2805, at *30 (holding that

---

[9] *See, e.g.*, Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Nat'l Immigration Law Ctr. (Jan. 26, 2017) (finding that "[c]rime is . . . significantly lower in sanctuary counties compared to nonsanctuary counties"), *available at* https://perma.cc/B57Q-XGTE.

[10] *See* Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 159-64 (2012) (arguing that information-sharing statutes such as Section 1373 violate anti-commandeering principle of *Printz*); *see also* Kalhan, *supra* note 1, 74 Ohio St. L.J. at 1159-62 (arguing the positive benefits of "information federalism").

10392183

Congress can no more "prohibit[] a State from enacting new laws" than it can "compel a State to enact legislation," because the "basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event").[11]  *See* Cal. Gov't Code § 7284(a)(1)(C)-(D); *id.* § 7284(e).  The United States' demands for additional information sharing could easily lead to the diversion of the resources of several full-time employees in a large police force or corrections agency.  Denying states the authority to adopt reasonable and targeted policies to disentangle local criminal justice systems from federal immigration enforcement in this way would diminish political accountability and would shift regulatory burdens to the states.  This forced entanglement of local criminal justice and federal immigration enforcement would, in turn, inflict the very harms that the Supreme Court's anti-commandeering prohibition is designed to prevent.  *See Murphy*, 2018 U.S. LEXIS 2805, at \*28–29 (explaining potential harms that anti-commandeering rule addresses).

The United States' fallback argument is even further off the mark.  It argues that 8 U.S.C. §§ 1226 and 1231 preempt SB 54 on their face on the theory that those provisions impliedly require states and localities to assist in federal immigration enforcement after an individual is released from local criminal custody.  U.S. PI Mot. 25-27, 29-31.  But Sections 1226 and 1231 plainly do no such thing.  Congress enacted Section 1226(c)(1) in 1996, directing the Attorney General to take certain noncitizens into custody, in response to what it perceived to be a "wholesale failure *by the INS*" to remove deportable noncitizens who had been convicted of criminal offenses by "fail[ing] to detain those [noncitizens] during their deportation proceedings."  *Demore v. Kim*, 538

---

[11] Because California has sought to protect only information that has not been shared with the public, the State has not adopted a "policy of no-voluntary-cooperation that does not protect confidential information generally."  *City of New York v. United States*, 179 F.3d 29, 37 (2d Cir. 1999) (declining to strike down Section 1373 on its face but explaining that City's Tenth Amendment concerns were "not insubstantial").

13

U.S. 510, 518-21 (2003) (emphasis added).  Congress directed that noncitizens taken into federal custody and placed in removal proceedings upon release from criminal custody are to be mandatorily detained, whereas those apprehended after returning to the community for some time or under other circumstances are to be detained at the discretion of immigration authorities.  *Compare* 8 U.S.C. § 1226(c) *with id.* § 1226(a). Section 1231(a)(1)(B), which the United States also cites, requires federal immigration authorities to act quickly to remove a noncitizen at the conclusion of removal proceedings.  If an order of removal becomes final while a noncitizen is still confined in criminal custody, then the removal period does not begin to run until after the noncitizen is released.  *Id.* § 1231(a)(1)(B)(i)-(iii).  The upshot is that sections 1226 and 1231 impose obligations on *federal* officials, but were not intended to disturb the prerogative of state and local officials to decide whether they would voluntarily cooperate with requests from federal immigration authorities.  Indeed, if they were intended to command the participation of states and localities, they would run afoul of the Tenth Amendment. *See Murphy*, 2018 U.S. LEXIS 2805, at *28–29; *Galarza*, 745 F. 3d at 644–45 (relying on *New York* and *Printz* to find that construing "a federal detainer filed with a state or local [law enforcement agency] [as] a command . . . would violate the anti-commandeering doctrine of the Tenth Amendment."); *Id.* at 641 (noting that Congress did not "authorize federal officials to command state or local officials to detain suspected aliens subject to removal").

　　While the United States suggests that *Arizona* requires the Court to find a conflict between SB 54 and federal law, the Supreme Court's holding in that case requires just the opposite.  *Arizona* concerned a state's attempt to entangle its criminal enforcement system with the enforcement of federal immigration law.  *See* 567 U.S. at 406-10.  Here, by contrast, California has decided with SB 54 to disentangle its local criminal justice apparatus from federal immigration enforcement.  The question is whether federal statutory law preempts that decision on its face.  And, as *Arizona* instructs, a federal court

14

1   answering that question must presume that state law is not preempted unless Congress

2   has clearly indicated otherwise.  *See id.* at 400.  Because Congress has not clearly

3   required state and local officials to accede to the Trump Administration's demands,

4   which themselves raise serious constitutional questions under the Tenth Amendment, this

5   Court should conclude that SB 54 is not preempted.

6                              **<u>CONCLUSION</u>**

7           For these reasons, *amici* urge the Court to deny the United States' motion for a

8   preliminary injunction because it has not shown a likelihood of success on the merits of

9   its challenge to SB 54.

