Jonathan Weissglass (SBN 185008)
Law Office of Jonathan Weissglass
410 12th Street, Suite 250-B
Oakland, CA 94607
Telephone: 510-836-4200
E-mail: jonathan@weissglass.com

Nicholas Espíritu* (SBN 237665)
Jana Whalley* (SBN 318367)
National Immigration Law Center
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: 213-639-3900
Email: espiritu@nilc.org
Email: whalley@nilc.org

Attorneys for *Amici Curiae*

*Application for admission forthcoming*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>Defendants. | Case No. 18-cv-00490-JAM-KJN<br><br>**BRIEF OF NATIONAL IMMIGRATION LAW CENTER AND 79 OTHER ORGANIZATIONS AS** *AMICI CURIAE* **IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:  June 20, 2018<br>Time: 10:00 a.m.<br>Judge: Hon. John A. Mendez |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

DISCUSSION ......................................................................................................................1

    I.     THE REQUESTED INJUNCTION WOULD HARM INDIVIDUALS,
          FAMILIES, COMMUNITIES, AND THE PUBLIC ...................................................1

         A.     SB 54.......................................................................................................1

         B.     AB 450 ....................................................................................................6

         C.     AB 103 ....................................................................................................9

    II.    THE COURT'S DECISION WILL RESONATE WELL BEYOND
         THIS CASE ..........................................................................................................13

CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Fuentes v. INS*,
    765 F.2d 886 (9th Cir. 1985),
    *vacated by Fuentes v. INS*,
        844 F.2d 699 (9th Cir. 1988) .........................................................................7

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984)..........................................................................................7

## CALIFORNIA STATUTES

Gov. Code §7284.2(b)........................................................................................2

Gov. Code §7284.6(a)(1)(D)..............................................................................14

Labor Code §90.2...............................................................................................9

## OTHER STATE LEGISLATIVE MATERIALS AND EXECUTIVE ORDERS

Ill. EO 15-2(1) (issued Jan. 5, 2015).................................................................14

Mass. SB 1305 ...................................................................................................15

Mich. HB 4720...................................................................................................15

Mich. HB 4721...................................................................................................15

N.Y. EO 170 (issued Sep. 15, 2017)..................................................................14

N.Y. AB 7430 ....................................................................................................15

N.Y. AB 8776 ....................................................................................................15

N.Y. SB 1215 .....................................................................................................15

N.Y. SB 4075 .....................................................................................................15

N.Y. SB 7849 .....................................................................................................15

Or. Rev. Stat. §180.805......................................................................................14

Pa. HB 1302 .......................................................................................................15

Pa. HB 1604 .......................................................................................................15

1

## MISCELLANEOUS

ABC7 Eyewitness News, *Domestic-violence victim calls 911 and is nearly deported*,
   May 12, 2011 ..............................................................................................................5

American Association of Pediatrics, *AAP Statement on Protecting Immigrant Children*,
   Jan. 25, 2017 ..............................................................................................................6

Attorney General of Washington,
   *Guidance Concerning Immigration Enforcement* (Apr. 2017)...............................14

The Atlantic, *How Fear of Deportation Puts Stress on Families*, Mar. 22, 2017 ...........5

CIVIC Complaint (Apr. 11, 2017) .........................................................................12, 13

Detention Watch Network, *A Toxic Relationship: Private Prisons and U.S. Immigration
   Detention* (Dec. 2016)..............................................................................................13

Detention Watch Network and National Immigrant Justice Center, *Lives in Peril: How
   Ineffective Inspections Make ICE Complicit in Detention Center Abuse* (Oct. 2015).............13

DHS OIG, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*
   (OIG-18-32; Dec. 11, 2017)................................................................................10, 11

DHS OIG, *Management Alert on Issues Requiring Immediate Action at the Theo Lacy
   Facility in Orange, California* (OIG-17-43-MA; Mar. 6, 2017) .............................10

Human Impact Partners, *Family Unity, Family Health: How Family-Focused Immigration
   Reform Will Mean Better Health for Children and Families* (June 2013) ...............6

Immigrant Legal Resource Center, *The Rise of Sanctuary* (Jan. 2018)...................13, 15

Los Angeles Times, *Latinos are reporting fewer sexual assaults amid a climate of fear in
   immigrant communities, LAPD says*, Mar. 21, 2017 ...............................................3

Los Angeles Times, *Noncriminals swept up in federal deportation program*,
   Apr. 25, 2011 ..............................................................................................................5

Los Angeles Times, *Police chiefs across the country support sanctuary cities because they
   keep crime down*, Mar. 6, 2017................................................................................3

National Employment Law Project, *Workers' Rights on ICE: How Immigration Reform
   Can Stop Retaliation and Advance Labor Rights | California Report* (Feb. 2013)...................7

National Public Radio, *Man Reports Car Stolen, Ends Up In Deportation Limbo*,
   Feb. 16, 2016..............................................................................................................5

NBC Los Angeles, *New Front in the Immigration Fight: Ice Cream Carts*, Feb. 18, 2011 ..........5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

