KARL A. RACINE
Attorney General for the
  District of Columbia
LOREN L. ALIKHAN
Solicitor General
ROBYN M. BENDER
Deputy Attorney General
VALERIE M. NANNERY
TAYLOR MOROSCO (STATE BAR NO. 316401)
Assistant Attorneys General
Office of the Attorney General
  for the District of Columbia
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
Telephone: 202-442-9867
Facsimile: 202-741-0499
Email: taylor.morosco@dc.gov
*Attorneys for Amici Curiae*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR.,** Governor of California, in his Official Capacity; and **XAVIER BECERRA,** Attorney General of California, in his Official Capacity,<br><br>Defendants. | 2:18-cv-490-JAM-KJN<br><br>**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, NEW JERSEY, NEW MEXICO, OREGON, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: June 20, 2018<br>Time: 10:00 a.m.<br>Courtroom: 6<br>Judge: The Honorable John A. Mendez<br>Action Filed: March 6, 2018 |

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The District of Columbia and the States of Connecticut, Delaware, Hawaii, Illinois, New Jersey, New Mexico, Oregon, and Washington (collectively, "the *Amici* States") submit this brief as *amici curiae* in support of Defendants' opposition to the federal government's motion for a preliminary injunction. The *Amici* States and their political subdivisions have adopted different approaches to policing based on their own determinations about what measures will best meet the needs of their residents. As relevant here, some jurisdictions have adopted, or are considering adopting, lawful policies designed to improve public safety by focusing local law enforcement agencies on crime prevention rather than the enforcement of federal immigration law. In so doing, these jurisdictions seek to build and maintain relationships of trust between their residents and law enforcement, thereby enhancing public safety for all.

The *Amici* States are concerned by the federal government's lawsuit against the State of California, which is based on an interpretation of federal immigration law that would impermissibly intrude on the sovereign authority of states to regulate law enforcement, enhance public safety, and allocate their limited resources. This suit is only the latest in a series of threats by the federal government against states and political subdivisions that do not wish to devote state and local resources to federal civil immigration enforcement. By seeking to make an example of California, the federal government threatens the sovereign authority of all the *Amici* States to adopt polices they deem important to the safety and well-being of their communities.

Contrary to the federal government's arguments, the issue at the heart of this case is not whether a state law "obstructs" federal law. Rather, the issue is whether the federal government can use any and all means to compel states to assist the federal government in its civil immigration enforcement efforts—something that the federal government itself has long maintained is voluntary, not required.

Together, the *Amici* States seek to protect their prerogative—indeed, their responsibility—to enact and implement policies that promote public safety, prevent crime, and facilitate positive and productive interactions between local law enforcement and all their residents, regardless of immigration status.

# BACKGROUND

On January 25, 2017, President Donald J. Trump issued an Executive Order requiring the Attorney General of the United States to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants," and ordering the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373."[1] Exec. Order No. 13768 § 9(a), 82 Fed. Reg. 8799, 8801. The County of Santa Clara and the City and County of San Francisco immediately challenged Section 9(a) of the Executive Order and, on April 25, 2017, the U.S. District Court for the Northern District of California entered a nationwide preliminary injunction against it. *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 540 (N.D. Cal. 2017). On November 20, 2017, the same court found that Section 9(a) violated the separation of powers doctrine and the Fifth and Tenth Amendments and entered a nationwide permanent injunction against it. *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017), *appeal docketed* No. 17-17480 (9th Cir. Dec. 14, 2017). Specifically, the court held that "[t]he Executive Order's threat to pull all federal grants from jurisdictions that refuse to honor detainer requests or to bring 'enforcement action' against them violates the Tenth Amendment's prohibitions against commandeering." *Id.* at 1216.

At the same time, the United States Department of Justice ("DOJ") has repeatedly threatened states and local jurisdictions with subpoenas and the loss of federal funding if they fail to both certify and confirm that their laws, policies, and practices do not violate Section 1373. Since April 2017, DOJ has sent dozens of letters to states and local jurisdictions threatening the loss of grant funding if the states and local jurisdictions did not verify compliance with Section 1373.[2] In

---

[1] As one federal judge aptly noted, the phrase "sanctuary jurisdiction" is a misnomer. *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 610 (E.D. Pa. 2017), *appeal docketed* No. 18-1103 (3d Cir. Jan. 18, 2018). None of the jurisdictions with policies targeted by the Attorney General provides "a sanctuary for anyone involved in criminal conduct, nor . . . a sanctuary as to any law enforcement investigation, prosecution, or imprisonment after having been found guilty of a crime." *Id. Accord City of Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018) (the term "'sanctuary'" cities or states is . . . commonly misunderstood").

