CHAD A. READLER
Acting Assistant Attorney General
MCGREGOR SCOTT
United States Attorney
AUGUST FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director
EREZ REUVENI
Assistant Director, Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel. (202) 307-4293
Erez.R.Reuveni@usdoj.gov
DAVID SHELLEDY
Civil Chief, Assistant United States Attorney
LAUREN C. BINGHAM
JOSEPH A. DARROW
FRANCESCA GENOVA
KATHRYNE GRAY
JOSHUA S. PRESS
Trial Attorneys
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>Defendants. | 2:18-cv-00490-JAM-KJN<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: June 20, 2018<br>Time: 10:00 a.m.<br>Courtroom: 6 |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    The United States Is Likely to Prevail on the Merits ......................................2

      A.    California may not restrict a private employer's voluntary cooperation with federal law enforcement officials (AB 450) .........................................3

      B.    California's exclusive inspection and review scheme for federal facilities (AB 103) is impermissible..............................................................................7

      C.    California's restrictions on local and state cooperation with federal efforts to detain aliens subject to removal proceedings (SB 54) are impermissible ...............................10

II.    Irreparable Harm to the United States, The Balance of Harms, and the Public Interest Strongly Militate in Favor of Injunctive Relief. ..........................................................23

CONCLUSION......................................................................................................................30

CERTIFICATE OF SERVICE................................................................................................32

# TABLE OF AUTHORITIES

## CASE LAW

*Adidas Am., Inc. v. Skechers USA, Inc.,*
   2017 WL 2604310 (D. Or. June 12, 2017)................................................................29

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003).........................................................................................5

*Arc of California v. Douglas,*
   757 F.3d 975 (9th Cir. 2014).............................................................................24

*Arcamuzi v. Cont'l Air Lines, Inc.,*
   819 F.2d 935 (9th Cir. 1987).............................................................................25

*Arizona v. United States,*
   567 U.S. 387 (2012)...........................................................................2, 3, 6, 12

*Baker & Drake, Inc. v. Public Service Commission of Nevada,*
   35 F.3d 1348 (9th Cir. 1994)...............................................................................4

*Boeing v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014)....................................................................2, 3, 9

*Cal. Pharmacists Ass'n v. Maxwell–Jolly,*
   563 F.3d 847 (9th Cir. 2009)..............................................................................30

*Chamber of Commerce of the U.S. v. Whiting,*
   563 U.S. 582 (2011).........................................................................................14

*Chicago v. Sessions,*
   264 F. Supp. 563 U.S. 3d 933 (N.D. Ill. 2017)......................................................23

*City of Chicago v. Sessions,*
   888 F.3d 272 (7th Cir. 2018).......................................................................14, 23

*City of L.A. v. Patel,*
   135 S. Ct. 2443 (2015)......................................................................................17

*City of New York v. United States,*
   179 F.3d 36 (2d Cir. 1999) ...........................................................15, 16, 22, 23

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000)...................................................................................*passim*

*Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
    475 U.S. 282 (1986) ....................................................................................... 4, 5, 11

*F.E.R.C. v. Mississippi*,
    456 U.S. 742 (1982) ................................................................................................... 23

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ................................................................................................... 22

*Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*,
    142 F. Supp. 2d 679 (D. Md. 2001) ........................................................................ 19

*Freilich v. Upper Chesapeake Health, Inc.*,
    313 F.3d 205 (4th Cir. 2002) ................................................................................... 19

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................................................................... 23

*Herrera-Inirio v. I.N.S.*,
    208 F.3d 299 (1st Cir. 2000) ................................................................................... 23

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................................................ 4, 22

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981) ............................................................................................. 22, 23

*I.N.S. v. Delgado*,
    466 U.S. 210 (1984) ..................................................................................................... 6

*In re Natl. Sec. Agency Telecom. Records Litig.*,
    633 F. Supp. 2d 892 (N.D. Cal. 2007) ................................................................ 9, 10

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ................................................................................................ 13

*Lamar, Archer & Cofrin, LLP v. Appling*,
    2018 WL 2465174 (U.S. June 4, 2018) ............................................................. 16, 22

*Landrigan v. Brewer*,
    2010 WL 4269559 n.6 (D. Ariz. Oct. 25, 2010) ................................................... 27

*Lopez v. U.S. I.N.S.*,
    758 F.2d 1390 (10th Cir. 1985) ............................................................................... 23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................................................... 21

*Murphy v. NCAA*,
　138 S.Ct. 1461 (May 14, 2018) ...................................................................*passim*

*Napa Valley Educators' Assn. v. Napa Valley Unified School Dist.*
　194 Cal. App. 3rd 243 (1987) ....................................................................16

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
　491 U.S. 3507 (1989) ..................................................................................24

*New York v. United States*,
　505 U.S. 144 (1992) ....................................................................................17

*Nken v. Holder*,
　556 U.S. 418 (2009) ....................................................................................30

*North Dakota v. United States*,
　495 U.S. 423 (1990) ..........................................................................7, 9, 15

*Oregon Prescription Drug Monitoring Program v. U.S. D.E.A.*,
　860 F.3d 1228 (9th Cir. 2017) ..............................................................6, 20

*Perez v. Campbell*,
　402 U.S. 637 (1971) ......................................................................................5

*Printz v. United States*,
　521 U.S. 898 (1997) ................................................................1, 17, 19, 23

*Puente Arizona v. Arpaio*,
　76 F. Supp. 3d 833 (D. Ariz. 2015) ........................................................24

*Reno v. Condon*,
　528 U.S. 141 (2000) ....................................................................................18

*Robotic Vision Sys. v. View Eng'g Inc.*,
　1995 WL 867456 (C.D. Cal. Dec. 6, 1995) ............................................29

*Steinle v. City & County of San Francisco*,
　230 F. Supp. 3d 994 (N.D. Cal.) ..............................................................16

*Sturgeon v. Bratton*,
　174 Cal. App. 4th 1407 (2009) ................................................................16

*Thorning v. Hollister School Dist.*,
　11 Cal. App. 4th 1598 (1992) ..................................................................16

*Trans World Airlines, Inc. v. Mattox*,
　897 F.2d 773 (5th Cir. 1990) ....................................................................24

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012).....................................................................24, 30

*United States v. Arizona*
   641 F.3d 399 (9th Cir. 2011)......................................................................24, 30

*United States v. Brown,*
   No. 07-485, 2007 WL 4372829 at *6 (S.D.N.Y. Dec. 12, 2007), *aff'd* 328 F. App'x. 57 (2d Cir. 2009).........................................................................................................19

*United States v. Campos-Serrano,*
   404 U.S. 293 (1971).........................................................................................21

*United States v. City of Arcata,*
   629 F.3d 986 (9th Cir. 2009)..........................................................................3, 7

*United States v. Miami Univ.,*
   294 F.3d 797 (6th Cir. 2002)............................................................................24

*United States v. Morrison,*
   529 U.S. 598 (2000).........................................................................................23

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013)..................................................................2, 3, 24

*Villas at Parkside Partners v. City of Farmers Branch,*
   726 F.3d 524 (5th Cir. 2013)............................................................................22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)............................................................................................24

## CONSTITUTIONAL PROVISIONS

U.S. Const. art I § 8, cl. 3.....................................................................................23

U.S. Const. art I § 8, cl. 4.....................................................................................23

## FEDERAL STATUTES

8 U.S.C. § 1101(a)(42)(U).....................................................................................14

8 U.S.C. § 1103(a)(3)............................................................................................21

8 U.S.C. § 1182(a)(3)(B).......................................................................................14

8 U.S.C. § 1184(a)(1)............................................................................................21

8 U.S.C. § 1201(b) ........................................................................................21

8 U.S.C. § 1221(c)(9) ....................................................................................21

8 U.S.C. § 1225(b) ...................................................................................15, 21

8 U.S.C. § 1225(d) ........................................................................................21

8 U.S.C. § 1226 .............................................................................................20

8 U.S.C. § 1226(a) ........................................................................................14

8 U.S.C. § 1226(c) ........................................................................................15

8 U.S.C. § 1226(c)(1) ....................................................................................13

8 U.S.C. § 1226(c)(1)(B) ...............................................................................14

8 U.S.C. § 1227 .............................................................................................20

8 U.S.C. § 1227(a)(2)(i)(II) ...........................................................................14

8 U.S.C. § 1227(a)(2)(B) ...............................................................................14

8 U.S.C. § 1229(a)(1)(F) ...............................................................................21

8 U.S.C. § 1231 .............................................................................................20

8 U.S.C. § 1231(a) ........................................................................................15

8 U.S.C. § 1231(a)(1)(B)(iii) .........................................................................13

8 U.S.C. § 1231(a)(2) ....................................................................................13

8 U.S.C. § 1231(a)(4) ....................................................................................12

8 U.S.C. § 1231(a)(4)(B) ...............................................................................12

8 U.S.C. § 1231(a)(6) ....................................................................................13

8 U.S.C. § 1252c ...........................................................................................14

8 U.S.C. § 1252c(a) .......................................................................................14

8 U.S.C. § 1301 .............................................................................................22

8 U.S.C. § 1302(a) ........................................................................................21

8 U.S.C. § 1303 ..................................................................................................21

8 U.S.C. § 1304-05 .............................................................................................21

8 U.S.C. § 1304(d) ..............................................................................................21

8 U.S.C. § 1305(a) ..............................................................................................21

8 U.S.C. § 1306 ..................................................................................................21

8 U.S.C. § 1324a .............................................................................................6, 14

8 U.S.C. § 1324a(b) ..............................................................................................3

8 U.S.C. § 1324a(b)(3) .......................................................................................21

8 U.S.C. § 1357 .............................................................................................20, 21

8 U.S.C. § 1357(a) ..............................................................................................15

8 U.S.C. § 1357(a)(1) ...........................................................................................6

8 U.S.C. § 1357(e) ................................................................................................6

8 U.S.C. § 1357(f) ..............................................................................................21

8 U.S.C. § 1357(g)(1) .........................................................................................15

8 U.S.C. § 1373 .............................................................................................passim

8 U.S.C. § 1373(a) .........................................................................................16, 22

8 U.S.C. § 1373(b) ..............................................................................................22

8 U.S.C. § 1373(c) ..............................................................................................22

12 U.S.C. § 4122 ................................................................................................21

15 U.S.C. § 391 ..................................................................................................21

15 U.S.C. § 1392(d) ...........................................................................................21

15 U.S.C. § 2224(a)(1) .......................................................................................19

15 U.S.C. § 6733(b) ...........................................................................................21

20 U.S.C. § 4013 ................................................................................................19

23 U.S.C. § 402(a) ...............................................................................................19

34 U.S.C. § 41307 ...............................................................................................19

34 U.S.C. § 41308 ...............................................................................................19

42 U.S.C. § 5779(a) .............................................................................................19

42 U.S.C. § 7543(a) .............................................................................................21

42 U.S.C. § 11133(b) ...........................................................................................19

42 U.S.C. § 14072(g)(4) .......................................................................................19

47 U.S.C. § 332(c)(3)(A) ......................................................................................21

49 U.S.C. § 14501 ...............................................................................................21

52 U.S.C. § 20701-06 ...........................................................................................19

49 U.S.C. App. § 1305(a)(1) .................................................................................21

**PUBLIC LAW**

Pub. L. No. 91-452 ..............................................................................................20

