SPENCER E. AMDUR (SBN 320069)
CODY H. WOFSY (SBN 294179)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
Email: samdur@aclu.org
         cwofsy@aclu.org

JESSICA KARP BANSAL (SBN 277347)
NATIONAL DAY LABORER
ORGANIZING NETWORK
674 South LaFayette Park Place
Los Angeles, CA 90057
Tel: (213) 380-2214
Fax: (213) 380-2787
Email: jbansal@ndlon.org

JULIA HARUMI MASS (SBN 189649)
ANGÉLICA H. SALCEDA (SBN  296152)
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
Email:  jmass@aclunc.org
         asalceda@aclunc.org

MICHAEL KAUFMAN (SBN 254575)
JENNIFER PASQUARELLA (SBN 263241)
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA  90017
Tel: (213) 977-5232
Fax: (213) 977-5297
Email: mkaufman@aclusocal.org
         jpasquarella@aclusocal.org

*Attorneys for Intervenor-Defendants*
*Additional counsel on next page*

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his official capacity; and XAVIER BECERRA, Attorney General of California, in his official capacity,<br><br>Defendants. | Case No. 2:18-cv-00490-JAM-KJN<br><br>Hon. John A. Mendez<br><br>**BRIEF OF AMICI CURIAE THE CALIFORNIA PARTNERSHIP TO END DOMESTIC VIOLENCE AND THE COALITION FOR HUMANE IMMIGRANT RIGHTS**<br><br>Date:   June 5, 2018<br>Time:   1:30 p.m.<br>Dept:   Courtroom 6, 14th Floor |

OMAR C. JADWAT (*pro hac vice*)
LEE GELERNT (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
Fax: (212) 549-2654
Email: ojadwat@aclu.org
        lgelernt@aclu.org

ANGELA CHAN (SBN 250138)
ASIAN AMERICANS ADVANCING JUSTICE -
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94404
Tel:  (415) 848-7719
Fax: (415) 896-1702
Email: angelac@advancingjustice-alc.org

BARDIS VAKILI (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: (619) 398-4485
Email: bvakili@aclusandiego.org

i

# TABLE OF CONTENTS

I.    Congress Cannot Preempt California's Choice Not to Help Administer the Federal
      Deportation Scheme. ................................................................................................... 2

II.   Even If It Could, Congress Has Not Preempted the Values Act. ........................................ 10

      A.   The United States Barely Defends Its Interpretation of 8 U.S.C. § 1373. ................... 10

      B.   Implied Preemption Is Foreclosed by *Gregory*. ............................................................ 10

      C.   Even If It Could, Congress Has Not Impliedly Preempted the Values Act. ................. 11

III.  The Values Act Does Not Violate Intergovernmental Immunity. ....................................... 14

i

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) .................................................................. 4

*Arizona v. United States*, 567 U.S. 387 (2012) .................................................. 11, 13

*Atay v. Cty. of Maui*, 842 F.3d 688 (9th Cir. 2016) ........................................ 12, 13

*Baggett v. Gates*, 32 Cal.3d 128 (1982) ............................................................. 4

*Bond v. United States*, 134 S. Ct. 2077 (2014) ......................................... 6, 11, 13

*Chicanos Por La Causa v. Napolitano*, 558 F.3d 856 (9th Cir. 2009) ........................ 12

*Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136 (9th Cir. 2015) ........... 13, 14

*City of Abilene v. FCC*, 164 F.3d 49 (D.C. Cir. 1999) ..................................... 11

*Clark v. Rameker*, 134 S. Ct. 2242 (2014) ....................................................... 12

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989) ............................... 15

*DeCanas v. Bica*, 424 U.S. 351 (1976) ........................................................... 6

*FERC v. Mississippi*, 456 U.S. 742 (1982) ................................................... 3, 5

*Freightliner Co. v. Myrick*, 514 U.S. 280 (1995) ............................................ 12

*Freilich v. Upper Chesapeake Health*, 313 F.3d 205 (4th Cir. 2002) ...................... 9

*Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ............................................ 4

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ........................................ 12

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ......................................... 9

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................. 1, 10, 11

*Hodel v. Va. Surface Mining & Recl. Ass'n*, 452 U.S. 264 (1981) ..................... 5, 6

*In re Tax Liabilities of Does*, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ............. 9

*Koog v. United States*, 79 F.3d 452 (5th Cir. 1996) .......................................... 4

*Lamar, Archer & Cofrin, LLP v. Appling*, No. 16-1215 (S. Ct. June 4, 2018) ........... 10

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) ........................................ 6

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ................. passim

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................... 2, 3, 8, 15

*New York v. United States*, 505 U.S. 144 (1992) ........................................ passim

ii

*Nixon v. Missouri Mun. League*, 541 U.S. 125 (2004) ................................................................ 10

*North Dakota v. U.S.*, 495 U.S. 423 (1990) .............................................................................. 15

*Oregon Prescription Drug Monitoring Program v. DEA*, 860 F.3d 1228 (9th Cir. 2017)............. 9

*Philadelphia v. Sessions*, 2018 WL 2725503 (E.D. Pa. June 6, 2018) ............................. 2, 7, 8, 10

*Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016)...................................................................... 14

*Printz v. United States*, 521 U.S. 898 (1997).................................................................... passim

*Reno v. Condon*, 528 U.S. 141 (2000) ................................................................................... 5, 7

*Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847 (9th Cir. 2002) ............................................ 10

*South Carolina v. Baker*, 485 U.S. 505 (1988) ......................................................................... 5

*Standley v. Dep't of Justice*, 835 F.2d 216 (9th Cir. 1987) ......................................................... 9

*Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994 (N.D. Cal. 2017)......................... 10

