1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   THE UNITED STATES OF AMERICA,      No.  2:18-cv-490-JAM-KJN

12              Plaintiff,

13        v.                             **ORDER RE: THE UNITED STATES OF
                                         AMERICA'S MOTION FOR PRELIMINARY**
14   STATE OF CALIFORNIA, et al.,        **INJUNCTION**

15              Defendants.

16

17                      I.   INTRODUCTION

18        Before this Court is the United States of America's

19   ("Plaintiff" or "United States") Motion for a Preliminary

20   Injunction ("Motion").  Plaintiff seeks an Order from this Court

21   enjoining enforcement of certain provisions of three laws enacted

22   by the State of California ("Defendant" or "California")[1] through

23   Assembly Bill 103 ("AB 103"), Assembly Bill 450 ("AB 450") and

24   Senate Bill 54 ("SB 54").  Specifically, Plaintiff requests that

25   this Court preliminarily enjoin the following provisions of

26   _____

[1] Because Edmund Gerald Brown Jr., Governor of California, and
27   Xavier Becerra, Attorney General of California, are sued in their
     official capacities only, the Court will address all three named
28   defendants as "California" or "Defendant."

                              1

1    California law: (1) California Government Code Section 12532 (as

2    added by AB 103); (2) California Government Code Sections 7285.1

3    and 7285.2 and California Labor Code Sections 90.2 and 1019.2 as

4    applied to private employers only (as added by AB 450); and (3)

5    California Government Code Sections 7284.6(a)(1)(C),

6    7284.6(a)(1)(D), and 7284.6(a)(4) (as added by SB 54).  Plaintiff

7    claims that these statutes violate the Supremacy Clause of the

8    United States Constitution, Art. VI, cl.2, and are invalid.

9    Compl., ECF No. 1, ¶¶ 61, 63 & 65.  Plaintiff argues that federal

10   law preempts each provision because, in the area of immigration

11   enforcement, California "lacks the authority to intentionally

12   interfere with private citizens' [and state and local employees']

13   ability to cooperate voluntarily with the United States or to

14   comply with federal obligations."  Motion for Preliminary

15   Injunction ("Mot."), ECF No. 2-1, at 2.

16       Plaintiff also contends that California "has no authority to

17   target facilities holding federal detainees pursuant to a federal

18   contract for an inspection scheme to review the 'due process'

19   afforded during arrest and detention."  Id.  Accordingly,

20   Plaintiff implores this Court to enjoin these state law

21   provisions because they "stand as an obstacle to the

22   accomplishment and execution of the full purposes and objectives

23   of Congress and are therefore preempted by federal law."  Id. at

24   3 (citations omitted).

25       Defendant vigorously opposes Plaintiff's motion for a

26   preliminary injunction, see Opp'n, ECF No. 74, contending that

27   these three state laws properly "allocate the use of limited law-

28   enforcement resources, provide workplace protections, and protect

2

1   the rights of [California's] residents." Id. at 1.  Defendant

2   further argues that these statutes "are consistent with

3   applicable federal law and do not interfere with the federal

4   government's responsibility over immigration." Id.  Defendant

5   claims that it "acted squarely within its constitutional

6   authority when it enacted the law[s] [the United States seeks to

7   enjoin] here[.]" Id.  None of the state laws, according to

8   Defendant, "conflict[] with federal law or undermine[] the

9   federal government's authority or ability to undertake

10  immigration enforcement and all are consistent with the

11  legislative framework [of the immigration laws and regulations]."

12  Id.

13      This Motion presents unique and novel constitutional issues.

14  The Court must answer the complicated question of where the

15  United States' enumerated power over immigration ends and

16  California's reserved police power begins.  The Court must also

17  resolve the issue of whether state sovereignty includes the power

18  to forbid state agents and private citizens from voluntarily

19  complying with a federal program.  Plaintiff's Motion requires

20  this Court to carefully examine the purposes and principles of

21  the federalist system–a system, established by the Constitution,

22  of dual sovereignty between the States and the Federal Government

23  whose principal benefit may be "a check on abuses of government

24  power." Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).

25      Deciding these critical issues requires this Court to

26  determine the proper balance between the twin powers of

27  California and the United States.  The law is clear that so long

28  as the Federal Government is acting within the powers granted to

3

1   it under the Constitution, Congress may impose its will on the

2   States.  Id. at 460.  However, if Congress is going to preempt or

3   interfere with the decision of the people of California, "it is

4   incumbent upon [this Court] to be certain of [Congress's] intent

5   before finding that federal law overrides" the constitutional

6   balance of federal and state powers.  Id. (citation omitted).

7   
8   >     If Congress intends to alter the usual constitutional
>     balance between the States and Federal Government it
>     must make its intention to do so unmistakably clear in
>     the language of the statute. . . . Congress should make
9   >     its intention clear and manifest if it intends to pre-
>     empt the historic powers of [the State].

10   

11   Id. at 460-61 (quoting Atascadero State Hosp. v. Scanlon, 473

12   U.S. 234, 242 (1985)) (quotation marks omitted).

13      Applying these well-established principles of law to the

14   present Motion, and as explained in detail below, this Court

15   finds that AB 103, SB 54, and the employee notice provision of AB

16   450 are permissible exercises of California's sovereign power.

17   With respect to the other three challenged provisions of AB 450,

18   the Court finds that California has impermissibly infringed on

19   the sovereignty of the United States.  Plaintiff's Motion is

20   therefore denied in part and granted in part.

21                      II.   Legal Standards

22      A.   Preliminary Injunction Standard

23      Plaintiff moves the Court to enjoin enforcement of the

24   challenged state laws.  Before the Court can grant the requested

25   relief, Plaintiff must establish—as to each challenged law—that

26   it is likely to succeed on the merits of its claim, that it is

27   likely to suffer irreparable harm in the absence of preliminary

28   relief, that the balance of the equities tips in its favor, and

1  that an injunction is in the public interest.  Winter v. Nat.

2  Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  In the Ninth

3  Circuit, an injunction may also be proper "if there is a

4  likelihood of irreparable injury to plaintiff; there are serious

5  questions going to the merits; the balance of hardships tips

6  sharply in favor of the plaintiff; and the injunction is in the

7  public interest."  M.R. v. Dreyfus, 697 F.3d 706, 725 (9th Cir.

8  2012).

9      Here, however, the nature of the requested relief increases

10  Plaintiff's burden.  An order enjoining the enforcement of state

11  laws would alter the status quo and thus qualifies as a mandatory

12  injunction.  Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d

13  1182, 1194 (E.D. Cal. 2015).  Plaintiff must establish that the

14  law and facts clearly favor its position, not simply that it is

15  likely to succeed on its claims.  See Garcia v. Google, Inc., 786

16  F.3d 733, 740 (9th Cir. 2015).

17      B.   Supremacy Clause

18      In the United States, "both the National and State

19  Governments have elements of sovereignty the other is bound to

20  respect."  Arizona v. United States, 567 U.S. 387, 398 (2012).

21  The Constitution establishes the balance between these sovereign

22  powers and the Nation's dual structure.  The Supremacy Clause

23  declares that the "Constitution, and the Laws of the United

24  States which shall be made in Pursuance thereof . . . shall be

25  the supreme Law of the Land; and the Judges in every State shall

26  be bound thereby[.]"  U.S. Const. Art. VI, cl. 2.  The Tenth

27  Amendment limits the powers of the United States to those which

28  the Constitution delegates, reserving the remaining powers to the

1   States.  U.S. Const. amend. X ("The powers not delegated to the

2   United States by the Constitution, nor prohibited by it to the

3   States, are reserved to the States respectively, or to the

4   people.").  Thus, rather than wielding a plenary power to

5   legislate, Congress may only enact legislation under those powers

6   enumerated in the Constitution.  See Murphy v. Nat'l Collegiate

7   Athletic Ass'n, 138 S. Ct. 1461, 1476 (2018) ("The Constitution

8   confers on Congress not plenary legislative power but only

9   certain enumerated powers."); United States v. Morrison, 529 U.S.

10  598, 607 (2000) ("Every law enacted by Congress must be based on

11  one or more of its powers enumerated in the Constitution.").

12      The United States' broad power over "the subject of

13  immigration and the status of aliens" is undisputed.  Arizona,

14  567 U.S. at 394.[2]  "But the Court has never held that every state

15  enactment which in any way deals with aliens is a regulation of

16  immigration and thus per se pre-empted by this constitutional

17  power, whether latent or exercised."  DeCanas v. Bica, 424 U.S.

18  351, 355 (1976) superseded by statute on other grounds as

19  recognized in Arizona, 567 U.S. at 404.

20          1.   Obstacle Preemption

21      Where Congress has the power to enact legislation it has the

22  power to preempt state law, even in areas traditionally regulated

23  by the States.  See Arizona, 567 U.S. at 399; Gregory, 501 U.S.

24  at 460.  Courts recognize three types of preemption: express

25  ─────────────
    [2] Unless quoting from another source, this Court will use the
26  term "immigrant" when referring to "any person not a citizen or
    national of the United States."  Cf. 8 U.S.C § 1101(a)(3)
27  (defining "alien").  For persons who have not obtained lawful
    immigration or citizenship status, the Court will use the term
28  "undocumented immigrants."

                                6

1  preemption, field preemption, and conflict preemption.

2  Plaintiff's preemption argument is primarily premised on the most

3  enigmatic member of this doctrinal family, "obstacle" preemption—

4  a species of conflict preemption.

5      Conflict preemption is found in cases where it is physically

6  impossible to comply with both federal and state regulations or

7  in cases where the "challenged state law 'stands as an obstacle

8  to the accomplishment and execution of the full purposes and

9  objectives of Congress.' " Arizona, 567 U.S. at 399–400 (quoting

10  Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "What is a

11  sufficient obstacle is a matter of judgment, to be informed by

12  examining the federal statute as a whole and identifying its

13  purpose and intended effects." Crosby v. Nat'l Foreign Trade

14  Council, 530 U.S. 363, 373 (2000).  The Court must examine and

15  consider the entire scheme of the federal statute, including

16  those elements expressed and implied.  Id.  "If the purpose of

17  the act cannot otherwise be accomplished—if its operation within

18  its chosen field else must be frustrated and its provisions be

19  refused their natural effect—the state law must yield to the

20  regulation of Congress within the sphere of its delegated power."

21  Id. at 373 (quoting Savage v. Jones, 225 U.S. 501, 533 (1912)).

22      There is a strong presumption against preemption when

23  Congress legislates in an area traditionally occupied by the

24  States.  Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136,

25  1141 (9th Cir. 2015).  The Court presumes " 'the historic police

26  powers of the States' are not superseded 'unless that was the

27  clear and manifest purpose of Congress.' " Arizona, 567 U.S. at

28  400 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230

7

1  (1947)); see Rice, 331 U.S. at 230 (When Congress legislates in a

2  "field which the States have traditionally occupied[,] [] we

3  start with the assumption that the historic police powers of the

4  States were not to be superseded by the Federal Act unless that

5  was the clear and manifest purpose of Congress."). Such purpose

6  must be "unmistakably clear in the language of the statute,"

7  Gregory, 501 U.S. at 460 (quoting Atascadero State Hosp. v.

8  Scanlon, 473 U.S. 234 (1985)), as must the presence of an

9  obstacle. Chinatown Neighborhood Ass'n, 794 F.3d at 1141 ("[T]he

10  California statute cannot be set aside absent 'clear evidence' of

11  a conflict."); see also Savage, 225 U.S. at 533 (1912) ("In other

12  words, [the intent to supersede the State's exercise of its

13  police power] is not to be implied unless the act of Congress,

14  fairly interpreted, is in actual conflict with the law of the

15  state."). "Mere possibility of inconvenience" is not a

16  sufficient obstacle—the repugnance must be "so direct and

17  positive that the two acts cannot be reconciled or consistently

18  stand together." See Goldstein v. California, 412 U.S. 546, 554–

19  55 (1973) (quoting The Federalist No. 32, p. 243 (B. Wright ed.