10

11   Dated:  May 18, 2018                    By:   */s/ Kevin A. Calia*

12                                          Kevin A. Calia
                                           LAW OFFICE OF KEVIN A. CALIA
13                                          1478 Stone Point Drive, Suite 100
                                           Roseville, CA 95661
14                                          Email: kevin@calialaw.com
15                                          Telephone: (916) 547-4175

16                                          Harry Sandick (*pro hac vice* pending)
17                                          Jamison Davies (*pro hac vice* pending)
                                           Michael D. Schwartz (*pro hac vice* pending)
18                                          PATTERSON BELKNAP WEBB & TYLER
19                                          LLP
                                           1133 Avenue of the Americas
20                                          New York, New York 10036
                                           Telephone:   (212) 336-2000
21
22
23                                          *Attorneys for Amici Curiae*
24
25
26
27
28

10392183

# APPENDIX A[*]

Kathryn Abrams
Herma Hill Kay Distinguished Professor of Law
University of California, Berkeley School of Law

Amna Akbar
Assistant Professor
The Ohio State University, Moritz College of Law

Carolina Antonini
Adjunct Professor
Georgia State University College of Law

Sabi Ardalan
Assistant Clinical Professor
Harvard Law School

David Baluarte
Associate Clinical Professor of Law
Washington and Lee University School of Law

Jon Bauer
Clinical Professor of Law and Richard D. Tulisano '69 Scholar in Human Rights
University of Connecticut School of Law

Steven W. Bender
Professor and Associate Dean for Planning and Strategic Initiatives
Seattle University School of Law

Henry Allen Blair
Robins Kaplan Distinguished Professor
Mitchell Hamline School of Law

Linda Bosniak
Distinguished Professor of Law
Rutgers Law School

---

[*] *Amici curiae* appear in their individual capacities; institutional affiliations and titles are provided here for identification purposes only.

A-1

10392183

Jason Cade
Associate Professor
University of Georgia School of Law

Benjamin Casper Sanchez
Director
James H. Binger Center for New Americans, University of Minnesota Law School

Linus Chan
Associate Professor of Clinical Law
University of Minnesota

Violeta R. Chapin
Clinical Professor of Law
University of Colorado Law School

Matthew H. Charity
Professor of Law
Western New England University

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley School of Law

Gabriel J. Chin
Edward L. Barrett Jr. Chair & Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

Marisa S. Cianciarulo
Professor of Law
Chapman University Fowler School of Law

Stephen Cody
Research Fellow
Human Rights Center, University of California, Berkeley

Dr. Neil H. Cogan
Professor of Law
Whittier Law School

David S. Cohen
Professor of Law
Drexel University Thomas R. Kline School of Law

A-2

Marjorie Cohn
Professor Emerita
Thomas Jefferson School of Law

Ericka Curran
Clinical Professor
Florida Coastal School of Law

Seth Davis
Assistant Professor of Law
University of California, Irvine School of Law

Frank E. Deale
Professor of Law
CUNY Law School

Ingrid Eagly
Professor of Law
UCLA school of law

Stella Burch Elias
Professor of Law
University of Iowa College of Law

Richard H. Frankel
Associate Professor
Drexel University Thomas R. Kline School of Law

Craig B. Futterman
Clinical Professor of Law
University of Chicago Law School

Lauren Gilbert
Professor of Law
St. Thomas University School of Law

Denise Gilman
Director, Immigration Clinic
University of Texas School of Law

A-3

10392183

Joseph Harbaugh
Emeritus Dean and Emeritus Professor
College of Law, Nova Southeastern University

Dina Francesca Haynes
Professor of Law
New England Law

Geoffrey A. Hoffman
Director
University of Houston Law Ctr. Immigration Clinic

Aziz Huq
Frank and Bernice Greenberg Professor of Law
University of Chicago Law School

Alan Hyde
Distinguished Professor
Rutgers University

Ulysses Jaen
Director & Asst. Professor
Ave Maria School of Law

Kevin R. Johnson
Dean and Mabie Apallas Professor of Public Interest Law
University of California, Davis School of Law