New York State Office of the Attorney General,
*Setting the Record Straight on Local Involvement in Federal Civil Immigration*
*Enforcement: The Facts and the Laws* (May 2017)....................................................................2

New York Times, *Immigration Crackdown Also Snares Americans*, Dec. 13, 2011 .....................5

National Day Laborer Organizing Network, *Our Litigation* .........................................................5

President's Task Force on 21st Century Policing,
*Final Report of the President's Task Force on 21st Century Policing* (May 2015)..................2

Press Release, *Legislators, Gov. Brown, and AG Rosenblum File Bill to Protect Privacy of*
*Oregonians*, May 31, 2017 .........................................................................................................14

Lisseth Rojas-Flores, *et al.*, *Trauma and psychological distress in Latino citizen*
*children following parental detention and deportation*, Psychological Trauma: Theory,
Research, Practice, and Policy, 9(3) (May 2017) ........................................................................6

San Jose Inside, *More Silicon Valley Employers Threatening Workers with Deportation,*
*Records Show*, Jan. 31, 2018 .......................................................................................................7

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in*
*Immigration Enforcement*, Dep't of Urban Planning and Policy, University of Illinois
at Chicago (May 2013) ................................................................................................................2

Time, *"No One Is Safe."  How Trump's Immigration Policy Is Splitting Families Apart*,
Mar. 8, 2018.................................................................................................................................3

Urban Institute, *Implications of Immigration Enforcement Activities for the Well-Being of*
*Children in Immigrant Families: A Review of the Literature*, Sep. 2015...................................6

Washington Post, *ICE chief tells lawmakers agency needs much more money for*
*immigration arrests*, June 13, 2017 ............................................................................................3

iv

**DISCUSSION**

*Amici curiae* are 80 organizations that advocate for the rights of immigrants and their families and work on related issues. *Amici* oppose the federal government's request for a preliminary injunction against portions of three California laws – SB 54, AB 450, and AB 103. The three laws seek to ensure that the State maintains its proper role in immigration enforcement and does not participate in overly aggressive and inhumane immigration enforcement actions that federal officials admit are intended to intimidate. The laws, among other things, advance public safety, prevent the mistreatment of undocumented individuals (and others who are believed to be undocumented), protect workers and workplace standards, and protect the health and safety of immigrant detainees. As part of deciding whether to grant the preliminary injunction the federal government seeks, the Court must assess the public interest. In this case, immigrants, their families, and their communities, as well as the public at large, have a significant stake in permitting the three laws at issue to continue to operate in their entirety. The experiences and stories in Part I of this brief demonstrate, on behalf of communities in California and throughout the country, why the public interest counsels against enjoining any part of the challenged statutes. Part II addresses legislation in state and local jurisdictions outside of California, and shows that the ramifications of this Court's decision will extend nationwide.[1]

I. **THE REQUESTED INJUNCTION WOULD HARM INDIVIDUALS, FAMILIES, COMMUNITIES, AND THE PUBLIC**

A. **SB 54**

SB 54 is the centerpiece of California's effort to protect public safety and promote its residents' health and general welfare, which are at risk from federal immigration enforcement. The law, including the three provisions challenged here – restrictions on the disclosure of personal information, release dates, and transfer of individuals to federal immigration authorities – seeks to disentangle state and local law enforcement from immigration enforcement.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to the preparation or submission of this brief. All parties consented to the filing of this brief.

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

SB 54 is informed by the well-supported view that it is a detriment to public safety to have state and local law enforcement at the forefront of enforcing federal immigration laws.  *See* Gov. Code §7284.2(b).  The President's Task Force on 21st Century Policing, consisting of law enforcement, academic, and non-profit members, engaged law enforcement officials, community leaders, nongovernmental organizations, and others to address how police practices can reduce crime and build public trust.  President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (May 2015), at iv-v, *available at* https://tinyurl.com/y9yd7kgy.  The Task Force found:

> Immigrants often fear approaching police officers when they are victims of and witnesses to crimes and when local police are entangled with federal immigration enforcement.  At all levels of government, it is important that laws, policies, and practices not hinder the ability of local law enforcement to build the strong relationships necessary to public safety and community well-being.  It is the view of this task force that whenever possible, state and local law enforcement should not be involved in immigration enforcement.

*Id.* at 18.  The Task Force recommended that the U.S. Department of Homeland Security ("DHS") "terminate the use of the state and local criminal justice system, including through detention, notification, and transfer requests, to enforce civil immigration laws against civil and nonserious criminal offenders."  *Id.*; *see also* New York State Office of the Attorney General, *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and the Laws* (May 2017), at 1, *available at* https://tinyurl.com/yc8qmjby (limiting local law enforcement involvement in federal civil immigration matters "can enhance public safety" by enabling law enforcement "to focus their limited resources on combatting serious and violent crime" as well as "by facilitating greater community cooperation with the justice system").  In SB 54, California has followed this well-considered approach.