[2] *See* U.S. Dep't of Justice, Office of Pub. Affairs, "Department of Justice Sends Letters to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373" (Apr. 21, 2017), *available at* https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373; *See* U.S. Dep't of Justice, Office of Pub. Affairs, "Justice
(continued…)

addition, beginning in mid-2017, DOJ announced that in order to receive future federal grants, states and local jurisdictions would be required to agree to allow their personnel and facilities to be used for federal civil immigration enforcement, in addition to agreeing to certify compliance with Section 1373.[3]

In August and September 2017, the State of California, and the Cities of Chicago, Los Angeles, Philadelphia, and San Francisco brought suits in their respective jurisdictions seeking declarative and injunctive relief regarding the new conditions on federal grants, including the requirement that jurisdictions certify compliance with Section 1373.[4] On September 15, 2017, a district judge in the Northern District of Illinois issued a nationwide preliminary injunction against two of the new conditions, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 951 (N.D. Ill. 2017), and the U.S. Court of Appeals for the Seventh Circuit recently affirmed, *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018). On November 15, 2017, a district judge in the Eastern District of Pennsylvania concluded that Philadelphia would likely succeed on the merits of its claim that two of the conditions violate the Tenth Amendment's anti-commandeering principles and noted that

---

Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373" (Nov. 15, 2017), *available at* https://www.justice.gov/opa/pr/justice-department-sends-letters-29-jurisdictions-regarding-their-compliance-8-usc-1373; U.S. Dep't of Justice, Office of Pub. Affairs, "Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. 1373 Compliance Review," (Jan. 24, 2018), *available at* https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373; U.S. Dep't of Justice, Office of Pub. Affairs, "Justice Department Sends 1373 Compliance Letter to City of Oakland, Document Request and Subpoena Threat to Two Other Jurisdictions," (Apr. 13, 2018), *available at* https://www.justice.gov/opa/pr/justice-department-sends-1373-compliance-letter-city-oakland-document-request-and-subpoena.

[3] U.S. Dep't of Justice, "Backgrounder on Grant Requirements," (July 25, 2017), *available at* https://www.justice.gov/opa/press-release/file/984346/download. DOJ added a similar condition and preference for applicants that participate in federal civil immigration enforcement as "considerations" used to assess applicants for grants from the Community Oriented Policing Services ("COPS") program under 34 U.S.C. § 10381(b)(1)-(22). *See* U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *2017 COPS Hiring Program (CHP) Application Guide*, 27, 29, 72, *available at* https://cops.usdoj.gov/pdf/2017AwardDocs/chp/app_guide.pdf.

[4] *See* Compl., *California v. Sessions*, N.D. Cal. No. 17-CV-4701, ECF No. 1 (filed Aug. 14, 2017); Compl., *City of Chicago v. Sessions*, N.D. Ill. No. 17-CV-5720, ECF No. 1 (filed Aug. 7, 2017); Compl., *City of Philadelphia v. Sessions*, E.D. Pa. No. 17-CV-3894, ECF No. 1 (filed Aug. 30, 2017); Compl., *City of Los Angeles v. Sessions*, C.D. Cal. No. 17-CV-7215, ECF No. 1 (filed Sept. 29, 2017); Compl., *City and County of San Francisco v. Sessions*, N.D. Cal. No. 17-CV-4642, ECF No. 1 (filed Aug. 11, 2017). Los Angeles also challenged the addition of certain immigration enforcement criteria to the "considerations" for COPS grants.

Section 1373 may "thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 651 (E.D. Pa. 2017) (internal quotation marks omitted), *appeal docketed* No. 18-1103 (3d Cir. Jan. 18, 2018).

On April 11, 2018, a judge in the Central District of California granted partial summary judgment to Los Angeles, holding that imposing new immigration enforcement considerations on the availability of grants provided through the Community Oriented Policing Services ("COPS") program was *ultra vires*, violated the Spending Clause, and was arbitrary and capricious under the Administrative Procedure Act. *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1098-1100 (C.D. Cal. 2018), *appeal docketed* No. 18-55599 (9th Cir. May 7, 2018). The court noted that, in imposing immigration enforcement considerations, the federal government "upset the constitutional balance between state and federal power by requiring state and local law enforcement to partner with federal authorities. These conditions infringe upon the state police power." *Id.* at 1096.