**FEDERAL REGULATIONS**

8 C.F.R. § 236.6 ...............................................................................................8, 9

**FEDERAL REGISTER**

68 Fed. Reg. 4364 .................................................................................................9

68 Fed. Reg. 4366 .................................................................................................9

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 104–725 (1996) ...................................................................22

S. Rep. No. 104–249, at 19-20 (2d Sess. 1996) ....................................................22

**CALIFORNIA STATUTES**

Assem. B. 103 ..............................................................................................*passim*

Assem. B. 450 ..................................................................................................................*passim*

CA. S.B. 54 ......................................................................................................................*passim*

Cal. Gov. Code § 6254(f)(1) ....................................................................................................19

Cal. Gov. Code § 7282.5(a)(1) ................................................................................................27

Cal. Gov. Code § 7282.5(b) .....................................................................................................29

Cal. Gov. Code § 7284.4(a) ......................................................................................................28

Cal. Gov. Code § 7284.6(a)(1)(C) ..............................................................................11, 15, 28

Cal. Gov. Code § 7284.6(a)(1)(C) ...........................................................................................15

Cal. Gov. Code § 7284.6(c)(2) ................................................................................................27

Cal. Gov. Code § 7284.6(a)(4) ........................................................................................11, 14

Cal. Gov. Code § 7284.8(b) .....................................................................................................28

Cal. Gov. Code § 7285.1(a) ...........................................................................................3, 5, 24

Cal. Gov. Code § 7285.2(a) ........................................................................................................3

Cal. Gov. Code § 7285.2(a)-(b) .................................................................................................6

Cal. Gov. Code § 12532(a) ...................................................................................................7, 8

Cal. Gov. Code § 12532(b) ...........................................................................................8, 9, 10

Cal. Gov. Code § 12532(c) ........................................................................................................8

Cal. Labor Code § 90.2 ..............................................................................................................3

Cal. Pen. Code § 6031.1-4 .........................................................................................................7

Cal. Pen. Code § 6030 ......................................................................................................9, 10

Cal. Pen. Code § 6031.1 ...................................................................................................9, 10

### CALIFORNIA ATTORNEY GENERAL PROVISIONS

Cal. Dep't of Justice, Info. Bulletin No. 14-01: Responsibilities of Local Law Enforcement Agencies under Secure Communities and the TRUST Act (June 25, 2014) .................................................. 1, 16

Cal. Dep't of Justice, Info. Bulletin No. DLE-2018-01 Responsibilities of Law Enforcement
    Agencies Under the California Values Act, California TRUST Act, and the California TRUTH
    Act (March 28, 2018) ...................................................................................................28

California Values Act's Statistical Reporting Requirements at 1-2, 18-02CJIS (March 28, 2018) .......27

Office of the Attorney General, Op. No. 92-607,
    75 Cal. Op. Att'y Gen. 270 (1992) ............................................................................ 1, 16

## CALIFORNIA LEGISLATIVE HISTORY

CA. Assem. Comm. on the Judiciary Rep., Apr. 22, 2017 ...................................................... 1, 2

CA. Assem. Comm. on the Judiciary Rep., (Senate) Jul. 10, 2017 ..........................................25

Hearing on S.B. 54 before the S. Standing Comm. On Public Safety (Jan. 31,
    2017) (statement of Sen. Scott Wiener), https://ca.digitaldemocracy.org/hearing/10091?
    startTime=275&vid=381a741e4e525c9efccbbf6062c67f3c (last visited on June 8, 2018) .............10

Senate Floor Hearing (April 3, 2017) ....................................................................................10

## MISCELLANEOUS

California Dept. of Corrections, 2017 OUTCOME EVALUATION, (October 2017),
    https://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/2017-Outcome-
    Evaluation-Report.pdf. (last visited on June 8, 2018) .................................................. 26, 29

County jails released 349 people wanted by ICE since 'sanctuary law' started, SAN DIEGO UNION-
    TRIBUNE http://www.sandiegouniontribune.com/news/immigration/sd-me-sanctuary-laws-
    20180525-story.html (last visited on June 8, 2018) .....................................................12

ICE Policy No. 10074.2 ¶¶ 2.4, 2.5, (Last visited Nov 9, 2017)
    https://www.ice.gov/detainer-policy ........................................................................30

Office of Justice Programs, 2018 UPDATE ON PRISONER RECIDIVISM: A 9-YEAR FOLLOW-UP
    PERIOD (May 2018), https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf (last visited on
    June 8, 2018) ..............................................................................................................26

# INTRODUCTION

Outside the context of this litigation, California candidly agrees with the core legal principles that decide this case. Barely six years ago, California told the Supreme Court that "Congress has carefully regulated not only who may be removed from the United States, but how such individuals should be identified, apprehended, and detained," and has "committed [that authority] to the federal government." Br. for New York, California, et al., *Arizona*, No. 11-182 (U.S.), 2012 WL 1054493, *1, *3. And the California Attorney General has previously instructed Californians that a local government may not, consistent with the Supremacy Clause, decline to provide "access to the city's records" regarding immigration status or decline to "cooperat[e] in their official capacities" with DHS "arrest procedures."[1] That still-operative, formal opinion was reaffirmed more recently by then-Attorney General Kamala Harris, who explained in another formal opinion that "state and local governments may not be prohibited from providing information to or receiving information from ICE."[2]

In its opposition brief here, however, California now speaks out of the other side of its mouth, contending that the State may actively thwart federal enforcement efforts in any context based on its purported interest in employment, conditions of confinement, and community relations with police. On California's theory, the State would be entitled to frustrate and discriminate against any form of federal law enforcement with which it disagrees, such as by limiting cooperation with federal criminal investigations. That cannot be the law, and California's position is particularly anomalous here given that the subject of the State's obstruction is immigration enforcement—the sole province of the Federal Government. California is free to disagree with the United States on matters of policy. But even where the State's ends are legitimate in the abstract, it must act "in such fashion as not to obstruct the operation of federal law," *Printz v. United States*, 521 U.S. 898, 913 (1997), and the State lacks any authority to promulgate laws enacted to interfere with "federal immigration enforcement actions,"[3] to protect criminal aliens from detection and apprehension, and to inflict ongoing, irreparable harm on the United States by impeding its ability to enforce the Nation's immigration laws and take custody of

---

[1] Office of the Attorney General, Op. No. 92-607, 75 Cal. Op. Att'y Gen. 270 (1992). Under separate cover, the United States contemporaneously requests judicial notice of a number of its factual citations.

[2] Cal. Dep't of Justice, *Information Bulletin No. 14-01: Responsibilities of Local Law Enforcement Agencies under Secure Communities and the TRUST Act* (June 25, 2014).

[3] California Committee on the Judiciary Report (Assembly), Apr. 22, 2017, at 1.

aliens known to reoffend when released to the public rather than to the United States.

California is thus wrong to suggest that our system of dual sovereignty allows a State to take deliberate and coordinated actions designed to impede federal law enforcement. This remarkable conception of federalism—that a state may effectively veto the enforcement decisions of the United States by making federal law more difficult to enforce—is entirely at odds with our constitutional structure. "The Supremacy Clause provides a clear rule" that where state actions "frustrate[] federal policies," "[s]tate law must . . . give way to federal law." *Arizona v. United States*, 567 U.S. 387, 388-89, 402 (2012). Accordingly, a State may not enact laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 (9th Cir. 2013), let alone do so intentionally, as California has done here. And a State similarly may not enact laws that facially discriminate against federal law enforcement, merely because the state's laws also operate against non-federal officials and private parties. To the contrary, a State cannot "discriminate against the Federal Government or *those with whom it deals*." *Boeing v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (emphasis added).

All told, the three California laws at issue do exactly as intended: they obstruct federal regulation and discriminate against the United States. As such, they offend the Constitution many times over, and should be enjoined.

## ARGUMENT

## I.    The United States Is Likely to Prevail on the Merits

Because California fails to justify its regulatory overreach into exclusive federal prerogatives, the Court should enjoin enforcement of the laws at issue, as explained in the United States' opening brief. After two rounds of briefing, all agree that the three statutes at issue have the purpose and effect of "protecting" illegal aliens from "federal immigration enforcement." California Committee on the Judiciary Report, Apr. 22, 2017, at 1. California argues, for example, that it is justified in "making it more difficult for federal officers to investigate both criminal and civil immigration violations," because it is "irrelevant" whether the state enactment "makes a job 'more difficult'" Br. 20.; *see also id.* ("To the extent that this makes immigration authorities' job more difficult, that is not a ground for preemption."). California makes virtually no attempt to square this assertion with the settled

understanding that "[a] statute is conflict preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Valle del Sol*, 732 F.3d at 1026 (quoting *Arizona*, 567 U.S. at 399).

Nor does California come to grips with principles of intergovernmental immunity. The State emphasizes that its enactments do not "regulate federal immigration enforcement officials," Br. 28, but the applicable doctrine prohibits states from enacting measures that "discriminate against the Federal Government *or those with whom it deals*." *Boeing*, 768 F.3d at 839 (emphasis added). In addition, the statutes at issue here explicitly single out federal enforcement, and thus do not "affect the federal government incidentally as the consequence of a broad, neutrally applicable rule." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2009).

Finally, California inverts principles of federalism when it invokes the Tenth Amendment in defense of measures intended to disrupt the orderly transfer of criminal aliens to the United States upon their release from local jails. Having confined individuals subject to federal removal proceedings, California cannot then undermine the United States' ability to enforce federal requirements that the same persons be taken into federal custody for removal proceedings when they are released. Critically, California is not being asked to enforce any aspect of a federal scheme; it is simply precluded from frustrating the enforcement of that scheme by federal officials.

## A. California may not restrict a private employer's voluntary cooperation with federal law enforcement officials (AB 450).

AB 450 imposes civil penalties on private employers in California who allow immigration officers to enter nonpublic areas of a place of labor or to inspect certain employee records, without a judicial warrant or legal authorization of a type satisfactory to California. Cal. Gov. Code §§ 7285.1(a), 7285.2(a). AB 450 also imposes civil penalties on employers who fail to provide notifications to their employees regarding upcoming and completed inspections by federal officials, or who reverify the employment eligibility of current employees in a manner not required by 8 U.S.C. § 1324a(b). Cal. Labor Code § 90.2. The statute thus penalizes private employers for doing nothing more than voluntarily cooperating with the United States.

The State does not contest that "AB 450 makes it more difficult for federal officers to

investigate both criminal and civil immigration violations at employment sites." Br. 28 (quoting Mot. 13) (brackets omitted). It nonetheless declares that "whether AB 450 makes a job 'more difficult' is irrelevant." Br. 28. California seriously misapprehends the nature of obstacle preemption, which occurs when "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 352 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Thus, far from being irrelevant, that a state enactment makes it "more difficult" for federal officials to carry out federal law and accomplished federal objectives is the *very definition* of an obstacle. After all, in that circumstance "the purpose of the [Federal] act cannot otherwise be accomplished" and "operation within [Congress'] chosen field [is] frustrated and its provisions [are] refused their natural effect." *Crosby*, 530 U.S. at 373. That is so even where an enactment merely "incrementally diminishes the [Federal Government]'s control over enforcement" thereby "detract[ing] from the integrated scheme of regulation created by Congress." *Wisconsin. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 288-89 (1986). And here, the obstacle to enforcement of the immigration laws is not an incidental byproduct of a state statutory scheme. Rather, it is the sole function of AB 450, which was enacted to preclude voluntary cooperation with federal officials by forbidding and penalizing such cooperation.