*United States v. Brown*, 2007 WL 4372829 (S.D.N.Y. Dec. 12, 2007) ....................................... 9

*United States v. Gomez*, 911 F.2d 219 (9th Cir. 1990) ............................................................... 3

*United States v. Lewis Cty.*, 175 F.3d 671 (9th Cir. 1999) ........................................................ 15

*United States v. Lopez*, 514 U.S. 549 (1995) ............................................................................ 6

*United States v. Morrison*, 529 U.S. 598 (2000) ...................................................................... 6

*Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ................................................... 4

*Wyeth v. Levine*, 555 U.S. 555 (2009). ............................................................................ 11, 12

**Federal Statutes**

8 U.S.C. § 1103(a)(10)............................................................................................................ 13

8 U.S.C. § 1226(c) ........................................................................................................ 12, 13, 14

8 U.S.C. § 1231(a) ........................................................................................................ 12, 13, 14

8 U.S.C. § 1252c........................................................................................................................ 13

8 U.S.C. § 1357(d) ........................................................................................................ 12, 13, 15

8 U.S.C. § 1373......................................................................................................... passim

15 U.S.C. § 2224........................................................................................................................ 9

20 U.S.C. § 4013 ....................................................................................................................... 8

20 U.S.C. § 4014 ....................................................................................................................... 8

34 U.S.C. § 41307 ............................................................................................. 9

42 U.S.C. § 11133(b) ........................................................................................ 8

42 U.S.C. § 14072(g)(4) ................................................................................... 8

52 U.S.C. § 20701 ............................................................................................. 9

17 Stat. 466 (1873) ........................................................................................... 8

54 Stat. 401 (1940) ........................................................................................... 8

Pub. L. No. 91-452, § 806 ................................................................................. 8

Pub. L. No. 102–559 ......................................................................................... 9

**State Constitution**

Cal. Const. art. IV ............................................................................................ 4

**State Statutes**

Cal. Gov't Code § 7284.2 ............................................................................ 8, 15

Cal. Gov't Code § 7282.5 ................................................................................ 14

Cal. Gov't Code § 7284.4(a) ............................................................................. 3

Cal. Gov't Code § 7284.6(a) ........................................................................ 3, 12

**Legislative History**

H.R. 2278, 113 Cong. § 114 (2013) ................................................................ 12

H.R. 2964, 114 Cong. § 5 (2015) .................................................................... 12

**Other Authorities**

Dep't of Justice, *Institutional Hearing Program* (2018) ................................ 14

*Group Rallies Against Deportation in Front of Alameda County Building*,
Mercury News, Nov. 19, 2015 ........................................................................... 8

Faced with a wall of Supreme Court precedent guaranteeing California the prerogative to decide whether its own agents will assist in federal deportation efforts, the government offers a series of unfounded and outlandish arguments in support of its claims against the Values Act.[1] PI Reply 10-23, Dkt. 171.  It posits, almost in passing, that States can only arrest and prosecute noncitizens *for state criminal offenses* if Congress decides to allow it—that Congress could essentially outlaw state criminal law enforcement as it has existed throughout our country's history.  That breathtaking claim to unlimited federal dominance is anathema to our system of dual sovereignty.  Alternatively, it contends that Congress can issue any commands it wants to the States so long as the commands relate to information.  No court has ever accepted that sweeping assertion, which cannot be squared with the Constitution's prohibition on federal control of state government.  At least where, as here, forced "information sharing" is integral to the daily operation of a federal regulatory program, Congress cannot destroy state officials' accountability to their own electorate and force them to participate.

Thus, because this case is about California's clear prerogative to opt out of assisting with deportations, the preemption principles the government invokes have no application.

But even if Congress could require States to share release dates and addresses, it has not done so.  The government attempts to rewrite the Immigration and Nationality Act (INA), warping provisions that expressly protect States' choices into supposed commands.  But the INA's consistent, explicit solicitude for States' independence does not carry some secret intention to conscript their officers.  To the contrary, the one narrow provision where Congress *did* seek to limit States' choices, 8 U.S.C. § 1373, is powerful evidence that, beyond its terms, Congress intended States to make their own decisions.  The government thus falls far short of showing, as it must, that an intent to preempt the Values Act is "unmistakably clear in the language of the statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

---

[1] Amici the California Partnership to End Domestic Violence and the Coalition for Humane Immigrant Rights submit this brief in defense of the California Values Act pursuant to the Court's Order of June 5, Dkt. 164, at 12.

Brief of Amici Curiae
the Partnership and CHIRLA

1

## I.      Congress Cannot Preempt California's Choice Not to Help Administer the Federal Deportation Scheme.

1.    The Constitution gives Congress "the power to regulate individuals, not States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).    That principle is fatal to both of the federal government's preemption claims (express and implied).    As *Murphy* held, Congress may not "issue orders directly to the States," *id.* at 1475, including orders to "refrain from enacting state law," *id.* at 1478.    That is exactly what 8 U.S.C. § 1373 does:   It orders States not to enact policies that withhold their own agents' enforcement assistance.    The government's obstacle preemption claim suffers the same defect, because if accepted, it would effectively order States to refrain from enacting laws regulating their own agents.    "A more direct affront to state sovereignty is not easy to imagine." *Id.*; *Philadelphia v. Sessions*, 2018 WL 2725503, at *31-33 (E.D. Pa. 2018) (holding that § 1373 is unconstitutional under *Murphy*).