20  1961)); Kelly v. Washington ex rel. Foss Co., 302 U.S. 1, 10

21  (1937).

22     The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101

23  et seq., is "the comprehensive federal statutory scheme for

24  regulation of immigration and naturalization." DeCanas, 424 U.S.

25  at 353. Congress has amended and supplemented the scheme over

26  the years by passing statutes like the Immigration Reform and

27  Control Act ("IRCA") and the Illegal Immigration Reform and

28  Immigrant Responsibility Act ("IIRIRA" or "IIRAIRA"), among

8

1  others.  Plaintiff argues that the INA, as amended, preempts the

2  state laws challenged in this case.  Mot. at 2-3, 11-32.

3          2.   Intergovernmental Immunity

4      The Supremacy Clause gives rise to another doctrine

5  restricting States' power: the doctrine of intergovernmental

6  immunity.  Under this line of precedent, a State may not regulate

7  the United States directly or discriminate against the Federal

8  Government or those with whom it deals.  North Dakota v. United

9  States, 495 U.S. 423, 435 (1990) (plurality op.).  "Since a

10 regulation imposed on one who deals with the Government has as

11 much potential to obstruct governmental functions as a regulation

12 imposed on the Government itself, the Court has required that the

13 regulation be one that is imposed on some basis unrelated to the

14 object's status as a Government contractor or supplier, that is,

15 that it be imposed equally on other similarly situated

16 constituents of the State."  North Dakota, 495 U.S. at 437-38.

17 The doctrine protects private entities and individuals even when

18 the burdens imposed upon them are not then passed on to the

19 Federal Government.  See Davis v. Michigan Dep't of Treasury, 489

20 U.S. 803, 814-15, 817 (1989) (finding a state tax system that

21 favored state retirees over federal retirees violated

22 intergovernmental immunity even though the tax arguably did not

23 interfere with the Federal Government's ability to perform its

24 governmental functions) (citing Phillips Chem. Co. v. Dumas

25 Indep. Sch. Dist., 361 U.S. 376, 387 (1960)).  Though the

26 doctrine finds its most comfortable repose in tax cases, courts

27 have extended its reach to other contexts.  See, e.g., North

28 Dakota, 495 U.S. 423 (analyzing North Dakota's liquor control

9

1   regulations); Boeing Co. v. Movassaghi, 768 F.3d 832 (9th Cir.

2   2014) (analyzing a California law governing cleanup of a federal

3   nuclear site); In re Nat'l Sec. Agency Telecomms. Records Litig.,

4   633 F. Supp. 2d 892 (N.D. Cal. 2007) (analyzing state

5   investigations into telecommunication carriers that concerned the

6   alleged disclosures of customer records to the NSA).

7       A targeted regulation is not invalid simply because it

8   distinguishes between the two sovereigns.  "The State does not

9   discriminate against the Federal Government and those with whom

10  it deals unless it treats someone else better than it treats

11  them."  North Dakota, 495 U.S. at 437–38 (quoting Washington v.

12  United States, 460 U.S. 536, 544–545 (1983)).  Accordingly, a

13  regulation should not be struck down unless it burdens the

14  Federal Government (or those dealing with the Federal Government)

15  more so than it does others.  North Dakota, 495 U.S. at 439

16  (finding a regulatory regime that did not disfavor the Federal

17  Government could not be considered to discriminate against it).

18  Furthermore, a regulation will survive if significant differences

19  between the two classes justify the burden.  Davis, 489 U.S. at

20  815–17.  "The relevant inquiry is whether the inconsistent []

21  treatment is directly related to, and justified by, significant

22  differences between the two classes."  Id. at 816 (citation and

23  quotation marks omitted).

24      C.   Tenth Amendment

25      The Tenth Amendment limits Congress's legislative authority

26  to those powers enumerated in the Constitution.  Absent from this

27  list of powers "is the power to issue direct orders to the

28  governments of the States."  Murphy, 138 S. Ct. at 1476.  Thus,

1  in addition to erecting a higher wall against preemption, the

2  Tenth Amendment restrains Congress's ability to impose its will

3  upon the States directly.

4      The Supreme Court's so-called "anticommandeering" doctrine

5  recognizes this check on Congressional power.  Congress may not

6  directly compel States to enact a regulation or enforce a federal

7  regulatory program, conscript state officers for such purpose, or

8  prohibit a State from enacting laws.  See New York v. United

9  States, 505 U.S. 144, 188 (1992) ("The Federal Government may not

10  compel the States to enact or administer a federal regulatory

11  program."); Printz v. United States, 521 U.S. 898, 935 (1997)

12  ("Today we hold that Congress cannot circumvent that prohibition

13  by conscripting the State's officers directly."); Murphy, 138 S.

14  Ct. at 1478 ("The PASPA provision at issue here—prohibiting state

15  authorization of sports gambling—violates the anticommandeering

16  rule. That provision unequivocally dictates what a state

17  legislature may and may not do.").  Even requiring state officers

18  to perform discrete, ministerial tasks violates the doctrine.

19  Printz, 521 U.S. at 929–30.

20      The reasons behind the anticommandeering doctrine are

21  several.  See Murphy, 138 S. Ct. at 1477 (Part III-B).  First,

22  the rule reflects "the Constitution's structural protections of

23  liberty."  Printz, 521 U.S. at 921.  By balancing power between

24  the sovereigns, it prevents the accumulation of excessive power

25  and "reduce[s] the risk of tyranny and abuse from either front."

26  Gregory, 501 U.S. at 458.  Second, the doctrine prevents Congress

27  from passing the costs and burdens of implementing a federal

28  program onto the States.  Printz, 521 U.S. at 930.  Third, the

1  doctrine promotes accountability; it ensures that blame for a

2  federal program's burdens and defects falls on the responsible

3  government.  Id. ("And it will likely be the [state chief law

4  enforcement officers], not some federal official, who will be

5  blamed for any error (even one in the designated federal

6  database) that causes a purchaser to be mistakenly rejected.").

7  These reasons, among others, counsel that courts must adhere to

8  the strictures of the rule even where a Congressional act serves

9  important purposes, is most efficiently effectuated through state

10 officers, or places a minimal burden upon the State.  Id. at 932.

11 "It is the very principle of separate state sovereignty that such

12 a law offends, and no comparative assessment of the various

13 interests can overcome that fundamental defect."  Id.

14                          III.  OPINION

15      A.   Likelihood of Success on the Merits

16           1.   Assembly Bill 103

17      Approved by the Governor and filed with the Secretary of

18 State on June 27, 2017, Assembly Bill 103 added Section 12532 to

19 the California Government Code and directs the Attorney General

20 to review and report on county, local, and private locked

21 detention facilities in which noncitizens are housed or detained

22 for purposes of civil immigration proceedings in California.

23 Cal. Gov't Code § 12532.  It directs the Attorney General to

24 conduct a review of such facilities by March 1, 2019.  Cal. Gov't

25 Code § 12532(b).  This review must include a review of the

26 conditions of confinement, the standard of care and due process

27 provided to the individuals housed or detained in the facilities,

28 and the circumstances around their apprehension and transfer to

1    the facility.  Cal. Gov't Code § 12532(b)(1).  Additionally—by

2    the same deadline—the Attorney General must provide a

3    comprehensive report of his findings to the Legislature, the

4    Governor, and the public.  Cal. Gov't Code § 12532(b)(2).  In

5    furtherance of this objective, the Attorney General "shall be

6    provided all necessary access for the observations necessary to

7    effectuate [these] reviews . . . , including, but not limited to,

8    access to detainees, officials, personnel, and records."  Cal.

9    Gov't Code § 12532(c).

10        Plaintiff argues that this review and reporting requirement

11   interferes with the Federal Government's exclusive authority in

12   the area of immigrant detention.  Mot. at 18–19.  Because the

13   decision whether to pursue removal is entrusted to the Federal

14   Government's discretion, California's efforts to assess the

15   process afforded to immigrant detainees poses an obstacle,

16   Plaintiff contends, to administering the federal immigration

17   scheme.  Id. at 19–20.  "Federal law," it argues, "does not

18   contemplate any role for the facility itself, or for states and

19   localities, in determining which aliens are properly subject to

20   detention or the terms and conditions of that detention."  Id. at

21   18.

22        Defendant responds that the Legislature passed AB 103 in

23   reaction to growing concerns of egregious conditions in

24   facilities housing civil detainees.  Opp'n at 6 (citing Decl. of

25   Holly Cooper and Def. RFJN, Exh. K (Office of Inspector General,

26   Management Alert on Issues Requiring Immediate Action at the Theo

27   Lacy Facility in Orange, California, OIG-17-43-MA, March 6,

28   2017)).  Several amici echo these concerns.  See See Br. for

1  Nat'l Health Law Program, et al., as Amici Curiae, ECF No. 104;

2  Br. for Immigrant Legal Res. Ctr., et al., as Amici Curiae, ECF

3  No. 126; Br. for Nat'l Immigr. Law Ctr., et al., as Amici Curiae,

4  ECF No. 136.  Defendant argues the review and reporting AB 103

5  requires fall well within the Attorney General's broad

6  constitutional powers to enforce state laws and conduct

7  investigations relating to subjects under his jurisdiction.

8  Opp'n at 6 (citing Cal. Const. art. V, § 13; Cal. Gov't Code

9  § 11180).  Rather than enacting a new regulatory scheme or

10 imposing substantive requirements, AB 103 "simply authorizes

11 funding" to address issues the Attorney General already has the

12 authority to review in response to increased concerns in this

13 area.  Id. at 7, 30; June 20, 2018, Hearing Transcript

14 ("Trans."), ECF No. 189, at 25:2-13.

15      The Court finds no indication in the cited portions of the

16 INA that Congress intended for States to have no oversight over

17 detention facilities operating within their borders.  See 8

18 U.S.C. § 1231(g)(1)-(2); 8 U.S.C. § 1103(a)(11).  Indeed, the

19 detention facility contracts Defendant provided to the Court

20 expressly contemplate compliance with state and local law.

21 Melton Decl., Exhs. M-S (filed under seal), ECF No. 81.  These

22 contracts demonstrate that California retains some authority over

23 the detention facilities.  Contrary to Plaintiff's

24 characterization, AB 103's review process does not purport to

25 give California a role in determining whether an immigrant should

26 be detained or removed from the country.  The directive

27 contemplates increased transparency and a report that may serve

28 as a baseline for future state or local action.  At this point,

1   what that future action might be is subject to speculation and
2   conjecture.