Michael Kagan
Professor
University of Nevada, Las Vegas

Anil Kalhan
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

Jennifer Lee Koh
Professor of Law
Western State College of Law

Hiroko Kusuda
Clinic Professor
Loyola University New Orleans

A-4

10392183

Kevin Lapp
Professor of Law
Loyola Law School, Los Angeles

Christopher N. Lasch
Associate Professor
University of Denver Sturm College of Law

Karen Pita Loor
Clinical Associate Professor of Law
Boston University School of Law

Peter Markowitz
Professor of Law
Cardozo School of Law

Fatma Marouf
Professor of Law
Texas A&M University School of Law

Julie Marzouk
Associate Clinical Professor
Chapman University—Fowler School of Law

Elizabeth McCormick
Associate Clinical Professor of Law
University of Tulsa College of Law

Vanessa Merton
Professor
Elisabeth Haub School of Law at Pace University

Nancy Morawetz
Professor of Clinical Law
New York University School of Law

Hiroshi Motomura
Susan Westerberg Prager Professor of Law
School of Law, University of California, Los Angeles (UCLA)

A-5

10392183

Elora Mukherjee
Associate Clinical Professor of Law
Columbia Law School

Karen Musalo
Professor
U.C. Hastings, College of the Law

Howard S. (Sam) Myers, III
Adjunct Professor of Law
University of Minnesota School of Law

Zhulmira Paredes
Attorney at Law
John Marshall Law School

William Quigley
Professor of Law
Loyola University New Orleans

Jaya Ramji-Nogales
I. Herman Stern Research Professor
Temple Law School

Andrea V. Ramos
Clinical Professor of Law
Southwestern Law School

Sarah Rogerson
Clinical Professor of Law
Albany Law School

Tom Romero II
Associate Professor
University of Denver Sturm College of Law

Victor Romero
Associate Dean for Academic Affairs, Maureen B. Cavanaugh Distinguished Faculty
Scholar & Professor of Law
Penn State Law (University Park)

A-6

10392183

Michael Rooke-Ley
Professor of Law Emeritus
Nova Southeastern University

Carrie Rosenbaum
Adjunct Professor
Golden Gate University School of Law

Rachel E. Rosenbloom
Professor of Law
Northeastern University School of Law

Sarah Sherman-Stokes
Associate Director
Boston University School of Law

Juliet P. Stumpf
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School

Maureen A. Sweeney
Law School Associate Professor
University of Maryland Carey School of Law

JoAnne Sweeny
Associate Professor of Law
University of Louisville, Brandeis School of Law

David B. Thronson
Professor of Law and Associate Dean for Experiential Education
Michigan State University College of Law

Katharine Tinto
Assistant Clinical Professor of Law
UC Irvine School of Law

Philip L. Torrey
Managing Attorney, Harvard Immigration and Refugee Clinical Program
Harvard Law School

Mary Pat Treuthart
Professor of Law
Gonzaga University School of Law

A-7

Laurence H. Tribe
Carl M. Loeb University Professor and Professor of Constitutional Law
Harvard Law School

Enid Trucios-Haynes
Progessor of Law
University of Louisville, Brandeis School of Law

Diane Uchimiya
Professor and Director of the Justice and Immigration Clinic
University of La Verne College of Law

Julia Vazquez
Director, Community Lawyering Clinic
Southwestern Law School

Leti Volpp
Robert D. and Leslie Kay Raven Professor of Law
UC Berkeley

Robin Walker Sterling
Associate Professor
University of Denver Sturm College of Law

Lindsey Webb
Assistant Professor
University of Denver Sturm College of Law

Jonathan Weinberg
Associate Dean for Research and Faculty Development and Professor of Law
Wayne State University Law School

Deborah M. Weissman
Reef C. Ivey II Distinguished Professor of Law
University of North Carolina School of Law

Richard A. Wilson
Professor
University of Connecticut School of Law

A-8

10392183

1   Mark E. Wojcik
    Professor of Law
2   The John Marshall Law School-Chicago

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A-9

10392183

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2018, I electronically filed the foregoing Motion of Administrative Law, Constitutional Law, Criminal Law and Immigration Law Scholars for Leave to File an *Amici Curiae* Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction using the CM/ECF system, which will send notification of such filing to all parties of record.


*/s/ Kevin A. Calia*  
Kevin A. Calia  
Attorney for *Amici Curiae*

10392183