There is a great deal of evidence supporting this tack.  One randomized study of Latinos living in four major U.S. cities, including Los Angeles, found that approximately 45 percent were less likely to contact law enforcement to report a crime against them or someone else out of fear that the interaction would lead to an inquiry about the immigration status of themselves or others.  Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in*

1     *Immigration Enforcement*, Dep't of Urban Planning and Policy, University of Illinois at Chicago

2     (May 2013), *available at* https://tinyurl.com/ks5gadz; *see also* Los Angeles Times, *Latinos are*

3     *reporting fewer sexual assaults amid a climate of fear in immigrant communities, LAPD says*,

4     Mar. 21, 2017, *available at* https://tinyurl.com/kds27av (reporting that Los Angeles Police Chief

5     tied plummeting reports of sexual assault and domestic violence by Latinos to concerns that

6     immigrants could risk deportation by interacting with police). On the other hand, cities that have

7     made efforts to build trust and cooperation with immigrant communities can point to success

8     stories where undocumented individuals have come forward to report crime and public safety is

9     served. *See* Los Angeles Times, *Police chiefs across the country support sanctuary cities*

10     *because they keep crime down*, Mar. 6, 2017, *available at* https://tinyurl.com/zyu6zu8 (citing

11     examples where undocumented immigrants helped police, including in Los Angeles).

12        The fear of immigration enforcement is real, and has affected numerous people, as media

13     reports indicate. *See, e.g.*, Time, *"No One Is Safe." How Trump's Immigration Policy Is*

14     *Splitting Families Apart*, Mar. 8, 2018, *available at* https://tinyurl.com/yadkcg7l (2017

15     immigration detainees "included community leaders, doting parents and children: a 10-year-old

16     girl with cerebral palsy in San Antonio; a grandmother described as the "backbone" of a Navy

17     veteran's family; a father of two in Detroit who had lived in the U.S. since he was 10 years old").

18     Indeed, Oxnard, California schools even ask parents to provide administrators with guardianship

19     instructions in the event of deportation. *Id.* Moreover, the current federal approach to

20     deportation is actually intended to inflict widespread mental distress and trauma – including on

21     families with mixed-legal status and U.S. citizen children. *See, e.g.*, Washington Post, *ICE chief*

22     *tells lawmakers agency needs much more money for immigration arrests*, June 13, 2017,

23     *available at* https://tinyurl.com/y84pn5ke ("'If you're in this country illegally and you

24     committed a crime by entering this country, you should be uncomfortable,' Acting Director

25     Thomas Homan told the House Appropriations Committee's Homeland Security Subcommittee.

26     'You should look over your shoulder, and you need to be worried.'").

27        The following stories illustrate the fear of deportation resulting from local law

28

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

enforcement engaging in immigration enforcement:[2]

    *Mario* entered the U.S. in the early 1990s and built a life for himself and his partner in the Sacramento area.  They were able to buy a house and start raising two children, both born here.  Unfortunately, they lost their home due to foreclosure in 2011, and his wife moved the children to Arizona to live with family there.  Mario remained in California where he worked and provided for the family as a day laborer.  On a trip to visit his family that same year, the local police in Arizona pulled him over for a broken tail light, called immigration authorities, and put them on the phone with Mario.  They asked Mario questions about his nationality and immigration status.  A police officer told Mario that normally he would have let him off with a citation, but because "immigration was involved," he was taking him to jail for immigration agents to pick him up.  Mario spent about one week in jail waiting for immigration agents to pick him up.  No criminal charges were ever filed against him.  Once immigration agents picked him up, he was detained in another jail in Phoenix because U.S. Immigration and Customs Enforcement ("ICE") agents said they did not have room in the processing center.  He was held in a freezing holding cell with dozens of other people.  Another inmate asked Mario to move, and began physically assaulting Mario when he did not move.  After a few more days, Mario was brought to the local field office where he was processed for removal proceedings and ordered to appear in immigration court.  Mario ultimately won cancellation of removal before an Immigration Judge.  He now works at a warehouse for a non-profit organization in the Bay Area.  Mario feels safer in California than in Arizona in part due to laws like SB 54.

    *Yaquelin* lives in Richmond, California, and is a recipient of Deferred Action for Childhood Arrivals ("DACA"), youth soccer coach, part-time community college student, and full-time employee at a non-profit that organizes to get job opportunities and child custody for previously incarcerated individuals.  In 2016, her uncle was a 38-year-old construction worker who lived in North Carolina.  He was on probation for a DUI conviction.  He had been compliant and only had a week left of probation when ICE came to his house; his probation officer was just

---

[2] Documentation for all advocate and immigrant stories in this brief is on file with the NILC Legal Department.  Some individuals did not want their full names used.

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1   down the street from the house, on the corner, when ICE arrived.  Yaquelin's uncle was

2   subsequently deported.  The only criminal record he had was the DUI.