Undeterred by the mounting losses across the nation, in March 2018, the federal government sued the State of California, its governor, and its attorney general, and sought a preliminary injunction against three state laws enacted by the California legislature in furtherance of the safety and best interests of its residents. Of particular concern to the *Amici* States is the federal government's challenge to the California Values Act, Cal. Gov't Code § 7284 *et seq.*, also known as Senate Bill 54 ("SB 54"), which sets forth the circumstances in which state and local law enforcement agencies may participate in federal immigration enforcement activities. Regardless of whether the *Amici* States would adopt similar laws, they believe that SB 54 was an appropriate exercise of California's legislative judgment and does not conflict with the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* or Section 1373.

# ARGUMENT

## I. The Federal Government's Interpretation Of The INA And Section 1373 Mandates State Cooperation With Federal Civil Immigration Enforcement Efforts And Intrudes On State Prerogatives.

The Constitution "establishes a system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), and "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992). "[T]he principle that the Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history." *See United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000) (internal quotation marks and brackets omitted). Our system of federalism gives states substantial autonomy to formulate policies and practices to protect their communities, including how to expend their limited resources.[5]

Based on the needs of their residents, jurisdictions across the nation have adopted laws or policies that place lawful limits on the extent to which state and local law enforcement agencies become involved in the enforcement of federal civil immigration laws. *See* N.Y. State Office of the Attorney General, et al., *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and The Laws* 3 (May 2017) ("Local Involvement").[6] Such limitations "reflect [the jurisdiction's] local judgment of what policies and practices are most effective for maintaining public safety and community health." *County of Santa Clara*, 250 F. Supp. 3d at 525-26; *accord City of Chicago*, 888 F.3d at 280-81. These laws—including the provisions of SB 54 under challenge here—enhance public safety, are a proper exercise of states' police powers, and do not conflict with the INA or Section 1373. The federal government's argument to the contrary rests on an overbroad reading of the INA and Section 1373 that tramples on federalism principles and commandeers the states into carrying out federal civil immigration enforcement.

---

[5] While these considerations are muted with regard to the District of Columbia, *see* U.S. Const. art. I, § 8, cl. 17, they apply with full force to California and the *Amici* States.

[6] *Available at* https://oag.ca.gov/system/files/attachments/press_releases/setting_the_record_straight.pdf.

**A. Policies that limit the participation of state and local officials in federal immigration enforcement, like California's SB 54, reflect states' judgments about how to enhance public safety.**

State and local government officials are in the best position to make judgments about how to allocate scarce resources to serve the particular public safety needs of their local communities. Those officials frequently recognize that using state and local law enforcement agencies to enforce federal civil immigration laws can divert critical resources—including the time and attention of officers—away from other pressing needs. For example, the chief of police of a New York town observed that "[o]ur department is set up to do basic law enforcement . . . and really not to specialize in immigration work . . . . We're leaving that up to the people that are being paid to do immigration work." Local Involvement, *supra*, at 14. Similarly, the Law Enforcement Immigration Task Force, comprised of sheriffs, police chiefs, and police commissioners from across the country, recently noted that:

> State and local law enforcement agencies face tight budgets and often do not have the capacity or resources to duplicate the federal government's work in enforcing federal immigration laws. Rather than apprehending and removing immigrants who have no criminal background or affiliation and are merely seeking to work or reunite with family, it is more important for state and local law enforcement to focus limited resources and funding on true threats to public safety and security.

*Id.* at 13. That is especially so given that immigrants are generally less likely to engage in criminal conduct than other members of the community.[7]

State and local governments also have the best perspective on what policies will encourage trust and cooperation between law enforcement officers and the communities they serve. Hundreds of jurisdictions have concluded that public safety is promoted by adopting lawful policies that avoid excessive entanglement between local police and enforcement of federal immigration laws. *See Local Involvement, supra*, at 3. These jurisdictions have concluded that the safety of a community