Making no attempt to reconcile its position with axiomatic principles of federalism and relevant Supreme Court decisions, the State relies on *Baker & Drake, Inc. v. Public Service Commission of Nevada*, 35 F.3d 1348 (9th Cir. 1994), which, as the State's own explanatory parenthetical recognizes, stands for the proposition that "'[s]imply making a bankruptcy reorganization more difficult for a particular debtor . . . does not rise to the level of stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress' in enacting the Bankruptcy Act, which does not mandate 'every company be reorganized at all costs.'" Br. 20-21 (quoting *Baker & Drake*, 35 F.3d at 1354) (alterations in original). As the Ninth Circuit observed, the enactment at issue in that case—a "ban on taxi leasing"—was a "broadly applicable regulation" that did "not directly conflict with the purposes of the Bankruptcy Code in any way which could be generalized beyond the particular facts of the present case." *Baker & Drake*, 35 F.3d at 1355. To be analogous, the regulation there would have had

1  to operate solely to prohibit private parties from assisting certain debtors in seeking federal bankruptcy

2  protection, a regulation that, like AB 450, would plainly be preempted.

3      Nor would AB 450 survive judicial scrutiny even if, as California asserts, "the State is acting

4  within its broad police power to regulate workplace protections." Br. 28. No matter their perceived

5  merit, a State's policy objectives cannot save a statute that interferes with the enforcement of federal

6  law. *See Perez v. Campbell*, 402 U.S. 637, 651-52 (1971) (overruling "the aberrational doctrine" of two

7  prior cases "that state law may frustrate the operation of federal law as long as the state legislature had

8  some purpose in mind other than one of frustration"). Indeed, the Supreme Court has repeatedly

9  made clear that state enactments may be preempted even where the state is acting in an area of

10  traditional state authority. *See, e.g., Crosby,* 530 U.S. at 366-67 (invalidating a Massachusetts law that

11  restricted the State itself from purchasing from companies doing business with Burma, even though

12  the statute applied only to the State's own purchases); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 525-

13  26 (2003) (California regulation of insurers doing business in the state impermissibly intruded into the

14  domain of foreign affairs); *Gould,*, 475 U.S. at 288-89 (Wisconsin law prohibiting certain violators of

15  the National Labor Relations Act from doing business with the State preempted). Here, California is

16  not even operating in an area of traditional state authority, let alone doing so consistent with the

17  Supremacy Clause. The only "protections" afforded by AB 450 are "*protections*" *from federal immigration*

18  *authorities*, and preventing interactions between private individuals and the United States is not a matter

19  within California's "broad police power."

20      California next makes the related assertion that AB 450 is also "designed to increase

21  information sharing between employers and employees," Br. 27. But that too does little to save the

22  statue from preemption. After all, even if AB 450 had a goal other than its stated purpose to thwart

23  federal immigration regulation, it remains true that state statutes that pose an obstacle to the

24  implementation of federal law are preempted even when the goals of the federal and state schemes

25  are substantially identical, as was the case in *Crosby*, *Garamendi*, and *Gould*.

26      Ultimately, the State rests most of its argument on the assertion that AB 450 does not make

27  immigration enforcement impossible, even if it makes it more difficult. For example, California notes

28  that Section 7285.1(a) of the Government Code, which restricts access by immigration officials to

nonpublic areas of a workplace, does not apply "when a judicial warrant is produced" or "if required by federal law," and it observes that Section 7285.2(a)-(b), which limits access to relevant records, still allows the Federal Government to seek the records "through either a subpoena, judicial warrant, or I-9 inspection." Br. 27. But California does not dispute that the statute prevents immigration officials from entering nonpublic areas of a workplace notwithstanding an employer's consent, and that it prevents immigration officials from reviewing records notwithstanding an employer's consent. And state laws are preempted even where they present an obstacle to the execution of federal law, even if they have not thwarted federal regulation entirely. Thus a State can no more force ICE to secure official legal process before entering a place of employment when the property owner has consented to its entry than it could require an FBI agent to do so before entering a crime scene.[4] And that is especially so where the INA itself establishes a "comprehensive regulatory scheme" that allows federal officers to rely on employer consent as a method of enforcement. Mot. (ECF 2-1) at 11-12. Congress's decision to allow enforcement efforts premised on employer consent means the State's "law to the contrary is an obstacle to the regulatory system Congress chose." *Arizona*, 567 U.S. at 407.[5]

Thus, contrary to the State's understanding, a state statute need not entirely thwart the implementation of federal law in order to be preempted. For example, in *Oregon Prescription Drug Monitoring Program v. U.S. D.E.A.*, 860 F.3d 1228 (9th Cir. 2017), the Ninth Circuit invalidated a state enactment that purported to require the Drug Enforcement Administration to secure a court order before it could obtain testimony and documents with a subpoena. The court noted that under the Controlled Substances Act (CSA), the United States "can obtain testimony and documents through a subpoena and without a court order" and a "court order is needed only in the event of noncompliance." The court explained that the additional requirement of obtaining a court order "stands as an obstacle to the full implementation of the [CSA] because it interferes with the methods

---

[4] The State's argument has no logical end-point. For example, California could, under its theory, instruct private employers to refuse to cooperate with federal environmental authorities investigating a toxic spill on private land or to obstruct the United States military or the National Guard's attempts to enter private property with the owner's consent in the event of foreign hostilities near the border. California has no authority to require private citizens to obstruct the United States in any of these circumstances.

[5] The State suggests the Court should look only to provisions of 8 U.S.C. § 1324a, but courts "examine the federal statute as a whole[,] identifying its purpose and intended effect," *Arizona*, 567 U.S. at 400. The INA establishes that federal officials enforcing criminal or civil immigration provisions need not procure a judicial warrant before seeking to enter a place of employment for immigration enforcement purposes and permit "officers [to be] lawfully present pursuant to *consent* or a warrant." 8 U.S.C. § 1357(e) (emphasis added); *see id.* § 1357(a)(1); *see also I.N.S. v. Delgado*, 466 U.S. 210, 211-12 (1984).

by which the federal statute was designed to reach its goal." *Id.* at 1236. AB 450 cannot be squared with this decision.

California also fundamentally misunderstands principles of intergovernmental immunity. California does not dispute that "the States may not directly obstruct the activities of the Federal Government." *Arcata*, 629 F.3d at 991 (quoting *North Dakota*, 495 U.S. at 437-38). The crux of the State's argument is that "AB 450 does not regulate federal immigration enforcement officials," but instead operates only against employers. Br. 28. But as California fails to acknowledge, "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *North Dakota*, 495 U.S. at 438.

No more availing is California's assertion that "AB 450 does not single out any particular federal entity or federal contractors; rather, its neutral terms apply generally to employers, and any person or entity seeking to enforce the civil immigration laws, whether federal, state, or local." Br. 29. That the statute does not single out certain officials, contractors, or employers has no bearing on the inquiry; the statute's breadth only underscores the extent of harm cause by its singling out the United States and enforcement of federal immigration law, by providing employees greater privacy protection from law enforcement in that sphere than in all other spheres.

**B. California's exclusive inspection and review scheme for federal facilities (AB 103) is impermissible.**

AB 103 establishes an inspection and review scheme applicable only to "county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov. Code § 12532(a). In seeking to defend this provision, the State seemingly treats the inspection regime as one applicable to all facilities across the board, scarcely acknowledging that the policy in fact singles out for inspection facilities that house federal immigration detainees, separate and apart from the inspections generally applicable to "local detention facilities" codified at Cal. Pen. Code §§ 6031.1-4. For instance, the State urges that the statute "simply directs the Attorney General to review and report on the conditions of confinement faced by residents of the State." Br. 30. But on its face, the provision is not a neutral one directed at "residents of the State"; instead, it singles out those individuals "housed or detained for purposes of civil

immigration proceedings." *Id.* § 12532(a). That discriminatory treatment of federal immigration regulation alone dooms the provision.

But California did not stop here. The California Attorney General is directed not only to report on "conditions of confinement," but also to review the circumstances of an alien's "apprehension" and "transfer," and the "due process" afforded him. Cal. Gov. Code § 12532(b). California barely refers to these provisions in its brief, presumably because it recognizes that they are independently indefensible and because they underscore that AB 103 is not a neutral inspection scheme that incidentally affects facilities housing federal detainees. Although California asserts that the contracts between the detention facilities and the Federal Government acknowledge the State's authority to apply certain neutral state laws to detention facilities (Br. 31), it cites no language that could plausibly justify a state inspection of the circumstances of an alien's apprehension or transfer. *See* Documents Filed Under Seal 31-35.

As to the facilities themselves, the State contends that singling out facilities housing federal detainees is permissible because the additional burdens imposed by the inspections are not sufficiently significant to raise constitutional concerns. But the State cites no relevant authority for that proposition. And it cites no instance in which a court has upheld a law that creates a unique regime for facilities that contract with the United States, regardless of the level of burden involved, let alone where the issues being reviewed are a matter of exclusively federal concern. What is more, California disregards the plain terms of the statute, which require that state officials "be provided all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but not limited to, access to detainees, officials, personnel, and records." Cal. Gov. Code § 12532(c). The inspection and review conducted by the California Attorney General are not the equivalent of a journalist investigating and writing a report based on publicly available information. Instead, Section 12532(c) compels facilities to participate in the inspection process, which diverts scarce resources from other important law enforcement tasks. *See* Homan Decl. (ECF 46-2) ¶¶ 58-60.

In addition, as discussed in our motion, the publication of the Attorney General's report and the requirement that facilities divulge confidential detainee information violate federal privacy protections for detainees. *See* 8 C.F.R. § 236.6; Br. 22. California's assertion that "much if not all" of

the confidential information would not be subject to disclosure under state law does not eliminate the conflict between AB 103 and 8 C.F.R. § 236.6. AB 103's purported mandate that local facilities acting on behalf of the United States provide the California Attorney General "access to detainees, officials, personnel, and records," cannot be reconciled with § 236.6's prohibition on disclosure of information other than as permitted by "provisions of applicable federal laws, regulations and executive orders."[6] Indeed, the federal regulation was adopted to "guarantee[] that information regarding federal detainees will be released under a uniform federal scheme rather than the varying laws of fifty states." 68 Fed. Reg. 4364, 4366 (Jan. 29, 2003).

Equally unavailing is California's defense of AB 103 from the intergovernmental immunity doctrine. AB 103 plainly discriminates against facilities holding federal immigration detainees because it applies only to such facilities and mandates inspections and public reports on the "apprehension" and "transfer" of detainees and the "due process" afforded to them, which are not mandated at other detention facilities. *Compare* Cal. Gov. Code § 12532(b) *with* Cal. Penal Code §§ 6030, 6031.1. AB 103 thus runs afoul of the principle, recognized in *Boeing Co. v. Movassaghi*, that a private contractor "cannot be subjected to discriminatory regulations because it contracted with the federal government." 768 F.3d 832, 842 (9th Cir. 2014). California purports to distinguish the state enactment at issue in *Boeing* as one having a more profound effect on the United States' operations than AB 103, Br. 32, but the Ninth Circuit's determination that the state enactment there impermissibly discriminated against the United States' contractor did not depend on the extent of the regulation.