*Murphy* is the latest in a long line of Supreme Court cases making absolutely clear that the Constitution guarantees States the ability to "decline to administer [a] federal program." *New York*, 505 U.S. at 176-77 ; *see Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 587 (2012) (Tenth Amendment ensures that States "may choose not to participate" in a federal program); *Printz v. United States*, 521 U.S. 898, 909-10 (1997) (States may "refuse[] to comply with [a] request" to help administer federal law).    Congress cannot interfere with this choice: States must retain the "prerogative to reject Congress's desired policy, not merely in theory but in fact." *NFIB*, 567 U.S. at 581.    The government's preemption theories would eliminate this "critical alternative." *New York*, 505 U.S. at 176-77.

Where, as here, the State exercises its anti-commandeering prerogative, there can be no preemption.    Like the law in *Murphy*, § 1373 "does not confer any federal rights on private actors" or "impose any federal restrictions on private actors." *Id.* at 1481.    Instead, it regulates only the States' own agents, by prohibiting them from opting out of the deportation system. Congress has no power to enact such a prohibition, either explicitly or implicitly.    Nor does the *state* law in this case confer rights or impose restrictions on private actors; it too regulates only

2

the States' own agents.  *Compare id.* at 1480 (valid obstacle preemption where State "impose[s] a duty" on private actors that conflicts with private actors' federal rights or duties).

The government ignores these holdings almost entirely.  It complains repeatedly that the Values Act "obstructs" immigration enforcement, Reply Br. 11, 13, 14, 15, 17, 25, but it does not and cannot deny that what it calls "obstruction" is simply the State's decision to limit its *own* participation in the federal deportation scheme[2]—a choice that is "essential" to the "[p]reservation of the States as independent political entities," *Printz*, 521 U.S. at 919-19, and a "quintessential attribute of sovereignty," *FERC v. Mississippi*, 456 U.S. 742, 761 (1982).  The government's complaint about California's decision to opt out would have applied equally to the sheriffs in *Printz* and the States in *NFIB*.[3]

The government fails to meaningfully grapple with the accountability concerns at the heart of these cases.  *See NFIB*, 567 U.S. at 578; *Printz*, 521 U.S. at 930; *New York*, 505 U.S. at 169.  Accountability requires "elected state officials" to "regulate in accordance with the views of the local electorate," including, crucially, by withdrawing from federal programs when the "State's citizens view federal policy as sufficiently contrary to local interests"—exactly as California's citizens have chosen.  *Id.* at 168-69.  Yet the government believes it can deny California's citizens that choice and force them to volunteer their officers' assistance.[4]

---

[2]  The challenged provisions of the Values Act only apply to "California law enforcement agenc[ies]."  Cal. Gov't Code §§ 7284.4(a), 7284.6(a).  Both state and local officers are "state officers" for purposes of the Tenth Amendment.  *Printz*, 521 U.S. at 905, 930-31.  The government does not claim otherwise.

[3]  The government's reliance on a 25-year-old California Attorney General opinion is misplaced, PI Reply 1, 16, as it predates *Printz* (applying anti-commandeering to state and local officers), *NFIB*, *Arizona*, and *Murphy*.  And because it interpreted *federal* as opposed to state law, it is entitled to "no special weight."  *United States v. Gomez*, 911 F.2d 219, 221 n.2 (9th Cir. 1990).  Nor can the government draw any support from the subsequent 2014 "Bulletin," PI Reply 1, 16, which is cursory, ambiguous, and contained no relevant analysis.

[4]  The government tries to minimize these accountability concerns by claiming that "the Federal Government retains full responsibility and accountability for its [immigration] actions."  PI Reply 18.  But *Printz* rejected a similar argument, citing major accountability problems even where States were only given "discrete, ministerial tasks" within a program administered principally by the federal government.  521 U.S. at 929-30.

Brief of Amici Curiae
the Partnership and CHIRLA

The government also cannot dispute that this suit seeks to override California's "distribution of power among its own agents." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 263 (2011) (Kennedy, J., concurring). California law places control over state and local police in the hands of the State Legislature, which exercised that power in enacting the Values Act. *See* Cal. Const. art. IV, § 1; *Baggett v. Gates*, 32 Cal.3d 128, 139 n.15 (1982). According to the government, however, Congress has displaced that arrangement and instead required the Legislature to delegate immigration enforcement decisions to thousands of line-level officers, who may now choose for themselves whether and when to help DHS deport state residents. But Congress cannot "displace a State's allocation of governmental power" in this way. *Alden v. Maine*, 527 U.S. 706, 752 (1999); *see also Stewart*, 563 U.S. at 263 (Kennedy, J., concurring) (States "need not empower their officers" to participate in a federal scheme); Dkt. 73-2, at 5-6, 9. The government fails to explain why it thinks Congress can make such an extreme "incursion into state sovereignty." *Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996).

2. The government's attempts to distinguish *Murphy* are deeply unpersuasive.

First, it claims *Murphy* is inapplicable here because the commands the government purports to identify are "part of" a federal "scheme regulating" private parties (the INA), which *Murphy* lacked. PI Reply 20-21. But *Printz* forecloses any suggestion that direct orders to States are permissible as "part of" a broader federal scheme. The invalid directive in *Printz* was attached to a broader federal scheme that regulated private handgun purchases. 521 U.S. at 902-03. The Court still invalidated the provision that dictated how state officers had to participate in the scheme's information-gathering efforts. Those "same principles" applied in *Murphy* and apply here. 138 S. Ct. at 1477; *see also Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014) (applying anti-commandeering in the INA context).

Straining to support this argument, the government suggests that *Murphy* approved of an earlier preemption provision because it was "part of" a federal scheme "regulating air carriers." PI Reply 21. But that is not remotely what *Murphy* said. *Murphy* explains that the airline provision is valid because it effectively "confers on private entities (*i.e.*, covered carriers) a

4

federal right to engage in certain conduct" free from state regulation.   138 S. Ct. at 1480.