3       The review and reporting requirement contemplated in AB 103
4   is different from the state licensing requirements struck down in
5   Leslie Miller and Gartrell.  See Leslie Miller, Inc. v. Arkansas,
6   352 U.S. 187, 190 (1956); Gartrell Const. Inc. v. Aubry, 940 F.2d
7   437 (9th Cir. 1991).  In Leslie Miller, the Supreme Court held
8   that an Arkansas statute imposing licensing requirements on a
9   federal contractor interfered with the federal government's power
10  to select contractors and schedule construction, and therefore
11  conflicted with the federal law regulating procurement.  352 U.S.
12  at 190.  Thirty-five years later, the Ninth Circuit upheld an
13  injunction of a similar licensing requirement as applied to a
14  federal contractor in California.  Gartrell, 940 F.2d at 438.  It
15  found that the Federal Government already considered many of the
16  factors involved in the State's licensing determination during
17  its own "responsibility" determination and held that, under
18  Leslie Miller, the licensing requirement was preempted.  Id. at
19  438–41.  The Circuit reasoned: "Because the federal government
20  made a direct determination of Gartrell's responsibility,
21  California may not exercise a power of review by requiring
22  Gartrell to obtain state licenses."  Id. at 441.

23      Unlike state licensing regulations, AB 103 does not impose
24  any substantive requirements upon detention facilities.  For all
25  its bark, the law has no real bite.  It directs the Attorney
26  General to channel an authority he already wields to an issue of
27  recent State interest.  The facility need only provide access for
28  these reviews, which is of little or no consequence.  Given the

15

1  Attorney General's power to conduct investigations related to

2  state law enforcement—a power which Plaintiff concedes, Trans. at

3  15:11-16:5—the Court does not find this directive in any way

4  constitutes an obstacle to the federal government's enforcement

5  of its immigration laws or detention scheme.

6  There is, however, one federal regulation that might

7  directly conflict with Government Code Section 12532(c).  Under 8

8  C.F.R. § 236.6, no one—including state or local government

9  entities or any privately operated detention facility—who obtains

10  information relating to any detainee, "shall disclose or

11  otherwise permit to be made public the name of, or other

12  information relating to, such detainee."  It continues:

13  
14  
15  
16  
17  
18  
19  
> Such information shall be under the control of the
> Service and shall be subject to public disclosure only
> pursuant to the provisions of applicable federal laws,
> regulations and executive orders. Insofar as any
> documents or other records contain such information,
> such documents shall not be public records. This
> section applies to all persons and information
> identified or described in it, regardless of when such
> persons obtained such information, and applies to all
> requests for public disclosure of such information,
> including requests that are the subject of proceedings
> pending as of April 17, 2002.

20  8 C.F.R. § 236.6 (Information regarding detainees).

21  According to Plaintiff, this regulation establishes that

22  information regarding detainees belongs solely to the Federal

23  Government and that facilities violate the regulation by turning

24  such information over to the Attorney General.  Mot. at 22; Reply

25  at 9.  For additional support, Plaintiff quotes the supplementary

26  information published with the rule in the Federal Register,

27  wherein the Immigration and Naturalization Service explained that

28  "the rule guarantees that information regarding federal detainees

16

1  will be released under a uniform federal scheme rather than the

2  varying laws of the fifty states."  68 Fed. Reg. 4364, 4366 (Jan.

3  29, 2003).

4      Defendant counters that there is no conflict because the

5  regulation prohibits only the public disclosure of information

6  about detainees, not disclosure to other government entities.

7  Opp'n at 30-31.  Because the Attorney General "conducts these

8  reviews in his capacity as the chief law officer of the State,"

9  and "not as a member of the public," Defendant maintains there is

10 no conflict.  Id.  Defendant points out that AB 103, on its face,

11 does not provide for disclosure of detainee information to the

12 public.  Id.  Further, such disclosure is unlikely because "much

13 if not all" of the information in question remains confidential

14 under state law.  Id.

15     The Court agrees with Defendant that there is no conflict

16 apparent on the face of Section 12532(c).  The federal regulation

17 at issue is most naturally read to prohibit public disclosures of

18 information, not the provision of information to other

19 governmental entities or law enforcement.  8 C.F.R. § 236.6.  The

20 information published in the Federal Register supports this

21 interpretation.  68 Fed. Reg. 4364, 4364 ("Summary: This final

22 rule governs the public disclosure . . . of the name and other

23 information relating to any immigration detainee[.]"), 4365

24 ("These provisions plainly authorize the Attorney General . . .

25 to provide by regulation that persons housing INS detainees on

26 behalf of the federal government shall not publicly disclose the

27 names and other information regarding those detainees."), 4367

28 ("Executive Order 13132[:] . . . This rule merely pertains to the

1   public disclosure of information concerning Service detainees

2   . . . .  In effect, the rule will relieve state or local

3   government entities of responsibility for the public release of

4   information relating to any immigration detainee being housed or

5   otherwise maintained or provided service on behalf of the

6   Service.  Instead, the rule reserves that responsibility to the

7   Service with regard to all Service detainees.").  Plaintiff's

8   cited cases do not broaden the scope of the rule; each case

9   concerned public disclosure of detainee information, not the

10  provision of information to another government entity.  See Voces

11  De La Frontera, Inc. v. Clarke, 373 Wis. 2d 348 (2017) (finding

12  records concerning detainees statutorily exempt from disclosure

13  under Wisconsin's public records law); Comm'r of Corr. v. Freedom

14  of Info. Comm'n, 307 Conn. 53 (2012) (finding former detainee's

15  records exempt from Connecticut's Freedom of Information Act);

16  ACLU of New Jersey v. Cnty. of Hudson, 352 N.J. Super. 44 (2002)

17  (finding § 236.6 preempts New Jersey's Right-to-Know Law to the

18  extent it requires public disclosure of information regarding INS

19  detainees).

20      Plaintiff nevertheless contends that California's Attorney

21  General is a member of the public as contemplated by the

22  regulation.  But Plaintiff did not identify, and the Court is

23  unaware of, any judicial decision interpreting the regulation to

24  restrict information sharing with government entities or law

25  enforcement.  The regulation contemplates that such information

26  would fall into the hands of state and local government entities

27  through their contractual relationships with the federal

28  government.  In light of the California Attorney General's role

18

1   in state law enforcement, and without any authority to the

2   contrary, the Court does not find a conflict, express or implied,

3   between the access required under Government Code Section

4   12532(c) and 8 C.F.R. § 236.6.

5        Finally, the Court finds AB 103 is not invalid under the

6   doctrine of intergovernmental immunity.  Plaintiff argues the law

7   violates this doctrine because it imposes a review scheme on

8   facilities contracting with the federal government, only.  This

9   characterization is valid.  However, the burden placed upon the

10  facilities is minimal and Plaintiff's evidence does not show

11  otherwise.  See Homan Decl. at ¶ 60 (summarily stating that the

12  inspections are burdensome).  Importantly, the review appears no

13  more burdensome than reviews required under California Penal Code

14  §§ 6030, 6031.1.  Thus, even if AB 103 treats federal contractors

15  differently than the State treats other detention facilities,

16  Plaintiff has not shown the State treats other facilities better

17  than those contractors.  North Dakota, 495 U.S. at 437–38 ("The

18  State does not discriminate against the Federal Government and

19  those with whom it deals unless it treats someone else better

20  than it treats them.").

21       Plaintiff is not likely to succeed on the merits of this

22  claim. Its motion for a preliminary injunction as to AB 103 is

23  denied.

24            2.   Assembly Bill 450

25       The regulation of employment traditionally falls within the

26  States' police power:

27  ///

28  ///

> States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples.

DeCanas v. Bica, 424 U.S. 351, 356 (1976) (decision superseded by statute).

AB 450 imposes various requirements on public and private employers with respect to immigration worksite enforcement actions.  2017 Cal. Stat., ch. 492 (A.B. 450).  It prohibits employers from providing voluntary consent to an immigration enforcement agent to enter nonpublic areas of a place of labor or to access, review, or obtain the employer's employee records.  Cal. Gov't Code §§ 7285.1, 7285.2.  It requires employers to provide notice to their employees of any impending I-9 (or other employment record) inspection within 72 hours of receiving notice of that inspection.  Cal. Lab. Code § 90.2.  Lastly, AB 450 prohibits employers from reverifying the employment eligibility of current employees when not required by federal law.  Cal. Lab. Code § 1019.2.  As passed, AB 450 states that its provisions are severable.  2017 Cal. Stat., ch. 492, Sec. 6 (A.B. 450).

Plaintiff challenges AB 450 as applied to private employers only,  Compl. ¶¶ 35, 61, Trans. at 10:2-19, arguing that the above-noted additions to state law pose an obstacle to immigration enforcement objectives under the Immigration Reform and Control Act ("IRCA") and the INA.

"Congress enacted IRCA as a comprehensive framework for 'combatting the employment of illegal aliens.' " Arizona, 567 U.S. at 404.  IRCA imposes criminal sanctions on employers who

1  knowingly hire, recruit, refer, or continue to employ

2  unauthorized workers, but does not impose criminal sanctions on

3  employees.  8 U.S.C. § 1324a; Arizona, 567 U.S. at 404-07 ("The

4  correct instruction to draw from the text, structure, and history

5  of IRCA is that Congress decided it would be inappropriate to

6  impose criminal penalties on aliens who seek or engage in

7  unauthorized employment.").  The statute authorizes the Attorney

8  General to establish procedures for complaints and

9  investigations.  8 U.S.C. § 1324a(e)(1).  It also confers

10  authority upon immigration officers and administrative law judges

11  to be given "reasonable access to examine evidence of any person

12  or entity being investigated" and to compel by subpoena the

13  attendance of witnesses and the production of evidence.  8 U.S.C.

14  § 1324a(e)(2).

15      The Supreme Court has found IRCA preempts additional

16  penalties on employers (via express preemption) and criminal

17  sanctions on unauthorized workers for seeking or performing work

18  (via conflict preemption).  Arizona, 567 U.S. 387.  Courts have

19  held IRCA does not preempt: a provision of Arizona law allowing

20  suspension and revocation of businesses licenses based on

21  employing unauthorized workers, Chamber of Commerce of U.S. v.

22  Whiting, 563 U.S. 582 (2011); an Arizona law requiring that every

23  employer verify the employment eligibility of hired employees

24  through the E-Verify system, id. (as amended by IIRIRA); and

25  various labor protections, with some limits on the damages an

26  unlawfully employed immigrant is entitled to receive, see, e.g.,

27  Salas v. Sierra Chem. Co., 59 Cal.4th 407 (2014) (holding the

28  State's extension of employee protections to all workers

1  regardless of immigration status is preempted only to the extent

2  it authorizes lost pay awards for any period after an employer

3  discovers the employee's ineligibility to work in the United

4  States).

5              a.    Prohibitions on Consent

6       The Court finds AB 450's prohibitions on consent, Cal. Gov't

7  Code §§ 7285.1, 7285.2., troubling due to the precarious

8  situation in which it places employers.  Trans. at 92:9–18.

9  Despite that concern, the question before the Court is limited to

10 Plaintiff's Supremacy Clause claim and the relationship between

11 the State and the Federal Government.

12      Plaintiff's preemption argument rests on the notion that

13 Congress presumed immigration enforcement officers could gain

14 access to worksites by consent of the employer.  Mot. at 11–13.

15 Plaintiff contends the entire enforcement scheme is premised on

16 this authority.  Id.

17      Defendant does not dispute that immigration enforcement

18 agents could, prior to AB 450, gain access to nonpublic areas of

19 a worksite through employer consent.  In enacting AB 450, the

20 state legislators acknowledged that immigration officers could do

21 so under existing law.  See Pl. Exh. J (Senate Judiciary

22 Committee Report), ECF No. 171-10.  But, Defendant argues, the

23 entry and access provisions do not conflict with IRCA because

24 "IRCA was not intended to diminish states' labor protections."