3       Many individuals have been caught up in immigration proceedings because of encounters

4   with local police.  For instance, reports of domestic violence have resulted in police turning

5   victims over to ICE.  *See, e.g.*, ABC7 Eyewitness News, *Domestic-violence victim calls 911 and

6   is nearly deported*, May 12, 2011, *available at* https://abc7.com/archive/8128621 ("A woman [in

7   Los Angeles] was placed in deportation proceedings after calling 911 for help."); Los Angeles

8   Times, *Noncriminals swept up in federal deportation program*, Apr. 25, 2011, *available at*

9   https://tinyurl.com/644o4bh (San Francisco woman "finally worked up the courage to call

10  police" about domestic abuse and was turned over to immigration authorities).

11      Other individuals have been referred to ICE due to a wide variety of local police matters,

12  including two in San Bernardino County: One, who had lived in this country since 1990 and is

13  the father of two U.S. citizen children, had a sheriff turn him over to ICE after an arrest for

14  driving without a license; the other is a street vendor who is the mother of five U.S citizen

15  children and who was arrested by a sheriff for selling goods without a license and has been held

16  in immigration detention and away from her children for months.  *See* National Day Laborer

17  Organizing Network ("NDLON"), *Our Litigation*, *available* at https://tinyurl.com/y8f3me6v.

18  Another individual was referred to ICE by the San Francisco Police Department after he reported

19  his car stolen, and ended up in an ICE detention center.  National Public Radio, *Man Reports Car

20  Stolen, Ends Up In Deportation Limbo*, Feb. 16, 2016, *available at* https://tinyurl.com/y7kd75b4.

21  A Los Angeles woman was cited by local law enforcement for pushing her vending cart within

22  500 feet of a school and ended up facing deportation.  NBC Los Angeles, *New Front in the

23  Immigration Fight: Ice Cream Carts*, Feb. 18, 2011, *available at* https://tinyurl.com/ybc9hby6.

24  Nor is the issue limited to undocumented immigrants – citizens have been caught up in

25  immigration enforcement as well.  As the New York Times reported: "In a spate of recent cases

26  across the country, American citizens have been confined in local jails after federal immigration

27  agents, acting on flawed information from Department of Homeland Security databases,

28  instructed the police to hold them for investigation and possible deportation."  New York Times,

5

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1   *Immigration Crackdown Also Snares Americans*, Dec. 13, 2011, *available at*

2   https://tinyurl.com/y6vp6lbv.

3       These examples show only a small number of the ways in which individuals, families,

4   and communities have been adversely affected by immigration enforcement.  Media reports and

5   experts have identified numerous effects.  *See, e.g.*, The Atlantic, *How Fear of Deportation Puts*

6   *Stress on Families*, Mar. 22, 2017, *available at* https://tinyurl.com/y7sul625 (describing effects

7   on undocumented immigrants and their families, which often include U.S. citizens, such as

8   problems in school and anxiety); Lisseth Rojas-Flores, *et al.*, *Trauma and psychological distress*

9   *in Latino citizen children following parental detention and deportation*, Psychological Trauma:

10  Theory, Research, Practice, and Policy, 9(3) (May 2017), at 352-361 (finding PTSD symptoms

11  for children of detained and deported parents significantly higher than children whose parents

12  were legal permanent residents or undocumented without immigration enforcement contact);

13  American Association of Pediatrics, *AAP Statement on Protecting Immigrant Children*, Jan. 25,

14  2017, *available at* https://tinyurl.com/ybymftlx (reacting to stepped-up immigration enforcement

15  by noting: "When children are scared, it can impact their health and development."); Human

16  Impact Partners, *Family Unity, Family Health: How Family-Focused Immigration Reform Will*

17  *Mean Better Health for Children and Families* (June 2013), *available at* http://bit.ly/1eU6dmk

18  (discussing consequences of immigration detention and deportation policy on individuals'

19  physical and mental health and children's educational and behavioral outcomes as documented

20  by numerous academic studies); Urban Institute, *Implications of Immigration Enforcement*

21  *Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Sep.

22  2015, *available at* https://tinyurl.com/y9bw3x66.

23      SB 54 seeks to minimize the harms described above while not conflicting with the federal

24  immigration enforcement scheme.  It is in the public interest to keep in place SB 54 in its entirety

25  to protect against those harms.

26      **B.**    **AB 450**

27      As explained in the State's brief, AB 450 was intended to ensure that California's

28  longstanding worker protections include protecting immigrant workers, particularly from

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1   employer retaliation.  Defs' Opp. at 5:7-20.  These concerns are very real.  The National

2   Employment Law Project ("NELP") issued a report that concluded: "Employers and their agents

3   have far too frequently shown that they will use immigration status as a tool against labor

4   organizing campaigns and worker claims."  National Employment Law Project, *Workers' Rights*

5   *on ICE: How Immigration Reform Can Stop Retaliation and Advance Labor Rights | California*

6   *Report* (Feb. 2013), at 1, *available at* https://tinyurl.com/y7rro9ne; *see also* San Jose Inside,

7   *More Silicon Valley Employers Threatening Workers with Deportation, Records Show*, Jan. 31,

8   2018, *available at* https://tinyurl.com/y9a4uyrz (reporting that workers filed 95 complaints

9   alleging immigration-related workplace retaliation with the California Labor Commissioner in