---

[7] *See, e.g.*, Bianca E. Bersani & Alex R. Piquero, *Examining Systematic Crime Reporting Bias Across Three Immigrant Generations: Prevalence, Trends, and Divergence in Self-Reported and Official Reported Arrests*, 33 J. of Quantitative Criminology 835, 838 (2017) ("[R]esearch dating back more than a century documents a pattern whereby the foreign-born are involved in crime at significantly lower rates than their peers."); Alex Mowrasteh, *Immigration Myths – Crime and the Number of Illegal Immigrants* (Mar. 20, 2017) (finding that the incarceration rates of immigrants—both legal and undocumented—are "far below those of native-born Americans"), *available at* https://www.cato.org/blog/immigration-myths-crime-number-illegal-immigrants.

increases when all residents—regardless of immigration status—feel comfortable reporting crimes and interacting with local police without fear of immigration consequences. In contrast, the perception that local law enforcement officials serve as agents of federal immigration authorities can undermine the trust between law enforcement and the community. For example, "[i]n the case of domestic violence or crimes of that nature, the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation." *City of Chicago*, 888 F.3d at 280. As a police chief in Maryland explained, "the reluctance of folks to come forward because they are undocumented and fear deportation is a much greater public safety problem than having people here who may be undocumented but are not committing other crimes." Local Involvement, *supra*, at 15.

Many prominent law enforcement organizations have also taken the position that it is best to avoid conscripting local agencies into enforcing federal civil immigration laws. The Major Cities Chiefs Association, which represents the 68 largest law enforcement agencies in the United States, has voiced concern that the enforcement of federal civil immigration laws by local police "undermines the trust and cooperation with immigrant communities which are essential elements of community oriented policing." Major Cities Chiefs Ass'n, *Immigration Policy*.[8] As recently as June 2017, the Association impressed upon members of Congress that "[t]he role of local police officers relating to immigration enforcement should be left to local government."[9]

Indeed, the federal government's own 21st Century Policing Task Force reached the same conclusion in 2015. After explaining that building relationships with immigrant communities based on trust "is central to overall public safety," it recommended "[d]ecoupl[ing] federal immigration enforcement from routine local policing for civil enforcement and nonserious crime." Final Report

---

[8] *Available at* https://www.majorcitieschiefs.com/pdf/news/2013_immigration_policy.pdf.

[9] Ltr. from Chief J. Thomas Manger, President, Major Cities Chiefs Ass'n, to U.S. Reps. Goodlatte & Conyers (June 26, 2017), *available at* https://www.nilc.org/wp-content/uploads/2017/07/MC-Chiefs-Oppose-HR3003-2017-06-26.pdf; *see also* Major Cities Chiefs Ass'n, "U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order" (Jan. 25, 2017) ("We must be able to continue to protect the safety of all of our residents while ensuring that local law enforcement is focused on community policing."), *available at* https://www.majorcitieschiefs.com/pdf/news/ mcca_mayors_pr_on_eo_12517.pdf.

(continued…)

of The President's Task Force on 21st Century Policing 18 (May 2015)[10]; *see also id.* ("[W]henever possible, state and local law enforcement should not be involved in immigration enforcement."). The Task Force also recommended that "[t]he U.S. Department of Homeland Security . . . terminate the use of the state and local criminal justice system, including through detention, notification, and transfer requests, to enforce civil immigration laws against civil and non-serious criminal offenders." *Id.*

These veteran law enforcement officials and experts have concluded that policies prioritizing local issues over enforcement of federal civil immigration law enhance public safety. As they have explained, such policies can help to ensure that local law enforcement agencies have the resources they need to protect against genuine threats to public safety and maintain the trust and support of their communities in doing so. It is against this backdrop that California enacted SB 54 to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the State's limited resources to matters of greatest concern to state and local governments." Cal. Gov't Code § 7284.2(f).

What is more, SB 54 is also a reasonable way to protect the state and its law enforcement agencies from monetary liability for unlawfully detaining individuals requested to be transferred to federal immigration authorities after their period of state custody expires. While the INA itself "does not require or contemplate the use of a judicial warrant for civil immigration enforcement," Mot. for Prelim. Inj. & Mem. of Law in Support at 30, ECF. No. 2-1, that does not obviate the need for due process before a state law enforcement officer can deprive an individual of his or her liberty. SB 54 makes clear that local law enforcement agencies may transfer individuals to federal immigration authorities only when doing so does not violate federal, state, or local law, or when federal immigration authorities demonstrate that there is probable cause to believe that the individual in custody has committed a criminal offense. *See* Cal. Gov't Code § 7282.5. Measures like this protect states from liability under 42 U.S.C. § 1983. *See* Local Involvement at 9 (listing monetary awards to individuals who alleged they were held unlawfully pursuant to requests from

---

[10] *Available at* https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

federal immigration authorities); *see also* Cal. Gov't Code § 7284.2(e) & (f) (finding that state and local participation in federal immigration enforcement raises concerns about the constitutional rights of California residents).