California's reliance on *North Dakota v. United States*, 495 U.S. 423 (1990), and *In re Natl. Sec. Agency Telecom. Records Litig.*, 633 F. Supp. 2d 892 (N.D. Cal. 2007), is similarly misplaced. Br. 31-32. In *North Dakota*, state law generally required liquor retailers to purchase liquor from in-state wholesalers, but provided an exception for the United States, allowing it to purchase liquor from out-of-state wholesalers as long as those wholesalers complied with certain labeling and reporting regulations. 495 U.S. at 439. Emphasizing that state law singled out the United States only insofar as it provided additional options unavailable to private persons, the Court concluded that "[a] regulatory regime which so favors the Federal Government cannot be considered to discriminate against it." *Id.* At the

---

[6] This includes privacy policies, which, contrary to California's claims, remain in effect. *See* Homan Dep., (Ex. C) 68:1-69:5.

same time, the Court reiterated the broad prohibition against actual instances of state discrimination against either the United States or its contractors: "Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State." *Id.* AB 103 plainly runs afoul of this principle.

*In re National Security Agency* involved state laws that had authorized investigation into telecommunication carriers' alleged unauthorized disclosure of customer telephone records to the National Security Agency. The district court held that the state enactments did not discriminate against the United States because they "regulate equally all public utilities, making no distinction based on the government's involvement" and "treat any unauthorized disclosure the same." 633 F. Supp. 2d at 904. Here, by contrast, California does not rely on the generally applicable law regulating conditions of confinement in "local detention facilities," Cal. Pen. Code §§ 6030, 6031.1, to inspect facilities holding federal immigration detainees. Br. 32. Instead, California enacted AB 103, which applies solely to such facilities and mandates inspection of issues beyond the conditions of confinement. *See* Cal. Gov. Code § 12532(b). Thus, even assuming *In re National Security Agency* was correctly decided on its own terms, it does not assist California here.

## C. California's restrictions on local and state cooperation with federal efforts to detain aliens subject to removal proceedings (SB 54) are impermissible.

1. As the state acknowledges, the California Legislature enacted SB 54 in response to "changes in federal immigration policy." Br. 3. In particular, SB 54 was enacted for the purpose of creating a "counterbalance to this administration" on immigration matters, *see* Hearing on S.B. 54 before the S. Standing Comm. On Public Safety (Jan. 31, 2017) (Ex. D) (statement of Sen. Scott Wiener), and to require state and local actions on immigration "separate from that of the federal government," Senate Floor Hearing (Apr. 3, 2017) (statement of President Pro Tempore De León) (Ex. E). In other words, the express aim of the legislation is to impair the enforcement of federal immigration law. To that end, new Section 7284.6 prohibits state and local officials, with certain exceptions, from "[p]roviding

information regarding a person's release date or responding to requests for notification by providing release dates or other information," Cal Gov. Code § 7284.6(a)(1)(C); providing "personal information," including an individual's home address or work address, id. § 7284.6(a)(1)(D); and "[t]ransfer[ring] an individual to immigration authorities," id. § 7284.6(a)(4).

There is no doubt that SB 54, like the other provisions at issue, furthers the State's acknowledged goals of impeding the administration of federal immigration laws. *See* Hearing on S.B. 54, *supra*; Br. 3 (conceding SB 54 responds to "changes in federal immigration policy"). California's defense of this provision echoes its themes in seeking to justify the State's other efforts to impair the effective enforcement of the immigration laws. California's lead argument is premised on its mistaken suggestion that state enactments related to immigration are lawful so long as they do not run afoul of 8 U.S.C. § 1373, which the State characterizes as a "floor with narrow limitations," or *Arizona v. United States*, which the State characterizes as a "ceiling." Br. 19. A single statute governing a narrow subject and a single Supreme Court decision do not provide the only limitations on state efforts to frustrate federal immigration law. There is no basis for the state's apparent view that it can take any action to obstruct federal immigration enforcement other than those actions expressly preempted by § 1373.

The State next argues that the impediments created by SB 54 do not entirely frustrate the enforcement of the immigration laws. Thus the State declares that "failing to arrest a person promptly after release from custody does not affect the ability of immigration authorities to proceed with deportation proceedings once that person is arrested by immigration authorities." Br. 20. But, as *Crosby*, *Garamendi*, and *Gould* illustrate, a state enactment is preempted when it creates an "obstacle to the accomplishment and execution" of federal law; it need not completely nullify the application of federal law. *E.g., Crosby,* 530 U.S. at 373; *see Gould*, 475 U.S. at 288–89 (finding obstacle even if state enactment merely "incrementally diminishes the [Federal Government]'s control over enforcement").

That a state law specifically aims 'just' to make federal officers less safe and less effective, instead of to completely and utterly frustrate their duties, is hardly a defense. Thus, the Arizona law imposing penalties on unauthorized aliens seeking employment was held to be an impermissible obstacle to the effectuation of the immigration laws even though it in no sense frustrated the United States' ability to deport removable aliens and, in Arizona's view, would enhance its enforcement

efforts. *See Arizona*, 567 U.S. at 403-07. Here, SB 54's purpose and effect are much starker: to make it more difficult to enforce federal law by making it far more burdensome to take unauthorized aliens into federal custody, thus creating new dangers if officers must effect an arrest once the alien has already returned to the community. Homan Decl. ¶¶ 36-41; Hutchens Decl. (Ex. F) ¶¶ 6-7 (SB 54 has forced Orange County to release hundreds of criminal aliens, including violent offenders and public safety threats); Youngblood Decl. ¶ 4 (Ex. U) (explaining that SB 54 "creates public safety concerns because it . . . requires the KCSO to release aliens arrested for crimes from KCSO custody into the community"); *County jails released 349 people wanted by ICE since 'sanctuary law' started*, SAN DIEGO UNION-TRIBUNE (May 28, 2018) (Ex. G) (as of April 15, 2018, SB 54 has forced San Diego County to release 349 of 605 criminal arrestees subject to ICE detainers).[7]

Next, the State incredibly urges that the impact on federal enforcement of being unable "to arrest a person promptly after release from custody" simply doesn't matter: "[t]o the extent that this makes immigration authorities' job more difficult, that is not a ground for preemption." Br. 20. Putting aside California's shocking indifference to the safety of law enforcement officers and the public, making the enforcement of federal law more difficult implicates obstacle preemption in the most direct fashion. It is precisely when a state enactment "makes immigration authorities' job more difficult," *id.*, that the enactment is preempted by federal law. This is particularly true when that is the only purpose of the law.

Tellingly, California makes virtually no attempt to come to grips with the relationship of the federal and state law enforcement schemes discussed in our motion. The United States carefully regulates the detention and removal of individuals who violate the nation's immigration laws. The statutory scheme permits states to interpose themselves into that regulatory scheme only in a limited way: states may vindicate their law enforcement interests by imprisoning criminal aliens for violation of state laws, thereby delaying their potential removal by federal authorities, so long as the states do not subsequently interfere with the detention and removal of the aliens upon their release. The INA provides that the United States "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4); *see id.* § 1231(a)(4)(B) (permitting earlier

---

[7] http://www.sandiegouniontribune.com/news/immigration/sd-me-sanctuary-laws-20180525-story.html.

removal in certain circumstances when the State agrees it is in the "best interest of the State"). The INA presumes that—at an absolute minimum—states will not abuse this arrangement by preventing the United States from learning the release date of removable aliens. On the contrary, the INA provides that an alien's release date from state criminal custody will trigger a 90-day period in which to execute removal. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) (removal period "begins on . . . the date the alien is released from [state criminal] detention"). Detention during this "removal period" is mandatory for aliens with a qualifying criminal history, among others. *See* 8 U.S.C. § 1231(a)(2), (a)(6). Likewise, as to aliens in removal proceedings but not yet subject to a final order of removal, the INA directs DHS to take criminal aliens into mandatory detention during removal proceedings "when the alien is released" from state criminal custody, 8 U.S.C. § 1226(c)(1), and authorizes it to take other aliens into custody, subject to bond review by immigration courts. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018) (explaining that in some circumstances Congress authorized federal officials to determine whether an alien should be subject to detention, and in others, Congress mandated that aliens be taken into federal custody when they are released from state or local custody).

This statutory scheme cannot work if a state can forbid local officials from answering a question regarding an alien's release date, or if a state official can take other measures to frustrate the lawful and orderly apprehension and removal of criminal aliens. But on California's theory, a State may seek to make it as difficult as possible for the United States to take custody of a removable alien immediately on release from state custody. For example, if federal officials manage to learn of an alien's release date, SB 54 prohibits transfers of custody within secure areas of local jails. Thus, even if they can ascertain a release date despite California's obstruction of the sharing of release dates, federal officers cannot obtain custody through a peaceful and secure transfer that requires minimal effort by federal officials and no further effort by state officers. Instead, federal officers must stake out a jail and seek to make a public arrest. Homan Dec. ¶ 30; Hoffman Dep. 82:2-15 (Ex. H). Indeed, under California's theory, the State would have authority to instruct the jail to release aliens through a variety of entrances to make the United States' task even more difficult, or even impede the Federal Government's efforts to obtain custody of persons wanted by federal law enforcement for criminal offenses. It is axiomatic that the United States' ability to safely and effectively enforce federal law may

not "be obscured by state or local action" in this fashion. *See Crosby*, 530 U.S. at 381.[8]

What is more, California does not even attempt to explain how it could be permissible under the INA for a state to demand a judicial warrant before allowing federal officials to take custody of aliens who are scheduled to be released from state custody. Cal. Gov. Code. § 7284.6(a)(4). Congress expressly provided the Attorney General with authority to issue administrative warrants that authorize federal officers to detain aliens. 8 U.S.C. § 1226(a). Accordingly, California has no authority to direct its officials to ignore these warrants, and to demand a judicial warrant that Congress chose not to require. California provides no response to this point (discussed in our motion at 30-31). Nor does California respond to our argument that SB 54 obstructs the United States' ability to take custody of criminal aliens as required by Congress.[9]

California's reliance on provisions of the INA that provide discretion to states and localities only underscores the error of its analysis. Under 8 U.S.C. § 1252c, for example, state and local officers have authority, "to the extent permitted by relevant State and local law . . . to arrest and detain" certain unlawfully present aliens. 8 U.S.C. § 1252c(a). Under 8 U.S.C. § 1324a, states have authority to impose sanctions on employers who hire unauthorized workers so long as those sanctions take the form of a "licensing law." *See Chamber of Commerce of the U.S. v. Whiting*, 563 U.S. 582 (2011). These provisions authorize state and local officers to take an active role in certain aspects of enforcing federal immigration laws, and states and localities can exercise that authority, or decline to exercise it, as they see fit. But the INA does not authorize states and localities to take affirmative action to take criminal

---

[8] California's reliance on *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) is misplaced, as that case merely held that the Attorney General lacked statutory authority to condition federal grant funds on certain immigration cooperation, and did not address in any way the United States' preemption argument presented here.