Likewise, preemption of state alien registration laws is permissible not because it is "part of" a

federal registration scheme, but because it gives private actors "a federal right to be free from

any [state] registration requirements."   *Id.* at 1481.   Here, in stark contrast, the government's

preemption theories would impose *no* private rights or restrictions.

Second, the government makes the puzzling assertion that § 1373 is permissible because

it "evenhandedly regulates an activity in which both States and private actors engage."  PI Reply

21 (quoting *Murphy*, 138 S. Ct. at 1478).  But § 1373 applies only to "a Federal, State, or local

government entity or official."  8 U.S.C. § 1373(a).  It imposes no restrictions on private actors at

all, including those who know about a person's citizenship or immigration status.  Nor is it

somehow rendered generally applicable by the INA's "registration rules" for noncitizens and

employers.  PI Reply 21; *see Printz*, 521 U.S. at 902-03, 932 & n.17 (holding that provision was

not generally applicable even though the Brady Act imposed related, but different, requirements

on handgun buyers and sellers).  To the extent "there is no private analog" for Congress to

regulate evenhandedly, PI Reply 22, that only confirms the commandeering problem.  *See Printz*,

521 U.S. at 932 n.17 (striking down statute where "extension of th[e] statute to private citizens"

was "impossible").  By contrast, the law upheld in *South Carolina v. Baker*, 485 U.S. 505, 514

(1988), "treat[ed] state bonds *the same* as private bonds."  *Murphy*, 138 S. Ct. at 1478 (emphasis

added).  And the law upheld in *Reno v. Condon*, 528 U.S. 141, 151 (2000), "applied *equally* to

state and private actors," regulating their dissemination of the *same* driver data.  *Murphy*, 138 S.

Ct. at 1479 (emphasis added).

Third, grasping at straws in the aftermath of *Murphy*, the government offers a startling

new assertion: that the orders it seeks to issue to the States are just conditions "for continued

state activity in an otherwise pre-emptible field."  PI Reply 22-23 (quoting *FERC*, 456 U.S. at

769, and *Hodel v. Va. Surface Mining & Recl. Ass'n*, 452 U.S. 264, 288 (1981)).  Without

specifying what "field" it means, the government appears to argue that Congress can demand

Brief of Amici Curiae
the Partnership and CHIRLA

whatever deportation assistance it wants, because it could have simply ordered States not to arrest, prosecute, or imprison noncitizens who violate their criminal laws.  MTD Opp. 13.

Every facet of this argument—which the government did not make in its opening brief—is wrong.  As *Murphy* explains, under a valid "cooperative federalism" arrangement of this sort, Congress "comprehensively regulate[s]" the activity at issue, and then offers States "the choice of either implementing the federal scheme or else yielding to" federal administration.  138 S. Ct. at 1479 (quoting *Hodel*, 452 U.S. at 288).  Nothing of the sort is even possible here.  The government's premise—that Congress could flatly prohibit States from arresting and prosecuting all (possible) noncitizens—is utterly at odds with our constitutional system, which gives States "primary authority for defining and enforcing the criminal law."  *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (citations omitted); *see Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).  Indeed, Congress lacks the power to punish ordinary crimes—much less occupy that field altogether.  *United States v. Morrison*, 529 U.S. 598, 618-19 (2000) ("The Constitution withholds from Congress a plenary police power.") (quotation marks and alteration omitted); *see also DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (rejecting the notion that "every state enactment which in any way deals with aliens is a regulation of immigration").  Congress simply could not make the "unprecedented incursion into the criminal jurisdiction of the States" of barring the States from enforcing their criminal laws against a large segment their residents.  *McDonnell v. United States*, 136 S. Ct. 2355, 2374 (2016) (citation omitted).[5]  The government offers no reasoning to support this stunning assertion.

In any event, the government is wrong that it can conscript the States simply by imagining a broad hypothetical statute Congress *might have* passed.  *New York*, for instance, struck down a statute even though "Congress could, if it wished, pre-empt state radioactive waste regulation" altogether.  505 U.S. at 160.  And it did so over Justice White's dissent, which made

---

[5] The government's suggestion that Congress could authorize DHS to forcibly pluck inmates out of state prisons, PI Reply 22, is likewise inconsistent with federalism principles.  That possibility is also irrelevant, because it would not constitute congressional occupation of any "field," so *Hodel* would have no application.

Brief of Amici Curiae
the Partnership and CHIRLA

the same argument the government presses here.  *See id.* at 204 (White, J., concurring in part and dissenting in part).  Likewise, in *NFIB*, Congress's ability to preempt state healthcare laws did not allow it to command state participation.  By contrast, in *Hodel*, Congress actually *had* "comprehensively regulated" the relevant field, and in *FERC*, Congress simply asked States to "to consider" federal standards, which they were free to disregard.  *Murphy*, 138 S. Ct. at 1479.[6]

3.   The government maintains that Congress can compel the States to help administer immigration law, as long as the help involves sharing information.  PI Reply 18-20.  It claims that it order States to produce any information about their residents, any time, for any purpose, as often as it wants.  That is wrong.  *Printz* left open the possibility that *some* kinds of information sharing *might* fall outside the anti-commandeering rule—specifically, information that does not entail "the actual administration of a federal program."  *Printz*, 521 U.S. at 918.  The Court thus declined to resolve whether "purely ministerial reporting requirements" are constitutional.  *Id.* at 936 (O'Connor, J., concurring).  But there is no question that forced information sharing, where it facilitates the on-the-ground, day-to-day administration of a federal program, runs afoul of the anti-commandeering rule.  Indeed, *Printz* itself invalidated a law because it required state officers "to provide information that belongs to the State."  *Id.* at 932 n.17.[7]

Here, the information the government seeks would clearly facilitate the "administration of a federal program."  *Printz*, 521 U.S. at 918.  The challenged provisions address whether state officers can make physical transfers of custody and otherwise help DHS identify, locate, and

---

[6] The government cites ambiguous language in *FERC* that Congress can issue commands in a field that is "pre-emptible."  PI Reply 23.  Whatever *FERC* meant by that, *New York* made clear that Congress cannot issue direct commands to States simply because it could have, but did not, regulate private conduct.  And *Murphy* counseled against applying *FERC* beyond its facts—asking States to "consider" standards—highlighting that "*FERC* was decided well before our decisions in *New York* and *Printz*."  138 S. Ct. at 1479.