25 Opp'n at 26.  Because AB 450 permits entry and access pursuant to

26 judicial warrant (or subpoena, for documents), or when otherwise

27 required by federal law, Defendant claims the law does not deny

28 the "reasonable access to examine evidence" required under IRCA.

1   See 8 U.S.C. § 1324a(e)(2).

2       The arguments are wanting on both sides.  By attempting to
3   narrow the Court's focus to the criminal penalties at issue under
4   IRCA, Defendant fails to acknowledge that immigration enforcement
5   officers might also seek to investigate civil violations of the
6   immigration laws or pursue investigative activities outside of
7   IRCA's provisions.  As Plaintiff pointed out at the June 20,
8   2018, hearing on its Motion, Trans. at 114:20–115:11, IRCA added
9   new sections to the already existing law governing immigration
10  enforcement activities; Defendant did not address any of these
11  other grants of power.  Further, Defendant cites no authority for
12  its proposition that AB 450's judicial warrant requirement and
13  savings clause together constitute "reasonable access" under
14  IRCA.  Irrespective of the State's interest in protecting
15  workers, the Court finds that the warrant requirement may impede
16  immigration enforcement's investigation of employers or other
17  matters within their authority to investigate.

18      Even though these two subsections of AB 450 interfere with
19  immigration enforcement's historical practices, the Court
20  hesitates to find the statutes preempted.  In preemption
21  analysis, the Court presumes " 'the historic police powers of the
22  States' are not superseded 'unless that was the clear and
23  manifest purpose of Congress.' " Arizona, 567 U.S. at 400.  Laws
24  governing labor relations and the workplace generally fall within
25  the States' police powers.  Congress has not expressly authorized
26  immigration officers to enter places of labor upon employer
27  consent, nor has Congress authorized immigration enforcement
28  officers to wield authority coextensive with the Fourth

23

1  Amendment.  Although Plaintiff's cited cases show instances of

2  immigration enforcement lawfully exercising its investigative

3  authority in accordance with the Fourth Amendment, none of these

4  cases establish that Congress has expressly or impliedly granted

5  immigration enforcement agents such authority.  See I.N.S. v.

6  Delgado, 466 U.S. 210 (1984) (noting that the federal immigration

7  officers were lawfully present at a worksite because they

8  obtained either a warrant or the employer's consent to their

9  entry); Zepeda v. I.N.S., 753 F.2d 719, 725 (9th Cir. 1983)

10 (explaining that Congress, by authorizing the INS "to interrogate

11 any alien or person believed to be an alien as to his right to be

12 or to remain in the United States" without a warrant, authorized

13 the INS "to question aliens to the fullest extent permissible

14 under the [F]ourth [A]mendment") (citing 8 U.S.C. § 1357(a)(1));

15 Int'l Molders & Allied Workers' Local Union No. 164 v. Nelson,

16 799 F.2d 547 (9th Cir. 1986) (striking part of an injunction

17 order that required every INS warrant to "contain a specific

18 description of each suspect to be questioned and be based on

19 'probable cause to believe that such person is an illegal

20 alien' " because it misstated the standard for non-detentive

21 questioning").  Nor do these cases show consent to be an

22 essential pillar of the enforcement regime.  Certainly, obstacle

23 preemption may be "implied," but precedent counsels against

24 reading Congressional "presumptions" or "assumptions" into the

25 statutes without a more robust record than that presently before

26 the Court.

27     Ultimately, however, the Court need not resolve the

28 preemption issue because Plaintiff is likely to succeed on its

Supremacy Clause claim under the intergovernmental immunity doctrine.  The doctrine applies in these circumstances even though the laws regulate employers and not the Federal Government directly.  See Davis, 489 U.S. at 814, 817; Phillips Chem. Co., 361 U.S. at 387 (holding that state taxes imposed on lessees of federal land were invalid where those taxes were more burdensome than taxes imposed on lessees of state land).  For those employers who choose to allow immigration enforcement agents to enter or access documents, AB 450 imposes significant and escalating fines.  See Cal. Gov't Code § 7285.1(b) (subjecting employers to a fine of $2,000 to $5,000 for a first violation and $5,000 to $10,000 for each subsequent violation); Cal. Gov't Code § 7285.2(b) (same).  These fines inflict a burden on those employers who acquiesce in a federal investigation but not on those who do not.

Defendant argues the application of the doctrine in these circumstances would expand its reach.  It notes that the intergovernmental immunity cases evaluating indirect discrimination have typically concerned laws that imposed burdens on entities contracting with, or supplying something to, the Federal Government, thus "dealing" with the United States in an economic sense.  Trans. at 93:1-95:6.

The Court is not convinced that the term "deal" is circumscribed in the manner Defendant suggests.  As in other intergovernmental immunity cases, the imposition of civil fines (like the imposition of taxes) turns on whether an employer chooses to work with federal immigration enforcement.  These fines are a clear attempt to "meddl[e] with federal government

1  activities indirectly by singling out for regulation those who

2  deal with the government." See In re NSA, 633 F. Supp. 2d at

3  903.  The Court does not find Defendant's argument that the law

4  is neutral convincing.  Opp'n at 29 (arguing the law applies to

5  "any person or entity seeking to enforce the civil immigration

6  laws, whether federal, state, or local").  Given that immigration

7  enforcement is the province of the Federal Government, it demands

8  no stretch of reason to see that Government Code Sections 7285.1

9  and 7285.2, in effect, target the operations of federal

10 immigration enforcement.

11      The Court finds that a law which imposes monetary penalties

12 on an employer solely because that employer voluntarily consents

13 to federal immigration enforcement's entry into nonpublic areas

14 of their place of business or access to their employment records

15 impermissibly discriminates against those who choose to deal with

16 the Federal Government.  The law and facts clearly support

17 Plaintiff's claim as to these two subsections and Plaintiff is

18 likely to succeed on the merits.

19                    b.   Notice Requirement

20      AB 450 also added a provision to the California Labor Code

21 requiring employers to provide notice to their employees "of any

22 inspections of I-9 Employment Eligibility Verification forms or

23 other employment records conducted by an immigration agency

24 within 72 hours of receiving notice of the inspection."  Cal.

25 Lab. Code § 90.2(a)(1).  It specifies the contents of the

26 requisite notice and instructs employers to provide a copy of the

27 inspection notice to any employee upon reasonable request.  Id.

28 § 90.2(a)(1)-(3).

1    Labor Code Section 90.2 also requires employers to provide

2  each current, affected employee with the results of the

3  inspection within 72 hours of receipt, including any obligations

4  of the employer and affected employee arising from the results.

5  Id. § 90.2(b).  The statute defines an "affected employee" as "an

6  employee identified by the immigration agency inspection results

7  to be an employee who may lack work authorization, or an employee

8  whose work authorization documents have been identified by the

9  immigration agency inspection to have deficiencies."  Id.

10 § 90.2(b)(2).  Employers are subject to civil penalties for

11 violations, except that the section "does not require a penalty

12 to be imposed upon an employer or person who fails to provide

13 notice to an employee at the express and specific direction or

14 request of the federal government."  Id. § 90.2(c).

15    Plaintiff argues that this notice provision stands as an

16 obstacle to the implementation of federal law by aiming to thwart

17 immigration regulation.  Reply at 5.  "Obviously," it argues,

18 investigations "will be less effective if the targets of the

19 investigations are warned ahead of time and kept abreast of the

20 status of the United States' enforcement efforts."  Mot. at 17.

21    This argument convolutes the purposes of IRCA enforcement

22 actions.  IRCA primarily imposes obligations and penalties on

23 employers, not employees.  See 8 U.S.C. § 1324a.  The new

24 California Labor Code section only requires employers to provide

25 notice to employees if the employer itself has received notice of

26 an impending inspection.  The "targets" of the investigation have

27 thus already been "warned."  Pursuant to federal regulations,

28 employers are to be given at least three business days' notice

1  prior to an I-9 inspection.  See 8 C.F.R. § 274a.2(b)(2)(ii).

2  The state law merely extends this prior notice to employees.

3  Given IRCA's focus on employers, the Court finds no indication—

4  express or implied—that Congress intended for employees to be

5  kept in the dark.

6       The Court declines to adopt Plaintiff's cynical view of the

7  law.  As amici point out, notice provides employees with an

8  opportunity to cure any deficiencies in their paperwork or

9  employment eligibility.  See Br. for Cal. Labor Fed'n, et al., as

10  Amici Curiae, ECF No. 134.  Federal law affords such a courtesy

11  to employers; the Court does not view an extension of that

12  courtesy to employees as an attempt to thwart IRCA's goals.

13       The notice provision also does not violate the

14  intergovernmental immunity doctrine.  Unlike the prohibitions on

15  consent, violations of this provision do not turn on the

16  employer's choice to "deal with" (i.e., consent to) federal law

17  enforcement.  An employer is not punished for its choice to work

18  with the Federal Government, but for its failure to communicate

19  with its employees.  This requirement does not readily fit into

20  the contours of the intergovernmental immunity doctrine and

21  application would stretch the doctrine beyond its borders.  The

22  Court thus finds no merit to Plaintiff's Supremacy Clause claim

23  as to California Labor Code Section 90.2.  Plaintiff's motion for

24  a preliminary injunction as to this subdivision of AB 450 is

25  denied.

26            c.   Reverification Prohibition

27       California Labor Code Section 1019.2 limits an employer's

28  ability to reverify an employee's employment eligibility when not

1  required by law:

2        Except as otherwise required by federal law, a public
       or private employer, or a person acting on behalf of a
3      public or private employer, shall not reverify the
       employment eligibility of a current employee at a time
4      or in a manner not required by Section 1324a(b) of
       Title 8 of the United States Code.
5

6  Cal. Lab. Code § 1019.2(a).  An employer that violates this

7  subsection is subject to a civil penalty of up to $10,000.  Id.

8  § 1019.2(b)(1).  The law should not be "interpreted, construed,

9  or applied to restrict or limit an employer's compliance with a

10  memorandum of understanding governing the use of the federal E-

11  Verify system."  Id. § 1019.2(c).

12       Under IRCA, an employer faces liability for continuing to

13  employ an immigrant in the United States knowing that the

14  immigrant is (or has become) unauthorized with respect to such

15  employment.  8 U.S.C. § 1324a(2).  Plaintiff argues that this

16  continuing obligation to avoid knowingly employing an

17  unauthorized immigrant worker conflicts with California's

18  prohibition on reverification.  Mot. at 17–18 (citing New El Rey

19  Sausage Co., Inc. v. I.N.S., 925 F.2d 1153 (9th Cir. 1991)).

20  Defendant responds that there is no obstacle because the state

21  law contains an express savings clause for instances where

22  reverification is required by federal law and does not limit an

23  employer's compliance with a memorandum of understanding

24  governing the use of the federal E-Verify system.  Opp'n at 26–

25  28.

26       The Court finds Plaintiff is likely to succeed on the merits

27  of this claim, with the caveat that a more complete evidentiary

28  record could impact the Court's analysis at a later stage of this

litigation.  Neither party provided the Court with much
information on how the verification system currently works in
practice and how the new law does or does not change those
practices.  Based on a plain reading of the statutes, the
prohibition on reverification appears to stand as an obstacle to
the accomplishment of Congress's purpose in enacting IRCA.  See
Arizona, 567 U.S. at 399-400.  Congress could have chosen to tie
employer liability to instances when an employer fails to verify
employment eligibility when required to do so by federal law.
Instead, Congress broadened liability to encompass situations
when an employer knows one of its immigrant employees is or has
become unauthorized to work and continues to employ them.  In a
single act, Congress premised criminal sanction on an employer's
subjective knowledge and established a system through which
employers could verify compliance with the law.  As the Ninth
Circuit explained in New El Rey Sausage Co.:

> The inclusion in the statute of section 1324a(b)'s
> verification system demonstrates that employers, far
> from being allowed to employ anyone except those whom
> the government had shown to be unauthorized, have an
> affirmative duty to determine that their employees are
> authorized. This verification is done through the
> inspection of documents. Notice that these documents
> are incorrect places the employer in the position it
> would have been if the alien had failed to produce the
> documents in the first place: it has failed to
> adequately ensure that the alien is authorized.