10  2017 – up from 20 in 2016).  Case law recognizes this threat as well.  *See, e.g.*, *Sure-Tan, Inc. v.*

11  *NLRB*, 467 U.S. 883, 886-87 (1984) (after union prevailed in election, employer inquired

12  whether employees had valid immigration papers and reported undocumented workers to federal

13  government); *Fuentes v. INS*, 765 F.2d 886, 887 (9th Cir. 1985) (employer reported

14  undocumented workers to federal government after they sued for minimum wage violations),

15  *vacated by Fuentes v. INS*, 844 F.2d 699 (9th Cir. 1988).  NELP found that "in many cases,

16  employers have improperly conducted I-9 [the form federal law requires employers to use to

17  verify workers' employment authorization] self-audits just after employees have filed workplace-

18  based complaints, or in the midst of labor disputes or collective bargaining, creating a climate of

19  fear."  NELP, *Workers' Rights on ICE* at 4.  NELP documented a dozen case studies of employer

20  retaliation throughout California, including re-verification of I-9 forms.  *Id.* at 5-10.

21          The following stories show the potential for retaliation and how AB 450 can decrease the

22  threat of employer retaliation and help vindicate workers' rights:

23          *MM*, a kitchen worker at Burma Superstar restaurant in Oakland, is one of three

24  immigrant kitchen workers who filed a class action to challenge extensive wage and hour

25  violations at the worksite.  *Navarrete v. Burma Superstar Oakland, Inc.*, Case No. RG16830336

26  (Alameda County Superior Court).  Shortly after the case was filed, the employer distributed a

27  mandatory arbitration agreement, a meal and rest period waiver, and a new Form I-9

28  employment eligibility verification form to all kitchen workers, even though the employer

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

already had completed I-9 forms on file. The employer informed the workers that they were required to sign and return the documents or their employment would be terminated. The plaintiffs asserted that the employer's actions intimidated and deterred potential class members from pursuing their rights in the case. The Court agreed that the actions were improper and enjoined I-9 reverification of any existing employees during the pendency of the case.

*Luis* worked as a security guard at a wood framing yard in Lancaster for more than ten years. As a condition of employment, his employer required him to live in a trailer on the property, which enabled him to guard the property seven days a week. Although Luis was required to be at the worksite every day, he was only paid for the hours of work when the yard was open to the public and was never paid at the overtime rate, regardless of the number of hours he worked in a workday or week. After Luis filed a wage claim with the California Division of Labor Standards Enforcement ("DLSE"), his supervisor demanded that Luis present an identification card and Social Security Number – which the employer had not requested for 10 years. The supervisor threatened that if Luis did not provide this documentation by the next day, the supervisor would call immigration authorities and Luis would have to face the consequence. The supervisor also forced Luis to vacate the on-site shipping container in which he had been residing. Given the threat of immigration-based retaliation, Luis ended his employment.

*Valerie* worked as a server and hostess at a restaurant in Santa Monica. After about a year, the employer hired a new supervisor who was verbally abusive towards employees, including Valerie, and who frequently came to work drunk. When Valerie attempted to talk to the supervisor about his behavior, he threatened to change her schedule to less desirable shifts. Valerie reported this behavior to the general manager and, when the abusive behavior continued, made a second complaint. After that complaint, the supervisor approached Valerie and informed her that the owner of the restaurant had received a call from the Internal Revenue Service to report an issue with Valerie's Social Security Number. Although the supervisor did not present any documentation to Valerie related to the ostensible issue with her Social Security Number, the supervisor fired Valerie without giving her any opportunity to correct the purported discrepancy.

*R.G.* worked for a house cleaning service in the County of Santa Clara as a housekeeper.

After several months of her employer failing to pay her wages consistently, R.G. left her job and was not fully paid the wages owed.  She filed a wage claim with DLSE.  Soon after, R.G.'s former supervisor confronted R.G.'s husband at his workplace and told him that if R.G. did not abandon her wage claim, she and her husband would have problems with immigration authorities.  She also warned R.G.'s husband that he and R.G. were the only people who would end up suffering and threatened that she had an attorney investigating them.  The supervisor also contacted R.G.'s cousin and threatened that R.G. would regret it if she did not withdraw her wage claim.  Despite the anxiety these threats caused her, R.G. pursued her wage claim, as well as a claim for retaliation, and was ultimately awarded unpaid wages and penalties.  But the employer has refused to pay and to post the required notices at the worksite.

Moreover, AB 450's requirement that employers post notice of inspections of I-9 records (Labor Code §90.2) also fulfills the important purpose of providing more information to workers in the I-9 audit process, as the following story indicates:

*O.A.* has worked in the service industry at the same Los Angeles-based business for eight years.  In February 2018, officers with "ICE" written on their jackets showed up at the business.  O.A. was not working that day but within minutes of their arrival, her friend called to tell her that ICE was at their workplace.  Everyone was worried and in a panic, wondering why the officers had come, whether the company knew ahead of time, and jumping to conclusions because they did not know what was going on.  Many workers believed a raid was taking place because they had heard that a lot of raids were happening in other parts of California.  O.A. and her coworkers did not know what was happening at first.  Some were crying.  Later, they found out that the officers had brought a letter saying they were going to audit the company.  As required by AB 450, the company posted notices informing the workers that an audit was taking place.  Although having ICE at their workplace was scary for O.A. and her coworkers, understanding that ICE was there to conduct an audit, rather than a raid, helped to reduce their fear.