### B. SB 54 is an appropriate exercise of California's police powers.

States and local jurisdictions have the primary responsibility for ensuring the safety of their communities and preventing crime. *See Morrison*, 529 U.S. at 618 ("[W]e can think of no better example of the police power . . . reposed in the States[] than the suppression of violent crime and vindication of its victims."); *see also Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power"). In addition, the allocation of state resources is at the core of a state's sovereign authority. *See Alden v. Maine*, 527 U.S. 706, 751 (1999). As the Seventh Circuit recently noted, states are well within their police power to prioritize safety and enforcement of state and local criminal law over the enforcement of federal civil immigration law. *City of Chicago*, 888 F.3d at 282 ("The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities.").

SB 54 is the product of the careful balance that California legislators struck to enact a law that enhances public safety, secures the constitutional rights of the state's residents, and protects the public fisc. The federal government's argument that the INA and Section 1373 render SB 54 invalid overreads those federal statutes and encroaches on state sovereignty.

First, contrary to the federal government's contention, provisions that limit the involvement of local law enforcement agencies in federal civil immigration enforcement, such as SB 54, do not prevent the enforcement of civil immigration law. Indeed, as the Seventh Circuit recently noted, it is a red herring for the federal government to characterize the issue here as whether states and local jurisdictions can be allowed to "impede" "obstruct" or "undermine" federal immigration enforcement. *City of Chicago*, 888 F.3d at 282. Federal civil immigration enforcement authorities operate freely within California, as in the *Amici* States, and SB 54 does not change that.

State and local law enforcement agencies also remain free to cooperate with federal immigration authorities to protect their communities from individuals who commit serious crimes

and are removable under federal law. In practice, this cooperation takes many forms. For example, as a matter of routine, local law enforcement agencies send fingerprints of individuals in their custody to the Federal Bureau of Investigation ("FBI"). *See City of Chicago*, 888 F.3d at 281. The FBI then provides that information to Immigration and Customs Enforcement, which can identify undocumented individuals in custody and procure judicial warrants to obtain transfer of custody. *See id.* at 282. Moreover, SB 54, like similar policies in other states, *see* Local Involvement at 20, does not apply to state correctional facilities, which house those convicted of the most serious crimes. *See* Cal. Gov't Code § 7284.4(a). Even when individuals who pose a threat to the community are held in local jails, SB 54 does not prevent local law enforcement agencies from cooperating with federal civil immigration enforcement authorities. Cal. Gov't Code § 7282.5 (permitting law enforcement officials to cooperate with immigration authorities when an individual who is the target of federal civil immigration enforcement has been convicted of any of hundreds of felonies and misdemeanors (including serious or violent felonies), is the subject of an outstanding federal felony arrest warrant, or a magistrate has found probable cause to charge the individual with a serious or violent felony). As the Seventh Circuit recognized, a jurisdiction's decision to cooperate with federal immigration authorities "for the persons most likely to present a threat to the community" but to "refuse such coordination where the threat posed by the individual is lesser[] reflects the decision by state and local authorities as how best to further the law enforcement objectives of their communities with the resources at their disposal." *City of Chicago*, 888 F.3d at 281.

Next, while the power to regulate immigration is a federal power, *Arizona v. United States*, 567 U.S. 387, 394 (2012); *Sturgeon v. Bratton*, 95 Cal. Rptr. 3d 718, 732 (2009), that power does not include the authority to dictate or supersede state laws that relate to internal state regulation of public safety and the allocation of state resources—which are unquestionably within the power of the States—when those state laws and regulations *do not regulate immigration. See Az. Dream Act Coal. v. Brewer*, 855 F.3d 957, 961 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018); *Sturgeon*, 95 Cal. Rptr. 3d at 732. Here, SB 54 regulates state law enforcement agencies, not immigration, *i.e.*, it does not regulate who should or should not be admitted into the country, who may be

removed from the country, or the conditions under which individuals may remain in the country. Nor does it run afoul of any particular federal statute. Section 1373 prohibits laws and regulations that restrict any government official or agency from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," but SB 54 specifically does not restrict or prohibit such information-sharing. *See* Cal. Gov't Code § 7284.6(e). And the INA permits state officials to cooperate in immigration enforcement, but it never requires it.