[9] SB 54 is circular and confusing in the crimes covered, which is likely to lead to noncooperation by local officers to avoid violating SB 54. The law does include an exception for individuals previously convicted of certain aggravated felonies as defined in federal law (*see* Cal. Gov. Code § 7285.5(a)(5)), but excludes other aggravated felonies where mandatory detention is required. *See id.* (not including aggravated felonies listed in 8 U.S.C. § 1101(a)(43)(Q) to (U)); 8 U.S.C. § 1226(c)(1)(B) (requiring detention for aliens who commit aggravated felonies)). That includes bribery, obstruction of justice, and failure to appear before a court for felony charges, as well as all attempt offenses such as attempted murder, rape, child pornography, drug and firearms trafficking, money laundering, and explosives offenses. 8 U.S.C. § 1101(a)(42)(U). SB 54 also excludes other crimes and actions where mandatory detention is required, including terrorism crimes or activities, 8 U.S.C. §§ 1182(a)(3)(B); crimes involving moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I); certain controlled substance offenses, 8 U.S.C. § 1227(a)(2)(B)(i); and crimes where a sentence of one year or longer has been imposed, 8 U.S.C. § 1227(a)(2)(i)(II). SB 54 also does not generally except crimes committed in other states, so that if one of the crimes listed in § 7282.5(a)(3) was committed in a different state—such as certain sex crimes against minors—cooperation would be barred. SB 54 does not allow cooperation prior to a conviction for most of the crimes where there are exceptions, and bars transfer even where a state magistrate has determined that probable cause exists that an alien committed a serious or violent felony under California law. *See* Cal Gov. Code § 7285(b).

aliens into custody for their own law enforcement purposes, only to later obstruct the apprehension and transfer of those aliens to the United States for vindication of federal law enforcement purposes. While states have no obligation to extend periods of state or local custody to accommodate federal immigration officers, state or local incarceration may not be used to impede the ability of federal officials to detain aliens as federal law requires, or to frustrate those officials' reliance on the enforcement tools Congress has authorized or even mandated they use. *See* 8 U.S.C. §§ 1225(b), 1226(c), 1231(a). That is the careful balance struck by the INA, which respects both state and federal law enforcement interests; SB 54 severely upends that balance.

2. The State's argument that SB 54 "does not single out federal immigration authorities, but applies to interactions with any federal, state, or local [entity] performing immigration enforcement functions" fails. Only federal officers, or those deputized by federal law, can perform immigration enforcement functions, 8 U.S.C. §§ 1357(a), (g)(1), and the statute is thus impermissibly limited to persons who deal with the federal government. *See North Dakota*, 495 U.S. at 438. It is irrelevant that SB 54 allows the sharing of certain information that is otherwise available to the public, Br. 23; the relevant point is that as to information that is not publicly available, SB 54 does not impose any restriction except as to persons who are trying to enforce federal immigration law. SB 54 thus cannot be analogized to a generally applicable privacy law,[10] but instead is directed only at "federal immigration officials." *See City of New York*, 179 F.3d at 36–37. California's claim that DHS "is devoting additional enforcement resources to the State because of SB 54," Br. 24, only underscores the point: but for SB 54's discriminatory treatment of the United States and those with whom it deals, it would not need to devote additional resources to the State.

3. Although SB 54 would be preempted by the INA even if Congress had not enacted 8 U.S.C. § 1373, that statute's express preemption provision underscores the importance of responding to federal inquiries regarding when an alien will be released from state or local custody, which is crucial to the Federal Government's authority—or, in some cases, obligation—to detain the alien. A state law

---

[10] Regardless, California's purported "strong interests [] in preserving the confidentiality" of such information, Br. 17, are empty where SB 54 permits a locality to establish a policy of providing such information to the public, Cal. Gov. Code § 7284.6(a)(1)(C), (D), and California now reads that provision to permit localities to publicly share such information in response to "requests from [*any*] members of the public," showing that the State lacks any confidentiality interest in this information. California Interrogatory Response, at 14-15 (Ex. I) (emphasis added)

designed to hide from federal officials the precise information that they need in order to carry out federal immigration law impermissibly limits the ability of state and local officers to share "information regarding . . . immigration status." 8 U.S.C. § 1373(a). That phrase does not merely denote an alien's technical immigration status (as California has argued), a reading that disregards the phrase "information regarding" and the interrelationship between state custody and federal obligations. *See Lamar, Archer & Cofrin, LLP v. Appling*, No. 16-1215, slip op. at 5-9 (S. Ct. Apr. 17, 2018) (holding that words like "regarding" should be read expansively).

Until the enactment of SB 54, California forthrightly recognized that prohibiting local officers from providing information necessary to allow the United States to carry out its immigration-enforcement functions would run afoul of § 1373 and violate the Supremacy Clause. In 2014, Attorney General Harris, in a formal opinion, explained that "law enforcement officials may provide information to ICE, including notification of the date that an individual will be released," and that "[f]ederal law provides that state and local governments may not be prohibited from providing information to or receiving information from ICE." *Information Bulletin No. 14-01, supra* (citing 8 U.S.C. §§ 1373, 1644); *see* 75 Cal. Op. Att'y Gen. at 278 (concluding, before § 1373 existed, that under the Supremacy Clause governments "may not prohibit its officers and employees from cooperating in their official capacities with [federal] investigation, detention, or arrest procedures relating to" enforcement "of the federal immigration laws"). According to California's Attorney General, a signatory of the State's brief, these formal AG opinions are to be "accorded 'great respect' and 'great weight' by the courts."[11] The United States agrees: the state's plain reading of federal law was correct in 2014 when Attorney General Harris opined, and remains correct today, even if the State legislature thinks otherwise. *See, e.g., New York*, 179 F.3d at 35-36; *Friendly House v. Napolitano*, No. 04-649, ECF 59 at 13 (D. Ariz. Dec. 22, 2004); *Sturgeon v. Bratton*, 174 Cal. App. 4th 1407, 1423 (2009).[12]

California asserts that its enactment "cannot conflict with § 1373(a) on its face because of SB 54's explicit savings clause, which expressly authorizes compliance with all aspects of 8 U.S.C. § 1373."

---

[11] http://ag.ca.gov/opinions/faqs.php (Ex. Y) (quoting *Thorning v. Hollister School Dist.*, 11 Cal. App. 4th 1598, 1604 (1992) and *Napa Valley Educators' Assn. v. Napa Valley Unified School Dist.* 194 Cal. App. 3rd 243, 251 (1987)).

[12] California's reliance on *Steinle v. City & County of San Francisco*, 230 F. Supp. 994 (N.D. Cal.), *appeal docketed*, No. 17-16283 (9th Cir. June 21, 2017), is misplaced. The district court in that case, discussing § 1373 in the context of dismissing a tort claim brought against San Francisco, did not address the arguments presented here.

Br. 11. But California does not read the "savings clause" to authorize its officers to provide release dates to federal officials as needed, which would render its own statute a nullity. Ex. I at 6-21. California cannot insulate prohibitions that on their face contravene § 1373 by merely declaring that the prohibitions do not violate it. And even if the statute's scope is limited to some degree by the savings clause, the relevant inquiry relates to the statute's actual application, not to circumstances in which it has no effect. *See City of L.A. v. Patel*, 135 S. Ct. 2443, 2451 (2015).

California is on no firmer ground in asserting that its obstruction of federal law enforcement should be sustained because of the state's concern about "law enforcement's ability to work with the State's large immigrant communities." Br. 12. As noted, the State's policy objectives, separate from its stated purpose of impeding immigration enforcement efforts, are not relevant to the preemption inquiry; it is the intent of Congress that matters. Even on its own terms, moreover, the State's argument is unpersuasive. *Compare, e.g.*, Alikhan Decl. (ECF 74-2) ¶¶ 6-8, *with* Hutchens Decl. ¶¶ 12-16. For example, the State notes that is has enacted prohibitions on certain misdemeanor arrests and restrictions on initiating actions seeking to discover immigration status. *See id.* But the provisions at issue here concern only the United States' ability to carry out the congressional scheme authorizing federal detention of certain aliens who have already been placed in local criminal custody.

4. California's invocation of the Tenth Amendment seeks to unravel the scheme of cooperative federalism that Congress devised. In advancing its preemption argument, the United States is not requiring California to regulate a particular activity, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. NCAA*, 138 S. Ct. 1461 (May 14, 2018), or to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898, 918 (1997). Instead, the federal government is seeking to regulate individuals and to access information necessary to that regulation. It has long been uncontroversial that the Federal Government may access information in the hands of state and local government officials in furtherance of federal regulation of individuals. The issue here is whether a State law can impair the Federal Government's enforcement of federal law by enacting policies that bar disclosure of the information Congress believed to be critical to federal regulation. The Constitution's system of dual sovereignty ensures that it may not.

This case cannot properly be analogized to *Murphy*. The statute at issue in *Murphy*—the

Professional Amateur Sports Protection Act of 1992 ("PASPA")—makes it "unlawful" for States to authorize any "betting, gambling, or wagering scheme based . . . on competitive sporting events." 138 S. Ct. at 1470. That Court found PASPA was a clear effort to avoid accountability by requiring the States themselves to regulate sports betting in the manner Congress wished. *See id.* at 1477. Section 1373, on the other hand, is an information-access component of a regulatory scheme—immigration removal—over which the Federal Government retains full responsibility and accountability for its actions.

In *Murphy*, the Supreme Court emphasized that the Federal Government did "not impose any federal restrictions on private actors," but instead sought to require the States to do so. *Id.* at 1481. But there can be no dispute that the INA—including the information gathering protected by Section 1373—is exclusively concerned with regulating private actors, namely aliens in the country in violation of federal law. And the information that is subject to Section 1373 is information regarding those private actors that is needed for DHS to perform its regulatory function against the private actors.

The fact that information needed to carry out this federal regulation of private actors is in the hands of a state or local government does not immunize it, under the Tenth Amendment, from being accessed by the federal government when necessary for federal enforcement or regulation. The Court's key Tenth Amendment cases reflect the different considerations that apply when the federal government needs to access information to perform its functions, and *Murphy*—which has nothing to do with information access—does not disturb this analysis or the basic principles that underlie it. As the Supreme Court has recognized, the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases." *Reno v. Condon*, 528 U.S. 141, 151 (2000). Thus, the Supreme Court held that a provision that "restricts the States' ability to disclose a driver's personal information without the driver's consent," *id.* at 144, was consistent with the Tenth Amendment even if the regulation would "require time and effort on the part of state employees," or the State had acquired the relevant information in its capacity as a regulator of drivers. *Id.* at 150. Similarly, the Court in *Printz* recognized that statutes "which require provision of information to the Federal Government[] do not involve . . . the forced participation of the States' executive in the actual administration of a federal

program." *Printz*, 521 U.S. at 918. Justice O'Connor further explained that Tenth Amendment jurisprudence is not properly read to invalidate information sharing requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).[13]

And it would be an extraordinary departure from historical practice to immunize states from this responsibility to provide information relevant to the federal regulation of individuals. Instead, Congress frequently calls on states to share relevant information, and these enactments have never been drawn into question.[14] It makes sense that information access works differently—for example, in a different context, it is not controversial that courts have the authority to obtain information relevant to the controversies before them, that this authority may extend to state officials, and that this is not treated as a regulation of those officials. *See* Judiciary Act of 1789, § 13, 15 (providing that "all . . . said courts . . . shall have the power . . . to require the parties to produce books or writings in their possession or power"); *cf. In re Special April 1977 Grand Jury (Scott)*, 581 F.2d 589, 592 (7th Cir. 1978) ("[n]othing in the United States Constitution immunizes any exclusive domain of the state . . . from the reach of a federal grand jury"); *In re Cohen*, 62 F.2d 249, 251 (2d Cir. 1932) (similar).  This is also true with respect to administrative processes that require information in state hands. *See In re Tax Liabilities of Does*, No. 2:10-MC-00130-MCE, 2011 WL 6302284, at *4 (E.D. Cal. Dec. 15, 2011) ("If the Tenth Amendment cannot bar a grand jury subpoena, it cannot bar an IRS summons"). These

---

[13] Reporting requirements like these merely require states to report information they already have in their possession. *See, e.g.*, *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *United States v. Brown*, No. 07-485, 2007 WL 4372829 at *6 (S.D.N.Y. Dec. 12, 2007), *aff'd* 328 F. App'x. 57 (2d Cir. 2009). Release dates and times, and work and home addresses, are precisely such information. *See* Cal. Gov. Code § 6254(f)(1) (requiring maintenance and disclosure of information concerning "the time and manner of release" of "every individual arrested by the agency"); Dominic Dep. 32:18-24 (testifying state databases can include home and work addresses). That SB 54 carves out this information when it may be used for immigration enforcement, thereby discriminating against the United States, does nothing to alter the fact that State and local law enforcement already collect this information through "their own state administered regulatory programs," *Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001), *aff'd sub nom. Freilich*, 313 F.3d 205, which is at an end in any event at the point of release.