[7] The government suggests that *Reno v. Condon* established a Tenth Amendment carve-out for information mandates.  PI Reply 18, 22.  It is mistaken.  *Condon* upheld a "generally applicable law," 518 U.S. at 150-51, because the law "evenhandedly regulate[d] an activity in which both States and private actors engage[d]," *Murphy*, 138 S. Ct. at 1478-79 ("That principle formed the basis for the Court's decision . . . .").  The Court did not announce any rule about information mandates, or even identify any mandate to send information to federal agents.  *See Philadelphia*, 2018 WL 2725503, at *32 (rejecting the government's identical argument about *Condon*).

7

arrest noncitizens.  The government itself stresses the operational impact of these actions: Transfer, release dates, and addresses help DHS "locate, detain, prosecute, and remove aliens," PI Mem. 33; they increase its "ability to identify and apprehend removable aliens," *id.* at 35; and they facilitate "ICE's efforts to take these aliens into custody for removal purposes," *id.*

That kind of conscription simply cannot be squared with anti-commandeering law.  The Constitution reflects a "fundamental structural decision" to *entirely* "withhold from Congress the power to issue orders directly to the States," a principle that leaves no room for systematic demands for information.  *Murphy*, 138 S. Ct. at 1475.  Indeed, when Congress "compels the States" to help administer a program, "it blurs the lines of political accountability" *regardless* of what form the involvement takes.  *NFIB*, 567 U.S. at 678.  Whether state officers are placing the handcuffs or helping DHS do so, residents understand that their government is funneling people to the deportation system.  Indeed, California's experience makes clear that when state officials pave the way for deportations—including by sending information about state residents to DHS— they incur serious political and financial costs.  *See Group Rallies Against Deportation in Front of Alameda County Building*, Mercury News, Nov. 19, 2015, https://bayareane.ws/2wbh6o4; Dkt. 73-2, at 7 & n.7, 10; Cal. Gov't Code 7284.2.

The government asserts that Congress "frequently calls on states to share relevant information," PI Reply 19, but none of its examples remotely resembles a system of state officers performing daily services for immigration agents.  Many of the purported requirements it cites impose no obligations at all; States are free to decline to participate.[8]  Others are in reality funding conditions, not direct orders.[9]  Yet others serve academic and record-keeping goals.

---

[8] *See, e.g.*, 54 Stat. 401 (1940) (directing federal government to collect data, without imposing any state or local obligation); 17 Stat. 466 (1873) (same); 42 U.S.C. § 11133(b) (state medical boards can opt out of reporting and be replaced by another agency); 42 U.S.C. § 14072(g)(4) (repealed sex offender reporting requirement that States could avoid entirely by choosing not to implement a qualifying registration program); Pub. L. No. 91-452, § 806 ("does not require states to provide any information," *Philadelphia*, 2018 WL 2725503, at *33 n.10).

[9] *See, e.g.*, *Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (explaining that 23 U.S.C. § 402 "condition[s] States' receipt of federal funds for highway safety program on compliance with federal requirements"); 20 U.S.C. § 4013 (information submitted as part of application for federal funds, *see id.* § 4014).

Brief of Amici Curiae
the Partnership and CHIRLA

These are "purely ministerial" because they do not facilitate the federal government's on-the-ground implementation of any federal regulatory program. *Printz*, 521 U.S. at 936 (O'Connor, J., concurring).[10]   As a result, they do not force state officials to "tak[e] the blame" for the "defects" of any federal program. *Id.* at 930. The information in this case is clearly different.[11]

Finally, the government suggests that a sweeping exception for information mandates "makes sense," because subpoenas involve information too. PI Reply 19. That is a nonsequitur. Of course States, like everyone else, must comply with judicial subpoenas and other court orders. *See Standley v. DOJ*, 835 F.2d 216, 218 (9th Cir. 1987) ("A grand jury is an arm of the judicial branch of government."). In fact, the Supremacy Clause "presupposes" as much. *New York*, 505 U.S. at 179. But "[t]he Constitution contains no analogous grant of authority to Congress." *Id.* The government also suggests that it can issue administrative subpoenas to States, so it must be able to demand systematic information sharing. PI Reply 19-20. But it offers no reason to think an agency could lawfully use subpoenas to conscript States to participate in the ongoing administration of a federal program, in a manner analogous to its preemption theories.[12]

The Court should reject the suggestion that information mandates are categorically exempt from the anti-commandeering rule—something no court has ever held.

---

[10]   *See* 34 U.S.C. § 41307 (statistical data regarding missing children); 15 U.S.C. § 2224 (information collected for FEMA publication). The few cases upholding reporting requirements have all addressed these kinds of purely ministerial duties to "forward[] . . . information to a federal data bank." *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 214 (4th Cir. 2002); *see United States v. Brown*, 2007 WL 4372829, at *5 (S.D.N.Y. Dec. 12, 2007) (requirement to forward information to "a national database"). In contrast to this case, 52 U.S.C. § 20701 *et seq.*—which addresses records about federal elections—is an exercise of Congress's "unique" Elections Clause authority. *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (en banc), *aff'd*, 570 U.S. 1 (2013).