925 F.2d at 1158.  Prohibiting employers from reverifying
employment eligibility complicates the subjective element of the
crime; e.g., could an employer who might otherwise be found to
"know" that one of its employees lacks authorization find shelter
behind the state law because it could not confirm its suspicion?
The law frustrates the system of accountability that Congress

30

1    designed.

2          Based on the authority and evidence before the Court at this

3    juncture, which clearly support Plaintiff's claim, the Court

4    finds Plaintiff is likely to succeed on the merits of its

5    Supremacy Clause claim against California Labor Code Section

6    1019.2(a).

7              3.   Senate Bill 54

8          SB 54 added several subsections to the California Government

9    Code.  Plaintiff seeks to enjoin three of these subsections.  The

10   first two challenged by Plaintiff prohibit state law enforcement

11   agencies from sharing  certain information for immigration

12   enforcement purposes:

13         (a) California law enforcement agencies shall not:

14         (1) Use agency or department moneys or personnel to
           investigate, interrogate, detain, detect, or arrest
15         persons for immigration enforcement purposes, including
           any of the following:
16
           . . .
17
           (C) Providing information regarding a person's release
18         date or responding to requests for notification by
           providing release dates or other information unless
19         that information is available to the public, or is in
           response to a notification request from immigration
20         authorities in accordance with Section 7282.5.
           Responses are never required, but are permitted under
21         this subdivision, provided that they do not violate any
           local law or policy.
22
           (D) Providing personal information, as defined in
23         Section 1798.3 of the Civil Code, about an individual,
           including, but not limited to, the individual's home
24         address or work address unless that information is
           available to the public.
25

26   Cal. Gov't Code § 7284.6(a)(1)(C) & (D).  Subsection (e) contains

27   a savings clause expressly exempting the exchange of information

28   pursuant to 8 U.S.C. §§ 1373 and 1644.  Cal. Gov't Code

1 § 7284.6(e).

2      Plaintiff also challenges the subsection limiting transfers

3 of individuals to immigration authorities:

4      (a) California law enforcement agencies shall not:

5      . . .

6      (4) Transfer an individual to immigration authorities
       unless authorized by a judicial warrant or judicial
7      probable cause determination, or in accordance with
       Section 7282.5.

8

9 Cal. Gov't Code § 7284.6(a)(4).  California Government Code

10 Section 7282.5 defines the circumstances in which law enforcement

11 officials have discretion to cooperate with immigration

12 authorities as referenced in subparagraphs (a)(1)(C) and (a)(4)

13 above, i.e., convictions for certain offenses.

14           a.   <u>Direct Conflict with Section 1373</u>

15      The primary, and most direct, conflict Plaintiff identifies

16 is that between the information sharing provisions and 8 U.S.C.

17 § 1373 ("Section 1373").[3]  Section 1373(a) bars States from

18 prohibiting, or in any way restricting, "any government entity or

19 official from sending to, or receiving from, the Immigration and

20 Naturalization Service <u>information regarding the citizenship or</u>

21 <u>immigration status, lawful or unlawful, of any individual.</u>"

22 (emphasis added).  Arguing for a broad interpretation of the

23 phrase "information regarding the citizenship or immigration

24 status, lawful or unlawful, of any individual," Plaintiff

25 contends the prohibitions on sharing release dates and home and

26

27 [3] In its Complaint, Plaintiff identifies another statute, 8
   U.S.C. § 1644, that contains the same prohibition as Section
28 1373(a).  Plaintiff does not discuss Section 1644 in its Motion.

1    work addresses violates Section 1373.

2         Defendant argues that Section 1373 is unconstitutional under

3    the Supreme Court's recent holding in Murphy.  138 S. Ct. 1461

4    (2018); see Supp. Br., ECF No. 156.  The Court in Murphy held

5    that Congress cannot dictate what a state legislature may and may

6    not do, "as if federal officers were installed in state

7    legislative chambers and were armed with the authority to stop

8    legislators from voting on any offending proposals."  Id. at

9    1482.  The decision clarified that the Court's anticommandeering

10   precedent extends to prohibitions on state legislative action.

11   Section 1373 does just what Murphy proscribes: it tells States

12   they may not prohibit (i.e., through legislation) the sharing of

13   information regarding immigration status with the INS or other

14   government entities.

15        Plaintiff argues that Murphy's holding—and the

16   anticommandeering rule generally—does not reach statutes

17   requiring information sharing between government entities.  Reply

18   at 17–22.  Plaintiff points to a number of federal statutes that

19   require States to convey information to the Federal Government.

20   Reply at 19 n.14.  For additional support, it cites Reno v.

21   Condon for the principle that a regulation on States as the

22   owners of databases does not violate the Tenth Amendment.  Reply

23   at 18; 528 U.S. 141 (2000).  Plaintiff also notes that the Printz

24   opinion distinguished federal laws regulating the provision of

25   information to the federal government from regulations requiring

26   forced participation of the States in administering a federal

27   program.

28        Reno v. Condon involved a constitutional challenge to the

33

Driver's Privacy Protection Act ("DPPA"), which bars States from disclosing a driver's personal information without the driver's consent.  528 U.S. 141 (2000); see 18 U.S.C. § 2721(a) ("A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity personal information . . . about any individual obtained by the department in connection with a motor vehicle record[.]").  The Supreme Court held the provision does not run afoul of the Tenth Amendment:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens.  The DPPA regulates the States as the owners of data bases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals.  We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in New York and Printz.

Id. at 150.  The Court rejected South Carolina's argument that the DPPA is unconstitutional for its exclusive regulation of the States, finding the Act to be generally applicable but not deciding whether general applicability is required to survive constitutional scrutiny.  Id.

Plaintiff's second source of support is dicta from Printz. 521 U.S. 898 (1997).  The Printz Court evaluated a federal statute that required state law enforcement officers to assist in administering a federal regulatory scheme.  In describing the issues to be resolved, Justice Scalia wrote:

> The Government points to a number of federal statutes enacted within the past few decades that require the participation of state or local officials in implementing federal regulatory schemes. . . . [Some of these statutes], which require only the provision of

34

1
2
3
> information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program.

4  <u>Id.</u> at 918.  Justice Scalia expressly distinguished the laws

5  under consideration in <u>Printz</u> from laws that require the

6  provision of information to the Federal Government.  Thus, <u>Printz</u>

7  left open the question of whether required information sharing

8  could constitute commandeering.

9      Defendant would have this Court follow the lead of the

10  district court in <u>City of Philadelphia v. Sessions</u>.  No. 17-3894,

11  2018 WL 2725503 (E.D. Pa. June 6, 2018).  That court rejected

12  Plaintiff's same—or substantially similar—arguments and found

13  Section 1373 unconstitutional under <u>Murphy</u>.  <u>Id.</u> at *28-33.  It

14  held that "on their face, [Section 1373(a) and (b)] regulate

15  state and local government entities and officials, which is fatal

16  to their constitutionality under the Tenth Amendment."  <u>Id.</u> at

17  *32.  The district court distinguished <u>Reno</u>, explaining that <u>Reno</u>

18  did not involve a "statute that commanded state legislatures to

19  enact or refrain from enacting state law."  <u>Id.</u> (noting the

20  <u>Murphy</u> Court's discussion of <u>Reno</u>).  It also refused to put much

21  weight in the cited dicta from <u>Printz</u>, finding that <u>Printz</u>'s

22  holding supports the court's conclusion as to Section 1373.

23      The Court finds the constitutionality of Section 1373 highly

24  suspect.  Like the district court in <u>City of Philadelphia</u>, the

25  Court reads Section 1373 to dictate what states may and may not

26  do, in contravention of the Tenth Amendment.  The more critical

27  question, however, is whether required information sharing

28  constitutes commandeering at all.  <u>Printz</u> left this question

1    open.

2        One view, which amici, the California Partnership to End

3    Domestic Violence and the Coalition for Humane Immigrant Rights,

4    articulate, is that the context of the information sharing

5    affects the commandeering inquiry.  See Br. for Cal. P'ship to

6    End Domestic Violence and the Coal. for Humane Immigrant Rights,

7    as Amici Curiae, ECF No. 182.  Amici argue "purely ministerial

8    reporting requirements" might not constitute commandeering, but

9    "forced information sharing, where it facilitates the on-the-

10   ground, day-to-day administration of a federal program, runs

11   afoul of the anti-commandeering rule."  Id. at 7.  They argue

12   that "none of [the] examples [Plaintiff cites to show that

13   Congress frequently calls on states to share relevant

14   information] remotely resembles a system of state officers

15   performing daily services for immigration agents."  Id. at 8.

16   The Court agrees—cautiously, because these other provisions were

17   not heavily briefed—that the information sharing provisions cited

18   in footnote 14 of Plaintiff's Reply do not appear to approximate

19   the level of state and local law enforcement integration into

20   federal immigration enforcement operations seen in this context.

21       Whether the constitutionality of an information sharing

22   requirement is absolute or whether it turns on how much the

23   requirement effectively integrates state law enforcement into a

24   federal regime is an interesting, and seemingly open,

25   constitutional question that may prove dispositive in another

26   case.  Here, however, the Court need not reach a definitive

27   answer because the Court finds no direct conflict between SB 54

28   and Section 1373.

1   The state statute expressly permits information sharing in

2   accordance with Section 1373.  Cal. Gov't Code § 7284.6(e).  The

3   functionality of this clause depends on whether Section 1373 is

4   construed broadly to encompass information such as release dates

5   and addresses or narrowly to include only one's immigration

6   status or citizenship (i.e., category of presence in the United

7   States, and whether an individual is a U.S. citizen, and if not,

8   the country of citizenship).  See City of Philadelphia, 2018 WL

9   2725503, at *35.

10   Two district courts have held that Section 1373 must be

11   interpreted narrowly.  In Steinle v. City & Cnty. of San

12   Francisco, the district court explained:

13   Nothing in 8 U.S.C. § 1373(a) addresses information
    concerning an inmate's release date. The statute, by
14   its terms, governs only "information regarding the
    citizenship or immigration status, lawful or unlawful,
15   of any individual." 8 U.S.C. § 1373(a).  If the
    Congress that enacted the Omnibus Consolidated
16   Appropriations Act of 1997 (which included § 1373(a))
    had intended to bar all restriction of communication
17   between local law enforcement and federal immigration
    authorities, or specifically to bar restrictions of
18   sharing inmates' release dates, it could have included
    such language in the statute. It did not, and no
19   plausible reading of "information regarding . . .
    citizenship or immigration status" encompasses the
20   release date of an undocumented inmate. Because the
    plain language of the statute is clear on this point,
21   the Court has no occasion to consult legislative
    history.
22

23   230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).  Plaintiff urges the

24   Court to limit its reliance on Steinle, which involved a

25   negligence claim and in which the United States did not appear as

26   a party.  But, the district court in City of Philadelphia—a case

27   in which the United States did appear—agreed with the Steinle

28   court's analysis and concluded that the United States' broad

37

1   interpretation "is simply impossible to square with the statutory

2   text."  2018 WL 2725503, at *34.