**C.    AB 103**

AB 103 serves to protect immigrants in civil detention facilities; the bill was enacted out of concern about the horrible conditions of some facilities.  *See* Defs' Opp. at 6:17-23.

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

These conditions are well-documented.  Even reports from the DHS Office of Inspector General have found significant problems in detention facilities.  An inspection of the Theo Lacy Facility, which the Orange County Sheriff's Department operates and which houses hundreds of ICE detainees, found "a host of potential food safety problems, which could endanger the health of detainees."  DHS OIG, *Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California* (OIG-17-43-MA; Mar. 6, 2017), at 3, *available at* https://tinyurl.com/yayrmwfo.  The food safety issues include serving spoiled meat.  The inspection also "found trash, mildew, and mold in the shower stalls" and "individual detainee cells that did not appear to be well-maintained or clean."  *Id.* at 6-7.  Moreover, the facility "is not properly documenting its detainee classification process, and its housing reclassifications do not comply with ICE detention standards."  *Id.* at 7.  The inspection therefore "found detainees identified by ICE as high risk who were housed in the least restrictive barracks and detainees identified by ICE as medium/low risk housed in more restrictive modular housing."  *Id.* at 8.  The facility also violates ICE's standards for disciplinary segregation: Detainees who are punished for breaking rules are "isolated for 24 hours a day in a cell with no access to visitors, recreation, or group religious services"; are "released briefly every other day to shower"; are not permitted recreation, visitation, religious guidance, or access to telephones; and are allowed only one book from the library for their entire stay in isolation of up to 30 days – even though ICE standards require at least one hour of recreation five times per week, "opportunities for general visitation, religious guidance, and limited access to telephones and reading material."  *Id.* at 9.  Finally, detainees' grievances are not properly documented.  *Id.* at 9-10.

Another report summarized problems at four other detention facilities.  DHS OIG, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (OIG-18-32; Dec. 11, 2017), *available at* https://tinyurl.com/ya7lrwq8.  The inspections found "significant issues" at the four facilities that "undermine the protection of detainees' rights, their humane treatment, and the provision of a safe and healthy environment."  *Id.* at 3.  Those issues in brief are:

> Upon entering some facilities, detainees were housed incorrectly based on their criminal history.  Further, in violation of standards, all detainees entering one facility were strip searched.  Available language services were not always used to

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

facilitate communication with detainees.  Some facility staff reportedly deterred detainees from filing grievances and did not thoroughly document resolution of grievances.  Staff did not always treat detainees respectfully and professionally, and some facilities may have misused segregation.  Finally, we observed potentially unsafe and unhealthy detention conditions.

*Id.*  Some of these issues are similar to ones at the Theo Lacy Facility in Orange, California.

Nor are these problems limited to what ICE itself has detected.  An attorney provides the following description of a detention facility with which she is familiar:

*Kelsey Provo* is a managing attorney at the Esperanza Immigrant Rights Project in Los Angeles.  She has represented about 30 clients detained at the Adelanto immigrant detention center ("Adelanto") on their immigration cases since 2015.  She has experienced many obstacles while trying to represent her clients, most of whom suffer serious mental illnesses.

Kelsey has had to wait four to five hours to meet with her clients at Adelanto.  Her colleagues experience similar delays.  Numerous times, Kelsey has shown up at a hearing only to be told that her client has been in the hospital and therefore unavailable.  There is also a lack of privacy during Kelsey's meetings with her clients.  Kelsey can hear what people are saying in adjacent rooms, or from the hallway outside of the rooms.  This is problematic, particularly when Kelsey needs to discuss confidential matters with her clients, including mental health issues and certain claims in which her clients acted as informants and could be in danger from cartels or gangs.  There is even less privacy when the limited number of visitation rooms are filled up, and Kelsey is forced to meet with her clients in the "no contact" room, which consists of a long line of about 10 booths and to talk to her clients through glass using two-way telephones.

Telephones are supposed to be available so that attorneys can use translation services when meeting with clients.  But in the West wing of Adelanto, there are about eight or ten meeting rooms and only one phone.  In the East wing, there are three meeting rooms with one phone, and that phone sometimes does not work.  Kelsey speaks English and Spanish, but some of her clients do not speak either of those languages.  For those clients, if she cannot use a phone, she is forced to speak in English, which they struggle to understand.  She has had this issue with every single client she has represented that does not speak English or Spanish.

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1    Over the past year, Kelsey has observed conditions become markedly worse.  In

2    particular, the attitude of deportation officers has changed.  Officers are unresponsive when she

3    tries to discuss issues like medical treatment for her clients.  She believes that officers no longer

4    feel like they need to respond to her.  This has led to her clients not receiving the treatment they

5    require, which causes her clients to feel physically ill and unable to help with their cases.