Finally, the federal government is interpreting the INA and Section 1373 broadly to supersede the historic police powers of the States—something that was not the clear or manifest purpose of Congress in enacting these laws. *See Gregory*, 501 U.S. at 461. Despite the federal government's arguments to the contrary, the question here is not whether Congress has preempted state laws regarding law enforcement or the well-being of their residents. Congress was not legislating in a field that the states have traditionally occupied. *See generally Wyeth v. Levine*, 555 U.S. 555, 565 (2009). As was the case in *Bond v. United States*, 134 S. Ct. 2077 (2014), the federal government's reading of federal law here would "alter sensitive federal-state relationships." *Id.* at 2091. The Court should reject this interpretation because it would intrude on the states' police power.

With the instant suit, the federal government attempts to curtail states "from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise." *Lopez*, 514 U.S. at 583 (Kennedy, J., concurring). Because state and local governments have primary responsibility for ensuring the safety of their communities and preventing crime, *see Morrison*, 529 U.S. at 618, they should be allowed to exercise their own discretion of how to best do that. No matter what a state or local jurisdiction decides—whether to communicate or cooperate with federal immigration officials or not—it should be the state or local jurisdiction that determines those policies. They are the ones that know their communities' needs and how best to address them.

**C.  The federal government's interpretation of the INA and Section 1373 are inconsistent with anti-commandeering principles.**

The Court should reject the federal government's interpretation of the INA and Section 1373 for the additional reason that it would result in impermissible commandeering of the States. Under the federal government's view, states must make their officers and resources available to enforce the federal government's interpretation of federal civil immigration law on the federal government's terms. Mot. for Prelim. Inj. & Mem. of Law in Support at 24, ECF 2-1. While California voluntarily cooperates with federal civil immigration enforcement in many ways, the federal government wants more. The federal government complains that California has not made available other limited resources—local law enforcement officers, including school police and security departments, and local jails that are run by local law enforcement agencies—to facilitate the location and detention of individuals who do not pose a threat to public safety. Yet the federal government's enumerated powers do not include the power to regulate state law enforcement and thus its attempt here to "regulate[s] the 'States as States,'" *FERC v. Mississippi*, 456 U.S. 742, 763 n.28 (1982), is inconsistent with Tenth Amendment jurisprudence.

"The Federal government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. While Congress may induce states through funding mechanisms to take actions that Congress cannot directly compel, *id.* at 167; *South Dakota v. Dole*, 483 U.S. 203 (1987), the federal government "may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). The Supreme Court recently confirmed that the anti-commandeering doctrine prohibits the federal government from issuing direct orders to states—either compelling them to do something or prohibiting state legislatures from enacting new laws. *Murphy v. Nat'l Collegiate Athletic Assn.*, No. 16-1477, 2018 WL 2186168, at *13 (U.S. May 14, 2018).

In the immigration context, a judge in the Northern District of California recently held that to the extent an executive order conditioned all federal grants on state and local authorities honoring civil immigration detainer requests, the order was "unconstitutional under the Tenth Amendment because it seeks to compel the state and local jurisdictions to enforce a federal regulatory program through coercion." *County of Santa Clara*, 275 F. Supp. 3d at 1216. There, just the risk of losing federal grant monies and the threat of an "enforcement action" was enough to run afoul of the anti-commandeering principle of the Tenth Amendment. *Id.* Here, the federal government has gone a step further and brought an action to enjoin a state from carrying out a law enacted within its sovereign authority on the view that federal law can control what state resources should be available for federal immigration enforcement. That is flatly contrary to precedent.