[14] *See, e.g.*, 15 U.S.C. § 2224(a)(1) (state public safety agencies must inform FEMA whether local hotels are in compliance with federal fire safety guidelines); 20 U.S.C. § 4013 (States must maintain records and report to the EPA regarding presence of asbestos in school buildings); 23 U.S.C. § 402(a) (state transportation authorities must provide traffic safety data to the Secretary of Transportation); 34 U.S.C. §§ 41307, 41308 (state law enforcement agencies must report every case of a missing child to the National Crime Information Center); 42 U.S.C. § 11133(b) (state medical boards must report all denials of staff privileges); 42 U.S.C. § 14072(g)(4) (state law enforcement must report known whereabouts of sex offenders to the FBI); 52 U.S.C. §§ 20701-06 (state election officers must provide certain voting records to the United States on demand); 54 Stat. 401 (1940) (providing for states to furnish information on goods produced in state prisons); 17 Stat. 466 (1873) (providing for Comptroller of Currency to obtain reports made by banks to state regulators).

cases involving subpoena authority raise different issues, but there is one important takeaway: obtaining information relevant to a regulatory function is not the same as regulating the party with that information, just as a court subpoena for information would never be thought of as regulation of the state qua state.  Here, Section 1373 protects access to information that is essential to the regulation of aliens and to initiating the removal process involving aliens. *See* 8 U.S.C. §§ 1182, 1226, 1227, 1231, 1357.

Indeed, the analysis in *Murphy* likely would have been very different had the law at issue not sought to prevent States from regulating or authorizing sports betting, but instead merely required States to share information regarding sports betting operations to facilitate federal regulation or enforcement of individuals. *See, e.g.*, *Organized Crime Control Act of 1970*, Pub. L. No. 91-452, § 806, 84 Stat. 922, 939-40 (creating commission to evaluate national policy towards gambling, which was "authorized to call upon . . . States to furnish, on a reimbursable basis or otherwise, such statistical data, reports, and other information as the Commission deems necessary"). As we have explained, the Ninth Circuit readily found state law preempted when it interfered with the United States' ability to obtain information from a state agency in furtherance of the enforcement of federal law. *See Or. Prescr. Drug*, 860 F.3d at 1236. California's position on SB 54 cannot be squared with this reasoning.

The dispositive point in these circumstances is that the United States is not "seeking to control or influence the manner in which States regulate private parties." *Id.* at 150; *see also Murphy*, 138 S. Ct. at 1479 (provision at issue in *Reno v. Condon* "did not regulate the States' sovereign authority to regulate their own citizens"). Instead, Section 1373 ensures that the Federal Government has the information it needs to "regulate individuals, not States." *Murphy*, 138 S. Ct. at 1479 (quotation omitted).

California nevertheless seeks to analogize the question here to that at issue in *Murphy*, urging that the statute cannot validly preempt state law because it is phrased as "a prohibition on 'state' or 'local governmental entit[ies] or official[s],'" Supp. Br. 2 (alterations in original). But the Supreme Court specifically rejected the relevance of this formulation, explaining that "it is a mistake to be confused by the way in which a preemption provision is phrased." *Id.* at 1480. The Court noted, for example, that it had upheld a provision stating that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of

law relating to rates, routes, or services of any [covered] air carrier." *Id.* (quoting 49 U.S.C. App. § 1305(a)(1) (1988 ed.)) (alterations in original).[15] Just as that provision formed a part of a permissible scheme regulating air carriers, 8 U.S.C. § 1373 forms part of a permissible scheme regulating aliens. Only by divorcing § 1373 from its context can it be analogized to a provision that dictates what state legislatures may do. *See Philadelphia v. Sessions*, No. 17-3894 (E.D. Pa. June 6, 2018), slip op. at 62 (making this analytical error).[16] Section 1373 simply underscores what §§ 1226 and 1231 already establish—states and localities may not use their custody of aliens subject to removal proceedings to impair the enforcement of federal law.

It is also no answer to contend that Section 1373 is problematic because the information sharing responsibilities it addresses apply only to state and local officials rather than more generally. *See Murphy*, 138 S. Ct. at 1478 (observing that "anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage"). As we have explained, the regulated activity here is the actions of private actors, not states, and providing special rules for access to information relevant to that private activity that address the types of information those actors might have does not constitute regulation of state or local government. For example, the INA has special information sharing and registration rules for employers, 8 U.S.C. § 1324a(b)(3), and for aliens in the country and their family members. *See* 8 U.S.C. §§ 1304-05.[17] This is

---

[15] Numerous other federal enactments work the same way. *E.g.*, 12 U.S.C. § 4122 (Housing and Community Development Act); 15 U.S.C. § 391 (Tax Reform Act of 1976); 15 U.S.C. § 1392(d) (Motor Vehicle Safety Act); 15 U.S.C. 6733(b) (Gramm-Leach-Bliley Financial Modernization Act); 42 U.S.C. § 7543(a) (Clean Air Act); 47 U.S.C. § 332(c)(3)(A) (Telecommunications Act of 1996); 49 U.S.C. § 14501 (Federal Aviation Administration Authorization Act of 1994).

[16] *Philadelphia* did not discuss, let alone address, any of the various provisions of the INA regulating aliens as individuals, or any of the other federal statutes on the books that preempt any state interference with federal regulation of private individuals. *See* Note 15, *supra*. Indeed, *Philadelphia* addressed none of the arguments raised by the United States here, and failed to acknowledge that *Murphy* expressly upheld the validity of express federal preemption provisions that prohibit actions by "state[s] or political subdivision[]" where those actions interfere with federal regulation of private actors. *See* slip op. 62 n.62 (erroneously distinguishing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) on the mistaken view that section 1373 is not an express preemption provision).

[17] The INA is replete with provisions requiring aliens to share such information under penalty of perjury with the United States, to carry proof of having furnished such information, establishing criminal penalties for failing to do so, and permitting DHS to subpoena such information. *See* 8 U.S.C. §§ 1201(b), 1221(c)(9), 1225(d), 1229(a)(1)(F), 1302(a), 1303, 1304(d), (e), 1305(a), 1306, 1357(f). And the INA criminalizes entry at places other than ports of entry, *id.* §§ 1324-27, in part because such entry thwarts the registration and admission procedures that allow the United States to know the *whereabouts* of such aliens, *see, e.g.*, *United States v. Campos-Serrano*, 404 U.S. 293, 299-300 (1971), a central and necessary feature of the INA so that the United States may take custody of and remove aliens who have violated the terms of their admission to or presence in this Country. *See* 8 U.S.C. §§ 1103(a)(3), 1184(a)(1), 1225(b), 1226, 1231, 1357. Section 1373 is thus but one of many similar provisions in the INA whose purpose is to ensure that the United States is able to confirm who is in its sovereign territory, and to take custody of those that have violated the terms of their admission for removal

a recognition that different types of entities are likely to have different information regarding the regulated individuals. States and localities are uniquely positioned to have the types of information addressed by Section 1373—for example, the home addresses and release dates of individuals in state criminal custody, where there is no private analogue. *See Murphy*, 138 S. Ct. at 1478-79 (approving *Reno*'s holding that driver's license information may be regulated, even though such information is most likely to be in the possession of state government actors). Further, Congress added section 1373 to the INA in 1996, in response to certain localities prohibiting the sharing of information relevant to federal enforcement responsibilities. *See City of New York*, 179 F.3d at 32. As Congress explained, "illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Conf. Rep. No. 104–725, at 383 (1996). "[I]nformation regarding the presence, whereabouts, or activities of illegal aliens," *id.*, and "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is . . . of considerable assistance to . . . achieving of the purposes and objectives of the [INA]." S. Rep. No. 104–249, at 19-20 (2d Sess. 1996).[18] It is not commandeering for Congress to address an information-sharing problem that specifically arose with respect to the actions of state and local governments.

Preempting state laws inhibiting the sharing of information regarding immigration status does not require States to participate in federal immigration enforcement. Congress could have authorized the federal government to take custody of aliens immediately, without regard to the status of state criminal enforcement. Congress did not go so far. Instead, mindful of "cooperative federalism" concerns, the INA allows States to take temporary custody of aliens potentially subject to removal so that they can first vindicate their own law enforcement interests. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-91 (1981). But if a State elects to take temporary custody for its

---

proceedings. *See, e.g.*, *Hines*, 312 U.S. at 73–74 ("the Nation [is] in need of the type of information to be secured"); *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (national sovereignty includes "the right to terminate hospitality to aliens").

[18] That is why Congress used the phrase "information regarding" in sections 1373(a) and (b), but not (c). Section 1373(c) establishes DHS's information sharing obligations vis-à-vis the States. DHS will generally already know the immigration status of an alien *lawfully* admitted and properly registered (including updating that registration) pursuant to §§ 1301-06. But it does not know the status of individuals who have entered *illegally* because it is unaware they have so entered. Only states and localities who have arrested such individuals will then have "information regarding" these individuals that will allow DHS in turn to determine their presence, lawful or unlawful. *See Appling*, 2018 WL 2465174, at *5–6 ("[u]se of the word[s]" "regard" and "respecting" "in a legal context generally [have] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject"). But they will not themselves know (or even lawfully be able to determine) an alien's immigration status in a technical sense, which is the exclusive purview of the Federal government. *See, e.g.*, *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 535 (5th Cir. 2013).

own purposes, it cannot detain aliens in a way that interferes with the United States' ability to later take custody of them for removal. *See Printz*, 521 U.S. at 913 (explaining "the duty owed to the National Government, on the part of all state officials, to enact, enforce, and interpret state law in such fashion as not to obstruct the operation of federal law"). Where Congress could have authorized the Federal Government to take custody of aliens immediately, the INA "does not become constitutionally suspect simply because Congress chose to allow the States" to take custody of such aliens for criminal law enforcement purposes first. *Hodel*, 452 U.S. at 290-91. Instead, the INA, and section 1373, merely establish "requirements for continued state activity in an otherwise pre-emptible field," *F.E.R.C. v. Mississippi*, 456 U.S. 742, 769 (1982), with no "commandeer[ing]" concerns. *Hodel*, 452 U.S. at 288.[19]

California relies on *United States v. Morrison*, 529 U.S. 598, 599 (2000), but there is no serious question that Congress has both *enumerated* and *inherent sovereign* authority to regulate immigration, so Congress plainly acted within enumerated powers. *See, e.g.*, U.S. Const. art I, § 8, cl. 3, 4; *Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) ("[s]uch is the traditional power of the Nation over the alien"). There is thus no Tenth Amendment defense to the United States' preemption argument. *See Lopez v. U.S. I.N.S.,* 758 F.2d 1390, 1392 (10th Cir. 1985) (Congress may preempt State exercise of "police powers" consistent with Tenth Amendment if enacted pursuant to "Congress' plenary power over immigration"); *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307–08 (1st Cir. 2000) (same).