[11]   In any event, all of these statutes were enacted before *Printz* established that anti-commandeering applied to state executive officers. Notably, the statute *Murphy* struck down was passed in 1992, Pub. L. No. 102–559, during the same period when Congress enacted many of the statutes the government cites here. Congress's decision to enact a handful of information-sharing statutes in the "few decades" before *Printz* is simply not "probative" of their constitutionality. *Printz*, 521 U.S. at 917-18.

[12]   The cursory analysis of *In re Tax Liabilities of Does*, 2011 WL 6302284, at *4 (E.D. Cal. Dec. 15, 2011), issued *ex parte*, does not address any of the anti-commandeering cases. In any event, it addressed a one-time enforcement operation rather than an ongoing, indefinite reliance on state officers to effectuate a federal program. And *Oregon Prescription Drug Monitoring Program v. DEA*, 860 F.3d 1228, 1236 (9th Cir. 2017), addressed no Tenth Amendment argument at all.

Brief of Amici Curiae
the Partnership and CHIRLA

## II.  Even If It Could, Congress Has Not Preempted the Values Act.

Even if Congress could bar states from opting out of the deportation regime, Congress would have to make that intention "unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460.  The government does not dispute that *Gregory* applies to its preemption theories.  *See* Dkt. 73-2, at 16.  To satisfy *Gregory*, the government's interpretation "must be plain to anyone reading the Act." *Id.* at 467.  Where *Gregory* applies, it is typically "fatal." *Nixon v. Missouri Mun. League*, 541 U.S. 125, 141 (2004).

### A.  The United States Barely Defends Its Interpretation of 8 U.S.C. § 1373.

The government does not explain why its broad reading of § 1373 is not just plausible, but "unmistakably clear in the language of the statute."  501 U.S. at 460.  That omission is striking, but not surprising.  As multiple courts have now held, the government's present interpretation "is simply impossible to square with the statutory text." *Philadelphia*, 2018 WL 2725503, at *33-35; *Steinle v. San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

The government offers little in response.  It does not deny that its interpretation of § 1373 is virtually limitless, Cal. PI Opp. 13-14; Dkt. 112, at 4-7.  It ignores the many statutes showing that Congress knows how to refer to information beyond citizenship and immigration status when it wants to, Cal. PI Opp. 12 & n.11; Dkt. 112, at 13-14.  It does not address the many failed efforts to expand § 1373 to reach the information it seeks through this lawsuit, Dkt. 112, at 14.  And it has no response to *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847, 850 (9th Cir. 2002) (interpreting "relate to" narrowly to preserve "the historic police powers of the States").[13]

### B.  Implied Preemption Is Foreclosed by *Gregory*.

Even if Congress could preempt a State from opting out of a federal program, it would have to do so explicitly.  This is a dispositive basis to reject the obstacle preemption claim.

---

[13] Unlike *Roach*, *Appling* did not involve preemption, and it had no occasion to consider the impact of *Gregory*.  PI Reply 16 (citing *Lamar, Archer & Cofrin, LLP v. Appling*, No. 16-1215 (S. Ct. June 4, 2018)).  *Appling* is also consistent with California's argument that § 1373 extends beyond a person's technical immigration status to include items that "indicate" a person's status, *Appling*, slip op. at 9—a narrow set of information such as verbal admissions, copies of immigration documents, and the like.  *See* Cal. PI Opp. 12-13; Dkt. 112, at 9; Dkt. 73-2, at 15.  In all events, *Appling* did not endorse any limitless interpretation like the government's.

Brief of Amici Curiae
the Partnership and CHIRLA

Implied preemption in this context would violate the rule that federal intrusions into core state prerogatives require "unmistakably clear" textual statements. *Gregory*, 501 U.S. at 460. Congress must be "explicit" if it wants to "readjust the balance of state and national authority." *Bond*, 134 S. Ct. at 2089 (quotation marks and alteration omitted). That principle forecloses the argument that Congress can *silently*, through implication only, "alter[] the State's governmental structure" and preempt States from exercising fundamental sovereign rights, like declining to help administer a federal program. *City of Abilene v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999). Courts do "not simply infer this sort of congressional intrusion." *Id.* Indeed, *Gregory* usually forecloses applying even an *express* requirement to a core state function. Where Congress has made *no* preemptive statement at all—as the government's implied preemption theory assumes—there is no assurance that Congress "has in fact faced" the gravity of interfering with the "substantial sovereign powers" of the States. *Gregory*, 501 U.S. at 461 (citation omitted).

The government has not even mentioned *Gregory*. It has not found a single case imposing obstacle preemption where *Gregory* applied. And it certainly has not found a case applying obstacle preemption to a State's policy limiting its own agents' participation in a federal program.[14] The Court should refuse to take that unprecedented step.

### C.  Even If It Could, Congress Has Not Impliedly Preempted the Values Act.

Even if it could preempt the Values Act through implication only, Congress has not made any such intention "clear and manifest." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

1.   The government has entirely ignored a dispositive reason to reject its implied preemption claim:  Congress has already determined what it deemed to be the proper scope of preemption in § 1373. Cal. PI Opp. 22. An express preemption statute like § 1373 is "powerful evidence" against implied preemption, because it shows that Congress has already decided which

---

[14] For instance, *Gregory* did not apply to the preemption claims in *Arizona v. United States*, 567 U.S. 387 (2012), because none of the challenged statutes exercised a State's fundamental prerogatives to structure its government or limit its participation in a federal program. Just the opposite:  The Court struck down three state laws that invaded *federal* prerogatives by enacting the State's "own immigration policy." *Id.* at 408; *see id.* at 403 (alien registration requirement); *id.* at 406-07 (alien employment prohibition); *id.* at 410 (authority to arrest immigrants).