3       Both district courts rejected the analysis in <u>Bologna v.</u>

4   <u>City & Cnty. of San Francisco</u>, the principal case Plaintiff cites

5   for persuasive value.  192 Cal. App. 4th 429, 438–40 (Ct. App.

6   2011).  In analyzing a tort claim similar to the claim at issue

7   in <u>Steinle</u>, the California Appellate Court characterized Section

8   1373 as invalidating "all restrictions on the voluntary exchange

9   of immigration information between federal, state and local

10  government entities and officials and federal immigration

11  authorities."  <u>Id.</u> at 438.  The <u>Steinle</u> court expressly disavowed

12  this interpretation:

13      This Court is not bound by the state court's
        interpretation of federal law, and respectfully
14      disagrees with the <u>Bologna</u> court's characterization of
        the scope of § 1373(a).  "As [the Supreme Court has]
15      repeatedly held, the authoritative statement is the
        statutory text, not the legislative history or any
16      other extrinsic material. Extrinsic materials have a
        role in statutory interpretation only to the extent
17      they shed a reliable light on the enacting
        Legislature's understanding of otherwise ambiguous
18      terms."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>,
        545 U.S. 546, 568 (2005).  The Ninth Circuit has
19      explained in some detail why the Constitution does not
        permit giving legislative effect to language found only
20      in congressional reports that is not consistent with
        the language of a statute itself: The principle that
21      committee report language has no binding legal effect
        is grounded in the text of the Constitution and in the
22      structure of separated powers the Constitution created.
        . . . Treating legislative reports as binding law also
23      undermines our constitutional structure of separated
        powers, because legislative reports do not come with
24      the traditional and constitutionally-mandated political
        safeguards of legislation.
25

26  <u>Steinle</u>, 230 F. Supp. 3d at 1014–15; <u>see</u> <u>City of Philadelphia</u>,

27  2018 WL 2725503, at *35 (disagreeing with <u>Bologna</u>).

28      The Court agrees with its fellow district courts that the

plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses.  See Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 878 (9th Cir. 2001) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.") (citation omitted).

A contrary interpretation would know no bounds.  The phrase could conceivably mean "everything in a person's life."  See Br. for City & Cnty. of San Francisco, as Amicus Curiae, ECF No. 112; see also State ex rel. Becerra v. Sessions, 284 F. Supp. 3d 1015, 1035 (N.D. Cal. 2018) ("Under the INA, almost every bit of information about an individual could be relevant to status, particularly with respect to the right to asylum or as a defense to removal.").  If Congress intended the statute to sweep so broadly, it could have used broader language or included a list to define the statute's scope.  See, e.g., 8 U.S.C. § 1367(a)(2) (prohibiting immigration enforcement officers from "permit[ting] the use by or disclosure to anyone . . . of any information which relates to an alien who is the beneficiary of an application for relief under [certain sections of the INA]").  One cannot naturally read "information regarding immigration status" to include the types of information Plaintiff now seeks to incorporate.  While an immigrant's release date or home address might assist immigration enforcement officers in their endeavors, neither of these pieces of information have any bearing on one's

1    immigration or citizenship status.

2    The parties offer competing precedent to aid the Court in

3    interpreting the term "regarding." In Roach, the Ninth Circuit

4    cautioned courts to refrain from interpreting the words "relate

5    to," in an express preemption provision, too broadly. Roach v.

6    Mail Handlers Ben. Plan, 298 F.3d 847 (9th Cir. 2002). The

7    Circuit explained:

8       [I]n the context of a similarly worded preemption
        provision in the Employee Retirement Income Security
9       Act (ERISA), the Supreme Court has explained that the
        words "relate to" cannot be taken too literally. "If
10      'relate to' were taken to extend to the furthest
        stretch of its indeterminacy, then for all practical
11      purposes pre-emption would never run its course, for
        'really, universally, relations stop nowhere.' "
12      Instead, "relates to" must be read in the context of
        the presumption that in fields of traditional state
13      regulation "the historic police powers of the States
        [are] not to be superseded by [a] Federal Act unless
14      that was the clear and manifest purpose of Congress."

15   Id. at 849-50 (citations omitted). Plaintiff urges the Court to,

16   instead, focus on the Supreme Court's more recent interpretation

17   of the term "respecting" in Lamar, Archer & Cofrin, LLP v.

18   Appling. 138 S. Ct. 1752 (2018) (interpreting a provision in the

19   Bankruptcy Code excepting debts obtained by fraud from

20   discharge); Reply at 16. In Appling, the Court read the word

21   "respecting" to have a broadening effect, instructing the Court

22   to read the relevant text expansively. Id. at 1760. The Supreme

23   Court also observed that a limiting construction would

24   effectively read the term "respecting" out of the statute. Id.

25   at 1761.

26   The Court finds the law in Appling sufficiently distinct

27   from the law at issue here to limit the decision's instructional

28   value. The Appling Court was not called upon to determine the

40

preemptive effect of a federal statute and thus did not have

presumptions against preemption to factor into its analysis.

Further, the Appling Court held that "a statement about a single

asset can be a 'statement respecting the debtor's financial

condition.' " Id. at 1757.  It reasoned, "[a] single asset has a

direct relation to and impact on aggregate financial condition,

so a statement about a single asset bears on a debtor's overall

financial condition[.]" Id. at 1761.  In contrast, as noted

above, a person's address or release date has no direct relation

to one's immigration or citizenship status.

Unlike the law in Appling, a narrow reading of the phrase

"regarding immigration status" does not read "regarding" out of

the statute.  Plaintiff makes a similar argument by noting the

omission of the term "regarding" in Section 1373(c) as compared

to subsection (a).  Mot. at 28.  Section 1373(c) governs the

obligation of federal immigration authorities in responding to

inquiries from other government entities, and an official record

of a person's citizenship or immigration status is presumably

within their control.  Opp'n at 12–13; Br. for City and Cnty. of

San Francisco, as Amicus Curiae, at 9.  Subsection (a) is

directed toward government entities and their officers, who might

possess information pertaining to an individual's immigration

status but not hold an official record.  The phrase "information

regarding" thus serves a purpose even when the statute is read

narrowly.

In any event, neither Roach nor Appling involved a provision

like the one at issue in this case.  The Court is convinced,

based on the analysis above, that "information regarding

immigration or citizenship status" does not include an immigrant's release date or home and work addresses.  Section 1373 and the information sharing provisions of SB 54 do not directly conflict.

### b.  Obstacle Preemption

Apart from any direct conflict with Section 1373, Plaintiff argues that "the structure of the INA makes clear that states and localities are required to allow a basic level of information sharing" and cooperation with immigration enforcement.  Mot. at 24.  Plaintiff points to 8 U.S.C. § 1226(c)(1), a law that requires "mandatory detention" for certain immigrants after their release from criminal custody.  It also cites 8 U.S.C. § 1231, which instructs the Attorney General to remove an immigrant within a period of 90 days after the immigrant has been ordered removed.  8 U.S.C. § 1231(a)(1)(A).  For certain immigrants, detention during the removal period is mandatory.  8 U.S.C. § 1231(a)(2).  With some exceptions "the Attorney General may not remove an [immigrant] who is sentenced to imprisonment until the [immigrant] is released from imprisonment.  Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal."  8 U.S.C. § 1231(a)(4)(A).

Plaintiff argues that SB 54 undermines the system Congress designed.  Mot. at 25.  The limits on information sharing and transfers prevent or impede immigration enforcement from fulfilling its responsibilities regarding detention and removal because officers cannot arrest an immigrant upon the immigrant's release from custody and have a more difficult time finding

immigrants after the fact without access to address information.
Id. at 25-27.  It contends that limiting adherence to transfer
requests affords undocumented immigrants an opportunity to
abscond.  Plaintiff also points out that the subset of crimes for
which SB 54 permits cooperation do not match the crimes under
federal law that may serve as the predicate for removability or
crimes for which detention is mandatory.  Id. at 26.
Additionally, it argues that requiring a judicial warrant or
judicial finding of probable cause is irreconcilable with the
INA, which establishes a system of civil administrative warrants
as the basis for immigration arrest and removal.  Id. at 30.

     The Court disagrees and instead finds that California's
decision not to assist federal immigration enforcement in its
endeavors is not an "obstacle" to that enforcement effort.
Plaintiff's argument that SB 54 makes immigration enforcement far
more burdensome begs the question: more burdensome than what?
The laws make enforcement more burdensome than it would be if
state and local law enforcement provided immigration officers
with their assistance.  But refusing to help is not the same as
impeding.  If such were the rule, obstacle preemption could be
used to commandeer state resources and subvert Tenth Amendment
principles.  Federal objectives will always be furthered if
states offer to assist federal efforts.  A state's decision not
to assist in those activities will always make the federal object
more difficult to attain than it would be otherwise.  Standing
aside does not equate to standing in the way.

     Though not analyzing an obstacle preemption claim, the
Seventh Circuit recently expressed a similar view with respect to

43

1   decisions to withhold assistance.  See City of Chicago v.

2   Sessions, 888 F.3d 272 (7th Cir. 2018).  The Circuit explained:

3       [T]he Attorney General repeatedly characterizes the
        issue as whether localities can be allowed to thwart
4       federal law enforcement.  That is a red herring.
        First, nothing in this case involves any affirmative
5       interference with federal law enforcement at all, nor
        is there any interference whatsoever with federal
6       immigration authorities. The only conduct at issue here
        is the refusal of the local law enforcement to aid in
7       civil immigration enforcement through informing the
        federal authorities when persons are in their custody
8       and providing access to those persons at the local law
        enforcement facility. Some localities might choose to
9       cooperate with federal immigration efforts, and others
        may see such cooperation as impeding the community
10      relationships necessary to identify and solve crimes.
        The choice as to how to devote law enforcement
11      resources—including whether or not to use such
        resources to aid in federal immigration efforts—would
12      traditionally be one left to state and local
        authorities.
13

14  City of Chicago, 888 F.3d at 282 (analyzing conditions imposed on

15  federal grants).  This common-sense distinction militates against

16  adopting Plaintiff's perspective of the laws.

17      The Court is also wary of finding preemption in the absence

18  of a "clear and manifest purpose of Congress" to supersede the

19  States' police powers.  See Arizona, 567 U.S. at 400.  California

20  has not crossed over into the exclusively federal realm of

21  determining who may enter and remain within the United States.

22  SB 54 only governs the activities of the State's own law

23  enforcement agencies.  Although Congress clearly intends its

24  immigration laws to exclusively regulate the subject of

25  immigration and the activities of federal immigration enforcement

26  officers, the Court sees no clear indication that Congress

27  intended to displace the States' regulation of their own law

28  enforcement agencies.

                                44

1    Despite Plaintiff's urgings, this case does not mirror

2  Arizona v. United States.  567 U.S. 387 (2012).  Arizona sought

3  to impose additional rules and penalties upon individuals whom

4  Congress had already imposed extensive, and exclusive,

5  regulations.  SB 54 does not add or subtract any rights or

6  restrictions upon immigrants.  Immigrants subject to removal

7  remain subject to removal.  SB 54, instead, directs the

8  activities of state law enforcement, which Congress has not

9  purported to regulate.  Preemption is inappropriate here.