6    A detainee in the Musick Jail Facility in Irvine experienced the following:

7    *Ana* (not her real name), is a 37-year-old native of Guatemala who fled her abusive ex-

8    partner in September 2017 and requested asylum in the U.S. in November 2017.  Ana and her

9    family were tortured for more than 19 years by her ex-partner, who almost killed her multiple

10   times before she fled.  The expert who testified at Ana's trial stated that Ana's was one of the

11   worse cases of abuse she had seen in her 20 years' experience.  Ana was detained for almost six

12   months at the Musick Jail Facility in Irvine while waiting to be granted asylum.  Ana struggled

13   with severe mental health issues, including depression, anxiety, and PTSD.  She was suicidal

14   several times throughout the representation because she could not understand why she was

15   incarcerated.  Ana began to experience symptoms similar to having a stroke, as she had suffered

16   one once before when she was still in Guatemala.  After Ana shared her condition to the nurse at

17   the detention center, she was given Tylenol only.  When she asked if she could have more time

18   to exercise and walk around outside, she was told that this was not a vacation, but a jail.  Ana

19   had no money when she arrived and was unable to communicate with her brother in Belize who

20   was taking care of her children because she could not afford to pay the high fees for long

21   distance calls.  Ana was very depressed because she had not spoken with her children in months.

22   Detainees were given moldy cheese sandwiches to eat, and guards would rip or destroy

23   documents while conducting random searches of their rooms.  A guard ripped one of Ana's

24   pictures, but she was afraid to report it because guards were known to retaliate against detainees

25   who complained about conditions.

26   Non-governmental organizations have also found significant issues.  Community

27   Initiatives for Visiting Immigrants in Confinement ("CIVIC") filed a complaint with DHS about

28   the prevalence of reports of sexual abuse, assault, and harassment in detention facilities.  CIVIC

1    Complaint (Apr. 11, 2017), *available at* https://tinyurl.com/y8y5nqt7.  Included in the complaint

2    are allegations with respect to facilities that would be covered by AB 103.  *See id.* at 7-10.

3    Detention Watch Network, a national coalition, along with the National Immigrant Justice

4    Center, found that ICE's inspections are wholly inadequate to ensure human rights and due

5    process.  Detention Watch Network and National Immigrant Justice Center, *Lives in Peril: How*

6    *Ineffective Inspections Make ICE Complicit in Detention Center Abuse* (Oct. 2015), *available at*

7    https://tinyurl.com/yboqclen.

8         Detention Watch Network has also documented (including by sworn declarations) such

9    problems at private detention facilities that contract with ICE as "inadequate medical care,

10   mistreatment and abuse in its many forms, poor quality of food and sanitation, language access

11   concerns, and lack of accountability for problems at the facilities."  Detention Watch Network, *A*

12   *Toxic Relationship: Private Prisons and U.S. Immigration Detention* (Dec. 2016), at 3, *available*

13   *at* https://tinyurl.com/yag39ckt.

14        Through AB 103, California provides for reasonable reviews of detention facilities to

15   guard against the harms described above.

16   **II.      THE COURT'S DECISION WILL RESONATE WELL BEYOND THIS CASE**

17        This case has significant ramifications for jurisdictions around the country that have

18   taken action or are considering taking action to protect their communities, including immigrant

19   communities, in ways that are similar to the challenged statutes.  Indeed, the statutory provisions

20   the federal government seeks to enjoin are only some of the efforts by states and localities to

21   ensure that their role in immigration enforcement is proper and consistent with the priorities of

22   their jurisdictions.  A January 2018 report by the Immigrant Legal Resource Center identified

23   several states that by legislation or executive order restricted the use of their resources on

24   immigration enforcement and cooperation.  Immigrant Legal Resource Center, *The Rise of*

25   *Sanctuary* (Jan. 2018), at 20 ("ILRC Report"), *available at* https://tinyurl.com/yafeobpw.  The

26   ILRC Report also found that numerous localities have enacted various policies in the

27   immigration area, some of which are similar to the challenged provisions here and others of

28   which concern different issues.  *Id.* at 9, 18-19.  The Washington Attorney General likewise

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1  collected sample language from jurisdictions around the country that have addressed

2  immigration issues.  Attorney General of Washington, *Guidance Concerning Immigration*

3  *Enforcement* (Apr. 2017), at 53-87, *available at* https://tinyurl.com/yah49ta8.  Although often

4  referred to as "sanctuary" policies, that term misses two important reasons for state and local

5  action.  First, as the Washington Attorney General put it in explaining why he issued guidance

6  about the law on immigration enforcement: "effective implementation of the policies set forth in

7  this guidance can help foster a relationship of trust between local agencies and immigrants that

8  will promote public safety for all Washingtonians."  *Id.* at 1.  Second, adopting polices can help

9  guide how to respond to federal immigration enforcement requests.  *Id.*  Such efforts can help

10  avoid inconsistency and confusion.