The federal government's position also stands in stark contrast with the long-time understanding that any cooperation or participation by states in federal civil immigration enforcement is completely voluntary. *See Galarza v. Szalczyk*, 745 F.3d 634, 639-42 (3d Cir. 2014) (holding that civil detainers are requests and a local law enforcement agency is not required to comply with them); *Miranda-Olivares v. Clackamas County*, No. 12-cv-2317, 2014 WL 1414305, at *5-8 (D. Or. Apr. 11, 2014) (same); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 40 (D.R.I. 2014) (same). The federal government acknowledges as much in its motion for preliminary injunction, *see* Mot. for Prelim. Inj. & Mem. of Law in Support at 25, ECF 2-1, while at the same time arguing that refusing to respond to every request from federal civil immigration enforcement authorities amounts to "obstruction," *id.* at 27. Yet, the federal government's requests for information themselves must be *voluntary* "requests" precisely because the federal government cannot command states to comply with them under the Tenth Amendment. *Galarza*, 745 F.3d at 643-45; *Ochoa v. Campbell*, 266 F. Supp. 3d 1237 (E.D. Wash. 2017); *Mercado v. Dallas County, Texas*, 229 F. Supp. 3d 501 (N.D. Texas 2017); *Orellana v. Nobles County*, 230 F. Supp. 3d 934 (D. Minn. 2017); *County of Santa Clara*, 275 F. Supp. 3d at 1216.

In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit rejected a Tenth Amendment facial challenge to Section 1373 because, the court said, "Congress has not compelled state and local governments to enact or administer any federal regulatory program. Nor

has it affirmatively conscripted states, localities, or their employees into the federal government's service." *Id.* at 35. The Supreme Court's recent decision in *Murphy* calls that holding into question because it suggests that no such affirmative command is necessary and the anti-commandeering doctrine is implicated when the federal government purports to prohibit states from regulating in an area within their police powers. 2018 WL 2186168, at *13. But even if *City of New York* remains valid after *Murphy*, the federal government's interpretation of the INA and Section 1373 here imposes affirmative duties on California to cede control over its resources and personnel in order to enforce the federal government's interpretation of federal law. The federal government's construction of the INA and Section 1373 raises serious Tenth Amendment concerns with respect to California, and it plainly serves as a shot across the bow to other jurisdictions that choose to limit their involvement in federal civil immigration enforcement. It is an immediate threat to every other state: comply or suffer the consequences.

Courts have called into doubt the constitutionality of applying the statute in a way that prevents states from allocating and controlling their own resources. *See City of Chicago*, 264 F. Supp. 3d at 949 ("If a state or local government cannot control the scope of its officials' employment by limiting the extent of their paid time spent cooperating with the INS, then Section 1373 may practically limit the ability of state and local governments to decline to administer or enforce a federal regulatory program."); *City of Philadelphia*, 280 F. Supp. 3d at 651 (explaining that imposing affirmative immigration-related obligations "implicate[s] the Tenth Amendment and its built-in anti-commandeering principles"). This Court should similarly reject the federal government's interpretation due to anti-commandeering concerns.

# CONCLUSION

This Court should deny Plaintiff's motion for a preliminary injunction.

Dated: May 18, 2018

Respectfully Submitted,

KARL A. RACINE
Attorney General for the
  District of Columbia
LOREN L. ALIKHAN
Solicitor General
ROBYN M. BENDER
Deputy Attorney General

*/s/ Taylor Morosco*
TAYLOR MOROSCO
VALERIE M. NANNERY
Assistant Attorneys General
*Attorneys for the District of Columbia*

| | |
|---|---|
| GEORGE JEPSEN<br>*Attorney General*<br>*State of Connecticut*<br>55 Elm Street<br>Hartford, CT 06106 | MATTHEW P. DENN<br>*Attorney General*<br>*State of Delaware*<br>Department of Justice<br>Carvel State Building, 6th Floor<br>820 North French Street<br>Wilmington, DE 19801 |
| RUSSELL A. SUZUKI<br>*Attorney General*<br>*State of Hawaii*<br>425 Queen Street<br>Honolulu, HI 96813 | LISA MADIGAN<br>*Attorney General*<br>*State of Illinois*<br>100 W. Randolph St.<br>Chicago, IL 60601 |
| GURBIR S. GREWAL<br>*Attorney General*<br>*State of New Jersey*<br>RJ Hughes Justice Complex<br>25 Market Street, Box 080<br>Trenton, NJ 08625-0080 | HECTOR BALDERAS<br>*Attorney General*<br>*State of New Mexico*<br>408 Galisteo St.<br>Santa Fe, NM 87501 |
| ELLEN F. ROSENBLUM<br>*Attorney General*<br>*State of Oregon*<br>1162 Court Street NE<br>Salem, OR 97301 | ROBERT W. FERGUSON<br>*Attorney General*<br>*State of Washington*<br>P.O. Box 40100<br>Olympia, WA 98504-0100 |