California advances no coherent theory of the Tenth Amendment that would entitle the State to thwart federal efforts to detain aliens. This case does not involve the State's efforts "to address crime and public safety" on its own behalf, Br. 16; rather, it concerns only the United States' ability to carry out federal immigration enforcement. The State has no constitutional authority to make it more difficult for immigration officers to carry out their lawful functions.

## II.   Irreparable Harm to the United States, The Balance of Harms, and the Public Interest Strongly Militate in Favor of Injunctive Relief.

---

[19] California concedes that "information regarding immigration status" may include an individual's "criminal history," or "personally identifiable information." Br. 3 ("SB 54 does not restrict an LEA from sharing criminal-history information"); *id.* 36 ("personally identifiable information" is available through state databases). They assert, however, that reading the INA to preempt State laws inhibiting the sharing of "release dates" would violate the Tenth Amendment. Br. 14-15. But the argument proves too much, as it would extend to immigration status itself, something California does not suggest the Tenth Amendment protects. *See e.g.*, *New York*, 179 F.3d at 35-36; *Chicago v. Sessions*, 264 F. Supp. 3d 933, 948 (N.D. Ill. 2017), *aff'd on other grounds*, 888 F.3d 272 (7th Cir. 2018).

1. The State has no response to the fact that as a matter of law the challenged provisions cause ongoing irreparable harm to the constitutional order. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989). Where the party invoking the Supremacy Clause is the United States, and it "[has shown it] is likely to prevail," the Court presumes that "the United States demonstrated that it face[s] irreparable harm." *See Arizona*, 641 F.3d at 366; *accord United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *accord Valle del Sol*, 732 F.3d at 1029; *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990).[20]

2. Regardless, the State has not rebutted the United States' strong showing of factual harm. AB 450 eliminates a critical enforcement tool—authorized by the INA—that DHS relies on to combat unauthorized employment of aliens and apprehend criminals, aliens unlawfully entering or re-entering between ports of entry, and aliens in flight, and impedes investigations into employer abuse, peonage, human smuggling and trafficking, and terrorism. Homan Decl. ¶¶ 84-88; Hoffman Decl. (ECF 46-4) ¶¶ 27, 28; Homan Dep. 48:24-49:13, 56:6-23.

California dismisses these concerns because they are based in part on ICE Director Tom Homan's "experience." Br. 37. But it is well-settled that "senior . . . officers' specific, predictive judgments" about how a decision "would reduce effectiveness" of an agency's activities or require an agency to "alter and adapt" its procedures to leave officers "more vulnerable" can satisfy a showing of harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 27, 28, 31 (2008). The question is not whether Mr. Homan has identified harms to enforcement personnel and efforts that have actually occurred, as at that time "it may be too late."[21] *Id.* at 31. Moreover, California's assertion that employer confusion

---

[20] The State argues that "delay in filing this motion undercuts" any harm. Br. 39. But suit was filed only shortly after SB 54 and AB 450 went into effect, and in any event the cases just cited articulate no exception to the *legal* presumption of harm based on any alleged delay. *See, e.g.*, *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 860 (D. Ariz. 2015) (finding *six-year* delay in filing lawsuit seeking to invalidate state action under Supremacy Clause did not mitigate ongoing, irreparable harm). Regardless, it is "prudent rather than dilatory" to build a "credible" factual case for preliminary relief before filing suit, particularly, where, as here, injuries occur "over a period of time and hav[e] a cumulative impact." *Arc of California v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014). The factual harms caused by AB 450, AB 103, and SB 54 are ongoing and increase daily with each criminal alien released and each at large arrest that must be attempted. *See, e.g.*, Homan Decl. ¶¶ 36-44; Hutchens Decl. ¶¶ 4-15.

[21] California incorrectly claims that "nothing precludes discussions with employers occurring in secluded areas or separate rooms." Br. 37. AB 450 prohibits an employer from taking ICE into "nonpublic areas" like separate rooms. Cal. Gov. Code § 7285.1(a). California is also wrong that the United States may not invoke the privacy interests of alien employees. *See, e.g.*, *See United States v. Miami Univ.*, 294 F.3d 797, 818 (6th Cir. 2002).

over whether they can cooperate with federal investigations is not a cognizable harm is simply wrong. The United States' declarants testified that AB 450 inhibits cooperation, Homan Decl. ¶ 84; Homan Dep. 38:19-40:9, and such chilling effects cause irreparable harm. *See Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 939 (9th Cir. 1987). California cannot both admit that AB 450's purpose is to shield the "more than 2.6 million undocumented immigrant[s]" residing in California from any "increase in workplace immigration enforcement," Committee on the Judiciary Report (Senate), July 10, 2017 (Ex. J), at 1, and assert that the Court should ignore Mr. Homan's predictive judgments about its intended impact on federal law enforcement.

AB 103 similarly has in fact caused, and continues to cause, harm by forcing federal contractors to permit additional inspections of their facilities, provide access to immigration detainees, and turn over sensitive information concerning detainees and immigration enforcement operations that violate federal confidentiality laws and policies and require contractors to devote scarce time and resources to responding to such inspection requests. This requires ICE and its contractors to re-allocate resources away from security and other mission-critical tasks to accommodate inspections. Homan Decl. ¶¶ 58-60, 65. California dismisses these concerns as speculative, but, again, an agency head's predictive judgments are entitled to deference. *Id.* ¶ 68. In any event, contractors *have* undergone inspections, and California seeks to inspect the remaining facilities. *See id.* ICE's contractors have thus been placed in the "untenable" position of complying with the inspections or breaching their federal contracts. *See* Peterson Decl., ECF 59-3, at ¶ 4 ("The Attorney General's review under AB 103 put the Sheriff in the untenable position of either (1) breaching the agreement with ICE, or (2) denying the Attorney General access to the jails and the immigration detainees.").

SB 54 fares no better. The United States has exhaustively, through evidence and the predictive judgments of senior agency officials, demonstrated that SB 54 "shield[s] from detection removable aliens detained in California prisons and jails and obstruct[s] ICE's efforts to take these aliens into custody for removal purposes," Homan Decl. ¶ 22, and forces ICE to attempt at-large arrests of removable criminal aliens that are far more dangerous and resource intensive. *Id.* ¶¶ 36-38; *see* Rocha Decl. (Ex. K) ¶¶ 11-12; Ziegler Decl. (Ex. T) ¶ 6.

California dismisses Mr. Homan's testimony that individuals previously arrested or convicted

of a crime are more likely to reoffend, thereby placing ICE officers at risk when they must apprehend them at large after California forces local law enforcement to release such criminals to the street. Br. 33-35. But that opinion is based on Mr. Homan's 34 years of experience, as well as the unrebutted fact that within three years of release, two out of three such individuals will reoffend, Homan Decl. ¶¶ 43, 46; *see* Hutchens Decl. ¶ 8 (explaining that 45 out of 341 criminal aliens SB 54 forced Orange County to release from January 1 to April 30, 2018, reoffended and were arrested and back in in Orange County custody during only a *four month span*); Alikhan Dep. (Ex. L) 97:21. Indeed, the most comprehensive dataset on recidivism echoes Mr. Homan's experience, showing that nearly 9 out of 10 such individuals commit new crimes at some point after release, California's blithe dismissal of the "possibility of violence," Br. 35, notwithstanding. *See* Office of Justice Programs, 2018 UPDATE ON PRISONER RECIDIVISM: A 9-YEAR FOLLOW-UP PERIOD (2005-2014) (Ex. M);[22] *accord* California Dept. of Corrections, 2017 OUTCOME EVALUATION REPORT at I (Ex. M) (finding nearly 50% of criminals release from California state prison are *convicted* of a new crime within three years).[23]

    California cites a study based on data from 2015 that purports to show that jurisdictions that do not cooperate with immigration enforcement have lower crime rates than jurisdictions that do, but the study did not analyze whether shielding aliens previously arrested or convicted of crimes from federal detection makes a community safer or ICE's efforts to arrest such aliens less dangerous. *See generally* Wong Decl. In any event, not only is it common sense that shielding such aliens allows them to commit more crimes endangering the officer and public safety, but it is the experience of sheriffs attempting to navigate SB 54. *See* Hutchens Decl. ¶¶ 7-8 (explaining that through April 30, 2018, SB 54 required Orange County to release 341 of 601 aliens with criminal arrests or convictions, nearly 50% of whom involved "violent crimes or serious crimes that present a public safety concern," 45 of whom were re-arrested by the County for, among other things, attempted murder (two), assault with a deadly weapon (four), spousal battery (five), and child abduction and sex crimes on a child (one)).

    California suggests SB 54 has not harmed the United States because nearly all local law enforcement did not cooperate with ICE prior to SB 54. Br. 34 (citing declaration of Dr. Wong

---

[22] https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf.
[23] https://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/2017-Outcome-Evaluation-Report.pdf.

asserting 53 of 58 counties did not cooperate with ICE as of 2015).[24] That claim is baseless. Homan Decl. ¶¶ 24, 27, 29; Rocha Decl. ¶ 11 (describing "decrease in apprehensions from local jails [of criminal aliens] resulting from lack of cooperation from state and local LEAs in the Los Angeles area"); Ziegler Decl. ¶ 6 (through June 3, 2018, San Diego has declined to notify ICE of a criminal alien releases more than 50% of the time); Jacques Decl. (Ex. V) ¶ 5-8 (describing changes in cooperation policies by five counties, with four ceasing cooperation outright, and one notifying ICE of release in only 12 of 205 cases as of June 2018). As their declarant concedes, "at least 22" California counties were confirmed as cooperating with ICE prior to adoption of SB 54, to say nothing of the hundreds of non-county law enforcement agencies in the State. Wong Dep. (Ex. O) 27:14-31:7.[25]

Likewise, the assertion that the United States is not harmed because it can obtain a removable criminal alien's personal information or release date and time from state databases is simply false. These databases contain no such information with respect to anyone who is not already exempt from SB 54's coverage. Dominic Dep. (Ex. P) 37:21-40:23, 42:16-43:5; Rocha Decl. ¶ 6; Jacques Decl. ¶ 9; Cal. Gov. Code § 7282.5(a)(1), (2), (4) (exempting each category of criminal whose information might be available on State databases from SB 54's coverage). Even for those aliens, the databases contain no information concerning prospective release dates and times, and no requirement that addresses be input at all, let alone in a remotely searchable manner, Dominic Dep., 54:4-23. 55:1-6, 55:11-56:1, 56:7-57:24, 62:22-63:2, 63:3-9, 68:10-23;[26] Rocha Decl. ¶ 8 ("there is no way to obtain a list of currently

---

[24] Dr. Wong's declaration and study rely on an extremely broad definition of "sanctuary"—namely, whether a jurisdiction has a policy that "delimits local cooperation with federal immigration enforcement officials," in any form. Wong Dep. 16:6-17. This definition qualifies as sanctuary jurisdictions, as of 2015, many jurisdictions that cooperated with ICE in significant ways, so long as there was a policy of not cooperating with ICE in *some* respect, however trivial. *Id.* 32:6-20. And the study is not a comprehensive tally of "sanctuary jurisdictions" in California as of the date SB 54 went into effect, nor indeed even at the time the study was completed. *Id.* 23:13-25:16, 31:14-20.