Brief of Amici Curiae
the Partnership and CHIRLA

state laws "posed an obstacle to its objectives." *Wyeth*, 555 U.S. at 574-75 (rejecting obstacle preemption on this basis). Fully cognizant of DHS's statutory duties, Congress chose only to preempt state policies that limit the sharing of "citizenship or immigration status" information. 8 U.S.C. § 1373(a). And Congress has consistently refused to go further, rejecting numerous proposals to expand § 1373.[15] The case for *implied* preemption is therefore "particularly weak" here. *Wyeth*, 555 U.S. at 575 (quotation marks omitted). Whatever its constitutionality, *see supra*, § 1373's intentional narrowness "creates a 'reasonable inference' that Congress did not intend to preempt state . . . laws that do not fall within [its] scope." *Atay v. Cty. of Maui*, 842 F.3d 688, 704 (9th Cir. 2016) (quoting *Freightliner Co. v. Myrick*, 514 U.S. 280, 288 (1995)).[16]

Moreover, the government's obstacle preemption claim would render § 1373 entirely unnecessary. If it were really true that the INA *already* implicitly preempted state policies that "restrict[] state and local officials . . . from cooperating" with DHS, PI Mem. 25, there would have been no need to enact § 1373, which singles out a small subset of those same policies for preemption. The government's theory thus "would render statutory text superfluous." *Clark v. Rameker*, 134 S. Ct. 2242, 2249 (2014). It makes no attempt to justify that result.

2. The statutes the government invokes confirm just how weak its obstacle preemption claim is. Its brief relies exclusively on statutes that direct DHS—but not the States—to detain and remove noncitizens after their release from criminal custody. *E.g.*, 8 U.S.C. §§ 1226(c)(1), 1231(a)(2), 1231(a)(4), 1357(d). Its basic theory is that DHS's job would be easier if California volunteered its own resources to help DHS, and so the INA implicitly requires California to offer that assistance.[17] *See, e.g.*, PI Mem. 35-36 (state assistance saves DHS "time and resources"); PI

---

[15] *See, e.g.*, H.R. 2964, 114 Cong. § 5 (2015); H.R. 2278, 113 Cong. § 114 (2013).

[16] While § 1373 does not "foreclose[]"implied preemption principles, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872-73 (2000), it is strong evidence against implied preemption because it shows that Congress "knew how" but did not "expressly forbid state laws" like the Values Act. *Chicanos Por La Causa v. Napolitano*, 558 F.3d 856, 867 (9th Cir. 2009).

[17] The government also criticizes an *exception* in the Values Act that allows transfers when DHS obtains a judicial warrant. PI Reply 14; *see* Cal. Gov't Code § 7284.6(a)(4). But that provision simply conditions the *State's* participation, which the State is free to withhold completely. If it can decline altogether, surely it can also identify the circumstances in which it will participate.

Brief of Amici Curiae
the Partnership and CHIRLA

Reply 13 (state assistance means "minimal effort by federal officials"). Those assertions are plainly insufficient to overcome the presumption against preemption. "The Supreme Court has warned that obstacle preemption analysis does 'not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Atay*, 842 F.3d at 704.

None of the statutes remotely supports preemption. For instance, § 1357(d) directs DHS to "take custody of the alien" after state criminal custody ends, and is the only place the INA mentions notification of release dates. *See Arizona*, 567 U.S. at 410 (explaining that § 1357(d) allows States to "respond[] to requests for information about when an alien will be released"). Critically, § 1357(d) lets *States* decide whether to "request[]" this form of cooperation. 8 U.S.C. § 1357(d)(3). Thus, the INA explicitly leaves notification of release dates to States' discretion.

Deference to States' choices is echoed in numerous other provisions throughout the INA, which explicitly allow States to limit their participation in the deportation scheme. *See, e.g.*, *id.* § 1357(g)(1) (allowing participation "to the extent consistent with State and local law"); *id.* § 1252c(a) (similar); *id.* § 1103(a)(10) (participation only "with the consent of" state officials); *id.* § 1226(d)(3) (federal "assistance" at the "request" of a State). These cooperative provisions "undermine[] any inference of interference with Congress's method." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015) (rejecting obstacle preemption where "the federal scheme is cooperative" and invites States to make their own choices).

Next, the government relies heavily on 8 U.S.C. § 1231(a)(4), which prohibits removal while a noncitizen is serving a criminal sentence. PI Reply 12-13; PI Mem. 24; MTD Opp. 11, 13. But § 1231(a)(4) serves to *protect* States' criminal justice systems from federal interference, in recognition of the States' paramount authority over "the punishment of local criminal activity." *Bond*, 134 S. Ct. at 2089. It exudes deference to the States, which are empowered to decide whether earlier removal is "in the best interest of the State." 8 U.S.C. § 1231(a)(4)(B)(ii). The government's theory would turn Congress's solicitude on its head.

Section 1231(a)(1) works the same way, directing DHS to pursue removal after criminal custody ends. 8 U.S.C. § 1231(a)(1)(B)(iii). Its function is to protect, not conscript, state criminal

Brief of Amici Curiae
the Partnership and CHIRLA

justice systems.  And it only imposes obligations on DHS, not the States.  Moreover, even by its terms it bears no relationship to most (if not all) releases from state detention: In virtually all cases, a person's "release date from state or local criminal custody" can only "trigger" the 90-day removal period (PI Mem. 24) when the person received a final removal order while in state custody.  *Id.* § 1231(a)(1)(B).  Yet that rarely, if ever, happens in California jails.  *See* DOJ, *Inst. Hearing Prog.*, at 2 (2018) (showing no California jails with an in-custody removal program), https://bit.ly/2rfubHM.  The government itself has produced *no* evidence that there is *anyone* in California jails subject to the Values Act whose release date triggers a 90-day removal period.