10    The Court's reluctance to glean such a purpose from the

11  cited statutes is amplified because Congress indicated awareness

12  that state law might be in tension with federal objectives and

13  decided to tolerate those competing interests.  See Bonito Boats,

14  Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166–67 (1989)

15  ("The case for federal pre-emption is particularly weak where

16  Congress has indicated its awareness of the operation of state

17  law in a field of federal interest, and has nonetheless decided

18  to stand by both concepts and to tolerate whatever tension there

19  is between them.") (citation and quotation marks omitted); see

20  also Wyeth v. Levine, 555 U.S. 555, 575 (2009) (quoting Bonito

21  Boats and finding that a plaintiff's failure-to-warn claims were

22  not preempted by federal law).

23    First, in the portions of the INA where Congress provided

24  for cooperation between state and federal officials, it

25  conditioned cooperation on compliance with state law.  For

26  instance, 8 U.S.C. § 1252c(a) authorizes state and local law

27  enforcement officials to arrest and detain certain immigrants "to

28  the extent permitted by relevant State and local law."

1   Subsection (b) imposes an obligation on the Attorney General to

2   cooperate with states in providing information that would assist

3   state and local law enforcement, but does not impose any

4   corollary obligations on state or local law enforcement.

5   Similarly, 8 U.S.C. § 1357(g) authorizes the Attorney General to

6   enter into agreements with the State to perform immigration

7   officer functions, but only "to the extent consistent with State

8   and local law."  These conditions on cooperation indicate that

9   Congress did not intend to preempt state law in this area.

10       Second, the primary mechanism—a "detainer"—by which

11  immigration enforcement agents solicit release dates, transfers,

12  and detention is a "request."  See 8 C.F.R. § 287.7(a); Mot. at

13  25 ("To effectuate the INA's provisions, DHS issues an

14  'immigration detainer[.]' ").  Even detainers soliciting

15  "temporary detention" have been found to be a non-mandatory

16  "request," despite the use of the word "shall" in the governing

17  provision.  8 C.F.R. § 287.7(d); see Galarza v. Szalczyk, 745

18  F.3d 634, 640 (3d Cir. 2014) ("[N]o provisions of the [INA]

19  authorize federal officials to command local or state officials

20  to detain suspected aliens subject to removal."); see also

21  Miranda-Olivares v. Clackamas Cnty., No. 3:12-CV-02317-ST, 2014

22  WL 1414305, at *7 (D. Or. Apr. 11, 2014) (following Galarza and

23  noting that the Ninth Circuit has interpreted detainer letters,

24  in the habeas corpus context, to be advisory in nature, not

25  imposing—or even allowing—a warden to hold a detainee at the end

26  of his term of imprisonment) (citing Garcia v. Taylor, 40 F.3d

27  299 (9th Cir. 1994)).  The voluntary nature of any response to

28  these requests demonstrates that the federal government has not

46

1    supplanted state discretion in this area.

2         Congress's deliberate decision to condition enforcement

3    cooperation on consistency with state law, and the primary

4    mechanism by which immigration officials seek law enforcement

5    assistance being merely a "request," counsels against implied

6    preemption in this area.  A clear and manifest purpose to preempt

7    state law is absent from these provisions.

8         Plaintiff argues that "Congress could have authorized the

9    federal government to take custody of aliens immediately, without

10   regard to the status of state criminal enforcement," Reply at 22–

11   23, and that because it did not, the Court can infer that

12   Congress intended states to cooperate with immigration law

13   enforcement.  The Court does not find such inference warranted.

14   The Court can just as readily infer that Congress recognized the

15   States' sovereign power to enforce their criminal laws and

16   thought interference would upset the balance in powers.  See Def.

17   Reply to MTD at 1 ("It is not Congress that offers California the

18   'opportunity' to enforce state criminal laws[;] it is a right

19   inherent in California's sovereignty.").  Furthermore, it is

20   often the case that an immigrant is not deemed removable or

21   inadmissible until after they have been convicted of a crime.  In

22   these cases, state process is a predicate to federal action.

23        The Ninth Circuit's holding in Preap does not require a

24   different outcome.  Preap v. Johnson, 831 F.3d 1193 (9th Cir.

25   2016) cert. granted sub nom. Nielsen v. Preap, 138 S. Ct. 1279

26   (2018).  The Preap court held that the INA's mandatory detention

27   provision only applies in cases when immigrants are "promptly"

28   detained after being released from custody.  Id. at 1197.  Preap

1 does not, however, require contemporaneous transfer for the

2 mandatory detention provision to apply.  And, a longer delay in

3 securing custody does not preclude detention. It just makes

4 detention a discretionary decision rather than a mandatory

5 obligation.  See id. at 1201; 8 U.S.C. § 1226.  The Court finds

6 that the operational challenges immigration enforcement agencies

7 may have faced following the Preap decision do not alter the

8 Court's conclusions with respect to Congress's clear and manifest

9 purpose.

10      The Court further finds that Tenth Amendment and

11 anticommandeering principles counsel against preemption.  Though

12 responding to requests for information and transferring

13 individuals to federal custody may demand relatively little from

14 state law enforcement, "[t]he issue of commandeering is not one

15 of degree[.]"  Galarza, 745 F.3d at 644; see Printz, 521 U.S. at

16 932 ("But where, as here, it is the whole object of the law to

17 direct the functioning of the state executive, and hence to

18 compromise the structural framework of dual sovereignty, such a

19 'balancing' analysis is inappropriate.  It is the very principle

20 of separate state sovereignty that such a law offends, and no

21 comparative assessment of the various interests can overcome that

22 fundamental defect.").  Under Printz, even enlisting state

23 officers to perform discrete, ministerial tasks constitutes

24 commandeering.  Thus, it is highly unlikely that Congress could

25 have made responses to requests seeking information and/or

26 transfers of custody mandatory.  See Cnty. of Santa Clara v.

27 Trump, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017), ("The Executive

28 Order uses coercive means in an attempt to force states and local

1   jurisdictions to honor civil detainer requests, which are

2   voluntary 'requests' precisely because the federal government

3   cannot command states to comply with them under the Tenth

4   Amendment.") (focusing on requests for detention).

5        The Printz Court outlined several reasons why commandeering

6   is problematic, which parallel California's concerns in enacting

7   SB 54.  The Court noted that commandeering shifts the costs of

8   program implementation from the Federal Government to the states.

9   Printz, 521 U.S. at 930.  The California Legislature enacted SB

10  54, in part, to divert California's resources away from

11  supporting the Federal Government's enforcement efforts.  It

12  stated:

13          (d) Entangling state and local agencies with federal
            immigration enforcement programs diverts already
14          limited resources and blurs the lines of accountability
            between local, state, and federal governments.
15
            . . .
16
            (f) This chapter seeks to ensure effective policing, to
17          protect the safety, well-being, and constitutional
            rights of the people of California, and to direct the
18          state's limited resources to matters of greatest
            concern to state and local governments.
19

20  Cal. Gov't Code § 7284.2 (Legislative findings and declarations).

21  Defendant contends that working with immigration enforcement

22  diverts resources from the States' priorities.  Opp'n at 15–16;

23  see e.g., Hart Decl., ECF No. 75-3, at 4 ("[W]e are often faced

24  with staffing shortages that make even processing the additional

25  paperwork related to detainers difficult.").

26       The Printz Court also explained that "even when States are

27  not forced to absorb the costs of implementing a federal program,

28  they are still put in the position of taking the blame for its

1   burdensomeness and for its defects."  521 U.S. at 930 ("And it

2   will likely be the CLEO, not some federal official, who will be

3   blamed for any error (even one in the designated federal

4   database) that causes a purchaser to be mistakenly rejected.").

5        Here, when California assists federal immigration

6   enforcement in finding and taking custody of immigrants, it risks

7   being blamed for a federal agency's mistakes, errors, and

8   discretionary decisions to pursue particular individuals or

9   engage in particular enforcement practices.  Under such a regime,

10  federal priorities dictate state action, which affects the

11  State's relationship with its constituency and that

12  constituency's perception of its state government and law

13  enforcement.  Indeed, Defendant and amici highlight the impact

14  these perceptions have on the community's relationship with local

15  law enforcement. See Cal. Gov't Code § 7284.2 ("This trust is

16  threatened when state and local agencies are entangled with

17  federal immigration enforcement, with the result that immigrant

18  community members fear approaching police when they are victims

19  of, and witnesses to, crimes, seeking basic health services, or

20  attending school, to the detriment of public safety and the well-

21  being of all Californians."); Br. for Current and Former

22  Prosecutors and Law Enforcement Leaders, as Amici Curiae, ECF No.

23  127; Br. for City of Los Angeles, as Amicus Curiae, ECF No. 128;

24  Br. for Cnty. of Los Angeles, et al., as Amici Curiae, ECF No.

25  129.

26       Plaintiff discounts Defendant's interest in extracting

27  itself from immigration enforcement, but fails to confront

28  California's primary concern: the impact that state law

1  enforcement's entanglement in immigration enforcement has on

2  public safety.  The historic police powers of the State include

3  the suppression of violent crime and preservation of community

4  safety.  In this power inheres the authority to structure and

5  influence the relationship between state law enforcement and the

6  community it serves.  The ebb of tensions between communities and

7  the police underscores the delicate nature of this relationship.

8  Even perceived collaboration with immigration enforcement could

9  upset the balance California aims to achieve.  It is therefore

10  entirely reasonable for the State to determine that assisting

11  immigration enforcement in any way, even in purportedly passive

12  ways like releasing information and transferring custody, is a

13  detrimental use of state law enforcement resources.

14      However, because Congress has not required states to assist

15  in immigration enforcement—and has merely made the option

16  available to them—this case presents a unique situation.  As

17  Judge Orrick observed in State ex rel. Becerra v. Sessions: "No

18  cited authority holds that the scope of state sovereignty

19  includes the power to forbid state or local employees from

20  voluntarily complying with a federal program."  284 F. Supp. 3d

21  1015, 1035 (N.D. Cal. 2018).  The Second Circuit in City of New

22  York concluded a state could not do so.  City of New York v.

23  United States, 179 F.3d 29, 35 (2nd Cir. 1999) ("We therefore

24  hold that states do not retain under the Tenth Amendment an

25  untrammeled right to forbid all voluntary cooperation by state or

26  local officials with particular federal programs.").

27  Nevertheless, the Supreme Court's holding in Murphy undercuts

28  portions of the Second Circuit's reasoning and calls its

conclusion into question.  Compare City of New York, 179 F.3d at 35 (distinguishing Section 1373 from the laws in Printz and New York because the Section does not compel state and local governments to enact or administer any federal regulatory program or conscript them into federal service) with Murphy, 138 S. Ct. at 1478 (holding the anticommandeering rule applies to Congressional prohibitions on state actions in addition to commands to take affirmative actions).  Further, the Second Circuit's broad proclamations may be limited to the specific City Executive Order at issue, procedural posture, and record in that case.  See Br. for Admin. L., Const. L., Crim. L., and Immigr. L. Scholars, as Amici Curiae, ECF No. 132, at 13 (distinguishing City of New York).  Regardless, the City of New York holding is not binding on this Court.