11      Of particular note, many state and local governments have enacted or are considering

12  legislation or executive action similar to the three challenged provisions of SB 54.

13      *State Action*.  In 2017, Oregon enacted legislation that restricts the state's use of personal

14  information to enforce federal immigration laws.  Or. Rev. Stat. §180.805 (similar to Cal. Gov.

15  Code §7284.6(a)(1)(D)).  The Governor, Attorney General, and Oregon legislators believed that

16  "consistency and clarity statewide" was important.  Press Release, *Legislators, Gov. Brown, and*

17  *AG Rosenblum File Bill to Protect Privacy of Oregonians*, May 31, 2017, at 2, *available at*

18  https://tinyurl.com/y9hlh7fd.  In 2015, the Governor of Illinois issued an Executive Order that

19  prohibits state law enforcement agencies from "communicating an individual's release

20  information or contact information."  Ill. EO 15-2(1) (issued Jan. 5, 2015).  In doing so, the

21  Governor noted that "law enforcement agencies rely on the trust of the communities they serve"

22  and that immigrants are less likely to report crime if they fear contacting law enforcement.  A

23  2017 New York Executive Order prohibits state employees from disclosing information other

24  than citizenship and immigration status to federal immigration authorities for the purposes of

25  civil immigration enforcement, unless required by law.  N.Y. EO 170 (issued Sep. 15, 2017)

26  (noting importance of immigrants reporting crime).

27      *Pending Legislation*.  Other states are considering legislation similar to SB 54.  One or

28  more bills are pending in Michigan, New York, and Pennsylvania that have provisions analogous

14

1   to each of the three challenged provisions of SB 54: restrictions on providing release dates,

2   providing information, and transferring detainees.  Mich. HB 4720, §3(1)(a)(iii), (iv), (5) (last

3   checked May 17, 2018); N.Y. AB 7430 (adding N.Y. Exec. Law §§234(1)(a)(3)-(5), (b), (e), (5),

4   235(2) (last checked May 17, 2018); N.Y. AB 8776 (adding N.Y. Exec. Law §319-a(1)(a)(iii),

5   (iv)(d) (last checked May 17, 2018); N.Y. SB 7849 (identical to N.Y. AB 8776); Pa. HB 1302,

6   §4(a)(1)(iii), (iv), (e) (last checked May 17, 2018); Pa. HB 1604, §4(a)(1)(iii), (iv), (e) (last

7   checked May 17, 2018).

8         In addition to the Michigan and New York legislation above, those states have other

9   legislation pending that concerns some of the challenged provisions of SB 54.  Mich. HB 4721,

10   §3(2) (restricting the provision of release dates and other personal information for civil

11   immigration purposes) (last checked May 17, 2018); N.Y. SB 4075 (adding N.Y. Exec. Law

12   §319-c) (restrictions on providing information to federal immigration authorities) (last checked

13   May 17, 2018); N.Y. SB 1215 (adding N.Y. Exec. Law §§71-b(2)(a)(ii)), 243-a(2)(a)(ii)), (c)(ii)

14   (restrictions on providing release dates) (last checked May 17, 2018).

15         There is also a Massachusetts bill pending that would place restrictions on providing

16   release dates and transferring individuals in local custody.  Mass. SB 1305 (adding Mass. Gen.

17   Laws ch. 126, §§41(10), 42) (last checked May 17, 2018).

18         *Local Action*.  Local governments have also taken action in this sphere.  The ILRC

19   Report found that 169 counties have a policy against sharing release dates or other information

20   about detainees.  ILRC Report at 9.  That report also identified two cities – Middlesex County,

21   New Jersey, and Atlanta, Georgia – as examples of localities that prohibit their enforcement

22   personnel from transferring detainees to ICE without a warrant.  *Id.* at 18, 19.

23         As the discussion above demonstrates, states and localities are striving for consistent

24   policies on immigration enforcement that support their concern about promoting public safety

25   and other state and local interests.

26                              **CONCLUSION**

27         For the reasons stated above and in Defendants' opposition brief, the Court should deny

28   the motion for preliminary injunction.

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN

1    Dated: May 18, 2018                    Respectfully submitted,

2                                            /s/ Jonathan Weissglass

3                                            Jonathan Weissglass
4                                            Law Office of Jonathan Weissglass
                                             410 12th Street, Suite 250-B
5                                            Oakland, CA 94607
                                             Telephone: 510-836-4200
6                                            E-mail: jonathan@weissglass.com

7                                            Nicholas Espíritu
8                                            Jana Whalley
                                             National Immigration Law Center
9                                            3450 Wilshire Boulevard, #108-62
                                             Los Angeles, CA 90010
10                                           Telephone: 213-639-3900
                                             Email: espiritu@nilc.org
11                                           Email: whalley@nilc.org

12                                           Attorneys for *Amici Curiae*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF NILC, *ET AL.*, AS *AMICI CURIAE* IN OPPOSITION TO PRELIMINARY INJUNCTION
USA v. CALIFORNIA, CASE NO. 18-cv-00490-JAM-KJN