[25] California claims the United States "is unable to provide evidence" that "SB 54 has led to a decline in cooperation by local jurisdictions." Br. 34. That is false. Rocha Decl. ¶ 11; Hutchens Decl. ¶¶ 6-8. It is also disingenuous. California refused to share information in its control about whether SB 54 causes the release of more criminal aliens, *see* Cal. Gov. Code § 7284.6(c)(2), even though it requires them to collect and report this information beginning January 4, 2018. *See* California Values Act's Statistical Reporting Requirements at 1-2, 18-02CJIS (March 28, 2018) (Ex. Q). Where a party "has the evidence necessary for resolution of the matter" at the preliminary injunction stage, but claims it "should not be produced," it "cannot . . . claim that the opposing party's claims fail for lack of factual support." *Landrigan v. Brewer*, 2010 WL 4269559, *9, *10 n.6 (D. Ariz. Oct. 25, 2010), *aff'd*, 625 F.3d 1144 (9th Cir. 2010), *vacated on other grounds*, 562 U.S. 996 (2010).

[26] California's declarant also testified that the only California law enforcement entity required by law to enter *any* information into the CLETS system is the State Department of Corrections and Rehabilitation, Dominic Dep. 54:4-14, 55:1-6, 55:11-56:1, 66:14-17, which is exempt from SB 54. Cal Gov. Code § 7284.4(a). Mr. Dominic, however, could not even testify that the State Department of Corrections and Rehabilitation accurately uploads information about the limited class of convicted felons that it is required to. Dominic Dep. 54:4-14, 55:1-6, 55:11-56:1. Indeed, none of the databases

detained individuals with their release date and time"); Ziegler Decl. ¶ 10 ("ERO San Diego is not aware of any database that provides a projected release date and time."); Jacques Decl. ¶ 5 ("the Supervised Release File (SRF) is not a reliable source for determining release dates"). So ICE obviously cannot procure such information in a timely or useful fashion from them. Rocha Decl. ¶¶ 6-7. And to the extent DHS currently has *any* access at all to other information, SB 54 quite emphatically instructs the Attorney General to, by October 1, 2018, discriminate against the United States by closing off those databases "to the fullest extent practicable . . . to anyone or any entity for the purpose of immigration enforcement" by October 1, 2018. Cal. Gov. Code § 7284.8(b).[27]

Finally, California's suggestion that the United States is not harmed by SB 54 because SB 54 allows LEAs to post release date information online is both wrong and misleading. Br. 35. Although Cal. Gov. Code § 7284.6(a)(1)(C) permits "providing release dates or other information" if "that information is available to the public," California concedes that this provision would not permit an LEA to share such information in a timely fashion in response to a detainer notification request unless it had a similar, and absurd, policy responding to such requests from "members of the public." Ex. I at 13-15 (interpreting Info. Bulletin No. DLE-2018-01, *Responsibilities of Law Enforcement Agencies Under the California Values Act, California TRUST Act, and the California TRUTH Act* (Ex. R)[28]); *see* Rocha Decl. ¶ 8 ("my officers cannot rely on publicly available information [] to obtain accurate release dates and times"). And, this provision does not allow LEAs to share such information in real time such that it may actually be operationally useful for ICE. *Id.* At best, it requires ICE and CBP to deploy immigration officers to stake out county jails so that they may give chase and attempt to apprehend aliens *after* they are released from state custody, Homan Decl. ¶ 30; Hoffman Dep. 83:10-15; Rocha Decl. ¶ 8, which can lead to flight and resisting arrest.[29] *See* Homan Decl. ¶ 36-39; Hutchens Decl. ¶

---

Mr. Dominic testified about "contain complete address information for all individuals encountered by law enforcement who may be sought by ICE," and ICE officers "routinely report an absence of timely, and useful information in these databases concerning addresses." Rocha Decl. ¶ 6; *see id.* ¶ 7 ("these databases are nowhere near as reliable as contacting County sheriffs directly, and do not contain on any consistent basis the information ICE previously received from law enforcement agencies in California prior to SB 54").

[27] Indeed, California's witness could not represent under oath that DHS would continue to have the same access as it currently does. *See* Dominic Dep. 86:3-87:2 ("I don't know" if, as of October 1, 2018 DHS will still be able to "access CLETS in the same manner as state and local law enforcement officers"); *see id.* 80:8-87:2, 111:13-112:5.

[28] https://oag.ca.gov/sites/all/files/agweb/pdfs/law_enforcement/dle-18-01.pdf.

[29] Even California's own witnesses concede that flight and resisting arrest is a possibility every time a person is subject to an arrest. Alikhan Dep. 101:12-15.

Reply in support of motion
for preliminary injunction

15 (explaining that "SB 54 has placed more risk in [California] communities and has put law enforcement officers at unnecessary risk" because forcing law enforcement to attempt to arrest criminal aliens at large "has inherent risks for both non-involved community members and members of law enforcement").[30] Congress in no way sought to establish an immigration system in which ICE officers could only perform their duties by sitting outside jails in the middle of the night in order to attempt take custody of removable criminal aliens who were surreptitiously released into the public by state officials. And it certainly did not conceive of a system in which a magistrate judge could determine that there is probable cause that an illegal alien has committed a violent or serious felony— such as murder or rape—but that a state could make it illegal to transfer that person to DHS custody in a secure environment. But that is precisely what SB 54 requires. *See* Cal. Gov. Code §§ 7282.5(b).

3. California asserts an injunction will "exacerbate the public-safety concerns" purportedly caused by "immigration enforcement efforts." But the consequences of *lawful*, Congressionally-authorized Executive action, whatever they may be, is not cognizable harm, *see Robotic Vision Sys. v. View Eng'g Inc.*, 1995 WL 867456, at *3 (C.D. Cal. Dec. 6, 1995) ("lawful activity" cannot cause "irreparable injury"); *Adidas Am., Inc. v. Skechers USA, Inc.*, 2017 WL 2604310, at *2 (D. Or. June 12, 2017) (similar), and in any event, California offers no such evidence; rather the record—and California's own data—show that the criminal aliens whom California forces LEAs to release reoffend at an astonishing rate. Homan Decl. ¶ 43; Outcome Evaluation Report, *supra*, at 32-33. And the assertion that an injunction might "erode[]" "trust between law enforcement and the community it serves," is not only unsupported,[31] Hutchens Decl. ¶¶ 12-16; Youngblood Decl. ¶ 5, *see* Alikhan Dep. 135:2-136:7 ("I don't think there is a connection between the two"), but misplaced: it is California that causes aliens to believe they *will* be deported (something they would have no cognizable interest in

---

[30] California's claim that criminal and national security investigations have not been harmed, Br. 36, is equally unavailing. Since SB 54 went into effect ICE "has experienced numerous instances wherein law enforcement has refused to cooperate with HSI in criminal enforcement actions," "which in turn, has affected public safety." Mar Decl. (Ex. W) ¶ 6; *see id.* ¶¶ 7-16 (describing instances of criminal investigations being hindered by SB 54); Streeter Decl. (Ex. X) ¶ 5 ("SB 54 has negatively affected HSI's ability to investigate and enforce criminal violations of federal law, which in turn, has affected public safety."); *see id.* ¶¶ 6-9 (describing criminal investigations impacted by SB 54); *see also* Homan Decl. ¶ 72.

[31] Indeed, the only actual record evidence demonstrates that local law enforcement did *not* report witnesses or victims of crimes to ICE before SB 54. Hutchens Decl. ¶ 14; Youngblood Decl. ¶ 5. Rather, the record shows that local law enforcement relied on U-visas to protect victims and witnesses, which "encourage[d] the reporting of crimes in [] immigrant communities." Hutchens Decl. ¶ 14; Youngblood Decl. ¶ 5 ("our policy of cooperation with ICE detainers prior to SB 54 did not prevent the reporting of crimes by witnesses or victims").

Reply in support of motion
for preliminary injunction

preventing), Hutchens Decl. ¶¶ 8, 12-13 ("if such fears exist in immigration communities it is not because of the actions or policies of the [Orange County Sheriff's Department,] it is, in my opinion, because of the myth perpetuated by the proponents of" SB 54); Youngblood ¶ 6 (explaining that arrests of criminal aliens by ICE at local jails help reduce fears in the immigrant community of cooperating with police). ICE only lodges detainers when an alien is *arrested on state criminal charges*. ICE does not affect state law arrests, and does not lodge detainers directed at individuals not at least *arrested* for crimes, *see* ICE Policy Number 10074.2, Issuance of Immigration Detainers by Ice Immigration Officers (April 2, 2017) (Ex. S) at ¶ 2.5, so any alleged "distrust" derives from California's own actions. Hutchens Decl. ¶¶ 12-13 (explaining that releasing domestic violence offenders to the street rather than ICE "creates greater reticence in immigrant communities to reporting crimes," and that "many of the crimes for which" individuals whom SB 54 forces law enforcement to release "are rearrested" for "crimes on the family"); Youngblood Decl. ¶ 6 ("We also know that many of these illegal immigrants who are released into our community re-offend and create more victims, many of whom are other illegal immigrants").

But even if California's assertions were not anything other than an incendiary political statement, "[f]rustration of federal statutes and prerogatives are not in the public interest, and [the state suffers] no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301; *Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009) ("it is clear that it would not be equitable or in the public's interest to allow the state to continue to violate the requirements of federal law"). There is, however, "always a public interest in prompt execution of [the immigration laws.]" *Nken v. Holder*, 556 U.S. 418, 436 (2009). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d at 366.

## CONCLUSION

The Court should grant the United States' motion for a preliminary injunction.

//

//

DATED: June 8, 2018                     Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General

                                        MCGREGOR SCOTT
                                        United States Attorney

                                        AUGUST FLENTJE
                                        Special Counsel

                                        WILLIAM C. PEACHEY
                                        Director

                                        /s/ Erez Reuveni
                                        EREZ REUVENI
                                        Assistant Director
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        Telephone: (202) 307-4293
                                        Fax: (202) 616-8202
                                        E-mail: Erez.R.Reuveni@usdoj.gov

                                        DAVID SHELLEDY
                                        Civil Chief, Assistant United States Attorney

                                        LAUREN C. BINGHAM
                                        JOSEPH A. DARROW
                                        FRANCESCA GENOVA
                                        KATHRYNE GRAY
                                        JOSHUA S. PRESS
                                        Trial Attorneys

                                        Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2018, I electronically transmitted the foregoing document to the Clerk's Office using the U.S. District Court for the Eastern District of California's Electronic Document Filing System (ECF), which will serve a copy of this document upon all counsel of record.

By:  */s/ Erez Reuveni*
EREZ REUVENI

Reply in support of motion
for preliminary injunction

32