Similarly, § 1226(c) simply provides for DHS—not the States—to detain certain noncitizens when they are released from criminal custody.  The Values Act, of course, leaves DHS free to arrest, detain, and remove noncitizens, just without certain assistance from California.  The government argues that without state aid, some people will not be arrested by DHS immediately upon release.  PI Mem. 24, 27.  But even if that happens, and DHS does not arrest them until later, the only possible consequence is that they become eligible for a bond hearing.[18]  *See Preap v. Johnson*, 831 F.3d 1193, 1206 (9th Cir. 2016), *cert. granted*, 138 S. Ct. 1279; 8 U.S.C. § 1226(a) (providing bond hearings).  The possibility of a bond hearing in some cases is a slender reed on which to base the government's preemption challenge.[19]

## III.   The Values Act Does Not Violate Intergovernmental Immunity.

The immunity doctrine cannot, consistent with the Tenth Amendment, prevent a State from choosing not to administer a federal program.  That would wipe out States' most essential Tenth Amendment prerogative, and it would do so *automatically*, without any indication of

---

[18]  The government disputes even that much.  On appeal in *Preap*, it argues that mandatory detention applies "regardless of when the arrest occurred," U.S. Br., *Nielsen v. Preap*, No. 16-1363, at 9 (June 2018), in which case the Values Act would *never* impact mandatory detention.

[19]  Even that connection is minimal.  Noncitizens are only subject to mandatory detention under § 1226(c) if they have committed an enumerated crime, and the exceptions in the Values Act allow for transfer and notification based on long list of crimes.  Cal. Gov't Code § 7282.5.  The government's § 1226(c) argument therefore only applies to the narrow set of people who have committed crimes that trigger § 1226(c) but not a Values Act exception.  Such occasional and hypothetical scenarios do not establish preemption.  *See Harris*, 794 F.3d at 1142 (no preemption based on "the prospect of a 'modest impediment' to general federal purposes") (citation omitted).

14

Brief of Amici Curiae
the Partnership and CHIRLA

preemptive intent from Congress.  Unsurprisingly, the government cannot find a single case that applies the immunity doctrine to a State's decision to opt out of a federal program.

The government argues that the Values Act violates intergovernmental immunity because it "treat[s] federal immigration officials worse than other entities."  PI Mem. 31.  But that is true every time a State exercises its anti-commandeering prerogative.  After *Printz*, for example, a sheriff who refused Brady Act background checks would be treating ATF officials worse than others who asked for background checks.  If the government were right, Congress could force States to administer programs simply by seeking assistance of the same sort that States provide to other entities.  That does not square with *Printz*, *New York*, *NFIB*, or the "prerogative to reject Congress's desired policy" that they recognize.  *NFIB*, 567 U.S. at 581; Dkt. 73-2, at 23-24.

Even if immunity could apply here, it would not bar the Values Act.  First, Congress retains "the primary role" in resolving immunity questions.  *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.).  And Congress has thoroughly addressed States' role in the deportation scheme.  *See, e.g.*, 8 U.S.C. §§ 1373, 1357(d), 1357(g).  Where "Congress has made its assessment of the federal interest" and allows the States leeway, its "action sufficiently qualifies the intergovernmental immunity of the United States to permit the state to make the distinction it has."  *United States v. Lewis Cty.*, 175 F.3d 671, 676 (9th Cir. 1999).  Second, there are "significant differences" between immigration enforcement and criminal enforcement.  *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 816 (1989) (discrimination permissible under these circumstances).  Immigration enforcement instills fear and destroys cooperation with state residents in a way that finds no parallel in ordinary law enforcement.  Cal. Gov't Code § 7284.2 (listing its unique harms).  Accordingly, the State's decision to treat immigration differently would be fully "justified" even if intergovernmental immunity applied.  *Davis*, 489 U.S. at 816 (citation omitted).

Brief of Amici Curiae
the Partnership and CHIRLA

Dated: June 12, 2018

Respectfully submitted,

/s/ Spencer E. Amdur

Julia Harumi Mass (SBN 189649)
Angelica H. Salceda  (SBN  296152)
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
jmass@aclunc.org
asalceda@aclunc.org

Jessica Karp Bansal (SBN 277347)
NATIONAL DAY LABORER
ORGANIZING NETWORK
674 South LaFayette Park Place
Los Angeles, CA 90057
Tel: (213) 380-2214
Fax: (213) 380-2787
jbansal@ndlon.org

Angela Chan (SBN  250138)
ASIAN AMERICANS ADVANCING
JUSTICE - ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94404
Tel: (415) 848-7719
angelac@advancingjustice-alc.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: (619) 398-4485
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Cody H. Wofsy (SBN 294179)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org

Omar C. Jadwat (*pro hac vice*)
Lee Gelernt (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org

Michael Kaufman (SBN 254575)
Jennifer Pasquarella (SBN 263241)
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA  90017
Tel: (213) 977-5232
mkaufman@aclusocal.org
jpasquarella@aclusocal.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2018, I electronically filed the foregoing Brief of Amici Curiae with the Clerk for the United States District Court for the Eastern District of California by using the CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Spencer E. Amdur
Spencer E. Amdur

Brief of Amici Curiae
the Partnership and CHIRLA