The Court finds that a Congressional mandate prohibiting states from restricting their law enforcement agencies' involvement in immigration enforcement activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment.  See City of Chicago v. Sessions, 888 F.3d 272, 282 (7th Cir. 2018) (stating, in dicta: "The choice as to how to devote law enforcement resources— including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities."); Koog v. United States, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies.").  The Tenth Amendment analysis

1    in Murphy supports this conclusion.  Murphy, 138 S. Ct. at 1478

2    (a prohibition on state legislation violates the

3    anticommandeering rule), 1481 ("[P]reemption is based on a

4    federal law that regulates the conduct of private actors, not

5    States."); see New York, 505 U.S. at 166 ("[T]he Framers

6    explicitly chose a Constitution that confers upon Congress the

7    power to regulate individuals, not States.").  If Congress lacks

8    the authority to direct state action in this manner, then

9    preemption cannot and should not be used to achieve the same

10   result.  The Supremacy Clause requires courts to hold federal law

11   supreme when Congress acts pursuant to one of its enumerated

12   powers; those powers do not include the authority to dictate a

13   state's law enforcement policies.

14        Having concluded that California may restrict the assistance

15   its law enforcement agencies provide immigration enforcement, the

16   Court finds California's choice to cooperate in certain

17   circumstances permissible.  See Cal. Gov't Code § 7284.6(a)(1)(C)

18   (allowing California law enforcement agencies to provide

19   information regarding a person's release date when that person

20   has been convicted of certain crimes), § 7284(a)(4) (permitting

21   California law enforcement agencies to transfer individuals to

22   immigration authorities when authorized by a judicial warrant or

23   judicial probable cause determination, or when the individual has

24   been convicted of certain crimes).  As the Seventh Circuit

25   explained:

26        [F]or the persons most likely to present a threat to
         the community, City law enforcement authorities will
27        cooperate with ICE officials even in "sanctuary"
         cities.  The decision to coordinate in such
28        circumstances, and to refuse such coordination where

                                    53

> the threat posed by the individual is lesser, reflects the decision by the state and local authorities as how best to further the law enforcement objectives of their communities with the resources at their disposal.

City of Chicago, 888 F.3d at 281.  While the Court, again, acknowledges that City of Chicago involved different claims than those presented here, the Court agrees with the assessment.  Just as the State may restrict the assistance its law enforcement officers provide immigration enforcement, the State may choose to outline exceptions to that rule in accordance with its own law enforcement priorities and concerns.  For example, California is concerned with the monetary liability law enforcement agencies may face if they maintain custody of an individual for purposes of transfer without a judicial warrant or probable cause determination justifying that custody.  See Roy v. Cnty. of Los Angeles, No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *22-24 (C.D. Cal. Feb. 7, 2018) ("The LASD officers have no authority to arrest individuals for civil immigration offenses, and thus, detaining individuals beyond their date for release violated the individuals' Fourth Amendment rights."); Br. for States and the District of Columbia, as Amici Curiae, ECF No. 139 ("SB 54's [warrant requirement] is a reasonable way to protect the state and its law enforcement agencies from monetary liability for unlawfully detaining individuals requested to be transferred to federal immigration authorities after their period of state custody expires.").  The California Legislature expressed this concern when it passed SB 54:

> State and local participation in federal immigration enforcement programs also raises constitutional concerns, including the prospect that California

54

residents could be detained in violation of the Fourth
Amendment to the United States Constitution, targeted
on the basis of race or ethnicity in violation of the
Equal Protection Clause, or denied access to education
based on immigration status. See Sanchez Ochoa v.
Campbell, et al. (E.D. Wash. 2017) 2017 WL 3476777;
Trujillo Santoya v. United States, et al. (W.D. Tex.
2017) 2017 WL 2896021; Moreno v. Napolitano (N.D. Ill.
2016) 213 F. Supp. 3d 999; Morales v. Chadbourne (1st
Cir. 2015) 793 F.3d 208; Miranda-Olivares v. Clackamas
County (D. Or. 2014) 2014 WL 1414305; Galarza v.
Szalczyk (3d Cir. 2014) 745 F.3d 634.

Cal. Gov't Code § 7284.2(e).  Because California's directive to

its law enforcement agencies is not preempted, the Court finds

its determination to make certain exceptions to the rule also

survives preemption analysis.

c.   Intergovernmental Immunity

The intergovernmental immunity doctrine has no clear

application to SB 54.  SB 54 regulates state law enforcement; it

does not directly regulate federal immigration authorities.

Plaintiff argues the information sharing and transfer

restrictions "apply only to requests made by federal entities[.]"

Mot. at 31.  It claims that although "the statute defines

'immigration authorities' to include, in addition to federal

officers, 'state, or local officers, employees or persons

performing immigration enforcement functions,' it also defines

'immigration enforcement' to mean 'any and all efforts to

investigate, enforce, or assist in the investigation or

enforcement of any federal civil immigration law, and also

includes any and all efforts to investigate, enforce, or assist

in the investigation or enforcement of any federal criminal

immigration law that penalizes a person's presence in, entry, or

reentry to, or employment in, the United States.' "  Id. (citing

1   the definitions in Cal. Gov't Code § 7284.4).

2       The Court is not convinced that the intergovernmental

3   immunity doctrine extends to the State's regulation over the

4   activities of its own law enforcement and decision to restrict

5   assistance with some federal endeavors.  None of the cases cited

6   in the parties' briefs involve an analogous regulation.  The

7   preemption analysis above thus counsels against expanding the

8   doctrine to the present situation.  North Dakota v. United

9   States, 495 U.S. 423, 435 (1990) ("The Court has more recently

10  adopted a functional approach to claims of governmental immunity,

11  accommodating of the full range of each sovereign's legislative

12  authority and respectful of the primary role of Congress in

13  resolving conflicts between the National and State

14  Governments.").

15      Even if the doctrine might arguably apply to this situation,

16  Plaintiff has not shown it is likely to succeed on this claim.

17  First, Plaintiff has not shown that the laws uniquely burden

18  federal immigration authorities.  The information sharing

19  provisions permit sharing when the information is available to

20  the public.  Cal. Gov't Code § 7284.6(a)(1)(C)-(D).  Plaintiff

21  has not identified any examples of similarly situated authorities

22  (i.e., civil law enforcement agencies) that the State treats

23  better than it does federal immigration authorities.  And while

24  the Court agrees with Plaintiff that "federal, state, or local

25  officer[s] . . . performing immigration enforcement functions"

26  boils down to federal immigration enforcement, see Cal. Gov't

27  Code § 7284.4, the Court finds the discrimination—if any—is

28  justified by California's choice to divert its resources away

1  from assisting immigration enforcement efforts.  As explained in

2  detail above, the purported "burden" here is California's

3  decision not to help the Federal government implement its

4  immigration enforcement regime.  The State retains the power to

5  make this choice and the concerns that led California to adopt

6  this policy justify any differential treatment that results.

7      For all of the reasons set forth in Part III.A.3 of this

8  Order, the Court finds that Plaintiff is not likely to succeed on

9  the merits of its SB 54 claim and its motion for a preliminary

10  injunction as to this statute is denied.

11      B.   Preliminary Injunction Equitable Factors

12      Each party submitted evidence showing hardships to their

13  sovereign interests and their constituencies should the Court

14  fail to decide this Motion in their favor.  See Exhs. to Mot. and

15  Reply, ECF Nos. 2-2-5, 46, 171-1-25, 173, 178; Exhs. to Opp'n,

16  ECF Nos. 75, 78, 81, 83.  Many of the amici curiae also

17  identified harms that would befall themselves or their

18  constituencies because of this Court's Order.  The parties'

19  interests largely hang in balance, each seeking to vindicate what

20  it—and its supporters—view as critical public policy objectives.

21  These harms are not susceptible to remediation through damages;

22  each side faces much more than mere economic loss.  See Ariz.

23  Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014)

24  ("Irreparable harm is traditionally defined as harm for which

25  there is no adequate legal remedy, such as an award of

26  damages.").

27      "[A]n alleged constitutional infringement will often alone

28  constitute irreparable harm."  United States v. Arizona, 641 F.3d

339, 366 (9th Cir. 2011) (citation omitted), rev'd in part on other grounds, 567 U.S. 387 (2012).  "It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law . . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount."  Id. (quoting Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852–53 (9th Cir. 2009)); see Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1059–60 (9th Cir. 2009) ("Similarly, while we do not denigrate the public interest represented by the Ports, that must be balanced against the public interest represented in [Congress's] decision to deregulate the motor carrier industry, and the Constitution's declaration that federal law is to be supreme.").

     For the state laws which the Court found no likelihood that Plaintiff will succeed on its claims—California Government Code Sections 12532 (AB 103), 7284.6(a)(1)(C) & (D), and 7284.6(a)(4) (SB 54), and California Labor Code Section 90.2 (AB 450)—no injunction will issue.  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the Court] need not consider the remaining three Winter elements."  Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (citation and quotation marks omitted).  The Court will not find an irreparable injury where it has not found an underlying constitutional infringement.  See Goldie's Bookstore, Inc. v. Super. Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984) ("In this case, however, the constitutional claim is too tenuous to support our affirmance on [the] basis [of irreparable harm].").

1    As to California Government Code Sections 7285.1 and 7285.2

2  and California Labor Code Section 1019.2, the Court presumes that

3  Plaintiff will suffer irreparable harm based on the

4  constitutional violations identified above.  The equitable

5  considerations favor an injunction in such circumstances.  See

6  United States v. Alabama, 691 F.3d 1269, 1301 (11th Cir. 2012)

7  ("The United States suffers injury when its valid laws in a

8  domain of federal authority are undermined by impermissible state

9  regulations.  Frustration of federal statutes and prerogatives

10  are not in the public interest, and we discern no harm from the

11  state's nonenforcement of invalid legislation.").  The Court

12  therefore enjoins enforcement of these provisions as to private

13  employers, as set forth in the Order below.

14    C.    Conclusion

15    This Court has gone to great lengths to explain the legal

16  grounds for its opinion.  This Order hopefully will not be viewed

17  through a political lens and this Court expresses no views on the

18  soundness of the policies or statutes involved in this lawsuit.

19  There is no place for politics in our judicial system and this

20  one opinion will neither define nor solve the complicated

21  immigration issues currently facing our Nation.

22    As noted in the Introduction to this Order, this case is

23  about the proper application of constitutional principles to a

24  specific factual situation.  The Court reached its decision only

25  after a careful and considered application of legal precedent.

26  The Court did so without concern for any possible political

27  consequences.  It is a luxury, of course, that members of the

28  other two branches of government do not share.  But if there is

1  going to be a long-term solution to the problems our country

2  faces with respect to immigration policy, it can only come from

3  our legislative and executive branches.  It cannot and will not

4  come from piecemeal opinions issued by the judicial branch.

5  Accordingly, this Court joins the ever-growing chorus of Federal

6  Judges in urging our elected officials to set aside the partisan

7  and polarizing politics dominating the current immigration debate

8  and work in a cooperative and bi-partisan fashion toward drafting

9  and passing legislation that addresses this critical political

10  issue.  Our Nation deserves it.  Our Constitution demands it.

11                          IV.   ORDER

12      For the reasons set forth above, the Court DENIES IN PART

13  AND GRANTS IN PART Plaintiff's Motion for Preliminary Injunction.

14      The Court DENIES Plaintiff's Motion to enjoin California

15  Government Code Sections 12532, 7284.6(a)(1)(C) & (D), and

16  7284.6(a)(4), and California Labor Code Section 90.2.

17      The Court GRANTS Plaintiff's Motion and preliminarily

18  enjoins the State of California, Governor Brown, and Attorney

19  General Becerra from enforcing California Government Code

20  Sections 7285.1 and 7285.2 and California Labor Code Section

21  1019.2(a)&(b) as applied to private employers.

22      IT IS SO ORDERED.

23  Dated: July 4, 2018

24

25  JOHN A. MENDEZ,
    UNITED STATES DISTRICT JUDGE

26

27

28

60